Adam Love, Ph.D.
June 07, 2018

1                UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF INDIANA
2                   INDIANAPOLIS DIVISION

3               CASE NO. 1:16-cv-01942-TWP-DML

4    VON DUPRIN LLC,                       )
                                           )
5            Plaintiff,                     )
                                           )
6                -vs-                       )
                                           )
7    MORAN ELECTRIC SERVICE, INC.,          )
     MAJOR HOLDINGS, LLC, MAJOR TOOL        )
8    AND MACHINE, INC., and ZIMMER          )
     PAPER PRODUCTS INCORPORATED            )
9                                           )
             Defendants.                    )
10

11

12        DEPOSITION OF ADAM HAMILTON LOVE, Ph.D.

13

14        The deposition upon oral examination of
     ADAM HAMILTON LOVE, Ph.D., a witness produced and
15   sworn before me, Diane Zeyen, RPR, a Notary Public
     in and for the County of Hamilton, State of Indiana,
16   taken on behalf of the Plaintiff, at the offices of
     Barnes & Thornburg, 11 South Meridian Street,
17   Marion County, Indiana, on the 7th day of June,
     2018, at 8:56 a.m., pursuant to the Federal Rules of
18   Civil Procedure with written notice as to time and
     place thereof.
19

20

21

22

23

24

25



Connor Reporting                    317.236.6022
www.connorreporting.com

2

```
 1                    A P P E A R A N C E S

 2


 3    FOR THE PLAINTIFF(S):

 4             E. Sean Griggs
               Alexandra Robinson French
 5             BARNES & THORNBURG
               11 South Meridian Street
 6             Indianapolis, IN  46204
               317.236.1313
 7             afrench@btlaw.com
               sgriggs@btlaw.com
 8


 9
      FOR THE DEFENDANT MORAN ELECTRIC SERVICE, INC.:
10
               Glenn D. Bowman
11             STOLL KEENON OGDEN PLLC
               201 North Illinois Street
12             Suite 1225
               317.464.1591
13             Indianapolis, IN  46204
               glenn.bowman@skofirm.com
14


15


16    FOR THE DEFENDANTS MAJOR HOLDINGS, LLC, AND MAJOR TOOL
        AND MACHINE, INC.:
17
               Samuel Gardner
18             ICE MILLER
               One American Square
19             Suite 2900
               Indianapolis, IN  46282
20             317.236.2234
               samuel.gardner@icemiller.com
21


22
      ALSO PRESENT:
23
               Baylie Miller - Exhibeo Specialist
24


25
```



Adam Love, Ph.D.
June 07, 2018
3

3

```
 1          I N D E X   O F   E X A M I N A T I O N

 2                                                      PAGE

 3    DIRECT EXAMINATION ...................................7
      Questions by E. Sean Griggs
 4    CROSS-EXAMINATION .................................207
      Questions by Samuel Gardner
 5    CROSS-EXAMINATION .................................216
      Questions by Glenn D. Bowman
 6    REDIRECT EXAMINATION .............................222
      Questions by E. Sean Griggs
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



Connor Reporting
www.connorreporting.com                317.236.6022

```
                                                          4
 1            I N D E X   O F   E X H I B I T S

 2                                                 PAGE


 3   Love Deposition Exhibit No.:

 4   Exhibit 1  - Aerial Photo . . . . . . . . . . . . . .8
     Exhibit 2  - Notice of Deposition of  . . . . . . . 10
 5                Adam Love
     Exhibit 3  - May 21, 2018 Expert Report of    . . . 12
 6                Adam Love, Ph.D.
     Exhibit 4  - May 21, 2018 Expert Report of  . . . . 43
 7                Michael Marsden
     Exhibit 5  - Major Holdings, LLC and Major  . . . . 45
 8                Tool and Machine, Inc.'s Disclosure
                  of Gary E. Hokkanen
 9   Exhibit 6  - March 23, 2018 Expert Report of  . . . 44
                  John W. McInnes, L.P.G.
10   Exhibit 7  - Major Holdings, LLC and Major  . . . . 47
                  Tool and Machine, Inc.'s Disclosure
11                of Robert B. Walker
     Exhibit 8  - March 23, 2018 Expert Report of  . . . 50
12                Sam Williams, PG, CHG, CEM
     Exhibit 9  - July 2017 Final Investigation  . . . . 90
13                Report of Geosyntec Consultants
     Exhibit 10 - Appendix A, Long-Term  . . . . . . . .165
14                Monitoring Network Well Construction
                  Logs
15   Exhibit 11 - Affidavit of Janna   . . . . . . . . .186
                  Stathyelich, P.E., Wilcox
16                Environmental Engineering, Inc.
     Exhibit 12 - Excel File pdf Output of Data  . . . .204
17                Compilation

