UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| VON DUPRIN LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MORAN ELECTRIC SERVICE, INC., | ) | |
| MAJOR HOLDINGS, LLC, | ) | |
| MAJOR TOOL AND MACHINE, INC., | ) | |
| and ZIMMER PAPER PRODUCTS | ) | |
| INCORPORATED, | ) | |
| | ) | |
| Defendants. | ) | |
| —————————————————— | ) | |
| MAJOR HOLDINGS, LLC, | ) | |
| Cross-Claimant, | ) | |
| | ) | |
| v. | ) | Case No. 1:16-cv-001942-TWP-DML |
| | ) | |
| MORAN ELECTRIC SERVICE, INC., | ) | |
| Cross-Claim Defendant. | ) | |
| —————————————————— | ) | |
| MORAN ELECTRIC SERVICE, INC., | ) | |
| Counterclaimant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| VON DUPRIN, LLC and | ) | |
| MAJOR TOOL AND MACHINE, INC., | ) | |
| Counterclaim Defendants. | ) | |
| —————————————————— | ) | |

**MORAN ELECTRIC SERVICE, INC.'S RESPONSE IN OPPOSITION TO VON DUPRIN'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND BRIEF IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT**

Moran Electric Service, Inc. ("Moran") files this memorandum in opposition to Von Duprin, LLC's ("Von Duprin") motion for partial summary judgment (Dkt. 133) and in support of Moran's cross-motion for partial summary judgment.

**I.   Contested Issues and Issues of Material Fact that Preclude the Entry of Summary Judgment in Von Duprin's Favor.**

A.   Von Duprin has moved for partial summary judgment against Moran, seeking a ruling that Moran may be held jointly and severally liable for contamination originating on the former Moran property.   Moran has designated conclusive evidence showing that the harm for which Von Duprin seeks recourse is divisible.   This is an issue of causation, rather than equitable allocation that is appropriately addressed on summary judgment.   This Court should deny Von Duprin's request for an order holding Moran jointly and severally liable.   This Court should instead rule that the harm is divisible and enter a partial summary judgment in Moran's favor, ordering that Moran may be held liable only for its proportionate share of the harm.   Allocation under the equitable Gore Factors may occur at trial.

B.   Von Duprin must establish NCP compliance as an essential element of its claim under 42 USC § 9607(a).   Moran is designating evidence showing that Von Duprin has not met its burden on summary judgment to establish that element of its claim.   Von Duprin's motion for summary judgment on the issue of liability should be denied for that reason.

Moran is also designating evidence sufficient to demonstrate that certain costs that Von Duprin seeks to recover categorically do not comply with the

NCP. Moran seeks the entry of partial summary judgment in its favor, ordering that those costs are not recoverable in this lawsuit.

C.      Von Duprin must also establish that the costs that it incurred were "necessary" to establish its claim under 42 USC § 9607(a). Moran is designating evidence that raises a genuine issue of material fact as to whether Von Duprin's costs were/are necessary so as to confer recoverability status under CERCLA.

## II.   Factual Background

### A. Facts pertaining to the contamination at the Von Duprin Site

Von Duprin, Inc. ("Von Duprin") is a prior owner of the Von Duprin Facility.[1] During its ownership and operation of that property from approximately 1955 through 1986 (MDE A, EPA Site Inspection, pp. ES-1 – ES-3, Von Duprin 000358-360), Von Duprin used chlorinated solvents in its operations, including TCE and PCE.  (MDE B, IDEM Rescission Letter, pp. 1-2; MDE C, TCE Disposal Letter; MDE D, PCE Disposal Letter, p. 1; MDE E, Mundell Report, p. 3; MDE F, Von Duprin Waste Forms).  On just one occasion, Von Duprin disposed of 3,900 pounds of unused, and 4,290 pounds of used, TCE.  (MDE C, TCE Disposal Letter).

Mundell & Associates reported that soil analytical result showed "an extensive area of the [Von Duprin] Site in the central and eastern portions where historical machining, parts washing, electroplating and painting operations occurred that contains non-saturated soil impacts above the IDEM

---

[1] Von Duprin refers to the Von Duprin facility located at 1929 Columbia Ave., Indianapolis, Indiana as the Threaded Rod facility.  Von Duprin is undisputedly the former owner and operator of that facility.

