UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| VON DUPRIN LLC, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| MORAN ELECTRIC SERVICE, | ) | 1:16-CV-01942-TWP-DML |
| INC., MAJOR HOLDINGS, LLC, | ) | |
| MAJOR TOOL AND MACHINE, | ) | |
| INC., and ZIMMER PAPER | ) | |
| PRODUCTS INCORPORATED, | ) | |
| Defendants. | ) | |

**VON DUPRIN'S SURREPLY BRIEF OPPOSING MORAN ELECTRIC SERVICE'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Von Duprin LLC ("Von Duprin") submits this surreply brief to respond to the new evidence cited in Moran Electric Service, Inc.'s ("Moran") reply brief. [Dkt. 154] Despite having two previous opportunities to fully explain his methods and results,[1] Moran's expert witness offers a new declaration in connection with Moran's reply brief. [Dkt. 155-1] Pursuant to S.D. Ind. L.R. 56-1(d), a surreply brief is allowed when the moving party "cites new evidence in the reply [brief]" as Moran has done.

Moran argues that Von Duprin has not used its own expert to oppose the divisibility opinion offered by Moran's expert, and that Dr. Love's opinion has been misunderstood by Von Duprin. [Dkt. 154 at 12-13] In fact, the opposite is true. Von Duprin understands exactly what Dr. Love was attempting to accomplish but finds those efforts to be legally and scientifically defective as should this Court.

---

[1] On May 21, 2018, Moran's expert authored an expert report that contained his "opinions and bases for opinions". [See Expert Report of Adam H. Love, Ph.D. [Dkt. 135-1 at 8] On June 7, 2018, Moran's expert gave his expert deposition in this case during which he testified at-length about the methods or processes he used to form his opinions in this case. [Dkt. 137-2, 131:8-136:19]

As the gatekeeper for the admission of expert testimony under Federal Rule of Evidence 702, this court has a duty to decide whether the proffered expertise will "help the trier of fact to understand the evidence or to determine a fact at issue"; "is based on sufficient facts and data"; "is the product of reliable principles and methods"; and "the expert has reliably applied the principle and methods to the facts of the case." FED. R. EVID. 702. Moran's expert fails to satisfy this standard for the admission of expert testimony.

**1. Moran's Expert Offers No Opinion On Divisible Harm.**

The expert opinion offered by Dr. Love does not address the fundamental issue before the Court. To avoid joint and several liability under CERCLA, the party seeking to allocate the damages must show that the *harm* is divisible. *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599 (2009); *United States v. NCR Corp.*, 688 F.3d 833 (7th Cir. 2012). [Dkt. 149 at 12-15] Moran agrees that divisibility of the harm is the applicable legal standard. [Dkt. 139 at 7-8] Moran's expert does not offer any opinion on this crucial question contrary to the unfounded claim in Moran's brief. [Dkt. 154 at 12 ("[Love] provides the opinion that the harm alleged in this matter is divisible")]

Instead, Dr. Love tries to calculate the "relative *mass* contributions" of CVOCs from each source property when the case law requires that the *harm* (not the mass) be divisible. [Dkt. 155-1 at 2, ¶5 ("The methodology I used for establishing divisibility of the CVOC contribution from each property and calculating the relative mass contributions from each site to the groundwater

contamination is based solely on my analysis of the site investigation data collected from environmental samples at the various sites. [Love Expert Report, p. 11-12]")]

Moran's expert uses available subsurface investigation data to develop a *geographical division of CVOC contamination* between the various source areas (Ertel, Zimmer Paper, Moran, and Von Duprin). [*See* Dkt. 135-1 at 18-22, Table 2] He does not reach (and never claims to reach) any conclusion regarding the harm posed by the particular CVOCs released at the individual source areas. [*Id*.] Dr. Love never mentions "harm" in his expert report [Dkt. 135-1], never says "harm" in his deposition testimony [Dkt. 137-2], and "harm" is conspicuously absent from his latest sworn declaration [Dkt. 155-1]. Moran's expert has not opined on the issue of divisibility of "harm" which is fatal to Moran's argument.[2]

