**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| VON DUPRIN LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| MORAN ELECTRIC SERVICE, INC., | ) | 1:16-CV-01942-TWP-DML |
| MAJOR HOLDINGS, LLC, MAJOR TOOL | ) | |
| AND MACHINE, INC., and ZIMMER | ) | |
| PAPER PRODUCTS INCORPORATED, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

# VON DUPRIN'S PRE-TRIAL BRIEF

Plaintiff Von Duprin LLC ("Von Duprin") respectfully files this Pre-Trial Brief in advance of the trial scheduled to begin July 22, 2019.[1]

## I.  INTRODUCTION

This case is about pollution. Several businesses in close geographical proximity used and released chlorinated solvents into the environment over several decades. The residual effects of these hazardous substance releases are still present. All of the pollution-causing businesses ceased operations more than a decade ago but the pollution caused by those businesses continue to plague the subsurface environment and to threaten the health and well-being of human receptors, including families who live in the downgradient area and children who play in the nearby public park building.

Pollution is an ugly word and no redeeming qualities are ever attached to it. No one wants to be associated with pollution, either past or present. Over the past 50 years, the government, industry, and the public have all become more aware of the harm to human health and the environment posed

---

[1] This Pre-Trial Brief incorporates relevant parts of Von Duprin's Trial Brief that was filed on January 2, 2019. [Dkt. 181]

by pollution in its many forms. Sadly, the increased awareness of the dangers posed by industrial pollution has not changed the almost visceral response to immediately deny any responsibility for its existence. Much like children playing a game of tag in the house when Mom's glass perfume bottle is knocked to the floor and shatters, no child wants to take responsibility. There is no real mystery—one or more of the kids did it and all of them are implicated by being a player in the forbidden indoor game. As in this case, all parties point to each other as most responsible for the damage and insist that their own role was minimal. As the final arbiter of household disputes, Mom must decide how to divide responsibility for the spilled perfume and what degree of punishment is to be meted out to the guilty parties. This court faces the same unenviable task of deciding how much responsibility to impose on each party in this case for the extensive, comingled groundwater pollution that poses a continuing threat to the local environment and those people living and playing in the area affected by the migrating chlorinated solvent plume.

## II.    FACTUAL BACKGROUND

The releases of hazardous substances relevant to the case occurred at several properties located in Indianapolis, Indiana including: the Von Duprin Property (Marion County Parcel Nos. 1077482 and 1104806);  the Moran Property (Marion County Parcel Nos. 1090311 and 1090578); the Zimmer Paper Property (Marion County Parcel No. 1104465); and the Ertel Property (Marion County Parcel No. 1006760). [*See* Dkt. 203 (Order on Cross-Motions for Summary Judgment) at 2-3; Dkt. 205 (Joint Stipulations of Fact) at ¶¶ 1, 7, 9, 26]. There have been releases or threatened releases of hazardous substances (specifically TCE, PCE, and their degradation products) at each of these four sites within the meaning of Sections 101(22) and 107(a) of CERCLA, 42 U.S.C. §§ 9601(22) and 9607(a). [Dkt. 205 at ¶¶ 12, 16, 19, 31, 43, 45]. Other known and suspected sources of chlorinated solvents exist in close proximity of the Plume Area that are not associated with the four sites identified above, including: several former dry cleaners, a former plating operation, and a former scrap yard.



Exhibit 1001

At trial, Von Duprin's expert witness, John McInnes, will testify (and other expert witnesses will agree) that the upgradient groundwater was impacted by releases of chlorinated solvents at the Ertel, Moran, and Zimmer Paper Properties which then flowed downhill to the Von Duprin Property and beyond. This groundwater migration resulted in the intrusion of potentially harmful vapors into nearby residences and a public park facility. Chlorinated solvent releases also occurred at the Von Duprin

3

Property. Mr. McInnes will further opine that the chlorinated solvent releases at the Ertel, Zimmer Paper, Moran, Von Duprin Properties (and likely other sources too), became comingled (mixed together) in the groundwater, and became indistinguishable from each other.[2] The comingled plume now covers an area nearly one mile long (the "Plume Area"). [*See* Dkt. 203 at 3; Exhibit 1032 (IDEM Commissioner's Order) at 5][3]

All three parties to this lawsuit are either current or prior owners of the properties that contributed to the comingled plume. Von Duprin is a prior owner and operator of the Von Duprin Property; Moran is a prior owner and operator of the Moran Property and Zimmer Paper Property; and Major Defendants are current owners of the Moran Property, the Zimmer Paper Property, and the Ertel Property.

### A. Facility Backgrounds.

#### 1. Ertel Property

Von Duprin incorporates by reference this Court's statement of the undisputed facts concerning the Ertel Property's historical operations, contamination, and soil removal. [*See* Dkt. 203 at 4] The evidence at trial will show that the excavation of 37,000 tons of soil at the Ertel Property addressed PCE- and TCE-impacted soil, but did not directly address impacted groundwater at the Ertel Property. There were no efforts to remediate the groundwater contamination that had been leaving the site year after year for decades. The Ertel Property is situated upgradient from the Von Duprin Property, and therefore contamination at Von Duprin cannot have impacted the nature and extent of the contamination at the Ertel Property, and Von Duprin should not be required to shoulder the costs of responding to the downgradient harms caused by the contamination at the Ertel Property.

---

[2] No witness in this case has offered any evidence claiming that the source of a particular TCE or PCE molecule is traceable to the original site where it was released.

[3] The hydraulic gradient determines the general direction in which groundwater flows. Groundwater seeks to move "downhill" in the direction indicated by gravity. Thus, the upgradient location can pollute the downgradient location but the reverse is never true because groundwater never flows "uphill" against gravity (at least without human intervention).

