Vol. 5-816

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

VON DUPRIN, LLC,                        )
                                        ) Cause No.
          Plaintiff,                    ) 1:16-cv-1942-TWP-DML
                                        ) Indianapolis, Indiana
     vs.                                ) **July 31, 2019**
                                        ) 8:33 a.m.
MORAN ELECTRIC SERVICE, INC.,           )
MAJOR HOLDINGS, LLC,                    )
MAJOR TOOL AND MACHINE, INC.,           )
and ZIMMER PAPER PRODUCTS               )
INCORPORATED,                           )
                                        )      **VOLUME V**
          Defendants.                   )

**Before the Honorable**
**TANYA WALTON PRATT**

OFFICIAL REPORTER'S TRANSCRIPT OF
BENCH TRIAL

Court Reporter:              David W. Moxley, RMR, CRR, CMRS
                             United States District Court
                             46 East Ohio Street, Room 340
                             Indianapolis, Indiana  46204

PROCEEDINGS TAKEN BY MACHINE SHORTHAND
TRANSCRIPT CREATED BY COMPUTER-AIDED TRANSCRIPTION

Vol. 5-817

**APPEARANCES:**

| | |
|---|---|
| **For Plaintiff:** | Edward S. Griggs, Esq. |
| | Alexandra Robinson French, Esq. |
| | Barnes & Thornburg, LLP |
| | 11 South Meridian Street |
| | Indianapolis, IN  46204-3535 |
| | |
| **For Defendant Moran:** | Glenn David Bowman, Esq. |
| | Marc Andrew Menkveld, Esq. |
| | Stoll Keenon Ogden, PLLC |
| | Suite 1225 |
| | 201 North Illinois Street |
| | Indianapolis, IN  46204 |
| | |
| | Bruce L. Kamplain, Esq. |
| | Norris Choplin & |
| |  Schroeder, LLP |
| | Ninth Floor |
| | 101 West Ohio Street |
| | Indianapolis, IN  46204 |
| | |
| **For Defendant Major:** | Angela Pease Krahulik, Esq. |
| | Samuel B. Gardner, Esq. |
| | Ice Miller, LLP |
| | Suite 2900 |
| | One American Square |
| | Indianapolis, IN  26282-0200 |

Vol. 5-818

# I N D E X

**PLAINTIFF'S WITNESS:**                          **PAGE**

ADAM HAMILTON LOVE

Direct Examination by Mr. Griggs ..............820
Cross-examination by Mr. Bowman ...............869
Cross-examination by Ms. Krahulik .............876
Redirect examination by Mr. Griggs ............881


**DEFENDANT'S WITNESSES:**                        **PAGE**

ADAM HAMILTON LOVE

Direct Examination by Mr. Bowman ..............900
Cross-examination by Mr. Griggs ...............917
Cross-examination by Ms. Krahulik .............922
Redirect Examination by Mr. Bowman ............923

NIVAS VIJAY ARAGHAVAN

Direct Examination by Ms. Krahulik ............931
Cross-examination by Mr. Griggs ...............960
Cross-examination by Mr. Bowman ...............968
Redirect Examination by Ms. Krahulik ..........973

# I N D E X   O F   E X H I B I T S

**PLAINTIFF'S EXHIBITS:**                         **PAGE**

101 .........................................868
106 .........................................885
1209 ........................................885

**DEFENDANT'S EXHIBITS:**                         **PAGE**

603 .........................................913
614 .........................................913
615 .........................................913
619 .........................................913
620 .........................................913
621 .........................................913
622 .........................................913
623 .........................................927
624 .........................................927

Vol. 5-819

 1                    (In open court.)

 2          THE COURT:  Good morning, everyone.  We are on the

 3   record.  This is Von Duprin, LLC, plaintiff, versus Moran

 4   Electric Service, Inc., and Major Holdings, LLC, and Major

 5   Tool and Machine, Inc., defendants, who are also

 6   counterdefendants and cross defendants and counterclaimants.

 7   And we are here this morning for the continuation of our bench

 8   trial.

 9          And we'll begin by having -- since we have a new

10   court reporter, David Moxley, we'll begin by having counsel

11   state your names, lead counsel, and introduce those at your

12   table.

13          And, Mr. Griggs, I think you have the microphone, so

14   you may.

15          MR. GRIGGS:  Sean Griggs, Barnes & Thornburg, for

16   Von Duprin; Alex French, also Barnes & Thornburg; Gladys

17   Thomas.

18          THE COURT:  The corporate representative?

19          MR. GRIGGS:  That's correct.

20          THE COURT:  Okay.  And at our defendants' table?

21          MR. BOWMAN:  Good morning, Your Honor.

22          THE COURT:  Good morning.

23          MR. BOWMAN:  Glenn Bowman, Stoll, Keenon and Ogden,

24   on behalf of Moran Electric Service; Marc Menkveld of Stoll,

25   Keenon and Ogden, also; Bruce Kamplain, Norris, Choplin &

*LOVE – DIRECT/GRIGGS*                 Vol. 5-820

1  Schroeder, for Moran Electric.  Thank you.

2           THE COURT:  Thank you.

3           And on behalf of the Major defendants?

4           MS. KRAHULIK:  Good morning, Your Honor.  Angela

5  Krahulik, Ice Miller, LLP, on behalf of the Major defendants,

6  along with Sam Gardner, also of Ice Miller.  And we are

7  accompanied by Natalie Weir, who is the CFO of Major Tool and

8  Machine.

9           THE COURT:  Okay.  Good morning.

10          All right.  So, Mr. Griggs, I see this is your first

11 witness of the day?

12          MR. GRIGGS:  Yes, Your Honor.

13          THE COURT:  All right.  Sir, would you please stand

14 and raise your right hand to be sworn.

15          (The witness is sworn.)

16          THE COURT:  You may have a seat.

17          And, Mr. Griggs, you may examine your witness.

18      **ADAM HAMILTON LOVE, PLAINTIFF'S WITNESS, SWORN**

19                  **<u>DIRECT EXAMINATION</u>**

20 BY MR. GRIGGS:

21 Q.  Good morning.

22 A.  Good morning.

23 Q.  Please state your name for the record.

24 A.  Adam Hamilton Love.

25 Q.  And who is your current employer?

*LOVE – DIRECT/GRIGGS*                    Vol. 5-821

1  A.  Roux Associates, Inc.

2  Q.  Which office or city of Roux Associates?

3  A.  The office that's at Oakland, California.

4  Q.  And what is your current position or title?

5  A.  Principal scientist and vice president.

6  Q.  Could you briefly describe your educational background?

7  A.  Sure.  I have an undergraduate in geoscience from Franklin

8  & Marshall College.  I have a master's degree from the

9  University of California at Berkeley in material science and

10  mineral engineering.  I have a Ph.D. from the University of

11  California at Berkeley in environmental engineering.

12  Q.  And, as you are a Ph.D. holder, if we refer to you as

13  "Dr. Love" today, is that okay?

14  A.  That's fine.

15  Q.  What percent of your work involves acting or serving as an

16  expert witness?

17  A.  Approximately 70 percent.

18  Q.  And what do you do the other 30 percent of your work time?

19  A.  I have other clients that do traditional environmental

20  site assessment, site remediation, as well as work that I do

21  for the federal government doing forensics for them.

22  Q.  What are your areas of expertise?

23  A.  I do a lot of different things for different types of

24  clients, but it's generally focused around areas of site

25  assessment and remediation, environmental forensics, which

*LOVE – DIRECT/GRIGGS*                Vol. 5-822

1  typically is understanding the source, the timing, and the

2  allocation of contribution of contaminants.  I do modeling

3  groundwater and air modeling.  I've done assessment of

4  occupational exposure and resident exposure, chemical

5  fingerprinting.

6  Q.  I believe in our discussion at your deposition, perhaps

7  also in your expert report, there were some additional areas,

8  there was quite a long list of expertise.  What about the area

9  of engineering?

10 A.  I'm not a professional engineer, but I'm involved in

11 engineering projects.

12 Q.  You consider yourself an expert in that area?

13 A.  It depends on the type of engineering you're talking

14 about.  Engineering is a pretty broad topic.

15 Q.  What about the area of geology?

16 A.  Yes.

17 Q.  Hydrogeology?

18 A.  Yes.

19 Q.  Chemistry?

20 A.  Yes.

21 Q.  And I believe you mentioned several things that might

22 cover this, but what about fate and transport?

23 A.  Yes.

24 Q.  Who is your client in this case?

25 A.  Moran Electric.

LOVE – DIRECT/GRIGGS                    Vol. 5-823

1  Q.  When were you retained to work on this case?

2  A.  I believe in 2016.

3  Q.  Do you remember what part of the year?

4  A.  Not off the top of my head, no.

5  Q.  Could it have been March or April of 2017?

6  A.  It could have been.  It may have been when the retention

7  was.

8  Q.  What's the difference between your memory of 2016 and

9  being retained in the spring of 2017?

10  A.  It may have been that there were earlier conversations,

11  but the retention may not have happened until 2017.

12  Q.  Okay.  Did you prepare an expert report in this case?

13  A.  I did.

14  Q.  And did you give a deposition in this case?

15  A.  I did.

16  Q.  After the deposition, did you submit an errata letter with

17  changes to your deposition testimony?

18  A.  I did.

19  Q.  Did you also prepare a post-deposition affidavit in this

20  case, or declaration?

21  A.  I did.

22  Q.  Do you know how much you've been paid so far to work on

23  this case?

24  A.  I haven't totaled the invoices as of recently.

25  Approximately $90,000.

*LOVE - DIRECT/GRIGGS*                    Vol. 5-824

1  Q.  Have you done any work since the time of your deposition

2  on this case?

3  A.  Yes.

4  Q.  What things have you done?

5  A.  I've gone back and rereviewed some of the data tables.

6  I've gone back and rereviewed a number of the technical

7  reports on the site and just sort of went back and checked and

8  reaffirmed that everything was as I expected.

9  Q.  Did you review the transcript of the deposition that you

10  had given?

11  A.  I did.

12  Q.  And you prepared the errata sheet?

13  A.  I did.

14  Q.  And did you do additional calculations, the results of

15  which were reported in that errata sheet?

16  A.  I did do some simple calculations, yes.

17  Q.  And you did prepare an affidavit or declaration?

18  A.  I did.

19  Q.  Did you prepare to testify at trial today?

20  A.  I did.

21  Q.  So if you testified at your deposition, which was in June

22  of 2018, over a year ago, that at that time you had spent 80

23  to $90,000, is it accurate to say that, as of today, you

24  believe you've still spent $90,000?

25  A.  It may have been maybe 10,000 more than that, maybe up to

*LOVE - DIRECT/GRIGGS*                    Vol. 5-825

 1  $100,000, but not much more than that.

 2  Q.  I think there are some points of agreement between Von

 3  Duprin and you.  I would like to see if we can establish where

 4  we agree.

 5          What are the contaminants of concern in the plume

 6  area, the area that's affected by this case?

 7  A.  Chlorinated solvents and their degradation products.

 8  Q.  And can you be specific about which chlorinated solvents

 9  those are?

10  A.  Sure.  PCE, TCE, DCE, and vinyl chloride.

11  Q.  Are those chlorinated compounds naturally occurring or are

12  they man-made?

13  A.  Those are man-made.

14  Q.  In your expert report, did you divide the plume area into

15  two parts, upgradient and downgradient?

16  A.  I did.

17  Q.  And did you calculate a percentage of the total

18  chlorinated solvent mass that was solely related to the

19  upgradient portion of that plume area?

20  A.  I did.

21  Q.  And do you recall what amount of that upgradient CVOC mass

22  you attributed to Von Duprin?

23  A.  Of the upgradient mass, 0 percent.

24  Q.  You see, we agree about a lot of things.

25          Did you also reach an opinion that the upgradient

*LOVE - DIRECT/GRIGGS*                    Vol. 5-826

1   sources contributed some chlorinated solvent mass to the

2   downgradient area?

3   A.  I did.

4   Q.  And did you include in your report some information

5   regarding the operations of various sites, both upgradient and

6   downgradient, that spanned many decades going back to the

7   1890s?

8   A.  I did.

9   Q.  Did you also, in your report, indicate that the

10  contaminants released at the former Ertel, former Zimmer

11  Paper, and former Moran sites have traveled in the groundwater

12  to the former Von Duprin site and beyond?

13  A.  Yes.

14  Q.  I want to talk for just a minute about the mechanics of a

15  contaminant release.

16          If we start with a spill or a release to soil, what

17  happens to that contamination over time?

18  A.  So over time, gravity will initially pull the liquid

19  through the unsaturated soil down to the groundwater table.

20  If there's enough momentum or driving force to get it, it will

21  go into the groundwater table.  And then if it goes in as a

22  separate liquid, it will -- in the case of these solvents, it

23  will sink to the bottom of the aquifer and then slowly

24  dissolve into the water over time.

25  Q.  As it -- as the contaminant is migrating downward through

*LOVE - DIRECT/GRIGGS*                    Vol. 5-827

1   the soil, will some of it absorb to the soil matrix?

2   A.  Yes.

3   Q.  And if, as you say, there's enough driving force and some

4   reaches groundwater, will the contaminant that reaches

5   groundwater begin to move in the direction the groundwater

6   moves?

7   A.  Yes.

8   Q.  And in the case of chlorinated solvents, is it possible

9   that some of the molecules will dechlorinate if the conditions

10  allow?

11  A.  Yes.

12  Q.  Did you express any opinion in this case regarding what

13  would be an appropriate final remedy for the groundwater?

14  A.  No.

15  Q.  Did you express any opinion regarding what the cost would

16  be for a groundwater remedy?

17  A.  No.

18  Q.  And did you express any opinion regarding the potential

19  risk of vapor intrusion associated with a commingled plume?

20  A.  No.

21  Q.  Do you recall that during your deposition, you were asked

22  whether or not you had used all of the data in performing your

23  analysis?

24  A.  I remember that, yes.

25  Q.  And do you remember what you answered, initially?

*LOVE - DIRECT/GRIGGS*                    Vol. 5-828

1  A.  I answered yes.

2  Q.  And you were asked that question a second time, and what

3  did you answer the second time?

4  A.  I believe I answered yes.

5  Q.  And there was a third time -- we had a long deposition, as

6  I recall -- and you also answered yes?

7  A.  Right.

8  Q.  But at a later point, still during the deposition, you had

9  to change that testimony; is that correct?

10 A.  No, I didn't change it.

11        MR. BOWMAN:  Objection, argumentative.  If you want

12 to impeach him, pull out the deposition.  Ask him a question.

13 It's argumentative.

14        THE COURT:  I'll overrule.  And the witness said no.

15 He can explain.

16        You may explain, witness.

17 A.  No.  I don't believe it was that I didn't use all the

18 data.  I believe the conversation was about how I used a

19 subset of the data for a particular analysis.  But in my

20 overall evaluation, I looked at all of the data, but I didn't

21 use every single data point for every calculation that I

22 performed.  That wouldn't have made sense.

23        THE COURT:  Okay.  Thank you.

24 BY MR. GRIGGS:

25 Q.  So there were some specific samples, I believe, that

LOVE - DIRECT/GRIGGS                    Vol. 5-829

1  involved soil samples, which had been taken at a depth greater

2  than ten feet.  Do you recall that?

3  A.  No.  It was depths less than ten feet.

4  Q.  Okay.  I'm talking about the samples that were not part of

5  the analysis.  Let me ask the question a different way.

6          During the deposition, we were trying to understand

7  what data had gone into your calculations.  And as it --

8  ultimately, at page 179 and page 180 of the deposition

9  transcript, we finally learned what there were, what were in

10  your soil database, samples from depths greater than

11  10 percent -- sorry -- ten feet that you indicated had -- you

12  had excluded from the soil analysis because of their depth.

13  Do you recall that?

14  A.  That's right.  Those were samples at groundwater depths

15  and so I only used soils that were unsaturated for my soil

16  analysis.

17  Q.  And what was the demarcation in your mind between

18  saturated and unsaturated soil samples?

19  A.  The 10-foot depth.

20  Q.  And do you recall that in your deposition, you also

21  testified about how data points from a single boring were used

22  in your calculations?

23  A.  I do.

24  Q.  And during the deposition, we all thought, I think, that

25  you had used an average for each boring; is that correct?

*LOVE - DIRECT/GRIGGS*                    Vol. 5-830

1  A.  That's right.

2  Q.  And that was the reason for your errata letter?

3  A.  That was.

4  Q.  And what was the change that the errata letter indicated

5  was needed?

6  A.  After the deposition, when I went back and looked at my

7  analysis, instead of actually using the average for the soil

8  concentrations, I had used the max soil concentrations in

9  order to perform the calculations.  That didn't affect

10 88 percent of the locations.  And even the ones that it did

11 affect, it didn't change the answer.  But I wanted to make

12 sure and be precise that the number that was used in the

13 calculations, in case somebody wanted to repeat them, wasn't

14 the average, but instead it was the max value.

15 Q.  And the question of whether you used an average number for

16 the boring had apparently come up several times in the

17 deposition.  I believe you in your errata letter found four

18 times in the deposition where you had testified that you used

19 the average and wanted to change that to say I actually used

20 the maximum concentration from the boring; is that correct?

21 A.  That's right.  We had done it both ways, leading up to

22 writing the report.  I just got it stuck in my head as to

23 which one we ended up with.

24 Q.  I guess the question that I want to give you the chance to

25 explain is:  Having spent $90,000 at the time of your

*LOVE - DIRECT/GRIGGS*                    Vol. 5-831

1  deposition, how was it that you were not aware of how you had

2  handled the data that led to your opinions?

3  A.  Well, like I had said, we had done the calculation both

4  ways.  It didn't make a substantive difference in the outcome.

5  For $90,000, we actually performed quite a few different types

6  of analyses.  And ultimately, it was a simple mistake that was

7  nonsubstantive.

8  Q.  And who is the we that you're referring to?

9  A.  I work with a team of people in my office.  In this case,

10  there was Walt McNab and Rachel Maxwell, who both supported

11  this project.

12  Q.  The demarcation that we talked about of soil below 10 feet

13  being excluded, what was the rationale for excluding that from

14  the soil data set?

15  A.  The rationale to exclude it is, what I wanted to do -- the

16  idea of looking at the soil data was to associate the

17  magnitude of the release impacts to the location that was

18  above it.  And while it's in the soil, it still has the right

19  geographic location to where the release point likely was.  In

20  the groundwater, because there is horizontal movement, as we

21  talked about earlier, when you look at concentrations that are

22  exposed to the groundwater, what you can see could be from

23  another location that has transported to that site.  And so

24  the rationale was, if we wanted to make an association between

25  what the magnitude of the release was, you really could only

*LOVE - DIRECT/GRIGGS*                    Vol. 5-832

1  rely on the soil in order to not confuse what came from

2  another location.

3  Q.  Okay.  I guess my question is:  What was the basis for

4  deciding that 10 feet was the delineation point between the

5  two?

6  A.  There's a number of reports from different sites that all

7  report groundwater elevations that are generally between 10

8  feet and 15 feet, with most of them really being between sort

9  of 11 and 13 feet, and so I chose 10-foot as sort of a

10 demarcation that reflected multiple sites over multiple years.

11 Q.  Okay.  And so the reports that you're referring to, are

12 those specifically mentioned in your report, the ones that you

13 used?

14 A.  I don't believe I specifically referenced them in the

15 report, but the Geosyntec 2017 report has it, the Mundell

16 report from 2008 has it, the -- it starts with a W.  I forget

17 what that consultant is.  They have two reports from -- hold

18 on.  I can look up what the --

19         Oh, Heartland.  Sorry.  Heartland has a 2011 and

20 2012 report that each all show groundwater elevations in that

21 area.

22 Q.  And for the record, before completing that answer, you

23 referred to your expert report in this case; is that correct?

24 A.  I did.

25 Q.  You mentioned the final investigation report by Geosyntec

*LOVE - DIRECT/GRIGGS*                    Vol. 5-833

1  of 2017.  I believe that says that the depth to groundwater

2  across the plume area ranges between 11 and 16 feet.  Is that

3  consistent with your memory?

4  A.  It is.

5  Q.  And did you -- what did you do to determine what the

6  groundwater -- depth of the groundwater was at the Moran site

7  specifically?

8  A.  One of the Heartland reports, I believe, is of the Moran

9  site.  I would have to go back and look at whether it was 2011

10 or 2012, but I believe there were groundwater elevations at

11 the Moran site from that report.

12 Q.  And what do you believe those groundwater elevations were?

13 A.  In that same range that I described.

14 Q.  But you don't remember a specific number?

15 A.  I have not put it to memory, no.

16 Q.  If the Heartland report indicated saturated conditions at

17 15 feet, would that be inconsistent with your recollection?

18 A.  No.  I believe what I said was that most of the elevations

19 were between 10 and 15 feet.

20 Q.  Okay.  What I'm trying to get at is:  What were they

21 specifically at the Moran site?

22 A.  I would have to go back to the report to see specifically

23 what was reported.

24 Q.  We'll let the report speak for itself.

25          If it was 15 feet to the groundwater, is there a

*LOVE - DIRECT/GRIGGS*                    Vol. 5-834

1  reason you couldn't have used a soil data point from 11 feet?

2  A.  Well, there -- like I said, across the whole region, the

3  groundwater levels were measured between 1,015 feet.  Just

4  because at one point in time it was measured at 15 feet

5  doesn't mean that it was always at 15 feet.  The idea was to

6  capture the depth which groundwater had -- you know, wouldn't

7  have essentially cross contaminated it.

8  Q.  And what I want to understand is:  What did you do to

9  determine whether that fluctuation existed at the Moran site?

10 A.  I mean, these sites are pretty close together.  And so

11 when you look at the fluctuations from, you know, 100 feet

12 away, 200 feet away, there's no reason to think that

13 fluctuation wouldn't be reflected in the site adjacent to it.

14 That's just -- groundwater typically fluctuates together on

15 that sort of scale.

16 Q.  Is that an assumption based on your experience or are you

17 thinking of a specific report that you read in this case?

18 A.  I'm not sure what you're referring to.

19 Q.  You said that they're close together; they tend to be

20 similar if they're close together.  And I was trying to

21 understand whether you were saying that, based on your

22 experience, that's what you have seen, or is there something

23 in a report in this case that led you to believe that the

24 groundwater elevations between sites would be about the same?

25 A.  Well, so, I know the sites are close together because I

1  have maps and I've been to the sites, so I know they're close

2  together from having been there.  In terms of groundwater

3  fluctuating together as a single -- I mean, that's my

4  experience doing hydrogeology and as a geologist and having

5  looked at hundreds and hundreds of sites with groundwater

6  elevation and looking at how they fluctuate over time.

7  Q.  Okay.  Did you look at the underlying geology for the

8  sites in this case?

9  A.  I have looked at the underlying sites and the geology

10  where that's available, yes.

11  Q.  Okay.  And so you reviewed boring logs from the various

12  sites?

13  A.  Some of them.

14  Q.  And do the boring logs typically reflect the depth at

15  which they encounter groundwater?

16  A.  Sometimes they do and sometimes they don't.

17  Q.  Can you think of a single report in this case where that

18  wasn't shown on a boring log?

19  A.  I couldn't recall every boring log as I'm sitting here.

20  Q.  What about the laboratory reports themselves, did you look

21  at the laboratory results for any of the soil samples below 10

22  feet in depth for things like the moisture content?

23  A.  No.

24  Q.  I believe that you said that one of the bases for

25  excluding the soil matrix samples that were taken deeper than

*LOVE - DIRECT/GRIGGS*                    Vol. 5-836

1  10 feet is that they were suspect, your words.  Do you recall

2  that?

3  A.  Yes.

4  Q.  And what I want to know is:  Would further review of the

5  available reports and/or -- by reports, I mean the laboratory

6  reports -- have given an indication of whether the conditions

7  that were suspect were actually present?

8  A.  No.  They wouldn't have helped me determine whether or not

9  the sample itself was suspect, because, again, at the time of

10 the sampling, whether it was fully saturated or not doesn't

11 mean that, with the fluctuating groundwater table, it hadn't

12 been saturated previously and had stuff transported

13 horizontally from another location.  I mean, you start to get

14 into a gray area where you just can't trust, if you got a

15 number, that that number was actually from the site above it.

16 Q.  Are you aware that at each of the upgradient sites that a

17 soil excavation occurred?

