Vol. 6-978

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| VON DUPRIN, LLC, | ) |
| | ) Cause No. |
|       Plaintiff, | ) 1:16-cv-1942-TWP-DML |
| | ) Indianapolis, Indiana |
|   vs. | ) **August 1, 2019** |
| | ) 8:38 a.m. |
| MORAN ELECTRIC SERVICE, INC., | ) |
| MAJOR HOLDINGS, LLC, | ) |
| MAJOR TOOL AND MACHINE, INC., | ) |
| and ZIMMER PAPER PRODUCTS | ) |
| INCORPORATED, | ) |
| | ) **VOLUME VI** |
|       Defendants. | ) |

**Before the Honorable
TANYA WALTON PRATT**

OFFICIAL REPORTER'S TRANSCRIPT OF
BENCH TRIAL

Court Reporter:          David W. Moxley, RMR, CRR, CMRS
                        United States District Court
                        46 East Ohio Street, Room 340
                        Indianapolis, Indiana  46204

PROCEEDINGS TAKEN BY MACHINE SHORTHAND
TRANSCRIPT CREATED BY COMPUTER-AIDED TRANSCRIPTION

Vol. 6-979

**APPEARANCES:**

| | |
|---|---|
| **For Plaintiff:** | Edward S. Griggs, Esq.<br>Alexandra Robinson French, Esq.<br>Barnes & Thornburg, LLP<br>11 South Meridian Street<br>Indianapolis, IN  46204-3535 |
| **For Defendant Moran:** | Glenn David Bowman, Esq.<br>Marc Andrew Menkveld, Esq.<br>Stoll Keenon Ogden, PLLC<br>Suite 1225<br>201 North Illinois Street<br>Indianapolis, IN  46204 |
| | Bruce L. Kamplain, Esq.<br>Norris Choplin &<br> Schroeder, LLP<br>Ninth Floor<br>101 West Ohio Street<br>Indianapolis, IN  46204 |
| **For Defendant Major:** | Angela Pease Krahulik, Esq.<br>Samuel B. Gardner, Esq.<br>Ice Miller, LLP<br>Suite 2900<br>One American Square<br>Indianapolis, IN  26282-0200 |

Vol. 6-980

# I N D E X

**DEFENDANT'S WITNESSES:**                                    **PAGE**

GARY ELMER HOKKANEN

Direct Examination by Mr. Gardner .............983
Cross-examination by Ms. French .............1017
Redirect Examination by Mr. Gardner ..........1035


ROBERT WALKER

Direct Examination by Ms. Krahulik ...........1039
Cross-examination by Mr. Griggs .............1064
Cross-examination by Mr. Bowman .............1081
Redirect Examination by Ms. Krahulik .........1082

# I N D E X   O F   E X H I B I T S

**DEFENDANT'S EXHIBIT:**                                      **PAGE**

105 .......................................1043


Closing argument by Mr. Griggs  .............1089

Closing argument by Mr. Menkveld  ...........1102

Closing argument by Ms. Krahulik  ...........1121

Closing argument by Mr. Griggs  .............1137

Vol. 6-981

 1                      (In open court.)

 2           THE COURT:  You may be seated.

 3           And, Witness, if you would remain standing, I'll get

 4  you sworn in.  Would you raise your right hand?

 5           (The witness is sworn.)

 6           THE COURT:  You may have a seat.

 7           So, good morning, everyone.  We are back on the

 8  record, Von Duprin, LLC, versus Moran Electric Service, Inc.,

 9  Major Holdings, LLC, Major Tool and Machine, Inc., and we are

10  here for the continuation of our bench trial.  And when we

11  adjourned yesterday, I believe Moran had rested, and Major

12  Tool called one witness.

13           And you have another witness on the stand; is that

14  correct?

15           MR. GARDNER:  We do, Your Honor.

16           THE COURT:  All right.

17           MR. BOWMAN:  And we have a preliminary matter to

18  address, two things.

19           THE COURT:  Certainly.

20           MR. BOWMAN:  First, Moran has a crossclaim against

21  Major Tool and Machine under the Indiana Environmental Legal

22  Action Statute --

23           THE COURT:  Okay.

24           MR. BOWMAN:  -- that is in addition to just the

25  CERCLA claim, and we're going to dismiss that so that -- and

Vol. 6-982

 1  we've talked with counsel for Major Tool about that -- it

 2  streamlines the case, and is appropriate under the

 3  circumstances.  So we want that on the record.  So Moran

 4  Electric is withdrawing its crossclaim against Major Tool and

 5  Machine and Major Holdings as asserted only under the Indiana

 6  Environmental Legal Action Statute.

 7             THE COURT:  Okay.  Got that, Tanesa, for the minute

 8  sheet?

 9             MR. BOWMAN:  And then, finally, we submitted into

10  evidence the deposition of Richard Phelps, I think --

11             THE COURT:  Correct.

12             MR. BOWMAN:  -- and we did not want to open it.  We

13  weren't certain if the exhibits were there.  Mr. Menkveld did

14  that.  And we do have to submit to the Court, and I believe

15  counsel has it, also, Exhibit 12 from the Phelps deposition,

16  is the only one we want to make sure is in the record.  I

17  think once the deposition is open, all exhibits might be in

18  there.  But if I can approach, I want to make sure this is

19  with the Phelps deposition.

20             THE COURT:  All right.  You may do so.

21             What number was Phelps, Tanesa?

22             COURTROOM DEPUTY:  623.

23             THE COURT:  She has the -- you can give that to

24  Tanesa, and she'll attach it to 623.

25             No objection, anyone?

*HOKKANEN - DIRECT/GARDNER*          Vol. 6-983

1         MR. GARDNER:  No, Your Honor.

2         MS. KRAHULIK:  No, Your Honor.

3         MR. BOWMAN:  Thank you.

4         THE COURT:  All right.  Any other preliminary

5    matters before we allow -- I believe Mr. Gardner, since he's

6    been speaking, is going to examine the witness?

7         MR. GARDNER:  Yes, Your Honor.

8         THE COURT:  Mr. Gardner, you may.

9         **GARY ELMER HOKKANEN, DEFENDANT'S WITNESS, SWORN**

10                        **DIRECT EXAMINATION**

11   BY MR. GARDNER:

12   Q.  Good morning, Mr. Hokkanen.

13   A.  Good morning.

14   Q.  Can you state and spell your name for the Court, please.

15   A.  Gary Elmer Hokkanen.  That's G-A-R-Y, E-L-M-E-R,

16   H-O-K-K-A-N-E-N.

17   Q.  And were you retained by Major Holdings and Major Tool to

18   offer an expert opinion in this case?

19   A.  Yes.

20   Q.  Okay.  And we've got a report pulled up here.  Do you

21   recognize that on the screen?

22   A.  That is my rebuttal report, yes.

23   Q.  Okay.  Would it be helpful if we gave you or if you had a

24   hard copy in front of you in case we need to reference it

25   during your testimony today?

*HOKKANEN – DIRECT/GARDNER*          Vol. 6-984

1  A.  Yes.

2          THE COURT:  What's the exhibit number, Counsel?

3          MR. GARDNER:  Von Duprin has marked it as

4  Exhibit 103.  I can give you a hard copy here if you'd like.

5          THE COURT:  Thank you.

6          MR. GARDNER:  And, Your Honor, since the other

7  expert reports have come in and we may be referencing this

8  report today, we would offer Mr. Hokkanen's report as an

9  exhibit.

10          THE COURT:  Any objection to 103?

11          MR. MENKVELD:  No objection.

12          MS. FRENCH:  No objection, Your Honor.

13          THE COURT:  Exhibit 103 is admitted into evidence

14  without objection.

15                    *(Defendant's Exhibit 103 was*

16                    *received in evidence.)*

17  BY MR. GARDNER:

18  Q.  Now, Mr. Hokkanen, very generally, what were you retained

19  to do in this case?

20  A.  I was asked to examine an expert report by Sam Williams

21  related to NCP compliance, and I was asked to provide rebuttal

22  opinions to that report.

23  Q.  Okay.  Have you ever done any work for Major Holdings or

24  Major Tool before?

25  A.  No.

*HOKKANEN - DIRECT/GARDNER*          Vol. 6-985

1  Q.  Okay.  Before we get to your expert opinions, can you

2  describe your educational background for the Court?

3  A.  Yes.  I have a civil engineering degree from the

4  University of Minnesota, specialized in environmental

5  engineering.  I received that in 1980.  I also have a master's

6  degree from the University of Waterloo in earth science.  I

7  specialized in the field of hydrogeology.  That was 1984.

8  Q.  What's your current occupation?

9  A.  I am a consultant at a company called EKI.

10 Q.  And what are your responsibilities in that role at EKI?

11 A.  Well, my title, I'm a vice president/principal

12 hydrogeologies.  I work on projects, deal with clients, bring

13 work in the door, do the work with others.  I have some

14 management responsibilities for the firm in my vice president

15 role.

16 Q.  And you're here today in an expert role.  Is that how you

17 devote all of your professional time at EKI?

18 A.  I do have a pretty robust expert practice.  About 70,

19 80 percent of my time is spent on expert litigation matters.

20 Q.  And how is the remainder of the time spent?

21 A.  I continue to work on contaminated sites, investigation,

22 and remediation of contaminated sites.

23 Q.  Okay.  And do those sites include sites that involve

24 chlorinated solvent contamination?

25 A.  As a matter of fact, most of them do.  I have several dry

1  cleaner sites right now where we're in the middle of either

2  investigating or remediating these sites.

3  Q.  Okay.  How long have you worked for EKI?

4  A.  A very short time.  I joined them about three months ago.

5  Q.  And where did you work before you started working for EKI?

6  A.  The prior five years, I worked at a company called

7  Farallon Consulting.

8  Q.  And then just briefly, could you describe your work

9  history from Farallon Consulting back for the Court, please?

10  A.  Yes.  I've been doing this for about four years so I'll

11  try to hit it all.  The 10 years prior to Farallon, I had my

12  own firm.  I was a solo practitioner.  It was called Hokkanen

13  Environmental.  Ten years prior to that, I worked for a

14  company based out of California called Geomatrix Consultants.

15  Prior to that, I worked for several other consulting firms,

16  including Geraghty & Miller, a national firm; a couple of

17  local firms in Minneapolis, one called Barr Engineering and

18  one called EWA.  I started at EWA in 1984 after my master's

19  program.  Between my bachelor's and master's, I worked at EPA

20  region nine in San Francisco.

21  Q.  Okay.  And just to clarify then, other than the EPA, are

22  the other employers that you described all environmental

23  consulting firms?

24  A.  That's correct.

25  Q.  Okay.  As a result of your work for these environmental

*HOKKANEN - DIRECT/GARDNER*              Vol. 6-987

1  consulting firms, do you have any experience with the National

2  Contingency Plan or, as we'll call here today, the NCP?

3  A.  Yes.  I started my experience at EPA in 1980.  CERCLA or

4  Superfund was passed in 1980.  I got -- for two years, I was

5  with a small group in Region 9 and our mission was to identify

6  potential Superfund sites and then develop the first national

7  priority list sites for Region 9, and so I got involved to a

8  certain extent with the NCP during that period.  After my

9  graduate program, working with consulting firms in the 1980s,

10  the majority of those sites were either EPA led Superfund

11  sites or state led Superfund sites.  And I continued to work

12  on sites where the NCP was a factor into the '90s.

13  Q.  And so just, again, generally for the Court, what is your

14  role -- or what role does the NCP play in the work that you're

15  doing at these sites?

16  A.  Well, at a CERCLA site, either state led or federal led,

17  the NCP lays out the procedures you follow in the

18  investigation and remediation or cleanup of the sites.

19  Q.  And then is it your responsibility to make sure that the

20  sites that you're working on are then in compliance with the

21  NCP?

22  A.  Yes.  You follow the procedures laid out in the NCP,

23  that's correct.

24  Q.  Okay.  And then you noted some work that you did for the

25  EPA.  Was the NCP that was in effect at the time you were

*HOKKANEN - DIRECT/GARDNER*          Vol. 6-988

1  working for the EPA different than the NCP that's in effect

2  now?

3  A.  Yes, it has changed.  Yes, that's correct.

4  Q.  Are you familiar -- well, let's -- briefly, how has the

5  NCP changed?

6  A.  Well, briefly, first of all, it was changed -- the NCP

7  actually existed before CERCLA was passed, and CERCLA then --

8  there was a major change to accommodate this new CERCLA law.

9  Those -- that change came out in about 1982.

10          In 1986, Congress reauthorized and added some

11  amendments to CERCLA.  And then two or three years later, then

12  the NCP was revised again to reflect those changes.  I think

13  the last change was in 1995.  There were some changes then.  I

14  think that's the last one.

15  Q.  Are you familiar with the current NCP requirements?

16  A.  Yes.

17  Q.  And have you performed work involving the -- involving NCP

18  compliance at sites after those amendments?

19  A.  A couple of sites, yes.  The majority of sites, these

20  days, based on my personal experience, aren't done following

21  the NCP rules.  They're done under various state programs

22  where you don't necessarily need to follow the NCP.

23  Q.  Okay.  You testified earlier that you spent a large

24  portion of your time on expert work.  Have you been retained

25  to testify as an expert on the issue of NCP compliance before

*HOKKANEN - DIRECT/GARDNER*               Vol. 6-989

1  this case?

2  A.  Yes.

3  Q.  Approximately how many times?

4  A.  I believe there were three cases where I had either

5  testified or provided opinions about NCP compliance.

6  Q.  And if you recall, who retained you in those cases?

7  A.  One of them was the U.S. DOJ.  There was an attorney out

8  of Washington, D.C.  I was retained on a large site in

9  southern California.  And then the others were private law

10  firms.

11  Q.  When you say the "U.S. DOJ," you mean the United States

12  Department of Justice?

13  A.  Correct.

14  Q.  Okay.  Were any of the opinions that you offered in those

15  cases regarding NCP compliance ever excluded by a court?

16  A.  Not that I'm aware of.

17        MR. GARDNER:  Okay.  Your Honor, at this time, we

18  move that the Court recognize Mr. Hokkanen as an expert in the

19  field of NCP compliance.

20        THE COURT:  Any objection?

21        MR. BOWMAN:  No objection for Moran, Your Honor.

22        MS. FRENCH:  No objection, Your Honor, but we do

23  note that the Courtroom Practices and Procedures of this Court

24  indicate that the Court does not typically admit an expert as

25  an expert witness.  The testimony is simply allowed.

 1          THE COURT:  We did change that rule because of the

 2    Seventh Circuit telling me to change that rule.

 3          MS. FRENCH:  Okay.  Understood.  Thank you very

 4    much.

 5          THE COURT:  And we did that when about?  Yeah, in

 6    the fall.  So we do have an updated rule.

 7          So the Court will recognize the witness as an

 8    expert.

 9    BY MR. GARDNER:

10    Q.  All right.  Mr. Hokkanen, with regard to this case

11    specifically, you noted at the outset that they had retained

12    you to rebut Mr. Williams' opinion.  Did Major Tool or Major

13    Holdings tell you that you needed to disagree with

14    Mr. Williams' opinions?

15    A.  No.

16    Q.  Okay.  So if you did agree with his opinions, how would

17    that be reflected in your report?

18    A.  I've done a number of rebuttal reports, and I followed the

19    same process in this one.  If I did not disagree, or if I

20    agreed, I didn't mention anything about it.

21    Q.  Are there some aspects of Mr. Williams' opinion that you

22    do agree with?

23    A.  Yes.

24    Q.  Okay.  Now I'm going to focus on the ones that you

25    disagree with or that I think you disagree with.

1          MR. GARDNER:  Ms. Woods, can we turn to page 5 of

2     the PDF here?  I'm sorry.  Let's keep scrolling down.  Stop.

3     It would be page 3 of his report.  Right there.  That's good.

4     Thank you.

5     BY MR. GARDNER:

6     Q.  Near the bottom of this page, where the heading "Rebuttal

7     Opinion" starts, you've quoted Mr. Williams' opinion, and his

8     first opinion was, "Von Duprin has incurred necessary response

9     costs for site investigation and remediation activities

10    associated with the release and threatened release of

11    hazardous substances on the defendant's properties."  Do you

12    see that?

13    A.  Yes.

14    Q.  Okay.  To offer this opinion, what would Mr. Williams need

15    to know?

16    A.  Well, the first part of that is the necessary response

17    costs, so that would incorporate examining the costs to

18    determine if they were necessary or not.

19    Q.  Okay.  And would Mr. Williams need to determine which

20    costs were associated with releases at the upgradient

21    properties to offer this opinion?

22    A.  I assumed that as part of that opinion, yes.

23    Q.  Okay.  So if he had not determined which costs were

24    associated with releases or threatened releases at these

25    properties, would he have a basis to offer this opinion?

*HOKKANEN - DIRECT/GARDNER*          Vol. 6-992

1  A.  Well, he -- it's just a general opinion, and he doesn't

2  break out what costs or who was responsible or how much, so

3  it's just a general opinion about responsibility of necessary

4  response costs.

5  Q.  Okay.  Let's turn to the next page.  I understand the bulk

6  of your opinion is in response to his second opinion.  And his

7  second opinion states, "Site investigation activities

8  performed at the property and study area have been performed

9  in substantial compliance with the National Contingency Plan."

10          I'm going to start with just a general question.

11  Why would a private party need to perform work in substantial

12  compliance with the NCP?

13  A.  Well, the NCP -- and this was through the amendments in

14  1986, the SARA amendments -- included the provision of private

15  cost recovery, so recovery through private party actions at

16  Superfund sites or sites in general.  And as a part of the

17  requirements for cost recovery in the NCP, one of the

18  requirements was that the work was done in substantial

19  compliance with this document, the NCP.

20  Q.  Okay.  And so if a person is conducting or a party is

21  conducting a voluntary cleanup of a property, then they don't

22  necessarily need to incur costs with the NCP; right?

23          MS. FRENCH:  Objection, Your Honor, leading.

24          MR. GARDNER:  I can rephrase it, Your Honor.  We've

25  been leading, but I can rephrase.

*HOKKANEN – DIRECT/GARDNER*           Vol. 6-993

1             THE COURT:  Okay.  Rephrase.

2             MR. GARDNER:  Yep.

3   BY MR. GARDNER:

4   Q.  Let me ask it this way.

5             THE COURT:  So I'll strike the last answer.

6   Rephrase.

7             MR. GARDNER:  Yep.

8   BY MR. GARDNER:

9   Q.  Does a person conducting a voluntary cleanup of property

10  need to incur costs consistent with the NCP?

11            MS. FRENCH:  Objection, Your Honor, still leading

12  the witness.

13            THE COURT:  I'll let him answer it.

14  A.  No, not necessarily.

15  BY MR. GARDNER:

16  Q.  Okay.

17  A.  I've worked on a number of sites under voluntary programs

18  where there was not a requirement to follow the NCP.

19  Q.  Okay.  But if they want to recover under CERCLA, do they

20  need to incur costs consistent with the NCP?

21            MS. FRENCH:  Objection, Your Honor.  Leading the

22  witness.

23            THE COURT:  I don't think so.  "If they want" -- his

24  question is "if they want to."

25            Why don't you rephrase it.

1          MR. GARDNER:  Okay.

2          THE COURT:  Go ahead and rephrase it.

3   BY MR. GARDNER:

4   Q.  A party that wants to recover under CERCLA, as their

5   requirements relate to the NCP, what do they need to do,

6   Mr. Hokkanen?

7   A.  Well, in CERCLA's, I believe it's Section 300.700, the NCP

8   lists the requirements for private cost recovery.  One of

9   those requirements is that the work be done under substantial

10  compliance with the requirements of the NCP, the National

11  Contingency Plan.

12  Q.  And you used the term a couple of times.  Mr. Williams

13  used the term in his testimony.  What does the term

14  "substantial compliance" mean for purposes of the NCP?

15  A.  Substantial compliance actually isn't defined in the NCP.

16  Q.  And so, in that context, then, what does it mean?

17  A.  Well, it means that you -- first of all, that you don't

18  have to comply with every single detail in the NCP.  The word

19  "substantial" means that the majority of it needs to be

20  followed.

21  Q.  Okay.  And turning back to Mr. Williams' opinion, he uses

22  the term "site investigations."  When he testified, he also

23  noted that this includes removal activities.  Can you clarify

24  for the Court what the term "removal activities" means under

25  the NCP?

*HOKKANEN - DIRECT/GARDNER*               Vol. 6-995

1  A.  Well, quite simply, we call remedial investigation work

2  the process where we collect data to characterize the site, to

3  find out what contamination is there, where it is, this sort

4  of thing.  Remediation in general is the cleanup of that

5  contamination.  There are two types specified in the NCP.  One

6  is called a removal action and the other is a remedial action.

7  Removal actions, in general, are done under a quicker

8  timeframe.  It's a problem that needs to be addressed in a

9  short timeframe.  Remedial actions, over a much longer

10 timeframe.

11 Q.  Okay.  Are there multiple sections or requirements under

12 the NCP that apply to removal actions?

13 A.  There is a Section 300.450, and that addresses

14 specifically removal actions.

15 Q.  And then are there other sections within NCP that also

16 apply to removal actions?

17 A.  In general, yes.  That 300.415 is specific to removal

18 actions.  There are other sections that apply through that

19 process, that's correct.

20 Q.  Okay.  I want to discuss some of those individually.

21        MR. GARDNER:  Your Honor, I have hard copies.  We'll

22 put the -- or the -- the regulation up on the screen, but I

23 would also like to give him a hard copy, if I may?

24        THE COURT:  You may.

25        MR. GARDNER:  And I've got a hard copy for you, if

*HOKKANEN - DIRECT/GARDNER*          Vol. 6-996

1  you'd like.

2  BY MR. GARDNER:

3  Q.  Mr. Hokkanen, those are in front of you, if you need to

4  reference them.  I will say that I don't think most of my

5  questions will involve you to read them, but if you need them.

6          Let's start with Section 40, CFR Section 300.150.

7  Mr. Williams testified that Von Duprin's actions complied with

8  Section 300.150.  What does this section require?

9  A.  It's 150, 150?

10  Q.  150.

11  A.  300.150 are requirements for the development of what we

12  call health and safety plans.  This covers the procedures you

13  do to protect your own health and the safety on the site of

14  the workers.

15  Q.  Okay.  And are they called HASPs in your --

16  A.  HASPs is the acronym for a health and safety plan.

17  Q.  Okay.  When is a HASP required under the NCP?

18  A.  A HASP is required anytime you do work on a site.  So when

19  you start out collecting data during what we call a remedial

20  investigation, you develop one of these documents to ensure

21  the health and safety of the workers.

22  Q.  So if Mr. Williams had testified that response actions

23  taken before August 2014 substantially complied with this

24  section, but he could not identify any HASP for work performed

25  before August 2014, would you agree with his opinion?

*HOKKANEN – DIRECT/GARDNER*          Vol. 6-997

1  A.  No.  One of my rebuttal opinions was that no health and

2  safety plans were documented in his expert report.  Therefore,

3  I couldn't verify that that work was done under compliance

4  with the NCP, and I concluded that it wasn't because there

5  weren't any HASPs that I could examine.

6  Q.  Okay.  Mr. Williams also testified that Von Duprin

7  complied with Section 300.160.

8         MR. GARDNER:  Ms. Woods, could we pull that section

9  up, please?

10  BY MR. GARDNER:

11  Q.  What does Section 300.160 require?

12  A.  There are several things in 160.  The title of it kind of

13  speaks for itself, documentation and cost recovery.  And as

14  part of that, it requires that costs expended during the

15  investigation and cleanup of a site be documented so you could

16  verify that the costs were necessary costs for that work.

17  Q.  Okay.  And does this section require an accurate

18  accounting of private party costs incurred for response

19  actions?

20  A.  That's the language in that section, that's correct.

21  Q.  Okay.  And just generally for the Court, what does that

22  language mean?

23  A.  Well, you need some way to determine what activities were

24  conducted during the work at a site, some information about

25  what was done, were you sampling wells, were you collecting

*HOKKANEN - DIRECT/GARDNER*              Vol. 6-998

1  data, what were you doing, and the costs associated with that.

2  Q.  Okay.  And if you're determining whether a party has kept

3  an accurate accounting of private party costs for response

4  actions, what do you need to review?

5  A.  Well, in consulting firms, generally the firms that do

6  this type of work, we provide invoices to our clients, which

7  vary to a certain extent about how much information is in

8  them.  It's helpful to have information about the person that

9  did the work, how many hours they did something, what it cost,

10  and then even a brief description about what they actually

11  spent that time on.

12  Q.  Okay.  In your experience as an expert, what did you

13  review to determine compliance or noncompliance with this

14  requirement?

15  A.  In previous cases?

16  Q.  Sure.

17  A.  I had one case where that was actually my sole job.  I

18  looked through about a three-foot stack of invoices, went

19  through one by one to determine if those costs actually were

20  done for work on the site or not.

21  Q.  Okay.  So if Mr. Williams had only reviewed a small subset

22  of the thousands of pages of invoices created by one of Von

23  Duprin's environmental consultants, could he offer an opinion

24  that there had been an accurate accounting of private party

25  costs incurred for those response actions?