18

19

20

21

22

23

24

25
```



Connor Reporting
www.connorreporting.com                     317.236.6022

5

1           ADAM HAMILTON LOVE, Ph.D.,

2       Having been duly sworn to tell the truth,

3   the whole truth, and nothing but the truth

4   relating to said matter was examined and

5   testified as follows:

6       MR. GRIGGS:  As far as preliminary matters

7   go, I believe that the parties have agreed that

8   the person asking questions will pay for the

9   time of the witness in the chair.  And if there

10  are multiple people who ask questions of the

11  witness, we will divide it appropriately.

12      MR. BOWMAN:  That's right.

13      MR. GRIGGS:  And then the idea is that we

14  would also pay a reasonable amount for you to

15  read the deposition and would divide that the

16  same way we divide the time in the chair.  Is

17  that clear?

18      THE WITNESS:  Understood.

19      MR. BOWMAN:  That is what we agreed to.

20      MR. GRIGGS:  And if it is possible, I guess

21  the question --

22      MR. BOWMAN:  Well, now I am changing my

23  mind from our discussion before.

24      I don't believe there is any way that

25  Mr. Love or Mr. McInnes or anybody after they



50

50

```
 1      that appears to have any overlap with my report.

 2   Q  I thought the same way.  Let's put Williams up

 3      just to round out the --

 4          (Love Deposition Exhibit 8 was marked for

 5      identification.)

 6   Q  All right.  Exhibit Number 8 is the expert

 7      report of Sam Williams, who apparently worked

 8      for Geosyntec Consultants out of San Diego,

 9      California.

10          Have you seen this report before?

11   A  I have.

12   Q  Did you read it?

13   A  I did.

14   Q  Did you find that it touched on any issues in

15      which you had expressed expert opinions in this

16      case?

17   A  No.

18   Q  So we have run the gamut.  We have your expert

19      report.  We have expert reports from five other

20      experts, McInnes, Williams, Walker, Hokkanen,

21      and Marsden that are now exhibits.

22          I want to run a few other names by you.

23      Does the name Steve Irvin mean anything to you?

24   A  No.

25   Q  Do you remember seeing any reports written by
```

Adam Love, Ph.D.
51                                June 07, 2018

51

```
 1         Steve Irwin or his company Acuity?

 2    A    Acuity sounds familiar, but I don't remember the

 3         specific author.

 4    Q    What about the name Janna Stathyelich?

 5    A    Janna I know.

 6    Q    You know her personally or you know her from

 7         documents that you have seen in this case?

 8    A    I know her from documents that I have seen in

 9         this case and I have spoken with her.

10    Q    The documents that you have seen, will they be

11         on the flash drive that you provided?

12    A    Yes.

13    Q    And when did you have occasion to speak to

14         Janna Stathyelich?

15    A    I have spoken with her on a number of occasions

16         since my initial retention through the

17         completion of the expert report.

18    Q    Are you aware that in prior litigations

19         involving Moran Electric that Janna Stathyelich

20         has acted as an expert witness for Moran

21         Electric?

22    A    That's my understanding.

23    Q    And you're now serving as an expert witness for

24         Moran Electric; correct?

25    A    That's true.
```



Adam Love, Ph.D.
52                      June 07, 2018

52

```
 1   Q   So I assume that these discussions with

 2       Janna Stathyelich were not about entertainment

 3       or political topics, they were about the case;

 4       right?

 5   A   Every time.

 6   Q   Did you obtain any information from your

 7       conversation with Janna Stathyelich which formed

 8       any part of the basis of the expert opinions in

 9       your expert report, Exhibit 3?

10   A   Could you repeat that?

11   Q   Yes.  What I am trying to ask is, is there

12       anything from those conversations with

13       Janna Stathyelich which formed a basis for or

14       informed any of the expert opinions that you

15       present in your expert report in this case?

16   A   There is nothing from our conversations that

17       form the basis, no.

18   Q   So was she helpful to you in locating documents

19       or information that you then relied upon?

20   A   That's right.

21   Q   Including her own prior reports, I assume?

22   A   I have seen her Wilcox Technical reports.

23   Q   And you know she has left Wilcox and moved to a

24       new company?