RISC IDCL for PCE and TCE, generally at depths beneath the slab and down to the water table." (MDE E, Mundell Report, p. 12). Likewise, IDEM has determined that TCE and PCE concentrations in monitoring wells on the Von Duprin Site "are likely attributable to the adjacent Plating, Painting & Plating Area ... at the [Site][.]" (MDE G, Site Status Letter, p. 4, ¶ 10; MDE M, IDEM Ltr., p. 3, Gen. Comments ("the site has its own source areas for various COCs which have not been properly characterized or delineated."). IDEM also noted that TCE and PCE (along with other chlorinated solvents) were detected in 31 of 41 soil samples analyzed. (Id.).

Although Von Duprin obtained a Corrective Action Complete Final Decision for the Threaded Rod Site from IDEM on September 1, 2010, IDEM rescinded that decision on May 2, 2014. IDEM's grounds for its rescission were that "releases of Perchloroethylene (PCE), Trichloroethene (TCE), and 1, 1, 1 Trichloroethane (1, 1, 1-TCA) have occurred at the [Von Duprin] site, resulting in a groundwater contamination plume." (MDE B, IDEM Rescission Letter, pp. 1-2). On April 18, 2012, IDEM commented that the "[Von Duprin] Site has its own source areas for various contaminants, which have not been appropriately characterized or delineated" and that data available to IDEM "shows a consistent source of PCE and TCE on the [Von Duprin] Site." (MDE G, Site Status Letter, pp. 2-5). Von Duprin has made no effort to address impacts to soil or groundwater, either at the Von Duprin Site or downgradient.

**B. Facts pertaining to the former Moran Property.**

In July of 1996 (after Moran's operations ceased) unsaturated soil samples were taken directly beneath Pits 1 and 2 – the pits that formerly housed Moran's degreasers.  One soil sample taken from directly below each Pit did not have detections.  TCE was detected in two samples, one from Pit 1 and one from Pit 2, at concentrations *well below industrial default closure levels.* (MDE I, Allied Phase II Limited Site Assessment dated August 1996, pp. 3-5, 9, ¶ VI).  Allied Environmental Services, Inc. ("Allied") – the entity that performed the Phase II investigation – reported that "samples obtained from parts washer/varnish pits indicate that levels of VOCs were either *below detection limits or negligible* in all soil borings taken below Pit 01 and Pit 02."  (MDE I, Allied Phase II Limited Site Assessment dated August 1996, p. 9, ¶ VI)(Emphasis added).   As for Pits 3 through 5, Allied opined that "[because of the thickness of concrete found in the foundations of Pits 01 and 02, it is not deemed necessary to drill into the bottoms of the remaining pits.  The remaining pits are in good shape and no fissures were observed in the concrete that could provide a conduit for VOC contamination to seep into the soil beneath the pits." (MDE I, pp. 3-5).

The buildings on the Moran Property were eventually demolished.  Following that demolition, soil borings were advanced across the Moran Property. (MED P, Figure 2).  TCE was detected in the unsaturated soil samples (2-4 feet) at are below the industrial default closure levels of 350 ug/kg.  (*Id.*, tables 1 and 2).  PCE concentrations in unsaturated soil samples were minor,

*below residential and industrial default screening levels.* (*Id.*). Von Duprin correctly states that soils were removed from the Moran Property, but it is important to note "[e]xcavation confirmation sidewall samples exhibited impacts of TCE below the applicable IDEM RISC [Industrial Default Closure Levels]". (MDE P, p.1). Also, "[i]mpacts of TCE in soil confirmation bottom samples were significantly below those concentrations encountered during subsurface activities." (Id. at p. 2). Further still, the soil that was removed from the Moran Property was "disposed of as non-hazardous special waste." (Id. at p. 5, ¶ 2.1b).

### C. Facts pertaining to the Ertel and Zimmer Facilities

Moran agrees with Von Duprin's statements of facts pertaining to the Ertel and Zimmer Facilities (Dkt. 134 pp. 7-8) with a notable exception. Von Duprin asserts that soil removal at the Ertel site addressed TCE impacted soil, but confirmation sampling following soil excavation at the Ertel site show elevated levels of TCE and PCE at levels that far exceed industrial default closure levels. (MDE Q, QEPI Soil Removal Report, Figures 7A-7E).