Each type of chlorinated solvent molecule is treated the same by Moran's expert. No differentiation is made between PCE and TCE molecules with respect to the relative risks posed by each to human health or the environment. Since these chlorinated solvent compounds have very different toxicity profiles, the risk of harm posed by TCE and PCE is different. [Dkt. 136-1 at 105 (shows IDEM Indoor Air Screening Level for TCE is 2.1 µg/m$^3$; the level for PCE is 42 µg/m$^3$)] The vapor intrusion investigations and subsequent mitigation of indoor air at several residences and a public park building were all based on the presence of TCE (not

---

[2] "The nature of the harm is the key factor in determining whether apportionment is appropriate." *Matter of Bell Petroleum Servs., Inc.*, 3 F.3d 889, 908 (5th Cir. 1993). As one commentator explained: "Even if a party's waste stream can be separately accounted for, its effect on the site and on other parties' wastes at the site must also be taken into account." William C. Tucker, *All Is Number: Mathematics, Divisibility and Apportionment Under Burlington Northern*, 22 Fordham Envtl. L. Rev. 311, 316 (2011). That is, "a defendant must take into account a number of factors relating not just to the contribution of a particular defendant *to* the harm, but also to the *effect* of that defendant's waste on the environment." *Id*.

PCE) in those structures. [Dkts. 136-1 at 53-55; 136-7 at 4-5; 136-8 at 7] The continuing threat to downgradient property owners is from TCE which is the compound that will drive the remedy selection and the associated costs to remediate the shallow groundwater plume. [Dkt. 136-1 at 50-52, 56-61 (highlighting risk of exposure to TCE in shallow plume as the only completed exposure pathway)]

A two-part test is used to decide when apportionment is appropriate. *Burlington*, 556 U.S. at 614; *NCR Corp.*, 688 F.3d at 838. The "threshold question" is whether the harm is capable of apportionment as a matter of law, and then a factual inquiry must point to a reasonable basis for apportionment. *Id*. Moran asks this Court to rely on expert testimony to find that the harm is both theoretically capable of apportionment and that the undisputed facts point to a reasonable basis for apportionment. Since Dr. Love never opines on whether the "harm" is divisible, Moran fails to answer the threshold question whether the harm is divisible as a matter of law. Moran has failed to carry its burden of proof. *Burlington*, 556 U.S. at 614 ("At all times, the burden remains on the party seeking apportionment …").

### 2. Moran's Expert Unreasonably Allocates All PCE Contamination To the Former Von Duprin Site.

Moran's expert incorrectly assumes that every PCE molecule on or near the Von Duprin site came from that site. There is no factual support for this conclusion. In his expert report, Moran's expert identifies two former dry cleaner sites downgradient from the Von Duprin site. [Dkt. 135-1 at 7, Fig. B-1] An expert hired by the Major Defendants identified additional dry cleaners. ["PCE is also a common solvent used by dry cleaners, and the former Von Duprin facility property was

historically occupied by at least two dry cleaning operations and a third was located nearby." [Dkt. 136-7 at 7; Dkt. 135-4 at 118:1-119:12] In his deposition, Moran's expert testified that PCE is a common solvent used by dry cleaners [Dkt. 137-2 at 94:17-22] but that he did not reach any conclusions about whether or not any of the dry cleaners made any contribution of PCE to the comingled plume. [*Id.* at 96:17-97:22] He simply allocated all the PCE to the Von Duprin site.

Moran claims that its expert provides a "reasonable basis for apportionment" when that expert ignored four or five dry cleaners as potential sources on or near the Von Duprin site of chlorinated solvent contamination. If one of the non-party dry cleaners has contributed to the comingled plume, then it should be allocated a share of the liability. Lumping any dry cleaner releases into Von Duprin's basket is not a reasonable way to divide the harm potentially caused by non-parties. Moran's expert does not provide a reasonable division (or apportionment) of liability between the parties as required by the *Burlington* and *NCR Corp.* decisions. Moran has failed the second prong of the two-part divisibility test.