### 2. Zimmer Paper Property

Von Duprin incorporates by reference this Court's statement of the undisputed facts concerning the Zimmer Paper Property's historical operations, contamination, and soil removal. [*See* Dkt. 203 at 4-5] The evidence at trial will show that the removal of a 16,000 gallon underground storage tank ("UST") along with 7,350 cubic yards of chlorinated solvent-impacted soil in 2007 did not directly address the groundwater impacts of that same contamination at Zimmer Paper Property or downgradient. Like the Ertel Property, no effort was undertaken to remediate the groundwater contamination that had been leaving the site year after year for decades. The Zimmer Paper Property is situated upgradient from the Von Duprin Property, and therefore contamination at Von Duprin cannot have impacted the nature and extent of the contamination at the Zimmer Paper Property, and Von Duprin should not be required to shoulder the costs of responding to the downgradient harms caused by the contamination at the Zimmer Paper Property.

### 3. Moran Property

Von Duprin incorporates by reference this Court's statement of the undisputed facts concerning the Moran Property's historical operations, contamination, and soil removal. [*See* Dkt. 203 at 5] The evidence at trial will show the removal of 4,641 tons of impacted soil from the Moran property did not directly address impacts to groundwater at the Moran Property or downgradient, which were the result of soil contamination at the facility. No effort was undertaken to remediate the groundwater contamination that had been leaving the site year after year for decades. The Moran Property is situated upgradient from the Von Duprin Property, and therefore contamination at Von Duprin cannot have impacted the nature and extent of the contamination at the Moran Property, and Von Duprin should not be required to shoulder the costs of responding to the downgradient harms caused by the contamination at the Moran Property.

### 4. Von Duprin Property

Von Duprin, Inc., a predecessor to Von Duprin, owned and operated the property located at 1929 Columbia Avenue between 1965 and 1986. During that time, Von Duprin, Inc. handled a variety of commercial chemical products while it owned and operated the site. [Dkt. 205 at ¶ 42] Environmental assessments and investigations at this site found contamination, including chlorinated solvents, in the soil and groundwater. Von Duprin does not seek to recover the costs of its response to soil contamination at the Von Duprin Property, nor for its investigations that relate solely to releases of hazardous substances at the Von Duprin Property.

### B. Regulatory Involvement

As a result of the hazardous substances in groundwater and soil gas, Threaded Rod (another prior owner of the Von Duprin Property) was ordered by IDEM to take action to delineate the extent of the groundwater contamination exceeding regulatory standards. [Dkt. 203 at 6] After undertaking significant investigation (but no remedial action), Threaded Rod ceded to Von Duprin its existing monitoring wells, sampling results, laboratory data, and environmental reports in an agreed settlement. [*Id.*] The acquisition of Threaded Rod's wells, data set, and knowledge base allowed Von Duprin to focus its investigative efforts on areas that had not yet been investigated adequately by Threaded Rod and to avoid the costs to design and implement a new monitoring well network in the Plume Area. [*See Id.* at 6-7]

In August 2013, IDEM notified Von Duprin that it was a potentially responsible party for conditions at the Von Duprin Property because its predecessor had owned and operated on that site. [*Id.* at 6] At the direction of IDEM, Von Duprin performed extensive sampling and investigation of the soil, soil gas, indoor air, and groundwater at the Former Von Duprin Property and the overall Plume Area. [*Id.*] IDEM also required Von Duprin to conduct groundwater and indoor air sampling downgradient to determine how far certain hazardous substances had migrated in the comingled plume. [*Id.*] Von Duprin confirmed the presence of hazardous substances at the Von Duprin Property

and several other properties located within the Plume Area, as well as the presence of potentially harmful substances in nearby residences. [*Id.*] Von Duprin installed vapor mitigation systems in each affected residence (where Von Duprin's consultant was given access) to reduce the amount of contaminants to accepted levels. [*Id.*] Von Duprin continues to maintain and pay the annual cost for the operation of each residential mitigation system. [*Id.*]

Testimony and documents introduced at trial will show that Von Duprin has continued to conduct investigations and take soil, soil gas, indoor air, and groundwater samples in the Plume Area at IDEM's direction. The evidence at trial will also show that the groundwater flowing beneath the JTV Hill Park, and under the existing homes along Yandes Street and Alvord Street, has generated soil gas with sufficient concentrations of TCE to require action to assess, and, where necessary, reduce or eliminate the exposure of human beings to the released contaminants.

Von Duprin will present evidence at trial to demonstrate that it sought the cooperation of Defendants in addressing the contaminants released from sites that are currently owned or previously operated by Defendants. Despite the dangers posed by the contaminants released on the upgradient properties that have migrated (and continue to migrate to this very day) to the southwest in a groundwater plume that flows under the Von Duprin Property and then further downgradient into residential areas, the Defendants refused to cooperate in coordinated remedial actions with Von Duprin or to share in the costs of performing such remedial actions.[4] Indeed, even after IDEM ordered Defendants to participate in remediation efforts in the Plume Area, they instead filed appeals to try to prevent IDEM's orders from going into effect. *See* Joint Trial Exhibits 1225, 1226, 1227, 1228, 1032.

As stated above, Von Duprin does not seek to recover response costs which relate solely to releases of hazardous substances at the Von Duprin Property—its claim for cost recovery against

---

[4] Very recently, the Major Defendants have agreed to reimburse Von Duprin's consultant for certain costs it is incurring to address potential vapor intrusion at additional residences along the path of the chlorinated solvent plume.

Defendants seeks to recover only a portion of the costs to investigate the nature of overall environmental contamination in the Plume Area, mitigate harmful vapor intrusion in residences and at the J.T.V. Hill Park building caused by the comingled plume, and to develop a remedial solution for the groundwater contamination in the downgradient Plume Area.[5] Von Duprin also seeks an allocation among the parties so that each will pay an appropriate share of the future costs to implement the downgradient groundwater remedy for which all parties are collectively responsible.

## III.   CLAIMS AT ISSUE

Von Duprin's First Amended Complaint asserted three claims: (1) Section 107(a) of CERCLA for response costs incurred and to be incurred; (2) declaratory judgment as to future response costs under Section 113(g) of CERCLA; and (3) an Environmental Legal Actions ("ELA") claim under Indiana Code § 13-30-9-1 *et seq*. Defendants filed counterclaims under Section 113(f) of CERCLA against Von Duprin, and cross-claims against one another under Section 113(f). [Dkt. 42] All of these claims are triable to the Court.