18 A.  Yes.

19 Q.  And the details about those excavations are from the

20 reports that you read in this case?

21 A.  Yes.

22 Q.  And those are reflected in your expert report, those

23 details?

24 A.  Yes.

25 Q.  The volume, tonnage that was removed, those sorts of

*LOVE - DIRECT/GRIGGS*                    Vol. 5-837

1  things?

2  A.  That's right.

3  Q.  And I believe that you have indicated that, in your

4  opinion, there is sufficient pre-excavation data on which to

5  base your opinions in this case?

6  A.  There's a lot of data in this case.  I mean, this data has

7  more soil samples than most sites that I work on.  And so in

8  terms of samples of native soil, including pre-excavation, as

9  well as samples that were taken of native soil during the

10 excavation process, there's plenty of data in order for me to

11 do the analysis that I needed to do.

12 Q.  Okay.  Do you know how deep the excavation was on the

13 Moran property?

14 A.  You know, I'd want to go back to the report to look at it

15 specifically, but I believe it might have been down to 15

16 feet.

17 Q.  Okay.  And that would be one of the Heartland reports of

18 either 2011 or 2012?

19 A.  I believe that's right.

20 Q.  If you dig a hole, excavate soil deep enough that you

21 reach the groundwater table, what will happen in the hole?

22 A.  Water will start to flow into the hole.

23 Q.  Do you recall anything in either of the Heartland reports

24 indicating that water infiltrated the excavation?

25 A.  It may not be the Heartland report from 2011 or 2012 that

*LOVE - DIRECT/GRIGGS*                    Vol. 5-838

1   has the excavation details.  I'd want to go back and check.  I

2   don't specifically remember them talking about dewatering the

3   excavation, but I would need to go back in order to see

4   whether or not there was any specific details along that line.

5   Q.  Okay.  And you also are aware that there was an excavation

6   at the Ertel site?

7   A.  Yes.

8   Q.  And that was done by a different environmental consultant

9   but by the same individual?

10  A.  That's my understanding.

11  Q.  He switched companies; right?

12  A.  Yes.

13  Q.  And does that report, to your recollection, indicate that

14  they did, in fact, have to remove 20,000 gallons of water that

15  infiltrated the excavation?

16  A.  I don't recall that, but I hadn't been looking for that

17  information.

18  Q.  And you don't recall what the depth of that excavation

19  was?

20  A.  Not off the top of my head, no.

21  Q.  In performing your analysis in this case, one of the

22  things that you ultimately did was to compare the total

23  chlorinated solvent mass between the various source

24  properties; is that correct?

25  A.  Yes.

*LOVE - DIRECT/GRIGGS*                    Vol. 5-839

1  Q.  And which data did you use to accomplish that part of your

2  analysis?

3  A.  So I separated between the upgradient properties and the

4  downgradient plume using groundwater data.  And then from

5  that, you could see the specific impact of the Von Duprin

6  property on the downgradient plume.  And so the groundwater

7  data was used to separate Von Duprin's contributions to the

8  groundwater plume from the upgradient parties.  And then in

9  the upgradient area, I used the groundwater data for two very

10 small areas, the north part of the Ertel site and the Zimmer

11 building.  So I used the groundwater data for there.  And then

12 the soil data is what I used in order to apportion between the

13 Zimmer Paper, the Ertel, and the Moran site.

14 Q.  Okay.  Which came first, the separation between upgradient

15 and downgradient using groundwater data or the evaluation of

16 the three upgradient properties' contribution?

17 A.  Process-wise, the first was to divide between the

18 downgradient/upgradient and then to identify Von Duprin's

19 contribution to the downgradient plume.

20 Q.  And I believe in your expert report, you have a diagram

21 that indicates what area is considered upgradient and what

22 area is considered downgradient.  Is my memory correct?

23 A.  I do.

24 Q.  And it may, in fact, be repeated a couple of times.

25          I'm looking at figure 3-1.  Is that reflective -- it

*LOVE - DIRECT/GRIGGS*                          Vol. 5-840

1    has a dotted line that says "upgradient plume"; and under the

2    line, it says "downgradient plume"?

3    A.  Yes.

4    Q.  Is there a better diagram in your report that you would

5    look to for that separation?

6    A.  B-1 is the other one that specifies the upgradient, and

7    then everything down from there is the downgradient area.

8    Q.  That was B, as in boy, 1?

9    A.  Yeah.

10          But I actually think figure 3.1 is a better one,

11   yeah.

12   Q.  Okay.  And it looks to me that you've identified a

13   particular boring location, TRMW9DD, as kind of the corner

14   point; is that correct?

15   A.  That's correct.

16   Q.  And if I understand the analysis, you're saying that you

17   were able to use groundwater data to determine how much of the

18   plume is in the downgradient area and how much is in the

19   upgradient area; is that correct?

20   A.  From a total mass, yes.

21   Q.  Total CVOC mass?

22   A.  That's right.

23   Q.  And just -- that result is actually shown on a table a

24   couple of pages before figure 3.1, correct; actually, the page

25   right before, table 2?

*LOVE - DIRECT/GRIGGS*                    Vol. 5-841

1  A.  That's right.

2  Q.  And that's also the table that indicates that for the

3  upgradient source areas, Von Duprin gets a zero?

4  A.  That's right.

5  Q.  Okay.  Tell me, if you can, in layman's terms, what you

6  did to come up with the upgradient percentage and the

7  downgradient percentage.

8  A.  So the four constituents that we talked about, PCE, TCE,

9  DCE, and vinyl chloride, were all averaged and summed at each

10 location, and then the mass that was in the hole plume was

11 integrated to calculate what the total mass would be in the

12 upgradient area and in the downgradient area.  And then the

13 relative amount of mass was compared to get the division

14 between 13 percent upgradient and 87 percent downgradient.

15 Q.  And the concentrations that you mentioned, were those from

16 specific borings or did you use the entire upgradient set of

17 borings to determine that concentration?

18 A.  So all of the upgradient groundwater data was used for

19 those calculations.

20 Q.  And you mentioned a word, that you integrated them.  Can

21 you explain what that means?

22 A.  Yeah.  So in environmental science, you have lots of data

23 opinions, but you have to be able to interpolate in between

24 data points to sort of say:  Here's what we think the

25 concentration is in between these areas where we have known

*LOVE - DIRECT/GRIGGS*                          Vol. 5-842

1  concentrations.  And so we typically do that by drawing

2  contours of lines that are -- instead of the same

3  concentration.  And then based on that, you can take the

4  blocks of different concentrations and sum them up throughout

5  the entire plume in order to get the total amount of mass

6  that's in that hole shape that is the plume.

7  Q.  In order to go from a concentration value -- and I think

8  you said you averaged time and depth average, CVOC

9  concentrations?

10  A.  That's right.

11  Q.  To go from that concentration to a mass number, don't you

12  need a volume?

13  A.  So in this case because --

14  Q.  Yes or no?

15  A.  If you wanted to get a volume, you would need a volume --

16  if you wanted to get an actual mass number, you would need a

17  volume.

18  Q.  And now please explain how that works.

19  A.  And so what -- because we were essentially time and depth

20  averaging all the points, we got essentially a mass per unit

21  depth as the unit in our calculation.  You could easily

22  translate that into a mass just by doing the calculation of

23  what you wanted to assume the depth was.  But in terms of the

24  actual mathematics, the units themselves are not strictly a

25  mass; they're a mass-per-unit depth.

*LOVE - DIRECT/GRIGGS*                    Vol. 5-843

1  Q.  So was it necessary to actually convert the concentrations

2  into mass or were you able to not have to go through that step

3  in the calculation?

4  A.  Because I was just looking for a relative contribution, I

5  didn't need to go through that step.

6  Q.  And since we're talking about groundwater only, you used

7  all of the upgradient groundwater data.  Did you also use all

8  of the downgradient groundwater data in determining that

9  value, the contribution from that area?

10  A.  I did.

11  Q.  The number that you calculated that's based on all of the

12  groundwater data, apparently, both upgradient and

13  downgradient, it was as accurate as you could make it based on

14  the data you had?

15  A.  I believe so, yes.

16  Q.  And the data set, there are a few outliers, but I believe

17  that the bulk of the data comes from the time period from 2005

18  to 2017; is that consistent with your recollection?

19  A.  Yes.

20  Q.  And what we don't have is data from earlier time periods?

21  A.  That's right.

22  Q.  And so I guess the question is:  Does your division

23  between upgradient and downgradient reflect the conditions now

24  or do they somehow reflect historical conditions?

25  A.  No, they would reflect conditions that include now,

*LOVE - DIRECT/GRIGGS*                    Vol. 5-844

1  because we have data up until recent.  It would also include

2  data that's a little bit older.  But the presumption is, and

3  based on the operations, that, you know, these releases

4  happened a fair amount of time ago and that this plume, for

5  the most part, appears to be fairly stable.  And so I don't

6  think there's been a dramatic change in the extent and

7  magnitude of the contamination over that 10-year period.

8  Q.  Okay.  So within the range of the data, 10 or 12 years,

9  whatever it is -- I think 2005 to 2017.  It might be 12 or 13

10 years -- you think it's representative of that entire period,

11 given the stability of the plume and, you know, the variations

12 over time?

13 A.  I think it's a reasonable representation of how much --

14 the relative proportions.

15 Q.  And the data that you used, particularly in the upgradient

16 area, included groundwater data that was taken after the soil

17 excavations had occurred at the upgradient properties?

18 A.  Yes.

19 Q.  And did those excavations have an effect on the

20 groundwater data?

21 A.  Not an observed one.

22 Q.  Okay.  Is that a function of time, they hadn't had time,

23 or that typically removing source mass doesn't have an effect

24 on groundwater?

25 A.  Well, it depends on the situation.  At these locations,

*LOVE - DIRECT/GRIGGS*                    Vol. 5-845

 1  there appears to be fairly significant releases at each of the

 2  upgradient locations, to the point that there was separate

 3  phase solvent that made it into the groundwater.

 4           While removing the soil mass is obviously a good

 5  thing to do, in terms of the groundwater, most of what its --

 6  most of what's getting into the groundwater is likely from the

 7  solvent that's in the groundwater itself, more so than what's

 8  coming -- continuing to sort of come down from the soil above.

 9  And so, because there's this source of solvent in the

10  groundwater itself, you wouldn't necessarily expect a

11  significant change in the groundwater in the upgradient area.

12  Q.  Okay.  And so if the upgradient groundwater sampling data

13  set, the entire data set, reflects a certain percentage of the

14  total chlorinated solvent mass, as in the upgradient area,

15  what did you do to account for the fact that when the

16  contamination reached the groundwater, it began moving

17  downgradient towards the downgradient area?

18  A.  I gave a portion of the CVOC allocation to upgradient

19  parties in the downgradient area that were proportional to

20  what their contribution was in the upgradient area.

21  Q.  So relative to one another, my understanding, that the

22  ratio of mass contribution between the three upgradient

23  properties in the upgradient area is the same ratio I would

24  see in the downgradient area between those same three sources?

25  A.  That's right, whatever was not assigned to the Von Duprin

*LOVE - DIRECT/GRIGGS*                    Vol. 5-846

1  property.

2  Q.  How did you determine how much mass in the downgradient

3  area was reflective of chlorinated solvent mass that had moved

4  from the upgradient sources?

5  A.  I essentially assigned all of it that wasn't -- that I

6  didn't directly attribute to Von Duprin.  All of the rest was

7  assigned to the upgradient parties.

8  Q.  So in the case of the downgradient area, you started with

9  Von Duprin and did a calculation or set of calculations to

10 determine their contribution, and whatever didn't come from

11 Von Duprin came from the upgradient sources?

12 A.  That's right.  And other lines of evidence supported that

13 that was a reasonable approach.

14 Q.  Okay.  We're here.  I might as well talk about it.  Tell

15 me about the calculation you did for the Von Duprin site and

16 how you determined how much contribution it was making to the

17 groundwater.

18 A.  So when you look at the groundwater concentrations and how

19 they change as you move from upgradient to downgradient, right

20 at the upgradient boundary of the Von Duprin property, both

21 the magnitude of the concentration, as well as the chemical

22 characteristics, change dramatically.  The concentration goes

23 up a factor of five and the concentrations change from being

24 TCE dominated to PCE dominated.  So that was a clear

25 indication, step one, that there was divisibility that you

*LOVE - DIRECT/GRIGGS*                    Vol. 5-847

1  could achieve just by looking at those things between Von

2  Duprin and the upgradient parties.

3           In order to calculate what that contribution was,

4  the PCE, at that point, because there was no upgradient -- no

5  real upgradient contribution, the PCE was entirely

6  attributable to the Von Duprin property.

7           And then there was also excess TCE that you saw when

8  you -- when the plume reached the Von Duprin property, and so

9  we used the ratio of PCE and TCE that was in the shallow soil

10 of the Von Duprin property to attribute or assign both the PCE

11 and the relative -- you know, comparable proportion of TCE

12 that was seen in the overlying soil.  When you do that, it

13 turns out the amount of TCE that's left looks just like what

14 was coming in from the upgradient property.  So that affirmed

15 that that approach was reasonable and physically consistent

16 and fit together in a coherent conceptual site model.

17 Q.  Okay.  So the calculations that you did ended up in a

18 table, I believe.  In your report table 1, is that where the

19 results would be found that you've just described?

20 A.  Table 1 is the actual specific concentrations of TCE, PCE,

21 DCE, and vinyl chloride, upgradient of -- immediately

22 upgradient of the Von Duprin property and then as you get to

23 the area where the contamination jumps up on the Von Duprin

24 property.

25 Q.  And in looking at this table, it's split into two parts,

*LOVE - DIRECT/GRIGGS*                    Vol. 5-848

1  upgradient and downgradient; correct?

2  A.  Yes.

3  Q.  And that for each of those parts, there's an average line.

4  Do you see that?

5  A.  Yes.

6  Q.  And is that the simple arithmetic average of the numbers

7  in the table above it?

8  A.  Yes.

9  Q.  So if there are one, two, three, four, five, six, seven,

10 eight, nine samples in the upgradient area, if you sum those

11 up and divide by 9, I should get what's at the bottom of the

12 column?

13 A.  Yes.

14 Q.  And because this is titled "time and depth averaged CVOC

15 concentrations and micrograms per liter," does each location

16 reflect a number of samples from that location?

17 A.  Yes.

18 Q.  And that's the average number?

19 A.  That's right.

20 Q.  And how did you select the locations that are shown in the

21 upgradient portion of this table?

22 A.  These are all of the groundwater monitoring locations that

23 are immediately upgradient.

24 Q.  Immediately upgradient of that corner point, MW9DD?

25 A.  That's right.

*LOVE - DIRECT/GRIGGS*                    Vol. 5-849

1  Q.  Okay.  And they happen to all be on the Von Duprin

2  property; is that correct?

3  A.  I believe that's correct.  Yeah, I believe that's correct.

4  I believe they're all on the Von Duprin property.

5  Q.  Several of the samples indicated here in this upgradient

6  section have similar identification tags.  I'm looking

7  particularly at TRMW6, TRMW6D.

8          THE COURT:  Now, counsel, it would be nice if I

9  could see what you're looking at, because I don't know what --

10          MR. GRIGGS:  Since they had given the witness a

11  copy, I assumed they had given you one, but --

12          THE COURT:  No.

13          MR. GRIGGS:  Here you go.  Sorry about that.

14          THE COURT:  All right.

15          And where are we?  What page are we on?

16          MR. GRIGGS:  We're on table --

17          THE WITNESS:  21 of the report, page 21.

18          THE COURT:  All right.  For the record, the parties

19  have -- well, for the record, Mr. Griggs has provided the

20  Court a copy of the expert report of Dr. Adam H. Love.

21          All right.  Page 21.  Thank you.

22  BY MR. GRIGGS:

23  Q.  So we're looking at three particular entries on table 1 at

24  the top, TRMW6, TRMW6D, TRMW6DD.  Do you see that?

25  A.  Yes.

*LOVE - DIRECT/GRIGGS*                    Vol. 5-850

1  Q.  What is the relationship between those three sampling

2  points?

3  A.  I believe those are nested wells.

4  Q.  Okay.  And what is a nested well?

5  A.  Wells at the same location that are -- essentially at the

6  same that are taken at different depths, the groundwater at

7  different depths.

8  Q.  So if we're using time and depth average, CVOC

9  concentrations, why didn't you average 6, 6D, and 6DD?

10 A.  Yeah.  I mean, I could have.  It obviously wouldn't have

11 changed the numbers at all in terms of the average of the

12 average.  But the -- you know, they're essentially separate

13 wells, right, because they're just nested, and so I could have

14 averaged them; I could have kept them separate.  It doesn't

15 change at all what the concentrations are.

16 Q.  So you don't consider that having those three separate

17 changed your average line in any way?  The average would have

18 been the same?

19 A.  Let's see.  Six has a value of 4.  6D has a value of zero.

20 6DD has a value of 22.

21         By having those numbers in three times, it would

22 bring the average of the nine samples down a little bit, but,

23 I mean, we're talking about the difference of -- you know, it

24 might have brought it, you know, down to 37 from 45; right?

25 We're not talking about -- we're not talking about a

LOVE - DIRECT/GRIGGS                    Vol. 5-851

1  meaningful --

2  Q.  Or 32 from 37?  There is no 45.  It would go down from 37?

3  A.  If we combine those, there would be fewer numbers and

4  so -- and that number would be smaller and so the PC number

5  would actually be higher --

6  Q.  Okay.

7  A.  -- if we dropped those out.  But, again, it would be

8  higher by the difference between like 37 and 45; right.  I

9  mean, we're not talking about -- that's not a meaningful

10  difference in this analysis.

11  Q.  Okay.  That is -- you're focused on the PCE column, right,

12  relatively small numbers there?

13  A.  Yes.

14  Q.  If we move across to the TCE column --

15          THE COURT:  Counsel, this only goes to page 18.  I

16  don't have that chart you all are looking at.

17          (Off the record.)

18          THE COURT:  Tanesa said it's Von Duprin Exhibit 101,

19  for the record?

20          MR. GRIGGS:  Yes, that's correct.

21          THE COURT:  Do you need this one back?

22          MR. GRIGGS:  No.  You can have that.

23          THE COURT:  Okay.

24          MR. GRIGGS:  Thank you.

25          THE COURT:  All right.  Now I see the table.  Okay.

*LOVE - DIRECT/GRIGGS*                    Vol. 5-852

 1  BY MR. GRIGGS:

 2  Q.  Let's look at table 1, the bottom portion, downgradient.

 3  We have a TRMW9D and a TRMW9DD.  Do you see those?

 4  A.  I do.

 5  Q.  Could those have been depth averaged together, as well?

 6  A.  They could have been.

 7  Q.  They're nested wells, again?

 8  A.  They are also nested wells.

 9  Q.  But we're missing one of the three nested wells, right?

10  Where is MW9?

11  A.  I don't know.

12  Q.  Do you know what the values were at MW9 and how they would

13  have affected this average?

14  A.  I would have to go back to the original data source to see

15  what that was.

16  Q.  Can you explain why you didn't choose to use MW9, which

17  is --

18          COURT REPORTER:  I'm sorry.  I lost you.  Please

19  start again.

20  BY MR. GRIGGS:

21  Q.  Can you explain why you didn't use MW9, which meets the

22  criteria of being close to the boundary between upgradient and

23  downgradient?

24  A.  I can't off the top of my head.  I would want to go back

25  and look at the data in order to have an explanation for you.

*LOVE – DIRECT/GRIGGS*                    Vol. 5-853

1   Q.  In the middle of that set -- and there are only seven data

2   points in the downgradient -- there's a VAP-21/SBJTV-1e and a

3   B332.  Do you see those two; they're right together?

4   A.  I do.

5   Q.  Do you know what the relationship is between those two

6   wells?

7   A.  Not off the top of my head.

8   Q.  Okay.  In your report, there's a diagram showing where

9   these are actually located; is that correct?

10  A.  Yes.

11  Q.  And do you have that picture handy?

12  A.  I do.

13  Q.  The one I'm looking at is figure 3-2.  Is that the right

14  one?

15  A.  Yes.

16  Q.  Okay.  It's a little small.

17          THE COURT:  Now, where is it?

18          MR. GRIGGS:  Page 24.

19          THE COURT:  Okay.  Got it.

20  BY MR. GRIGGS:

21  Q.  And, Dr. Love, the upgradient locations are in blue on

22  this diagram; is that correct?

23  A.  That's right.

24  Q.  And the downgradient ones are in red?

25  A.  That's right.

*LOVE - DIRECT/GRIGGS*                    Vol. 5-854

1   Q.  And the two we were just talking about, VAP 21 and B332,

2   do you see where those two are?

3   A.  I do.

4   Q.  And where are they?

5   A.  They are just downgradient of the site itself.

6   Q.  Downgradient of the Von Duprin site?

7   A.  That's right.

8   Q.  And those are the only two locations that are not on the

9   Von Duprin property, including both upgradient and

10  downgradient?

11  A.  In this data set, yes.

12  Q.  But you don't recall what the relationship is between

13  those two boring locations?

14  A.  It's been a long time since I put the database together.

15  Q.  If we showed your report indicating that VAP 21 was a

16  replacement well for B332, would that refresh your memory

17  about these being essentially the same well, just at different

18  times?

19  A.  Well, and they're not the same well; they're different

20  wells.  The other wells that are on the property are, you

21  know, equally as close.  And so the fact that they are wells,

22  kind of like the nested wells, the fact that they are close

23  together doesn't mean they're duplicative, right.  They're

24  actually just distance-wise, you know, in close proximity.

25  That doesn't make it duplicative.  That just means that

*LOVE - DIRECT/GRIGGS*                    Vol. 5-855

1  they're close together, so you can see how much variability

2  there is.

3  Q.  And in terms of the selection criteria for both the

4  upgradient and the downgradient locations, were those all of

5  the ground -- all of the borings with available groundwater

6  data or were some, like MW9, omitted from consideration?

7  A.  I would have to go back to the database to see if there

8  was anything omitted.  I don't recall anything being omitted,

9  so I would have to go back to the database to see if there

10  was.

11  Q.  Let's ask it this way:  We can see what's included; is

12  that correct?  The nine upgradient and the seven downgradient,

13  those you did include, and anything beyond those was excluded?

14  A.  Yes.

15  Q.  Okay.

16  A.  And for this analysis, yes.

17  Q.  My -- you've described the analysis that you did, both

18  with the groundwater, upgradient, downgradient, how the

19  upgradient sources were accounted for in the downgradient.

20  And if I understood your testimony, that's based on the

21  entirety of the groundwater database available in this case?

22  A.  Which portion are we talking about?

23  Q.  Both, all the available groundwater data in the upgradient

24  was used for that, all the available data in the downgradient

25  was used for that, in terms of determining the total mass

*LOVE - DIRECT/GRIGGS*                    Vol. 5-856

1   chlorinated solvent in the groundwater.

2   A.  All of the data that was reported, yes.

3   Q.  And you had indicated that you thought that because of the

4   stability of the plume, I think was the word you used, that

5   you thought it was fair to treat that monolithically, the

6   entire data set as a single unit; is that right?

7   A.  Yes.

8   Q.  And the data set goes back 12 or 13 years, a few spotty

9   samples before that.  What does your analysis say about what

10  the conditions were in 1990?

11  A.  It doesn't.

12  Q.  Do you know what the conditions were in 1990?

13  A.  No.

14  Q.  Do you know how much chlorinated solvent mass had moved

15  off of the Ertel site into the groundwater and began flowing

16  in the groundwater direction before it was sampled starting in

17  2004 or '05?

18  A.  No.

19  Q.  And the same is true for the Zimmer Paper Parcel; is that

20  right?

21  A.  That's right.

22  Q.  And for the Moran site?

23  A.  That's right.

24  Q.  And even for the Von Duprin site?

25  A.  That's right.

*LOVE - DIRECT/GRIGGS*                    Vol. 5-857

1  Q.  We just don't know what the data -- we don't know the data

2  we don't know?

3  A.  We don't know the specific release histories of any of the

4  sites.

5  Q.  Okay.  What we do know, I think you agree, is that there

6  is a specific direction of flow once the contaminants hit the

7  groundwater; is that correct?

8  A.  That is one of numerous things that we know.

9  Q.  Okay.  And in this case, you're aware of what we are

10 terming the plume area, that it extends beyond the Von Duprin

11 property?