*HOKKANEN – DIRECT/GARDNER*          Vol. 6-999

1  A.  Well, you could do it for the invoices that you examine.

2  But if there's no documentation in what we've been talking

3  about or invoices, then it would be hard to do that, yes.

4  Q.  So he could offer the opinion for the small subset of

5  invoices that he did actually review?

6          MS. FRENCH:  Objection, Your Honor.  Leading.

7  A.  That would be my opinion, yes.

8          THE COURT:  Hold up, sir.  When there's an

9  objection, let's be quiet.

10          MR. GARDNER:  I can rephrase it, Your Honor.

11          THE COURT:  I'll sustain the objection.  Rephrase.

12          MR. GARDNER:  Okay.

13  BY MR. GARDNER:

14  Q.  If Mr. Williams had only reviewed that small subsection,

15  could he offer an opinion about the entirety of the invoices

16  that had been created and offer an opinion that they had, in

17  fact -- that there had been, in fact, an accurate accounting

18  of private party costs incurred for the response actions in

19  all of the invoices?

20  A.  No.  My rebuttal opinion was that I believe what he said

21  in his expert report, that he reviewed a summary of costs, not

22  invoices.

23  Q.  What if Mr. Williams testified that he did review some

24  invoices, but those invoices did not contain any narratives

25  for the work being performed?  Then, in your opinion, could

1  Mr. Williams say that there had been an accurate accounting of

2  private party costs incurred for those response actions?

3  A.  It's clearly not ideal.  There, sometimes, in my review of

4  invoices in the past, you don't get narrative, and so you try

5  to match up invoices with reports and work that's done and

6  that sort of thing.  It's clearly not ideal.  It's better to

7  have some sort of description.

8  Q.  Okay.  And then I believe earlier you were testifying

9  about cost summaries.  If Mr. Williams said he reviewed cost

10 summaries for other environmental consultants and those cost

11 summaries did not have -- did not list the people working on

12 the activity, the hours they worked, or the activities they

13 were undertaking, could Mr. Williams support an opinion that

14 that work complied with Section 300.160?

15 A.  Well, the opinion I gave in my rebuttal report was

16 two-fold.  One, that would be quite difficult to do that.

17 Two, that particular summary wasn't referenced or available

18 for me to examine, and so there was no way for me to make that

19 determination.  Without the document itself, I concluded and

20 my opinion was that those costs, based on this section, were

21 not in compliance with the NCP.

22 Q.  Okay.  Let's turn --

23          MR. GARDNER:  Ms. Woods, can we go to

24 Section 300.400, Subsection C?  That's good right there.

25 Thank you.

*HOKKANEN - DIRECT/GARDNER*                    Vol. 6-1001

 1  BY MR. GARDNER:

 2  Q.  Mr. Williams testified that Von Duprin complied with

 3  Section 300.400(c).  What does this subsection require?

 4  A.  Well, there were several requirements in this subsection.

 5  The one that I focused on in my rebuttal report was

 6  300.400(c)(4) which requires that private parties, "be

 7  sensitive to local community concerns."  My opinion was, based

 8  on my review of documents that Mr. Williams cited, that they

 9  did not substantially meet that requirement.

10  Q.  Okay.  Let's back up just one step.  What does it mean to

11  be sensitive to local community concerns?

12  A.  Well, it's not defined in the NCP in that section.

13  There's quite a bit of language for community relations in

14  other sections of the NCP.  Based on that, in general, what

15  that means -- and CERCLA itself talks about this -- that you

16  need to involve the community in your activities.  You need to

17  inform the potentially affected community in what you're

18  doing, get their feedback, respond to that feedback, because

19  people are impacted by this contamination, so you need to

20  determine what their concerns are and then respond to those

21  concerns.

22  Q.  And in your opinion, is this requirement, that a private

23  party be sensitive to local community concerns, an important

24  requirement under the NCP?

25  A.  Well, Congress certainly thought so, because it

*HOKKANEN – DIRECT/GARDNER*                    Vol. 6-1002

1  specifically addressed this in the legislation.

2  Q.  Okay.  Does communicating with affected -- strike that.

3           Would communicating with owners and residents of

4  homes that have been affected by the migration of

5  contamination alone be considered being sensitive to local

6  community concerns?

7  A.  Well, it would be a part of the process.  What the NCP and

8  the guidance documents at EPA's created to address community

9  relations, that would be part of it.  However, it also, these

10 guidance documents and the NCP itself, discusses other

11 parties, local officials; city officials, for example; state

12 officials; and also potentially affected parties.  If you have

13 contamination that's moving, you have people who might be

14 affected, they would clearly be concerned about that.

15 Q.  And those other people that you mentioned, the government

16 agents, the other potentially affected residents, would they

17 be considered part of the local community under the NCP?

18 A.  That's my understanding, yes.

19 Q.  Okay.  Would performing all work in accordance with

20 schedules from a government agency like IDEM alone constitute

21 being sensitive to local community concerns?

22 A.  It could, but not necessarily.  If the -- if you're under

23 a state order, for example, and the state order requires you

24 to follow the NCP either directly or spells out the

25 requirements, then, yes.

*HOKKANEN – DIRECT/GARDNER*          Vol. 6-1003

1        My experience, these days, is the majority of the

2   sites we don't do under strict NCP compliance or even

3   substantial compliance.  A lot of the voluntary cleanup

4   programs don't require following the NCP.

5   Q.  Okay.  So if Mr. Williams had testified that Von Duprin

6   substantially complied with Section 300.400(c) and was

7   sensitive to local community concerns because it had

8   communicated with owners and residents that were affected by

9   the contamination and was performing work in accordance with

10  government schedules or by IDEM, would you agree with

11  Mr. Williams' opinion?

12  A.  My rebuttal opinion was, no, I didn't agree with that.

13        MR. GARDNER:  Okay.  We can stay on this section,

14  but can we scroll down to Subsection G, Ms. Woods?  That's

15  good right there.  Thank you.

16  BY MR. GARDNER:

17  Q.  Mr. Williams also testified that Von Duprin's activities

18  complied with Section 300.400(g).  Can you briefly describe

19  for the Court what this subsection requires?

20  A.  Yes.  This is the identification of what we call ARARs.

21  It's sort of an arcane part of the NCP.  It's a little

22  confusing.  Essentially what these are are the requirements

23  under federal law, federal regulation, also state law if the

24  state law is as strict or stricter than federal regulation.

25  These are the laws and regulations that you need to follow and

1  meet in either the investigation or the remediation of a site.

2  Q.  And you used the term "ARAR."  Is that an acronym?

3  A.  It's an acronym that's applicable or relevant and

4  appropriate requirements.

5  Q.  Okay.  Let's take these separately.  Is the term

6  "applicable requirements" defined somewhere under the NCP?

7  A.  In this section, as a matter of fact, 400 -- 300.400(g),

8  there's quite a bit of description about what these ARARs

9  actually are, what you need to look at.

10  Q.  And I guess, to close the loop, is the term "relevant and

11  appropriate requirements" also defined under this?

12  A.  It -- there is discussion about what that means, yes.

13  There's also -- part of this section, there's something called

14  "to be considered," which includes guidance documents and this

15  sort of thing.

16  Q.  Would you need to know these definitions to understand the

17  requirements of this section?

18  A.  That would be helpful, yes.

19  Q.  Would you need to know these definitions to determine

20  whether a private party had complied with this section?

21  A.  I believe so, yes.

22  Q.  Okay.  In general, how can you tell if a party has

23  complied with this requirement?

24  A.  Well, this process is a bit onerous.  I've done it myself

25  at a number of sites.  Essentially what you need to do is

HOKKANEN - DIRECT/GARDNER          Vol. 6-1005

1   start with the universe of potential laws and regulations that

2   might apply to what you're doing at a contaminated site.

3   These are hazardous waste laws, it could be Clean Air Act,

4   Clean Water Act, a whole series of laws, and you need to then

5   examine the requirements of each of these laws and see if they

6   apply to what you're doing at a site or potentially what

7   you're doing at a site.

8   Q.  Should the regulations identified -- should the

9   regulations be identified and referenced in a document that

10  relates to the work being performed?

11  A.  Yes, that's been my experience.  As I testified, I've

12  actually done this, and so you go through this process of

13  examining each of these laws, see if it applies.  If it

14  doesn't, fine.  If it does, then you determine what -- how it

15  applies to what you're doing at a site.  And then what we do

16  is we document that in some manner.  We document that in a

17  document to the regulator that's overseeing the site.

18  Q.  Does the EPA have guidance for identifying ARARs?

19  A.  There is guidance, yes.  EPA has addressed that.

20  Q.  Are you familiar with that guidance?

21  A.  Yes.

22  Q.  Did you review that guidance before forming your opinion

23  in this case?

24  A.  Yes, I did, and they're referenced in my documents

25  section.

*HOKKANEN - DIRECT/GARDNER*                 Vol. 6-1006

1  Q.  Okay.  Are you familiar with IDEM's screening levels,

2  generally?

3  A.  Generally, yes.

4  Q.  Okay.  Would applying IDEM's screening levels to evaluate

5  site data and establish goals for the soil, soil vapor, and

6  groundwater satisfy this ARAR requirement?

7          MS. FRENCH:  Objection, Your Honor, outside the

8  scope of this expert's disclosed opinions.

9          THE COURT:  Your response?

10         MR. GARDNER:  I believe that his opinion is that --

11  and I don't want to speak for him -- that Mr. Williams has not

12  complied with this section or that he has not offered enough

13  support that Von Duprin complied with this section.  And as

14  the basis for that, Mr. Williams argued that complying with

15  IDEM's screening levels was sufficient to comply with this

16  section of the NCP.

17         THE COURT:  All right.  What's your -- what's your

18  response to that, Counsel?  Do you have a --

19         MS. FRENCH:  The way the question was asked sounded

20  more like a question for a generalized opinion of whether

21  IDEM's screening levels are sufficient to meet this

22  requirement, which is different than the limited rebuttal

23  opinions offered by Mr. Hokkanen -- or Mr. Hokkanen in this

24  case.

25         THE COURT:  All right.  Why don't you rephrase the

 1  question.

 2          And for the record, is the acronym A -- it's

 3  A-R-A-R; correct?

 4          THE WITNESS:  That's correct.

 5          THE COURT:  All right.  The court reporter has all

 6  kinds of different things.

 7          COURT REPORTER:  Sorry.

 8          THE COURT:  A-R-A-R.  Thank you.

 9  BY MR. GARDNER:

10  Q.  And then, to rephrase the question, Mr. Hokkanen, if

11  Mr. Williams had testified that Von Duprin satisfied this ARAR

12  requirement of Section 300.400(g) by complying with IDEM's

13  screening levels, would you agree with his opinion?

14  A.  Well, my rebuttal opinion was that, based on my

15  examination of the work that was done to develop cleanup

16  requirements, these ARARs, that the work did not meet the

17  requirements in the NCP.

18  Q.  Thank you.

19          MR. GARDNER:  Ms. Woods, can we turn to

20  Section 300.415, please?

21  BY MR. GARDNER:

22  Q.  Mr. Williams testified that Von Duprin's activities

23  complied with Section 300.415.  Again, on a general level, can

24  you tell the Court what this section requires?

25  A.  300.415, as I testified a little earlier, addresses what

*HOKKANEN - DIRECT/GARDNER*          Vol. 6-1008

1  we call removal actions.  These are cleanup activities that

2  are done in somewhat of a shorter time period than what we

3  call remedial actions.

4  Q.  And are there different elements within this statute that

5  a private party would have to undertake in order to comply

6  with this section?

7  A.  Yeah.  The NCP discusses the different levels of

8  timeliness, is a good way to put it.  There are three basic

9  types of removal actions based on time.  The first one would

10  be an emergency action where you have some release or

11  something going on that you need to immediately take care of.

12  There may be a leak of some chemical into a surface water body

13  and you need to take care of it right away.  There's a

14  second level where you identify the need to take some action

15  and you have what the NCP calls a six-month planning period

16  before you take that action.  The third one is where you

17  need to address some release in a fairly timely manner, but

18  you have more than six months to initiate that activity.

19  Q.  Okay.  Does this section require an engineering -- an

20  engineering evaluation and cost analysis?  Does that require

21  that an EECA, as it's called, or an EECA, be prepared?

22  A.  It does for the third category that I talked about.  These

23  are when you have greater than six months to plan for and then

24  implement that removal action.

25  Q.  Okay.  And what is an EECA?

HOKKANEN – DIRECT/GARDNER          Vol. 6-1009

1  A.  An EECA is what I would call sort of a mini feasibility

2  study.  In essence, what it is, it's a process where you look

3  at different ways to address or clean up some sort of release.

4  We call those alternatives.  You look at different

5  alternatives, and then based on an analysis of those

6  alternatives you then choose one to implement and take care of

7  the problem.

8  Q.  Is there EPA guidance relating to creating EECAs?

9  A.  Yes.

10 Q.  And are you familiar with that guidance?

11 A.  Yes.

12 Q.  Did you review that guidance before forming your opinion

13 in this case?

14 A.  Yes, I did.

15 Q.  Okay.  If an EECA is required, at what point in the course

16 of the work should the EECA be created?

17 A.  You initiate that process right after you determine if a

18 removal action is necessary.

19 Q.  Okay.  If Mr. Williams had testified that removal actions

20 performed for Von Duprin needed to comply with Section 300.415

21 but there were no EECA for those actions, would you agree with

22 his opinion?

23 A.  Well, in my rebuttal report -- well, let me go back to his

24 report.  What Mr. Williams' opinion was was that, for

25 Section 300.415, an EECA was necessary.  I examined the

*HOKKANEN - DIRECT/GARDNER*          Vol. 6-1010

1  documents that he referenced and my opinion was that an EECA

2  actually was not prepared.

3  Q.  What is a sampling and analysis plan or a SAP?

4  A.  A sampling and analysis plan is kind of what it sounds

5  like.  When we collect samples of either soil, soil gas, or

6  groundwater, these are the procedures that we use to collect

7  those samples and sort of industry standard, so it lays out

8  how you're going to collect samples and what you're going to

9  do with those samples.

10 Q.  Is a SAP required under this section, 300.415?

11 A.  Yes.

12 Q.  Okay.  If Mr. Williams testified that work performed

13 before 2014 complied with Section 300.415 but no SAP was

14 created before 2014, would you agree with his opinion?

15 A.  Well, again, I examined the documents that he referenced,

16 and I was unable to find a sampling and analysis plan prior to

17 that date.

18 Q.  Okay.

19 A.  So my opinion was that, based on a lack of sampling and

20 analysis plans, no, that work did not substantially comply

21 with the NCP.

22 Q.  Okay.  Last requirement under this section relates to a

23 QAPP, Q-A-P-P.  Can you describe to the Court what that means?

24 A.  Yes.  Again, it's sort of an arcane document that we

25 create, but it's a very important document.  This is how we

*HOKKANEN - DIRECT/GARDNER*                    Vol. 6-1011

1   handle the data that's generated through our sampling, and

2   it's going -- it's the procedures and processes that we use to

3   ensure that the data is reliable and accurate and we can use

4   that for the development of our remediation plans.

5   Q.  Okay.  When a QAPP is required, when in the course of the

6   work should it be created?

7   A.  What the NCP requires is that a QAPP be created before you

8   start collecting data, and so the very purpose of the QAPP is

9   to make sure that the data that you collect is reliable, and

10  so that would be right at the front end of the investigation

11  process.

12  Q.  If Mr. Williams had testified that activities performed

13  before May 2017 needed to comply with Section 300.415 but he

14  could not identify a QAPP created before May 2017, would you

15  agree with his opinion?

16  A.  Well, what you're referencing is that a QAPP indeed was

17  submitted to the state agency in May of 2017 that then met the

18  requirement in the NCP.  Again, I examined the documents prior

19  to that and I did not see a QAPP in any of the documents, and

20  so my conclusion was, because there was no QAPP that was

21  required in the NCP, that, no, that work then did not meet the

22  NCP.

23  Q.  Okay.  Final sections here, the CFR.  We can lump them

24  together.

25          MR. GARDNER:  And, Ms. Woods, you don't need to pull

1  any of them up yet.

2  BY MR. GARDNER:

3  Q.  But I want to discuss 300.155, 300.415, and 300.430.  Do

4  all of those sections contain community relations requirements

5  under the NCP?

6  A.  Portions of them, yes.

7  Q.  Okay.  Generally, what are the objectives of those

8  community relations requirements in those sections?

9  A.  Again, in a general sense, and I believe I testified

10  earlier, what the NCP requires is the involvement of the local

11  community.  And so what that means and what is described in

12  these various sections of how to do that is to identify,

13  first, who the community is, inform the community about your

14  activities, solicit feedback from the community about what

15  you're doing, and then address whatever concerns or questions

16  they might have.

17  Q.  Okay.  Has the EPA issued any guidance on the community

18  relation sections of the NCP?

19  A.  Yes.

20  Q.  Have you reviewed that guidance?

21  A.  Yes.

22  Q.  And were you familiar with it before you formed your

23  opinion in this case?

24  A.  Yes.

25  Q.  Okay.  Can you give the Court an example of the types of

*HOKKANEN – DIRECT/GARDNER*          Vol. 6-1013

1  requirements, community relations requirements, that are

2  contained in these sections?

3  A.  A couple of examples.  One is mechanisms to inform the

4  public, as I testified, what you're doing.  This could be

5  development of a fact sheet.  It could be notices to the local

6  community.  Part of that process would be informing the

7  local -- the local officials, for example, who then might

8  communicate to their constituents.  That's one way.

9  Q.  Are public meetings ever required under these sections?

10 A.  Public meetings sometimes are conducted.  I've been part

11 of those myself over the years, so that's another process,

12 yes.

13 Q.  If Mr. Williams testified that Von Duprin had

14 substantially complied with these community relation

15 requirements by communicating with downgradient property

16 owners and communicating with IDEM, would you agree with his

17 opinion?

18 A.  Well, again, I examined his opinion.  I examined the

19 documents that he cited.  My conclusion was that the public

20 outreach that they did was primarily for the purpose of

21 gaining access to properties that potentially could have been

22 affected by the downgradient contamination, so it was trying

23 to gain access and then gain permission to potentially put in

24 some sort of mitigation if that was necessary.  The sort of

25 requirements and community relations that are spelled out in

1  the NCP, my opinion was, no, that the activities did not

2  meet -- substantially meet that requirement.

3  Q.  If a state government oversees a private party's response

4  activities, does the private party necessarily comply with the

5  NCP?

6  A.  And I believe you've asked this before in a different way.

7  But if the state agency requires that you follow the process

8  of the NCP, then, yes.  But just the mere fact that you're

9  working under the oversight of a state agency, not

10  necessarily.

11  Q.  Okay.  Could you give the Court an example of how the

12  NCP's community relations requirements differ from IDEM's?

13  A.  IDEM requires the development of a community relations

14  plan, which has now been done when you submit what's called a

15  remediation work plan, so those are what you plan to do to

16  clean up a site.  The NCP has requirements for community

17  relations prior to that during the investigation process.

18  Q.  Okay.  So if Mr. Williams testified that Von Duprin had

19  substantially complied with Sections 300.155, 300.415, and

20  300.430 because it complied with IDEM's guidelines, would you

21  agree with his opinion?

22  A.  Well, my rebuttal opinion was no.

23  Q.  Okay.

24          MR. GARDNER:  Ms. Woods, let's go back to his report

25  just briefly.

HOKKANEN - DIRECT/GARDNER          Vol. 6-1015

1   BY MR. GARDNER:

2   Q.  I want to ask you a couple of questions about

3   Mr. Williams' final opinion.

4          MR. GARDNER:  It is on page 8 of his report.  Right

5   there.  Thank you.

6   BY MR. GARDNER:

7   Q.  Mr. Williams' third opinion was: "Remedy selection and

8   remediation within the study area has been performed in

9   substantial compliance with the NCP."  What section of the NCP

10  applies to remedial actions?

11  A.  Well, we've already talked about Section 300.415 that

12  applies to removal actions.  Remedial actions, usually the

13  ones that take place over a longer period of time, that's

14  Section 300.430.

15  Q.  And on a very general level, what does Section 300.435

16  require?

17  A.  Well, 430 -- excuse me.  430 is the remedial

18  investigation.  435 is the remedial action.  And what that

19  requires is the process to develop alternatives for cleaning

20  up or remediating a site.  And it describes in quite some

21  detail about the process you need to go through to ultimately

22  determine what you're going to do in terms of remediation at a

23  site.

24  Q.  So if Mr. Williams did not consider Section 300.435, could

25  he support an opinion that any remedial work had substantially

HOKKANEN – DIRECT/GARDNER                Vol. 6-1016

1  complied with the NCP?

2  A.  Well, again, the NCP addresses requirements for remedial

3  actions in Section 300.435, so, no, you would need to consider

4  that to determine if you were in compliance or not.

5  Q.  Okay.  Mr. Williams testified that costs that Von Duprin

6  had paid through settling a separate litigation were costs

7  incurred consistent with the NCP.

8        Are you aware of any provision in the NCP that

9  relates to costs incurred in settling a litigation?

10  A.  I have read the NCP's pertinent sections a number of

11  times.  I have not seen any language to that effect.

12  Q.  Okay.  The provisions in the NCP that we've discussed and

13  that Mr. Williams discussed used the term "lead agency."

14        When a private party is undertaking the response

15  actions, what does the term "lead agency" refer to?

16  A.  Well, it's a bit confusing.  The NCP was basically written

17  for federal agencies, so to guide federal agencies on dealing

18  with releases.  And so the lead agency, again because it was

19  written for federal agencies, the language is written

20  basically addressing federal agencies.

21  Q.  Okay.  So in this case, today, would that term "lead

22  agency" refer to Von Duprin?

23  A.  In general, yes.  Basically, if you're going to, again in

24  Section 300.700, seek private cost recovery, and you follow

25  the NCP, then, yes, if you're doing a remedial investigation,

*HOKKANEN – CROSS/FRENCH*                Vol. 6-1017

1  for example, and it says "lead agency," it's actually the

2  private party doing the work.

3  Q.  Okay.  And if Mr. Williams had testified that it was

4  IDEM's responsibility to perform community relations

5  requirements in this case, would you agree with him?

6  A.  In part, the agency does have a role, but, for example,

7  the private party would develop the community relations plan

8  and be involved in that process, and the agency itself then

9  has a part of that process.

10  Q.  Okay.  Final question, Mr. Hokkanen:  The testimony you

11  offered here today, what did you rely on to form those

12  opinions?

13  A.  I relied on my experience working on sites following the

14  NCP.  I listed a series of documents that I reviewed, both

15  documents that were done -- work on the site and then various

16  guidance documents that I looked at.

17          MR. GARDNER:  Nothing further at this time, Your

18  Honor.

19          THE COURT:  All right.  Thank you.

20          And who will cross-examine first?  Okay.

21  Ms. French, you may.

22          MR. GARDNER:  Thank you.

23                    **CROSS-EXAMINATION**

24  BY MS. FRENCH:

25  Q.  Good morning, Mr. Hokkanen.

*HOKKANEN – CROSS/FRENCH*                    Vol. 6-1018

1   A.  Good morning.

2   Q.  Do you recall being asked at your deposition whether Von

3   Duprin incurred some necessary response costs?

4   A.  Yes.

5   Q.  And did you agree at your deposition that Von Duprin

6   incurred necessary response costs in its work at this site?

7   A.  Some -- yes, I did.  Some of them were necessary.

8   Q.  Did you agree at your deposition that some of those costs

9   were incurred to investigate and remove harm associated with

10  upgradient contamination?

11  A.  Not specifically.  I don't know if you could give me the

12  section.

13  Q.  Sure.

14          I believe at your deposition, you were asked, "When

15  you say that he did not specify which costs are associated

16  with releases on the property, can you tell me what that

17  means?"

18          And you discussed your rebuttal to that and

19  concluded your response, saying, "And I agree that in the

20  first part of my rebuttal, that they" -- being Von Duprin --

21  "incurred response costs at and in the vicinity of the

22  property," and that you read documents where they investigated

23  the site and the surrounding area; is that correct?

24  A.  I believe, if that's what I said, yes.

25  Q.  We agree that Mr. Williams' opinion does not attempt to

*HOKKANEN – CROSS/FRENCH*                Vol. 6-1019

1  allocate costs among the upgradient parties?

2  A.  That's correct.

3  Q.  Do you agree that site investigation is a separate

4  category of costs addressed by the NCP?

5  A.  Remedial investigation activities; is that the question?

6  I'm sorry.

7  Q.  Yes.  Is site investigation separate from removal or

8  remedial actions under the NCP?

9  A.  It is a separate activity, yes.  It's the collection of

10 data to determine if you need to do either removal or remedial

11 action, and the data that you generate from that is used to

12 help make that determination.

13 Q.  And I believe you stated that substantial compliance is

14 not specifically defined in the NCP; is that right?

15 A.  That's correct.

16 Q.  Do you recall being asked at your deposition that --

17 sorry.

18         Do you recall stating at your deposition that

19 substantial compliance is a matter of opinion?

20 A.  And -- yes.  What I testified to was that I related my

21 opinions about substantial compliance for this matter in my

22 rebuttal report.

23 Q.  Is substantial compliance a standard that applies to a

24 private party's action as a whole or as to each individual

25 task completed by a private party?