25            I think her last report may have been for
```



53

```
 1        somebody else.

 2    A   That's right.  Yes.

 3    Q   Let's move off of Janna for a minute.

 4            Does the name Dr. Richard Lewis mean

 5        anything to you?

 6    A   The name by itself is not familiar, no.

 7    Q   Your expert report, Number 3, yeah, you provide

 8        somewhere, if I can find it, at the end of the

 9        first paragraph, under the heading

10        "Introduction", you disclose your compensation

11        for this case at $300 per hour; is that correct?

12    A   That's correct.

13    Q   Do you know how much the total compensation, not

14        the hourly rate, but the total compensation from

15        when you started working on the case until your

16        expert report was completed on May 21?

17    A   I haven't specifically done that calculation.

18    Q   Can you give me a rough idea?

19    A   I would say 80- to $90,000.

20    Q   And there are records, I assume, that would

21        verify that number to a certain penny?

22    A   There are.  The invoices would obviously have

23        the total.

24    Q   And as we have discussed at the beginning of

25        this deposition, the costs are still being
```

54

```
 1       incurred, you're being paid to be here today;

 2       correct?

 3   A   I am.

 4   Q   Or you will be paid?

 5   A   Yeah.

 6   Q   That's a promise, we are going to pay you.

 7           MR. GRIGGS:  Let me go off the record for a

 8       second.

 9           (A recess was taken between 10:09 a.m. and

10       10:10 a.m.)

11           MR. GRIGGS:  Back on.

12       BY MR. GRIGGS:

13   Q   Just to close this out, your CV attached to your

14       expert report includes a work history, who you

15       worked for, with the dates; right?

16   A   It does.

17   Q   Are there any private employments that don't

18       show up on your CV?  And by private employments

19       I mean moonlighting, consulting on the side,

20       serve on a board of directors, perhaps.

21   A   Yes.

22   Q   What is not included that is part of your

23       employment history?

24   A   So I was the wine maker and vineyard relations

25       for Two Mile Wines.
```



Adam Love, Ph.D.
55                              June 07, 2018

                                                                55

 1   Q    What time period?

 2   A    That would have been 2005 to 2012 or 2013.

 3             MR. BOWMAN:  Can we go off the record?

 4             MR. GRIGGS:  Sure.

 5             (A recess was taken between 10:10 a.m. and

 6        10:11 a.m.)

 7             MR. BOWMAN:  Go back on.

 8        BY MR. GRIGGS:

 9   Q    So that was work that you did independently of

10        your other professional jobs?

11   A    It is.

12   Q    Okay.  Anything other than your work for the

13        vineyard?

14   A    I have a side, like a subcontractor agreement

15        with a company that I am not going to remember

16        the name of that's located in Buffalo, New York,

17        because they hold my security clearance, and so

18        I need the subcontractor agreement for them to

19        hold my security clearance.

20   Q    And the security clearance is in relation to the

21        work you do for the Federal Government?

22   A    It is.

23   Q    And are there particular agencies of the

24        Federal Government that you work with or is it

25        the government as a monolithic hole that you are



Adam Love, Ph.D.
June 07, 2018

56

56

```
 1        employed by?

 2   A    So I don't typically contact directly with the

 3        Federal Government, but via other contractors

 4        for various intelligence community

 5        organizations, Department of Defense,

 6        Department of Homeland Security.  Those are the

 7        primary ones.

 8   Q    What about the EPA?

 9   A    I haven't worked directly for the EPA.  I have

10        worked for the EPA, via the Department of

11        Justice, when I was an allocation expert for the

12        Safety Light Superfund site.

13   Q    Is that the only time that you have given

14        allocation testimony on behalf of the government

15        is that in Safety Light case?

16   A    With regards to environmental contamination?

17   Q    Yes.

18            MR. BOWMAN:  Could you repeat the question?

19        I'm sorry.

20            MR. GRIGGS:  Yeah.

21   Q    I was following up on the answer you have just

22        given.