## III.   Argument

### A. Summary judgment standard

This Court is well-aware of the summary judgment standard. Moran incorporates Von Duprin's recitation of the summary judgment standard with the exception of the last sentence, which cites to no legal authority. (Dkt. 134 p. 11-12).

**B. Von Duprin is a responsible party that contaminated its own property. It cannot hold Moran jointly and severally liable for the costs that it incurred as a result of its own distinct releases of contamination.**

While Von Duprin, a responsible party who contaminated its own property, is eligible for asserting a cost recovery claim under 42 U.S.C. § 9607(a), § 107(a), the CERCLA defendants' liability need not be joint and several. *See Bernstein v. Bankert*, 733 F.3d 190, 201 (7th Cir. 2013). Although CERCLA "imposed a strict liability standard, it did not mandate joint and several liability in every case. Rather, Congress intended the scope of liability to be determined from traditional and evolving principles of common law." *See Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 613 (2009)(internal citations and quotation marks omitted). A CERCLA defendant may avoid joint and severable liability by showing a reasonable basis for apportionment. *Id.* at 614-15. This is referred to as the divisibility doctrine. The divisibility doctrine is conceptually distinct from contribution or allocation of damages. The divisibility doctrine is guided by principles of causation. At the allocation phase, the only question is the extent to which a defendant's liability may be offset by the liability of another; the inquiry at this stage is an equitable one in which the courts take into account the so-called "Gore factors." *United States v. Hercules, Inc.*, 247 F.3d 706, 718 (8th Cir. 2001).

The Supreme Court, in *Burlington*, cited to *United States v. Chem-Dyne Corp.*, 572 F. Supp. 802, 811 (S.D. Ohio 1983), stating that *Chem-Dyne* has "been fully embraced by the Courts of Appeals." *Id.* at 613. *Chem-Dyne*

provides an excellent legislative history and background of CERCLA.  In that case, the defendants moved for an early determination as to whether they may be held jointly and severally liable under CERCLA.  The court characterized and treated that motion as one for partial summary judgment.  The court then noted that "[t]his case, as do most pollution cases, turns on the issue of whether the harm caused at [the site] is 'divisible' or 'indivisible.'  If the harm is divisible and if there is a reasonable basis for apportionment of damages, each defendant is liable only for the portion of harm he himself caused." *Chem-Dyne Corp.*, 572 F. Supp. at 811.

Defendants can demonstrate that harms are distinct based on geographical considerations, such as where a site consists of non-contiguous area of soil contamination, *Akzo Coatings, Inc. v. Aigner Corp.,* 881 F.Supp. 1202, 1210 (N.D. Ind. 1994), *clarified on reconsid.,* 909 F.Supp. 1154 (N.D. Ind. 1995).  Even cases involving a single harm may be "treated as divisible in terms of degree" based, for example, on the relative quantities of waste discharged into a stream.  *Hercules, Inc.*, 247 F.3d at 718.  Divisibility may be provable even where wastes have become cross-contaminated and commingled, "for 'commingling is not synonymous with indivisible harm.'"  *Id.* (quoting *United States v. Alcan Aluminum Corp.*, 990 F.2d 711, 721 (2d Cir. 1993).  All that a defendant is required to show for apportionment is that "there is a reasonable basis for determining the contribution of each cause to a single harm." *Burlington N. & Santa Fe Ry. Co.,* 556 U.S. at 614 (citing Restatement (Second) of Torts § 433A(1)(b), p. 434 (1963–1964)).

Moran has met the threshold of establishing divisibility in this case, and Von Duprin's expert agrees.  Moran retained Adam Love of Roux Associates, Inc. to opine on the division of chlorinated solvent contamination within the study area, and to offer a reasonable basis for apportioning damages.  Mr. Love opines as follows:

> The areas of chlorinated solvent contamination can be divided based on geographic and chemical characteristics and then apportioned to appropriate RPs (responsible parties) based upon those divisions.

(MDE J, Love Report, p. 11).  He states further:

> For CVOC [chlorinated volatile organic compound] groundwater plumes in the Site [defined by Love as an area encompassing the four sites at issue in this matter], the CVOC chemical composition from the Von Duprin site is distinct from upgradient CVOC source locations because it consists largely of PCE, whereas the CVOCs from upgradient direction is characterized primarily by TCE.