### 3. Moran's Expert Uses A Static Model When Dynamic Conditions Have Existed and Still Exist in the Plume Area.

The 2011 Advisory Notes to Rule 702 indicate that "common sense"[3] is one of the most important tools for determining when an expert witness can be used to offer an opinion based on facts—not just speculation unmoored by reliable facts. As stated in his expert report:

---

[3] "There is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute." Ladd, Expert Testimony, 5 Vand.L.Rev. 414, 418 (1952).

5

> Industrial operations across the Site vicinity RPs extend over many decades, with few if any records available with which to calculate specific CVOC handling or disposal quantities. Soil and groundwater monitoring data at the locations where RPs operated are available only from relatively recent years. Moreover, the resulting CVOC plumes stemming from different sources across the Site vicinity are co-mingled (Figure 2-1 panels). Therefore, integrated historical CVOC quantities based on distinct groundwater plumes also cannot be discerned.
>
> In addition, the widespread presence of the reductive dehalogenation transformation products *cis*-1,2-DCE and vinyl chloride and the shift downgradient in the general concentration distributions of these two chemicals relative to those of PCE and TCE indicates widespread CVOC degradation has occurred in the groundwater.

[Dkt. 135-1 at 11] This description indicates that the conditions at each of the sites had changed over time and are still changing today. How could any expert possibly apportion the harm from such disparate sources over such long periods of time with no eyewitnesses or contemporary records are available? The Herculean-task experts face is why cases finding that divisibility of harm has been proven are so rare.

Moran's expert takes the static conditions at a certain point in time as being representative of dynamic conditions occurring over a long period of time. Dr. Love admits that: "Apportionment calculations described in this document derive from groundwater and soil CVOC monitoring data collected in the Study Area since 2004." [Dkt. 135-1 at 11, n. 37] In effect, Dr. Love uses a single camera frame to describe a feature-length film. When the first chlorinated solvent release occurred, the CVOCs began interacting with the environment in an ever changing ballet. The next day this environmental ballet was somewhat changed because of adsorption effects in soil, groundwater flow direction and rate, off-gassing of CVOC volatiles, rainfall percolation through the impacted soil dragging CVOC molecules toward the

6

groundwater, the presence of more oxygen or less oxygen near to the impacted area, or the release of additional contaminants to the environment in the vicinity. These changes occurred constantly for decades and are still occurring today.

To qualify under Rule 702, the proffered expertise must be "based on sufficient facts and data" to give reliable and reproducible results. Moran's expert offers an estimation based on the conditions observed since 2004. However, even the limited data available to Moran's expert has been biased by the removal of about 50,000 tons of soil from the three upgradient source areas (Ertel, Zimmer Paper, and Moran).[4] The time-limited facts do not permit a reasonable person to estimate the dynamic events occurring over many decades that have resulted in the soil and plume conditions now being observed. The available facts and data do not provide a reasoned basis for expressing "expert opinions" but instead allow only speculation masquerading as expert opinion. A common sense evaluation of the facts would reject such pseudo-scientific guesswork.

## CONCLUSION

The two-part test used in *Burlington* and *NCR Corp.* to decide when the divisibility doctrine applies has not been met in this case. The "threshold question" is whether the "harm" is theoretically capable of apportionment as a matter of law, and then a factual inquiry must point to a reasonable basis for apportionment. Moran has failed to establish either prong of the two-part test, and has not proven that the harm is divisible.

---

[4] Significant soil excavations occurred at Ertel (37,000 tons), Zimmer Paper (7,350 tons), and Moran (4,641 tons). [Dkt.135-4 at 107:7-15; Dkt. 135-1 at 64; Dkt. 135-4 at 77: 9-23]

Respectfully submitted,

*/s/ E. Sean Griggs*
E. Sean Griggs (17716-49)
Alexandra R. French (32737-29)

**BARNES & THORNBURG LLP**
11 South Meridian Street
Indianapolis, Indiana 46204
alexandra.french@btlaw.com
sean.griggs@btlaw.com
Phone: (317) 231-7793
Facsimile: (317) 231-7433

*Attorneys for Plaintiff,*
*Von Duprin LLC*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing was filed on the 5th day of October, 2018 through the Court's electronic filing system. Notice of the filing was sent to all counsel of record by operation of the ECF notification system, and the parties may access the filing through ECF and/or PACER.

*/s/ E. Sean Griggs*