### A.   CERCLA § 107(a)

After its amendment in 1986, CERCLA provided for a right to cost recovery in certain circumstances under Section 107(a), and a separate right to contribution in other circumstances under Section 113(f)(1). "The cost recovery remedy of §107(a)(4)(B) and the contribution remedy of §113(f)(1) are similar at a general level in that they both allow private parties to recoup costs from other private parties. But the two remedies are clearly distinct." *Cooper Industries, Inc. v. Aviall Services, Inc.*, 543 U.S. 157, 163 (2004). Von Duprin asserted a claim for cost recovery under Section 107(a) of

---

[5] The upgradient Plume Area is solely the responsibility of Moran and the Major Defendants. No one alleges that Von Duprin contributed any contamination to the upgradient Plume Area. Whether the remedial cost to address the upgradient Plume Area is one dollar or several million dollars has no bearing on Von Duprin although it likely bears on the cross-claims asserted between Moran and the Major Defendants.

CERCLA against Moran, Major Defendants, and Zimmer Paper Products Incorporated ("Zimmer Paper"). [Dkt. 42; Counts I, IV, VI, & VIII][6]

All elements of CERCLA liability have been established by undisputed evidence except the question whether the release or threatened release of hazardous substances in the Plume Area has resulted in necessary response costs being incurred by Von Duprin consistent with the National Contingency Plan ("NCP").[7] The parties only dispute the responsibility each party should bear for the releases of hazardous substances to the collective harm presented by the comingled plume.

At trial, Von Duprin will present the testimony of Russ Eiler, Rob Ferree, Ryan Fimmen, Ryan Groves, John McInnes, and Sam Williams concerning the nature of the contamination in the Plume Area, the nature of the harm caused by the contamination, the costs Von Duprin has incurred in responding to the contamination, the necessity of those costs, and Von Duprin's substantial compliance with the NCP. After hearing the evidence, this Court should find the Defendants liable to Von Duprin for an equitable share of the past response costs incurred to address risks to human health and the environment presented by the comingled plume.

### B. CERCLA § 113(g)(2)

Von Duprin also seeks a declaratory judgment against the Defendants under CERCLA § 113(g)(2). [Dkt. 42; Counts II, V, VII, & IX] This provision of CERCLA avoids a revolving courthouse door by allowing the responsibility for future response costs to be allocated among the parties to a single private action prior to the completion of all remediation activities. At trial, Von Duprin will present testimony from Ryan Fimmen, Ryan Groves, and Rob Ferree regarding the remedial selection and the estimated future costs to remediate the downgradient Plume Area. The

---

[6] Zimmer Paper failed to respond to the Amended Complaint and a default judgment was entered against Zimmer. [Dkt. 90 (Clerk's Entry of Default as to Zimmer Paper Products Incorporated)]

[7] *See also Sycamore Indus. Park Assocs. v. Ericsson, Inc.*, 546 F.3d 847, 850 (7th Cir. 2008); *Nutrasweet Company v. X-L Engineering Co.*, 227 F.3d 776, 791 (7th Cir. 2000); *G.J. Leasing Co. v. Union Elec. Co.*, 54 F.3d 379, 386 (7th Cir. 1995); *Kerr-McGee Chem. Corp. v. Lefton Iron & Metal Co.*, 14 F.3d 321, 325 (7th Cir. 1994); *Environmental Transp. Systems., Inc. v. Ensco, Inc.*, 969 F.2d 503, 506 (7th Cir. 1992).

allocation percentages that this Court determines for the past response costs should be applied to these future response costs.

### C. ENVIRONMENTAL LEGAL ACTION, IND. CODE § 13-30-9-1

Von Duprin also asserted a state law Environmental Legal Action ("ELA") claim against Moran and Zimmer Paper. [Dkt. 42, Counts III & X] The ELA provides for the recovery of reasonable costs of environmental assessment and removal and remedial actions, as well as attorneys' fees, from persons who caused or contributed to the releases of a hazardous substance that pose a risk to human health or the environment. There are two principal differences between the state ELA claim and the federal CERCLA claims. First, the ELA has no requirement that the response costs must be incurred "consistent with the NCP". Second, the ELA permits the Court to award attorneys' fees in its discretion.

### D. CERCLA § 113(f)(1)

The Defendants (other than Zimmer Paper) have asserted counterclaims against Von Duprin—and cross-claims against one another—under Section 113(f). [Dkt. 46 (Major Holdings' Answer); Dkt. 68 (Major Tool's Answer); Dkt. 118] The elements of proof necessary to establish *liability* under Section 113(f) (CERCLA contribution claim) are identical to the Section 107(a) liability requirements (CERCLA cost recovery claim). *See* 42 U.S.C. § 9613(f) ("Any person may seek contribution from any other person who is liable or potentially liable under section 107(a), during or following any civil action under … section 107(a)") (internal citations omitted). It is undisputed that all three parties to this dispute can be made liable for at least a portion of the cost of remediating the comingled plume. [*See* Dkt. 206 at 2-3] The two causes of action are different in how damages are allocated.

Under Section 113(f), a plaintiff must prove the allocation share of each particular defendant based on equitable factors deemed applicable by the court. *Environmental Transp. Sys., Inc. v. ENSCO, Inc.*, 969 F.2d 503, 508 (7th Cir. 1992) (describing the six *Gore* factors). The Court must evaluate (a)

the **distinguishability** of each party's waste; (b) the **amount** of hazardous waste; (c) degree of **toxicity** of the contaminants at issue; (d) **degree of involvement** of the parties in waste generation; (e) **degree of cooperation** with federal, state or local officials to prevent any harm to public health or the environment; and (f) **degree of care** taken by the parties with respect to the hazardous waste concerned.