12 A.  That's right.

13 Q.  And are you aware that it extends into some residential

14 areas?

15 A.  Yes.

16 Q.  Did you happen to see those when you visited the site?

17 A.  I have.

18 Q.  Okay.  One of the issues where we probably don't agree has

19 to do with this concept of divisibility of harm.  Are you

20 familiar with that term?

21 A.  I am.

22 Q.  And what is the harm that we're talking about when we use

23 that term?

24 A.  So in this case, the harm is apportioned based on the mass

25 contribution.

*LOVE - DIRECT/GRIGGS*                    Vol. 5-858

1  Q.  Okay.  I understand that.  My question is:  What is the

2  harm itself?  What's the single harm that's being divided?

3  A.  The chlorinated solvents in the environment.

4  Q.  Okay.  And those chlorinated solvents have existed at some

5  point in time in soil which has now been largely excavated.

6  They predominantly now exist in groundwater; is that correct?

7  A.  Predominantly, yes.

8  Q.  And what harm or what risk of harm do those chlorinated

9  solvents pose where they are now in the groundwater?

10 A.  I want to make sure I understand your question.  You're

11 asking me:  What is the risk of having chlorinated solvents in

12 groundwater?

13 Q.  Yeah.  I'm associating harm and risk.

14 A.  Okay.

15 Q.  What's -- they're in the ground.  What's the problem?

16 A.  People could be exposed to them.

17 Q.  Okay.  Are they drinking it?

18 A.  I don't believe so, not in this area.

19 Q.  So we're talking about groundwater that's at least 11 to

20 16 feet below the ground; right?

21 A.  Right.

22 Q.  Any chance they're going to get into it digging posts for

23 playground equipment?

24 A.  Not unless they're doing something crazy.

25 Q.  And even utility lines, likely, aren't going to be that

*LOVE – DIRECT/GRIGGS*                    Vol. 5-859

1  deep, correct?

2  A.  That's right.

3  Q.  So where's the exposure?

4  A.  It's most likely to be through vapor exposure.

5  Q.  Okay.  Explain that, please.

6  A.  So the chlorinated solvents in groundwater will vaporize

7  from the top of the groundwater into the soil.  That vapor

8  will continue to travel upwards towards the surface.  And if

9  there is a way for that vapor to get inside somebody's house,

10 that can be an indoor exposure hazard, if it's at a high

11 enough concentration.

12 Q.  So the contaminant molecules can separate from the water,

13 move through the soil column, I guess it's called, and get

14 into a house or other structure?  That's what you're

15 describing?

16 A.  Yes, that's possible.

17 Q.  Okay.  In your analysis of the divisibility of the harm,

18 do you distinguish between the different chlorinated solvent

19 types?

20 A.  I don't, because this sort of class of contaminants has a

21 fairly similar sort of toxicity range.

22          In other allocations that I've done, when you're

23 looking at very different families, you might, you know, sort

24 of apportion based on toxicity first, but -- you know, the

25 specific toxicity of the molecule because there's big

LOVE – DIRECT/GRIGGS                    Vol. 5-860

1  differences.  In this case, the toxicity is fairly comparable

2  and so I essentially weighted them all equally.

3  Q.  So where in your report do you talk about the relative

4  toxicities of the CVOC types?

5  A.  I didn't.

6  Q.  So that's a new opinion today, that, one, they're about

7  the same toxicity?

8  A.  Well, no.  I mean, you asked me in terms of why I didn't,

9  you know, address them differently.  I'm telling you the

10  answer of why I didn't address them differently.  Typically,

11  in these sorts of allocations, chlorinated solvents, the

12  apportionments are done on a mass basis, because the

13  difference in toxicity in pathway and exposure is either

14  open-ended or, you know, comparable enough that you wouldn't

15  make that difference.

16  Q.  Okay.

17  A.  Especially in this case with PCE, which degrades to TCE.

18  There's essentially the possibility that any PCE could be the

19  equal toxicity of TCE.  And so there's no difference,

20  obviously, in the potential toxicity from PCE versus TCE.

21  Q.  And did you do any calculations to measure the rate of

22  degradation between PCE and TCE?

23  A.  There's not enough data at this site to do that

24  calculation.

25  Q.  So you're just saying that, in the normal degradation

LOVE - DIRECT/GRIGGS                    Vol. 5-861

1  process, under the right conditions, PCE does degrade to TCE?

2  A.  Yes.  And we know that those conditions exist at this site

3  because you can see the degradation of the chlorinated

4  solvents in the groundwater.

5  Q.  You can see the further degradation by product SIS or DCE

6  and vinyl chloride a little bit?

7  A.  That's right.

8  Q.  But you didn't attempt to quantify it; there's not enough

9  data for that?

10  A.  That's right.

11  Q.  Okay.  Do you know whether any actions have been taken to

12  address vapor intrusion related to this chlorinated solvent

13  plume?

14  A.  I didn't look into that at all.

15  Q.  So you would not know which chemical is requiring vapor

16  mitigation of any structures?

17  A.  I have not reviewed any human health risk assessment.

18  Q.  Okay.  And so you would not also have any information

19  about what concentrations, relative concentrations, are in

20  these structures between, say, TCE and PCE and DCE and vinyl

21  chloride?

22  A.  Are you talking about indoor air concentrations?

23  Q.  Yes.

24  A.  I have not reviewed indoor air concentrations.

25  Q.  What is the basis for your statement that the relative

*LOVE - DIRECT/GRIGGS*                    Vol. 5-862

1  toxicities between these particular chlorinated solvents is, I

2  think you said, roughly the same?

3  A.  Well, it's primarily with PCE and TCE, again, because PCE

4  degrades to TCE, the potential toxicity is equivalent, since

5  every PCE -- PCE has its own toxicity.  But because PCE can

6  degrade to TCE, the potential toxicity of TCE versus PCE over

7  the lifetime of the plume isn't different at all.

8  Q.  Okay.  So until it degrades, it does have a distinct

9  toxicity and it's lower than TCE?

10 A.  It is slightly lower than TCE.  It's not a lot lower than

11 TCE.

12 Q.  Is it one order of magnitude lower?

13 A.  It depends on what criteria you're using.

14 Q.  Fair question.

15         In Indiana, are you aware of the relative toxicities

16 between TCE and PCE?

17 A.  I don't believe the toxicities depend on state, and that's

18 usually performed by a human health risk assessment person,

19 and I have not seen any reports on a site-specific human

20 health risk assessment at this site.

21 Q.  So you're not aware of whether the state environmental

22 agency publishes values of what they consider to be a safe

23 exposure for TCE and a safe exposure level for PCE?

24 A.  I mean, typically states have screening levels, but most

25 sites perform site-specific risk assessments in order to

*LOVE – DIRECT/GRIGGS*                   Vol. 5-863

1  understand, because the screening levels are a starting point.

2  They're not necessarily a decision criteria.

3  Q.  Okay.  But for purposes of your analysis and the potential

4  for harm to human receptors, you treated all of the

5  chlorinated solvent molecules the same?

6  A.  Yes.

7  Q.  Do PCE and TCE have different soil attenuation values?

8  A.  When you say "soil attenuation values," what is that

9  referring to, what type of attenuation?

10  Q.  Let me go to the next question.  Maybe it will be clearer.

11        In your experience and based on sites that you've

12  worked on, has it been your experience that TCE tends to move

13  farther in a plume than PCE?

14  A.  Yes.

15  Q.  Okay.  So they have different relative rates of what we

16  call migration?

17  A.  They do.  I mean, the difference isn't huge, but there is

18  a difference.

19  Q.  Okay.  And did you take that into account in determining

20  the relative harm or potential for harm in this case?

21  A.  No.  The analysis doesn't include any fate and transport

22  modeling of that ilk.

23  Q.  Other than separating the groundwater data into upgradient

24  and downgradient, did you treat groundwater at every depth the

25  same?

*LOVE – DIRECT/GRIGGS*                    Vol. 5-864

1   A.   In what way?

2   Q.   You averaged within a boring?

3   A.   Yes.

4   Q.   And other than coming up with an average depth, whether

5   the concentration comes from 20 feet or 30 feet or 50 feet,

6   you averaged them all together?

7   A.   I did.

8   Q.   Okay.  And in terms of the risk of vapor intrusion, which

9   poses the greater risk, shallow groundwater with contamination

10  or deep groundwater with contamination?

11  A.   The vapor comes from the shallow groundwater, so that's

12  the groundwater that, you know, the vapor would come from.

13  Q.   So if we were concerned about the potential harm to human

14  receptors, would it be valid to look at the shallow

15  groundwater and the contributions being made to the shallow

16  groundwater?

17  A.   I think that would be one component to look at.

18  Obviously, the deeper groundwater mixes in with shallow

19  groundwater and there's a concentration gradient, and so

20  things go from high concentration to low concentration, and so

21  the high concentrations at depth will move upwards towards the

22  areas of lower concentration.  And so in the longer

23  perspective, the deep groundwater poses a risk, as well.  It

24  just isn't there yet.

25  Q.   Okay.  And the assumption that you've made in giving that

*LOVE - DIRECT/GRIGGS*                    Vol. 5-865

1  answer is that the concentration in the deep groundwater is

2  higher than in the shallow groundwater; that's why it's

3  driving that direction?

4  A.  In lots of locations, that's the case.

5  Q.  Okay.  Of course, the deeper groundwater is -- has a much

6  further distance to travel to reach a structure at the

7  surface; correct?

8  A.  It does.

9  Q.  And it will eventually interact with the shallow

10 groundwater before reaching that structure?

11 A.  Right.  That's what I was trying to describe, yes.

12 Q.  And so in your analysis, by treating all groundwater,

13 regardless of depth, you made no differentiation between

14 shallow and deep groundwater?

15 A.  My analysis just looks at the total concentration of

16 CVOCs.  It was not specific with depth.

17 Q.  I wanted to ask you about a couple of specific items that

18 came up in your declaration.  I think, in a couple of cases,

19 they helped to clarify maybe some of the misunderstandings

20 about your expert report and what you had done.

21        This is a sentence in two parts, and I want you to

22 treat each part separately.  The first part says:  Mass

23 contribution to a discharge release or disposal of a hazardous

24 waste is one of the Gore factors.  Is that correct?

25 A.  Yes.

*LOVE - DIRECT/GRIGGS*                    Vol. 5-866

1  Q.  Okay.  And is that the only one of the Gore factors that
2  your analysis touches on?
3  A.  That's ultimately what I apportion on its mass
4  contribution, yes.
5  Q.  But there are other Gore factors?
6  A.  There are.
7  Q.  They just don't affect your analysis in this case?
8  A.  Well, there's Gore factors and there's other allocation
9  factors, Torres factors.  There's other allocation factors
10 that have been used.
11          You know, I think my experience has been, when you
12 can allocate on mass contribution, that tends to be the one
13 that most people use as the starting point.
14 Q.  We'll forgive you your legal opinion.  But suffice it to
15 say, in this case, that's the one you focused on?
16 A.  It is, yes.
17 Q.  Okay.  And continuing, the same sentence but the
18 second part says:  And -- we're talking about still talking
19 about mass contribution -- is a reasonable basis for
20 apportionment that I have used in numerous other matters.
21          Is that also an accurate statement of your views?
22 A.  Yes.
23          MR. GRIGGS:  I think that's all the questions I have
24 for direct.  I may have some additional questions for cross
25 later.  Thank you.

*LOVE - DIRECT/GRIGGS*                    Vol. 5-867

 1              THE WITNESS:  Thank you.

 2              THE COURT:  Do you want to take a break or are you

 3  ready?

 4              MR. BOWMAN:  Well, I want to be clear, if I can,

 5  Your Honor.  This is a bit unusual, but we're dealing with it.

 6              Mr. Love, Dr. Love, has been called as part of their

 7  case in chief.

 8              THE COURT:  Correct.

 9              MR. BOWMAN:  I think, for purposes of clarifying his

10  testimony, it would be helpful for me to have 10 minutes for

11  cross.

12              THE COURT:  All right.

13              MR. BOWMAN:  But then we will -- we've done what we

14  can to call witnesses one time.  We would call him back in our

15  case in chief, which is -- will be pretty quickly.

16              THE COURT:  Okay.

17              MR. BOWMAN:  But then can I -- will you -- do you

18  rest after this?

19              MR. GRIGGS:  Yeah.  He's our last witness.

20              MR. BOWMAN:  Yeah.

21              And so then we would have motions to the Court

22  following that with Mr. Love not in the room, we'll hear that,

23  and then I would recall him, and so --

24              THE COURT:  All right.  So you can do your 10-minute

25  cross, and then we'll allow the Major defendants to do their

*LOVE – DIRECT/GRIGGS*                   Vol. 5-868

1  cross, and then we can allow Mr. Griggs to rest.

2          MR. BOWMAN:  Right.  I just wanted to be clear, then

3  that --

4          THE COURT:  All right.  Come and do --

5          MR. BOWMAN:  -- we will call him again after --

6          THE COURT:  Fair enough.

7          MR BOWMAN:  So I'll be very -- I'll be brief with

8  this one.

9          THE COURT:  All right.  And Von Duprin, you have

10  several exhibits that you haven't offered, including you

11  referred extensively to Dr. Love's report, which is

12  Exhibit 1 --

13          MR. GRIGGS:  101.

14          THE COURT:  101.

15          So do you want to offer that now?

16          MR. GRIGGS:  Sure, Your Honor.  We would offer

17  Dr. Love's exhibit that he's used in testifying today into the

18  record.

19          THE COURT:  No objection?

20          MR. BOWMAN:  No objection.

21          MS. KRAHULIK:  No objection.

22          THE COURT:  All right.  So 101 is admitted into

23  evidence without objection.

24                          *(Plaintiff's Exhibit 101 was*

25                              *received in evidence.)*

*LOVE - CROSS/BOWMAN*                    Vol. 5-869

1          THE COURT:  During the break, Mr. Griggs, talk with

2   Tanesa before you rest, because she says there's others that

3   you've identified and looked at but haven't offered.

4          MR. GRIGGS:  I'll talk to her.

5          THE COURT:  And she'll make sure we get everything

6   into evidence.

7          Okay.  You may.

8          MR. BOWMAN:  Thank you, Your Honor.

9                        **CROSS EXAMINATION**

10  BY MR. BOWMAN:

11  Q.  Dr. Love, let's look at this at a higher level and then

12  we'll get down to the minutia.

13         In order to allocate contribution and thus harm in

14  this matter -- and you've looked at it in many other

15  matters -- is it fair to say that one of the cornerstones of

16  your opinion is the fact that there's four distinct areas,

17  geographic areas of release of chlorinated solvents?

18  A.  Right.  I mean, this site is pretty ideal for divisibility

19  because of that, because there are four distinct sites of

20  releases.

21  Q.  The other interesting thing about this site, while it's

22  chlorinated solvent and it's very similar in the harm that it

23  causes, it happens that the upgradient sites were primarily

24  TCE, which is three chlorine molecules, and as you looked at

25  the groundwater of Von Duprin, it was PCE, which is four

*LOVE – CROSS/BOWMAN*                     Vol. 5-870

1  chlorine molecules; right?

2  A.  Right.  That was a clear difference in chemical

3  fingerprint that showed the contribution of Von Duprin, not

4  only that there was a contribution, but really the magnitude

5  of that contribution to the overall plume.

6  Q.  Your opinions are thus expressed regarding those

7  geographic locations, meaning Von Duprin, Ertel, Zimmer, and

8  Moran; correct?

9  A.  Yes.  The designations are just on source areas.

10 Q.  While you looked at operations, you expressed no opinions

11 regarding whether any particular party, as you understand it,

12 in this lawsuit, did or did not cause contamination at any of

13 those particular properties; correct?

14 A.  That's right.

15 Q.  You looked at dozens of reports relating to these four

16 different sites; correct?

17 A.  Yes.

18 Q.  Can you quantify -- can you help the Court understand how

19 many reports you and your team had to weed through?

20 A.  Probably 30, at least.

21 Q.  Have any idea -- can you describe for the Court the

22 magnitude of this comprehensive data set that's in evidence

23 and that we're all relying upon?

24 A.  Yeah.  I mean, it's thousands of different individual data

25 points.

*LOVE - CROSS/BOWMAN*                    Vol. 5-871

1  Q.  And you helped --

2  A.  Organize and -- you know, organize and then analyze the

3  data that comes out of it.

4  Q.  Vetted it?  You vetted it?

5  A.  Vetted it, checked the database, you know, double-checked

6  the database against the reports, yes.

7  Q.  So that's all the work that -- some of the work that's

8  included that ended up being invoiced to Moran Electric?

9  A.  Yes.  I mean, that's the fundamental sort of setting the

10  foundation work.

11  Q.  Yeah.

12          There was discussions about depth of groundwater.

13  And the Court has heard this before, but let's go through

14  this.

15          MR. BOWMAN:  I need -- let's have Exhibit 1112.

16  BY MR. BOWMAN:

17  Q.  You were asked about a Heartland report, not shown it.

18  Now I'm showing it to you.  Does this look familiar to you as

19  far as a Heartland report regarding the former Moran Electric

20  property from 2011?

21  A.  Yes, this is the 2011 report that I was referring to.

22  Q.  Okay.  Let's look at 31 of 175.

23          MR. BOWMAN:  And we'll need to turn it and zoom in a

24  bit.

25

*LOVE – CROSS/BOWMAN*                    Vol. 5-872

1  BY MR. BOWMAN:

2  Q.  Look over on the left for us there.  Do you remember

3  seeing this table 10?

4  A.  I do.

5  Q.  Tell us and the Court, for the monitoring wells identified

6  there, what depth the groundwater there is reported?

7  A.  So in 2011, the depth of groundwater range, from

8  essentially 10 feet to about 13-and-a-half feet.

9  Q.  Okay.  And we can go to a figure.  But was it your

10  understanding, can we just establish for the record, that

11  these were monitoring wells on the Moran site?

12  A.  That's right.

13  Q.  Okay.  Let's go to Exhibit 1107, the Mundell report.

14         MR. BOWMAN:  And we'll turn that.

15  BY MR. BOWMAN:

16  Q.  Does that look familiar to you, the Mundell baseline

17  report?

18  A.  Yes.  That's from 2008, I believe.  Yeah.

19  Q.  If we look on page 12 of that report, which is the PDF, 19

20  of 57, second full paragraph.  Let's see.  The second full

21  paragraph.

22  A.  No.  This is geophysical survey.

23  Q.  Yeah.

24         Need PDF, page 19 of this report.  If you look in

25  the second full paragraph -- I'll let you find it there -- do

*LOVE – CROSS/BOWMAN*                    Vol. 5-873

1   you remember seeing what Mundell reported for --

2   A.  Yes.  Mundell reported the depth to groundwater ranged

3   from 11.8 feet to 15.4 feet.

4   Q.  Now, these are only -- and you saw -- and you saw a

5   removal report relating to Moran, also; correct?

6   A.  That's right.

7   Q.  Okay.  And we can go on and on.  But the point is:  As you

8   were trying to determine soil samples to take within the

9   vadose zone, V-A-D-O-S-E -- that we've talked about, meaning

10  an area not impacted by groundwater, you looked at lots of

11  data to come up with the 10-foot; correct?

12  A.  That's right.

13          And, in fact, the Mundell report talks about the

14  sort of saturated zone being something that's impacted by

15  groundwater, and so the Mundell report supports the idea of

16  not using that for the characterization of soil.

17  Q.  If that data was included in the face of your knowledge

18  that every indication is that's within the smear zone, within

19  your area of practice, you would know that you were factoring

20  in soil data that probably, almost certainly, has impact from

21  upgradient properties; correct?

22  A.  It would at least be suspect.  And as an expert, if

23  somebody else did that, I would question that, you know, that

24  that was the appropriate technical thing to do.

25  Q.  Mr. Griggs asked you about the migration of TCE and how it

*LOVE – CROSS/BOWMAN*                    Vol. 5-874

1  differed from PCE.

2          As I understood your -- as I understand your

3  opinion, you looked at migration of chlorinated solvents from

4  upgradient to downgradient and actually considered and looked

5  at the extent to which TCE was or was not continuing to

6  migrate from upgradient on to Von Duprin; correct?

7  A.  That's right, and I was able to do that from observations.

8  I didn't need to do a groundwater model, you know, a fade and

9  transport model, as he suggested, in terms of understanding

10 those differences.  You can see that just from the observation

11 in the data itself.

12 Q.  And final point.  By having PCE used at the Von Duprin --

13 shown as impacting at the Von Duprin property, that's a

14 marker; PCE was a marker to allocate between upgradient and

15 downgradient; correct?

16 A.  Right.

17 Q.  You then used:  By reviewing shallow soil samples within

18 vadose zone, from the three other distinct areas, Ertel,

19 Zimmer, and Moran, able to look at that data to analyze

20 contribution to mass; correct?

21 A.  That's right.

22          In fact, if you look at the total CVOCs, you know,

23 the contribution from Von Duprin site appears to be 80 percent

24 of the total CVOC mass, but we didn't assign any of the DCE

25 mass to Von Duprin.  They only got assigned PCE and TCE, and

*LOVE – CROSS/BOWMAN*                    Vol. 5-875

1  so that's -- that, you know, fraction that got assigned to

2  them is really a minimum apportionment, because any DCE

3  component was completely assigned to the upgradient parties,

4  even though we know some of that would have come from the

5  degradation of the solvents coming off the Von Duprin

6  property.

7  Q.  And you got to my point, but I'll punctuate it.

8          When you had -- there were times like that one when

9  you could have done a calculation that would have actually

10 made it higher for Von Duprin, downgradient, but you actually

11 factored it in so that it was a lower allocation to Von

12 Duprin; correct?

13 A.  That's right.

14         And so when we talked about, you know, risk, the

15 fact that none of the DCE was assigned to Von Duprin

16 essentially takes out that component and any differential

17 toxicity that may be associated with it.  They didn't get any

18 DCE risk assigned to them and so their percentage is only for

19 PCE and TCE-related risk.

20 Q.  And for the Court to understand, then, through the

21 degradation process, PCE eventually reaches that SIS and those

22 levels; correct?

23 A.  That's right.  After TCE, it becomes less toxic in terms

24 of vapors.

25 Q.  Final point, then.  In this process by which you

*LOVE - CROSS/KRAHULIK*                    Vol. 5-876

1  reasonably allocated the contribution and the harm, you can do

2  that based on the data and don't need to know what happened in

3  1990, do you?

4  A.  Right, because we're doing it on current conditions and

5  so -- and we're assuming everybody's contribution in the plume

6  itself is commingled, but we can apportion it based on what we

7  know about the characteristics at each site.

8          MR. BOWMAN:  Thank you.

9          THE COURT:  Okay.  All right.  Who's going to do the

10 cross-examination on behalf of Major?  Ms. Krahulik?

11         MS. KRAHULIK:  Yes.

12         THE COURT:  You may.

13                   **CROSS EXAMINATION**

14 BY MS. KRAHULIK:

15 Q.  Good morning.

16 A.  Good morning.

17 Q.  Now, you just mentioned that you did not assign the DCE to

18 Von Duprin, even though, in table 1, there is DCE in the

19 particular locations that you assigned to the downgradient

20 plume?

21 A.  That's right.

22 Q.  What's the rationale for that?

23 A.  I wasn't sure technically how I would apportion, how I

24 would split that up.  I could have split it up similarly as I

25 did with the PCE and TCE, but I think there's enough technical

*LOVE – CROSS/KRAHULIK*                      Vol. 5-877

1   sort of questions that could get raised about it that I chose

2   just to be very conservative in terms of really keeping the

3   assignment to the Von Duprin property as small as technically

4   justifiable.

5   Q.  But in table 1, you did assign the D, D as in dog, DCE, in

6   the upgradient, what you've termed the upgradient plume, to

7   the upgradient properties?

8   A.  I did.

9   Q.  Did you assign the downgradient DCE to the upgradient

10  properties?

11  A.  Yes.

12  Q.  So that would skew the numbers in favor of the lower

13  allocation percentage for the downgradient plume?

14  A.  DCE is included in the total mass for both plumes, but

15  essentially all of the DCE is assigned to the upgradient

16  parties.

17  Q.  So that results in a higher number or percentage of the

18  mass contribution for the upgradient plume based on the

19  assignment of downgradient DCE to that plume?