*HOKKANEN - CROSS/FRENCH*                    Vol. 6-1020

 1  A.  Well, Section 300.700, which spells out the requirements

 2  for private cost recovery, spells out that you need to

 3  substantially comply with a series of provisions -- series of

 4  sections -- excuse me -- in the NCP, so it requires

 5  substantial compliance with all of those sections.

 6          MS. FRENCH:  Mr. Bartholomew, could you pull up

 7  Section 300.700(c)(3)(I), please.

 8          I think we need to switch to his screen.  Thank you.

 9  BY MS. FRENCH:

10  Q.  Could you read 300.700(c)(3)(I) for the Court, please?

11  A.  It's a little small.  Hang on.

12          MS. FRENCH:  Can we enlarge it, please,

13  Mr. Bartholomew?  It's the very first paragraph on this page.

14          THE WITNESS:  I think I can read it from here.  Oh,

15  there it is.  Thank you.

16  A.  "A private party response action will be consistent with

17  the NCP if the action, when evaluated as a whole, is in

18  substantial compliance with the applicable requirements in

19  paragraphs 5 and 6 of this section and results in a CERCLA

20  quality cleanup."

21  BY MS. FRENCH:

22  Q.  Does the NCP also specify that response actions will not

23  be considered inconsistent with the NCP if they're immaterial

24  or in substantial deviations from the NCP's requirements?

25  A.  I believe that's correct, yes.

*HOKKANEN – CROSS/FRENCH*          Vol. 6-1021

1    Q.  And your experience as a regulator at the EPA was from

2    1980 to 1982; correct?

3    A.  Correct.

4    Q.  So that regulatory experience was prior to the

5    implementation of the SARA amendments; correct?

6    A.  Yes.

7    Q.  I believe you testified earlier regarding

8    Section 300.400(c), which discusses fund finance actions.  Do

9    each of the provisions within 300.400(c) apply to privately

10   funded actions?

11           MS. FRENCH:  And we can pull up 300.400(c), if

12   that's helpful.  One page back, please.

13   A.  I don't believe so, no.  There's some that are addressed

14   to the federal agency.  In this case, EPA.

15   BY MS. FRENCH:

16   Q.  And this is not a Superfund or federally funded site, is

17   it?

18   A.  That's correct.

19   Q.  Do you agree that the NCP does not specify a specific

20   format for the identification of ARARs in a response action?

21   A.  It identifies what they are, and the guidance documents

22   that EPA has developed go into much, much greater detail about

23   how to go through that process.

24   Q.  But do you recall being asked at your deposition whether

25   the only way to comply with 300.400(g) is to list in your

*HOKKANEN – CROSS/FRENCH*                    Vol. 6-1022

1  report all of the regulations that you found to be

2  inapplicable?

3  A.  That was my testimony, yes, and --

4  Q.  I believe that was the question.

5  A.  Oh, sorry.

6  Q.  Your response -- do you recall being asked that question?

7  A.  Yes, I do.

8  Q.  And do you recall your response to that question from your

9  deposition?

10  A.  Not specifically.  In general, I do, but if you have the

11  specifics.

12  Q.  Certainly.  At your deposition, you responded that, "No,

13  the process that you go through is you list the ones that

14  potentially are applicable, and you go through a process of

15  comparing them with your response action to determine which

16  ones you need to comply with.  Now you don't necessarily have

17  to list every single one out."

18          Do you recall that testimony?

19  A.  Yes.

20  Q.  Do you agree that the NCP does not specify a format for

21  sampling analysis plans?

22  A.  That is correct.  Their guidance documents discuss that.

23  Q.  And similarly, the NCP does not specify a format for a

24  quality assurance project plan; correct?

25  A.  Not specifically, no.

*HOKKANEN - CROSS/FRENCH*          Vol. 6-1023

1  Q.  Does the NCP specify when the clock begins to run for

2  purposes of determining whether a removal action is time

3  critical?

4  A.  The NCP actually doesn't use the word "time critical."

5  Q.  So the answer to my question is, no, it does not specify

6  when the clock begins to run?

7  A.  Not for the term "time critical," no.  It specifies -- as

8  I testified to earlier, there are two types -- three types,

9  actually, I testified to:  Emergency; the next removal action

10 is one that you have less than six months to plan for; and the

11 other one is where you have greater than six months to plan

12 for.

13 Q.  So going back to your deposition, do you recall being

14 asked, "How do we distinguish between a time critical removal

15 action and a non-time-critical removal action"?

16 A.  I was asked that, yes.

17 Q.  And do you recall what your response was?

18 A.  Not specifically, no.

19 Q.  Your response was, "Well, the NCP has some.  It partially

20 defines it.  For example, the first one is a removal action

21 that will be in place for greater than 120 days.  And the

22 second one is a removal action where you have six months to

23 essentially plan removal action.  Now, that second one, from

24 what I can tell from the NCP, that isn't really specifically

25 defined when the clock starts, for example."

*HOKKANEN – CROSS/FRENCH*                    Vol. 6-1024

1              Do you recall that testimony?

2   A.  Yes.

3   Q.  Does ongoing monitoring count toward the six-month time

4   period for a time critical removal action?

5   A.  Could you define "ongoing monitoring"?

6   Q.  Certainly.

7              So if you continue to monitor the effectiveness of a

8   removal action following its implementation, does that count

9   towards the six-month planning period?

10  A.  No.

11  Q.  Have you reviewed all reports and documents associated

12  with Von Duprin's response actions in the plume area?

13  A.  Could you repeat that question, please?

14  Q.  Certainly.

15             Have you reviewed all of the reports and documents

16  associated with Von Duprin's response actions in the plume

17  area?

18  A.  Well, the documents I reviewed are listed in my rebuttal

19  report.  There may have been documents that I didn't review or

20  list.  I tried to be fairly comprehensive.

21             MS. FRENCH:  Could we pull up Exhibit 106?  And

22  could we go to Exhibit B?  I'm not totally sure of the PDF but

23  it's the last section, and it should be about 18, 19 pages

24  from the back of the document.  Thank you.  A little bit

25  further.  Sorry, the other way.  That's good.

*HOKKANEN - CROSS/FRENCH*          Vol. 6-1025

1  BY MS. FRENCH:

2  Q.  This is appendix B or Exhibit B to Mr. Williams' expert

3  report.  Did you review every document listed in this exhibit

4  for the purposes of forming your opinion?

5  A.  I don't believe I reviewed every document, that's correct.

6  Q.  Is it your opinion, as stated in your expert report, that

7  Von Duprin's response actions in the plume area do not

8  substantially comply with the NCP based only on your

9  disagreement with Williams' opinion?

10  A.  Could you repeat that question?

11  Q.  Sure.  I'll rephrase.

12          Is it your opinion that Von Duprin's response

13  actions in the plume area do not substantially comply with the

14  NCP based only on your disagreement with Mr. Williams'

15  opinion?

16  A.  I don't completely understand your question.  I guess how

17  I'll answer that is that I reviewed his opinions, and in my

18  rebuttal report I was very specific about what portions of his

19  opinions that I disagreed with.

20  Q.  So you did not render an independent opinion regarding

21  whether or not Von Duprin, in fact, complied with the NCP?

22  A.  That's correct.  I responded in my rebuttal report to his

23  opinions.

24  Q.  In Exhibit 106, if we can go back to what's marked as

25  page 24 on the paper copy of that report, so probably 28 on

*HOKKANEN - CROSS/FRENCH*                    Vol. 6-1026

1  your copy, did you review every document listed in this

2  references section of Mr. Williams' report in rendering your

3  opinions?

4  A.  Well, I would have to go back and compare that to my

5  reference list, so I'm -- as I sit here, I'm not certain.

6  Q.  You don't recall a process of looking at each document

7  listed in that report?

8  A.  That was the process that I tried to carry out.  There may

9  have been a few that, for whatever reason, weren't on the IDEM

10 site or I didn't have access to, but that actually was my

11 process, to go through this reference list, try to locate all

12 of these documents.

13 Q.  Did you ask counsel to provide those documents to you so

14 you could review them?

15 A.  The ones that I couldn't find on the IDEM site, yes.

16 Q.  Is it possible that additional information and reports you

17 never reviewed would confirm that Von Duprin's actions at the

18 site did, in fact, substantially comply with the NCP?

19 A.  Well, anything's possible.  I base my opinions on the

20 documents that I reviewed.

21 Q.  Did you review any invoices from Geosyntec in reaching

22 your opinion that Von Duprin's response costs were not

23 properly accounted?

24 A.  What I did is I reviewed his expert report.  As I

25 testified to earlier, I didn't see any reference to any

*HOKKANEN – CROSS/FRENCH*          Vol. 6-1027

1  invoices for anyone, including Geosyntec.

2  Q.  Did you request any invoices to conduct your analysis?

3  A.  No.  I was relying on Mr. Williams' expert report.  I

4  didn't do an independent analysis.  What I was asked to do was

5  to provide rebuttal opinions to his expert report.

6  Q.  And you agree that narratives are not always included in

7  consultant invoices at environmental cleanup sites?

8  A.  Not always, that's correct.

9  Q.  Do you agree that "local community concerns" is undefined

10 in Section 300.400(c)(4) of the NCP?

11 A.  That's correct.

12 Q.  Where in the NCP does it state that a private party

13 assumes all duties of a lead agency in conducting a private

14 party response action?

15 A.  I couldn't point you to a specific section.  As I

16 testified to earlier, the NCP was not written for private

17 parties.  It was written specifically for federal agencies.

18 So the terminology in the NCP speaks to the lead agency.

19 Typically, that's a federal agency, because it was written to

20 guide federal agencies in responses for releases.

21 Q.  So your answer to my question is that you cannot point to

22 a specific provision that states that a private party assumes

23 the role of the lead agency?

24 A.  Not a specific section, no.

25 Q.  Thank you.

*HOKKANEN – CROSS/FRENCH*          Vol. 6-1028

1        You stated in your expert report that you do not

2   believe IDEM oversight is significant enough to satisfy public

3   participation requirements under the NCP; correct?

4   A.   My read of IDEM's guidance documents is that it doesn't

5   meet the same requirements that the NCP does, that's correct.

6   Q.   Would it influence your opinion if EPA had agreed that the

7   public involvement opportunities under the voluntary

8   remediation program were adequate?

9   A.   I'm not familiar with that, so I can't offer an opinion

10  about that.

11  Q.   Did you review the IDEM remediation program enclosure

12  guides in reaching your conclusions in this case?

13  A.   Yes.

14  Q.   Are you familiar with Section 8 of the remediation program

15  guide, which has been entered as Exhibit 1209?

16  A.   Could you refresh my memory, what that section is?

17  Q.   Yes.  We're going to pull that -- we're going to pull it

18  right up.

19  A.   Thank you.

20        MS. FRENCH:  I believe we need page 176.

21  BY MS. FRENCH:

22  Q.   Does seeing this page refresh your recollection on

23  Section 8 of the remediation program guide?

24  A.   Ah, yes.  Okay.

25  Q.   And I direct your attention to the last bullet on that

*HOKKANEN – CROSS/FRENCH*                    Vol. 6-1029

 1   page.

 2            MS. FRENCH:  If we could enlarge that.

 3   BY MS. FRENCH:

 4   Q.  Did you review the memorandum of agreement between IDEM

 5   and EPA that's linked in this section?

 6   A.  No.

 7            MS. FRENCH:  Can we pull that up, please?  Could you

 8   pull up the memorandum of agreement?  Thank you.

 9   A.  The reason -- let me -- can I add to my answer?

10   BY MS. FRENCH:

11   Q.  Sure.

12   A.  The reason I didn't is, it was not specifically cited or

13   referenced in Mr. Williams' expert report.  I had no need to

14   review that.

15   Q.  But part of your opinions is based on your review of

16   IDEM's guidance documents and your determination that they

17   don't substantially comply with the NCP; correct?

18   A.  No.  My review was -- what I did is I reviewed the work

19   that was done by Von Duprin's consultants, and my

20   determination was based on Mr. Williams' opinions, did that

21   work comply with the NCP.  I did not specifically determine if

22   that work complied with IDEM's requirements.

23   Q.  I understand that.

24   A.  What I was asked to do was to determine if that work

25   complied with the NCP.

*HOKKANEN - CROSS/FRENCH*                  Vol. 6-1030

1  Q.  Right.

2          But earlier in your deposition -- earlier in your

3  testimony today, you testified that you did not believe that

4  IDEM's requirements are consistent with the NCP; correct?

5  A.  I can't -- I don't remember my specific answer.  What I

6  believe I was asked is:  If a state agency -- if you do work

7  under the -- under the guidance oversight of a state agency,

8  does that work necessarily comply with the NCP?  And my answer

9  was:  Not necessarily.

10 Q.  Didn't you also provide an example of a particular timing

11 provision of IDEM's guidance documents that you believed is

12 inconsistent with the NCP, specifically the timing of

13 community relations plan within the voluntary remediation

14 program?

15 A.  I did, yes.

16 Q.  Okay.  So what I'm asking you today is whether you

17 considered the fact that the EPA has agreed that the voluntary

18 remediation program is -- provides adequate public involvement

19 opportunities and whether that influenced your opinion.

20 A.  No.

21 Q.  So what I would like you to do is look at this memorandum

22 of agreement, which was part of the remediation program guide

23 you reviewed in rendering your expert opinions.

24          MS. FRENCH:  And we'll go to the next page.  One

25 more page, please.  And if we could enlarge the last four

*HOKKANEN – CROSS/FRENCH*                    Vol. 6-1031

1  paragraphs, so the introduction, and then one, two, and three

2  at the bottom.

3  BY MS. FRENCH:

4  Q.  If Region 5 of EPA found that the voluntary remediation

5  program provides adequate opportunities for public involvement

6  and technical assistance, how does that -- sorry.  I'll strike

7  that question.

8         If you didn't consider whether the EPA found that

9  public involvement opportunities under the voluntary

10  remediation program were adequate, how can you opine that the

11  public involvement timing requirements under the voluntary

12  remediation program are inconsistent with the NCP?

13  A.  Well, my answer is:  I'm not familiar with this document,

14  and I did not consider it in offering my rebuttal opinions.

15  Q.  Have you ever offered an opinion in an expert report or

16  deposition that a private party's response costs were both

17  necessary and incurred in substantial compliance with the NCP?

18  A.  Yes.

19  Q.  When?

20  A.  I had the case I referenced earlier where I reviewed a

21  big, large stack of invoices and I determined that the vast

22  majority of those costs were necessary and in compliance with

23  the NCP.  There were some that I determined were not, but

24  not -- very little of it.

25         MS. FRENCH:  Can I have the document camera, please?

*HOKKANEN – CROSS/FRENCH*          Vol. 6-1032

1  BY MS. FRENCH:

2  Q.  What I'm showing you is page 42 of your deposition at line

3  9.  Actually, line 11 is where the question begins.  It says,

4  "Is it true that in every case that you have been engaged as

5  an expert on NCP issues, you have determined that at least

6  some of the costs were not compliant with the NCP?"

7          And what was your response?

8  A.  "I think that's a fair statement."  And that's actually

9  what I just testified to.

10 Q.  Great.

11         Are you familiar with case law finding that

12 investigative costs need not comply with the NCP in order to

13 be recoverable?

14 A.  Well, I actually did not go to law school and I don't read

15 cases, so the answer is no.

16 Q.  Is vapor mitigation a remedial action or a removal action?

17 A.  It could be both.

18 Q.  And at this particular site, has vapor mitigation been a

19 removal action or a remedial action?

20         MR. GARDNER:  Your Honor, I'm going to object to

21 outside the scope of his testimony.  He's testified multiple

22 times.  He was here to offer a rebuttal opinion of

23 Mr. Williams' expert report.  This is outside the scope of

24 that report.

25         MS. FRENCH:  I'll withdraw it.

*HOKKANEN − CROSS/FRENCH*                    Vol. 6-1033

 1              THE COURT:  Okay.

 2  BY MS. FRENCH:

 3  Q.  So you agree that the recoverability of costs under the

 4  NCP is a legal opinion?

 5  A.  I'm not quite sure I understand your question.  Could you

 6  rephrase that?

 7  Q.  Certainly.

 8              At your deposition, you were asked about a situation

 9  in which a party seeks to recover costs of cleanup from a

10  third party, and the question was, "Is their failure to comply

11  with the NCP, assuming they hadn't fully complied, going to be

12  a bar to cost recovery?"

13              And I believe your response was, "That sounds like a

14  legal question," which you're not qualified to answer.

15              Do you recall that testimony?

16  A.  Yes.

17  Q.  And does that remain your answer today?

18  A.  Could you repeat the question, please?

19  Q.  Sure.  I'll just put it up on the document camera, and

20  we'll go -- so the bottom of 69 begins with, "What if a

21  governmental agency issues an order requiring certain

22  investigation activities, for example?  Does that have a

23  bearing on what the party needs to do as far as NCP

24  compliance?"

25              Your response was, "If the order requires compliance

*HOKKANEN - CROSS/FRENCH*                  Vol. 6-1034

1   with the NCP, then yes.  If the order doesn't require

2   compliance with the NCP, then not necessarily."

3           Went to ask, "Let's say the order is silent about

4   NCP compliance, and the work is carried out in accordance with

5   the order.  Nobody wants to pay those civil penalties.  The

6   party then seeks to recover those costs from a third party.

7   The question is:  Is their failure to comply with the NCP

8   going to be a bar to that recovery?"

9           Could you read your response to that question?

10  A.  "Well, that sounds like a legal question, which I am not

11  qualified to answer."

12  Q.  Does that remain your answer today?

13  A.  Well, what I opined on in my rebuttal report was if the

14  work -- what I replied in my rebuttal report were, did the

15  work done by Von Duprin's consultants comply with the NCP.  I

16  did not address cost recovery.

17  Q.  Thank you.

18          And we agree that not every requirement of the NCP

19  must be complied with in order to meet the substantial

20  compliance standard?

21  A.  I don't know if we agree about that.

22  Q.  I believe you testified to that fact earlier in your

23  testimony today.

24  A.  Could you repeat that testimony to me, please?

25  Q.  I don't have a live transcript, but I believe you stated

*HOKKANEN− REDIRECT/GARDNER*          Vol. 6-1035

1  that not every single requirement must be complied with in

2  order to meet the substantial compliance standard.

3  A.  Possibly words to that effect, yes.

4          MS. FRENCH:  Nothing further, Your Honor.  Thank

5  you.

6          THE COURT:  Okay.  We're going to take a break,

7  because it says my real time cache is full, so David needs to

8  delete some things for me.  So we'll go ahead and have our

9  morning break, about 10 or 15 minutes.

10          THE COURTROOM DEPUTY:  All rise.

11          (Recess at 9:57, until 10:17.)

12          THE COURT:  We're back on the record.

13          And Mr. Menkveld, you're going to the

14  cross-examination?

15          MR. MENKVELD:  Moran doesn't have any questions of

16  this witness, Your Honor.

17          THE COURT:  Okay.  Any redirect?

18          MR. GARDNER:  Very briefly, Your Honor.

19          THE COURT:  You may.

20                    **REDIRECT EXAMINATION**

21  BY MR. GARDNER:

22  Q.  Mr. Hokkanen, you were asked a question by counsel about a

23  section of the NCP that addresses immaterial and insubstantial

24  deviations from the NCP.  Do you remember that?

25  A.  Yes.

1  Q.  Were Von Duprin's deviations from the NCP that we've

2  discussed today and that you identified after reviewing

3  Mr. Williams' report immaterial or insubstantial, in your

4  opinion?

5          MS. FRENCH:  Objection, Your Honor.  This goes

6  beyond this witness's disclosed opinions.  He clearly stated

7  he was providing rebuttal to Mr. Williams' opinion and not an

8  independent opinion regarding Von Duprin's compliance with the

9  NCP.

10          MR. GARDNER:  Well, I think that Mr. Williams'

11  opinions includes an opinion that the work was done in

12  substantial compliance or at least not in an immaterial or

13  insubstantial deviation from the NCP.

14          But, Your Honor, I can rephrase the question to

15  resolve this.

16          THE COURT:  Okay.  Go ahead and rephrase it.

17          MR. GARDNER:  Yeah.

18  BY MR. GARDNER:

19  Q.  If Mr. Williams offered an opinion that Von Duprin's work

20  did not deviate substantially or materially from the NCP;

21  would you agree with that opinion?

22  A.  No.

23  Q.  If a party provides no evidence that some of its work

24  failed to comply with a particular NCP section, can an expert

25  reviewing that work then say that the party had substantially

1  complied with the NCP?

2          MS. FRENCH:  Objection, Your Honor.  It goes beyond

3  the scope of this expert's disclosed opinions.

4          MR. GARDNER:  I would disagree with that, Your

5  Honor.  I think that it is clearly within his scope that

6  Mr. Williams has not provided the support to say that Von

7  Duprin's work substantially complied with the NCP.

8          THE COURT:  I will overrule the objection.  You may

9  answer the question.

10  A.  Yes, and I actually gave a specific example, if I remember

11  right.  I didn't see an EECA performed, for example, for the

12  removal action; therefore, I concluded it wasn't in

13  substantial compliance with the NCP.

14          THE COURT:  What?  You didn't see an EECA?

15          THE WITNESS:  EECA is the sort of mini feasibility

16  study where you look at alternatives to how you're going to

17  clean up a site.

18          THE COURT:  Okay.

19          THE WITNESS:  That was during the removal action.

20          THE COURT:  All right.

21  BY MR. GARDNER:

22  Q.  Do the guidance documents that you reviewed relating to

23  ARARs, A-R-A-R-S, provide guidance as to how the ARARs should

24  be identified under the NCP?

25  A.  Yes.

 1  Q.  Did you -- well, strike that.

 2        Counsel asked you questions about

 3  Section 300.400(c)(4) regarding the requirement to be

 4  sensitive to local community concerns.  Do you recall that?

 5  A.  Yes.

 6  Q.  Did you offer a rebuttal to Mr. Williams' opinion

 7  regarding that section because Mr. Williams cited that section

 8  as an applicable section to the work that was being performed

 9  in this case?

10  A.  That's correct.

11  Q.  Okay.  And just generally, on the same note, are the

12  sections that you reviewed and offered an opinion on in this

13  case those that Mr. Williams identified as applicable in this

14  case?

15  A.  Yes.  I rebutted his opinions, yes.

16        MR. GARDNER:  No further questions, Your Honor.

17        THE COURT:  Any questions on those?

18        MS. FRENCH:  No recross.  Thanks.

19        THE COURT:  And no questions on those, Menkveld?

20        MR. MENKVELD:  No.

21        THE COURT:  All right.  Thank you very much.  You

22  may be excused.

23        (Witness excused.)

24        THE COURT:  And I believe you have one more witness?

25        MS. KRAHULIK:  We do, Your Honor.  Major Tool and

Vol. 6-1039

1    Major Holdings call Robert Walker.

2            THE COURT:  Mr. Walker, if you would come up front,

3    up here.  He was getting ready to go out the door.  Up here to

4    the witness stand, please.  Right over here.  And, sir, if you

5    would remain standing and raise your right hand.

6            (The witness is sworn.)

7            THE COURT:  You may have a seat.

8            And as soon as your witness is comfortable,

9    Ms. Krahulik, you may begin your examination.

10           MS. KRAHULIK:  Thank you, Your Honor.

11        **ROBERT WALKER, DEFENDANT'S WITNESS, SWORN**

12                  **DIRECT EXAMINATION**

13   BY MS. KRAHULIK:

14   Q.  Good morning.

15   A.  Good morning.

16   Q.  Would you please state and spell your name for the record.

17   A.  Yes.  My name is Robert Walker.  R-O-B-E-R-T, W-A-L-K-E-R.

18   Q.  Mr. Walker, how are you employed?

19   A.  I am a geologist for SME.

20   Q.  And how long have you been with SME?

21   A.  Four years this month.

22   Q.  What is SME?

23   A.  SME is an engineering and consulting firm headquartered in

24   Plymouth, Michigan.  We have an office here in Indianapolis

25   that focuses on geotechnical materials testing, as well as

*WALKER - DIRECT/KRAHULIK*                    Vol. 6-1040

 1  environmental science type projects.  We provide our clients

 2  technical services for identifying -- for building properties,

 3  development of properties, and in my case I assist them in

 4  identifying and understanding environmental issues at

 5  properties they may be interested in purchasing or that they

 6  own currently.

 7  Q.  What is your title in your role with SME?

 8  A.  I'm a senior consultant.

 9  Q.  Where have you worked prior to SME?  You've been there for

10  four years.

11  A.  Yeah.  I worked at ATEC, A-T-E-C, Associates, from 1989 to

12  1997.

13  Q.  Uh-huh.

14  A.  Prior to that, I worked -- then, subsequent to that, I

15  went -- I moved to Geraghty & Miller, which became Arcadis,

16  from '97 to 2005.  And then from 2005 to 2015, I worked at ATC

17  Associates.

18  Q.  And what business are each of those companies in, ATEC,

19  Geraghty & Miller, Arcadis, ATC?

20  A.  They're all in very similar businesses.  They are

21  engineering and consulting firms.  ATEC, A-T-E-C, and ATC

22  Associates, both, were very similar to SME in that they

23  offered not only environmental science and environmental

24  consulting services, they also offered the geotechnical and

25  materials testing services.