23            So the question was, is the Safety Light

24        case the only case in which you have offered

25        allocation or apportionment opinions on behalf
```



                                                                    57

1       of the government?

2           MR. BOWMAN:  On behalf of the government,

3       okay, I see.

4   A   On behalf of the Federal Government, yes.

5   Q   Have you also offered opinions on behalf of

6       State Government?

7   A   I can't think of a State Government where I have

8       offered allocation.

9   Q   How about local government?

10  A   I have offered allocation opinions to the

11      County of Los Angeles.

12  Q   Which particular site, do you remember?

13  A   The Exide Technology Site in Vernon, California.

14  Q   Is that beyond the four-year time frame that

15      would be reflected of projects in your CV?

16  A   I didn't testify about it, but I --

17  Q   Just offered?

18  A   -- just offered opinions.

19  Q   Was that one of those situations you described

20      where you were maybe acting as a consulting

21      expert, never got to the testifying stage?

22  A   Right.  There is no active litigation.

23  Q   Okay.  I am about to turn to the expert report

24      of John McInnes.  Do you want to take a break

25      here?



58

58

```
 1              MR. BOWMAN:  I need to go to the bathroom.

 2              MR. GRIGGS:  Let's take a break.

 3          (A recess was taken between 10:13 a.m. and

 4      10:25 a.m.)

 5              MR. GRIGGS:  Let's go back on a short

 6      break.

 7      BY MR. GRIGGS:

 8  Q   You remember you're under oath?

 9  A   I do.

10  Q   Let's talk about the expert report of John

11      McInnes.  Do you have that in front of you?

12  A   I do.

13  Q   Do you recall how many opinions are in the

14      McInnes report?

15  A   Not by memory, no.

16  Q   Take a look.

17  A   It looks like four.

18  Q   How many of those four opinions do you disagree

19      with?

20  A   I wouldn't disagree with any of the opinions

21      statements that are numbered.

22  Q   So that's zero?

23  A   That would be zero.

24  Q   Does the scientific community have a way of

25      determining whether there has been a release of
```



                                                                    59
 1      contaminants at a particular location?

 2   A  Well, there's a number of different ways you can

 3      determine whether there has been a release.

 4   Q  What do you look for at a given location to

 5      decide if there has been a release of

 6      contaminants?

 7   A  The first thing I would look at would be

 8      operational documents of a facility.

 9   Q  And why would you look at those?

10   A  To see if the facility operations either had

11      reported spills or reported discharges or had

12      processes that were known to release chemicals

13      as part of their process.

14   Q  And what would you use in order to determine

15      what those operations or processes might have

16      been?

17   A  Typically they would be facility -- you know,

18      descriptions of the process that are operating

19      procedures, wastes, discharge, spill reports,

20      those types of documents that a facility would

21      have.

22   Q  Would that include Phase I reports?

23   A  It could.

24   Q  Phase II reports?

25   A  Certainly.



Adam Love, Ph.D.
June 07, 2018

60

60

```
 1   Q   For a facility that was no longer in operation,

 2       might it include reports by environmental

 3       consultants that included data from the site?

 4   A   Certainly.  I mean, I would consider site

 5       investigation data to be a separate category

 6       from facility operations, but absolutely

 7       environmental data would factor into that as

 8       well, could factor as a separate line of

 9       evidence as well.

10   Q   What about witness testimony?

11   A   Yes.

12   Q   If it was available you would --

13   A   I would factor that in, yes.

14   Q   Once you have that information, whether it is

15       from site investigation reports or from facility

16       documents, particularly facilities in operation

17       still, what are you looking for in those

18       documents?

19           You said -- you mentioned, you know,

20       whether there had been a release or not.  Are

21       you looking for the true smoking gun?  Are you

22       looking for a statement that says, well, on

23       Thursday, we spilled a bunch of X at this point

24       in the facility?

25   A   Well, it depends on the facility and the
```



Adam Love, Ph.D.
61                              June 07, 2018

                                                                    61

1       operations.  I mean, there are some facilities

2       where there are actually documented releases

3       like that.  It says there was a X spill of this

4       amount on this date, here is how we responded.

5       That would be one line of evidence.

6            Or it could be just here is the process

7       that happened.  And based on understanding from

8       an engineering perspective what that process

9       was, you know different points in that process

10      where releases, you know, typically occur.  But

11      that's just the facility operations portion.

12      There is a whole other line of evidence related

13      to environmental data.

14   Q  And maybe for a moment let's separate those two.

15   A  Right.

16   Q  Because the operations data seems to be much

17      more prevalent in an ongoing operation than a

18      historical operation.

19           MR. BOWMAN:  I am going to object.  Lack of

20      foundation.  Calls for speculation.

21   Q  Yeah.  Let me put it this way.  A manufacturing

22      facility that is in operation has certain

23      regulatory requirements that they are supposed

24      to meet; is that correct?

25   A  It depends on what operations you're talking