(MDE J, Love Report, p. 12).  Based upon the distinct shallow environmental impacts at each site and the "divisibility of CVOC contamination," Love is able to allocate the CVOC contributions from each of the sites into a percentage for the total mass.  (MDE J, Love Report, pp. 3-28).

Von Duprin's expert, John McInnes agrees that the four properties at issue in this case have separate and distinct areas of chlorinated solvent contamination.  He looked at observed patters of TCE presence in shallow soil, TCE presence in the underlying vadose zone soil, and TCE presence in the underlying groundwater zone, and opined that TCE was released at each of the Zimmer, Ertel, Moran, and Von Duprin sites.  (Dkt. 135-3, pp. 3,4,5 and 6).

During his deposition, Mr. McInnes agreed that the four sites at issue have separate and distinct areas of impact:

> Q.     Yeah. The word "distinct" is important to me.  As you look at all four sites, is there just one big blob of shallow soil impacts?
>
> A.     No.
>
> Q.     Okay.
>
> A.     That doesn't cover the entire site.
>
> Q.     So it doesn't cover all four sites?
>
> A.     Right.
>
> Q.     There are distinct areas of release on those four sites?
>
> A.     That's correct.

(MDE L, McInnes Trans. 26:19-27:4).  Moran's expert's testimony is sufficient to achieve application of divisibility, and Von Duprin's expert's testimony provides additional support.  There is no countervailing evidence that the harm at issue in this matter is not divisible.  Moran cannot be held jointly and severally liable on this record.

Also, Von Duprin may recover only the marginal costs that it incurred solely as a result of contamination caused by other potentially responsible parties.  "Section 107(a)(4) of CERCLA applies only to a release or threatened release that *'causes the incurrence of response costs.'*" *Ninth Ave. Remedial Grp. v. Allis-Chalmers Corp.*, No. 2:94-CV-331, 2001 WL 1823815, at *10 (N.D. Ind. Aug. 30, 2001)(Emphasis added); 42 U.S.C. § 9607(a)(4).  Von Duprin, as a CERCLA plaintiff who seeks to recover costs under Section 107(a)(4), must demonstrate that any release attributable to Moran actually caused the

incurrence of costs in addition the costs that Von Duprin incurred by virtue of its own disposal of contamination. *See Ninth Ave. Remedial Grp.,* 2001 WL 1823815, at *12; *PMC, Inc. v. Sherwin-Williams Co.,* 151 F.3d 610, 616 (7th Cir. 1998); *Akzo Nobel Coatings, Inc. v. Aigner Corp.*, 197 F.3d 302, 305 (7th Cir. 1999).

The 7th Circuit Court of Appeals created a three-part structure for allocating environmental response costs to PRPs. A CERCLA defendant, such as Moran, may not be allocated *any* costs if any release of contamination attributable to Moran did not "significantly increase[] Site response costs." *See Ninth Ave. Remedial Grp.,* 2001 WL 1823815, at *12 (citing *PMC,* 151 F.3d at 616). If Von Duprin is able to clear that hurdle, then any costs allocated to Moran must be capped by "the total cost [that Von Duprin] would have borne" had any release attributable to Moran been the only cause of contamination at the Von Duprin Site. *Ninth Ave. Remedial Grp.,* 2001 WL 1823815, at *12 (*citing Akzo,* 197 F.3d at 305.)("in other words, the 'ceiling' established in *Akzo*," 197 F.3d at 305.). The third part of this three-part structure is that any costs allocated to Moran are measured by "'the increase in marginal cost' necessitated by [a release of contamination attributable to Moran]." *See Id.*

Von Duprin would have incurred the response costs that it now seeks to recover even if Moran and the other PRP's were absent. Von Duprin's expert acknowledged that Von Duprin incurred costs as a result of releases of contamination at the Von Duprin Site that are not attributable to upgradient potential sources – such as Moran. (Dkt. 137-3, 102:20-104:6). He also

testified that if Von Duprin's contamination was the only contamination on the Von Duprin Site, then Von Duprin would have incurred the same costs.  (Dkt. 137-3, 104:1-104:19).  This expert testimony is the only testimony from Von Duprin's expert on the topic of whether any contamination attributable to entities other than Von Duprin "significantly increased" response costs at the Von Duprin Site – *and the answer is no.*  Under these circumstances, Moran cannot be held jointly and severally liable for Von Duprin's response costs on summary judgment.  The Court should deny Von Duprin's request to hold Moran jointly and severally liable for Von Duprin's recoverable response costs. The Court should rule instead that Von Duprin's harm is divisible, and that Moran may be held liable only for its proportionate share of the harm.