Here, the contaminants at issue are all chlorinated solvents, but primarily PCE and TCE. The most relevant harm is the risk of vapor intrusion, which is posed by TCE alone. However, PCE degrades to TCE over time, and each further degrades to cis-1,2-DCE (less harmful), then to vinyl chloride (more harmful), and ultimately to ethene (wholly innocuous end product). Thus, as the contaminants in the Plume Area comingle and degrade, their relative risk to human health and the environment waxes and wanes with each step of the degradation process, until innocuous end products are achieved. That the wastes are comingled and also continually degrading makes it impossible to accurately identify the true nature of the original contamination (*i.e.,* whether the original contaminants were PCE or TCE) and distinguish the effects of each party's contributions to the harm presented by the comingled plume. Thus, the first *Gore* factor of distinguishability bears little weight on the Court's allocation analysis.

Similarly, the amount of hazardous substances released at each property is nearly impossible to determine. The lack of data concerning the contaminated soil excavated at the upgradient properties prevents the Court from evaluating the full extent and nature of the upgradient chlorinated solvent releases contamination prior to the excavations. Even if such data did exist, it would not provide the Court with a timeline of releases on each property or the volume of such releases, given that the releases, once in the soil, migrate and degrade at unknown rates. Therefore, the second *Gore* factor, amount of hazardous waste, also provides minimal guidance to the Court in allocating damages among the parties.

The third *Gore* factor, degree of toxicity of the contaminants, is also of little assistance to the Court in allocating response costs, because the relative toxicity of the degradation products varies over time, depending on the rate and status of the degradation process. Thus, the factor is generally irrelevant where, as here, there are not discharges of different types of contaminants with distinct toxicological profiles. *See El Paso Natural Gas Co LLC v. United States, et al.*, No. CV14-8165-PCT-DG 2019 WL 2137265, at *22 (D. Ariz. Apr. 16, 2019) (citing *Gavora, Inc. v. City of Fairbanks*, No. 4:15-cv-00015-SLG, 2017 WL 3161626, at *8 (D. Alaska July 25, 2017)).

The fourth *Gore* factor, degree of involvement with release of hazardous substances at the site, is more relevant, but not the most important. Von Duprin's predecessor handled hazardous substances at its site, and  it is undisputed that there were releases at the Von Duprin Property. Similarly, it is undisputed that releases of hazardous substances occurred while Moran owned and operated the Moran Property. Major Defendants, too, have been involved insofar as the still-present groundwater contamination at the Moran, Zimmer Paper, and Ertel Properties continues to migrate and release hazardous substances into the downgradient portion of the Plume Area. However, the evidence of anyone's direct, actual involvement in the releases of hazardous substances at their properties is limited at best, and in most cases, fully lacking.

Therefore, the most relevant equitable factors in this case are the fifth and sixth *Gore* factors: (1) the degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such hazardous waste; and (2) the degree of cooperation by the parties with federal, state or local officials to prevent any harm to the public health or the environment. For each of these factors, the Court will have all the evidence it needs to evaluate the parties' relative responsibility for the environmental harm at issue in this case. Moreover, each of these factors addresses what the current parties are doing (or not doing) to prevent harm to human health and the environment during the past several years, in which all parties were well aware of the contamination and had the opportunity to begin to rectify it. These equities favor Von Duprin, who has worked

hand-in-hand with IDEM to prevent harm caused by vapors emitting from the groundwater plume and against Defendants who failed to exercise due care over harm resulting from releases at properties for which they were (and remain) responsible.

## IV.    PROVING LIABILITY

CERCLA is a remedial statute and is interpreted broadly in order to accomplish environmental cleanups. *United States v. Nalco Chem. Co.*, 2002 WL 548840 at 10 (N.D.Ill 2002) ("[T]he remedial intent of CERCLA requires a liberal statutory construction in order to avoid frustrating its purpose.").

At trial, Von Duprin's expert witness, John McInnes, will opine that hazardous substances were released at the former Von Duprin, Ertel, Zimmer Paper, and Moran Properties, as the shallow soils show elevated levels of TCE, a hazardous substance. The evidence at trial will also show that expert witnesses retained by the Defendants, Robert Walker and Adam Love, agree with Mr. McInnes' opinions. The manufacturing operations conducted at the relevant properties necessarily involved, by their nature, a risk that hazardous substances would be released into the environment. *Gould, Inc. v. A&M Battery & Tire Serv.*, 987 F. Supp. 353, 356 (M.D. Penn. 1997), *rev'd on other grounds*, 232 F.3d 162 (3d Cir. 2000). No other potential sources of those on-site hazardous substance releases have been identified to date, despite the investigatory efforts of several environmental professionals at each of the sites.[8] Indeed, none of the Defendants has joined any additional potentially responsible party in this case, nor has either Defendant raised a cross-claim against Zimmer Paper.

### A.    Moran Electric Operated the Moran Property When a Release of a Hazardous Substance Occurred.

Under CERCLA § 107(a)(2), CERCLA liability attaches to any person who, at the time of disposal of any hazardous substance, owned or operated any facility at which such hazardous substances were released. 42 U.S.C. § 9607(a)(2). As discussed above, CERCLA liability does not

---

[8] Other chlorinated solvent releases have occurred that are independent of the properties identified with the named parties in this case.

require any intentional disposal or even negligence on the part of any person for liability to attach. The parties have stipulated that a chlorinated solvent was released at the Moran property and that Moran used degreasers and cleaning agents in its business operations at the Moran Property. [Dkt. 205 at ¶¶ 11, 12, 16]  The how or why of a release is not relevant to the question of Moran's liability under CERCLA. It is sufficient that a release of TCE and/or PCE did, in fact, occur at the Moran Property and that Moran stored and used the same hazardous substance in its operations.