20  A.  Yes.  It is -- it is proportionally -- you know, like I

21  said, Von Duprin, it's sort of the minimal number, and I think

22  there's -- there are technically justifiable reasons that that

23  number could have been larger.

24  Q.  DCE doesn't volatilize to indoor air like PCE and TCE;

25  right?

*LOVE – CROSS/KRAHULIK*                    Vol. 5-878

1   A.  That was right.

2   Q.  So would it have been reasonable to have excluded DCE from

3   your calculations as to upgradient and downgradient?

4   A.  At the time, I wasn't apportioning based on -- well, and I

5   still am not apportioning based on hazard.  You could take DCE

6   out if you wanted to apportion strictly based on hazard, and

7   you'd get a different allocation.

8   Q.  Have you done that calculation?

9   A.  I have not.

10          At the time of doing this, I wasn't even -- it

11  wasn't clear to me what the hazard -- you know, what the --

12  that the total hazard had been determined and whether or not

13  there were any other risks other than indoor air that people

14  were concerned about.

15  Q.  And the corner point of your delineation between the

16  upgradient and downgradient areas was TRMW9DD; right?

17  A.  Yes.

18  Q.  But you excluded that sampling point from your

19  calculations?

20  A.  No.

21  Q.  Well, let's take a look at table 1, which is page 21 of

22  your report.  I don't -- there's 9DD down at the bottom.

23          So you assigned that to the downgradient plume?

24  A.  Yes.

25  Q.  Did you take into consideration the particular activities

LOVE - CROSS/KRAHULIK                    Vol. 5-879

1  performed on the Von Duprin property near any particular

2  sampling location in determining whether to assign those

3  locations to the upgradient or downgradient plumes?

4  A.  No.

5  Q.  So you didn't take into consideration the location of the

6  vapor degreaser, for example?

7  A.  I did not.

8  Q.  Are you aware whether the vapor degreaser was nearest

9  points in the upgradient locations or downgradient locations?

10  A.  My understanding is that it was in the downgradient

11  locations.

12  Q.  You don't believe it was near HPTO5?

13  A.  I have to -- I have seen a picture with a vapor degreaser

14  at that location.  There's other operations that are further

15  south, and maybe I'm thinking about something that's not the

16  vapor degreaser.

17  Q.  And the vapor degreaser general location was assigned in

18  your calculation to the upgradient plume, again, which would

19  skew the numbers lower for Von Duprin as to the downgradient

20  plume, basically giving them the benefit of the doubt in your

21  calculation?

22  A.  Yes.  The benefit of the doubt that says, in that north

23  part of the area, they did not get allocated CVOCs that were

24  in that north part.

25  Q.  Any of them?

*LOVE - CROSS/KRAHULIK*                    Vol. 5-880

1   A.   Any of them.

2   Q.   Despite the fact that their degreaser was there?

3   A.   That's right.

4   Q.   We talked a little bit about the relative toxicities of

5   PCE and TCE.  Are you aware of the NIOSH standard for each of

6   those constituents?

7   A.   I have read the NIOSH standard but I have not put it to

8   memory.

9   Q.   If I told you that the risk -- the immediate risk standard

10  under NIOSH for PCE is at 150 parts per million and TCE is at

11  a thousand parts per million, would that surprise you?

12  A.   No.

13  Q.   And I just want to clarify.  Your allocation analysis

14  performed in this matter does not take into consideration the

15  operations of any particular party, even though you discussed

16  the operations in your report?

17  A.   Right.  No, it just uses the extent and magnitude of

18  contamination in the environment.

19  Q.   And in fact, would it surprise you if I told you the words

20  "Major Tool and Machine" appeared in your report just one time

21  when not referring to the title of this case?

22  A.   That would not surprise me.

23  Q.   And you did not discuss Major Tool and Machine's

24  operations or their effect on the plume?

25  A.   I did not.

1          MS. KRAHULIK:  Thank you.

2          THE COURT:  You may redirect.

3          MR. GRIGGS:  Thank you, Your Honor.

4                    **REDIRECT EXAMINATION**

5    BY MR. GRIGGS:

6    Q.  Dr. Love, earlier you testified that we did not have any

7    specific release histories for these properties; is that

8    correct?

9    A.  I didn't incorporate any specific release histories into

10   my analysis.  There may be some out there.  I just didn't

11   incorporate them.

12   Q.  Is it correct to say that each of the four source area

13   properties did have a fairly significant release that reached

14   groundwater that moved downgradient?

15   A.  I think based on the extent and magnitude in soil and

16   groundwater at each site, there was releases at each site,

17   yes.

18   Q.  You also emphasized, again, on your cross-examination

19   answer, that your analysis was reflective of current

20   conditions; is that what you said?

21   A.  Current conditions being relatively modern times, right.

22   As we talked about, the data spans, you know, 10 years.  But

23   compared to the lifetime of what we're talking about

24   operations being, it's relatively current conditions.

25   Q.  Okay.  You mentioned, also, that -- or maybe it was put to

*LOVE - REDIRECT/GRIGGS*                    Vol. 5-882

1  you -- that PCE was a marker.  And I guess I'm wondering if

2  PCE is a marker for any other common types of operations that

3  occurred both in the past and perhaps even today.

4  A.  PCE is used by a number of different types of operations.

5  It was a marker in this analysis in terms of being able to

6  observe the impacts between the upgradient parties and those

7  of the Von Duprin property.  Von Duprin property isn't unique

8  in terms of their use of PCE.

9  Q.  Okay.  And would one of those other potential users of PCE

10 include dry cleaners?

11 A.  Dry cleaners have historically used PCE quite a bit.

12 Q.  And in fact, you identify at least one dry cleaner in the

13 plume area on figure B1 of your report, page 7?

14 A.  That's right, and I believe I took that from a Geosyntec

15 report.

16 Q.  Okay.  Are you aware of any other reports or other expert

17 opinions that have been offered in this case that say there

18 could have been even more dry cleaners historically in this

19 area?

20 A.  I believe at some point there was discussion about there

21 being a dry cleaner on the Von Duprin property at some point.

22 Q.  Was that from the expert report of Rob Walker?

23 A.  I don't specifically recall, but I do remember reading

24 that where it came from.

25 Q.  Did you do anything to verify the accuracy of that

*LOVE – REDIRECT/GRIGGS*                    Vol. 5-883

1  statement?

2  A.  I didn't.  Again, I didn't use site-specific operations at

3  any of those sites for my analysis.

4  Q.  If there was a dry cleaner on the Von Duprin site at any

5  time, is it possible that it would have had a release of PCE?

6  A.  It's possible.

7  Q.  And so just to be clear, you were asked on cross that you

8  did not allocate to specific operations or specific persons

9  the chlorinated solvent mass; you allocated it to a site

10  location?

11  A.  That's right, different source areas.

12  Q.  So when we say "Von Duprin got all the PCE," what you're

13  saying is the Von Duprin site was given responsibility for all

14  the PCE?

15  A.  That's right.

16  Q.  You're not saying there wasn't a dry cleaner that

17  contributed 90 percent of that?

18  A.  Not at all.

19  Q.  You just don't know?

20  A.  I'm saying that site is the source area for that

21  contribution.

22          MR. GRIGGS:  Okay.  Thank you.

23          THE COURT:  Any questions on those?

24          MR. BOWMAN:  No, Your Honor.

25          THE COURT:  Ms. Krahulik?

*LOVE – REDIRECT/GRIGGS*                    Vol. 5-884

 1          MS. KRAHULIK:  No, Your Honor.

 2          THE COURT:  All right.  Dr. Love, you may step down.

 3          (Witness excused.)

 4          THE COURT:  Do you want to rest with the --

 5          MR. GRIGGS:  I wanted to check on the exhibits, if I

 6   could, make sure we've entered everything that needs to be

 7   entered.  You said there may have been some we missed.

 8          THE COURT:  Okay.  We'll go ahead and take a break,

 9   and then we'll come back and let you rest.

10          And then you're going to make a motion under Rule

11   52(c)?

12          MR. BOWMAN:  Yes, ma'am.

13          THE COURT:  Okay.  All right.  Okay.  We'll take our

14   break and then we'll come back.  Fifteen minutes.

15          THE COURTROOM DEPUTY:  All rise.

16          (Recess at 10:09, until 10:29.)

17          THE COURT:  We're back on the record.

18          And, Mr. Griggs, you're standing.

19          MR. GRIGGS:  Yes, Your Honor.  Two items to clear up

20   on the documentary evidence.

21          One is Exhibit 106, the expert report of Sam

22   Williams.  Our notes show that we had moved that to be

23   admitted, but that's not consistent with the courtroom deputy,

24   so we would move to admit 106 now, just out of an abundance of

25   caution.

Vol. 5-885

1          THE COURT:  All right.  Any objection to 106?

2          MS. KRAHULIK:  No objection.

3          THE COURT:  Moran?

4          MR. BOWMAN:  No, no objection.

5          THE COURT:  106 is admitted into evidence without

6    objection.

7                        *(Plaintiff's Exhibit 106 was*

8                        *received in evidence.)*

9          MR. GRIGGS:  Thank you, Your Honor.

10          The other item is a document that is linked in

11   Exhibit 1209, a joint exhibit, but it is not part of that

12   exhibit.  It was shown to at least two witnesses, and Your

13   Honor has reviewed it, as well.  It's an IDEM EPA memorandum

14   of agreement, and we would ask to provide a copy of that to be

15   added to Joint Exhibit 1209.

16          THE COURT:  Any objection?

17          MS. KRAHULIK:  No objection.

18          THE COURT:  Moran?

19          MR. BOWMAN:  No objection.

20          THE COURT:  The Court will allow the addition to

21   1209.

22                        *(Plaintiff's Exhibit 1209 was*

23                        *received in evidence.)*

24          MR. GRIGGS:  Thank you.

25          THE COURT:  All right.  Anything else on exhibits?

Vol. 5-886

1          MR. GRIGGS:  Your Honor, Von Duprin rests.

2          THE COURT:  Okay.  All right.

3          Are there any motions?

4          MR. BOWMAN:  Yes, Your Honor, on behalf of Moran

5     Electric.

6          THE COURT:  All right.  Come on up to the lectern so

7     I can get a good look at you while you're talking.

8          MR. BOWMAN:  I got a new suit.

9          Your Honor, we want to make a motion under 52(c).

10    And to be clear, it's a request for partial findings.

11         Von Duprin brought claims against Moran under

12    CERCLA, 107.  It brought claims under the Indiana

13    Environmental Legal Action Statute.  Under either of those --

14    so that's -- and we're moving for partial findings under both

15    CERCLA and ELA on this point.

16         Your Honor has heard reference to the Zimmer Paper

17    Parcel, Moran.  The evidence is Moran owned the Zimmer Paper

18    Parcel for a period of time.  There is no evidence brought

19    forward by Von Duprin in their case in chief that Moran can be

20    held liable or responsible under either CERCLA or ELA for

21    releases tied to the Zimmer Paper Parcel.  And without that

22    evidence, they simply don't make the appropriate case under

23    either CERCLA or ELA.

24         The third point is -- and I'll elaborate very

25    quickly.

Vol. 5-887

1        THE COURT:  Okay.

2        MR. BOWMAN:  -- on each point, but I wanted the

3   Court to get it in one motion.

4        So a partial finding that Moran cannot be liable

5   under either CERCLA or ELA for releases identified, tied to,

6   confirmed on the Zimmer Paper Parcel.

7        The other thing is that Von Duprin has included a

8   $1.5 million payment from Von Duprin to Threaded Rod as part

9   of a settlement of a state court case in <u>Threaded Rod versus</u>

10  <u>Von Duprin and others</u>.  And as a result -- at the end of their

11  case in chief, it's clear that, whether you use NCP and CERCLA

12  or whether you're looking at what damages are recoverable

13  under the Indiana Environmental Legal Action statute, they

14  cannot recover those.  So let me cover this quickly.

15       Under CERCLA -- well, first, Your Honor has already

16  determined that the contamination harm is divisible.  The

17  evidence is there's four distinct areas.  If Von Duprin shows

18  that Moran used to own Zimmer Paper Parcel, that's not enough.

19  Under CERCLA, they have to show that there was a disposal,

20  that there was a release of contaminants during the ownership.

21  Under CERCLA, Von Duprin also has to show that the release

22  caused -- caused it to incur response costs as a result of

23  that release by Moran.

24       Under the ELA, the ELA is more of a causation --

25  pardon me.  The ELA also has a causation element.  You have

Vol. 5-888

1   to -- Von Duprin needed to show that Moran caused or

2   contributed to contamination that led to them incurring

3   necessary costs, actually contamination that's a threat to

4   human health or environment.  That's part of the elements.

5          Courts -- I can cite the Court to Reed v. Reid,

6   which is R-E-E-D, R-E-I-D, where Indiana courts have looked at

7   what it means to cause or contribute.

8          THE COURT:  What's that cite?

9          MR. BOWMAN:  980 N.E.2d 277.

10         COURT REPORTER:  I'm sorry.  Can you repeat that?

11         MR. BOWMAN:  980 N.E.2d 277.

12         -- specific page cite to 289 where there's a

13   reference to how cause or contribute is defined, and courts

14   have looked at it using its normal terms, its common terms.

15         It is not sufficient to say, under either CERCLA or

16   under ELA, that a certain party owned it.  It's not sufficient

17   to say that they happened to be there.  It is not even

18   sufficient to say they used the constituent of concern.  You

19   must prove a release.  You must prove cause and contribute

20   under ELA.  You must prove release under CERCLA.

21         And they've not done that.  They did not do that in

22   their case in chief.  And the Court has heard other testimony

23   in ours.  But in their case in chief, there's no evidence that

24   Moran caused or contributed to contamination at the Zimmer

25   Parcel.  There's no evidence that Moran even used a degreaser

Vol. 5-889

1   on the Zimmer Parcel.  There is no evidence that Moran used

2   chlorinated solvents on the Zimmer Paper Parcel.

3        There is evidence that there was a UST there that

4   leaked during removal.  There's evidence of Ertel -- from the

5   IDEM people of Ertel's potential use of the Zimmer Paper

6   Parcel.  There's ways to explain it.  But, regardless, if

7   Moran is going to be brought into this court, Von Duprin

8   needed to show that they caused the release.

9        Our request is just as to the Zimmer Paper Parcel.

10  That's the finding that we look for.  It's very narrow, not

11  academic, Your Honor.  It's important for us to know that,

12  yes, indeed, Moran didn't cause that release, because we

13  don't -- we know we didn't.

14       On the settlement amount, it's got to be put in

15  context of Threaded Rod, current owner, then, of the Threaded

16  Rod property, former Von Duprin, sued Von Duprin to recover

17  costs that Threaded Rod had incurred for investigation and

18  cleanup.  That was the complaints before this Court, the

19  amended complaint.

20       The evidence is, Russ Eiler said we paid 1.5 lump

21  sum.  That's what they paid.  They paid 1.5 lump sum to the

22  current owner who sued them for prior operations.

23       Under the ELA, for Moran to have to pay some of

24  that, or pay any of it, they would have to show that, as part

25  of the 1.5 they paid, those were costs incurred because of

Vol. 5-890

 1  Moran, because of releases of Moran, and there's no evidence

 2  of that.

 3          Under CERCLA, it's even more of a challenge for

 4  them.  We all listened.  And it is just a statute that Your

 5  Honor has to deal with.  This NCP is a tough animal.  It is

 6  what it is, right.  They have to show NCP compliance.  I --

 7  there is no NCP compliance for the 1.5 million.  And I believe

 8  the evidence is they said that Williams didn't look at it.  He

 9  didn't look at the invoices related to that.  He didn't look

10  at the August Mack invoices.  I don't believe that that 1.5

11  has any evidence that it complies with the NCP.

12          So I think now is the time to be able to say:  Look,

13  the 1.5 was a payment from Von Duprin to Threaded Rod,

14  Threaded Rod suing for costs they incurred relating to that

15  property.  And for better or for worse, what Von Duprin did in

16  this case is tell the Court it's 1.5 lump sum, and that's all

17  they can say.

18          THE COURT:  Okay.  Thank you.

19          MR. BOWMAN:  Thank you.

20          THE COURT:  All right.  Mr. Griggs, you're going to

21  come up and respond?

22          MR. GRIGGS:  Yes, Your Honor.

23          I'll divide my response into the same two parts,

24  environmental legal action and then CERCLA.

25          The case referred to by Mr. Bowman, Reed versus

Vol. 5-891

1  Reid, the party that was found to not have caused or

2  contributed was a landlord.  The party that was found to be

3  responsible and could be held responsible under the ELA was

4  the operator of the site.  The evidence in this case that is

5  undisputed is that Moran did operate at the Zimmer Paper

6  property.  So could they be among the parties who caused or

7  contributed?  Yes.  Reed v. Reid simply does not absolve them

8  of responsibility.

9          There is no requirement under the EPA -- or sorry --

10  under the ELA as to when a release occurred.  It does have to

11  pose a risk to human health or the environment.  We believe

12  the witnesses have demonstrated that, with the downgradient

13  vapor intrusion effects, that real people are facing real

14  injuries as a result of this commingled plume and the

15  contaminants that were contributed to it.

16          Also, Mr. Bowman seems to ignore that there are 226

17  joint exhibits in this case, some of which indicate that Moran

18  did, in fact, contribute chlorinated solvents to the Zimmer

19  Paper Property.  So if you look simply at the oral testimony

20  in the case, he might have a point.  But on the record

21  testimony in the case that has been admitted, it's clear that

22  Moran could be found responsible by this Court if it believes

23  that evidence --

24          THE COURT:  Which exhibits would that be?

25          MR. GRIGGS:  I have -- this is -- I heard about this

Vol. 5-892

1  motion 15 minutes ago, Judge.  I have not had a chance to go

2  through and identify the specific exhibits.  I can do that,

3  given some time, and I suspect that those same exhibits will

4  come up during the rest of this case, and you'll have an

5  opportunity to see those.

6          With respect to CERCLA, essentially the argument

7  being made is that Moran is a former owner or operator, which

8  is a 107(a)(2) CERCLA party, and a 107(a)(2) CERCLA party has

9  to have been the owner/operator at the time of the release.

10  So the same problem exists.  While there may not have been an

11  eyewitness testimony of a release during the Moran period of

12  operation and ownership of Zimmer, it is clearly a disputed

13  fact.  We believe the admitted record evidence goes to it.

14  And this is a case in which the Court is being asked to

15  allocate responsibility based on equitable factors.

16          And to the extent that the Court finds or believes

17  that Moran's involvement was small, even zero, the Court will

18  have that opportunity to assign that share to Moran.  There's

19  no reason to cut short that process at this stage simply

20  because Moran says that no one saw me do it.  They did have a

21  vapor degreaser in that site.  That's in the testimony that's

22  been heard so far.

23          CERCLA deals in not only releases but, if you look

24  at 107(a), which is the section we're proceeding under, it is

25  a release or a threat of release.  So Mr. Bowman misquoted the

Vol. 5-893

1  statute in saying there must be a release.  That's not true.

2  There must merely be a nexus, a nexus between the responsible

3  person and the contaminant.  In this case, it is undisputed

4  that Moran did use chlorinated solvents at the Zimmer Paper

5  property.  That's what a vapor degreaser is about.

6        Whether they used the underground storage tank,

7  nobody seems to know who used that underground storage tank.

8  Nobody did it.  As we pointed out in our pretrial brief, with

9  pollution, nobody wants to be responsible for it.  Nobody saw

10  it.  Nobody wants it.

11        Finally, with respect to the $1.5 million payment,

12  Mr. Bowman is correct in saying that that reflected

13  investigation costs and remedial investigation costs that the

14  testimony shows would have needed to be incurred by somebody

15  and that paying the settlement avoided repeating those costs

16  or duplicating those costs, costs that would have been

17  available to be allocated.

18        When this Court determined, in its pretrial ruling

19  on pending motions -- I'm sorry.  It was on summary

20  judgment -- that this case was divisible, that eliminated

21  joint and several liability and made this case a contribution

22  case, a case in which the Court must now allocate

23  responsibility based on equitable factors.

24        One of those equitable factors would be things like:

25  Unjust enrichment, subrogation rights.  Is it fair that

Vol. 5-894

1  $1.5 million of investigation that was done by a third party

2  should be borne solely by Von Duprin or should it be a shared

3  cost among all those responsible for creating the commingled

4  plume?

5       We certainly believe that, under CERCLA, 113(g),

6  that having a contribution action to be settled by this Court

7  between the parties, had we paid that $1.5 million to the EPA

8  for cleanup work they had done, it does not have to comply

9  with the NCP.  We are entitled to seek recovery from other

10 responsible parties for any amount in excess of our share of

11 those costs, and we believe that 100 percent is not an

12 equitable share of the $1.5 million that was paid to Threaded

13 Rod for investigative work and remedial investigation that

14 they had performed.

15      Thank you.

16      THE COURT:  Okay.  Anything further?

17      MR. BOWMAN:  Do you want to?

18      And she gets a shot at it, too.

19      MS. KRAHULIK:  Yes.  Sorry.

20      As to the $1.5 million number -- I'm going to go in

21 reverse order here -- the 1.5 million number, we would join in

22 Moran's motion on that point, specifically for the reason that

23 those costs have not been sufficiently put in evidence, and

24 NCP compliance with respect to those costs cannot be found

25 because they are not sufficiently before the Court, and

Vol. 5-895

1  there's been no testimony that sufficiently qualifies them

2  under the National Contingency Plan for CERCLA recovery.

3          As to the issue of Moran's liability for operations

4  at the Zimmer Paper property, that issue, you know, bears on

5  Major Tool and Machine's crossclaim against Moran as the only

6  party in this lawsuit who actually operated on the Zimmer

7  Paper property for a number of years.

8          And while Mr. Griggs said there was a vapor

9  degreaser used at that property, I believe the testimony

10  actually was that there were multiple parts washers used at

11  that property, and that testimony came from Mr. Sharkey.  And

12  while he said that he didn't believe it was TCE used in those

13  parts washers, he couldn't identify what was used in them, and

14  he certainly didn't say it wasn't PCE or some other

15  chlorinated solvent.  And I think the Court can then give his

16  testimony whatever weight as to identifying a particular

17  chemical solvent used in a parts washer that it deems

18  appropriate.  So I do believe there is record evidence.  And

19  in fact -- I forgot to bring the exhibit up, if you'll let me

20  grab it.

21          THE COURT:  Sure.

22          MS. KRAHULIK:  When Mr. Griggs talks about showing

23  the necessary nexus between the operator and operations using

24  the constituents of concern, we have a joint exhibit, 1109,

25  which is a report by Allied Environmental Services specific to

Vol. 5-896

1  the Moran properties south of the Zimmer Paper property.  But

2  in that particular report, Allied acknowledges that parts

3  washers, not vapor degreasers but parts washers, used by Moran

4  on the southern parcels utilized chlorinated solvents and

5  specifically trichloroethylene, TCE, so I believe that nexus

6  has been demonstrated here.  And for that reason, the CERCLA

7  crossclaim that Major Tool and Machine has asserted against

8  Moran as to the Zimmer Paper property should proceed.

9          THE COURT:  Okay.

10          MS. KRAHULIK:  Thank you.

11          THE COURT:  Anyone else?

12          MR. BOWMAN:  Can I respond?

13          THE COURT:  I think, yes, you're next.  You may

14  respond.

15          1109 is a joint exhibit?

16          MR. BOWMAN:  This is a motion at the close of

17  plaintiff's, Von Duprin's, case.  In order to benefit the

18  Court, we took witnesses out of order.

19          THE COURT:  Agree.

20          MR. BOWMAN:  I went through quickly.

21          Russ Eiler was called.  Russ Eiler was the Von

22  Duprin health and safety guy.  He doesn't know anything about

23  Moran.  Ferree did not express opinions regarding releases on

24  Moran.  Another, Fimmen.  McInnes expressed no opinions

25  regarding causation of the releases on the Zimmer Paper

Vol. 5-897

1  Parcel.  McInnes did not express those opinions.

2          So this is at the close of Von Duprin's case.  That

3  was part of our concern over bringing Sharkey.  I mean, this

4  is at the close of their case.  If you look at what's before

5  the Court, there is no evidence that Moran released at Zimmer

6  Paper Parcel, and that includes the Allied report.  The Allied

7  report does not address operations of Moran at any place other

8  than the former Moran.