*WALKER - DIRECT/KRAHULIK*                 Vol. 6-1041

1  Q.  And in each of those jobs, was your role similar to that

2  that you hold with SME today?

3  A.  It was, yes.

4  Q.  Tell the Court briefly about your educational background.

5  A.  I have a bachelor's degree from -- in geology from

6  Michigan State University.

7  Q.  Go Spartans.

8  A.  Yeah.

9          And a master's of science degree from Florida

10 Institute of Technology.

11 Q.  And what is your master's of science degree in?

12 A.  I'm sorry.  It's in environmental science.

13 Q.  Do you hold any certifications or designations that you

14 use in your professional capacity?

15 A.  I do.  Early on, I was a certified hazardous materials

16 manager.  And subsequent to that, I actually allowed that to

17 lapse and am a registered licensed professional geologist here

18 in the State of Indiana.

19 Q.  Describe your experience working with environmental issues

20 related to chlorinated solvent contamination.

21 A.  Oh, I've worked with chlorinated solvent sites throughout

22 my career, for 30 years.  My time spent at Arcadis from 1997

23 to 2005, that was probably my sole function, was I had a

24 client that had multiple sites across Indiana that all had

25 chlorinated solvent impacts.  This was a large industrial

*WALKER - DIRECT/KRAHULIK*                    Vol. 6-1042

1  manufacturer in Indianapolis, as well as in Kokomo, that

2  utilized degreasers, parts washers, solvent storage areas.

3  And in that regard, I focused on the investigation,

4  delineation, risk evaluation, and then ultimate remediation of

5  those -- of those concerns, all of them being -- and solely --

6  and generally, the solvents I was working with have been

7  tetrachloroethylene, which is perchloroethylene;

8  trichloroethylene; and occasionally 111 trichloroethane.  It's

9  another chlorinated solvent and it's similar.

10 Q.  What are the common terms for those long words you just

11 used?

12 A.  Yeah.  Tetrachloroethylene is PCE; Paul, cat, elephant.  I

13 might use tetrachloroethylene instead of PCE because it's also

14 commonly referred to as perchloroethylene.

15 Tetrachloroethylene and perchloroethylene are one and the

16 same.  And then trichloroethylene is TCE; Tom, cat, elephant.

17 Q.  Do you consider yourself an expert in the investigation,

18 characterization, and remediation of contaminated properties,

19 in particular those contaminated with chlorinated solvents?

20 A.  Yes.

21 Q.  And do you consider yourself an expert in hydrogeology?

22 A.  Yes.

23       MS. KRAHULIK:  Your Honor, we move the Court

24 recognize Mr. Walker as an expert in hydrogeology and in the

25 investigation, characterization, and remediation of properties

WALKER - DIRECT/KRAHULIK          Vol. 6-1043

 1   contaminated by chlorinated solvents.

 2            And I will slow down.

 3            THE COURT:  Any objection?

 4            MR. BOWMAN:  I have no objection on behalf of Moran.

 5            MS. KRAHULIK:  As we've done with --

 6            THE COURT:  We've got to let Mr. Griggs respond.

 7            Mr. Griggs?

 8            MR. GRIGGS:  No objection.

 9            THE COURT:  The Court will declare the witness an

10   expert.

11            MS. KRAHULIK:  And as we have done with the other

12   expert witnesses, Your Honor, I would like to provide the

13   Court and Mr. Walker with a copy of his expert report to aid

14   in his testimony.

15            THE COURT:  You may.

16            MS. KRAHULIK:  And this has been marked by Von

17   Duprin in its exhibit set as Exhibit 105.

18            THE COURT:  Any objection to the admission of 105,

19   Mr. Bowman?

20            MR. BOWMAN:  No, Your Honor.

21            MR. GRIGGS:  No, Your Honor.

22            THE COURT:  105 is admitted into evidence.

23                      (Defendant's Exhibit 105 was

24                      received in evidence.)

25            MS. KRAHULIK:  Ms. Woods, if you could pull up

*WALKER – DIRECT/KRAHULIK*                    Vol. 6-1044

1  Exhibit 1001, please.

2  BY MS. KRAHULIK:

3  Q.  This is a document we've looked at a lot throughout this

4  trial.  I want to specifically talk about your involvement

5  with the properties shown on this map.

6            When were you first engaged by the Major defendants?

7  A.  I believe it was in the late fall/winter of 2015.

8  Q.  And what was the purpose of your engagement then?

9  A.  That was with relation to a lawsuit between Major Tool and

10  Machine, Major Holdings, and the Moran parties.

11  Q.  And what is your understanding as to what happened with

12  regard to that lawsuit?

13  A.  I believe it was settled.

14  Q.  And you've likewise been asked to serve as an expert

15  witness by Major Tool in this case?

16  A.  That's true.

17  Q.  What documents have you reviewed and considered for

18  purposes of rendering your opinions in this case?

19  A.  I don't believe I could state them all.  It's -- I think

20  during my -- after my deposition with Von Duprin, I looked

21  at -- I think it was over 14,000 files were reviewed.  I think

22  currently it's over 15,000 files that I reviewed.

23  Q.  And when you say "files," you mean 15,000 separate

24  documents of multiple pages?

25  A.  Oh, absolutely, yeah.

*WALKER – DIRECT/KRAHULIK*                    Vol. 6-1045

1  Q.  And is there a place in your report where the documents

2  reviewed at the time of its preparation can be found?

3  A.  Yeah, in the back -- in the back of my opinion, I do list

4  those documents that I relied upon in my response.

5  Q.  That's at appendix B?

6  A.  That's not the exhaustive list.  Well, I guess I do have

7  some of the electronic documents referenced here, too, so,

8  yeah.

9  Q.  And that's at appendix B titled "List of Documents

10  Reviewed" in Exhibit 105?

11  A.  That's correct.

12  Q.  And you've reviewed every single document listed there?

13  A.  That is correct.

14  Q.  Did you prepare this report, Exhibit 105?

15  A.  I did.

16  Q.  And what are your opinions, your overarching opinions,

17  generally?

18  A.  Well, I generated -- I have two general overarching

19  opinions related to this -- to the documents, and that is that

20  the -- that the opinions and claims offered by Mr. Williams

21  and Mr. McInnes are not founded on sound scientific principles

22  and/or the data presented in this case.  Second was that I did

23  offer opinions regarding my review of several investigative

24  and remedial -- remediation activities that were conducted at

25  the various sites in this case.

*WALKER - DIRECT/KRAHULIK*                     Vol. 6-1046

1  Q.  And in your report, you break down your opinions by site.

2  Would it be helpful if we discussed them in that same manner

3  today?

4  A.  Yes.

5        MS. KRAHULIK:  If you look at page 4 of the PDF,

6  Ms. Woods, of his report, which is Exhibit 105, you have an

7  introduction, and then Section 2, which is on page 2 of the

8  report, again page 4 of the PDF, relates to the former Zimmer

9  facility.

10  BY MS. KRAHULIK:

11  Q.  What opinions did you render related to that specific

12  property?

13  A.  Well, I will tell you that I was shocked originally when I

14  looked at -- when I was referencing Mr. McInnes' opinions, and

15  that is that apparently he looked at 12 documents, and I was

16  shocked by that small of a subset of data in order to develop

17  an opinion.  The -- so that was a concern.

18        Secondly, that the -- I think that he referenced --

19  he references more recent documents that have been created,

20  Phase I, Phase II documents, that in turn referenced previous

21  documents.  And I guess, for an example, in the 2013 Heartland

22  Phase I, that he references that document, that solvents and

23  silicones inside the building.  It sounds scary.  Oh, there's

24  solvents and silicones inside the building.  And I think that

25  if he had reviewed the 2006 Phase I or even the deposition

*WALKER - DIRECT/KRAHULIK*                    Vol. 6-1047

1  offered by David Brown, he would have realized that silicones

2  are not scary.  It's the term "solvent," and --

3  Q.  And we're talking about the Zimmer property?

4  A.  That's right, yes.  This is for the Zimmer.

5          Well, the Phase I is a little complex because the

6  Phase I was for the Ertel and the Zimmer Paper Parcel

7  property.  There's a subsequent -- there's multiple Phase Is

8  out here for these properties, and adjacent to that is the

9  Zimmer packaging property, so it can get convoluted.

10         MS. KRAHULIK:  Actually, will you pull up

11 Exhibit 101 -- 1001 again, because I think we need to identify

12 the specific property we're talking about.

13 BY MS. KRAHULIK:

14 Q.  When we were talking about the Zimmer facility property

15 listed in Section 2.0 of your expert report, can you tap on

16 the screen maybe twice on that property?  There you go.

17 A.  (Witness complies.)

18 Q.  So the pink arrow is pointing at the property we're

19 discussing right now?

20 A.  The Zimmer Paper property.

21 Q.  And where is the Zimmer packaging property?

22 A.  The Zimmer packaging property is adjacent, to the east of

23 it, adjacent.

24 Q.  Okay.

25 A.  And according -- reviewing the Phase I report, the same

*WALKER - DIRECT/KRAHULIK*                    Vol. 6-1048

1   site contact for the Zimmer packaging property was also the

2   contact for the Zimmer Paper packaging property, which was

3   David Brown, and he was the vice president of operations.  In

4   his -- in his interview, he acknowledged that there were

5   solvents at the Zimmer property, but those solvents were ethyl

6   acetate and -- I'm sorry -- or propyl alcohol, which are

7   solvents.

8   Q.  Can you spell those for the benefit of our court reporter?

9   A.  Oh, gosh.  Ethyl acetate, E-T-H-Y-L, A-C-E-T-A-T-E.  And

10  then propyl alcohol, P-R-O-P-Y-L, alcohol.

11  Q.  Thank you.

12  A.  Those are both solvents, but they are not chlorinated

13  solvents, and that -- that fits very well with the operations

14  that I believe were ongoing, which was this paper, where he

15  also acknowledged that he used waxes and inks and adhesives,

16  and then these solvents, ethyl alcohol and propyl -- I'm

17  sorry -- ethyl acetate and propyl alcohol.  My apologies.

18  Q.  And you are talking about the operations of what company?

19  A.  This is -- this was in the -- this was -- it's the Zimmer

20  Paper property, I believe.

21  Q.  And what company's operation is on that property?

22  A.  Zimmer.

23  Q.  Mr. Brown was the executive of what company?

24  A.  Of Zimmer Paper, of Zimmer.

25  Q.  Okay.  So he wasn't speaking to prior operations?

*WALKER - DIRECT/KRAHULIK*                    Vol. 6-1049

1  A.  No, not at all, and -- but in his -- in his deposition --

2  or in his deposition, he acknowledged that those two solvents

3  were used, so that explains what solvents were being used

4  there.

5          Additionally, in the Heartland Phase I, the 2013

6  Phase I, referenced by Mr. McInnes, in the database that you

7  get when you do a Phase I, in the EDR database, there was a

8  list of the hazardous waste codes that Zimmer used at that

9  facility, and those were FOO3, FOO5.  Both of those waste

10 codes are for nonhalogenated spent solvents.

11          Nonhalogenated meaning nonchlorinated.  If you

12 remember from your chemistry in high school, the halogens are

13 all on your right-hand side of your periodic table, and that

14 includes chlorine and bromine and others.

15          So chlorine was not included in those solvents, and

16 that was in -- that's listed in the FOO3, FOO5 waste streams,

17 so that corresponds to the ethyl acetate and propyl alcohol

18 solvents that he recognized.

19 Q.  And used by Zimmer?

20 A.  And used by Zimmer.

21 Q.  Not previous owners of the property?

22 A.  Not previous owners, that's right, and I'm going to get to

23 that in a moment.

24          THE COURT:  All right.  You need to wait and let her

25 ask you questions, please.

*WALKER - DIRECT/KRAHULIK*          Vol. 6-1050

1          THE WITNESS:  Oh, okay.

2          THE COURT:  You're kind of testifying by just

3   telling me what you want me to know.

4          THE WITNESS:  Oh, okay.

5          THE COURT:  You may ask your next question.

6   BY MS. KRAHULIK:

7   Q.  What other opinions did you render related to the former

8   Zimmer property?

9   A.  Well, that the -- Mr. McInnes or -- there's been no

10  indication, no evidence that Major Tool and Machine, Major

11  defendants, has used, stored, or disposed of chlorinated

12  solvents at this -- at this property.

13  Q.  And what opinions do you have related to the Major

14  defendants soil removal and UST removal at the former Zimmer

15  Paper property?

16  A.  Well, I believe that it was incredibly helpful in bringing

17  the -- in remediating the site.  By removing the entire vadose

18  zone, which is the soil between the ground surface and the

19  water table, by removing all of that and replacing it with

20  unimpacted material, you've eliminated a huge contaminant,

21  potential contaminant source, that could eventually or could

22  ultimately leach to the groundwater and then into the

23  groundwater.  By removing that, that can't happen.  That

24  contamination has been eliminated from this -- from this site

25  and from this area.  So I thought it was incredibly helpful

WALKER – DIRECT/KRAHULIK                Vol. 6-1051

1  and not a trivial operation to remove that much soil.

2  Q.  How much was it?

3  A.  7,350 cubic yards.  I will say that I think, in my

4  opinion, I may have switched it to tons in one location.  I

5  may have referenced it as 7,350 tons, and that's just -- it's

6  unorthodox to refer to this as cubic yards because you dispose

7  of it in tons, because that's how you pay for it.

8  Q.  But you do believe it was 7,350 cubic yards removed?

9  A.  Yes.  That's what was reported.

10  Q.  Why was it important to remove the soil in the tank?

11  A.  If -- well, for multiple reasons.  If you don't remove it,

12  it will -- it will remain there.  Chlorinated solvents are

13  fairly recalcitrant in the vadose zone, which means they don't

14  break down readily in the soil and will continue to serve or

15  act as a potential source for vapor or groundwater in the

16  future.

17  Q.  And so the sooner you remove them, the better,

18  essentially?

19  A.  Most certainly, and I think that has been demonstrated in

20  the subsequent groundwater samples that have been collected

21  downgradient from the site.

22  Q.  You beat me to my next question.  Is there evidence that

23  you've reviewed that the soil removal and UST removal was

24  effective?

25  A.  Yes.  I think -- yes, I have.

*WALKER – DIRECT/KRAHULIK*                    Vol. 6-1052

1  Q.  And what did you review?

2  A.  Well, looking at the groundwater that -- the repeated

3  quarterly groundwater sampling events that were conducted by

4  QEPI and subsequently Heartland and then even groundwater

5  samples collected after that, it's evident to me that the

6  concentrations downgradient of the Zimmer Paper property have

7  decreased, those groundwater concentrations of

8  trichloroethylene and perchloroethylene.

9  Q.  Now, let's turn to the Ertel facility property.  Take a

10 look at Exhibit 1001, which is on your screen.  And would you

11 tap twice on the Ertel property?

12 A.  (Witness complied.)

13 Q.  And that's the property that's now showing the pink arrow?

14 A.  Yes.

15 Q.  What have you concluded specific to the Ertel property?

16 A.  Well, the -- the investigations have been thorough, and

17 the remediation activities, which included the removal of

18 37,000 tons of vadose zone soil, I think, has been incredibly

19 beneficial to the property, so much so that subsequent -- I

20 think this excavation occurred in 2007, December 2007, or

21 September to November.  And that, in October of 2012,

22 Heartland Environmental prepared and submitted an exposure

23 pathway analysis -- or a potential exposure analysis and a

24 no-further-action request to IDEM based on the data they had

25 collected prior to their work and then prior to the

*WALKER – DIRECT/KRAHULIK*                    Vol. 6-1053

1  remediation and then subsequent to that remediation in an

2  effort to demonstrate that the site no longer poses a risk to

3  human health or the environment.

4  Q.  And what did IDEM do with that request?

5  A.  IDEM granted that request, that no-further-action letter.

6          Additionally, they submitted a comfort letter

7  request application that also went to IDEM.  It's a different

8  department of IDEM.  And that comfort letter request

9  application was also granted.

10 Q.  And who was the comfort letter issued to?

11 A.  The comfort letter was issued to Major Tool and Machine,

12 Major Holdings.

13 Q.  Explain to the Court a little bit about what a comfort

14 letter is.

15 A.  Okay.  A comfort letter -- the comfort letters kind of

16 came into being over the last 15, 20 years, maybe, 15 years,

17 from IDEM, and they're issued by the Indiana Brownfields

18 Program following their review of all available data that is

19 provided to them, and you're supposed to provide all your

20 available data to them.  And they do a review.  And based on

21 their review, they will evaluate that for is the -- is the

22 requesting applicant a bona fide prospective purchaser, and

23 does the site pose a risk to human health and the environment.

24          And I think I may have gotten off track on your

25 question.

WALKER – DIRECT/KRAHULIK          Vol. 6-1054

1  Q.  No, you're --

2  A.  Well, the comfort letter is really prepared to provide a

3  prospective purchaser and a prospective purchaser's lender

4  with comfort that they're not getting into a huge problem and

5  that they do have these protections, these bona fide

6  prospective purchaser protections, and that the site doesn't

7  pose a risk to human health and the environment.

8            In addition to the comfort letter, IDEM will list

9  out -- and they did in this case -- their conclusions relative

10 to the applicant's BFPP receipt, as well as they will include

11 some continuing obligations.

12 Q.  And IDEM said that Major Tool and Machine and Major

13 Holdings were BFPPs for purposes of the Ertel property?

14 A.  That is correct.

15 Q.  Okay.  And IDEM listed out some ongoing requirements, and

16 those, I think, are contained in your report?  And I'm looking

17 specifically at page 5.

18 A.  Yeah.  In page 5, I list off the three bullets that IDEM

19 identified in their comfort letter, and that is that IDEM --

20 in IDEM's opinion, there are no known conditions on the site

21 that constitute an imminent threat and substantial threat to

22 human health or the environment.

23            And the second item is that neither Major Tool and

24 Machine nor any agent or employee of Major Tool and Machine

25 caused or contributed to or knowingly exacerbated the release

*WALKER - DIRECT/KRAHULIK*                    Vol. 6-1055

1  or threat of release of any hazardous substance or petroleum

2  at the site.

3  Q.  And the third bullet point?

4  A.  The third bullet point is that Major Tool and Machine is

5  eligible for an applicable exemption to liability for the 2045

6  Dr. Andrew J. Brown Avenue parcel, and I believe that to be

7  the Ertel parcel.

8  Q.  What's the significance of obtaining a comfort letter to a

9  party who is acquiring property that's contaminated by someone

10  else for redevelopment?

11  A.  Well, most of the prospective purchasers want to be

12  comfortable.  That's why they call it a comfort letter.

13  Because in addition to a comfort letter, you can also request

14  a site status letter.  It's the same type of application.  But

15  they wanted -- they want to know that, if something is

16  discovered subsequent to their purchase, that they're not

17  on -- they're not responsible for cleaning it up.  There will

18  be -- again, there will be some continuing obligations that

19  they will have to maintain and prevent exposures at the site

20  itself and maintain the contamination, or contain it, but they

21  want to know that they're not -- they don't have liability

22  that extends forever to everyone.

23  Q.  For things that other people caused?

24  A.  That's right.

25  Q.  What is your overall opinion about the Ertel property as

WALKER – DIRECT/KRAHULIK                    Vol. 6-1056

1  it pertains to Major Tool?

2  A.  Well, clearly -- oh, as far as with Major Tool?

3           Well, clearly, Major Tool and Machine never stored,

4  used, or disposed of hazardous solvents or chlorinated

5  solvents, tetrachloroethylene, trichloroethylene,

6  dichloroethylene, or vinyl chloride at the Ertel property, nor

7  have they caused or contributed to the contaminants on that

8  property.

9  Q.  And that's evidenced by IDEM's recognition of BFPPs?

10 A.  Certainly.

11 Q.  Let's turn to the Moran property.  All right.  Can you

12 touch on the screen that property?  And it's actually, I

13 think, two parcels but they're contiguous.

14 A.  I put a much smaller --

15 Q.  If you tap twice, I think that does the trick.

16 A.  Okay.  There you go.

17 Q.  There you go.

18          What have you concluded about the Moran property?

19 A.  Well, the remedial -- the corrective action, remedial

20 action, undertaken by Moran -- I'm sorry -- by Major Tool and

21 Machine, which resulted in the removal of about 4600 tons of

22 vadose zone soil from underneath the former Moran motor works

23 shop, I think has had a substantial beneficial impact on the

24 contaminant mass and potential contaminant contribution to the

25 groundwater.

WALKER - DIRECT/KRAHULIK          Vol. 6-1057

1   Q.  We've mentioned vadose zone soil being removed at all

2   three of the properties we've discussed.  How far down does

3   one dig to remove all the vadose soil?

4   A.  Well, you dig to the water table, and I believe at Zimmer

5   it was to 15 feet and to 17 feet at places.  At Ertel, it was

6   to 17 feet.  And at Moran, I believe it was 15 feet.  I --

7   there may have been an occurrence where when they collected

8   their confirmation samples, there were still some elevated

9   levels and they went back and over-excavated a little bit

10  deeper.  It gets tricky to dig below the groundwater table.

11  Q.  And would the removal at Moran have a similar -- or did it

12  have a similar effect as that at Zimmer?

13  A.  Well, I would actually expect so, and I think some of the

14  data does support that, yes.

15  Q.  Let me finish my question before you answer just so we get

16  a clear record.

17          But do you have any other opinions related to the

18  Moran property?

19  A.  I think --

20  Q.  Specific to Major Tool.

21  A.  Right, certainly.

22          I think Major Tool and Machine, there's actually no

23  evidence, indication that Major Tool and Machine ever used,

24  stored, or disposed of TCE, PCE, DCE, or vinyl chloride at the

25  Moran -- former Moran properties.

*WALKER - DIRECT/KRAHULIK*                    Vol. 6-1058

1  Q.  And did they cause or contribute -- or is there any

2  evidence that Major Tool caused or contributed to any

3  contamination on that property?

4  A.  No, not at all.

5  Q.  All right.  Let's turn to the former Von Duprin property.

6  A.  Okay.  Oh, Threaded Rod.

7  Q.  Yes.

8       Can you place an arrow on that property, on

9  Exhibit 1001?

10  A.  (Witness complied.)

11  Q.  Thank you.

12       And have you set forth any opinions related to the

13  Von Duprin property in your report?

14  A.  I have.

15  Q.  And what are those opinions?

16  A.  Well, I concur with Mr. McInnes that there is -- there are

17  indications that a release of TCE, PCE, DCE -- well, I'm going

18  to stick with PCE and TCE -- have occurred at the Von Duprin

19  property and that the operations that were -- that took place

20  on that property are operations that traditionally do result

21  in contamination of chlorinated solvents to the soil and the

22  groundwater.

23  Q.  When you say "operations," what specific operations are

24  you thinking of?

25  A.  Those operations would include plating operations where

1  you would use a degreaser, a vapor degreaser; parts washers,

2  including painting, which you'll use -- you'll clean the parts

3  before you paint them.  So these cleaning operations,

4  historically or traditionally at our industrial facilities

5  will result in these kinds of -- this kind of impacts.

6  Q.  And how are those impacts documented in the documents and

7  records that you've reviewed?

8  A.  Well, I think the reports back to 1987 document the

9  presence of some of these compounds in the shallow soils and

10  groundwater.  I think that the levels that were seen at the

11  Von Duprin property are higher than were seen -- this is in

12  groundwater -- higher than were seen anywhere else.  The --

13  the levels -- again, and this is where I had a disagreement

14  with Mr. Williams, and that is I believe that the remedial

15  efforts, investigative efforts that they've undertaken would

16  have had to have been done regardless of any upgradient

17  contribution, if any.

18  Q.  So the releases at the Von Duprin property alone would

19  have required investigation and remediation regardless of

20  releases at Moran or Zimmer or Ertel or anywhere else?

21  A.  I believe that to be true.

22  Q.  Mr. Bowman walked through some exhibits with a witness

23  earlier this week and created kind of neat chart of the

24  highest concentrations of TCE and PCE in the shallow soils at

25  each of the properties and some dates when those impacts were

WALKER - DIRECT/KRAHULIK            Vol. 6-1060

1  discovered and removed.

2  A.  For soil?

3  Q.  For soil.  I'm telling you this.  You weren't here.

4          So I asked you, in connection with your testimony,

5  to create a demonstrative exhibit in a similar fashion with

6  regard to groundwater contamination.

7  A.  Yes.

8  Q.  And you provided that to me?

9  A.  I have.

10         MS. KRAHULIK:  Your Honor, can I put that up on the

11  ELMO?  It's a demonstrative.  We're not seeking admission.

12  And I'll give copies to counsel.

13         THE COURT:  You may.

14  BY MS. KRAHULIK:

15  Q.  And rather than walk you through each of these, and to

16  save a little time today, is this the demonstrative that you

17  created?

18  A.  It is.  There is a second page to this.

19  Q.  Okay.  What is depicted on this first page?

20  A.  This first page references, I refer to as, the peak PCE

21  and TCE concentrations in the shallow groundwater at each of

22  the four primary sites in this case.

23  Q.  And I see there are a footnote designations --

24  A.  Yes.

25  Q.  -- by the sampling locations.  Did you record where you

*WALKER – DIRECT/KRAHULIK*                    Vol. 6-1061

1  found this information?