**C. For costs to be recoverable under 107(a), they must be both necessary and incurred in compliance with the National Contingency Plan.**

Von Duprin is pursuing a claim against Moran under 42 U.S.C. 9607(a)(4)(B) to recover certain environmental response costs. (Dkt. 42, p. 12). Only "necessary costs of response incurred by any other person consistent with the national contingency plan" are recoverable under that section of CERCLA. See 42 U.S.C. § 9607(a)(4)(B).  To establish a prima facie case under § 107(a), a nongovernmental plaintiff must show than any costs incurred in responding to a release of contamination are consistent with the national contingency plan. *Id.*; *NutraSweet Co. v. X-L Eng'g Co.*, 227 F.3d 776, 791 (7th Cir. 2000); *Valbruna Slater Steel Corp. v. Joslyn Mfg. Co.*, No. 1:10-CV-044-JD, 2015 WL 8055999, at *3 (N.D. Ind. Dec. 4, 2015); *Cty. Line Inv. Co. v. Tinney*, 933 F.2d

1508, 1512 (10th Cir. 1991)("Proof of response costs incurred 'consistent with' the NCP is, therefore, an element of a prima facie private cost recovery action under CERCLA."). It is appropriate for the trial court to evaluate conformity with the NCP at the summary judgment stage. *NutraSweet Co.*, 227 F.3d at 791.

The NCP was formulated to provide "specific steps that parties must take in choosing a remedial action plan and in cleanup up hazardous waste." *Metro. Water Reclamation Dist. of Greater Chicago v. N. Am. Galvanizing & Coatings, Inc.,* 473 F.3d 824, 827 (7th Cir. 2007). CERCLA plaintiffs are required to substantially comply with NCP requirements, and courts have customarily ruled that costs that are not incurred in compliance with the NCP are not eligible for recovery. For example, in *Sherwin-Williams*, the 7th Circuit Court of Appeals noted that the "[NCP] requires that the proposed clean-up method in which the costs will be incurred be submitted for public comment before it is implemented … PMC failed to do this and a s a result the it could not obtain any contribution under section 113(f)(1) for the cleanup costs that it has already incurred." *PMC, Inc.,* 151 F.3d at 617-18; see also, *Washington State Dep't of Transp. v. Washington Nat. Gas Co., Pacificorp*, 59 F.3d 793, 803 (9th Cir. 1995)("we have no difficulty concluding that WSDOT's actions were inconsistent with the NCP. WSDOT failed to assess accurately both the nature and the extent of the threat posed by the presence of PAHs in the soil, failed to evaluate alternatives in the matter prescribed in the NCP, and failed to provide opportunity for public comment."); *Cty. Line Inv. Co.*, 933 F.2d at 1512 (costs

not recoverable where plaintiff "provided no such opportunity for public comment on their response action at the Landfill."); *Channel Master Satellite Sys., Inc. v. JFD Elecs. Corp.*, 748 F. Supp. 373, 389 (E.D.N.C. 1990)(holding that cleanup effort was not in substantial compliance with the NCP where remedial alternatives were not adequately developed, a cost estimate was not properly created, and there was no public notice and opportunity to comment).

### 1. Von Duprin has not met its burden of establishing compliance with the NCP as a necessary element of its claim.  Its summary judgment motion must be denied on that basis.

Von Duprin has not shown that the costs that it has incurred and seeks to recover are in compliance with the NCP. Von Duprin's argument on this issue is that "At least some of Von Duprin's Response Costs were Necessary and Incurred Consistent with the National Contingency Plan." (Dkt. 134, p. 20).  This section of Von Duprin's argument covers about five pages, but contains no analysis of Von Duprin's NCP compliance.  Von Duprin references of portion of its NCP expert's testimony that involves the incurrence of certain costs, but does not discuss the requirements of the NCP.  (Dkt. 134, p. 20-21)(citing Dkt. 135-13, 123:3-23).  The statement provided and supporting evidence does not help counsel or the Court understand the analysis, and it certainly does not establish compliance with the NCP.