### B. Major Tool and Major Holdings are the Current Owners of Sites Where Releases of a Hazardous Substance Occurred.

Major Tool is the current owner of the Ertel Property. [Dkt. 205, ¶ 27] Major Holdings is the current owner of the Zimmer Paper and Moran Properties. [Dkt. 205, ¶¶ 22, 23] The current owner of a facility may be held strictly liable, as Section 107 does not require the present owner to contribute to the release; mere proof of ownership is enough to establish CERCLA liability. *Valbruna Slater Steel Corp. v. Joslyn Mfg. Co.*, 298 F. Supp. 3d 1194, 1204 (N.D. Ind. 2018)  (allocating 25% of the  response costs to the current owner of the site even though the owner had no involvement in the polluting activities); *see also California Department of Toxic Substances Control v. Westside Delivery, LLC*, 888 F.3d 1085 (9th Cir. 2018); *California Dept.  of Toxic Substances Control v. Hearthside Residential Corp.*, 613 F.3d 910 (9th Cir. 2010); *Carson Harbor Village, Ltd. v. Unocal Corp.*, 270 F.3d 863 (9th Cir. 2001) *(en banc).*

### C. Zimmer Paper has been Defaulted and Defendants Cannot Shift Responsibility to Zimmer Paper.

Defendant Zimmer Paper will be notably absent from trial. Von Duprin, despite numerous attempts, was unable to achieve traditional service, and Zimmer Paper was then defaulted following service by publication and service on the Secretary of State. [Dkt. 54; Dkt. 71; Dkt. 73, Dkt. 75; Dkt. 79; Dkt. 94] The alternate service and default of Zimmer Paper is directly related to Zimmer Paper's dissolution of its business and assignment of its assets years before this litigation began. Defendants may argue at trial that responsibility for the Zimmer Paper Property ought to be placed upon Zimmer Paper only. This argument ignores both Moran's responsibility as a former operator of the Zimmer

14

Paper Property, and Major Holdings' ownership of the property without benefit of an innocent landowner defense under CERCLA. [Dkt. 203 at 31-32] Defendants who bear liability for contamination under CERCLA cannot sidestep their obligations by merely pointing to an empty chair; otherwise, CERCLA's broad liability and cost recovery provisions would be rendered moot anytime a defendant could find a prior, now defunct owner.[9] A responsible party cannot contract away its CERCLA liability but may be indemnified against such liability by another party. 42 U.S.C. § 9607(e)(1); *Peoples Gas Light & Coke Co. v. Beazer East, Inc.*, 802 F.3d 876, 880 (7th Cir. 2015).[10]

### D. Von Duprin Has Incurred Response Costs as a Result of a Release or Threatened Release of Hazardous Substances at or near the Sites.

To find Defendants liable, this Court need only determine that Von Duprin has incurred recoverable response costs. Under CERCLA, "response costs" include all administrative, investigative,

---

[9] Importantly, should Moran and/or the Major Defendants later find that Zimmer Paper has identifiable and attachable assets, they have three years from any judgment in this case to bring an action for CERCLA contribution against Zimmer Paper. 42 U.S.C. § 9613(g)(3).

[10] In *Peoples Gas*, the Seventh Circuit stated: "Section 107(e)(1) of CERCLA provides:

No indemnification, hold harmless, or similar agreements or conveyance shall be effective to transfer from the owner or operator of any vessel or facility or from any person who may be liable for a release or threat of release under this section, to any other person the liability imposed under this section. Nothing in this subsection shall bar any agreement to insure, hold harmless, or indemnify a party to such agreement for any liability under this section.

42 U.S.C. § 9607(e)(1). At first blush, this section appears internally inconsistent. However, we have joined other federal courts of appeals in reconciling these two sentences by construing them to mean that responsible parties may not transfer their CERCLA liability, but may obtain indemnification for that liability. *See PMC v. Sherwin-Williams Co.*, 151 F.3d 610, 613 (7th Cir. 1998) ('Parties are free ... to allocate [CERCLA] expenses between themselves by contract.'); *Kerr-McGee Chem. Corp. v. Lefton Iron & Metal Co.*, 14 F.3d 321 (7th Cir. 1994); *Harley-Davidson, Inc. v Minstar, Inc.*, 41 F.3d 341, 342-43 (7th. Cir. 1994) (holding that § 107(e)(1) 'does not outlaw indemnification agreements, but merely precludes efforts to divest a responsible party of his liability')." *Peoples Gas*, 802 F.3d at 880 (other internal citations omitted).

and prejudgment interest,[11] the costs of removal and remedial actions,[12] and attorney's fees incurred to identify potentially responsible parties.[13] 42 U.S.C. § 9601(25).

There can be no serious dispute that Von Duprin has incurred substantial response costs in connection with the releases at and from the Ertel, Zimmer Paper, and Moran Properties. Testimony at trial will show that Von Duprin has spent more than $2 million to date, excluding any prejudgment interest or attorney's fees. Further, trial witnesses will testify that Von Duprin incurred these costs as a direct result of the release or threatened release of PCE and TCE at the upgradient facilities. The comingled nature of the plume renders it impossible to determine what specific costs in investigating and mitigating vapor intrusion caused by the entire plume are attributable to individual parties, and indeed, no expert in the case has conducted such an analysis. The issues for the Court to decide at trial will be whether Von Duprin incurred necessary response costs, whether those costs were incurred in substantial compliance with the NCP, and what proportion of those past costs and future costs should be assigned to each viable party.

## 1. Von Duprin's Response Costs were Necessary.

Under CERCLA, costs are "necessary" if they are incurred in response to a threat to human health or the environment and they are necessary to address that threat. *G.J. Leasing Co. v. Union Elec. Co.*, 854 F. Supp. 539, 562 (S.D. Ill. 1994), *aff'd*, 54 F.3d 379 (7th Cir. 1995). Whether costs are necessary is a mixed question of law and fact. *G.J. Leasing Co. v. Union Elec. Co.*, 54 F.3d 379, 386 (7th Cir. 1995).

---

[11] *United States v. R.W. Meyer*, 889 F.2d 1497, 1503, 1506 (6th Cir. 1989); *United States v. South Carolina Recycling*, 653 F. Supp. 984, 1008-09 (D.S.C. 1984), *aff'd in part*, *United States v. Monsanto*, 858 F.2d 160 (4th Cir. 1988) (remanding for consideration of prejudgment interest question under amended statute); *United States v. American Cyanamid Co.*, 786 F. Supp. 152, 164 (D.R.I. 1992).