9          I'll go ahead and then address -- there is no

10  evidence that Moran used a vapor degreaser, and Your Honor has

11  heard about that today.  That's an important comment.  A vapor

12  degreaser has a term of art which is the Detrex degreaser.

13  Sharkey said he remembered parts washers and it smelled like

14  mineral spirits.  That was his testimony, so I --

15          And finally, if Von Duprin is going to cite reports,

16  joint exhibits, that they think show that Moran released at

17  Zimmer Paper Parcel, these last few days was that time.  They

18  needed to do that.  Your Honor had the right question.  What's

19  your exhibit?  We need that now.  Didn't have it.

20          Here's the other concern of that.  We started this

21  trial knowing that there are the dozens of environmental

22  reports that Love and others have looked at.  Buried within

23  those could be someone who opines -- and I'm just telling you

24  a possibility.  We agreed, then.  Bring them forward.  Lawyers

25  can decide whether there's a buried expert opinion in there.

Vol. 5-898

1  I don't agree that, simply because it's a joint exhibit, that

2  they've made their case.  One, I don't think that's how it

3  works.  I think they've got to demonstrate it to the Court.

4  And, two, I would object if someone says, "Oh, I found this

5  report where somebody opines that Von Duprin did this," or,

6  you know, "Moran did that."  That's -- that's not how we do

7  this.  We bring the evidence to the Court, we get to weigh it,

8  and we get to decide it.  And what we've got here is no

9  evidence that Moran used chlorinated solvents north of that

10  corridor on the former Zimmer Paper Parcel.

11         THE COURT:  Okay.  Mr. Griggs?

12         MR. GRIGGS:  Your Honor, one point.

13         We've heard from two experts, Mr. McInnes and this

14  morning Dr. Love, who have testified consistently with one

15  another that there was a release of chlorinated solvents at

16  the Zimmer Paper property.  That's undisputed.  Everybody here

17  says, "It wasn't me," but it was somebody, Your Honor.  And

18  the evidence that we do have, while it isn't of eyewitness

19  quality, we have a party who just, across the alley, admits to

20  using chlorinated solvents, denies that they ever crossed the

21  alley.  And so that is going to be a credibility question for

22  you, Judge, whether that is believed, or whether it's more

23  likely that, because the contamination is, in fact, present at

24  Zimmer Paper, that somebody associated with that site took

25  chlorinated solvents and used them in that building on the

Vol. 5-899

1 north side of the alley.

2        Obviously, there can be conflicting testimony, and

3 Your Honor can decide based on that who it was that might have

4 done that, but there's been no one identified in the case to

5 this point who had a closer connection to the site than Moran.

6 Moran operated there.  Moran owned the property.  It was later

7 owned by Major.

8        All I can say for sure is that Von Duprin didn't put

9 anything there, and both of the experts, I think, have agreed

10 on that point, as well.

11        Thank you.

12        MR. BOWMAN:  Thank you.

13        THE COURT:  Okay.  All right, lawyers.

14        Well, Rule 52(c) does require the Court to provide

15 findings of fact and conclusions of law.  And we're in the

16 middle of a trial, and we've got these out-of-town witnesses,

17 which I know is frustrating to the lawyers.  But the Court

18 is -- I promise you, I'm going to divide up the evidence that

19 we've heard in your case in chief, in each parties'

20 presentation.

21        So what I'm going to do is reserve ruling on the

22 52(c) motions.  And, hopefully, after the lunch break, I'll be

23 able to come back in and give you a ruling on that, okay.

24        But we're going to go ahead and let you begin your

25 direct case if you're next, Moran.

Vol. 5-900

1          MR. BOWMAN:  Yes.  We'll call -- we call Dr. Love

2     back to the stand.

3          THE COURT:  Okay.  Dr. Love.

4          (Off the record.)

5          THE COURT:  All right, Dr. Love, you were sworn this

6     morning.  You're still under oath.  If you would, have a seat.

7          THE WITNESS:  Thank you.

8          **ADAM HAMILTON LOVE, DEFENDANT'S WITNESS, SWORN**

9                    <u>**DIRECT EXAMINATION**</u>

10    BY MR. BOWMAN:

11    Q.  Dr. Love, you covered your background, but I want to cover

12    more of that.  But let's at least start from a foundation and

13    go forward.  What's your educational background?

14    A.  So I have an undergraduate in geology degree from Franklin

15    & Marshall College.  I have a master's degree in material

16    science and mineral engineering from the University of

17    California at Berkeley.  And I have a Ph.D. from the

18    University of California at Berkeley in environmental

19    engineering.

20    Q.  Okay.  And what did you do after getting that Ph.D.?

21    A.  After that, I did a postdoctorate research and then became

22    a principal investigator at Lawrence Livermore National

23    Laboratory in their Forensic Science Center.

24    Q.  And explain to us -- you talked a little bit in the direct

25    and cross in Von Duprin -- the concept of forensics within

*LOVE - DIRECT/BOWMAN*                    Vol. 5-901

1  environmental science.

2  A.  So forensic science uses multiple lines of evidence

3  typically to reconstruct what the source, timing, and

4  contribution is from various parties.

5  Q.  Okay.  And then what did you do after Lawrence Livermore

6  National Laboratory?

7  A.  I became a principal at an environmental consulting firm

8  called Johnson Wright.

9  Q.  Okay.  And then --

10 A.  And then from there, I went and came to Roux Associates,

11 and I've been at Roux Associates now six years.

12 Q.  And you covered this before, but let's state it clearly.

13 Within your field, do you actually present at consortiums or

14 educational forums regarding allocation of indivisibility of

15 hazardous substances?

16 A.  Yes.  I have a number of different presentations on

17 technical tools for divisibility and the implications for

18 allocation.

19 Q.  Okay.  And you have, indeed, opined similar, as you've

20 done here, you've provided other opinions regarding

21 allocability or divisibility of harm both within courts and

22 outside of court?

23 A.  Yeah.  I would say, probably, I do six to eight cases a

24 year where my expert opinion is doing an allocation.

25 Q.  And specifically, then, does your education and experience

*LOVE - DIRECT/BOWMAN*                    Vol. 5-902

1  provide the background you believe necessary to perform the

2  assignment that you had for Moran?

3  A.  I mean, the field of forensics specifically suits the

4  questions that are related to allocation.

5         MR. BOWMAN:  Okay.  Well, Your Honor, we've not done

6  this before, but I believe we need to do this, that I want to

7  make sure that the Court recognizes Dr. Adam Love as an expert

8  in the areas of environmental science, environmental

9  forensics, environmental engineering.

10         THE COURT:  And the Court will recognize the doctor

11  as an expert.

12         MR. BOWMAN:  Thank you.

13  BY MR. BOWMAN:

14  Q.  What precisely was the assignment, as you understood it,

15  when you started this project?

16  A.  So the initial assignment was to take a look at the

17  technical documents, the site investigation documents, what

18  operational information was available, remediation documents,

19  and first just to assess was there divisibility of this

20  contamination, and, then, if so, could I quantify what the

21  allocation would be.

22  Q.  Okay.  And clearly stated, because I don't think they have

23  been, what were the opinions that resulted from your

24  assignment?

25  A.  So my report has three opinions.

*LOVE - DIRECT/BOWMAN*                    Vol. 5-903

1          The first one has to do with whether or not there

2   was a continuous clay layer that prevented the releases from

3   the Von Duprin property from getting into other deeper

4   groundwater, and my opinion was that there was not a

5   continuous clay layer that provided that type of boundary.

6          But the two other opinions, the first one is on

7   divisibility and the fact that the contamination at this site

8   is divisible; and then the other one is the allocation, and

9   that allocation concludes that the division between the

10  various parties is 54 percent for the Von Duprin site,

11  29 percent from the Zimmer sites, 14 percent for the Ertel

12  site, and 3 percent for the Moran site.

13  Q.  And is that figure -- you're looking at figure 3.6 of your

14  report?

15  A.  I was, just to make sure I got the numbers right.

16  Q.  Right.

17  A.  Yeah.

18  Q.  And I've asked --

19          MR. BOWMAN:  Thank you, Ms. Hill.

20  BY MR. BOWMAN:

21  Q.  She's brought up Exhibit 622.  Is that figure 3.6?

22  A.  Yes.

23          And as we talked about earlier, the Von Duprin

24  number really is the minimum because of all the various ways

25  and the analysis that we skewed the analysis in favor of the

                        *LOVE - DIRECT/BOWMAN*                    Vol. 5-904

 1  Von Duprin site.

 2           MR. BOWMAN:  And, Your Honor, so that it's clear,

 3  this is our witness, and what we've been able to do, we

 4  will -- I have his demonstrative exhibits that you'll be able

 5  to see.  It's the same figures that are in the report.

 6           THE COURT:  All right.  Thank you.

 7           MR. BOWMAN:  And we'll go quickly, but I thought it

 8  might be helpful to hear from the expert as he walks through

 9  the report.

10  BY MR. BOWMAN:

11  Q.  So we covered this, but I want to be clear.  What data did

12  you rely upon in order to reach these conclusions?

13  A.  So we created a database of all the site investigation

14  data and native soil data that had been collected from all the

15  different sites, as well as the groundwater data.

16  Q.  Okay.  And did you precisely exclude any data?

17  A.  We started with all of the data in the database; right?

18  Depending on what type of analysis you do, you would use

19  subsets to do -- to perform specific analyses, but we started

20  with the entire database and didn't exclude any data that was

21  necessarily inconvenient to us.  We just incorporated it in

22  and included it in our analysis.

23  Q.  Yeah.  And I'll cover it here because we covered it in

24  cross.

25           You knew the soil data gathered at the site from

*LOVE - DIRECT/BOWMAN*                    Vol. 5-905

 1  what you defined by looking at data as the smear zone?

 2  A.  Right.  That sort of 10 to 15 feet where the groundwater

 3  fluctuates over time is considered a smear zone where the

 4  groundwater can move contaminants in and out of that zone.

 5  Q.  So a better way of stating it is, that data was part of a

 6  data set; and in analyzing areas of impact and wanting to look

 7  at the vadose zone, you excluded the smear zone, not because

 8  you disliked it, but because it wasn't appropriate under the

 9  science; correct?

10  A.  It was unreliable scientifically for what we were trying

11  to do with the soil data.

12  Q.  Now, as far as Von Duprin, the upgradient and

13  downgradient, that was -- was that an area -- you created a

14  general division there; correct?

15  A.  Yes.

16          Overall, right.  I mean, the site is pretty ideal,

17  like I said, in terms of there being four distinct release

18  points.  But the groundwater at the Von Duprin site provided a

19  unique step function increase, right.  I mean, the water

20  coming in had a certain composition and certain concentration.

21  And then you get to the Von Duprin site and it spikes up,

22  right, and it changes chemistry, and that for an environmental

23  professional like me is a giant red flag that there's a new

24  contribution of contamination into the groundwater, and so

25  that became the delineation mark for upgradient versus

*LOVE - DIRECT/BOWMAN*                    Vol. 5-906

1  downgradient.

2  Q.  Let's look at Exhibit 603.  I think this might be -- does

3  that speak, to some degree, on that issue?

4  A.  So that shows that the boundaries, but there's a stacked

5  bar, which is figure 3.4.

6  Q.  I think that's Exhibit 620.

7  A.  So if we look at this, this is -- I'm sorry.

8  Q.  Don't jump ahead.

9  A.  Yes.

10  Q.  Is this the bar chart you wanted?

11  A.  Yes.

12  Q.  Okay.  Explain that to the Court.

13  A.  If you look at this, the concentration -- so the orange is

14  TCE, the gray is DCE, and the blue is PCE.  And so if you look

15  at the concentrations of the solvents that are coming from the

16  upgradient area, just upgradient of Von Duprin, you can see

17  there's about 1400 TCE and about 760 DCE.

18          If you move right past this point of delineation,

19  and all of a sudden there's a ton of PCE that shows up,

20  there's a lot more TCE shows up and a lot more DCE shows up.

21  I mean, that's, I think, for everybody, sort of a pretty

22  obvious step function change in terms of the groundwater

23  concentration.  And so from that, we then wanted to figure out

24  how much of that came from upgradient and how much of that

25  step function came from Von Duprin itself.

1      And so if we go to the bottom figure of 3.4, we

2  started by looking at what was the --

3  Q.  What's the top figure, 619?

4  A.  Yes.  Thank you.

5      We started by looking at what was the ratio of PCE

6  to TCE in soil at Von Duprin, because that would be the same

7  release that would have entered the groundwater.  And so we

8  took that ratio, and the 4,916 that's PCE, right, is

9  attributable to the Von Duprin property.

10      If we then use the ratio that we saw in the soil and

11  give that same proportion to Von Duprin, you get about 1,821

12  parts of TCE that would appear to have come from Von Duprin if

13  it stayed in the same proportions.  And what's left is 1,276

14  parts of TCE that is not from Von Duprin.

15      Well, if you take that 1,276 and compare it to what

16  was coming in the upgradient water, just upgradient at that

17  point, they're virtually the identical number, so that really

18  was confirming that this way of dividing up the Von Duprin

19  share was not only valid scientifically, but it's consistent

20  with a totally different approach to get to the same number.

21  Q.  Okay.  And to help the Court, as you were doing that,

22  going back before the further division, you actually found

23  13 percent was upgradient and 87 percent was downgradient?

24  A.  Yes, just by totaling up the totals, the total amount of

25  CVOCs upgradient and downgradient.

LOVE - DIRECT/BOWMAN                    Vol. 5-908

1  Q.  Let's look at 651, which is figure 3.5.  Explain to us how

2  that was used and what you're trying to represent as far as

3  the geographic --

4  A.  So, while the Von Duprin contribution was clearly

5  divisible based on the groundwater concentrations, this area

6  of the upgradient, you know, release points, the groundwater

7  was commingled, and so we couldn't use the groundwater itself

8  to create the divisibility.  So what we did instead is we used

9  the level of solvent impacts in the soil above each of the

10 sites to essentially be a surrogate for groundwater impacts.

11         And so this graph essentially shows the soil data

12 and what those impacts were and which areas, you know, were

13 contributing from each source.  And so the lines to really

14 take note of is the black rectangle that's labeled Zimmer

15 Paper.  That's the boundaries that we sort of summed up the

16 contamination from in the soil to attribute to Zimmer Paper.

17 Then there's a dotted line that comes off the bottom of that.

18 And north of that, all of that soil was attributed to Ertel.

19 And south of that but east of the road was attributable to

20 Moran.  And so when we summed up each of the -- you know, the

21 total CVOC mass in those soils, we used that to generate a

22 relative contribution in that area of groundwater that was

23 mixed.

24 Q.  And in that line -- and I can officially, if I do it

25 right -- that line right there, the property boundary on the

*LOVE - DIRECT/BOWMAN*                    Vol. 5-909

1  south, there is actually shading that goes further over in

2  here, you understand that that's been called the 19th Street

3  or 19th Street corridor, the 20th Street corridor?  It's a

4  corridor, whether it's 19th or 20th.

5  A.  Yes, south of the dotted line.

6  Q.  The line you used isn't a legal -- you didn't go to the --

7  legal definition; but, as I understand it, you actually ran

8  that line as far north as you thought was reasonable to be as

9  conservative as possible in order to have a data point that if

10 someone -- well, explain.  Explain that line and how you drew

11 it.

12 A.  That line was essentially the southernmost building wall

13 of the Ertel structure when it was there, and so everything

14 south of that we assigned to Moran.

15          THE COURT:  Are you referring to the dotted line?

16          THE WITNESS:  Yes, the dotted line.

17          THE COURT:  Okay.

18 BY MR. BOWMAN:

19 Q.  But south of the dotted line, you know, from looking at

20 some of the environmental reports, that was actually an alley?

21 There was an alley between Ertel and Moran?

22 A.  That's right.

23 Q.  Sampling within the alley you've allocated to Moran?

24 A.  That's right.

25 Q.  Even though it's the alley?

*LOVE - DIRECT/BOWMAN*                    Vol. 5-910

1   A.   That's right.

2   Q.   I think we've talked about chemical uniqueness, but I

3   think Exhibit 614 speaks to an issue of -- oops, I need to

4   clear this.  And I think this was up before.  But is this

5   where you -- helps us understand how you looked at the unique

6   chemical patterns?

7   A.   Right.  This is essentially the data that supports that

8   stacked bar chart that I showed earlier with the various

9   amounts of PCE, TCE, DCE, upgradient versus downgradient.

10  Q.   So let's cover further about how you calculated -- we were

11  a little bit -- but how you calculated the allocation of

12  chlorinated solvent upgradient, recognizing downgradient was

13  based on groundwater and PCE.

14          Upgradient, that allocation was done how?

15  A.   The upgradient was -- other than the two tiny pieces that

16  were calculated because they were divisible, the small

17  groundwater contamination in the north Ertel site and the

18  very, very, very small amount that was in the Zimmer building,

19  the other three were apportioned based on the relative amounts

20  of CVOC in the soil at each of those sites.

21  Q.   Okay.  So let's look at Exhibit 620, and I think this has

22  been up before.  But you used figure 3.4.

23          Is that -- I don't know if that's 3.4.  620.  It is

24  620.

25          There was -- you did look at the shallow soil data

LOVE - DIRECT/BOWMAN                    Vol. 5-911

1  from each site; correct?

2  A.  Right.  The shallow soil data was essentially what was

3  totaled to have the relative allocation in the upgradient

4  area.

5  Q.  And what figure should we refer to for that?

6  A.  That would be table 2, which is --

7  Q.  Okay.  We had table 2 before.  Okay.  That's what we

8  looked at before.

9  A.  And so you can see, in the upgradient area, 13 percent --

10 if you sort of walk through it, 13 percent of the total CVOC

11 mass is in the upgradient area, and that gets divided among

12 each of these different source areas based on the percentage

13 that's just to the right of that.  Those numbers come from the

14 relative amounts of contamination in the upgradient area.

15       If we look at the downgradient area, right, we said

16 87 percent of the total CVOC mass is in the downgradient area.

17 The initial -- the amount that we apportion for Von Duprin,

18 the 63 percent, is there.  The remaining 37 percent is

19 essentially allocated in the same proportions as what was used

20 in the upgradient area, assuming everybody contributed -- that

21 contributed to the upgradient area contributed the same amount

22 to the downgradient area, relatively.

23 Q.  So you have an allocation of Von Duprin property based

24 upon groundwater; the upgradient is then allocated based upon

25 this shallow soil data?

*LOVE - DIRECT/BOWMAN*                                Vol. 5-912

1   A.  That's right.

2   Q.  And you're taking percentages of that percentage?

3   A.  That's right.

4   Q.  Which then leads us to, I think it's, 622.  You do that

5   math, and then you end up with then Von Duprin at 54 percent;

6   correct?

7   A.  That's right.  If you just total up each source area's

8   contribution from the upgradient and downgradient area, you

9   get those total percentages that are shown in that bar plot.

10          THE COURT:  Mr. Bowman, you've exhibited 615, 614,

11  621, 620, 619, 603, and 622.

12          Do you want to offer them into evidence?

13          MR. BOWMAN:  I would like them in evidence.  I

14  believe his report's in, but they're just easier to see.

15          THE COURT:  Right.

16          Any objection?

17          MR. GRIGGS:  Other than the fact that they are

18  already part of Exhibit 101 that the Court has admitted.

19          THE COURT:  Okay.  Well, if there's an appeal, the

20  Court of Appeals is not going to know what you're talking

21  about, unless we have these exhibit numbers in there --

22          MR. BOWMAN:  Yeah.  Thank you.  Thank you, Your

23  Honor.

24          MS. KRAHULIK:  No objection.

25          THE COURT:  -- for the record.

LOVE - DIRECT/BOWMAN                    Vol. 5-913

1          Oh, you're with him.  Okay.

2          So the Court is going to admit into evidence 603,

3  614, 615, 620, 621, and 622.

4          *(Defendant's Exhibits 603, 614, 615, 619, 620, 621,*

5  *622 were received in evidence.)*

6          THE COURT:  Did I get them all?

7          (Off the record.)

8          THE COURT:  And 619.  All right.

9          You may continue.

10          MR. BOWMAN:  Thank you.

11  BY MR. BOWMAN:

12  Q.  And, again, all of this, as you come to these conclusions,

13  that's giving no allocation to the Von Duprin Parcel property

14  for any upgradient at all; correct?

15  A.  That's right.  They wouldn't -- the contamination wouldn't

16  have flown sort of backwards in the groundwater so they got a

17  zero in the upgradient area.

18  Q.  Is the scientific method you've described consistent with

19  what you've lectured on in public forums?

20  A.  Yes.  I mean, this is exactly what I discuss in terms of

21  going through different methodologies and, you know, what you

22  have to go through in order to find the most reliable one.

23  Q.  Is the scientific method you've described here consistent

24  with methods you've used at other sites with comparable

25  assignments?

*LOVE - DIRECT/BOWMAN*                    Vol. 5-914

1  A.  It is.

2  Q.  Is scientific method you've described consistent with the

3  standard of practice in your field of expertise?

4  A.  Yes.

5  Q.  And do you believe the conclusions are reliable to a

6  reasonable degree of scientific certainty?

7  A.  I do.

8  Q.  We talked about depth of groundwater -- or soil samples

9  and vadose zone versus smear zone.

10           If you used a different interval -- well, first,

11  that only -- that doesn't impact an allocation of Von Duprin

12  because that's based on a PCE, TCE analysis and groundwater?

13  A.  That's right.

14           The only thing the soil data in the upgradient area

15  would impact is the relative contribution between Zimmer,

16  Ertel, and Moran.  Von Duprin's contribution is unaffected by

17  what soil data was chosen in the upgradient area.

18  Q.  Right.

19           And I think what's important for the Court to know

20  is, the soil data from the vadose zone was a result of other

21  consultants going out and taking soil samples before

22  excavation 10 feet and above; correct?

23  A.  That's right.  I mean, it's part of a normal site

24  investigation that had as the objective to understand the

25  extent and magnitude of contamination because they wanted to

*LOVE - DIRECT/BOWMAN*                    Vol. 5-915

1  know where they needed to clean up.

2  Q.  And then the normal practice, then, is, when they

3  excavated, you take -- is normal practice to take sidewall

4  samples to see how you're doing, as far as -- the consultant,

5  as they're digging up the contamination; correct?

6  A.  That's right.  You want to know whether you got it all.

7  And to do that, you would sample the edges of where you've dug

8  out to see if there's any remaining contamination there that

9  you would still want to remove.

10 Q.  So the sidewall samples used in your analysis were vadose

11 zone and were actually the native soils?  I just want to be

12 clear.  It was not sampling of clean soil; it was sidewall

13 samples of the native soils?

14 A.  That's right.  All of the data in the database is native

15 soil that was used to determine the extent and magnitude of

16 contamination at the site.

17 Q.  When challenged, you looked at the database to see whether

18 there was the potential for having grabbed a sample that was

19 in clean soil, and what did you find out?

20 A.  Right.  In terms of looking at the order at which samples

21 were taken and the location of them, there was only one sample

22 that I could find in the entire database of hundreds of soil

23 samples where, at a later time, it may have been right on the

24 edge of where there was some clean fill put in.  But, like I

25 said, that was one out of hundreds of soil samples, so that

*LOVE - DIRECT/BOWMAN*                    Vol. 5-916

1  sort of fit that description.

2  Q.  And the final area -- we covered it, but I want to be

3  clear -- explain to us and the Court how you could do this

4  analysis and know that the soil remediation, the soil removals

5  did not impact or would not cause you to be unable to do this

6  analysis?

7  A.  Yeah.  I mean, if we were talking about a site with much,

8  much lower levels of groundwater contamination, the removal of

9  the soil above it, I think, might play a more significant

10 role.  But we're talking about releases from sites where a

11 separate phase solvent has gone all the way through down into

12 the groundwater, and so the soil is not the primary source of

13 contamination in the groundwater at that point.  It's the

14 actual solvents that is, you know, within the groundwater

15 itself that slowly dissolves over time into the groundwater.

16 So while obviously removing the contamination from the soil is

17 a good thing, there's not a reason why you would expect that

18 to make a dramatic difference in the concentrations of the

19 groundwater until somebody goes and actually cleans the

20 solvents that are within the groundwater itself.

21 Q.  And, then, finally, then, trying to understand that, for

22 those of us who don't practice it every day, even though that

23 contamination that's contributing is in groundwater, the

24 science is very reliable for scientists like you to take

25 vadose zone soil samples and use those for an indication and

*LOVE - CROSS/GRIGGS*                    Vol. 5-917

1  calculate a mass of release; correct?