2  A.  I did.  And that's what those footnotes indicate.

3  Q.  Okay. I will show you that page.  Is this your reference

4  document, for lack of a better term, for those concentrations?

5  A.  Yes.  Those are the individual references that provide the

6  data that is included in that table.

7  Q.  What were you trying to show with this demonstrative?

8         MR. BOWMAN:  Objection.  The concern that I have

9  here is, I've read his opinions, and I did not see in his

10  opinions -- this is data at this point, and I don't see in his

11  opinions an analysis or comparison of groundwater.  I've truly

12  not -- this is the first time that we've had any -- Mr. Walker

13  has delved into analysis of groundwater at the various sites,

14  so I truly don't know where this is going, and I'm concerned.

15         MS. KRAHULIK:  Mr. Walker has opined that the

16  removal activities conducted by Major Tool at each of these

17  properties resulted in impacts to groundwater, and this is

18  simply a summary of data that's already in evidence.  You

19  know, obviously, if they want to cross-examine him about any

20  of these numbers, that would be fine, but I don't believe we

21  will get outside of the scope of his opinions with this.

22         MR. BOWMAN:  Well, for the record, he said in his

23  opinions that they were beneficial.  He made no reference to

24  numbers at all, and so I -- this may end up being beneficial

25  to my client.  It may hurt my client.

*WALKER - DIRECT/KRAHULIK*                    Vol. 6-1062

1          MS. KRAHULIK:  I'm kind of wondering what you're

2  doing.

3          MR. BOWMAN:  I just don't know where it's going.

4          THE COURT:  Can I have a copy that shows the

5  reference page, also, so I can look at both?

6          MS. KRAHULIK:  Oh, yes.  I'm sorry.

7          THE COURT:  I'm going to allow you to get started

8  and we'll see.

9          MR. BOWMAN:  Okay.

10          MS. KRAHULIK:  The reference is on the second page.

11          THE COURT:  Okay.  So we can see where he got these

12  numbers from.  I'll give her a little leeway.  Let's see where

13  it goes.

14          MR. BOWMAN:  Okay.

15          MS. KRAHULIK:  And we won't have a whole lot of

16  questions about this demonstrative.

17  BY MS. KRAHULIK:

18  Q.  But, Mr. Walker, why is it important to also look at

19  groundwater concentrations?

20  A.  Well, I think it's most important to look at groundwater

21  concentrations.  The groundwater is the mobile -- or, I'm

22  sorry, is the vector that is mobilizing these contaminates to

23  the -- the potential sensitive receptors.  Ultimately, the

24  exposure pathway is vapor, but the vapor is generated from the

25  dissolved contaminants in the shallow groundwater.

*WALKER - DIRECT/KRAHULIK*                    Vol. 6-1063

1  Q.  And as a general proposition, what does the data that you

2  summarized here tell you about the shallow groundwater impacts

3  of the properties?

4  A.  Well, I think it's clear -- well, for me, to get a

5  perspective on the -- in the universe, there's so much data

6  for these properties -- just to try to get a sense of where

7  everything was.  It was clear to me that the concentrations of

8  trichloroethylene and perchloroethylene beneath the Von Duprin

9  property are multiples greater than what we're finding at the

10 Ertel, the Moran, or the Zimmer Paper property.

11 Q.  And what did looking at these numbers tell you about the

12 efficacy of the removal activities upgradient?

13 A.  Well, I really -- one data set that was really important

14 to me was under the Moran property, and that is the

15 trichloroethylene under Moran, and that is because MW110,

16 which was the sample location pre-excavation, is very similar

17 to the location, that VAP-108, which was the sample location

18 post-excavation.  They're very similar to one another.  And

19 from that, I -- you can see that there's a pretty substantial

20 reduction in the concentrations of TCE at that location.  Now,

21 other locations, that isn't true because the samples are not

22 collected in proximity to one another.

23 Q.  So you mean the samples depicted on this exhibit showing

24 the highest groundwater concentrations at each property

25 weren't necessarily right by each other?

*WALKER – CROSS/GRIGGS*                 Vol. 6-1064

1   A.  That's correct.

2   Q.  But at Moran, it was, and it shows the reduction?

3   A.  Yes, at Moran, it did show.

4   Q.  Okay.  Final area of inquiry here.  Mr. Walker, have you

5   reached an opinion as to whether the harm in this case can be

6   apportioned as to the Major defendants?

7   A.  Yes.  Yes, I have.

8   Q.  And what did you conclude?

9   A.  I concluded that Major Tool and Machine, the Major

10  defendants, have never used, stored, or disposed of these

11  chlorinated solvents, trichloroethylene, perchloroethylene,

12  dichloroethylene, or vinyl chloride, at any of these

13  properties and have never -- and have not caused or

14  contributed to the contamination that's there.  And in my

15  opinion, the apportionment would be zero.

16  Q.  Zero to the Major Tool and Major Holdings defendants?

17  A.  That's correct.

18          MS. KRAHULIK:  I have no further questions.  Thank

19  you.

20          THE COURT:  All right.  Mr. Griggs, you may go next.

21                    **CROSS-EXAMINATION**

22  BY MR. GRIGGS:

23  Q.  Good morning, Mr. Walker.

24  A.  Good morning.

25  Q.  Do you recall giving a deposition in this case?

*WALKER - CROSS/GRIGGS*                    Vol. 6-1065

1  A.  I do.

2  Q.  Let's begin with what I think is the second leg of each of

3  the opinions, rebuttal opinions, as you call them, in your

4  expert report.

5          I believe for each of the three upgradient

6  properties, what we referred to as upgradient properties,

7  Ertel, Zimmer Paper, and Moran, you offer a consistent opinion

8  that Major, Major Tool and Machine, Major Holdings, did not

9  use, dispose -- you give me the language that you used.  It

10 was the same every time; right?

11 A.  Yes, I believe so.  Used, stored, or disposed.

12 Q.  Are you aware of whether any claims in this lawsuit allege

13 that Major Tool or Major Holdings used, stored chlorinated

14 solvents?

15 A.  I'm not aware of that, that claim.  It's -- you know, I'm

16 not aware of that.

17 Q.  You don't know one way or the other or you know that

18 that's not the case?

19 A.  No, I don't know one way or the other.

20 Q.  Okay.  Thank you.

21          Let's look at your --

22 A.  I'm sorry.  I mean, intuitively, if they're being sued, I

23 would assume that it's because they have been charged or

24 assumed to have caused this contamination.

25          MR. GRIGGS:  I'll move to strike that as

WALKER - CROSS/GRIGGS                Vol. 6-1066

1   nonresponsive.

2            THE COURT:  And I'll strike that as nonresponsive.

3            You have to wait for a question.  Just answer

4   questions.

5            THE WITNESS:  Okay.

6            THE COURT:  Thank you.

7   BY MR. GRIGGS:

8   Q.  I think this would have been covered in your -- in the

9   direct examination questions about your qualifications, but

10  let's just be clear.  You're not a lawyer?

11  A.  I'm not a lawyer.

12  Q.  And you're not here offering any legal opinions to help

13  the Court decide how to decide the case?

14  A.  Not my intention.

15  Q.  Thank you.

16           In your rebuttal opinion to McInnes' opinion number

17  1, you indicated that you were concerned -- and this may apply

18  to all of the opinions -- that Mr. McInnes didn't have a broad

19  enough set of reports on which he relied; is that correct?

20  A.  I think that's correct.

21  Q.  Are you aware of anything else that Mr. McInnes relied

22  upon besides those, I think you said, 12 reports?

23  A.  Only the reports that he referenced in his opinion.

24  Q.  Were you ever given a copy of his deposition?  Did you

25  review that?

*WALKER - CROSS/GRIGGS*                    Vol. 6-1067

1   A.  I have reviewed that.

2   Q.  Did you review a similar deposition for Dr. Love?

3   A.  I have.

4   Q.  And do you recall that, in both of those cases, there was

5   indication of what was called a comprehensive database?

6   A.  Yeah, each of them created a database.

7   Q.  And so each of them claimed that they had a database that

8   they used for their opinions that contained every data point

9   from every report?  Do you remember that?

10  A.  Yeah.  Yes.

11  Q.  If Mr. McInnes had the data available, what was the

12  usefulness of having the report?

13  A.  The usefulness is very real, and that is you take from the

14  report, you get context in which certain statements are made.

15  Phase I includes not just data.  It includes interviews and

16  other -- and review of other documents.  And if you don't

17  review those foundational documents, you lose all context in

18  which those statements are being made.

19  Q.  And yet, at your deposition with respect to Ertel -- we'll

20  start there -- you ultimately said that you agreed with the

21  opinion stated by Mr. McInnes regarding the Ertel, that a

22  release of a hazardous substance had occurred at that site; is

23  that correct?

24  A.  I do agree with that.

25  Q.  And you also agreed with Mr. McInnes' opinion that a

*WALKER - CROSS/GRIGGS*                    Vol. 6-1068

1  release of a hazardous substance had occurred at the Zimmer

2  Paper site?

3  A.  Yes.

4  Q.  And you agreed, finally, with Mr. McInnes' opinion, that a

5  release of hazardous substance occurred at the Moran site?

6  A.  Yes, but that wasn't his sole opinion.

7  Q.  Do you quote Mr. McInnes' opinion in your report?

8  A.  I do.

9  Q.  Let's look at page 2 of your report.

10 A.  Okay.

11 Q.  I'm at the very top.  "Operations at the former Zimmer

12 facility...resulted in the release of chlorinated solvents

13 that contributed to the commingled chlorinated plume."  Did

14 you agree with that opinion?

15 A.  I didn't.

16 Q.  You did not?

17 A.  I did not, because I don't know what he's referring to

18 when he mentioned -- when he references a commingled plume.  I

19 don't know if that is a plume immediately beneath Zimmer, or

20 is that just Moran, does it include Ertel, does it include

21 Threaded Rod?  I don't -- he doesn't define that.

22        MR. GRIGGS:  Let's bring up 1002.

23 BY MR. GRIGGS:

24 Q.  You've been doing environmental consulting work for how

25 long, Mr. Walker?

*WALKER - CROSS/GRIGGS*                    Vol. 6-1069

1  A.  Thirty years.

2  Q.  Thirty years.

3       You don't know what a commingled plume is?

4  A.  I understand what a commingled plume is, but I don't know

5  what his definition of a commingled plume is.

6  Q.  Okay.  Do you think they're different?

7  A.  In this case, absolutely.  They're different for every

8  case.

9  Q.  Okay.  Well, we've got a picture for you.

10       MR. GRIGGS:  1002.  That's not the one I wanted.

11       (Off the record.)

12       MR. GRIGGS:  Exhibit numbers keep coming into my

13  head.  But once we got past 200, I lost track of them.

14       THE WITNESS:  I appreciate that.

15  BY MR. GRIGGS:

16  Q.  While they're looking for that, you testified earlier

17  about two solvents, ethyl acetate and propyl alcohol?

18  A.  That's correct.

19  Q.  Did you read anything in Mr. McInnes' expert report

20  dealing with ethyl acetate or propyl alcohol?

21  A.  It's the absence of those two in his report that cause me

22  concern.

23  Q.  Okay.  Did he identify any particular hazardous substances

24  in his report that he was concerned about?

25  A.  He references TCE and PCE.

*WALKER − CROSS/GRIGGS*                    Vol. 6-1070

1  Q.  So do you understand that his opinions that he offered

2  relate to TCE and PCE?

3  A.  Yeah, that's my understanding.  I mean, he's referencing

4  chlorinated solvents, and neither ethyl acetate nor propyl

5  alcohol are chlorinated solvents.

6  Q.  Okay.  Looking at the demonstrative exhibit that you were

7  shown on your direct examination, looking at the Ertel numbers

8  for TCE, am I understanding correctly that the post-excavation

9  number in groundwater is 2900?

10 A.  MW1, I don't have a copy of that here, so I'm doing this

11 from memory.

12          MS. KRAHULIK:  Oh, I'm sorry.

13          Can I hand him mine, Your Honor?

14          THE COURT:  You may.

15 A.  That was for --

16 BY MR. GRIGGS:

17 Q.  I'm sorry.  I thought you had a copy.

18          So we're looking at Ertel, TCE, the sample at MW108,

19 2900?

20 A.  Yeah.  Yes, on December 21st, 2009.

21 Q.  Okay.  But the pre-excavation number was 210?

22 A.  That's correct, but that was at SB268, in August 2007, and

23 sample location SB268 is on the north side of Ertel.  And the

24 south -- on the very south edge of Ertel is where -- MW108.

25 It was the first time a water sample was collected from the

*WALKER – CROSS/GRIGGS*                    Vol. 6-1071

1  vicinity of Ertel, from that location at Ertel.

2  Q.  So let's focus on MW108.

3  A.  Uh-huh.

4  Q.  As of December 21, 2009, that was after the excavation of

5  37,000 tons of soil?

6  A.  That's correct.

7  Q.  The amount of TCE close to the southern border, southern

8  boundary of the property, was 2900 PPB?

9  A.  That's correct, and it's the southeast corner of Ertel.

10  Q.  And do you know what the drinking water limit is, the

11  residential number, for TCE?

12  A.  Yes.

13  Q.  What is it?

14  A.  5 micrograms per liter.

15  Q.  So after the excavation, we have TCE at the edge of the

16  property almost 600 times what IDEM says is the cleanup level

17  for groundwater?

18  A.  600 times?

19  Q.  Five to 2900.  580, if you want to do the math.  How's

20  that?

21  A.  I gotcha.

22  Q.  Do you agree with that?

23  A.  Yes.

24  Q.  Was this groundwater moving?

25  A.  This groundwater is likely -- it likely does move, yes.

*WALKER – CROSS/GRIGGS*                    Vol. 6-1072

1   Q.  Do you know which direction it's moving?

2   A.  The groundwater generally at this vicinity of the site is

3   to the south and west.

4   Q.  And we have our picture, finally.

5   A.  Yes.

6   Q.  So if we can go to the picture, can you identify --

7          THE COURT:  For the record, it is Exhibit 1001.  You

8   were correct.

9          MR. GRIGGS:  I think I said -- I think I said 1002.

10  We brought up 1001.  We were off by one.  It's 1002.

11         THE COURT:  Okay.  You may continue.

12         MR. GRIGGS:  Let's blow up maybe the top half of

13  that.

14  BY MR. GRIGGS:

15  Q.  I just want to make sure you can get oriented to what

16  you're seeing in the picture, whether you recognize the

17  properties that we're looking at.

18  A.  I do.

19  Q.  You see Ertel on there?

20  A.  I do.

21  Q.  You see Zimmer Paper on there?

22  A.  I do.

23  Q.  And Moran?

24  A.  I do.

25  Q.  And Von Duprin?

WALKER - CROSS/GRIGGS                    Vol. 6-1073

1  A.  That's correct.

2  Q.  Okay.  And what we're showing here is an isoconcentration

3  line at 19 parts per billion.

4  A.  Okay.

5  Q.  And this is vapor, I believe, soil gas.

6  A.  It says micrograms per liter, I believe, in the ledger, so

7  that would be water.

8  Q.  In the groundwater, okay.

9         So this is the plume area that we've been dealing

10 with in this case.  Is this what you would typically

11 understand when the word "commingled plume" is used?

12 A.  This would describe a commingled plume.

13 Q.  Okay.  And each of the four properties that we've been

14 talking about, Ertel, Zimmer Paper, Moran, and Von Duprin, all

15 touch on that isoconcentration line?

16 A.  Yes.

17 Q.  The excavation that occurred at Ertel, I think we -- you

18 testified in your deposition that that was 37,000 tons.  I

19 think it's in your report, as well.

20 A.  Yes.

21 Q.  Did that excavation directly address impacted groundwater?

22 A.  There are nuances here that it would have a direct impact

23 on groundwater, yes.

24 Q.  Okay.  So you're changing your testimony from your

25 deposition; is that correct?

*WALKER – CROSS/GRIGGS*                    Vol. 6-1074

1   A.   No.

2   Q.   No?

3   A.   I don't believe so.

4   Q.   All right.  Let's look and see.

5              MR. GRIGGS:  Page 77.  Can we get that on the

6   reader?

7   BY MR. GRIGGS:

8   Q.   Can you see the upper left-hand quadrant is page 77?  Can

9   you see line 20?

10  A.   I see line 20.

11  Q.   Okay.  And do you understand the question there is whether

12  the excavation changes anything about the groundwater plume

13  before the excavation occurred?

14  A.   That's a different question.

15  Q.   Okay.  I'm asking you about this question.

16  A.   Does it change any -- does it -- I've got to read more.

17             No, I don't -- I don't -- I agree with what I've

18  said here.  I agree with both of them.

19  Q.   Okay.  And your testimony is that the excavation of

20  impacted soil has an effect on groundwater?

21  A.   Yes.

22  Q.   And what is that effect?  Maybe that's where we're

23  confused.

24  A.   It has an effect on the groundwater quality.  When you

25  remove the contaminant source above it and no longer -- and

*WALKER – CROSS/GRIGGS*                    Vol. 6-1075

1  that groundwater is no longer receiving a contribution from

2  the vadose zone, then that groundwater concentration of TCE or

3  PCE is subject to the natural degradation, dispersion,

4  dilution that occurs, which is already underway once it gets

5  into the water.

6  Q.  Okay.  Let me try and simplify this and see if I got it

7  right because this is all technical stuff.  I want to make

8  sure I got it.

9         Before the excavation, there is contamination in the

10  soil matrix?

11  A.  Uh-huh.

12  Q.  And while it's there, it may be -- it may move and it may

13  go into the groundwater and it may move off-site?

14  A.  In a gross way, yes.

15  Q.  Okay.  Once you take it away, once you take the

16  contaminated soil away, that is no longer possible because

17  there's no contamination in the soil to feed into the

18  groundwater; is that accurate?

19  A.  That is accurate.

20  Q.  Okay.  And that's what you're describing, is removing that

21  soil made it impossible for more contamination from that no

22  longer existent soil to move into the groundwater?

23  A.  That is my point, yes.

24  Q.  Okay.  Thank you.  I think we're together now.

25  A.  Okay.

*WALKER – CROSS/GRIGGS*                    Vol. 6-1076

1  Q.  And you actually measured on a percentage basis the

2  reduction in concentration in groundwater immediately

3  downgradient of Zimmer Paper in your report?

4  A.  From a well that was installed and had data prior to the

5  excavation and then was -- and remained after the excavation,

6  yes.

7  Q.  Okay.  And so essentially it was comparing apples to

8  apples, in your view?  The location before, the location after

9  were very close?

10 A.  Yes.  If you're going to do this kind of an analysis, you

11 want to remove as many variables as possible.  The fact that

12 the well is there and isn't changing, sampling procedures were

13 done by the same parties, so a lot of those variables that

14 could affect the groundwater quality data have been

15 stabilized, that you can then do an assessment looking at

16 groundwater quality before, groundwater quality after from the

17 same sampling point.

18 Q.  And do you remember what the reduction was that you saw in

19 the groundwater concentration between the before and after

20 samples?

21 A.  From Zimmer -- I know little in my opinion -- I think it

22 was around 63 percent or something.

23 Q.  You got it.

24 A.  Is that right?

25 Q.  It's the bottom paragraph of page 3.

*WALKER - CROSS/GRIGGS*                    Vol. 6-1077

1  A.  All right.

2  Q.  And it looks like the earlier sample was from -- I'm

3  looking for the date here.

4  A.  2008.

5  Q.  2008, maybe -- is it March 31?

6  A.  It would be March 31, 2008.

7  Q.  And the later one was October of 2010?

8  A.  '10.

9  Q.  Have you been able to further assess this reduction with

10 later samples?

11 A.  I haven't been asked to do that and I haven't.

12 Q.  Do you know if there's any later data available from

13 MW108?

14 A.  This is not 108.  I'm looking at 109.

15 Q.  109.  I'm sorry.

16 A.  Yeah, 109, I believe, and 108 were both removed during the

17 excavation of the Moran properties, I believe.

18 Q.  Okay.

19 A.  They were within the footprint of the excavation, so they

20 were removed.

21 Q.  Mr. Walker, in your demonstrative exhibit, you show TCE

22 and PCE concentrations for the Threaded Rod Von Duprin

23 property?

24 A.  Yes.

25 Q.  But you don't split those up into pre-excavation and

*WALKER - CROSS/GRIGGS*                    Vol. 6-1078

1  post-excavation?

2  A.  Yeah.  I'm not -- I believe -- I don't have -- I don't

3  know that there was data after the excavation.

4  Q.  You -- that implies that you do know there's been an

5  excavation.

6  A.  There was an excavation, I think, of 300 yards, 300 tons

7  of soil.  I'm not impressed by that.

8  Q.  Well, as we limit it to your expert report, the only --

9  only sites at which you offered an opinion that the excavation

10  had had an impact were Ertel, Moran, and Zimmer?

11  A.  No, actually that's not my -- that's not what this is.

12  For Moran, I think, there's a demonstration, because the

13  sampling point is the same or similar, but -- so I'm not

14  trying to demonstrate that there's a reduction from the

15  excavation.  This was to provide me with an understanding of

16  where were the peak concentrations in the shallow groundwater

17  across the sites, across this area.

18  Q.  Okay.  When did you create this demonstrative exhibit?

19  A.  I created this -- I think it was finalized yesterday.  I

20  began creating it about two weeks ago.

21  Q.  Well after your expert report in this case?

22  A.  Oh, absolutely.

23  Q.  And long after your deposition was concluded?

24  A.  Yes.  As this case was getting closer.

25  Q.  Prior to the excavation of soils at the three upgradient

*WALKER - CROSS/GRIGGS*               Vol. 6-1079

1  properties, is it your opinion, or do you have an opinion,

2  that those properties -- not individual companies, right --

3  that the properties had experienced a release of chlorinated

4  solvents?

5  A.  I agree with that.

6  Q.  And that those releases did reach groundwater?

7  A.  I think there's evidence of that, yes.

8  Q.  And given the orientation of the properties, how close

9  they are together, do you see any indication that the

10 contamination from the individual sites didn't merge together?

11 A.  I am -- I guess to answer that question, yes, I don't know

12 that there is.  I think there is evidence that they did not

13 all merge together.

14 Q.  So the picture we saw with one plume, you have a picture

15 that shows four plumes?

16 A.  No.  No, no, no.

17 Q.  So help me understand what you're saying.

18 A.  This might be more of a discussion on a commingled plume.

19 I think the contribution from some of the sites may never have

20 reached Von Duprin, in my opinion, and commingled with Von

21 Duprin.

22 Q.  So there's one plume --

23 A.  I'm sorry?

24 Q.  -- from four sources?

25 A.  Okay.

*WALKER – CROSS/GRIGGS*                    Vol. 6-1080

1  Q.  If we include Von Duprin; right?

2  A.  Okay, yeah.

3  Q.  And we know the boundaries of that plume.  We've seen

4  that.  And your question -- your answer goes more to, you

5  don't know where within that boundary the molecules from one

6  of the properties actually are?

7  A.  I think that's -- that's probably a better description.

8  That's a good description.

9  Q.  You know the direction they're moving, but you're not sure

10  of time of travel; you're not sure of whether they attenuate

11  in the soil, you're not sure whether they degraded into

12  another chlorinated solvent molecule --

13       MR. BOWMAN:  Objection, compound.  Objection,

14  compound.

15       THE COURT:  He wants you to break them down to each

16  one.  So, if you could.

17       MR. GRIGGS:  All right.  He was nodding at me so I

18  assumed I should go on.

19       MR. BOWMAN:  I didn't hear his head, Mr. Griggs.

20       THE COURT:  The court reporter can't pick up nods so

21  we do need answers.

22       MR. GRIGGS:  Now I have to try and remember the

23  litany.  I was on a roll.

24  BY MR. GRIGGS:

25  Q.  There are things you don't know about what's going on in

*WALKER - CROSS/BOWMAN*                    Vol. 6-1081

1  the subsurface that caused you to hesitate to give a firm

2  answer to how far a particular site's chlorinated solvents

3  have gone?

4  A.  That's true.

5          MR. GRIGGS:  Okay.  I'm going to stop there.

6          THE COURT:  Okay.  Thank you.

7          And who's going to examine the witness?

8          MR. BOWMAN:  Glen Bowman.  Thank you.

9          THE COURT:  All right.  Come on, Mr. Bowman.  You

10  may cross-examine.

11                  **CROSS-EXAMINATION**

12  BY MR. BOWMAN:

13  Q.  Mr. Walker, Glenn Bowman, for Moran.

14  A.  Good morning.

15  Q.  As part of your opinions, you did not do what is called in

16  your area of practice a fate and transport analysis; correct?

17  A.  That is correct.

18  Q.  And so to be clear on that, in my mind, a fate and

19  transport analysis would be whether a release of contamination

20  at one property is or is not migrating to another; that's a

21  fair representation of fate and transport?

22  A.  That would work.  That will work.

23  Q.  So you agree with me, then, for the next question:  As

24  part of your opinions that you're expressing to the Court,

25  you're not expressing an opinion regarding whether any release

*WALKER– REDIRECT/KRAHULIK*           Vol. 6-1082

1  of contaminants at any one property are or are not migrating

2  to another?

3  A.  No, I -- I think that's too vague.

4  Q.  You don't agree with that?

5  A.  I don't agree with the way that that's phrased.

6  Q.  What opinions have you expressed regarding migration of

7  groundwater, then?