Von Duprin then makes the assertion that it "easily meets the current standard for NCP compliance" and references Mr. Williams' expert report. (See Dkt. 134, p. 4).  But there is no analysis or explanation of that report, the requirements of NCP itself, or how the removal action undertaken to date

complies with those requirements.  Last, Von Duprin discusses its investigative activities and asserts that such activities need not comply with the NCP. Whatever the merits of that argument, Von Duprin does not cite to its NCP expert, but instead to the affidavit of a fact witness, Mr. Ferree.  And again, there is no explanation of analysis that supports Von Duprin's conclusory assertions.  (Dkt. 134, p. 24).

This is a failure of proof.  On summary judgment, Von Duprin cannot just point us to its expert's report and expect that counsel and the Court will perform the required analysis.  Von Duprin carries the burden of establishing the NCP compliance element of its claim.  That it has not done.

### 2. *Von Duprin's NCP expert's report does little to help understand Von Duprin's NCP compliance analysis.  Some costs were certainly not incurred in compliance with the NCP and must be excluded from recovery on summary judgment.*

During his deposition, Mr. Williams admitted that he has not reached a conclusion that 100% of the work that Geosyntec (Von Duprin's current consulting firm) performed complied with the NCP.  (Williams Trans., 16:6-10). And he admitted without qualification that he has performed no NCP compliance analysis for the work that was performed by other consultants (hired by other PRPs), the costs of which Von Duprin seeks to recover in this case.  (Dkt. 137-3, 83:5-86:11; 126:23-127:25).  If Mr. Williams cannot explain his opinions as to certain portion of the NCP, then any such opinion is insufficient to avoid summary judgment in Moran's favor on the issue of whether certain costs must be excluded from recovery.   "An expert is entitled to offer a view on the ultimate issue … but an expert's report that does nothing

to substantiate this opinion is worthless, and therefore inadmissible." *Minasian v. Standard Chartered Bank, PLC*, 109 F.3d 1212, 1216 (7th Cir. 1997). Summary judgment cannot be avoided by presenting conclusory testimony of an expert witness. *State Farm & Cas. Co. v. Miles*, 730 F. Supp. 1462, 1472 (S.D. Ind. 1990).

Mr. Williams' states in his expert report that he "considered 40 CFR 300.700(c)(3)(i) and the requirements specified in 40 CFR 300.700(c)(5)(6). In doing so, I concluded that the following sections of the NCP are applicable[.]" (Dkt. 135-14, p. 10). Mr. Williams went on to cite at least twelve separate NCP sections with which Von Duprin's incurrence of costs must comply. But his analysis of several of the sections is sparse, largely conclusory, and/or shows that Von Duprin's recovery of costs incurred must be limited.

### a. Worker health and safety

Paragraph 5.1 of Mr. Williams report recites the requirement of preparing worker health and safety plans ("HASP") and Task Hazard Analyses ("THA") in accordance with 40 CFR § 300.150. Mr. Williams identifies the HASPs and THAs that Geosyntec has created, which date back to August of 2014. (Dkt. 135-14, p. 10-11). There is no analysis for any work performed prior to that month and year. Any work that was performed prior to that time was not performed in compliance with this section of the NCP.

### b. Work performed by consultants other than Geosyntec

In section 5.2.4 of his expert report (Dkt. 135-14), Mr. Williams has identified various consultants other than Geosyntec that he claims, to some

extent, performed some work in substantial compliance with the NCP.  Those firms include Alt & Witzig Engineering, Inc., Arcadis U.S., Inc., August Mack Environmental, Inc., EnviroForensics, and Mundell & Associates.  ("Other Consultants").  (Dkt. 135-14, p. 13, Heading 5.2.4).  These Other Consultants were almost exclusively hired and paid by other PRPs in the area (with perhaps the exception of Arcadis).  According to Von Duprin, it paid money to another PRP as part of settling state law claims, and received the data generated by the Other Consultants as part of that deal.  Those settlement costs are not recoverable, regardless of whether title to the data (which was almost certainly public information) changed hands.