[12] The significance of the removal/remedial distinction is that situations calling for an urgent response are generally characterized as "removal" actions, while non-urgent situations are generally considered "remedial." *Channel Master Satellite Systems, Inc. v. JFD Electronics Corp.*, 748 F. Supp. 373, 385 (E.D.N.C. 1990).

[13] The Supreme Court has held that attorneys' fees spent identifying potentially responsible parties are recoverable as "costs of response" under CERCLA. *Key Tronic Corp. v. United States*, 511 U.S. 809, 819-20, 114 S.Ct. 1960, 128 L.Ed. 2d. 797 (1994).

The evidence will show that Von Duprin incurred costs to investigate and address vapor intrusion in commercial and residential structures that posed a threat to human health.[14] First Threaded Rod, then Von Duprin, investigated the soil, groundwater, and soil gas in the Plume Area to adequately define the extent of contamination, as required by IDEM. [Dkt. 203 at 6] The goal was to establish the exact boundaries of the Plume Area in which the concentration of the hazardous substance posed an *actual* risk to human health or the environment. [*Id.*] Testimony at trial will show that those investigations revealed unhealthy levels of TCE had entered a public park building used by children, and several private residences, in quantities that IDEM found unacceptable. Until very recently, only Von Duprin spent money to address vapor intrusion at these downgradient properties that posed a threat to human health, and Von Duprin was solely responsible for removing toxic vapors from the public park building. This is sufficient under the Seventh Circuit case law to establish that Von Duprin's response costs were necessary. *See Valbruna Slater Steel Corp. v. Joslyn Mfg. Co.*, No. 1:10-CV-044-JD, 2015 WL 8055999 at \*4 (N.D. Ind. Dec. 4, 2015) (finding defendants liable for costs incurred by plaintiff who "spent at least some money in response to a public health threat and consequently incurred some necessary costs"). At trial, the Court will hear testimony concerning the necessity of Von Duprin's actions, which will confirm the necessity of Von Duprin's response costs at the site. Von Duprin will also present expert testimony, based on thirty years' experience in supervising CERCLA-quality environmental site investigations and remedial work, that the costs Von Duprin incurred were necessary.

### 2. Von Duprin's Response Costs were Incurred Consistent with the National Contingency Plan.

The National Contingency Plan ("NCP") is a federal regulation promulgated by the USEPA that establishes criteria for performing removal and remedial actions designed to assure that a

---

[14] *See, e.g.*, Joint Trial Exhibit 1029 (JTV Hill Park Vapor Intrusion Mitigation Work Plan; Joint Trial Exhibit 1089 (IDEM Approval of JTV Hill Vapor Intrusion Mitigation Work Plan); Joint Trial Exhibit 1052 (Residential Vapor Intrusion Sampling Work Plan).

CERCLA-quality cleanup is achieved. 40 C.F.R. part 300. Under the current version of the NCP, a "private party response action" is consistent with the NCP "if the action, when evaluated as a whole, is in *substantial compliance* with the applicable requirements … and results in a CERCLA-quality cleanup." 40 C.F.R. § 300.700(c)(3)(i) (emphasis added); *Franklin Cty Convention Facilities Auth. v. Am. Premier Underwriters, Inc.*, 240 F.3d 534, 543 (6th Cir. 2001).

A person seeking to recover response costs must substantially comply with only the portion of the NCP that applies to the task being performed. Importantly, as Sam Williams will opine at trial, many NCP requirements simply do not apply in the investigation phase of a response, nor do some requirements apply in actions undertaken to remove, rather than remediate, hazardous substances from a site. Indeed, "because any clean-up proposal and, consequently, any clean-up of a contaminated site must first be preceded by an investigation of the nature and extent of contamination, such investigative and assessment costs need not be incurred in compliance with the NCP and are 'necessary.'" *CNH Am., LLC v. Champion Envtl. Servs.*, 863 F. Supp. 2d 793, 809 (E.D. Wis. 2012) (collecting Seventh Circuit district court cases which hold that "initial investigation, site-assessment, and monitoring costs are recoverable under § 107(a) of CERCLA irrespective of compliance with NCP requirements."). Most of the response costs incurred by Von Duprin to date have been purely investigative in nature and others are removal action costs necessary to address the soil gases emanating from the contaminated groundwater and entering structures on the surface. [Dkt. 136, ¶ 18] Given that NCP compliance does not apply to investigations, the majority of Von Duprin's activities to date are *per se* complaint.

At trial, Von Duprin will present evidence that releases of hazardous substances at and from the Ertel, Zimmer Paper, and Moran Properties have resulted in the expenditure of response costs to investigate, delineate, and mitigate the environmental impacts caused by the hazardous substances (including TCE, PCE, and their breakdown byproducts) that are migrating downgradient with the flow of groundwater. Von Duprin's investigative activities were undertaken to assess the nature and

extent of the contamination in preparation for selecting interim response actions to protect human health from potentially harmful vapors in their homes and a public park building. [Dkt. 136, ¶ 19] The Court will also hear testimony at trial confirming that through IDEM's participation in Von Duprin's investigation and removal activities in the Plume Area, Von Duprin's partial Remediation Work Plan was submitted for public comment, and IDEM closely monitored Von Duprin's efforts to contact affected homeowners and organizations in order to perform these necessary investigative and removal actions, in compliance with the NCP. *Haber Land Co. v. Am. Steel City Indus. Leasing*, No. 1:18-cv-04091-JMS-MJD, 2019 U.S. Dist. LEXIS 74962, *26 (S.D. Ind. May 3, 2019) (Magnus-Stinson, C.J.) (*citing favorably NutraSweet Co. v. X-L Eng'g Co.*, 227 F.3d 776, 791 (7th Cir. 2000) (finding adequate evidence of compliance with national contingency plan where "[t]he Illinois EPA approved NutraSweet's clean-up plan, and the agency monitored the progress of the remediation" and "NutraSweet remediated its property until the Illinois EPA advised it that it could stop")).[15]

## V. DEFENDANTS' AFFIRMATIVE DEFENSES

Once every element needed to impose CERCLA liability under §107(a) has been established, Defendants must prove an affirmative defense by a preponderance of the evidence to avoid CERCLA liability. The affirmative defenses available to avoid CERCLA liability are very limited and unavailable to the Defendants here.