2  A.  That's a pretty standard environmental forensic technique,

3  yes.

4          MR. BOWMAN:  Thank you.

5          THE COURT:  Mr. Griggs is going to go next?  You may

6  cross-examine, Mr. Griggs.

7                    **CROSS-EXAMINATION**

8  BY MR. GRIGGS:

9  Q.  Dr. Love, I just have a few questions.  We spent a bit of

10 time already talking.

11         Your analysis, as reflected in table 1 and table 2

12 of your expert report, Exhibit 101, does that assume that

13 there is a single commingled plume for groundwater impacts?

14 A.  Well, I mean, there are some small portions that are not

15 commingled, right, like the Ertel north portion and this

16 little tiny bit that's in the Moran building.  Those appear to

17 be separate and distinct.  But the other upgradient -- the

18 other upgradient source areas in the Von Duprin property all

19 appear to be commingled in the same plume.

20 Q.  You testified, in response to a question asked by

21 Mr. Bowman, that the contamination is divisible and that that

22 was one of the opinions that you expressed in this case; is

23 that correct?

24 A.  That's right.

25 Q.  Have you expressed an opinion in this case whether the

*LOVE – CROSS/GRIGGS*                    Vol. 5-918

1  harm is divisible?

2  A.  I mean, I guess it depends on how you define harm, because

3  in my report, I would say I'm equating the contribution with

4  harm.

5  Q.  So division of contamination is what we call allocation in

6  your field of study; right?

7  A.  There's lots of different, apportionment, allocation,

8  yeah.  There's lots of different ways.

9  Q.  Do those words mean the same thing to you or different

10 things to you?  You just said them like they were synonymous.

11 A.  You know, I've found that people use them interchangeably,

12 and I know that some people think that there's a distinction,

13 so I usually ask for clarification.

14 Q.  In your usage --

15 A.  Yes.

16 Q.  -- is apportionment different from allocation?

17 A.  I tend to use them interchangeably, but I've also been

18 asked not to, so --

19 Q.  And the third in this three-headed monster that we have, I

20 think, is the word divisibility.  Does divisibility go with

21 allocation or apportionment or both?

22 A.  It can go with both.

23 Q.  Okay.  You have expressed an opinion, as reflected in your

24 expert report, on what you believe the evidence shows the

25 overall responsibility for the plume is among each of the

*LOVE - CROSS/GRIGGS*                    Vol. 5-919

1  parties in this case?

2  A.  Among each of the source areas, yes.

3  Q.  Thank you.  I appreciate that clarification.  Among each

4  of the source areas.

5           You have not expressed an opinion that would give a

6  different number than what is shown in table 2 to any one of

7  these source areas?

8           Let me ask that question in a better way, maybe.

9           You were asked on direct examination whether or not

10  there might have been some decisions made in the process that

11  might have helped one of the sites versus one of the other

12  sites.  What I'm asking is:  The opinion that you ultimately

13  rendered in this case is reflected in table 2?

14  A.  That's right, and that opinion reflects a minimum number

15  for the Von Duprin site and likely a maximum number for the

16  Moran site.

17  Q.  And one final point.  You testified that soil removal was

18  not as big an impact in this case as maybe in some other cases

19  because solvent went directly to groundwater; did I hear that

20  correctly?

21  A.  Well, solvent went through the soil into the groundwater.

22  What's in the soil is the residual amount of contamination

23  from the solvent that traveled through it, and there is

24  separate phase solvent in the groundwater from the surface

25  release.

*LOVE - CROSS/GRIGGS*                    Vol. 5-920

1  Q.  Okay.  Separate phase.  Maybe that's the adjective I need.

2        What you're describing is that, upon reaching the

3  groundwater zone, there was still pure phase solvent present?

4  A.  Based on the concentrations that are observed in

5  groundwater, it appears that there is, yes.

6  Q.  And in the context of chlorinated solvents, is there a

7  name that we give to that pure phase solvent when it interacts

8  with groundwater?

9  A.  Oftentimes we call it a dense nonaqueous phase liquid or a

10 DNAPL.

11        THE REPORTER:  I'm sorry.  Can you repeat that?

12        THE COURT:  And spell that, also?

13        THE WITNESS:  Yeah.

14        A dense nonaqueous phase liquid, and the acronym is

15 DNAPL, D-N-A-P-L.

16 BY MR. GRIGGS:

17 Q.  And did you, in fact, see in the data that you reviewed in

18 this case evidence of the presence of DNAPL on one more of the

19 sites?

20 A.  Yes.

21 Q.  Which site?

22 A.  So the Von Duprin site appears to have had DNAPL released.

23 The concentrations at the lowest part of the groundwater

24 appear higher than that at the shallower locations, same

25 locations.

*LOVE - CROSS/GRIGGS*                    Vol. 5-921

1   Q.  Any other sites that you saw evidence that there was

2   DNAPL?

3   A.  I'd have to go back and look specifically at the data.

4   Off the top of my head, I wouldn't want to guess.

5   Q.  Okay.  And do you remember the nature of the evidence that

6   you saw, wherever it was, that indicated you -- was it merely

7   the fact that the concentrations in the deep part of the

8   groundwater were higher than in the shallower part?  Is that

9   what you were saying?

10  A.  That's one of the primary lines of evidence, yes.

11  Q.  Okay.  Were there any --

12  A.  As well as --

13  Q.  Go ahead.

14  A.  -- the overall absolute concentrations.

15  Q.  Were there any other lines of evidence that you would have

16  looked to in making the determination about the presence or

17  absence of DNAPL in this plume area?

18  A.  I mean, certainly the high levels of contamination that

19  are observed in soil also support that what was released was

20  a, you know, concentrated solvent.  It wasn't, you know,

21  dissolved, a solvent dissolved in water or something like

22  that, and so that certainly also provides another line of

23  evidence to a DNAPL release.

24          MR. GRIGGS:  That's all I have.  Thank you.

25          THE COURT:  Ms. Krahulik, you may cross-examine the

1    witness.

2                         **CROSS-EXAMINATION**

3    BY MS. KRAHULIK:

4    Q.  Hello, again.

5    A.  Hi.

6    Q.  I just have a couple of follow-up questions for you.

7              Your analysis did not take into consideration the

8    relative concentrations leaving the property boundary of any

9    particular one of these properties at any particular point in

10   time, did it?

11   A.  Not in the groundwater.  The only place where that sort of

12   consideration was taken was at the upgradient, the

13   downgradient boundary between the groundwater coming towards

14   the Von Duprin property and once you got onto the Von Duprin

15   property.

16   Q.  And all of those locations were actually on the Von Duprin

17   property?

18   A.  They were, yes.

19   Q.  And I think Mr. Griggs cleared this up, but you mentioned

20   contributions by specific parties earlier.  And you do mean

21   properties?

22   A.  I do mean properties, yes.

23   Q.  Do you know what depth the degreaser at the Moran property

24   was recessed to into the ground?

25   A.  I don't know the depth, off the top of my head.

*LOVE – REDIRECT/BOWMAN*                    Vol. 5-923

1  Q.  You don't know if it was more than 10 feet?

2  A.  I don't know.

3          MS. KRAHULIK:  Okay.  Thank you.

4          THE COURT:  Any redirect?

5          MR. BOWMAN:  Yeah.

6                   **REDIRECT EXAMINATION**

7  BY MR. BOWMAN:

8  Q.  I covered it before, but we need it clear.  With this

9  constituent of concern, chlorinated solvent; right?

10 A.  Yes.

11 Q.  And we have PCE and TCE; correct?

12 A.  Yes.

13 Q.  Is it the case, based on your knowledge and experience and

14 your testifying before, an allocation of contribution to a

15 commingled plume of PCE and TCE was the same as saying that's

16 a contribution to the harm?

17 A.  Yes, and I've used it at numerous other solvent sites.

18          MR. BOWMAN:  Okay.  Thank you.

19          THE COURT:  Any questions on those couple,

20 Mr. Griggs?

21          MR. GRIGGS:  (Shakes head from side to side.)

22          THE COURT:  Ms. Krahulik?

23          MS. KRAHULIK:  No, Your Honor.

24          THE COURT:  All right.  Then Dr. Love is excused.

25          All right.  Thank you, Dr. Love.

*LOVE - REDIRECT/BOWMAN*                    Vol. 5-924

 1            THE WITNESS:  Thank you.

 2            (Witness excused.)

 3            THE COURT:  Do you have another witness?

 4            MR. BOWMAN:  We do not.

 5            THE COURT:  Okay.  So you --

 6            MR. BOWMAN:  But we have depositions to cover.

 7            THE COURT:  All right.

 8            MR. BOWMAN:  And I don't know whether you want to do

 9  the lunch break.  You can tell, I've passed this off to a much

10  smarter person.

11            THE COURT:  All right.  Well, let's let your

12  co-counsel, Mr. Menkveld, present.

13            MR. MENKVELD:  Your Honor, before we got started

14  calling witnesses in this case, we talked about, rather than

15  putting a lawyer in the box to read through deposition

16  transcripts, that we would simply admit the original

17  deposition transcripts as exhibits in this case.

18            THE COURT:  That would be perfect.

19            MR. MENKVELD:  And then we also -- those originals

20  are in sealed envelopes, and then we also have deposition

21  transcripts, copies of those with the portions highlighted,

22  which is my understanding of the way the Court wants it.

23            THE COURT:  Perfect.

24            MR. MENKVELD:  Okay.  So let's get those.

25            So the number we would use here, Your Honor, would

Vol. 5-925

1  be Exhibits 623 and 624.

2           If I may approach, Your Honor?

3           THE COURT:  You may.

4           623 and 624.

5           MR. MENKVELD:  Yes, Your Honor.

6           And 623 will be the original deposition transcript

7  of Richard W. Phelps.  Phelps is spelled P-H-E-L-P-S.

8           And 624 will be the original deposition transcript

9  of John D. Letsinger.  Letsinger is spelled L-E-T-S-I-N-G-E-R.

10          THE COURT:  All right.  Exhibits 623 and 624 are

11 admitted into evidence without objection, Mr. Griggs?

12          MR. GRIGGS:  We have no objection to those original

13 transcripts being admitted.  I understand that there is a

14 separate copy that's been highlighted.  I wonder if we will be

15 getting a copy of that as well?

16          THE COURT:  If you would.  Do you have an extra

17 copy?

18          MR. MENKVELD:  We can get you a copy.

19          THE COURT:  Okay.  All right.

20          MR. MENKVELD:  And I will also mention, Your Honor,

21 before we started trial, Moran filed the excerpts that it

22 intends to use, which are highlighted, and counsel do have

23 copies of those.

24          THE COURT:  All right.  Very good.

25          Any objection?

Vol. 5-926

1          MR. GARDNER:  No objection, Your Honor.

2          I would only add, though, that we also intended to

3  offer excerpts from the Phelps deposition, and we had filed a

4  motion highlighting those earlier with the Court.

5          And we also have some cross or some excerpts from

6  the Letsinger deposition that we would intend to offer as

7  cross to the excerpts that Moran is offering.

8          THE COURT:  You may do that as soon as we get his

9  in.

10         MR. GARDNER:  Okay.

11         THE COURT:  Okay.

12         MR. MENKVELD:  And the only thing to add, Your

13  Honor, is:  There is an exhibit to the Phelps deposition that

14  references the properties that were discussed in the Phelps

15  deposition.  I want to make sure that exhibit -- because it's

16  a sealed, you can never be sure whether those exhibits make it

17  in, so we would submit that exhibit, along with this, as well.

18         And we will have to get that to the Court.  I

19  thought it was in my briefcase.  It's not.  So we will have to

20  get that to the Court.

21         THE COURT:  All right.  Okay.  623 and 624 are in

22  evidence.

23         Those are the sealed versions of the entire

24  transcripts; correct?

25         MR. MENKVELD:  That's correct, Your Honor.

Vol. 5-927

 1                    *(Defendant's Exhibits 623, 624 were*

 2                    *received in evidence.)*

 3              THE COURT:  And then you've got some designated

 4    portions?

 5              MR. MENKVELD:  Yes, Your Honor.

 6              THE COURT:  Okay.  We'll let Tanesa hold onto those

 7    for right now so that I don't write on anything.

 8              Anything further?

 9              MR. MENKVELD:  There's nothing further on those,

10    Your Honor.  Thank you.

11              THE COURT:  All right.  And Mr. Gardener?

12              MR. GARDNER:  Yes, Your Honor.  We have -- what we

13    did with the Phelps deposition was we identified the

14    particular excerpts that we thought were relevant from that,

15    rather than reading it to the Court.  We've done the same with

16    the excerpts from the Letsinger deposition.  So I have a

17    document that outlines those.  We could also highlight them,

18    if that's easier for the Court.  I can leave that to your

19    discretion.  But what I've got here are notice or -- excuse

20    me -- references to the deposition with the particular page

21    and line numbers that we think are relevant.

22              THE COURT:  Oh.  I would prefer a highlighted

23    version.

24              MR. GARDNER:  We can do that for Your Honor.

25              THE COURT:  That would be very easy for me to read.

Vol. 5-928

1  Okay.

2          So you'll get that to me?

3          MR. GARDNER:  We will, Your Honor.

4          THE COURT:  All right.

5          No objection?

6          MR. MENKVELD:  None from Moran, Your Honor.

7          MR. GRIGGS:  No objection.

8          THE COURT:  All right.  Okay.  So is Moran going to

9  rest?

10          MR. MENKVELD:  Moran rests, Your Honor.

11          THE COURT:  Thank you.

12          Will you be presenting evidence, live evidence?

13          MS. KRAHULIK:  We will, Your Honor.

14          Our first witness is not arriving for a few more

15  minutes, so -- but he will be ready this afternoon.  We only

16  have one witness this afternoon who will be here.  Our other

17  witnesses can't be here until tomorrow.  One is coming from

18  California.  So we will have one live witness today, two

19  tomorrow, and that is all the additional testimony we

20  anticipate in the case.

21          THE COURT:  Wonderful.

22          So we should finish tomorrow?

23          MS. KRAHULIK:  That was my question, if we should be

24  prepared to present closing tomorrow.  I think we were

25  finishing early tomorrow, 3:00?

Vol. 5-929

1          THE COURT:  3:00.  We would love to finish tomorrow;

2   okay.

3          MS. KRAHULIK:  We would, too.

4          THE COURT:  So be prepared for your closing

5   tomorrow.

6          Do you believe you'll have any rebuttal?

7          MR. GRIGGS:  At this time, I don't believe so, Your

8   Honor.

9          THE COURT:  Okay.

10          MR. GRIGGS:  We'll keep our fingers crossed.

11          THE COURT:  Okay.  Very good, lawyers.  You're being

12   very efficient.

13          So we'll go ahead and take our lunch break.  It's

14   11:35.  We're going to start back at 1:00 to give me time to

15   read over this transcript for this 52(c) motion that's

16   pending.

17          MR. BOWMAN:  Wonderful.

18          THE COURT:  So that's an hour and a half.  All

19   right.  So we'll resume at 1:00 p.m.  Have a good lunch break.

20          THE COURTROOM DEPUTY:  All rise.

21          (Recess at 11:35, until 1:02.)

22          THE COURT:  We are back on the record.

23          And, lawyers, the Court has taken under advisement

24   the Rule 52(c) motion.  As you know, Rule 52(c) says the Court

25   may decline to render any judgment until the close of

Vol. 5-930

1   evidence.  A judgment on partial findings must be supported by

2   findings of fact and conclusions of law as required by Rule

3   52(a).  We scrambled, we did research, but we're not ready to

4   issue a ruling.

5          Rule 52(c) also provides that, in addition, a Court

6   may enter judgment on partial findings sua sponte at any time

7   during a bench trial so long as the party against whom

8   judgment is to be rendered has been fully heard with respect

9   to an issue essential to the parties' case.  So I believe both

10  parties -- all parties have been fully heard on the issue.  So

11  if I can have a ruling for you in the morning, I'll give it to

12  you in the morning.  Otherwise, we're going to continue with

13  the trial.

14          And I see you have a witness here.

15          MS. KRAHULIK:  We do, Your Honor.

16          Major Tool and Machine and Major Holdings call Nivas

17  Vijay.

18          THE COURT:  Okay.  Mr. Vijay, would you please stand

19  and raise your right hand so that I can get you sworn.

20          (The witness is sworn.)

21          THE COURT:  You may have a seat.

22          And, Counsel, you may examine your witness.

23          MS. KRAHULIK:  Thank you.

24

25

1          **NIVAS VIJAY ARAGHAVAN, DEFENDANT'S WITNESS, SWORN**

2                       **DIRECT EXAMINATION**

3    BY MS. KRAHULIK:

4    Q.  Would you please state your name and spell it for our

5    court reporter, please.

6    A.  It's Nivas Vijay Araghavan.  N-I-V-A-S, V-I-J-A-Y,

7    A-R-A-G-H-A-V-A-N.

8    Q.  And people commonly refer to you at -- your last name as

9    "Vijay"?

10   A.  Correct.

11   Q.  And you're fine with me doing that today, Mr. Vijay?

12   A.  Yes.

13   Q.  And one thing.  You have to let me finish before you

14   answer just so we can get a good record.

15            What is your occupation?

16   A.  I'm the principal of Heartland Environmental Associates.

17   Q.  What is your title at Heartland?  It's just principal?

18   A.  Senior project manager and principal.

19   Q.  And what education do you have?

20   A.  I have a degree in geology from Purdue and have been in

21   the environmental consulting business since 2003.

22   Q.  Do you have any certifications?

23   A.  I'm a certified hazardous materials manager, and I also

24   have multiple certifications with underground storage tanks,

25   asbestos inspections, and other common environmental

*VIJAY - DIRECT/KRAHULIK*                    Vol. 5-932

1  related -- HAZWOPER, and also OSHA training, as well.

2  Q.  All those things you use in your job?

3  A.  Yes.

4         MS. KRAHULIK:  Will you please pull up Exhibit 1001,

5  Ms. Woods?

6  BY MS. KRAHULIK:

7  Q.  And do you recognize this general geographic area?

8  A.  Yes, I do.

9  Q.  And you've had some involvement, at least, with many of

10 the properties depicted on Exhibit 1001; right?

11 A.  Correct.

12 Q.  Let's take them one at a time.  I think that's the easiest

13 way to go about this.

14        Let's talk, first, about the property that's labeled

15 Ertel property on this map.  Tell the Court, generally, about

16 your involvement at the Ertel property.

17 A.  Starting in 2006, while I was with QEPI, I worked with the

18 City of Indianapolis to do emergency threat to health removal

19 activities -- that was funded by the U.S. EPA -- where we

20 removed hazardous materials from the site.  Then, afterwards,

21 I worked to do environmental assessment and remediation work

22 on the property.

23        THE COURT:  Mr. Vijay, what's QEPI?

24        THE WITNESS:  Quality Environmental Professionals,

25 Incorporated.  They were the consulting firm I was employed

*VIJAY - DIRECT/KRAHULIK*                Vol. 5-933

1  with prior to employment with Heartland.

2           THE COURT:  All right.  Thank you.

3  BY MS. KRAHULIK:

4  Q.  And what sort of activities did QEPI undertake on the

5  Ertel property?

6  A.  We undertook environmental assessment work, including the

7  advancement of numerous soil borings throughout the property,

8  and then assessed and provided oversight for the remediation

9  of the property and also oversaw the demolition of the former

10 site building.

11 Q.  And what was involved in the remediation of that property?

12 A.  After the assessment was completed, we removed and hauled

13 off site approximately 37,000 tons of contaminated soil from

14 the footprint of the property.

15          MS. KRAHULIK:  Would you please pull up

16 Exhibit 1092?

17          And, Your Honor, if it is okay with the Court, on

18 these environmental reports because I'm going to be showing

19 Mr. Vijay several of them, with the Court's permission, I

20 would like to be able to give him copies and the Court copies

21 of those reports, even though they're already in the record,

22 just for ease of reference.

23          THE COURT:  That's fine.  Thank you.

24          Mr. Vijay, while she's doing that, what do you guys

25 do with 37,000 tons of contaminant?  When you get rid of it,

*VIJAY - DIRECT/KRAHULIK*                    Vol. 5-934

1  where do you put it?

2          THE WITNESS:  After profiling, the contaminated soil

3  was disposed of at a landfill, at Southside Landfill.

4          THE COURT:  Here in Indianapolis?

5          THE WITNESS:  Correct.

6          THE COURT:  So there's a contaminated landfill now;

7  right?

8          THE WITNESS:  Landfills typically take a lot of

9  contaminated material, but typically it's lined so it prevents

10 further migration from -- or the contaminates from migrating

11 from the landfill.

12         THE COURT:  All right.  Thank you.

13 BY MS. KRAHULIK:

14 Q.  So I've handed you what's been marked as Exhibit 1092,

15 which is a stipulated exhibit in this case.  Can you tell the

16 Court what we are looking at here?

17 A.  This is the soil remediation completion report for the

18 former Ertel manufacturing facility, dated May 29th, 2008.

19 Q.  And take a look at page 4 of this document and

20 specifically at the summary of remediation activities at

21 Section 2.1.1, which continues, I think, then onto the next

22 several pages, and tell the Court what this document shows.

23 A.  This section summarizes the excavation and disposal of the

24 37,000 tons of impacted soil, along with documenting the

25 backfilling and the confirmation samples that were collected.

*VIJAY - DIRECT/KRAHULIK*                    Vol. 5-935

1  Q.  And I believe this report also talks about, as the Judge

2  was just asking you, the disposal of the soil that was

3  excavated?

4  A.  That's correct.

5  Q.  And were all the VOCs contained in that soil below the

6  industrial default closure levels for IDEM?

7  A.  The VOCs in the soil would have been above the industrial

8  default screening levels.

9  Q.  And were those then averaged in order to allow disposal?

10 A.  Correct.

11 Q.  Take a look at page 16 of this report.  What did you

12 ultimately conclude on behalf of QEPI here?

13         THE COURT:  There is no page 16.

14         MS. KRAHULIK:  I'm sorry.  It's page 16 of the PDF.

15 It's actually page 13 of the soil closure report.  It's the

16 second to last page.  I wrote down the PDF numbers to make it

17 easier for her to pull them up.

18 A.  We concluded that the soil excavation was completed and

19 the confirmation sampling based on the averages that we

20 utilized were below the IDEM risk industrial default closure

21 levels and that we requested closure for surface and

22 subsurface soil at the site, and we also proposed additional

23 groundwater monitoring to document the effectiveness of the

24 soil remediation at remediating groundwater.

25 Q.  And at that point, did Major Tool and Machine begin to

*VIJAY - DIRECT/KRAHULIK*                     Vol. 5-936

1  undertake some activities at the site?

2  A.  After the completion of the soil removal, Major Tool and

3  Machine began redevelopment of the site.

4  Q.  And do you understand that Major Tool and Machine was

5  acting under a lease for the property at that time?

6  A.  That's my understanding.

7  Q.  And have you seen or reviewed a document whereby Major

8  Tool and Machine performed a Phase I investigation of the

9  property before that lease was effective?

10  A.  Yes, I have.

11  Q.  Do you recall who performed that investigation?

12  A.  I believe that was conducted by EnviroForensics.

13  Q.  I'm going to show you Exhibit 1152.  Can you tell the

14  Court what this document is?

15  A.  This is a document issued to Major Tool and Machine from

16  the Indiana Brownfields Program regarding a vapor intrusion

17  mitigation system monitoring plan.

18  Q.  And it looks like you were carbon copied on this document?

19  A.  That's correct.

20  Q.  And what was the purpose of obtaining the Brownfields

21  Program's letter here?

22  A.  The purpose of this letter was to get feedback from the

23  Brownfields Program related to a vapor intrusion mitigation

24  system that was proposed and a monitoring plan to address the

25  effectiveness of the vapor intrusion system that was proposed

*VIJAY - DIRECT/KRAHULIK*                    Vol. 5-937

1  to be installed as part of the -- or that was installed as

2  part of the development of the new Major Tool building.

3  Q.  On the former Ertel property?

4  A.  Correct.

5  Q.  All right.  Let's take a look at 1123.  And, actually, I

6  will hand you 1123 and 1124 together because I think we'll

7  talk about both of those at the same time.  I'll give you a

8  minute to review these documents.