8  A.  Well, the migration of groundwater is inherent in all of

9  my opinions, whether they're specifically stated or not.  It's

10 taken into consideration when I'm developing my opinions.

11 Q.  Let me try it another way. I want to bring this to

12 conclusion.

13      Have you expressed any opinions in this case, are

14 you expressing any opinions, regarding whether release of

15 contamination at one of the properties at issue is or is not

16 migrating via groundwater to another?

17 A.  I have not made that a part of my opinion.

18      MR. BOWMAN:  Okay.  Thank you very much.

19      THE COURT:  Ms. Krahulik, you may redirect.

20                **REDIRECT EXAMINATION**

21 BY MS. KRAHULIK:

22 Q.  Mr. Walker, you were asked a little bit about the

23 demonstrative exhibit we had on the screen earlier.  The data

24 that you placed in that demonstrative covered at least your

25 review of all samples at all locations on all properties

*WALKER– REDIRECT/KRAHULIK*                Vol. 6-1083

1  throughout time?

2  A.  That is correct.

3  Q.  And the particular result that Mr. Griggs was asking you

4  about of 2900 parts per billion on the Ertel property, what

5  was the date of that sample?

6  A.  That was December 21st, 2009.

7  Q.  So it was three years before the property was closed?

8  A.  Yes.

9  Q.  Do you remember the levels at which the property was

10 closed -- or let me rephrase that.

11        Do you recall the level in parts per billion that

12 was cited by IDEM as being at the property boundaries at the

13 time of closure?

14 A.  I don't recall specifically, but I know that it was less

15 than the commercial industrial standard, which for

16 trichloroethylene it may have been at 55 micrograms per liter.

17 I think it's less than 100.  I don't recall.  I'm sorry.

18 Q.  And you were asked about some boundaries of a plume.  That

19 graphic you were shown, that's not a result of any work you

20 did?

21 A.  No, not at all.

22        MS. KRAHULIK:  That's all I have.  Thank you.

23        THE COURT:  Any questions on those, Mr. Griggs?

24        MR. GRIGGS:  Nothing further.

25        THE COURT:  Mr. Bowman?

*WALKER— REDIRECT/KRAHULIK*                    Vol. 6-1084

1          MR. BOWMAN:  Nothing further.

2          THE COURT:  Thank you very much, Mr. Walker.  You

3  may be excused.

4          THE WITNESS:  Do I go back to my room or --

5          THE COURT:  You may go back to your room, and they

6  will probably let you go home in just a minute.

7          (Witness excused.)

8          THE COURT:  All right, lawyers.  It's 11:30.

9          Do you have any other evidence, Ms. Krahulik?

10         MS. KRAHULIK:  We have a couple of deposition

11  excerpts to offer into evidence, but other than that, we are

12  through with witness testimony.

13         THE COURT:  Okay.  Well, let's get your deposition

14  excerpts in.

15         MR. GARDNER:  Your Honor, just briefly, counsel for

16  Moran offered the depositions of Mr. Richard Phelps and John

17  Letsinger yesterday.  We told you that we had highlighted

18  portions for the Court.  You asked them to actually be

19  highlighted and so we've done that.  We can also give copies

20  to counsel, as well.

21         THE COURT:  Okay.  We'll accept those.  You can give

22  those to Tanesa.  Those are the ...

23         MR. MENKVELD:  And, Your Honor, Moran asks only

24  that, for confirmation, that the highlighted portions of the

25  depositions correspond with the excerpts that were previously

Vol. 6-1085

1   identified.

2          MR. GARDNER:  That was our intent.  I mean, that's

3   what we tried to do.

4          THE COURT:  Okay.  Do they have a number?  I think

5   maybe we need a -- let's put an exhibit number on these.

6          MR. GARDNER:  Okay.  And then we would move to admit

7   them, Your Honor.

8          THE COURT:  All right.  What number would you be at

9   on your exhibits?

10         MR. GARDNER:  I don't know that we had any.  We

11  could start at 700, I believe.

12         THE COURT:  Seven?

13         MR. GARDNER:  We were in the 700 series, the Major

14  defendants were, Your Honor, and I don't think that we offered

15  any in this trial, so we could be 700 and 701.

16         THE COURT:  Okay.  700 will be the smaller packet.

17  And who is that?  That's Mr. --

18         MR. GARDNER:  That's Mr. Letsinger, I assume.

19         THE COURT:  Letsinger.

20         And 701 will be Mr. Phelps?

21         MR. GARDNER:  Mr. Phelps.

22         I'm being told to use numbers 722 and 723.

23         THE COURT:  Tanesa said that would be better.

24         MR. GARDNER:  Everybody knows better than me, Your

25  Honor, so let's use that.

Vol. 6-1086

1          THE COURT:  So Mr. Letsinger will be 722.

2          MR. GARDNER:  And then Mr. Phelps will be 723.

3          THE COURT:  723.

4          MR. GARDNER:  Okay.

5          THE COURT:  Any other deposition designations?

6          MS. KRAHULIK:  No, Your Honor.

7          Sorry.  This is off.

8          No, Your Honor, we don't have any further

9  designations of depositions, we have no further witnesses, and

10  the Major Tool and Major Holdings defendants rests their case.

11          THE COURT:  Okay.  Thank you.

12          Do you have any rebuttal?

13          MR. GRIGGS:  No, Your Honor.

14          THE COURT:  No rebuttal on behalf of Von Duprin.

15          Any rebuttal on anyone's cross claims?

16          MR. MENKVELD:  No, Your Honor.

17          THE COURT:  No?

18          MS. KRAHULIK:  No, Your Honor.

19          THE COURT:  All right.  So the Court has received

20  all of the evidence.

21          It's 11:32, so let's go ahead and take our lunch

22  break.  Let's reconvene at maybe, let's say, 1:00, and we'll

23  hear closing arguments of counsel.  And I know I still have to

24  tell you something on that Rule 52(c) motion, which I'll do

25  when we get back.  But go ahead and prepare for your closing

Vol. 6-1087

1  argument, all right?

2          And how about 30 minutes, lawyers?  I think that

3  should be sufficient.  We've heard a lot and it's all in here.

4  So we'll give you each 30 minutes for your closing argument.

5          And Von Duprin, you can reserve some of your time

6  and get final rebuttal.

7          Sounds good.  Okay.  We're on our lunch break.

8          THE COURTROOM DEPUTY:  All rise.

9          (Recess at 11:33, until 1:07.)

10          THE COURT:  And we are back on the record.

11          Counsel, the first thing that we're going to discuss

12  very briefly is the Rule 52(c) motion, and the case law as

13  well as the rule states that the district court is not

14  required to make a ruling.  The rule merely authorizes the

15  Court to enter judgment at any time that it can appropriately

16  make a dispositive finding of fact on the evidence.  And

17  because you're allowed findings of fact and we just don't have

18  time to do findings of fact and it's a close call, the Court

19  is going to continue to defer ruling on the Rule 52(c) motion.

20          And there are some cases that say -- well, the

21  Seventh Circuit says it's discretionary for the Court.  And

22  there's a case that says the Court exercises discretion under

23  Rule 52(c) to defer its ruling on the request for judgment on

24  partial findings until the close of all evidence.  A decision

25  on the Rule 52(c) motion after deferral is tantamount to

Vol. 6-1088

1  making a decision on the case after trial on the complete

2  trial record as if no such motion had ever been made so that

3  separate consideration of the motion for judgment on partial

4  find findings is pointless.

5         So at this point in the proceedings, I think it's

6  pointless for me to try to give you a ruling on those motions.

7  The practical effect of the Court's deferral over a Rule 52(c)

8  motion and its entry of judgment based on the totality of the

9  evidence that's been admitted at trial is a denial of the

10 motion.  So for that reason only, I'm going to deny the

11 motion.

12        MR. MENKVELD:  We appreciate the consideration, Your

13 Honor.  Thank you.

14        THE COURT:  All right.  So let's start with our

15 closing arguments on behalf of Von Duprin.

16        And we do have a big clock.  We'll stop you -- I'll

17 give you a notice when you've got five minutes left.

18        MR. GRIGGS:  And that's when I plan to stop or be

19 done earlier.

20        THE COURT:  Okay.

21        MR. GRIGGS:  And before I begin, I wanted to thank

22 Your Honor for the cough drops earlier.  That was very

23 helpful.  Thank you.

24        THE COURT:  That happens to me sometimes, too.  I

25 don't know why.  We just get choked up, don't we?

Vol. 6-1089

1                    **CLOSING ARGUMENT BY**:

2            MR. GRIGGS:  Your Honor, thank you for your time and

3    attention to this case over the six days that we have

4    presented our evidence.

5            In our closing argument, we understand we'll only be

6    able to hit highlights and we do plan to provide you with the

7    required proposed findings and conclusions at the appropriate

8    time.

9            This case, as we stated in our pretrial brief, is

10   about pollution.  And if nothing else has been clear over six

11   days -- and I understand that some of it may have been

12   confusing -- there is pollution in a neighborhood here in

13   Indianapolis that really does affect people, and Von Duprin is

14   the person who has been spending money, taking steps, trying

15   to mitigate those potential exposures.  We have done so at a

16   public park building and at several residences to the

17   southwest of the industrial properties at issue in this case.

18           As the Court has seen and as this picture is an

19   indication, there is a commingled plume.  Chlorinated solvents

20   from multiple properties came together and remains together

21   and has a negative effect in the environment.

22           Vapor intrusion by TCE is the only identified harm

23   in the plume area.  That's what we're fighting.  We're

24   fighting it in the homes and eventually we're going to have to

25   fight it in the groundwater with some kind of a remedy,

Vol. 6-1090

1    because that's the only complete exposure pathway.

2            All of the parties in this case are connected to the

3    plume area in some way.  The diagram that you've seen,

4    probably more times than you wish to, Exhibit 1001, shows the

5    relative location of the properties, and we just summarize

6    here each party's connection to the site.  Ertel has one

7    connection.  Major Tool and Machine is the current owner.

8    Zimmer Paper has two connections.  Major Holdings is the

9    current owner.  And Zimmer Paper -- sorry -- Moran is a former

10   owner and operator.

11           The Moran property, again, has two connections.

12   Moran owned and operated that property and Major Holdings now

13   owns it.  And the Von Duprin property, the only connection is

14   Von Duprin is a former owner and operator.

15           The key points established during the trial, we

16   didn't have many left after the summary judgment motion.  Your

17   Honor had ruled at the summary judgment stage that all the

18   parties are covered persons and that a release or threatened

19   release of a hazardous substance had occurred at each of the

20   facilities and the trial testimony has confirmed those

21   findings.

22           What was left was to determine whether or not

23   response costs were necessary and whether or not they were

24   incurred consistent with the NCP.

25           On the issue of whether the costs were necessary, we

1  heard from at least five witnesses listed here, Mr. Groves,

2  Mr. Eiler, Mr. Ferree, Mr. Williams and Mr Fimmen, who

3  indicated that costs to investigate and delineate the plume

4  area were incurred and were necessary and that cost to

5  mitigate vapor intrusion in downgradient homes and buildings

6  were necessary.

7          And I would just particularly emphasize the

8  testimony here of Mr. Groves.  He is a state employee.  He is

9  a high-level official in the Indiana Department of

10  Environmental Management.  He deals with 650 sites across the

11  state of Indiana with contamination.  And they simply do not

12  allow people to be exposed to dangerous chemicals without

13  taking some action to prevent that.  They have -- they

14  demanded Von Duprin act, and we did.

15          We summarized, through testimony, the cost.  They're

16  split here into four different categories:  The investigation

17  cost, three quarters of a million dollars; the specific cost

18  to address the vapor intrusion at the park building property,

19  JTV Hill Park, $120,000; vapor intrusion at the residences,

20  $465,000; and then the work that was done on a bench scale

21  study and pilot studies to try and isolate and determine the

22  appropriate groundwater remedy for the site.  This totaled to

23  $1.7 million.  There was also testimony regarding IDEM

24  oversight costs.  Those were reflected in Exhibits 107 and

25  1017 and the total amount there was $38,946.

Vol. 6-1092

1          Had a big question in this case about whether costs

2    are incurred consistent with the NCP.  What the NCP has to say

3    is that in a private party response action, like this one,

4    costs will be considered consistent with NCP if the action,

5    when evaluated as a whole, is in substantial compliance with

6    the relevant NCP requirements.

7          I believe we've established, both with Mr. Williams

8    and with Mr. Hokkanen earlier today, that different types of

9    costs trigger different parts of the NCP.  It's a

10   multi-hundred-page regulation.  Not every page applies to

11   every cost.  Some of the requirements apply only to

12   investigative costs.  Others apply specifically to removal

13   costs or what is in the NCP called a remedial cost.

14          With respect to the investigation cost of $750,000,

15   cases in the courts, particularly in the Seventh Circuit, have

16   often found that investigative costs are per se consistent

17   with the NCP, and the logic here is fairly simple.  Until you

18   know what you're dealing with, it's hard to plan.  And you

19   have to gather the data that allows you to make decisions

20   about what the appropriate steps would be, whether that's an

21   immediate removal action, whether that's a longer term removal

22   action, whether that's going directly to the final remedy at

23   the site.  You need information to do that.  And in

24   environmental cases involving an area this size, that takes

25   many years sometimes to gather that information.

Vol. 6-1093

1          And they don't run sequentially.  When we gathered

2    enough information in 2014 to realize that we had structures

3    that were being threatened by vapor intrusion, while we

4    continued our investigation, we also started taking action in

5    the form of a removal action to deal with those immediate

6    threats.  And so the investigation wasn't concluded until the

7    final investigation report in 2017.  Although, by then, we had

8    conducted multiple removal actions to deal with vapor

9    intrusion.

10          I just note here that in a filing with this Court,

11   that the Major defendants agreed that investigation costs are

12   per se consistent with the NCP.  That was part of their

13   *Daubert* filings regarding Mr. Williams.

14          I think it's important, too, to note that Von Duprin

15   has been very careful and has tried throughout this case to be

16   clear that we are not seeking any recovery for costs that

17   relate to the Von Duprin site.  Whatever we did to take away

18   and haul away soil at the site, whatever we did to, you know,

19   comply with other requirements that might be involved at the

20   site, including vapor intrusion testing and evaluation at the

21   former Threaded Rod site, that all belongs to us, and I

22   believe that the other parties, particularly Major, has taken

23   the same stance.  Whatever efforts they made to address soil

24   contamination at Zimmer Paper and then later at Moran, those

25   were costs that they incurred, and they have not presented any

1   evidence in this trial suggesting that that should be shared

2   with Von Duprin.

3           We also have the removal costs, and here I've

4   combined the JTV Hill and the residential, the 120,000 and the

5   465,000 to total 585, just so I could get it onto one slide

6   instead of two.  One of the key issues of dispute coming into

7   the trial was whether or not sufficient efforts had been made

8   to involve the public.  And although the NCP doesn't talk

9   about exactly who the public is, I believe we heard from

10  Mr. Williams, and I think the trial transcript will reflect

11  from this morning that Mr. Hokkanen agreed that, at a minimum,

12  the affected persons are included within who the public is

13  that is intended to be protected, to whom information is owed.

14  And we presented evidence and there was a long -- I believe it

15  was called table 11 that was reviewed with at least one and

16  maybe two of our witnesses that detailed action by action:  We

17  called this person, didn't get an answer; we stopped at their

18  house and we left them a note; we gave them a fact sheet, you

19  know, explaining what was happening; we asked for permission

20  to come in their house; we signed an agreement with them that

21  we would incur all of the costs associated with testing the

22  indoor air and, if necessary, putting in a remediation system.

23          You know, the suggestion, if there is one, that

24  taking out a legal notice in a publication of general

25  circulation in Indianapolis would have done a better job of

1  notifying the people that mattered, I think that's wrong.  The

2  NCP wants the people who have a stake in what's happening to

3  have a say in how it occurs, and that happened here.

4          Also, it's notable that the only constituent, the

5  only contaminant that has caused us to incur any cost for

6  vapor intrusion is TCE.  It has the greater ability to find

7  its way into structures.  It has a much lower screening level

8  above which you have to take some action by IDEM's

9  requirements.  Had we only been dealing with PCE, the other

10  main contaminant in this case, none of those levels in homes

11  reached the level that would have required any mitigation

12  systems, so TCE is the driver of the costs.

13          In terms of remedial costs, we're still a little bit

14  early in this.  We did do a remedial work plan for soil, which

15  we're not seeking to recover costs of that in this case, but

16  we split the remediation work plan into the soil for which we

17  were solely responsible and the groundwater for which we

18  believe that the parties in this case share responsibility.

19  Those preparatory costs were $365,000.  They were to determine

20  whether or not ISBR, the remedy that we thought was the right

21  remedy, would in fact work in the soils that we have at these

22  sites.  And to accomplish that, we took soils from these sites

23  and sent them to a lab and ran a little bench scale test.  And

24  when that was successful, we brought the equipment and all of

25  the necessary chemicals right to the site, right here to town,

Vol. 6-1096

1   and injected those things in the ground with a permit from the

2   government to do that, and then watched and monitored how the

3   subsurface contaminants reacted.  Again, the results were very

4   favorable and we believe we identified a groundwater remedy

5   that will, in fact, work.

6          So the public participation requirements, although I

7   believe that we met them straight up in terms of the actions

8   taken by Geosyntec and by Von Duprin, there is case law,

9   particularly the *NutraSweet* case, that has found that

10  involvement of a state regulatory agency and approval of the

11  work that's being done does satisfy the public participation

12  components of the NCP.  Here, that's just icing on the cake.

13  You know, we've accomplished the cake, but we have that, as

14  well.

15         The State Cleanup Program and the Voluntary

16  Remediation Program are based on the NCP requirements and the

17  goal of the State, as reflected in their State Cleanup

18  Program, Remediation Program Guide and Remediation Cleanup

19  Guide, is that, by following the State's requirements, you

20  will be meeting the requirements necessary to achieve a CERCLA

21  quality cleanup, and that is ultimately the goal of all of the

22  NCP compliance, is that the remedy that is actually put into

23  place is what's called a CERCLA quality cleanup, meaning that

24  it has addressed the contamination to a degree and in a way

25  that protects human health and the environment.

1          We also have reflected an EPA IDEM memorandum of

2    agreement.  I'm not going to spend any time really going into

3    the details of that.  It's been presented in the evidence and

4    speaks for itself.

5          Another one of the issues that was at issue at the

6    start of the trial and may still be was whether or not Major

7    Tool was a BFPP for Ertel.  You had ruled in summary judgment

8    that they were not a BFPP, and we think that was the correct

9    ruling.

10          A document that had not come up at summary judgment,

11   a 2006 Phase I, was presented both in the pretrial brief of

12   Major and was presented through expert testimony and during

13   this trial.

14          When we spoke to Mr. Vijay yesterday, we presented

15   him both with the lease that began on November 16th, 2007, and

16   with this never-used-before Phase I from September 8th, 2006.

17   As the Judge can calculate, that's 14 months.  Mr. Vijay

18   testified that, in his opinion, a Phase I becomes invalid for

19   all appropriate inquiry purposes after 180 days.

20          This Phase I cannot serve as the basis for

21   compliance with all appropriate inquiry.  All of the other

22   Phase I's for the Ertel property didn't exist until after the

23   lease date of November 16, 2017.

24          There was also an issue for Major Holdings regarding

25   their BFPP status for the Zimmer Paper property.  Again, this

Vol. 6-1098

1  Court found at summary judgment that they were not a BFPP

2  because they had failed to comply with certain sections of the

3  all appropriate inquiry's rule, particularly Sections 312.21

4  and 312.22.

5          We also note that, during the trial, evidence was

6  presented regarding Exhibit 600, which is a settlement

7  agreement between Major and Moran that affects both the Moran

8  property and the Zimmer property.  It is heavily redacted, and

9  we can't see all the details, but I believe that what we can

10  see is sufficient to indicate that certain obligations were

11  taken on by Major to -- in exchange for money, $1.25 million,

12  as it turns out.

13          The requirements of the AAI at 312.21 and 312.22,

14  I've got slides here that I'm going to skip through for time's

15  sake, and this final one merely points out where in the Phase

16  I for the Zimmer Paper property some of these failures are

17  shown.

18          Also, whether Major Holdings is a BFPP for the Moran

19  property, this Court found at summary judgment that they were

20  a BFPP, even though no Phase I exists prior to the purchase or

21  prior to the acquisition.  And at that time, we believed that,

22  by acquisition, we meant when they bought it.

23          For the first time in testimony during the trial,

24  Natalie Weir indicated that a lease between Major Holdings and

25  Moran began in 2003.  There was no Phase I or Phase II

1   conducted prior to that date.  So the document that the Court

2   relied upon as a Phase II type document, it's only three pages

3   long; it doesn't have much to say of what a Phase II would

4   normally say; it has nothing of what a Phase I would say.  But

5   because of the lease, which we were unaware of, I believe that

6   the lease predates even the one document that the Court relied

7   upon in finding that they had met the BFPP requirements.  The

8   date of that document, which was Exhibit 1236, is December 28,

9   2004.

10          So we would ask the Judge to reconsider whether or

11   not Major Holdings is, in fact, entitled to BFPP protection

12   for the Moran property.

13          The all appropriate inquiries are found at 40 CFR

14   Section 312.20.  These are the things that a Phase I does for

15   you.  And we would suggest that Exhibit 1236, which now has a

16   very bad timing problem, even without the timing problem, even

17   if we were just talking about the date that they purchased the

18   property instead of the their lease began, that document, that

19   three-page document in Exhibit 1236, doesn't meet these

20   requirements.

21          And to say that, "Well, a Phase II must be better

22   than a Phase I because it says II and the other says I," I

23   think, is wrong.  They serve completely different purposes.

24   The Phase I accomplishes things that the regulation wants to

25   be accomplished in order to grant bona fide prospective

Vol. 6-1100

1  purchaser protection that a Phase II simply doesn't do.

2         There are other reasons why you might not find Major

3  to be a BFPP.  The document, the 1236 document, never

4  references Major Holdings.  It was done for somebody else.  It

5  was done for something called the Martindale-Brightwood

6  Community Development Corporation.  So they're trying to make

7  use of somebody else's document.  Like with a Phase I, the

8  user, the person who can rely upon it, is the person who has

9  the work done.  And there are several items indicated there

10 that are missing in this three-page document that are required

11 in a Phase I.

12         Did the defendants investigate and prevent further

13 releases?

14         Even if you meet the requirements of all appropriate

15 inquiry, you have to also perform the continuing obligations.

16 One of the continuing obligations is making sure that no

17 contamination is affecting off-site properties.  Here, the

18 testimony is that a lot of work was done on these properties,

19 thousands of tons of soil was removed.  We accept that.  We

20 acknowledge that.  We think that's great.  What we have a

21 problem with is that that soil, while it was there and while

22 it was contaminated, and even after it was removed, the

23 evidence is that there were still molecules, too many

24 molecules, of dangerous chemicals leaving those properties and

25 flowing downgradient and we believe ultimately impacting

Vol. 6-1101

1   receptors, human receptors.  And by not addressing those

2   releases that got off-site -- and, granted, got off-site

3   before Major Tool was even involved -- but by taking on the

4   obligation and becoming the current owner, they had

5   requirements.

6          The last thing I want to talk about in this section

7   is divisibility of the harm.  You were promised that the harm

8   was divisible.  You were told that if you let Mr. Love come,

9   he would explain to you why it's divisible.

10          Divisibility has two requirements.  The Supreme

11   Court, in *Burlington Northern*, said there's a threshold

12   question of whether a harm, not a release, is capable of

13   apportionment as a matter of law.  The second is a factual

14   inquiry that must point to a reasonable basis for

15   apportionment of the harm.

16          Mr. Love did not do that.  Mr. Love made an

17   allocation.  He divided the contamination among the sites.

18   That is not apportioning the harm.  He never did the things

19   that you would need to do.  He never considered the things

20   that would tell you where the real harm rested.

21          Since we have a single commingled plume, the

22   homeowner who is facing vapor intrusion has no way of telling

23   which of the contributors to that commingled plume, which of

24   their molecules is the ones in their house.  There's simply no

25   way to divide that.  The harm is indivisible, people breathing

Vol. 6-1102

1  contamination that they shouldn't be breathing.

2         Now, to say the cause of that might be divisible,

3  that's what allocation is about.  That's dividing

4  responsibility.  But from the perspective of the person facing

5  the harm, it is completely indivisible.  There's no way of

6  saying, "You pay that.  You pay that.  You pay that."  It

7  truly is a situation of joint tortfeasors from the perspective

8  of the homeowner.  It doesn't matter where it came from.  You

9  can't track individual molecules in the groundwater.

10         TCE is the harmful contaminant.  He did not divide

11  between PCE and TCE.  It's all total chlorinated solvents.  So

12  the thing that poses the greatest risk, 20 times greater risk

13  than PCE, he treated them all the same.

14         The shallow groundwater, we heard today from another

15  witness, the shallow groundwater is what gives off vapor.

16  That's what causes vapor intrusion.  He treated all the

17  groundwater, whether it was shallow or deep, all the same.