Mr. Williams offered the opinion that some of the costs associated with the Other Consultants comply with the NCP and other costs do not – but he cannot tell us which are compliant and which are not.  (Williams Trans. 83:5-86:14).  This is a bare opinion with no support.  There is zero analysis in Mr. Williams' expert report that approaches a competent opinion of NCP compliance regarding work performed by the Other Consultants.  (Dkt. 137-3, 83:5-86:11).   Mr. Williams performed only an analysis of the work that Geosyntec performed.   Mr. Williams testified that he has not performed an analysis as to whether those costs are recoverable when performing his NCP analysis. (Dkt 137-3, 83:5-86:11; 126:23-127:25). Von Duprin's expert has not assessed whether those costs are compliant with the NCP, so as to be recoverable, and he agrees that settlement costs do not come within the scope of the NCP.   (Dkt. 137-3, 63:7-15; 65:8-66:6).  Mr. Williams states only that

Von Duprin paid for the data as part of a settlement; that he believes some of those costs are compliant with the NPC; that he cannot state which costs are or are not compliant with the NCP; that he drew information from a summary of those costs, but he did not disclosed that summary as part of his expert opinion (Dkt. 137-3 83:5-84:10).  And, Von Duprin has not presented evidence detailing the settlement agreement here.  The costs that Von Duprin paid to another PRP as part of a settlement *are not* costs incurred in substantial compliance with the NCP.  And there is no expert testimony showing that the underlying work was performed by the Other Consultants in substantial compliance with the NCP.  Costs associated with the Other Consultants must be excluded as non-recoverable.

### c. Public information and community relations

Section 5.9 of Williams' report discusses 40 CFR 300.700(c)(6)'s public participation requirement for private parties undertaking response actions. There is no analysis or explanation of how Von Duprin's response actions satisfied the NCP's public participation requirement, or which response actions were undertaken with IDEM's oversight.  (Dkt. 135-14, p. 20).  Mr. Williams does little more than refer to his attached Exhibit B and a report create by Geosyntec.  Exhibit B offers little more than a reference back to the Geosyntec report and a statement that "correspondence with IDEM and property owners is summarized above" – somewhere.  (Dkt. 135-14, Ex. B, p. 19).  The job of an expert is to help aid the trier of fact.  Fed. R. Evid. 702(a); *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591 (1993).

18

An expert is not helpful if he simply refers his audience to documents without providing any sort of explanation of those documents.  Moran could have done that in the absence of an expert.  Williams' opinion that the NCP's public participation requirement has been established is not adequately supported or explained so as to warrant the grant or avoidance of summary judgment.

> **d. Moran joins Major Tool and Major Holdings' ("Major") arguments on summary judgment that some or all of Von Duprin's costs were not necessary or incurred in compliance with the NCP.**

Moran anticipates that Major will offer an analysis of the shortcomings of Von Duprin's NCP expert's analysis, and whether Von Duprin incurred costs in compliance with the NCP.  Moran joins those legal arguments to the extent that they challenge the NCP compliance element of Von Duprin's CERCLA claim.

> **3. Whether Von Duprin's incurrence of costs was "necessary" is a mixed question of law and fact.  There is an issue of fact as to whether the costs that Von Duprin seeks to recover were necessary.**

Under CERCLA, costs are "necessary" if they are incurred in response to a threat to human health or the environment, and they are necessary to address that threat.  *Valbruna Slater Steel Corp. v. Joslyn Mfg. Co.*, No. 1:10-CV-044-JD, 2015 WL 8055999, at *4 (N.D. Ind. Dec. 4, 2015).  Whether costs are necessary is a mixed question of law and fact.  *Id.* (*citing G.J. Leasing Co. v. Union Elec. Co.,* 54 F.3d 379, 386 (7th Cir.1995)).