### A. The Divisibility Defense Will Not Withstand Scrutiny at Trial.

Under CERCLA, apportionment is the term used to describe the process by which courts determine whether a PRP is jointly and severally liable for an entire site or, instead, only severally liable for a portion of the site. *Yankee Gas Servs. Co. v. UGI Utils., Inc.*, 852 F. Supp. 2d 229, 241 (D. Conn. 2012). In contrast, allocation is performed after apportionment to decide a PRP's share of liability after joint and several liability of the defendant has been established. Thus, "allocation, under § 113(f),

---

[15] Von Duprin incorporates by reference its further discussion of public agency involvement and public participation requirements from its Trial Brief. [Dkt. 181 at 17-19]

is the equitable division of costs among liable parties." *Id.* As the *Yankee Gas* court further explained, "To apportion is to request separate checks, with each party paying only for its own meal. To allocate is [to] take an unitemized bill and ask everyone to pay what is fair." *Id.* at 241-42.

In *Burlington N. & S.F.R. Co., v. United States*, 556 U.S. 599 (2009), 129 S.Ct. 1870, 173 L.Ed.2d 812 (2009), the Supreme Court addressed the issue of apportionment of harm under CERCLA for the first time. The Supreme Court adopted the standard from the Restatement (Second) of Torts that the harm should be apportioned only where "a reasonable basis for determining the contribution of each cause to a single harm" exists. *Id.* at 614.[16] A two-part test is used to decide when apportionment is appropriate. The "threshold question" is whether a *harm*, not a release, is capable of apportionment as a matter of law, and then a factual inquiry must point to a reasonable basis for apportionment.[17] Although the Court held on summary judgment that the harm at issue here is theoretically capable of apportionment, Defendants must still establish a reasonable basis for apportioning that harm among the parties at trial in order to take advantage of the divisibility doctrine. The evidence will show there is no reasonable basis for apportionment here, because (1) Dr. Love went straight to the allocation of contaminant mass with no apportionment analysis at all, and (2) Moran's secondary argument for divisibility, that it is liable only for marginal costs, also fails.

### 1. Dr. Love's Opinions Do Not Establish a Reasonable Basis for Apportionment.

Defendants have not shown that the facts point to a reasonable basis for apportionment, because the only divisibility opinion in this case is Dr. Love's. Dr. Love's opinion, as explained in Von Duprin's earlier trial brief and *Daubert* motion, fails to support a finding of divisibility:

---

[16] Until *Burlington Northern*, courts apportioned damages only four times in 160 cases. *See* Martha Judy, *Coming Full CERCLA: Why Burlington Northern is Not the Sword of Damocles for Joint and Several Liability*, 44 NEW ENG. L. REV. 249, 283 (2010). Furthermore, the first forty cases to cite *Burlington Northern* for its divisibility and apportionment analysis, not one of those courts apportioned liability among PRPs. Hopp, O'Donovan & Kline, *Four Years Later: How has BNSF Changed CERCLA Practice?*, Case 1:10-cv-00910-WCG, Dkt. 675-1, at 26 & n. 168 (2012).

[17] David Erickson and Vanessa Dittman, *CERCLA Apportionment and Allocation*, American Bar Assn., Section of Environment, Energy, and Resources, pp. 4-7 (March 21-23, 2013).

(a) The opinion is fatally flawed by the lack of critical data concerning the nature of releases at upgradient properties and Dr. Love's failure to utilize key data that was available to him, in forming his opinions;

(b) Dr. Love's testimony is not credible given his considerable backtracking both during his deposition and his post-deposition attempts to salvage his testimony through self-serving errata and an affidavit; and

(c) Dr. Love's report crucially fails to ever even mention the **harm** caused by the comingled plume, much less offer any opinion regarding the divisibility of that harm (the standard required under *Burlington Northern*), focusing instead on the undisputed presence of multiple areas of release.[18]

These issues go directly to Dr. Love's credibility and the weight (if any) his opinions should be given. The evidence at trial will show that damages should be equitably allocated among the parties, but that no reasonable basis for apportionment exists.

## 2. Moran's Marginal Cost Argument is Inapplicable.

The Court's task in allocating harm among the parties at trial will be to determine "how each party's waste affected the total cost of cleanup." Importantly, this standard establishes a range of appropriate allocation outcomes among responsible parties, <u>after</u> liability has been determined. Under *Akzo Nobel Coatings, Inc. v. Aigner Corp.*, 197 F.3d 302, 305 (7th Cir. 1999), "the increase in marginal cost" necessitated by a responsible party's release of hazardous substances establishes a <u>floor</u> for allocation of costs. *Id.* Then, the maximum amount or ceiling a party can be allocated is the "total cost [the remediating party] would have borne" had only the responsible party's contamination been placed at the site. *See id.* Note, however, that the ability for a responsible party to escape liability by claiming it did not significantly contribute to the cost of cleanup is bounded: it is only available if the party can

---

[18] Von Duprin incorporates by reference its arguments regarding Dr. Love from its Trial Brief and *Daubert* briefing. [Dkt. 181 at 20-22; Dkt. 170; Dkt. 189]

demonstrate that "its share of hazardous waste deposited at the site constitutes no more than background amounts of such substances in the environment and cannot concentrate with other wastes to produce higher amounts." *Acushnet Co. v. Mohasco Corp.*, 191 F.3d 69, 77 (1st Cir. 1999).