9          So it looks like both of these are Heartland

10  Environmental Associates reports submitted to Mr. Ryan Groves

11  at IDEM and signed off on by you?

12  A.  That's correct.

13  Q.  What were the purposes -- or what was the purpose of these

14  submittals to IDEM?

15  A.  The purpose of the initial submittal from May 30th was to

16  provide a status update to IDEM and also request no further

17  action for the incident at the Ertel facility.  And the

18  follow-up submittal from October 15th was to provide IDEM with

19  additional information related to exposure pathways to augment

20  the initial no-further-action request.

21  Q.  And in both of these documents, did Heartland also request

22  closure or no-further-action status for what we've referred to

23  as the Zimmer Paper parcel or the Moran Electric rewind shop?

24  A.  It was our understanding that the closure request was for

25  both those parcels.

*VIJAY - DIRECT/KRAHULIK*                    Vol. 5-938

1  Q.  If you take a look at the October 15 submittal -- and this

2  is Exhibit 1124 -- I'm looking at figure 1, which is the

3  first figure to this document.  Do you see that Zimmer

4  property, Zimmer Paper parcel, included within the site

5  footprint?

6  A.  Yes, I do.

7  Q.  What was the result of these requests to IDEM?

8  A.  IDEM issued a no-further-action for the Ertel property.

9  Q.  I'm going to show you Exhibit 1099.  Mr. Vijay, it appears

10 that you are copied on this document.  What are we looking at

11 here?

12 A.  This is a no-further-action letter issued by IDEM from

13 November, 2012.

14 Q.  Please take a look at the second page of this document.

15 It's page 3 of the PDF.  And, again, this was in November of

16 2012.

17        The final full paragraph on this page sets out the

18 highest remaining concentrations at the Ertel property at the

19 time of closure.  Can you tell the Court what those were?

20 A.  The highest concentration of tetrachloroethene was 271

21 parts per billion, and the highest concentration of

22 trichloroethylene was 267 parts per billion.

23 Q.  And tetrachloroethene is commonly known as PCE, right?

24 A.  Correct.

25 Q.  And "tri" is known as TCE?

*VIJAY - DIRECT/KRAHULIK*                    Vol. 5-939

1   A.  Correct.

2           MS. KRAHULIK:  Can you pull up Document 1138,

3   please?

4   BY MS. KRAHULIK:

5   Q.  What are we looking at here?

6   A.  This is an e-mail that I sent to Michael Anderson with

7   IDEM regarding the no-further-action request and providing

8   some clarifications that were requested related to the

9   request, the request.

10  Q.  And what were the clarifications related to, specifically?

11  A.  Specifically related to vapor intrusion and the existing

12  vapor intrusion system that was installed in the Major Tool

13  building that was built over the Ertel facility.

14  Q.  If you take a look at paragraph 2 of this e-mail, around

15  the middle of that paragraph, it says, "Minor concentrations

16  of volatile organic compound chemical constituents were

17  encountered in indoor air ambient samples" -- I'm sorry --

18  "indoor ambient air samples collected within the site

19  building.  It is likely that these concentrations were the

20  result of manufacturing operations at the site, not the result

21  of vapor intrusion."

22          When you say "VOCs," are you talking about

23  chlorinated solvents?

24  A.  VOCs, including chlorinated solvents, yes.

25  Q.  So VOCs as a class would include chlorinated solvents?

*VIJAY - DIRECT/KRAHULIK*                    Vol. 5-940

1  A.  Correct.

2  Q.  But, here, the constituents were those being used in

3  operations and were not chlorinateds?

4  A.  I believe so, yes.

5  Q.  And after this, IDEM issued the no-further-action letter

6  that we saw in Exhibit 1099?

7  A.  Yes.

8  Q.  Now, you've spent a lot of time on these properties.  And

9  kind of in connection with this e-mail, there's been testimony

10 that Major Tool and Machine has never used chlorinated

11 solvents on any of these properties in its operations.

12         Have you ever seen any use of chlorinated solvents

13 on any of these properties by Major Tool and Machine?

14 A.  No, I have not.

15 Q.  And with respect to the NFA, the Zimmer Paper parcel was

16 not included in that NFA, despite your intention that it would

17 be?

18 A.  Correct.

19 Q.  In your written requests twice; right?

20 A.  Correct.

21 Q.  And what conditions did IDEM place on the site as far as

22 the ERC -- I'm sorry -- the no-further-action status?

23 A.  The no-further-action status, the conditions that were

24 placed, were restricting groundwater usage at the site,

25 restricting residential re-usage, and maintaining the vapor

*VIJAY - DIRECT/KRAHULIK*                    Vol. 5-941

1   intrusion system.

2   Q.  And, to your knowledge, have those continued to be met?

3   A.  Yes.

4   Q.  And the vapor intrusion system is still there, but it's

5   not in active operation today?

6   A.  I believe it is acting passively still, yes.

7   Q.  And did IDEM direct Heartland to abandon the groundwater

8   monitoring wells related to the Ertel site?

9   A.  Yes.

10  Q.  I'm going to show you Exhibit 1191.

11       MS. KRAHULIK:  I have to take my glasses off.  They

12  make me dizzy when I walk.

13  BY MS. KRAHULIK:

14  Q.  What is this document?

15  A.  This is the Phase I environmental site assessment

16  Heartland conducted on behalf of Major Tool and Major Holdings

17  from January, 2013.

18  Q.  And what did you understand the purpose of this Phase I to

19  be since Major Tool and Machine had already done one before it

20  leased the property?

21  A.  This -- the purpose of this Phase I was to have an updated

22  Phase I prior to Major Tool's acquisition of the property.

23  Q.  If you take a look at page 45 of this document -- which,

24  Ms. Woods, I believe is page 49 of our PDF -- could you just

25  read that second paragraph that starts with "Heartland has

*VIJAY - DIRECT/KRAHULIK*               Vol. 5-942

1  performed" into the record?

2  A.  The second paragraph of page 45?

3  Q.  Yes, page 45 of the document.

4  A.  "Heartland has performed a Phase I ESA in general

5  conformance with the scope and limitations of ASTM Practice

6  E1527-05 and U.S. EPA AAI rule that was finalized

7  November 1st, 2006, for the property addressed at 2045

8  Dr. Andrew J. Brown Avenue in Indianapolis, Indiana.  This

9  assessment has revealed no evidence of RECs in connection with

10 the property except for the following."

11 Q.  And you noted what those were?

12 A.  Yes.

13 Q.  And what was the purpose in obtaining this Phase I, as far

14 as Major Tool and Machine went, to your understanding?

15 A.  To document the due diligence prior to acquisition of the

16 property.

17 Q.  And, in fact, after this, did you assist Major Tool and

18 Machine in a comfort letter request to Indiana Brownfields?

19 A.  Yes, we did.

20 Q.  I'm going to show you Exhibit 1185, and I'm also going to

21 hand up Exhibit 1192 because we'll talk about those together.

22         Okay.  First, tell us:  Is 1185 the comfort letter

23 request we just discussed?

24 A.  Yes, it is.

25 Q.  And you are listed as the environmental consultant on this

*VIJAY - DIRECT/KRAHULIK*                Vol. 5-943

1  document, on the second page, the back of the paper copy?

2  A.  Yes.

3  Q.  And then what is Exhibit 1192?

4  A.  This is the comfort letter issued by IDEM for the Major --

5  for the Ertel property on behalf of Major Tool.

6  Q.  If you look at the document on the paper copy that's

7  page 8 of 10, at the bottom of that page, IDEM set out certain

8  reasonable steps that Major Tool had to comply with in order

9  to remain a BFPP for the comfort letter; right?

10  A.  Correct.

11  Q.  And take a minute to read that.  And it says Major Tool

12  would implement and maintain all existing land use

13  restrictions in the REC that was recorded on this site; and,

14  if they became aware of information, to communicate it to IDEM

15  about existing hazardous substance contamination or new or an

16  identified contamination.

17         To your knowledge, has Major Tool and Machine

18  complied with those reasonable steps?

19  A.  Yes.

20  Q.  And then I want to show you -- this is the last document

21  related to the Ertel site -- an e-mail, Exhibit 1215.  I'm

22  showing this to you because somebody is going to.  Take a look

23  at this e-mail and tell me what we're seeing here.

24  A.  This is an e-mail sent from me to Chris Harrell, who was

25  with the City of Indianapolis, from October 13th, 2007.

*VIJAY - DIRECT/KRAHULIK*                    Vol. 5-944

1   Q.  And why did Chris send you this e-mail?

2   A.  Chris was sending me this e-mail in response to a request

3   from IDEM to do some additional deep groundwater sampling at

4   the Ertel site.

5   Q.  And specifically, he says here, "I'm a bit worried about

6   the random sampling events and how that could uncover

7   additional area to further delineate and excavate" --

8           COURT REPORTER:  I'm sorry.

9           MS. KRAHULIK:  I'm sorry.

10  BY MS. KRAHULIK:

11  Q.  -- "further delineate and excavate and how that could make

12  even more budget fund, but don't want to go down that route

13  until we get the results from the Geo Program."

14          And then you reply and you use the word random in

15  quotation marks.  What did you mean by that?

16  A.  It was a facetious e-mail sent at 1:49 a.m., as is shown

17  on the time stamp, and IDEM had dictated exactly where those

18  soil borings needed to go in areas where there was potential

19  sources of DNAPLs, so the "random" was in quotations, more or

20  less, as a joke between me and Chris as we were working a lot

21  of hours together and as you can tell by this time stamp of

22  the e-mail.

23  Q.  And you didn't believe they were random at all; they were

24  in areas where you thought you might uncover additional

25  impacts?

VIJAY - DIRECT/KRAHULIK          Vol. 5-945

1  A.  Correct.

2  Q.  Okay.  Let's move on to the Zimmer Paper/Moran Electric

3  rewind site.  Are you aware of Major Tool and Machine did a

4  Phase I investigation of that property before it was

5  purchased?

6  A.  I believe they have, yes.

7  Q.  And you've seen that document?

8  A.  Yes.

9  Q.  Do you recall which consultant performed that work?

10 A.  I believe that was done by EnviroForensics.

11 Q.  And we've seen it as Exhibit 1241.

12         How did you become involved, then, at that property?

13 A.  During the work at the Ertel facility, the electric

14 rewind -- Moran Electric rewind shop was also brought into the

15 remediation plans, as the footprint of the redevelopment would

16 have incorporated that property, as well.

17 Q.  I'm going to show you what's been marked as Exhibit 1100.

18 And what is this document?

19 A.  This is a limited subsurface investigation conducted for

20 what we were calling the Zimmer Paper parcel from August 3rd,

21 2007.

22 Q.  And I guess I should point out, we're now back to QEPI,

23 because I'm going property by property, so the reports span

24 both employers, right?

25         And what did you recommend after undertaking this

*VIJAY - DIRECT/KRAHULIK*          Vol. 5-946

1  limited subsurface investigation?

2  A.  Based on the results of the investigation, we recommended

3  the removal of impacted soils throughout a majority of the

4  former site building, the southern portion of the courtyard

5  area, and areas in the northern and northwestern portions of

6  that parcel to remove elevated chemical-impacted soils.

7  Q.  Okay.  And I'm going to show you Exhibits 1129 and 1131.

8  We will talk about those together.

9          What is Exhibit 1129?

10 A.  This is a soil excavation and remediation scope of work

11 prepared for the Ertel and Zimmer Paper parcels dated

12 September 7th, 2007.

13 Q.  Okay.  Take a look at figure 6 to this document, which,

14 after the text of the document, is -- I'm trying to see how

15 many pages here -- six pages in, I believe.  And I believe, on

16 the PDF, that is page 11.

17          What are the areas shown here as A, B, and C in this

18 figure?

19 A.  Those are areas that we highlighted based on the results

20 of the limited subsurface investigation where chemical impacts

21 were encountered that we recommended removal of soils.

22 Q.  And what is Exhibit 1131?

23 A.  This is a limited Phase II sampling and analysis report

24 for the Zimmer Paper parcel from November 30th, 2007.

25 Q.  Okay.  And what was the purpose of the limited Phase II?

*VIJAY - DIRECT/KRAHULIK*          Vol. 5-947

1  A.  The purpose was to vertically delineate impacts to

2  groundwater and to investigate for the potential presence of

3  dense nonaqueous phase liquids or DNAPLs.

4  Q.  And what did QEPI conclude as to the presence of DNAPLs in

5  that area?

6          And that's on the third page of the document, if

7  that helps, the QEPI's conclusion and recommendations.

8  A.  Based on the sample results, it did not appear that DNAPLs

9  were present, and we did not -- QEPI did not recommend any

10 additional investigation for DNAPLs.

11 Q.  And what did you do next, then, at that Zimmer Paper

12 property?

13 A.  I would have to check the timeline, but this would have

14 been done in close concert with the removal of soils and the

15 removal of an underground tank at the Zimmer Paper parcel.

16 Q.  And in fact, I have Exhibit 1094 here.  What are we

17 looking at here?

18 A.  This is the underground storage tank closure report for

19 the Zimmer Paper parcel from December 12th, 2007.

20 Q.  And tell us, generally, what work QEPI performed with

21 regard to that underground storage tank removal.

22 A.  After the demolition of the building, the underground

23 storage tank was uncovered.  There was approximately a

24 16,000-gallon tank within the footprint of the former site

25 building.  We opened the tank, cleaned and purged any contents

1  that were still remaining inside the tank, and then removed

2  the tank from the ground.  Afterwards, we removed and

3  excavated approximately 7,300 tons, or cubic yards, of soil

4  within the area of the tank pit and then also extending

5  throughout the former footprint of the site building.

6  Q.  So you excavated the area where the tank was and then

7  over-excavated around the tank --

8  A.  Correct.

9  Q.  -- area?

10       And those were the figures we saw in the scope of

11  work, the excavation areas?

12  A.  It would have been the southern excavation area in the

13  scope of work that was provided below -- or provided in the

14  previous document.

15  Q.  And you were present for the tank removal and excavation

16  work?

17  A.  Yes.

18  Q.  Were there fill ports for that tank present?

19  A.  Within the site building, yes.

20  Q.  And was there any piping associated with the tank?

21  A.  When the site building was still erected, there was piping

22  that was extending from the subsurface into the southern

23  portion of the site building.

24  Q.  And the fill port for that tank was accessible?

25  A.  Yes.

*VIJAY - DIRECT/KRAHULIK*                    Vol. 5-949

1   Q.  And you said you pumped out about how much liquid?  I

2   think it was like 3200 gallons, but check the report.

3   A.  Based on the report, approximately 3200 gallons of

4   residual product and sludge was removed from the tank and

5   disposed of.

6   Q.  And were those contents sampled at that time?

7   A.  No, they were not.

8   Q.  Take a look at page 6 of the report -- which is page 9 of

9   the PDF, Ms. Woods -- under tank contents.

10          QEPI states here that, "Based on historical

11  information obtained by QEPI pertaining to the subject site,

12  it is likely the tank contained chlorinated solvent

13  materials"?

14          MR. BOWMAN:  Objection, undisclosed expert opinion.

15  The testimony is that he didn't sample the contents.

16          THE COURT:  Your response?

17          MS. KRAHULIK:  I withdraw the question.

18          THE COURT:  Okay.

19  BY MS. KRAHULIK:

20  Q.  What was the condition of the tank upon its removal?

21  A.  The tank was a steel tank, and there was some evidence of

22  some pitting, but besides -- due to the age, likely, of the

23  tank -- but there was no gaping holes or anything like that in

24  the tank.

25  Q.  And in the area of that tank, had shallow soil sampling

*VIJAY - DIRECT/KRAHULIK*                    Vol. 5-950

1   revealed soil that was contaminated with chlorinated solvents?

2   A.  Yes.

3   Q.  And we already talked about the no-further-action requests

4   that you submitted on behalf of the city to IDEM with respect

5   to the Ertel site, and those actually contained the footprint

6   of the Zimmer Paper building; right?

7   A.  Correct.

8   Q.  I'm just trying to cover the timeline of this particular

9   property.

10          What happened next with regard to this particular

11  property?

12  A.  After the completion of the soil remediation, the property

13  was backfilled, and then included in the redevelopment as part

14  of the new Major Tool facility.

15  Q.  And the building footprint sits on that property?

16  A.  The building footprint is over the entirety of that

17  property.

18  Q.  And it was equipped with the vapor mitigation system we

19  already discussed?

20  A.  Yes.

21  Q.  I'm going to hand you Exhibit 1242.  We're skipping ahead

22  quite a ways.  What's the date on this document?

23  A.  April 3rd, 2018.

24  Q.  And this is a letter signed by you; right?

25  A.  Correct.

*VIJAY - DIRECT/KRAHULIK*          Vol. 5-951

1   Q.  What was the purpose of this letter?

2   A.  This letter was provided to IDEM in response to IDEM's

3   demand-for-compliance letter from March 19th, 2018.

4   Q.  And what did Heartland communicate to IDEM in this

5   response to that demand-for-compliance letter, generally?

6   A.  In general, the letter was provided to document Major

7   Tool's efforts with regard to complying to IDEM's previous

8   notice-of-liability letters and to document prior submittals

9   to IDEM and future proposed submittals to IDEM.

10  Q.  And what were Major Tool and Machine's plans at that point

11  with regard to submittals to IDEM related to this site?

12  A.  Future plans were to submit an application to IDEM for

13  enrollment into the Voluntary Remediation Program, also submit

14  a remediation work plan, and also to provide a vapor intrusion

15  assessment work plan for off-site properties.

16  Q.  And did Heartland, in fact, submit that vapor -- I'm

17  sorry -- that Voluntary Remediation Program application?

18  A.  Yes, it did.

19  Q.  And is this a copy, Exhibit 1194, of the VRP application?

20  A.  Yes, it is.

21  Q.  What was the result of that submission to IDEM?

22  A.  The application was denied.

23  Q.  And before that happened, did IDEM take some other step

24  toward -- or other action related to Major Tool and Machine?

25  A.  Prior to denying the VRP application, a commissioner's

VIJAY - DIRECT/KRAHULIK                    Vol. 5-952

1  order was issued.

2  Q.  How many sites have you worked on with IDEM throughout

3  your career?

4  A.  Hundreds.

5  Q.  Have you ever seen IDEM issue a commissioner's order to a

6  party when there is an unremediated downgradient site with

7  regard to homes on the other side of the unremediated site?

8  A.  I'm sorry.  Could you repeat that?

9  Q.  Have you ever seen similar treatment by IDEM of a property

10  where there is an intervening unremediated site downgradient

11  and IDEM is requesting vapor work in homes near that

12  unremediated site?

13  A.  I'm not aware of IDEM doing that, no.

14  Q.  Have you ever seen IDEM issue a commissioner's order to

15  any party that has performed the level of work that Major Tool

16  and Machine has performed at the properties it now owns?

17  A.  I'm not aware of IDEM doing that.

18  Q.  Have you ever seen IDEM issue a commissioner's order to a

19  party who has agreed to perform all work requested in a demand

20  for compliance?

21  A.  No, I have not.

22  Q.  Now, finally, let's talk about the Moran south properties,

23  what we've called the motor shop and dynamometer shop.

24          MS. KRAHULIK:  Will you pull up Exhibit 1001,

25  Ms. Woods?

*VIJAY - DIRECT/KRAHULIK*              Vol. 5-953

BY MS. KRAHULIK:

Q.  And which properties on this map represent the motor shop
and dyna shop?

A.  This would be the property south of the Ertel and the
Zimmer Paper property on this figure.

        THE COURT:  You can touch the screen and it will do
an arrow point.

        THE WITNESS:  Oh, okay.

        MS. KRAHULIK:  You kind of have to tap it kind of
hard.

        THE WITNESS:  I think there's an arrow there.

        MS. KRAHULIK:  Oh.  Is there?  I'm sorry.  Oh, yeah,
I see it.  There's a mark.

A.  So it would be 109-0578.

        THE COURT:  Okay.

A.  And 109-0311.

BY MS. KRAHULIK:

Q.  Thank you.

        And those are orange on our map, the two
southern-most orange properties?

A.  Correct.

Q.  Okay.  How did you become involved with efforts at those
properties?

A.  Heartland was contracted with Major Tool to begin
environmental assessment work on those properties.

*VIJAY - DIRECT/KRAHULIK*                     Vol. 5-954

1  Q.  Okay.  I'm going to show you Exhibit 1122.  Is this a

2  report prepared by Heartland with regard to those properties?

3  A.  Yes.

4  Q.  Take a minute to look through it, but tell us generally

5  about this report.

6  A.  This report documents Phase II environmental site

7  assessment activities on the two Moran Electric parcels, how

8  we refer to them as Moran Electric, and documented the

9  advancement of 30 soil borings and the sampling of both soil

10  and groundwater throughout the site.

11  Q.  And what did Heartland recommend in conclusion of this

12  report?

13  A.  We recommended the excavation of impacted soils that

14  exceeded IDEM industrial default closure levels to not only

15  remove impacted soils, but to also remove a source of

16  continual contamination to groundwater.

17  Q.  I believe Heartland did another report related to this

18  site before it conducted that work; is that right?

19  A.  That's correct.

20  Q.  What is this document?

21  A.  This is a further site investigation completed by

22  Heartland, a report dated June 6th, 2011.

23  Q.  And why was the further site investigation conducted after

24  the Phase II had already been performed?

25  A.  Heartland consulted with the project manager from the

*VIJAY – DIRECT/KRAHULIK*                    Vol. 5-955

1  Indiana Brownfields Program who recommended some additional

2  investigation to further delineate impacts that were found on

3  the property and to evaluate for impacts closer to the

4  right-of-way of Dr. Andrew J. Brown.

5         MS. KRAHULIK:  Did I not say the exhibit number

6  there?  1112.  Sorry.

7  BY MS. KRAHULIK:

8  Q.  And I'm going to hand you Exhibit 1031.

9         Now, this appears to be a comment letter from IDEM

10  directed to Natalie Weir at Major Tool and Machine on which

11  you're copied; is that right?

12  A.  Correct.

13  Q.  And what was this comment letter in response to?

14  A.  This comment letter was in response to the Phase II

15  environmental site assessment and the further site

16  investigation that we conducted and to request from IDEM

17  whether the proposed excavation was suitable and appropriate

18  to conduct.

19  Q.  So this was in regard to the two previous reports we just

20  saw?

21  A.  Correct.

22  Q.  And what did IDEM conclude about the proposed excavation

23  on the Moran property?

24  A.  IDEM concluded that the hot spot excavation and soil

25  removal appeared to be adequate and acceptable.

*VIJAY - DIRECT/KRAHULIK*                    Vol. 5-956

1  Q.  And then did Heartland perform that work?

2  A.  Yes, we did.

3  Q.  I'm going to show you Exhibit 1093.  What is this

4  document, Mr. Vijay?

5  A.  This is the soil remediation completion report for the

6  Moran Electric property, dated January 20th, 2012.

7  Q.  And specifically, what work was performed in that soil

8  excavation?

9  A.  We removed and disposed of 4,641 tons of impacted soil

10 from the site.

11 Q.  And what was the plan, or what did Heartland conclude,

12 after the excavation was complete?  And if it helps, the

13 conclusions are on page 9 of the report, which is page 13 of

14 the PDF.

15 A.  Based on the confirmation sampling that was conducted as

16 part of the soil excavation, the sidewall confirmation samples

17 exhibited volatile organic compound impacts below industrial

18 default closure levels.  There were bottom samples that

19 exhibited TCE impacts above the industrial default closure

20 levels, but they were -- they exhibited decreased

21 concentration from the soil samples collected prior, in prior

22 investigations.

23 Q.  Now, did Heartland assist Major Tool and Machine with a

24 comfort letter request related to the Moran properties?

25 A.  Yes, we did.

*VIJAY - DIRECT/KRAHULIK*                    Vol. 5-957

1  Q.  I'm going to show you Exhibit 1102.  And is this the

2  comfort letter request I just referred to?

3  A.  Yes, it is.

4  Q.  And you're listed on the back page of this, page 2 of the

5  PDF, as the environmental consultant representing the letter

6  recipient?

7  A.  Yes.

8  Q.  And it's signed by Natalie Weir?

9  A.  Yes.

10  Q.  Was that NFA -- I'm sorry.  Was that comfort letter ever

11  issued, to your knowledge?