18         So that's where I'll end my presentation.  I realize

19  I have four minutes left for rebuttal.  Thank you.

20         THE COURT:  Okay.  Thank you very much.

21         All right.  Who's going next?

22         Mr. Menkveld, you may.

23                    **CLOSING ARGUMENT BY**:

24         MR. MENKVELD:  Thank you, Your Honor.

25         Over many days now, it seems, we've obtained a lot

Vol. 6-1103

1  of evidence that, at this point, is largely fragmented, as is

2  the case at trial.  But now when we're able to take that

3  evidence and form it into some sort of a picture, a few things

4  come into focus and really stand out in high relief.

5          One of those is that Moran was a very small

6  contributor to the problem being complained about today.  IDEM

7  and the other people in the area walked by the Moran property

8  to deal with the real problem for years and years.

9          The second thing is that Von Duprin is far and away

10  the largest contributor to the problem being dealt with in

11  this lawsuit.  And knowing that, Von Duprin sat on the

12  sidelines for years.  It was the last to the game.  It was the

13  last entity involved in this lawsuit to do anything to address

14  contamination and very specifically remove soils, which it did

15  just about three months ago before this lawsuit started.

16          And last, Your Honor, while Major Tool may have done

17  something good by constructing building 20, what it didn't do

18  is pay attention to what was underneath building 20.  Major

19  Tool is not the innocent third party.  It is not the BFPP that

20  it would lead this Court to believe that it is.

21          Now, there are two claims being made in this case

22  against Moran.  One is CERCLA liability under Section 107(a),

23  which is the cost recovery action, and the other is an ELA

24  claim.

25          So for Von Duprin to establish a claim against

Vol. 6-1104

1   Moran, it has to show that Moran is either the current owner

2   or operator of one of the properties involved in this lawsuit

3   or that Moran was an owner or operator of a property at the

4   time the disposal occurred.  Now, disposal under the statute

5   just means release, leak, discharge, et cetera.  Under the

6   ELA, what Von Duprin has to show is that Moran not only caused

7   or contributed to release of contamination, but Moran's

8   contribution of release poses a risk to human health or the

9   environment.

10          Now, by way of overview, Moran never owns the Ertel

11  property, never owns the Von Duprin property, owned and

12  operated on the Moran property, and owned and operated on the

13  Zimmer property.  But Moran has never denied that it operated

14  on the Moran property and that it, in fact, used TCE on that

15  property.  From day one, Moran has admitted that, Your Honor.

16          With respect to the Zimmer property, Moran hotly

17  contests, as forceful as you can make it, that it ever used

18  TCE on that property.  There's no person on the witness stand

19  with personal knowledge that Moran ever used chlorinated

20  solvents on that property, that Moran used a degreaser on that

21  property.  There is no document in the record that was made by

22  any person who witnessed Moran's operations showing that Moran

23  used chlorinated solvents on that property.

24          Moran cannot be liable under the ELA with respect to

25  the Zimmer property or under CERCLA, under any CERCLA theory,

Vol. 6-1105

 1  Your Honor.

 2          We appreciate the ruling that we received today,

 3  Your Honor, and we're confident that, after the Court has a

 4  chance to review the record, the Court will reach the same

 5  conclusion.

 6          Now, we've said that Moran is liable under CERCLA

 7  for the Moran property, to some extent.  When a PRP is liable

 8  under CERCLA, you can pick one of two paths.  You can accept

 9  that your liability will be joint and several.  In which case,

10  you have the option of pursuing a contribution action against

11  other potentially responsible parties or you can show that the

12  harm is divisible.  And in this case, Your Honor, the Court

13  has already concluded that divisibility is appropriate as a

14  matter of law and that Moran is liable only for its share of

15  the harm committed, that it is not jointly and severally

16  liable.

17          Now, because we are operating under the Doctrine of

18  Divisibility, there are a couple of key points to raise.  One

19  is the concept of an orphan share, which is a share of harm

20  that cannot be allocated to any party in this case.  Under the

21  Divisibility Doctrine, the orphan share that cannot be

22  allocated to either Major Tool or Moran is borne by the party

23  in this case, Von Duprin, who has incurred the costs.

24          Secondly, under divisibility, allocation can be --

25  or excuse me -- allocation can be made to a defaulter party.

Vol. 6-1106

1   We have a defaulter party in this case.  It's Zimmer Paper.

2   Zimmer Paper was the owner and operator of the Zimmer Parcel

3   and has been defaulted on the substance of this case.  So

4   Zimmer Paper, the entity, can be allocated a share of harm for

5   that property that it owned, Your Honor.

6           Now, Mr. Griggs just stood up and talked about

7   apportionment under the Divisibility Doctrine.  This is the

8   second thing that happens after the Court concludes that it

9   can happen as a matter of law, which the Court has.  Now, the

10  second step of apportionment is not guided by principles of

11  equity the way a contribution claim is.  It's guided purely by

12  principles of causation alone.  Now, apportionment does not

13  have to be mathematically precise -- a lot of the questions

14  posed to Dr. Love went to mathematical precision -- but it

15  must be reasonable.

16          Dr. Love apportioned harm in this case based on a

17  variety of factors, including geographic considerations,

18  contaminants, specific considerations, migratory potential,

19  and if you have to sometimes you can even use time that the

20  property owned -- was owned by a particular PRP.  Now, there's

21  just one apportionment expert in this case who has done this,

22  and that is Dr. Love.  Dr. Love has shown as a matter of fact

23  that the harm can be apportioned.

24          I'm going to address what Mr. Griggs just said as

25  quickly as I can here.  Historically, what would happen is

Vol. 6-1107

1  parties would fight over what was driving the remedy as in

2  what was driving the vapor intrusion problem downstream.  The

3  courts have throttled back on that and said we're not going to

4  look at what's driving the remedy; we're going to look at the

5  contribution from each party, if we can find distinct area of

6  releases, but we're going to assume that your release is

7  contributing to the remedy.

8         So when we talk about people who might be breathing

9  in vapors, all of those issues have been resolved in Von

10  Duprin's favor.  You heard questions yesterday going to

11  whether contamination is migrating from the Moran property or

12  the Zimmer or Ertel properties down to the extent of the plume

13  where the vapor intrusion issues are occurring.  Dr. Love

14  concluded and opined that every single release from an

15  upgradient property has migrated to the groundwater all the

16  way to the extent of the plume and is part of the VI problem.

17        That is how you apportion harm.  You have to give up

18  a little bit to do it that way as a defendant.  You lose the

19  arguments that there's no causal link between the release and

20  the VI downstream.

21        So, to make this allocation, those issues had to be

22  revolved in Von Duprin's favor.  The issue of whether DCE is a

23  problem in this area was resolved in Von Duprin's favor, and

24  you heard yesterday that DCE was not attributed to Von Duprin

25  at all.  The same with the type of release, Your Honor, in

1    that the levels of contamination downgradient versus

2    upgradient and whether they cause a VI problem.

3              In terms of Von Duprin's share, that was done by way

4    of a groundwater analysis under the Von Duprin property, which

5    absolutely can be done, because at the Von Duprin property

6    line is what we see as a result of Von Duprin's operations and

7    releases there, which is a very big spike in groundwater

8    contamination, and the type of contamination flops in terms of

9    dominance.  In terms of upgradient releases, Dr. Love can use

10   shallow soil impacts, vadose zone impacts, that indicate a

11   release at those properties and assume that all of those

12   impacts went all the way down to where their VI issue is

13   occurring.  That is more than a reasonable basis.  Dr. Love

14   used multiple methods.  He cross-checked and rechecked his

15   results and they came out the same.

16             To that question, I want to say a word about the

17   smear zone that you've heard a lot about, and the smear zone

18   is a place in the soil where the groundwater touches, is the

19   easiest way to say it.  We know that groundwater moves up,

20   groundwater moves down, and it moves left to right,

21   horizontally and vertically.  When groundwater is contaminated

22   and it moves up in the soil, what we say is it smeared

23   contaminants on the soil, and that's why we call it the smear

24   zone.

25             The important point about this is Moran understands

1  that there were impacts on the Moran property above the

2  industrial default closure level, which is the level IDEM

3  might actually require you to do something, but they were in

4  the smear zone; they were not in the vadose zone soils.

5        Now, Von Duprin asks at least two witnesses about

6  depths to groundwater, but for some reason did not put this

7  exhibit in front of the witnesses.  This exhibit shows depth

8  to groundwater on the Moran property, at Monitoring Wells 200

9  through 202, and shows that depth to groundwater is 9.9 to

10  10.62 feet.  Any soil sample taken at that depth is a smear

11  zone groundwater level sample.

12        We also heard that the excavation on the Moran

13  property down to 15 feet below ground surface was not a soil

14  sample, but was a groundwater sample.  We heard that from Von

15  Duprin.  That, too, is incorrect.  The report that was

16  referred to during that questioning shows that 15 feet below

17  ground surface is located at the groundwater saturated zone.

18        Dr. Love's divisibility conclusion, taking all of

19  this into account, allocates 3.1 percent to Moran,

20  28.9 percent to Zimmer, 13.8 percent to Ertel, and

21  54.2 percent to Von Duprin.

22        Von Duprin you heard just say there's no analysis as

23  to the distinction between contaminates, TCE or PCE.  There's

24  a chart that says otherwise -- that's in evidence -- that

25  Dr. Love put together.  TCE is 27 percent of the problem, PCE

1    is 73 percent of the problem.  TCE, Von Duprin says, is

2    driving the remedy.  You heard evidence from multiple

3    witnesses that PCE degrades into TCE.  It starts with four

4    molecules and it loses one and it becomes TCE over time.

5              Now, this result that Dr. Love came up with complies

6    with what we see in the samples of Moran's operational

7    history.  We know from Sharkey, Phelps, and Letsinger that

8    Moran never used PCE.  It only used TCE.  It never used TCE at

9    the Zimmer parcel.  It did not use them in the parts washers.

10   And even though there was evidence from Mr. Sharkey saying he

11   doesn't know what was used in the parts washers, what he said

12   is he knows for sure that it was not TCE because he knows what

13   TCE is.

14             Moran used TCE in the degreaser in the motor shop

15   from 1967 to '74.  That was replaced.  It was recessed into a

16   pit.  There was another TCE degreaser that was used on the

17   dine shop, but it was just for a matter of months.  And you

18   look at the contamination in any soils on the dine shop, and

19   even a contour you'll see in a minute, there's no problem

20   coming from Moran's dine shop at all, Your Honor.

21             So what's the environmental result of these

22   operations?  Where the motor shop were located, where the pits

23   were located in the motor ship, pits 1 and 2, they were

24   drilled through while they were in place, concrete, three feet

25   thick.  The results were that detection limits taken directly

Vol. 6-1111

1  below those pits were below detection limits, which means they

2  could not be detected with the equipment or they were

3  negligible in all soil borings.

4         Now, if you want to look at the rest of the Moran

5  property, we can look at the Exhibit 1112, which shows borings

6  that were advanced across the entire Moran property.

7         I will bring your attention here.  That's the

8  excavation area for the Moran property, the only place where

9  impacts above IDCLs were found, and they were found in the

10 smear zone.

11        COURT REPORTER:  I'm sorry.  I lost you.

12        MR. MENVELD:  The only place, Your Honor, where soil

13 samples on the Moran property were found above industrial

14 default closure levels, and they were found in the smear zone.

15        You'll see the excavation area includes the alley.

16 Moran did not have operations in the alley.  That is

17 indicative of the groundwater flow south to southwest.  The

18 impacted soil samples are a result of groundwater flow coming

19 from the north.

20        And as far as the results of the data are concerned,

21 we know the exact number of vadose zone soil impacts above

22 industrial default closure levels on the Moran property.  The

23 number is zero.  The Moran soil is removed as nonhazardous.

24 This supports and brings Love's apportionment to Moran into

25 focus.

Vol. 6-1112

1         Another point to be made with respect to data found

2    on the Moran property.  It shows that any release on Moran did

3    not pose a risk to human health or the environment.  That's an

4    essential element under the ELA.  It's also necessary for a

5    CERCLA plaintiff to show that a release attributable to Moran

6    required the incurrence of costs.  In other words, it was

7    necessary.  That is the definition of necessary, is whether it

8    poses a risk to human health or the environment.

9         And let's contrast this against release data on the

10   Von Duprin property.  PCE, 45,100 parts per billion.  TCE,

11   14,800 parts per billion.  Here's a comparison.  That's a two

12   to three orders of magnitude higher on the Von Duprin property

13   versus the Moran property.  On the Ertel site and the Zimmer

14   Parcel, you see also very high numbers, well above industrial

15   default closure levels, two to three or more magnitudes higher

16   than anything found on the Moran property.

17        And to be sure, Your Honor, let's look at the

18   contour map that is part of Von Duprin's exhibit.  This was a

19   contour that was established by using a number in consultation

20   with IDEM.

21        This is the Moran dine shop.  It's not even within

22   the contour map.  This is the Moran motor shop.  The contour

23   line cuts off the northwestern side of the motor shop.

24        We've heard from several experts that TCE, when it's

25   released, travels downward and it keeps going down.  And when

Vol. 6-1113

1   it hits groundwater, it starts to pancake out.  So what you

2   see when you look at a contour like this is an area of

3   release, which we know to be the case.  The Zimmer property,

4   you see, is in the middle of the contour, the southern part of

5   Ertel -- I'm not doing a good job with my arrows -- which is

6   in the middle of the contour.  You don't see the portion of

7   Moran where any pit was located to be in the middle of a

8   contour.  What you see, for sure, is Von Duprin right smack in

9   the middle of the biggest, widest, nastiest part of the

10  contour on this map.

11          Now, at the beginning of this case, Von Duprin's

12  first witness was Mr. Eiler.  Mr. Eiler attempted and did

13  testify that there were no -- or at least he was not aware of

14  operations on the Von Duprin property that even used TCE or

15  PCE.

16          Now, former Moran -- or excuse me -- a former Von

17  Duprin employee took the stand, Mr. Fye, and explained that

18  Von Duprin in fact used a large Detrex degreaser and used TCE.

19  Now, what do the documents say?  Your Honor may remember

20  looking at this document, where Mr. Eiler said, "I can't read

21  this," and Your Honor said, "I can," and it shows that Von

22  Duprin was disposing of perchloroethylene.

23          Another disposal document put into evidence shows

24  Von Duprin disposed of perchloroethylene and specifically

25  references Detrex PERC.

Vol. 6-1114

1          Regarding TCE, we have a document in the record that
2     shows Von Duprin disposing of 630 gallons total of TCE on just
3     one occasion.
4          And then to round it out, we have a document showing
5     that Von Duprin did in fact use degreasing solvents in its
6     operations.  So any idea that Von Duprin did not use TCE or
7     PCE in its operations is just not the case.
8          Now, Von Duprin's refusal to even acknowledge its
9     operations has carried over into its remediation efforts.
10    Mr. Eiler testified that he began looking for documents when
11    notified of a lawsuit in 2010.  Von Duprin did not perform
12    investigations until it received a special notice liability
13    letter in 2013.  And as I stated earlier, soils were not
14    removed from the Von Duprin property until just a few months
15    ago.  Until then, the community just sat on it, and Von Duprin
16    did nothing.
17         We'll look at a soil removal comparison here.  You
18    can see for Moran, Ertel, and the Zimmer sites, contaminated
19    soils were found in a certain year and were removed within a
20    year or at about the one-year mark.
21         Contaminated soils were discovered on the Von Duprin
22    property in 2008 and removed in 2019, more than a decade
23    later.  Even if you give Von Duprin the benefit of the doubt
24    of bumping the discovery up to 2010 when Mr. Eiler started
25    looking for documents, you're still looking at a nine-year

Vol. 6-1115

1   delay before the source of contamination there was removed.

2        Now, Major Tool performed the removal of the soils

3   on the Moran property.  It's important to note, Your Honor,

4   that Moran has reimbursed Major Tool more than -- that says

5   1.1.  That should say $1.2 million.

6        There was some testimony that Moran sat and did

7   nothing.  That is not true.

8        Divisibility with respect to Major Tool.  We heard,

9   Your Honor, an expert, I believe it was just this morning, say

10  that Major Tool would be apportioned a zero percent share.

11  Under divisibility, that is not permitted, under the case that

12  I cited at the bottom of this slide.  A CERCLA defendant

13  cannot apportion itself a zero percent share under the

14  Divisibility Doctrine.  The reason is because, if you step up

15  as a defendant and say, "Look, I'm liable for some percent,

16  not all of it but some percent, and I can show you what that

17  percentage is," you can't give yourself a zero percent share.

18  To do so would undermine the strict liability feature of

19  CERCLA.

20        If you own or operate a property, if you are the

21  current owner or operator of a property, you are strictly

22  liable under CERCLA regardless of your innocence.

23        Major Tool strictly liable under CERCLA as the

24  current owner and operator and as an owner at the time the

25  disposal occurred.  Major Tool is currently the owner and

Vol. 6-1116

1  operator of these properties, the Ertel site and the Zimmer

2  property, and there's evidence from Mr. Groves that there was,

3  in fact, a release of chlorinated solvents, and the deed is in

4  the record showing that Major Tool owned the property at the

5  time of that release.

6        Now, compare that with Moran.  Moran never owned the

7  Ertel site, is not the current owner or operator of the Ertel

8  site or the Zimmer Parcel.  And, again, Your Honor, there is

9  zero evidence showing that a release occurred on the Zimmer

10  Parcel during Moran's period of ownership, zero evidence

11  showing that Moran used degreasers on that property.

12        For Major Tool to come away with zero percent

13  apportionment, it has to establish a defense that's recognized

14  under CERCLA that's either the innocent landowner defense or

15  the bona fide prospective purchaser defense.  To avail itself

16  of the innocent landowner defense, Major Tool has to show that

17  it exercised due care with respect to hazardous substances,

18  which we know existed below the Ertel and Zimmer parcels.  It

19  also has to take precautions against foreseeable acts by any

20  third parties that lead to foreseeable consequences.

21        The comfort letter that has been put into evidence,

22  Exhibit 1192, shows what Major Tool has to do to receive BFPP

23  status.  That includes not impeding the performance of a

24  response action, stopping a continuing release, preventing or

25  limiting human environmental or natural resource exposure, and

1   then there are some communication requirements.

2          Mr. Griggs also just went through what it means for

3   Major Tool because it indemnified Moran for certain potential

4   future remediation on the Moran and the Zimmer properties, so

5   I won't duplicate that now.

6          So now we have to ask:  Can Major Tool be one of

7   these things, an innocent third party -- excuse me -- an

8   innocent party -- excuse me -- innocent landowner or a BFPP?

9          We are not taking away from Major Tool the benefits

10  of building 20 at all.  If that were the end of the story, we

11  wouldn't be here, or maybe Major Tool wouldn't be here with

12  respect to contamination continuing to flow off-site.

13         The problem here, when you look at the whole story,

14  is that Major Tool did not construct building 20 out of the

15  pureness of its heart.  It did it to make money.  And in doing

16  so, it rushed the remediation of the Ertel and Zimmer

17  properties to obtain a financial incentive.

18         Your Honor, you saw these pretty disgusting pictures

19  at trial.  This is what preceded Major's building 20.  In

20  circumstances like this, we know that there are environmental

21  problems.  And in fact, the data showed and the evidence

22  showed that Major had knowledge of impacts as high as 82,000

23  parts per billion on those properties in August of 2007.

24         And after that, Major Tool entered into a contract

25  with a company named USEC.  And in that contract, Major Tool

1    received financial incentives or contracted to receive

2    financial incentives if it had its building constructed and

3    operational by a certain day.  Major Tool then used the dates

4    in that agreement to establish the dates in the project

5    agreement with the City of Indianapolis to perform soil

6    excavation.  So the financial incentive date drove the

7    remediation dates.  In other words, Major Tool subordinated

8    proper remediation of these properties to construct building

9    20, and it did that to obtain a financial incentive.

10           Now, the Zimmer parcel was not placed into a cleanup

11   program.  There's knowledge that a 16,000-gallon UST was

12   leaking when it was removed, according to Ryan Groves.  There

13   was no soil testing of the UST removal area that anyone can

14   locate.  And we know there's evidence that there was a leaking

15   drum found on the Zimmer Parcel during removal.  That actually

16   belonged to the Zimmer entity.

17           And with that knowledge, Major actually avoided an

18   environmental problem.  Mr. Vijay, who took the stand

19   yesterday, was sent an e-mail explaining that there was a

20   concern about deep groundwater testing and how that could turn

21   up further issues.  Mr. Vijay's response was, "We can ensure

22   that our random samples don't uncover further issues."  The

23   explanation for this e-mail was that it was a joke.  There's

24   nothing about this e-mail that indicates that it's a joke,

25   even a terrible joke.

Vol. 6-1119

1          And true to his word, Mr. Vijay delivered the

2   results, deep soil boring samples, for the Ertel and Zimmer

3   property, that did show impacts above industrial default

4   closure levels, but nothing that concerned IDEM too much, at

5   least to halt remediation and construction of the building.

6          Now, Major Tool could have done more to investigate,

7   but it didn't.  It turned the lights out on remediation.

8   There was no investigation to determine migration of

9   contaminants to downgradient properties.  There were no wells

10  sampled between the Ertel and Zimmer properties and Moran

11  before a NFA was issued for the Ertel site.  Major Tool

12  refused to let Moran on that property to investigate and had

13  to be compelled by the Marion Superior Court.  There's an

14  agreed order that establishes cleanup levels for the Ertel

15  site.

16         By the way, the Moran property is included in the

17  site that was supposed to be cleaned up using funds that were

18  received by a settlement agreement.  You'll see that in our

19  findings, Your Honor.

20         Mr. Meyer, who we have an e-mail from, pushed IDEM

21  to close the site before Major Tool's option to purchase the

22  Ertel site expired at the end of 2012.  Mr. Vijay echoed that

23  request to IDEM and sent a letter shortly thereafter.  And

24  sure enough, at the end of 2012, IDEM issued a NFA letter in

25  November of that year.

Vol. 6-1120

1        Upon the issuance of that NFA letter, the money that
2   was allocated to cleaning up these properties was gone.
3   $860,000 earmarked for remediating the Ertel site was gone,
4   used for other purposes.
5        You heard through the testimony given that that NFA
6   letter, the Marion County Superior Court has held that the
7   terms of the agreed order were not met, the cleanup standards
8   were not met.
9        Now, as part of a related lawsuit, Moran and Major
10  Tool did enter into an agreement, a settlement agreement.
11  Moran and Major Tool volunteered -- this is where Moran and
12  Major Tool both stepped up -- to enter into the Voluntary
13  Remediation Program.  That application was rejected.  It's a
14  bit of a mystery as to why.  I expect that we will find out
15  going forward.  But at this point, it is inexplicable.
16       One key feature of that settlement agreement, which
17  has been brought up before, is that Major did agree to
18  indemnify Moran for certain things, which does defeat BFPP
19  status.  So Major Tool is strictly liable under CERCLA.  It
20  cannot assert the innocent landowner defense, and it cannot
21  assert the BFPP defense for the properties here.
22       Damages.  There's an issue as to damages of
23  $1.5 million.  Under multiple theories, those are not
24  recoverable.  They were not put into evidence.  No NCP
25  compliance.  Those are settlement costs.  If Von Duprin wanted

Vol. 6-1121

1  to recover those, it could have asserted a contribution claim.

2  It did not.  Those are not recoverable under any ELA theory.

3        The second set of damages, the $1.7 million and

4  change made up by the Geosyntec invoices, which has major NCP

5  compliance problems which we'll flesh out in our findings and

6  conclusions.

7        As to future costs, there's zero evidence in the

8  record pertaining to future costs.

9        Your Honor, Moran is a small part of this; Von

10 Duprin is a very big part of this; and Major Tool is not off

11 the hook.

12       Thank you, Your Honor.

13       THE COURT:  Okay.  Thank you very much.

14       All right, Ms. Krahulik.

15                  **CLOSING ARGUMENT BY**:

16       MS. KRAHULIK:  Thank you, and may it please the

17 Court.

18       I know the fact that the polluters of these

19 properties are standing here and pointing the finger at each

20 other and at Major Tool is not lost on this Court.

21       Major Tool and Machine isn't only a world class

22 manufacturer; it's a growing Indianapolis employer that

23 provides its employees excellent wages and opportunities.  It

24 trains its workforce and provides products needed to the

25 aerospace, defense, transportation, and other industries.  But

Vol. 6-1122

1   not only that, Major Tool is an excellent member of the

2   Martindale-Brightwood community.  It's made its home there for

3   half a century and it hopes to be there for many generations

4   to come.

5           Major Tool and its real estate holding entity, which

6   is called Major Holdings -- and I'm going to refer to both of

7   them as Major Tool for purposes of my argument -- has

8   strategically acquired properties near their manufacturing

9   operations over the year -- over the years.  They've expanded

10  those capabilities.  They've expanded their workforce.  And

11  every single instance, Major Tool knew that those properties

12  were blighted Brownfields, and Major Tool knew they were

13  likely impacted by the previous industrial use by companies

14  just like Moran and Von Duprin.  And Major Tool conducted due

15  diligence as to each and every one of those properties,

16  conducting what we've heard is called all appropriate

17  inquiries by engaging in environmental consultants to perform

18  Phase I environmental site assessments and other

19  investigations, all before Major Tool ever leased or acquired

20  any of these properties.

21          And Major Tool has redeveloped some of these

22  properties already, put them back to productive use,

23  eliminated blight, created jobs, and beautified the overall

24  area.