Opinion 1 of Mr. Williams expert report is stated as follows: "Von Duprin has incurred necessary response costs for site investigation and remediation activities associated with the release and threatened release of hazardous

substances on the Defendants' properties." (Dkt. 135-14, p. 8). There is not a single reference to "human health or the environment" in Mr. Williams analysis. (*Id.* at pp. 8-9). During his deposition, Mr. Williams was asked, "In determining which costs were necessary, did you look at whether those costs were related to a risk to human health or the environment in the study area?" He responded, "I didn't distinguish between risk to human health, just what was necessary to defined the extent of contamination." He then stated that during delineation, "there is an evaluation of what the concentration represents in terms of a threat to human health and the environment." Mr. Williams was then asked to clarify his opinion: "Have you developed any conclusion as to what contaminants pose a risk to human health and the environment?" Answer: "Yes." Next question: "*Is that part of any opinion that you are offering in this case*? Answer: "*Not specifically, no.*" (Dkt. 137-3, Williams Trans., 43:18-44:14)(emphasis added). Further, Mr. Williams was asked, "Have you determined whether any release on the Moran property has posed a risk to human health and the environment? His answer, "I have not." (Dkt. 137-3, 47:2-5). It may be the case that there are impacts in the vicinity of the Von Duprin site, but he does not offer an opinion of whether Von Duprin's incurred costs were necessary to address contamination that poses a risk to human health or the environment.

Last, Von Duprin submitted an application for entry into Indiana's Voluntary Remediation Program ("VRP") on June 2, 2016. Mr. Williams refers to Von Duprin's entry into a voluntary remediation agreement with IDEM in his

expert report.  (Dkt. 135-14, p. 8-9).  The VRP contains a section that asks Von Duprin whether there is an immediate threat to human health or the environment.  Here is Von Duprin's response:

**Threat To Human Health Or The Environment:**
Are contaminants from this release believed to pose an imminent or substantial threat to human health or the environment? ☐ Yes  ☒ No
If the answer is **Yes**, describe below and take immediate steps to mitigate the release.

(MDE M, VRP App., p. 4 of 20).  On that same application, Von Duprin reported TCE impacts to soil at 14.8 mg/kg, which converts to 14,800 ug/kg (or 14,800 parts per billion (ppb)).  Von Duprin also reported PCE impacts to soil at 45.10 mg/kg, which converts to 45,100 ug/kg (or 45,100 ppb).  (Id.).  According to Von Duprin's VRP application, those levels of contamination do not pose an immediate or substantial threat to human health or the environment.  If that level of contamination does not pose a risk to human health or the environment, it is difficult to conceive an argument that contamination at the Moran Site poses a risk to human health or the environment.  (MDE P, Table 1, showing the highest TCE soil impact at 11,600 ppb and the highest PCE soil impact at 116 ppb). At the very least, there is an issue of material fact as to whether costs incurred were necessitated by addressing a threat to human health or the environment.   The existence of this issue of fact provides a separate basis for precluding the entry of partial summary judgment in Von Duprin's favor.

## IV.   Conclusion

Moran respectfully requests that this Court deny Von Duprin's motion for partial summary judgment and grant Moran's cross-motion for partial summary judgment on the following grounds:

a. Moran has demonstrated that divisibility is property.  Moran is entitled to a ruling that it may be responsible for only its proportionate share of harm.  Allocation of costs will occur at trial;

b. Von Duprin has not established the NCP compliance element of its claim under § 107(a).  This provides a separate basis for denying Von Duprin's motion.   Moran has demonstrated that certain costs that Von Duprin seeks to recover were categorically not incurred in compliance with the NCP.  Moran is entitled to partial summary judgment as to those costs, which will be excluded from any allocation analysis that occurs at a later date.

c. Von Duprin has not established that the costs it seeks to recover were "necessary" as required by § 107(a).  There is a genuine issue of material fact on this issue.   This provides a distinct basis for denying Von Duprin's motion for partial summary judgment.

Respectfully submitted,

/s/ Marc A. Menkveld
Glenn D. Bowman  IN# 4085-49
Marc A. Menkveld  IN #29381-32
STOLL KEENON OGDEN PLLC
201 North Illinois Street, Suite 1225
Indianapolis, IN  46204
Email:  Glenn.Bowman@skofirm.com and
Marc.Menkveld@skofirm.com
ATTORNEYS FOR DEFENDANT MORAN
ELECTRIC SERVICE, INC.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 17th day of August 2018 a copy of the foregoing was filed through the court's electronic filing system. Notice of this filing was sent to all counsel of record by operation of the Court's ECF notification system, and the parties may access this filing through ECF and/or PACER.

/s/ Marc A. Menkveld