The instant case is similar to *Browning-Ferris Indus. of Ill., Inc. v. Ter Maat*, 195 F.3d 953, 958 (7th Cir. 1999). There, the court found it equitable to allocate cleanup costs to a responsible party in an amount that exceeded the responsible party's volumetric contribution to the contamination, because the individual pollution, though perhaps not "so serious all by itself as to have required the incurring of *all* the clean-up costs that were incurred," nevertheless did contribute to the cost of clean-up. *Id.* at 958-59. Therefore, Moran's arguments that it can avoid liability on a divisibility theory and reliance on *Ninth Avenue Remedial Group v. Allis-Chalmers Corp.*, , 2001 WL 1823815 (N.D. Ind. Aug. 30, 2001) are misplaced. *Compare Ninth Ave.*, 2001 WL 1823815 at *12-13 (holding that defendant's alleged contribution to the harm, foundry sand, did not require any cleanup and actually reduced the overall cost of the cleanup, rendering the defendant not responsible for the overall cost of remediating the harm) *with Browing-Ferris* 195 F.3d at 958-59 (reversing and remanding trial court's allocation of costs that was based solely on volumetric contribution to the contamination). Moran's releases of chlorinated solvents did not alleviate contamination or reduce the costs of remediating the comingled groundwater plume. Rather, Moran's releases, and their resulting migration into the comingled plume for decades, have concentrated with other chlorinated solvents and contributed to the overall contamination in the Plume Area, increasing the cost to remediate the comingled release.

## B. Major Defendants' Lack of Direct Involvement with Chlorinated Solvents is not a Defense.

Major claims that there is no evidence it "ever used, stored, disposed of or otherwise caused or contributed to any chlorinated solvent contamination at" the upgradient sites, and should therefore be saved from liability. Despite Major's protest to the contrary, CERCLA liability is broad enough to encompass those with indirect connections to the release of a hazardous substance including the

current owner of the facility, as this Court noted in its summary judgment order. [*See* Dkt. 203 at 3] As a result, Major Defendants must establish an affirmative defense to liability. As to the Zimmer Paper and Ertel Properties, this Court appropriately determined at summary judgment that no affirmative defense exists. [Dkt. 203 at 30-32] As to the Moran Property, Major Defendants' settlement agreement with Moran establishes an ongoing contractual relationship with the party responsible for contamination, which should take Major Defendants wholly outside the safe harbor of the third party and bona fide prospective purchaser ("BFPP") defenses to CERCLA liability for the Moran Property. [Dkt. 142 at 43]

To qualify for a third party defense, Major must satisfy the criteria set forth in section 107(b)(3) and key embedded terms that are defined in section 101(35). 42 U.S.C. §§ 9607(b)(3) & 9601(35). These criteria consist of four prongs. Prong 1 requires that the release was solely caused by a third party. Prong 2 evaluates whether there was a direct or indirect contractual relationship with the responsible third party. Prongs 3 and 4 demand action and require that Major exercise due care and take precautions in connection with the release(s). *Id.* The evidence at trial will also show that as to the Moran Property, Major Defendants entered into a settlement agreement with Moran years after purchasing the property, creating an ongoing relationship between Major Tool and Moran (the party responsible for the contamination). Given this ongoing contractual relationship, the Court should reconsider its summary judgment holding regarding Major's status as a BFPP for the Moran Property and also deny Major Defendants' third party purchaser defense as to the Moran Property. Moreover, Major Defendants' foot-dragging failure to address IDEM's demands for compliance should take it outside the safe harbor of CERCLA's innocent-landowner affirmative defenses. *See generally Kerr-McGee*

*Chem. Corp. v. Lefton Iron & Metal Co.*, 14 F.3d 321 (7th Cir. 1994) (innocent-owner defense rejected when owner failed to take precautions to prevent damage from known hazardous substances).[19]

## VI.  DAMAGES

Von Duprin seeks to recover costs it has incurred and that it will incur to investigate, monitor, and clean up the comingled groundwater plume. Von Duprin has never sought (and does not now seek) to recover any costs associated with the soil cleanup at the Von Duprin Property from Defendants. Von Duprin's recoverable costs are related solely to the investigation and cleanup of the comingled groundwater plume and the soil gas and indoor air contamination related to that plume.[20] The Court will hear testimony at trial to verify that past costs exceed two million dollars and the future costs will be millions of dollars more. To date, only Von Duprin has paid any of the costs necessary to investigate, assess, remove, and ultimately remediate the problem. Testimony and documentation will be presented to establish the amount of Von Duprin's recoverable costs and attorneys' fees under CERCLA and the ELA. Based on this evidence, the Court should award Von Duprin an equitable share of past and future response costs from both Moran and the Major Defendants.

The Court must also award prejudgment interest under 42 U.S.C. § 9607(a); *United States v. Consolidation Coal Co.*, 345 F.3d. 409, 415 (6th Cir. 2003). The statute specifies exactly when the interest begins to accrue as being "the later of (i) the date payment of a specified amount is demanded in writing, or (ii) the date of the expenditure concerned." *Id.* In this case, that date is January 13, 2017, when Von Duprin made a specific demand on Defendants in writing. With the triggering date

---

[19] Von Duprin incorporates by reference its arguments regarding BFPP and third party defense status as to the Moran Property. [Dkt. 181 at 26-28, 30-31]

[20] Von Duprin has never sought (and does not now seek) to recover any costs associated with soil remediation at the Von Duprin Property from Defendants. The response costs at issue in this case are related solely to the investigation and cleanup of a comingled groundwater plume and the soil gas related to that plume.

established, the computation of prejudgment interest only requires a determination of the amount of response costs for which the defendant is liable and the application of an appropriate interest rate.

## CONCLUSION

Defendants' CERCLA liability is clear. The task remaining for trial is to determine the amount of Von Duprin's recoverable costs and the allocation of those costs among the parties. The evidence at trial will show Defendants must bear the primary responsibility for the costs of responding to the environmental harm presented by the comingled plume.

Dated:  July 15, 2019                                Respectfully submitted,


                                                    /s/   Alexandra R. French
                                                    E. Sean Griggs (17716-49)
                                                    Alexandra R. French (32737-29)


                                                    BARNES & THORNBURG LLP
                                                    11 South Meridian Street
                                                    Indianapolis, Indiana  46204
                                                    alexandra.french@btlaw.com
                                                    sean.griggs@btlaw.com
                                                    Phone: (317) 231-7793
                                                    Facsimile:  (317) 231-7433

                                                    *Attorneys for Plaintiff,*
                                                    *Von Duprin LLC*