12  A.  To my knowledge, I'm not sure if that comfort letter was

13  issued.

14  Q.  After the soil excavation activities on the Moran

15  properties, what did Heartland do with regard to that property

16  next?

17  A.  Afterwards, we conducted groundwater monitoring of --

18  monitoring what permanent monitoring wells that were installed

19  around the perimeter of the Moran Electric property and also

20  on monitoring wells that were located slightly upgradient and

21  downgradient of the Moran Electric property.

22  Q.  In what years did Heartland perform that monitoring?

23  A.  We did monitoring on a quarterly basis in 2012 and did

24  annual sampling events in 2013, 2014, and 2015.

25  Q.  And I won't put these in front of you, but just for the

*VIJAY - DIRECT/KRAHULIK*                    Vol. 5-958

1  Court's purposes, I will say that the monitoring reports are

2  in evidence as stipulated Exhibits 1125, 1168, and 1126.

3           And what was the general observation based on

4  that -- those monitoring events?

5  A.  The general observation was groundwater concentrations

6  were exhibiting either a stable or decreasing trend in

7  concentration over the course of those years.

8  Q.  And you documented that for IDEM?

9  A.  Yes.

10 Q.  After 2015, then, what has been your role, or Heartland's

11 role, with the Moran properties?

12 A.  After 2015, it's just been assisting Major Tool in

13 reviewing reports and going through the legal process.

14 Q.  And that property was also the subject of the demand for

15 compliance, the VRP application, the commissioner's order?  I

16 won't go back through all those, but the same -- that property

17 was also included in those?

18 A.  Yes, it was.

19 Q.  So Major Tool and Machine tried to submit that property to

20 the voluntary remediation program, and IDEM said no?

21 A.  Correct.

22 Q.  Have you been asked to prepare a plan detailing steps to

23 be taken for closing out the Moran property and the Zimmer

24 Paper parcel?

25 A.  We did prepare a remediation work plan, pending acceptance

*VIJAY - DIRECT/KRAHULIK* Vol. 5-959

1  into the voluntary remediation program with IDEM.  So a

2  remediation work plan has been developed.  It just has not

3  been submitted at this time.

4  Q.  And what does that plan recommend as to closure for Zimmer

5  Paper and Moran property?

6  A.  The plan currently recommends or documents exposure

7  pathways, it documents the large quantities of soil and source

8  material that have been removed from the property, and

9  recommends that no additional active remediation be conducted,

10  and that additional groundwater monitoring take place just to

11  further document the stable and decreasing trend of

12  concentrations in groundwater at the site.

13  Q.  And is that based, at least in part, on the levels of the

14  contaminants of concern in the most recent sampling events at

15  the border of the site?

16  A.  It is, yes.

17  Q.  And as you sit there today, can you tell the Court what

18  those levels generally are?

19  A.  They're in the neighborhood of, I believe, about a

20  thousand parts per billion.  I would have to look at those

21  reports again, but I do not believe they exceed 1500 parts per

22  billion.

23  Q.  You talked a little bit about the soil removal activities

24  and the magnitude of those.  What effect have those had on the

25  trend you've seen in groundwater monitoring?

*VIJAY ARAGHAVAN – CROSS/GRIGGS*          Vol. 5-960

1   A.  Since the removal of the contaminated soil, the

2   groundwater concentrations have either been stable or

3   decreasing in concentration.

4          MS. KRAHULIK:  I don't have anything further.  Thank

5   you.

6          THE COURT:  Okay.  Do you want to go next,

7   Mr. Griggs?

8          MS. KRAHULIK:  I'll need a minute because I've got

9   all of this stuff.

10                    **CROSS-EXAMINATION**

11  BY MR. GRIGGS:

12  Q.  Good afternoon.

13  A.  Good afternoon.

14  Q.  Let's start where you just left off.

15          A thousand to 1500 parts per billion of which

16  contaminant at the property boundary?

17  A.  I would have to look at the report again, but I believe

18  it's PCE or TCE.  I would have to look at those reports one

19  more time to confirm.

20  Q.  Seen a lot of PCE on those upgradient properties?

21  A.  I would have to look at the report, again, to confirm

22  which chemical of concern.

23  Q.  Which report is that?  Sorry.

24  A.  The most recent groundwater report from Heartland from

25  2015.

VIJAY ARAGHAVAN - CROSS/GRIGGS        Vol. 5-961

1  Q.  And your -- I think your testimony was that you were

2  seeing decreasing trends in the groundwater; is that correct?

3  A.  Stable or decreasing trends.

4  Q.  Okay.  Is that because the chlorinated molecules are

5  dechlorinating into ethene?

6  A.  There's not been sampling for ethene.

7  Q.  Where are the lost concentration -- where is it going?

8  A.  It appears to be attenuating due to the removal of source

9  contamination, the contaminated soil, which was presenting a

10 continual source of impacts to groundwater.

11 Q.  Okay.  What do you mean by "attenuating"?

12 A.  Chlorinated solvents could potentially naturally attenuate

13 if you remove a source of contamination.  We, Heartland, has

14 not done additional sampling at this time to document for

15 further breakdown of those to determine what those attenuating

16 factors are.

17           THE COURT:  Mr. Vijay, what do you mean by

18 "attenuating," just absorbing into the air or disappearing or

19 --

20           THE WITNESS:  Basically, I guess for -- it would

21 mean that it's naturally degrading into breakdown products

22 that are less toxic than its natural product.

23           THE COURT:  Okay.

24 BY MR. GRIGGS:

25 Q.  And your testimony is:  You do not -- have not taken any

*VIJAY ARAGHAVAN - CROSS/GRIGGS*          Vol. 5-962

1  samples or done any testing to determine if that's the case?

2  A.  At this time, no, we have not.

3  Q.  Is the groundwater still flowing to the south-southwest

4  underneath the plume area?

5  A.  As far as we know, the historic groundwater flow direction

6  has been to the south-southwest.

7  Q.  Is it still carrying molecules along with the groundwater

8  flow?

9  A.  Potentially.

10 Q.  Is it possible that the concentrations that you're seeing

11 going down in the upgradient is because the contaminants are

12 being moved to the downgradient area?

13          MR. BOWMAN:  Objection.  This is not a disclosed

14 expert witness.  He's a fact witness.  He's asking for

15 undisclosed expert testimony.

16          MR. GRIGGS:  I think it merely is calling for his

17 observation of what he's seen in the data.  He's talked about

18 the possibility of attenuation, although there's no data to

19 support that.  I'm merely wanting to know if it's possible

20 that -- and I think the question was, "Is it possible" -- that

21 it's being carried away with the groundwater?

22          MR. BOWMAN:  Can I respond?

23          THE COURT:  You may.

24          MR. BOWMAN:  What we have done in this matter before

25 is that environmental consultants who are just fact witnesses

*VIJAY ARAGHAVAN – CROSS/GRIGGS*        Vol. 5-963

1   testify:  The data, the protocol, how it was collected, what

2   the data results are.  Without expert analysis of that what

3   they then believe that data means is an expert opinion.  And

4   those kinds of experts have been brought forward.  When

5   we're with fact witnesses, we've stayed just with what the

6   data and the protocols are.  He's now asking him what he

7   thinks.

8           THE COURT:  All right.  I'll sustain the objection.

9           Next question.

10  BY MR. GRIGGS:

11  Q.  When you were with QEPI, you did some work at the Ertel

12  property; is that correct?

13  A.  That's correct.

14  Q.  And as recently as 2013, I believe you did a Phase I

15  environmental site assessment; is that correct?

16  A.  That's correct.

17  Q.  Have you done many Phase I site assessments in your

18  career?

19  A.  Yes, I have.

20  Q.  You're familiar with the process?

21  A.  Yes, I am.

22  Q.  Are you also familiar with EPA's all appropriate inquiry

23  rule?

24  A.  Yes.

25          MR. GRIGGS:  Can we pull up Exhibit 1191, please?

*VIJAY ARAGHAVAN - CROSS/GRIGGS*        Vol. 5-964

1  BY MR. GRIGGS:

2  Q.  This is an exhibit that you were shown earlier in your

3  direct testimony.

4        MR. GRIGGS:  And let's look at page 8, please.

5  Q.  Can you tell me:  Does this look like your Phase I report

6  for the Ertel site, Exhibit 1191?

7  A.  Yes, it does.

8  Q.  And can you tell me, on this page, what entities are

9  designated as the user of the Phase I?

10  A.  That would be Major Tool and Machine and Major Holdings,

11  LLC.

12  Q.  Okay.  Thank you.

13        And did you, in connection with this Phase I,

14  require that both Major Tool and Major Holdings complete user

15  questionnaires?

16  A.  To my recollection, the representatives of Major Tool and

17  Machine and Major Holdings were the same, so the user

18  questionnaire would have been for both Major Tool and Machine

19  and Major Holdings.

20  Q.  Okay.  And do you recall whether this Phase I report

21  includes a declaration regarding whether it complied with the

22  relevant CERCLA regulations?

23  A.  I believe it does.

24        MR. GRIGGS:  Let's see small ii.  I think it's a

25  couple pages ahead of this.  Let's scroll up and see if we've

*VIJAY ARAGHAVAN - CROSS/GRIGGS*      Vol. 5-965

1  got that.  Can you move up the document?

2  BY MR. GRIGGS:

3  Q.  Do you still have a copy of Exhibit 1191?

4  A.  I do.

5  Q.  Can you look at page ii?  Can you find that?

6        And does that contain a declaration regarding

7  compliance with relevant CERCLA regulations?

8  A.  Yes, it does.

9  Q.  Thank you.

10        MR. GRIGGS:  Page 48.

11  BY MR. GRIGGS:

12  Q.  You include a list of references, and I think 48 may

13  reflect the -- there it is.  It's actual page 48.

14        And on this list of references, do you see a

15  reference to a September 6th, 2006, Phase I?

16  A.  Conducted by Environmental Forensics Investigations,

17  Incorporated.

18  Q.  Okay.

19  A.  That's September -- I'm sorry.  That's September 8th,

20  2006.

21        What date did you --

22  Q.  I think I said, "September 6th, 2006."  So, September 8th.

23        So you were aware of that Phase I report when you

24  prepared the one in 2013?

25  A.  Yes, I was.

*VIJAY ARAGHAVAN - CROSS/GRIGGS*          Vol. 5-966

1              MR. GRIGGS:  Can we pull up Exhibit 1166?  I think

2    that's the report we were looking for.  Next page.

3    BY MR. GRIGGS:

4    Q.  Is this the report, September 8, 2006, that was referenced

5    in your 2013 report?

6    A.  It appears to be, yes.

7    Q.  And it's also for the Ertel site; correct?

8    A.  Correct.

9    Q.  And when you were asked on direct examination about

10   whether or not there was a prior -- or a Phase I report prior

11   to Major Tool acquiring the property, is this the report that

12   you were referring to?

13   A.  This report.  I also believe there were two other Phase I

14   reports that were completed prior to Major Tool acquiring the

15   property.

16   Q.  And what do you mean by "acquiring the property"?

17   A.  When Major Tool took title to the property.

18   Q.  Okay.  So at the time that you prepared your Phase I, who

19   was the owner of the property, in your view?

20   A.  The owner was the City of Indianapolis, Department of

21   Metropolitan Development.

22   Q.  And who was occupying the property at that time?

23   A.  Major Tool was occupying the property at that time.

24   Q.  Do you know when Major Tool began its 99-year lease of the

25   Ertel property?

1  A.  No, I do not.

2          MR. GRIGGS:  Exhibit 1021, page 4, please.

3  BY MR. GRIGGS:

4  Q.  In the middle of this page, it has a section called

5  "Term."

6          MR. GRIGGS:  Let that go up on the screen.

7  BY MR. GRIGGS:

8  Q.  Do you see the effective dates of the lease beginning

9  November 16, 2007?

10  A.  Yes, I do.

11  Q.  Do you have any reason to believe that that's not

12  accurate?

13  A.  No, I do not.

14          MR. GRIGGS:  Let's look at Exhibit 1166, please.

15  BY MR. GRIGGS:

16  Q.  This is going back to the Phase I report that we were just

17  looking at.  What's the date of that Phase I report?

18  A.  September 8th, 2006.

19  Q.  Okay.  Under the EPA's all appropriate inquiry rule, how

20  long is a Phase I report good for?

21  A.  As of 2013, 180 days.

22  Q.  Okay.  Do you know if it was different prior to that?

23  A.  I would have to review the AAI -- the historic AAI rule.

24  But as of 2013, I know it was 180 days, a viability date on

25  the Phase I.

*VIJAY ARAGHAVAN - CROSS/BOWMAN*      Vol. 5-968

1  Q.  And what happens after 180 days as it affects AAI

2  compliance?

3  A.  The Phase I would be considered out of date and would need

4  to be updated.

5          MR. GRIGGS:  Thank you.  Nothing else.

6          THE COURT:  Mr. Bowman, you may.

7                  **CROSS-EXAMINATION**

8  BY MR. BOWMAN:

9  Q.  Mr. Vijay, Glenn Bowman, Stoll, Kennon, Ogden, for Moran.

10         MR. BOWMAN:  Pull up 1099, please.

11  BY MR. BOWMAN:

12  Q.  This is the no-further-action letter issued to the City of

13  Indianapolis, you testified before, from November 19th, 2012;

14  correct?

15  A.  Correct.

16         MR. BOWMAN:  So if you'll scroll down.  On the next

17  page.  Stop.  Keep going further down.

18  BY MR. BOWMAN:

19  Q.  There was reference to remaining groundwater on the site.

20  There it is.  It starts at:  Groundwater monitoring began in

21  2008.

22          I believe Ms. Krahulik referenced you to 271 parts

23  per billion and 267 parts per billion.  Do you see that, in

24  that paragraph, during the April, 2012 groundwater monitoring

25  event, the highest tetrachloroethene concentration was found

*VIJAY ARAGHAVAN - CROSS/BOWMAN*      Vol. 5-969

1   at Monitoring Well MWE - MWE105, at 271?  Do you see that?

2         THE REPORTER:  I'm sorry.  I lost you.

3   BY MR. BOWMAN:

4   Q.  During the April, 2012 groundwater monitoring event, the

5   highest tetrachloroethene concentration was found at

6   Monitoring Well MWE-105, at 271 parts per billion; do you see

7   that?

8   A.  Yes.

9   Q.  And it says:  The highest concentration of trichloroethene

10  was at Monitoring Well 1 at 267 ppb; correct?

11  A.  Correct.

12  Q.  To be clear, those were numbers that -- found in

13  groundwater, not soil; correct?

14  A.  That is correct.

15  Q.  Okay.  And you've testified that groundwater flow across

16  this site has been south-southwest; correct?

17  A.  Correct.

18         MR. BOWMAN:  You can pull up Exhibit 1101, please.

19  BY MR. BOWMAN:

20  Q.  So the remediation completion report for former Ertel.

21  She'll make it smaller so you can see it.

22         MR. BOWMAN:  Ms. Hill.

23  BY MR. BOWMAN:

24  Q.  QEPI from May of 2008.  Is this a report that you

25  prepared?

VIJAY ARAGHAVAN – CROSS/BOWMAN        Vol. 5-970

1  A.  Yes.

2  Q.  Okay.  If you go to page 7 of the report, 10 of the PDF,

3  top of the page, you talk about the excavation was to 15 feet

4  below ground surface; correct?

5  A.  Correct.

6  Q.  If you then go to the fifth full paragraph, it talks about

7  sidewall samples -- do you see that here -- sidewall samples

8  collected.  They were halfway down the excavation; correct?

9  A.  Correct.

10  Q.  So as you did sidewall samples here at Ertel, they were

11  taken about seven to eight feet?

12  A.  That's correct.

13  Q.  Okay.  If we look at page 28 of 104 and at the top, very

14  top, E, SW19, it's the case that, remaining after this

15  excavation, for example, a sidewall sample of ESW19 still had

16  28,700 parts per billion of tetrachloroethene; correct?

17  A.  Correct.

18  Q.  Regarding the NFA, are you aware that a Marion County

19  court has held that the responsible parties have not met the

20  terms of the agreed order that's the basis for that NFA?

21  A.  I'm not aware of that, no.

22        MR. BOWMAN:  Exhibit 1094, please.

23  BY MR. BOWMAN:

24  Q.  This is the underground storage tank closure report

25  regarding the former Zimmer Paper parcel; correct?

*VIJAY ARAGHAVAN - CROSS/BOWMAN*      Vol. 5-971

1   A.  Correct.

2   Q.  And I want to be clear so there's no confusion.  In your

3   reports, when you talked about and submitted a report to IDEM,

4   you called it the former Zimmer Paper parcel; correct?

5   A.  Correct.

6   Q.  Page 8 of 22, UST Piping.  It says right there that

7   there's no product piping attached to the UST.  Do you see

8   that?

9   A.  Yes.

10  Q.  There was no UST piping attached to the UST, was there?

11  A.  Attached to the UST, there was not.

12  Q.  Do you report -- in this report, do you make any reference

13  to any product piping other than that there aren't any?

14  A.  The only reference I make in the report is product piping

15  attached to the UST.

16  Q.  Of which there is none?

17  A.  There was nothing attached to the UST, no.

18  Q.  Page 10 of 22 of the PDF.  When you pull -- when you

19  pulled this out, there was also some soil removed; correct;

20  right?

21  A.  I wouldn't say some soil.  I'd say quite a bit of soil.

22  Q.  Okay.  There was soil remediation activities, including

23  soil sampling results; right?

24  A.  Yes.

25  Q.  And that would be provided under separate cover.  Do you

*VIJAY ARAGHAVAN – CROSS/BOWMAN*      Vol. 5-972

1  see that?  Right?

2  A.  Right.

3  Q.  Have you ever found that report?

4  A.  No, I have not.

5  Q.  During removal of the UST, did the contents leak?

6  A.  The contents were purged prior to the removal of the UST.

7  Q.  Was there any leakage of that material during the UST

8  removal process?

9  A.  During the UST removal process, no, I'm not aware.

10  Q.  But the contents were not sampled?

11  A.  They were not sampled.

12  Q.  You did assist Major Tool and Machine, Major Holdings in

13  an application for the Voluntary Mediation Program.  Moran was

14  a co-applicant on that, was it not?

15  A.  Yes, it was.

16  Q.  Regarding the soil removal from the Moran property, the

17  true Moran property, were those soils taken out to Twin

18  Bridges Landfill?

19  A.  I would have to confirm which landfill it went to in the

20  report.

21  Q.  Exhibit 1093.  I think it's page 9 of the 27.

22           Waste disposal documentation, taken to Twin Bridges;

23  correct?

24  A.  Correct.

25  Q.  And you were able to do that because the soils were

*VIJAY ARAGHAVAN– REDIRECT/KRAHULIK*    Vol. 5-973

1  removed as nonhazardous, weren't they?

2  A.  That's correct.

3  Q.  And then the final point.  The bottom samples were, as you

4  took it, Moran, you -- the report states that you took them at

5  first encountered groundwater; correct?

6  A.  Where in the report are you referencing?

7          MR. BOWMAN:  Zoom down.  Make it smaller.  Up.

8  BY MR. BOWMAN:

9  Q.  I don't know that I have that cite.

10         Well, look at this paragraph.  You acknowledged at

11  the time that soils present at 12 to 14 above would be in

12  first encountered saturated zone; correct?

13  A.  Yeah, the elevated impact of soil was present from depths

14  of 12 to 14 feet above the first encountered groundwater

15  saturated zone.

16         MR. BOWMAN:  Okay.  Thank you.

17         THE COURT:  All right.  You may redirect.

18             **REDIRECT EXAMINATION**

19  BY MS. KRAHULIK:

20  Q.  We talked earlier about a comfort letter request that you

21  assisted Major Tool and Machine and Major Holdings with making

22  to IDEM with respect to the Ertel property.  And in fact, we

23  looked at the comfort letter that was issued; right?

24  A.  Correct.

25  Q.  That's Exhibit 1192.  Please take a look at page 7 of that

*VIJAY ARAGHAVAN- REDIRECT/KRAHULIK*     Vol. 5-974

1  letter.

2        And for the record, the letter from IDEM directed to

3  Major Tool and Machine and Major Holdings and copying you as a

4  recipient is dated June 5, 2013; right?

5  A.  Yes, June 5th, 2013.

6  Q.  And on page 7, in the first full paragraph, it says, "As

7  discussed below, the owner" -- meaning Major Tool and Machine

8  and Major Holdings -- "has demonstrated to IDEM's satisfaction

9  that it is eligible for the BFPP exemption from liability for

10  hazardous substance and petroleum contamination under state

11  law pertaining to 2045 Dr. Andrew J. Brown Avenue parcel,

12  provided it takes the reasonable steps required by statute

13  recommendations for which are also discussed below."  Do you

14  see that?

15  A.  Yes.

16  Q.  And you testified earlier that, as to the reasonable steps

17  contained on page 8 and 9 of this document, Major Tool and

18  Machine has complied, to your knowledge?

19  A.  Yes.

20  Q.  So after the dates that were being discussed earlier with

21  regard to a September 8, 2006, report, Major Tool and Machine

22  was found by IDEM to be a BFPP for CERCLA liability protection

23  purposes?

24  A.  That's correct.

25        MS. KRAHULIK:  I don't have anything further.  Thank

*VIJAY ARAGHAVAN— REDIRECT/KRAHULIK*     Vol. 5-975

1  you.

2          THE COURT:  Any questions on those, Mr. Griggs?

3          MR. GRIGGS:  No.

4          THE COURT:  Mr. Bowman?

5          MR. BOWMAN:  No, Your Honor.

6          THE COURT:  All right.  Mr. Vijay, thank you very

7  much.  You may be excused.

8          THE WITNESS:  Thank you.

9          (Witness excused.)

10          THE COURT:  Okay.  Major Tool, do you have any other

11  witnesses or evidence to present today?

12          MS. KRAHULIK:  We don't.  We will have two witnesses

13  tomorrow and can start with them first thing in the morning.

14          THE COURT:  All right.  So you're going -- who are

15  the two?

16          MS. KRAHULIK:  We have Gary Hokkanen and Robert

17  Walker.  They're both expert witnesses disclosed in this

18  matter.

19          THE COURT:  Okay.

20          MS. KRAHULIK:  And that will conclude our witnesses.

21          THE COURT:  All right.  So we'll finish -- do you

22  think that will be before lunch break or --

23          MS. KRAHULIK:  Yes, we should be done, at least from

24  our perspective, before lunch with those witnesses.

25          THE COURT:  Okay.  All right.  Well, then we can do

Vol. 5-976

1  closing -- lawyers, you should be prepared to do your closing

2  arguments tomorrow, okay.

3          How much time do you think you'll need, like 20

4  minutes, 30 minutes?

5          MR. MENKVELD:  Ten.

6          THE COURT:  I like that, because you are going to do

7  proposed findings of fact and conclusions of law.

8          MR. GRIGGS:  Correct.

9          I believe that we can complete our presentation in

10  no more than 40 minutes.

11          THE COURT:  Oh, Lordy.

12          MR. GRIGGS:  We've overestimated all along, Your

13  Honor.

14          THE COURT:  You sure have.

15          MR. MENKVELD:  I can complete mine in 39 minutes.

16          MS. KRAHULIK:  I'll take 38.

17          THE COURT:  We'll say no more -- let's say no more

18  than 40 minutes.

19          What time would that put us at, Tanesa?  Yeah,

20  because I do have a 3:00 matter.

21          At least 30, and we'll see what time we finish

22  tomorrow.  If we finish early enough, I'll give you 40.

23          MS. KRAHULIK:  We will do our best.

24          THE COURT:  But at least 30, okay.

25          All right.  Anything further tonight?  Okay.  It's

Vol. 5-977

1  early.  We can all do some work, and I'll see everyone at

2  8:30 a.m.

3          THE COURTROOM DEPUTY:  All rise.

4

5          (Proceedings adjourned at 2:25 p.m.)

6

7                          ***

8

9              CERTIFICATE OF COURT REPORTER

10

11      I, David W. Moxley, hereby certify that the

12  foregoing is a true and correct transcript from

13  reported proceedings in the above-entitled matter.

14

15

16  /S/ David W. Moxley                August 13, August 1, 2019.
    DAVID W. MOXLEY, RMR/CRR/CMRS
17  Official Court Reporter
    Southern District of Indiana
18  Indianapolis Division

19

20

21

22

23

24

25