25          Now, while all of these things are admirable and the

Vol. 6-1123

1    all appropriate inquiry activities of Major Tool entitle it to

2    legal protections against claims just like the ones that have

3    been asserted here under CERCLA, the real distinguishing

4    factor as to Major Tool in this case is that Major Tool never

5    caused or contributed to any of the contamination at issue.

6    There's no allegation of that and there's no evidence of that.

7           Better yet, Major Tool has voluntarily and within a

8    very short time of acquiring these properties contaminated by

9    others performed remedial activities, eliminated contamination

10   sources, stopped continuing migration of contamination.  And

11   while it did that, it communicated with the regulators,

12   including Indiana Brownfields and IDEM, and it spent

13   considerable time and resources in its efforts.

14          And you've heard from Natalie Weir, from Nivas

15   Vijay, from Rob Walker about these significant efforts, their

16   results, and the documentation of the all appropriate

17   inquiries, which establish the defenses to CERCLA, which is in

18   the record before this Court.

19          Now, let's talk a little bit about these properties.

20   We've seen this map a whole lot in this litigation.

21          Let's talk, first, about the Moran property.  Moran,

22   as it is -- as Mr. Menkveld just told you, used chlorinated

23   solvents, had a degreaser, actually two degreasers at this

24   property.

25          Major Tool, the Court has already found, is a BFPP

1  entitled to CERCLA liability protection for this property, and

2  I don't believe the record will reflect a date of any lease on

3  the property.  In fact, Ms. Weir, when asked about a lease,

4  wasn't aware of its terms or when it began.  There's no

5  evidence of this, and the Court's ruling on BFPP status for

6  that property should stand, and the considerable efforts of

7  Major Tool in removing over 4,000 tons of soil at that

8  property should be recognized.

9       Secondly, there's the Zimmer packaging property.

10 Not much to say about that, other than there is a comfort

11 letter associated with that property, and the Court has found,

12 as a matter of law, Major Tool and Machine is a BFPP with

13 respect to that property, as well.

14      And we've heard a whole lot in the litigation about

15 the Zimmer Paper property or what I believe we could aptly

16 call Moran north, because Moran is the only party other than

17 Zimmer that operated there, operated there from at least 1967

18 to 1984 while it owned the property.  And Mr. Walker has

19 referred to it in his report as the Moran Electric rewind

20 shop.

21      That property was operated both by Zimmer and Moran.

22 And at that property, Major Tool removed 7,350 tons of

23 impacted soil.  And as you heard from Mr. Vijay, he twice

24 requested a no-further-action letter, along with closure for

25 Ertel.  In fact, the City of Indianapolis, in its project

Vol. 6-1125

1  agreement with Major Tool, which is in evidence, agreed to

2  obtain closure on that property, along with the Ertel

3  property, as part of the overall redevelopment of the area.

4          Now, as to Ertel, we've seen the before pictures.

5  We've seen the after pictures.  It's an amazing success story.

6  37,000 tons of soil were removed from that property.  And not

7  only that, Major Tool and Machine requested a comfort letter,

8  which was issued by IDEM, related to that property, which

9  specifically sets out that Major Tool and Machine has met the

10  requirements for BFPP protection, and that site is closed.

11  IDEM has issued a no-further-action letter for that site.  It

12  is found in documents before this Court that the site no

13  longer poses a threat to human health or the environment.  And

14  in fact, IDEM has ordered that the monitoring wells associated

15  with that site be closed, and nothing else needs to be done.

16          Now, Major Tool and Machine built on that property,

17  including this vapor mitigation system, which we've talked

18  about at length, which is now operating in a passive state due

19  to the decreased levels of any vapor issues, and it built this

20  building.  And did it build this building to make parts and

21  make money?  Yes.  But it did something, which is more than we

22  can say for anyone else in this room.

23          THE COURT:  Is it in the plume, the big plume

24  picture?  Is that facility still in the plume?

25          MS. KRAHULIK:  It would be -- I would have to look

Vol. 6-1126

1   at the picture.  I would assume that where the building sits

2   is either at the edge or near, or it could be on it.

3               THE COURT:  In the plume map?

4               MS. KRAHULIK:  In the plume map of the vapor.  And

5   that's why it has a vapor mitigation system, Your Honor,

6   because IDEM wanted to protect against any vapor impacts to

7   the occupants of the building before it closed the property.

8               And, in fact, counsel for the former occupant of the

9   Von Duprin property went to IDEM in 2013 and said, "Hey, we

10  want what Ertel got.  What do we need to do that," and IDEM

11  responded with a comparison of the Ertel site, which had been

12  closed, and the Threaded Rod, the former Von Duprin site.  And

13  the contrast between the two is stark.

14              In conclusion of that letter, which was written by

15  one of our witnesses, Mr. Ryan Groves, he said there wouldn't

16  be any cleanup required at Threaded Rod, Von Duprin, if the

17  Ertel groundwater contamination was the only source of

18  contamination on the Threaded Rod/Von Duprin site, and he said

19  he looked forward to working with Threaded Rod to bring that

20  property to a remediation import point where, like Ertel, it

21  no longer poses a threat to human health and the environment.

22              Now, let's talk a little bit about the Von Duprin

23  property.  Von Duprin has also admittedly used chlorinated

24  solvents, degreasers in its operations.  Contamination was

25  first noted there in 2018, and no on-site remediation was

 1  undertaken until 2019.

 2          Mr. Fye, who testified, I thought, gave us a very

 3  good idea of the type of operations that Von Duprin and the

 4  specific mechanisms for some of the releases to the surface

 5  and into the groundwater there.  He talked about a large

 6  degreaser, a Detrex, I think, is what he called it, degreaser.

 7  And my favorite part about his testimony was when he told us

 8  that the degreaser was not only located within this footprint,

 9  but it was situated along the east wall of the Von Duprin

10  facility, smack up against Andrew J. Brown Avenue, and, in

11  fact, Your Honor, right where Von Duprin claims off-site

12  impacts from upgradient properties are coming onto their

13  property.

14          You've already heard a lot about this, but the

15  difference in the levels of contaminants at these properties

16  tells a real story.

17          Now, the Court has the, I guess, unenviable task of

18  figuring out how to divide the responsibility among the

19  parties in this case.  But as to Major Tool and Machine, at

20  every avenue -- and there are several different ways the Court

21  can get there -- the answer as to Major Tool is zero.

22          The Court can look at liability considerations.  And

23  as to liability, the Court would look at the BFPP protections,

24  could look at the fact that Von Duprin has not demonstrated

25  NCP compliance, and can find that the Major Tool defendants

Vol. 6-1128

1  should get a zero share of any responsibility, and the Court

2  could stop its analysis there as to Major Tool.

3           However, if the Court moves on to apportionment, it

4  can also find zero percent, and Rob Walker testified to that.

5           Likewise, if the Court considers allocation -- and

6  that's where equitable considerations come in, what's fair,

7  what's right -- certainly can come to a zero percent share for

8  Major Tool.

9           Let's talk, first, about the liability aspects of

10 this.  While the polluters want to try to poke holes in Major

11 Tool's BFPP defense, if we look at the CERCLA defenses,

12 including the BFPP defense, and the reason that Congress

13 enacted legislation with those defenses, it was enacted to

14 prevent barriers for parties like Major Tool from purchasing

15 and cleaning up these properties that others had contaminated

16 in industrial use.  It was to remove those barriers, remove

17 the fear of ending up somewhere just like this trying to

18 defend those actions, and it provided important protections to

19 give the parties purchasing those sites confidence.  And not

20 only did it provide those protections, but they needed to be

21 achievable.

22           As to Ertel, the Court has in the record now not

23 only the Phase I that was performed before a lease was ever

24 entered, a Phase I that was entered into before purchasing --

25 and the Court, by the way -- Mr. Griggs said the Court has

1  ruled that Major Tool is not a BFPP.  I actually think what
2  the Court has found is questions of fact remain for trial
3  regarding BFPP status.

4          And even not looking at these two environmental
5  investigations that Major Tool performed on that property,
6  IDEM answers the question for us.  IDEM issued a comfort
7  letter to Major Tool saying that it was a BFPP for the Ertel
8  property, eligible for the BFPP exemption from liability.
9  That other parties' deflections to the contrary are just that.

10         As to Zimmer, the Court has before it the Phase I
11 that was performed in November of 2006.  Major Tool took title
12 to that property just a couple of months later in January of
13 2007.  We believe it has been established that Major Tool is a
14 BFPP for the Zimmer property.

15         However, there was some question, I believe, at the
16 summary judgment stage, as to whether certain sections of the
17 Code of Federal Regulations had been complied with and the
18 performance of the Phase I investigation of the Zimmer Paper
19 property.  And, in fact, EPA has guidance on this very issue.
20 The EPA's final all appropriate inquiries rule finds that, if
21 a person conducts all appropriate inquiries and they use the
22 procedures that are outlined in the American Society for
23 Testing and Materials Standard applicable at that time -- and
24 in 2006, it was ASTM E1527-05, that complies with all
25 appropriate inquiries for purposes of BFPP protection or other

Vol. 6-1130

1    CERCLA liability protections.

2            The reporting requirements don't require that you

3    run through every CFR section.  But if you do cite the

4    applicable ASTM standard, you have complied, according to the

5    EPA guidance.

6            Now, I have to address this.  I think this is kind

7    of a red-herring type argument, because the other parties want

8    the benefit of this agreement, but then they want to argue and

9    try to use it against Major Tool for purpose of its BFPP

10   status.

11           It's been argued that the settlement agreement

12   between Moran and Major Tool is a disqualifier to BFPP status,

13   and that's simply not true, for a couple of reasons.  The

14   agreement itself states, in no uncertain terms -- and those

15   terms aren't redacted -- that it has no effect upon the claims

16   asserted by the parties in this specific litigation or

17   anything to do with the Von Duprin property.

18           Now, the EPA has, in fact, identified where certain

19   contractual relationships are disqualifiers for BFPP status,

20   and it has also identified specifically affiliations it does

21   not treat as disqualifying, and those include specifically

22   post-acquisition contractual relationships between a purchaser

23   of a property and a responsible party, like Moran, that came

24   into being after the purchase and sale of the property.

25   That's exactly what this is.  It's not a disqualifying

Vol. 6-1131

1   relationship.  And you note that there was no authority

2   provided for those assertions.

3           Mr. Menkveld talked about the National Contingency

4   Plan, and it's a very dry subject, but the fact of the matter

5   is, Von Duprin chose to bring its action for recovery of its

6   costs under CERCLA.  And as a result, it is absolutely

7   required to show that it complied with the NCP in order to

8   place liability on any other party.  It did not do so.

9           And we're not just talking about public

10  participation.  We are talking about multiple, multiple

11  sections of the NCP that were not complied with, and that

12  there's no evidence to demonstrate that Von Duprin's costs are

13  recoverable.  It didn't comply at all, let alone substantially

14  comply, Your Honor.

15          And when Von Duprin says they are not seeking costs

16  related to their site alone, Major Tool takes issue with that,

17  because we believe the vapor intrusion costs that are sought

18  in Von Duprin's recovery do relate to their site alone, based

19  on the magnitude of the contamination of that site, and that

20  those response costs would be required regardless of any

21  upgradient contamination.

22          Now, we got into the subject, I think, with

23  Dr. Love, a little bit, about allocation and apportionment.

24  And Von Duprin included this quote in one of its briefs, and I

25  think it's really helpful, because it explains it in terms at

Vol. 6-1132

1  least that I can understand, that apportionment is to request

2  separate checks, with each party paying only for its own meal,

3  and to allocate is to take that bill, unitemized, and ask

4  everyone to chip in what's fair.

5          Here, Your Honor, I would submit to the Court that

6  Moran and Von Duprin showed up, ate a big dinner, pushed back

7  from the table, and left the dishes for Major Tool to clean

8  up.

9          Von Duprin has argued that you can't consider

10  causation.  But that's just not the case.  In apportionment,

11  at the divisibility stage, causation comes into play.  And

12  parties can, in fact, be apportioned a zero percent share at

13  the divisibility stage.

14          In looking at apportionment as to Major Tool,

15  there's really two questions that have to be asked.  Is the

16  harm at issue capable of apportionment as to Major Tool?  The

17  answer is yes.  And then what portion of the harm, the harm,

18  is attributable to Major Tool?  And as Rob Walker testified,

19  that is zero percent.  And there's no evidence to the contrary

20  in the record.

21          Now, should the Court find that the liability

22  defenses or Von Duprin's failure to prove its compliance with

23  the NCP aren't enough, or that apportionment isn't enough as

24  to Major Tool, we get to allocation, and allocation brings in

25  equity, concepts of fairness.  It's allocating the relative

Vol. 6-1133

1   fault of the parties to that party.

2          We heard a lot about the Gore factors with respect

3   to allocation.  The Court can consider all of these factors;

4   it can consider some; it can give weight to whatever factors

5   it finds most applicable to the particular case.  However, I

6   would submit to the Court that multiple of these factors weigh

7   in favor of a zero percent finding of responsibility to Major

8   Tool.

9          In looking at these, the first is the ability of the

10  parties to demonstrate that fair contribution to a discharge

11  release or disposal of a hazardous substance can be

12  distinguished.  Major Tool had no contribution.  No one

13  asserts otherwise.  That leads to a zero percent conclusion.

14         The degree of involvement by the parties in the

15  generation, transportation, treatment, storage, or disposal of

16  the substance.  Major Tool had no involvement.

17         The degree of care exercised with respect to the

18  substance involved, taking into account the characteristics of

19  the substance.  Your Honor, you heard testimony and you've

20  seen documentation that, within a year, at most, of acquiring

21  each of these properties, Major Tool performed significant

22  remedial activities, has continued to monitor the properties,

23  and has asked for closure from the regulators.

24         And that plays into number 6, the degree of

25  cooperation with federal, state, or local officials.  There

1  was never any issue between Major Tool and IDEM until it

2  received a demand for compliance in 2018.  All of these things

3  that it's been doing have been in concert with regulators from

4  the very beginning and the start of the Ertel project.

5          There was a comment that Major Tool refused to let

6  Moran onto the property.  And, Your Honor, I believe Natalie

7  Weir testified that was because the plan that was being

8  presented would have, we believed, damaged the vapor

9  mitigation system, and we had to get comfortable and get a

10  court to order that the plan to perform that investigation

11  would not take away from the past efforts that had been made

12  on that site.

13          Now, I don't want the Court to leave this case with

14  the impression that, even if it, under any of these analyses,

15  gives zero to Major Tool, Major Tool has no further

16  involvement and just walks off into the sunset.  Major Tool's

17  good stewardship as a community member and as an employer and

18  as a property owner will continue.  In fact, Major Tool is

19  obligated to resolve its issues with IDEM and to obtain

20  closure on its properties and has every intention to do so.

21          Now, in looking at allocation, courts in the Seventh

22  Circuit and many other jurisdictions have found that where it

23  is the fair and equitable and right thing to do, a zero

24  percent allocation as to a party is appropriate.  That is both

25  in cases where the party had no involvement whatsoever with

1   the contamination and even in some cases where the property

2   owner had some minimal involvement, but not enough to rise to

3   the level of allocating it responsibility.

4        If you just look at fairness and what makes sense

5   and what is equitable, I think it is clear that the conclusion

6   as to Major Tool is that it should not be held liable.

7        Mr. Menkveld talked about orphaned shares, but I

8   just want to mention the fact that I believe, as the party

9   seeking recovery of costs in this action, Von Duprin bears the

10  burden of establishing that Zimmer Paper is either insolvent,

11  immune from suit, bankrupt, or doesn't have assets to satisfy

12  any judgment that would be rendered in this case.  And, in

13  fact, there's no evidence that's been presented to that.  And

14  Moran is a perfect example of this.  It is an administratively

15  dissolved corporation who is here.  So I believe the Court

16  should consider that in the allocation of any orphan share.

17  Simply not appearing in court doesn't mean it is an orphan

18  share.

19       And because the Court has found here that the harm

20  is divisible, as Mr. Menkveld stated, the burden of response

21  costs for any orphan share are to be borne by the party who

22  incurred them.  That's a ruling from the Fourth Circuit, and

23  any orphan share costs should be borne by Von Duprin.

24       Finally, I want to talk a little bit about Von

25  Duprin's costs, because I kept wondering where they were

Vol. 6-1136

1  during this trial.  March 2018 was the last update we received

2  as to any costs, and the reason offered for that at trial was

3  a discovery cutoff in this case.  However, even though the

4  parties couldn't proffer additional discovery requests after

5  that date, the obligations under the rules require each party

6  to continue to supplement their responses, and so I would

7  submit to the Court that all of those costs, up to the current

8  date and under existing discovery that was proffered long ago,

9  should have been provided, and weren't.  Again, Von Duprin has

10  not proven that its costs were necessary response costs, and

11  it hasn't demonstrated which costs were incurred in responding

12  to releases from upgradient properties as opposed to its own

13  property.

14        It also hasn't offered any documentary evidence of

15  attorneys' fees.  We've not seen any bills.  We've just heard

16  about settlement amounts and amounts that Von Duprin has

17  allegedly incurred, but there is no evidence in the record for

18  which the Court can consider that request for these.

19        I guess, in closing, there are many roads that the

20  road -- or many roads that the Court can take in considering

21  the responsibility in this case as to Major Tool, and they all

22  lead to a zero share conclusion.

23        Liability.  Major Tool has established liability

24  defenses.  Von Duprin has failed to prove their case under the

25  statute they chose to proceed under.

1          Under apportionment, it is possible to have a

2   zero percent share, and Mr. Walker says, as to Major Tool,

3   it's zero.

4          Allocation.  What's fair, what's right?  Major Tool

5   should not be held responsible for the mess that was created

6   by these other two parties who then walked away.  And, in

7   fact, I would ask:  What more could Major Tool have done?  Yet

8   we're here.  The effect of holding parties just like Major

9   Tool responsible after they've done everything at every step

10  of the way, tried to cover their bases, tried to help

11  situations, would disincentivize any redevelopment of

12  Brownfields and would continue the blight of neighborhoods.

13  We would not be able to acquire these without fear of ending

14  up a defendant in a lawsuit just like this one.  So any way

15  you slice it, Major Tool should not be held responsible for

16  any of Von Duprin's alleged damages.

17         Thank you.

18         THE COURT:  Thank you.

19         And, Mr. Griggs, you have about four minutes.

20              **CLOSING ARGUMENT BY**:

21         MR. GRIGGS:  Thank you, Your Honor.

22         Buying blighted Brownfields can result in CERCLA

23  liability under Section 107(a)(1).  To become the current

24  owner of contaminated property makes you liable.

25         Can you take special care to avoid that liability?

1  Yes.  That's what the BFPP and the innocent landowner defense

2  are about.  But the burden is on the person acquiring the

3  property to establish that they have done that correctly.

4  That didn't happen in this case three times, three different

5  properties.  They failed each time.

6          Major theorizes -- no evidence, just theory -- that

7  maybe the molecules from Ertel, Zimmer, and Moran didn't make

8  it down to those residential homes, even though they had

9  decades to get there, because the only evidence we have in the

10 soil and groundwater is essentially from around 2004 or '5

11 until 2017.  All the witnesses have indicated that they don't

12 know what happened before that.

13         You could see the mess in the pictures at Ertel.

14 That problem didn't happen the day before they left.  All of

15 these -- all of these industrial operations tended to have the

16 same problems.  I'm not surprised that all four of these

17 properties had releases that reached groundwater, because all

18 four of them operated in a similar fashion at the time.

19         So to say -- I mean, the only evidence in the record

20 is the molecules did get together in a single plume.  And once

21 they're together, you can't identify where they came from.  So

22 to say, "I shouldn't have to pay anything because you can't

23 prove that my molecules, the one that the person is breathing

24 at 1746 Alvord," I don't think is the correct analysis.

25         We heard that there was apportionment that occurred

1  in this case.  But if you remember the testimony of Dr. Love,

2  he says that he uses the words apportionment, allocation, and

3  divisibility interchangeably.  He doesn't know the difference.

4         He never said divisibility of the harm in his expert

5  report, not once.  He never said divisibility of the harm in

6  his deposition, which lasted hours, not once.  His errata

7  sheet, or errata letter, as it turned out to be, never

8  mentioned divisibility of the harm.  It's not until summary

9  judgment, in fact in a reply brief on summary judgment, that

10 an affidavit or declaration from Mr. Love was attached that,

11 for the first time, said, "I meant divisibility of the harm."

12 I'm not buying it.  Neither should the Court.

13        I think Mr. Menkveld misspoke.  He said Von Duprin

14 is the biggest contributor.  I think he meant the site,

15 because all the evidence in the case -- and they've been very

16 careful to guard this -- is that the work done by Mr. Love,

17 the allocation, is on a site-by-site basis, not on

18 a party-by-party basis.  He's not saying, I hope, that Von

19 Duprin, the plaintiff, should be assigned 54 percent.  All the

20 evidence is that the site, the Von Duprin site, might be

21 responsible for 54 percent.  And we know from Dr. Love and

22 others that there are nonparties, like dry cleaners, who are

23 not here, who may have operated on or near the Von Duprin

24 property and certainly would explain the large quantity of PCE

25 that is found there.

Vol. 6-1140

 1          We would ask the Court not only to use the Gore

 2   factors to equitably divide the liability among the parties,

 3   but we also have a second CERCLA count for declaratory

 4   judgment as to any future costs, that those would be divided

 5   by the Court as well.

 6          Thank you.

 7          THE COURT:  Thank you, Counsel.

 8          So, lawyers, when you do your proposed findings of

 9   fact, would you discuss the declaratory issue, also, all

10   right?

11          Okay.  Let's get some dates real quick.  The court

12   reporters -- we can have two methods.  We can do an aggressive

13   method and get you a ruling before September 30th or not.

14          Have any of you ever had a federal clerkship?  And

15   this is a big secret.  But in the federal system, cases that

16   are three years of age or older, we have to report those to

17   Congress, so our goal is to try to dispose of cases within the

18   three-year period.  This case will be three-year reportable on

19   September the 30th.

20          Now, if we can get you -- the court reporters, if we

21   go on the aggressive track -- and I'll let you guys tell me

22   which track you want to do.  If your clients want a ruling --

23   I'm sure that Ms. Weir probably wants to go on the fast

24   track -- but we can have the transcripts from the trial from

25   the court reporters -- David, can you think -- do you need two

Vol. 6-1141

1   weeks or three weeks?  I know it's a lot of complex terms.

2   The court reporter says he can do it in two weeks, so we can

3   have transcripts for you by August -- let's see --

4   August 15th.  And, then, lawyers, that would mean, if you

5   could get me your proposed findings of fact, if I give you

6   three weeks -- I could give you three weeks, September 5th, or

7   four weeks, September 12th.

8           MS. KRAHULIK:  Either is fine with the Major Tool

9   defendants.

10          MR. BOWMAN:  We would prefer the 12th.

11          THE COURT:  Can you do it by the 12th, Mr. Griggs?

12          MR. GRIGGS:  Yes, by the 12th, we can.

13          THE COURT:  All right.  If you guys can get your

14   proposed findings of fact and conclusions of law by September

15   the 12th, we'll get you guys a ruling by September the 30th,

16   so we'll do the aggressive track.

17          All right, Lawyers.  Is there anything else,

18   Lawyers, before we adjourn?

19          MS. KRAHULIK:  No, Your Honor.

20          MR. BOWMAN:  Thank you.  Nothing.

21          THE COURT:  Well, I just want to compliment you

22   lawyers.  You all did a very good job, and it was a pleasure

23   having you in court.  I appreciate your civility.  We had

24   these two opposing defendants sitting at the table together,

25   and you all did great.  And we were efficient.  Even though we

Vol. 6-1142

1  had some gaps, we were able to take care of other business,

2  all of us.  And you guys were very professional, so I do

3  appreciate having you all in court.

4          Does anyone know anything about JTV Hill, who the

5  JTV Hill Park is named after?

6          MR. KAMPLAIN:  No.

7          THE COURT:  JTV Hill was the first African-American

8  attorney to practice law in Indianapolis.  He wasn't the

9  first in the state of Indiana, but he was one of the first in

10 Indiana, and he went to what's now McKinney and graduated in

11 1882.

12         MS. KRAHULIK:  Oh, wow.

13         THE COURT:  So it's a big deal that we get that

14 court -- keep that facility clean and get rid of all that

15 contamination.

16         All right, Lawyers.  We are adjourned, and we'll get

17 an entry with all those deadlines, and we'll get this case

18 wrapped up shortly.

19         MR. BOWMAN:  Thank you, Your Honor.  It's been a

20 pleasure.

21         THE COURT:  Thank you all.

22         THE COURTROOM DEPUTY:  All rise.

23         (Proceedings adjourned at 2:41 p.m.)

24

25

Vol. 6-1143

1          CERTIFICATE OF COURT REPORTER

2

3        I, David W. Moxley, hereby certify that the

4   foregoing is a true and correct transcript from

5   reported proceedings in the above-entitled matter.

6

7

8   /S/ David W. Moxley_____   August 13, 2019.
    DAVID W. MOXLEY, RMR/CRR/CMRS
9   Official Court Reporter
    Southern District of Indiana
10  Indianapolis Division

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25