UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| VON DUPRIN, LLC, | ) |
| | ) CAUSE NO. |
| Plaintiff, | ) 1:16-cv-1942-TWP-DML |
| | ) |
| -vs- | ) |
| | ) Indianapolis, Indiana |
| MORAN ELECTRIC SERVICE, INC. | ) July 22, 2019 |
| MAJOR HOLDINGS, LLC, | ) 8:30 a.m. |
| MAJOR TOOL AND MACHINE, | ) |
| INC. and ZIMMER PAPER | ) VOLUME 1 |
| PRODUCTS INCORPORATED, | ) |
| | ) |
| Defendants. | ) |

**BEFORE THE**
**HONORABLE TANYA WALTON PRATT**

OFFICIAL REPORTER'S TRANSCRIPT OF

BENCH TRIAL

Court Reporter:    Cathy Easley Jones, RDR, FCRR
                   Official Court Reporter
                   46 East Ohio Street, Room 290
                   Indianapolis, IN  46204

PROCEEDINGS TAKEN BY MACHINE SHORTHAND
COMPUTER-AIDED TRANSCRIPTION

2

1                         **A P P E A R A N C E S**

2

3   FOR VON DUPRIN, LLC:          Edward S. Griggs
                                  Alexandra Robinson French
                                  BARNES & THORNBURG
4                                 11 South Meridian Street
                                  Indianapolis, IN  46204

5

6   FOR MORAN ELECTRIC           Glenn D. Bowman
    SERVICE, INC.:               Marc A. Menkveld
7                                STOLL KEENON OGDEN, PLLC
                                 201 North Illinois Street
8                                Suite 1225
                                 Indianapolis, IN  46204

9
                                 Bruce L. Kamplain
10                               NORRIS CHOPLIN & SCHROEDER LLP
                                 101 West Ohio Street
11                               Ninth Floor
                                 Indianapolis, IN 46204

12

13  FOR MAJOR HOLDINGS           Angela Pease Krahulik
    and MAJOR TOOL AND           Samuel B. Gardner
14  MACHINE, INC.:               ICE MILLER
                                 One American Square
15                               Suite 2900
                                 Indianapolis, IN  46282

16

17

18

19

20

21

22

23

24

25

3

1              **I N D E X   O F   W I T N E S S E S**

2                                                        PAGE

3     For The Plaintiff:

4     RUSSELL EILER
      Direct Examination by Mr. Griggs ...............16
5     Cross-examination by Mr. Bowman ................55
      Cross-examination by Ms. Krahulik ..............94
6     Redirect examination by Mr. Griggs ............106
      Recross-examination by Mr. Bowman .............108
7

8     JOHN WILLIAM MCINNES
      Direct Examination by Mr. Griggs ..............110
9     Cross-examination by Mr. Bowman ...............157
      Cross-examination by Mr. Gardner ..............166
10    Redirect examination by Mr. Griggs ............179

11    RYAN LOUIS GROVES
      Direct Examination by Mr. Griggs ..............186
12    Preliminary examination by Mr. Menkveld .......210
      Direct Examination (Cont.) by Mr. Griggs ......212
13

14

15

16

17

18

19

20

21

22

23

24

25

4

1                           I N D E X   O F   E X H I B I T S

2                                                           PAGE
        Joint Exhibit No.:
3
        1001 .........................................16
4       1002 .........................................16
        1003 .........................................16
5       1004 .........................................16
        1005 .........................................16
6       1006 .........................................16
        1007 .........................................16
7       1008 .........................................16
        1009 .........................................16
8       1010 .........................................16
        1011 .........................................16
9       1012 .........................................16
        1013 .........................................16
10      1014 .........................................16
        1015 .........................................16
11      1016 .........................................16
        1017 .........................................16
12      1018 .........................................16
        1019 .........................................16
13      1020 .........................................16
        1021 .........................................16
14      1022 .........................................16
        1023 .........................................16
15      1024 .........................................16
        1025 .........................................16
16      1026 .........................................16
        1027 .........................................16
17      1028 .........................................16
        1029 .........................................16
18      1030 .........................................16
        1031 .........................................16
19      1032 .........................................16
        1033 .........................................16
20      1034 .........................................16
        1035 .........................................16
21      1036 .........................................16
        1037 .........................................16
22      1038 .........................................16
        1039 .........................................16
23      1040 .........................................16
        1041 .........................................16
24      1042 .........................................16
        1043 .........................................16
25      1044 .........................................16

# INDEX OF EXHIBITS

PAGE

Joint Exhibit No.:

1045 .........................................16
1046 .........................................16
1047 .........................................16
1048 .........................................16
1049 .........................................16
1050 .........................................16
1051 .........................................16
1052 .........................................16
1053 .........................................16
1054 .........................................16
1055 .........................................16
1056 .........................................16
1057 .........................................16
1058 .........................................16
1059 .........................................16
1060 .........................................16
1061 .........................................16
1062 .........................................16
1063 .........................................16
1064 .........................................16
1065 .........................................16
1066 .........................................16
1067 .........................................16
1068 .........................................16
1069 .........................................16
1070 .........................................16
1071 .........................................16
1072 .........................................16
1073 .........................................16
1074 .........................................16
1075 .........................................16
1076 .........................................16
1077 .........................................16
1078 .........................................16
1079 .........................................16
1080 .........................................16
1081 .........................................16
1082 .........................................16
1083 .........................................16
1084 .........................................16
1085 .........................................16
1086 .........................................16
1087 .........................................16

1

# I N D E X   O F   E X H I B I T S

2
                                                    PAGE
Joint Exhibit No.:

3
1088 .......................................16
4   1089 .......................................16
1090 .......................................16
5   1091 .......................................16
1092 .......................................16
6   1093 .......................................16
1094 .......................................16
7   1095 .......................................16
1096 .......................................16
8   1097 .......................................16
1098 .......................................16
9   1099 .......................................16
1100 .......................................16
10  1101 .......................................16
1102 .......................................16
11  1103 .......................................16
1104 .......................................16
12  1105 .......................................16
1106 .......................................16
13  1107 .......................................16
1108 .......................................16
14  1109 .......................................16
1110 .......................................16
15  1111 .......................................16
1112 .......................................16
16  1113 .......................................16
1114 .......................................16
17  1115 .......................................16
1116 .......................................16
18  1117 .......................................16
1118 .......................................16
19  1119 .......................................16
1120 .......................................16
20  1121 .......................................16
1122 .......................................16
21  1123 .......................................16
1124 .......................................16
22  1125 .......................................16
1126 .......................................16
23  1127 .......................................16
1128 .......................................16
24  1129 .......................................16
1130 .......................................16
25  1131 .......................................16
1132 .......................................16

1          **I N D E X   O F   E X H I B I T S**

2                                                    PAGE
     Joint Exhibit No.:
3
     1133 .........................................16
4    1134 .........................................16
     1135 .........................................16
5    1136 .........................................16
     1137 .........................................16
6    1138 .........................................16
     1139 .........................................16
7    1140 .........................................16
     1141 .........................................16
8    1142 .........................................16
     1143 .........................................16
9    1144 .........................................16
     1145 .........................................16
10   1146 .........................................16
     1147 .........................................16
11   1148 .........................................16
     1149 .........................................16
12   1150 .........................................16
     1151 .........................................16
13   1152 .........................................16
     1153 .........................................16
14   1154 .........................................16
     1155 .........................................16
15   1156 .........................................16
     1157 .........................................16
16   1158 .........................................16
     1159 .........................................16
17   1160 .........................................16
     1161 .........................................16
18   1162 .........................................16
     1163 .........................................16
19   1164 .........................................16
     1165 .........................................16
20   1166 .........................................16
     1167 .........................................16
21   1168 .........................................16
     1169 .........................................16
22   1170 .........................................16
     1171 .........................................16
23   1172 .........................................16
     1173 .........................................16
24   1174 .........................................16
     1175 .........................................16
25   1176 .........................................16
     1177 .........................................16

1              **I N D E X   O F   E X H I B I T S**

2                                                      PAGE

Joint Exhibit No.:

3

   1178 ...........................................16
4  1179 ...........................................16
   1180 ...........................................16
5  1181 ...........................................16
   1182 ...........................................16
6  1183 ...........................................16
   1184 ...........................................16
7  1185 ...........................................16
   1186 ...........................................16
8  1187 ...........................................16
   1188 ...........................................16
9  1189 ...........................................16
   1190 ...........................................16
10 1191 ...........................................16
   1192 ...........................................16
11 1193 ...........................................16
   1194 ...........................................16
12 1195 ...........................................16
   1196 ...........................................16
13 1197 ...........................................16
   1198 ...........................................16
14 1199 ...........................................16
   1200 ...........................................16
15 1201 ...........................................16
   1202 ...........................................16
16 1203 ...........................................16
   1204 ...........................................16
17 1205 ...........................................16
   1206 ...........................................16
18 1207 ...........................................16
   1208 ...........................................16
19 1209 ...........................................16
   1210 ...........................................16
20 1211 ...........................................16
   1212 ...........................................16
21 1213 ...........................................16
   1214 ...........................................16
22 1215 ...........................................16
   1216 ...........................................16
23 1217 ...........................................16
   1218 ...........................................16
24 1219 ...........................................16
   1220 ...........................................16
25 1221 ...........................................16
   1222 ...........................................16

1          **I N D E X   O F   E X H I B I T S**

2                                              PAGE

Joint Exhibit No.:

3

1223 ..........................................16
4   1224 ..........................................16
1225 ..........................................16
5   1226 ..........................................16
1227 ..........................................16
6   1228 ..........................................16
1229 ..........................................16
7   1230 ..........................................16
1231 ..........................................16
8   1232 ..........................................16
1233 ..........................................16
9   1234 ..........................................16
1235 ..........................................16
10  1236 ..........................................16
1237 ..........................................16
11  1238 ..........................................16
1239 ..........................................16
12  1240 ..........................................16
1241 ..........................................16
13  1242 ..........................................16

14

15

16

17

18

19

20

21

22

23

24

25

**I N D E X   O F   E X H I B I T S**

                                                        PAGE

Defendant's Exhibit No.:

104 ........................................166

1      *(In open court)*

2              THE COURT:  Good morning, everyone.

3              We are on the record.  This is Von Duprin LLC,

4      plaintiff; and Von Duprin is also counterdefendant.

5              Our defendants are Moran Electric Service, Inc. and

6      Major Holdings LLC and Major Tool and Machine, Inc.; and the

7      defendants are also counterclaimants.

8              We are here this morning for a bench trial, and

9      we're going to begin by having counsel state your names; and I

10     believe lead counsel only are the ones who have the

11     microphones.  So if you have the microphone, would you

12     introduce yourself and everyone at your table, beginning with

13     plaintiffs.

14             MR. GRIGGS:  Good morning, Your Honor.  Sean Griggs,

15     Barnes & Thornburg, for Von Duprin.  With me is Alex French,

16     also Barnes & Thornburg, and Russ Eiler of Von Duprin.

17             THE COURT:  Okay.  Good morning.

18             And at our defendants' table.

19             MR. BOWMAN:  Good morning, Your Honor.  Glenn

20     Bowman, Stoll Keenon Ogden, counsel for Moran Electric.  Mark

21     Menkveld, with Stoll Kennon Ogden, is with me also.  Bruce

22     Kamplain of Norris Choplin Schroeder is also on record for

23     Moran Electric Service.

24             MS. KRAHULIK:  Angela Krahulik of Ice Miller, along

25     with Sam Gardner of Ice Miller; and Natalie Weir is sitting

1  behind us.  She is the CFO of Major Tool and Machine.

2          THE COURT:  Good morning everyone.

3          For the record, our court reporter is Cathy Jones.

4          Our case number is 1:16-cv-1942.  As the Court

5  stated we are here for a bench trial.

6          Counsel, you did file very informative and well

7  written and very thorough pretrial briefs, which the Court has

8  had an opportunity to review.  So thank you very much for

9  that.  It put everything in perspective, each parties' claims.

10 So the Court has an idea -- a very good idea of what each

11 party is going to attempt to prove over the next few days.

12         And lawyers, plaintiff is going to go first; and

13 defendants, you-all were going to work out your order of

14 proof.  Have you figured that out?

15         MR. BOWMAN:  Yes.  Moran will go second, and then

16 Major will go third.

17         THE COURT:  Okay.  Very good.

18         All right.  Are there any matters before we get

19 started?

20         MR. KAMPLAIN:  Your Honor, may we please have use of

21 our laptops?

22         THE COURT:  You have permission to use your laptops,

23 as long as nothing rings out.  Okay.

24         All right.  Anything else?

25         Okay.  All right.  Mr. Griggs.  Come on up.

1          MR. GRIGGS:  Your Honor, we jointly submitted a set

2 of exhibits that have been agreed --

3          THE COURT:  Those are these?  Sorry.

4          MR. GRIGGS:  There are separate sets for each party

5 and a common set of joint exhibits.

6          THE COURT:  Okay.  The joint exhibits are the

7 binders.  Tanesa has them marked for me, 1 through 5 and 6

8 through 10.

9          MR. GRIGGS:  I think all you have is an exhibit list

10 from each of the parties.

11          THE COURT:  And these over here are exhibits that

12 are not agreed upon.

13          MR. GRIGGS:  Right.

14          THE COURT:  Very good.  Do you want to offer the

15 joint ones into evidence?

16          MR. GRIGGS:  That was my point, yes.

17          THE COURT:  Any objection?

18          MR. BOWMAN:  Yes.  There is an objection, and it's

19 noted on the joint exhibit as submitted in June and then

20 recently.

21          This is an environmental case involving lots of data

22 gathered by environmental scientists; and we have before the

23 Court a data set that counsel have agreed upon, although I

24 believe there might be some issues over it, but there's lots

25 of data that for better or for worse, we'll have to take the

1   Court through.

2          Through the process of that sort of data collection,

3   environmental scientists sometimes put statements in those

4   reports that within the context of 701 versus 702 would be

5   considered, we believe, expert opinion.  And so with agreement

6   of all counsel, we've discussed -- in an effort to be

7   efficient and get this before the Court, we have a joint set

8   but simply have said to the extent that counsel asks to admit

9   an environmental report, there are certainly -- and I have

10  found some statements within those that I think the Court

11  would consider expert opinion if we brought it out.  But

12  they're voluminous.  And so before trial, we were unable to

13  identify any and every one of those.

14          THE COURT:  So you're saying during trial, if they

15  discuss an exhibit that you believe is one that's calling for

16  an expert opinion, you may object?  Is that what you're

17  telling me?

18          MR. BOWMAN:  Object to certain statements within

19  that report or testimony to be elicited from the consultant

20  that was involved in that work.  I mean, the data that's in

21  the report -- the reports have data, and the reports have

22  protocols of how the data was collected.  That's very

23  important, and that's fact.

24          If that environmental scientist then decided at that

25  time -- nothing wrong with it -- to decide where did that

1 contamination come from, who caused it, where is it going, we

2 believe those are 702 kinds of opinions, that the reports

3 themselves are appropriate fact reports with important facts

4 for the Court.

5          I don't want to be long-winded.  We looked at this

6 issue, and I'm sure Mr. Griggs would want to address it; and I

7 feel maybe I'm getting long-winded, but there is some guidance

8 in federal court on CERCLA cases on where to draw the line

9 between environmental reports that are fact and then how it

10 then may get into 702.  Thank you.

11          THE COURT:  Did you want to respond?

12          MR. GRIGGS:  Only to say that the joint stipulation

13 of exhibits that was submitted to the Court as part of the

14 court docket includes a caveat at the end to the effect that

15 Mr. Bowman is talking about.  All the parties agreed to that

16 caveat.  I don't think anything further needs to be said about

17 it.

18          THE COURT:  Okay.  I agree.

19          Are you fine with that also, Ms. Krahulik?

20          MS. KRAHULIK:  Yes, thank you.

21          THE COURT:  All right.  So the Court notes that you

22 may have some concerns or objections and that you've

23 stipulated for limited purposes on some exhibits; and if it

24 comes up that you need to bring anything to the Court's

25 attention, Mr. Bowman, then you should do that, okay?

1          MR. BOWMAN:  I'll pop up.

2          THE COURT:  All right.  I'm sure you will.

3          MR. GRIGGS:  Your Honor, other than that or with

4    that objection, can we consider those joint exhibits to be

5    admitted?

6          THE COURT:  The joint exhibits are admitted pursuant

7    to stipulation of the parties.

8          MR. GRIGGS:  Thank you.

9      *(Joint Exhibits 1000 through 1042 were received in*

10   *evidence.)*

11         MR. GRIGGS:  We're prepared to call our first

12   witness.

13         THE COURT:  You may call your first witness.

14         MR. GRIGGS:  We would call Russell Eiler.

15         THE COURT:  Mr. Eiler, if you would come right up

16   here to the witness stand.

17         Sir, if you would remain standing and raise your

18   right hand.

19     *(Witness sworn.)*

20         THE COURT:  Once your witness is comfortable, you

21   may begin your examination.

22         **RUSSELL EILER, PLAINTIFF'S WITNESS, SWORN**

23              **DIRECT EXAMINATION**

24   BY MR. GRIGGS:

25   Q   Good morning.  Please state your name.

EILER - DIRECT/GRIGGS                              17

1   A    Russell Eugene Eiler.

2   Q    Who is your current employer?

3   A    Schlage Lock Company LLC.

4            THE COURT:  Can you have the witness spell his last

5   name for me?

6            THE WITNESS:  My last name is Eiler, E-I-L-E-R.

7   BY MR. GRIGGS:

8   Q    Would you please explain the relationship between Schlage

9   Lock Company LLC and the plaintiff in this case, Von Duprin

10  LLC?

11  A    Von Duprin LLC was merged into Schlage Lock Company LLC in

12  around late 2017.  It was formerly the parent company of

13  Von Duprin LLC.

14  Q    And that occurred after this lawsuit was filed?

15  A    That's correct.

16  Q    What type of business is Schlage Lock Company?

17  A    Schlage Lock Company makes locks, door locks, entry

18  hardware for residential and commercial applications.  We make

19  extra devices, door closures, doors themselves.

20  Q    What is your current position at the company?

21  A    I hold the role of director of global environmental health

22  and safety compliance.

23  Q    And what job responsibilities go with that title?

24  A    I am responsible for compliance with environmental and

25  safety rules and regulations across our company.  Schlage Lock

EILER - DIRECT/GRIGGS                    18

1  is a subsidiary or has a parent that's Allegion plc, which is

2  a global company.  I'm responsible for ensuring our compliance

3  with local, state, and federal regulations at all of our

4  operations, both current and former operations, throughout the

5  world.  That includes remediation.

6  Q   How long have you been working with environmental

7  consultants?

8  A   I've worked with environmental consultants off and on for

9  around 20 years.

10  Q   What's your educational background?

11  A   I have an associate's degree in chemistry, and I have a

12  bachelor of science in forensic science.

13  Q   Do you have any other professional certifications?

14  A   I do.  I have -- among others, I am a certified hazardous

15  materials manager.

16  Q   What experience do you have with chlorinated solvent

17  sites?

18  A   I've been -- throughout the years that I've been in this

19  role, I've worked on several chlorinated solvent sites within

20  our operations for probably around eight years.  I've been off

21  and on, most heavily in the last five years.

22  Q   When did you first become involved with the environmental

23  actions related to the former Von Duprin property?

24  A   In late 2010, I received a communication from our then

25  corporate parent at the time, indicating that there was a

EILER - DIRECT/GRIGGS                    19

1    lawsuit pending and that I was requested to produce as many

2    documents to them as I could find.

3           I was at the Von Duprin facility working at that

4    facility from 1997 through 2011, and so I was in a position to

5    know where the documents were located and stored as well as

6    any history that might be related to the previous facility.

7    We did move into a new facility in 1986, so I was at the new

8    facility.  The old facility is the one that we're discussing

9    here.

10   Q   Just to be clear, you didn't work at the former Von Duprin

11   facility at 1929 Columbia Avenue?

12   A   That's correct, I did not.

13   Q   Can you tell the Court generally what Von Duprin's

14   corporate policy is as it relates to managing environmental

15   regulatory issues?

16   A   Generally speaking, we take a proactive stance to ensure

17   that we comply with any regulations, any government requests,

18   any timely submittals of information requests or demands.  One

19   of our values is to do the right thing, and so we try to be

20   protective of the communities that we work and live in.

21   Q   And does that apply both to your current facilities and to

22   any former facilities that you were involved in?

23   A   Yes, it does.

24   Q   Are you familiar with what's referred to as the plume area

25   in which the Von Duprin property is situated -- the former

EILER - DIRECT/GRIGGS                        20

1  Von Duprin property?

2  A    Yes, I am.

3         MR. GRIGGS:  I would like to put up Joint

4  Exhibit 1001 on the screens.

5  BY MR. GRIGGS:

6  Q    Can you see that, Mr. Eiler?

7  A    Yes, sir, I can.

8  Q    There.  It looks a little bigger now.

9  A    Um-hum.

10 Q    Can you identify the former Von Duprin property?

11 A    The former Von Duprin property is highlighted here in

12 green, which is near the center of the page that's on the

13 screen and slightly to the left of center.

14 Q    Okay.  And just so we can identify the key properties

15 here, can you identify where the former Ertel property is?

16 A    The former Ertel property is highlighted in yellow.

17 However, there's several places highlighted in yellow, but

18 it's the centermost northernmost section or the top of the

19 page here.  It's that particular property.

20 Q    I see a dot rolling around there.  Is that you or somebody

21 else?

22 A    That's not me, but that is exactly where it is.

23        THE COURT:  Do you know the address?  I'm familiar

24 with the area, by the way.

25        THE WITNESS:  Okay.  I don't have the address

EILER - DIRECT/GRIGGS                    21

1   committed to memory; but it's north of 20th Street, which is

2   north of the Von Duprin property in green.

3            THE COURT:  I went to St. Rita's Grade School and

4   church as a kid.

5   BY MR. GRIGGS:

6   Q   Mr. Eiler, how about the former Zimmer Paper property, can

7   you identify where that's at?

8   A   The former Zimmer Paper property is located just south of

9   the Ertel property.  It's highlighted in orange on the map

10  that's shown on the screen.

11  Q   And there are two different items in orange.  It's the top

12  of the two; is that correct?

13  A   Correct.  Correct.

14  Q   And then finally, the former Moran property.

15  A   The former Moran property is the southern or the bottom

16  orange portion of that map that's near the center of the page.

17  It's below the Zimmer Paper property and to the right of the

18  Von Duprin property.

19  Q   Thank you.  Have you been involved in retaining and

20  managing environmental consulting work in the plume area?

21  A   Yes, I have.

22  Q   Would it be correct to say that you were Von Duprin's

23  point man for the plume area work?

24  A   Yes.

25  Q   In that capacity, did you review and approve work plans?

EILER - DIRECT/GRIGGS                        22

1  A   I did.  Yes, I did.

2  Q   Did you review and approve sampling results?

3  A   Yes.

4  Q   Did you review and approve reports to IDEM about the work?

5  A   Yes, I did.

6  Q   Did you review and approve invoices for the work being

7  performed?

8  A   Yes.

9  Q   Did you also correspond and/or meet with IDEM staff about

10 the plume area work?

11 A   Yes, I did.

12 Q   Was there any particular person at IDEM that you primarily

13 dealt with?

14 A   Yes.  Our project manager for this particular project is

15 and continues to be Ryan Groves who works for IDEM.

16 Q   How did or has Von Duprin responded to IDEM's request

17 related to the former Von Duprin property?

18 A   We've responded with open communication.  We've

19 continually tried to do what they had requested.  We've had

20 several meetings through our communications.  There's been

21 telephone conferences as well as in-person meetings.

22       We've received a special notice of liability back in

23 August of 2013, and there was a request at the time for a

24 history; and we have complied with that request.

25       And since that time, we've been -- attempted to be

EILER - DIRECT/GRIGGS                      23

1  proactive once we determined what the facts were with respect

2  to, I think, groundwater contamination.  So we were proactive

3  in taking care of any requests such as soil vapor

4  investigations.

5          MR. GRIGGS:  I would like to put Exhibit 1010 on the

6  screen, please.

7  BY MR. BOWMAN:

8  Q    Do you see that, Mr. Eiler?

9  A    Yes.

10 Q    Is that the 2013 Special Notice of Potential Liability and

11 Request For Information letter from IDEM to Von Duprin?

12 A    Yes, it is.

13 Q    At what point did Von Duprin begin performing

14 environmental response actions at the former Von Duprin

15 property or in the plume area?

16 A    It was early 2014.  I would guess around February of 2014.

17 We were asked to take care of the -- I think the word is "to

18 investigate" the plume area for the residents and ensure that

19 any soil gas -- there was some data that was available that

20 indicated that the concentration of trichloroethylene in the

21 groundwater could lead to vapor intrusion into homes.  And so

22 we stepped up and ensured that we did some door knocking.  We

23 had our consultants do door knocking and asked for access to

24 do sampling of the homes and then followed through to the

25 results; and if any of the results indicated mitigation was

EILER - DIRECT/GRIGGS                    24

1  necessary, then we ensured that that was occurring where we

2  were given access.

3  Q   Was someone else already investigating the plume area when

4  Von Duprin received the 2013 special notice letter?

5  A   Yes.  As I understand it, Threaded Rod Company was given a

6  Special Notice of Potential Liability letter in 2009; and they

7  were ordered by IDEM to begin the investigation.  So they had

8  been -- they had employed another consultant, August Mack, to

9  do some of the work, including the soil vapor analysis that I

10 had spoke of earlier.

11 Q   So I want to be clear.  Was Threaded Rod supposed to do

12 the vapor -- soil vapor work or was Von Duprin supposed to do

13 that work?

14         MR. BOWMAN:  Objection, foundation.  Hearsay.

15         THE COURT:  Do you have a response?  He's saying it

16 would be hearsay.

17         MR. GRIGGS:  I think the question was probably

18 compound and certainly half of it can't be hearsay.

19         THE COURT:  So why don't you uncompound it, and then

20 we'll see if he has an objection.

21 BY MR. GRIGGS:

22 Q   Mr. Eiler, was Von Duprin instructed by IDEM to do

23 investigation related to the vapor intrusion issue?

24 A   Yes.

25 Q   What was the relationship between Threaded Rod and

EILER - DIRECT/GRIGGS                          25

1   Von Duprin when Von Duprin received the 2013 Special Notice of

2   Liability letter?

3   A    There was a lawsuit that was filed by Threaded Rod against

4   Von Duprin.

5   Q    And you're familiar with that lawsuit?

6   A    Yes, I am.

7   Q    You mentioned that Von Duprin took action related to, I

8   think you said, the vapor intrusion issue?

9   A    Correct.

10  Q    Can you be more specific and tell the Court what it is

11  that Von Duprin did?

12  A    Von Duprin learned of the plume area, the size of the

13  plume area, the potential vapor intrusion for the -- for the

14  trichloroethylene or TCE, as we call it.  Our first responses

15  were to collect the addresses for the homes that needed to be

16  contacted or the names and addresses of the residents that

17  needed to be contacted.

18       Following the -- that collection, there was door

19  knocking.  As I mentioned, we would go address or approach the

20  homeowners to let them know what was going on, try to educate

21  them on what the concerns were, and at the same time try to

22  gain access in order to do -- continue an investigation.

23       In this particular instance, we would do an indoor air

24  investigation.  There would be a sampler that would be placed,

25  whether it would seven days or 24 hours.  We would collect the

EILER - DIRECT/GRIGGS                          26

1  new air samples, send those to the lab.  That analysis would

2  be returned to us.  There is a standard that is in place for

3  those particular chemicals.  Each one has their own set of

4  standards; and if we were above those standards or we were

5  above the immediate action levels, then we would approach the

6  homeowner and let them know that the results are indicating or

7  not indicating that they need a mitigation system.  In other

8  words, we would need to help remove some of the contaminants

9  from the indoor air of their homes.

10  Q    When did Geosyntec become involved with the work?

11  A    Geosyntec became involved around July of 2014.

12  Q    How does that time frame relate to the vapor intrusion

13  work that you described?

14  A    Some of the homes, specifically on Yandes Street, had

15  already been sampled.  There were several of those homes that

16  needed to be mitigated or needed to have systems installed to

17  remove the indoor air contaminants.  We were with a different

18  consultant at the time.  It was -- we needed to switch

19  consultants because our relationship with the other consultant

20  had gone sour, and so Geosyntec was the company that we

21  switched to.  They were able to accommodate us immediately,

22  and they helped us install the first mitigation systems.

23        In addition to that, they also continued to address or

24  approach the residents that we had not been successful in

25  doing so in the past and continued to sample and continued to

EILER - DIRECT/GRIGGS                    27

1  install mitigation systems where necessary.

2  Q    Was the vapor intrusion investigation and mitigation work

3  the only work that Von Duprin was doing in the plume area?

4  A    No.  We had -- we had continued to address groundwater,

5  meaning that we had -- we needed to delineate or to find the

6  boundary of the plume itself for the different constituents of

7  concern, whether it be the PCE, TCE, or DCE or others.

8        We also would do a vertical delineation to determine

9  how deep the contaminants might have gone.  We did this both

10  upgradient and downgradient of the Von Duprin facility -- or

11  Von Duprin property.

12  Q    Was the Von Duprin property entered into any kind of

13  formal IDEM program?

14  A    In the beginning, we were in the formal State Cleanup

15  Program.  As I indicated earlier, our project manager was Ryan

16  Groves.  So we were part of the State Cleanup Program, yes.

17  Q    And did Von Duprin continue participating in the State

18  Cleanup Program as it began conducting its environmental

19  response actions?

20  A    We did.  We stayed in that program throughout.  At some

21  point, we did switch to the Voluntary Remediation Program.

22  Q    Did you get a new IDEM project manager when you made that

23  switch?

24  A    No.  Ryan Groves maintained as our project manager after

25  the switch from the State Cleanup Program to the Voluntary

EILER - DIRECT/GRIGGS                    28

1  Remediation Program.

2  Q    What steps did Von Duprin take to enter into the Voluntary

3  Remediation Program?

4  A    In the summer of 2016 following the settlement with

5  Threaded Rod, we moved our project -- we had taken at that

6  point full -- we had taken over what Threaded Rod had started.

7  So we were now in full control, if you will, of that portion

8  of the on-site portion.

9         And so in the summer of 2016, I completed an

10 application for the Voluntary Remediation Program.  There was

11 some back and forth with respect to our negotiations on the

12 Voluntary Remediation Agreement.  And most of those

13 negotiations related to timing:  What report comes first?  How

14 long do we have in order to submit the report?  What's the

15 review time, et cetera.

16        And then once those negotiations were completed, we

17 were accepted into the program.  Our Voluntary Remediation

18 Agreement was signed I believe in December.  We were accepted

19 in November of that same year -- November of 2016, and then it

20 was signed officially in December of 2016.

21 Q    Did this transition from State Cleanup Program to the

22 Voluntary Remediation Program change in any fashion

23 Von Duprin's work and commitments?

24 A    No, it did not.  We had continued to do the same work.  We

25 now had a more formal structure related to timing.  Other than

EILER - DIRECT/GRIGGS                    29

1  that, we continued to do exactly what we had committed to.

2  Q   And as part of the commitment that Von Duprin made, did

3  you develop a remediation work plan for soil at the former

4  Von Duprin site?

5  A   Yes, we did.

6          MR. GRIGGS:  If we can have Exhibit 1057.

7  BY MR. GRIGGS:

8  Q   Is that up on your screen?

9  A   Yes, it is.

10 Q   Is that the Remediation Work Plan dated April 2018?

11 A   Yes, it is.

12 Q   And did you submit that work plan to IDEM for approval?

13 A   Yes, we did.

14 Q   Did IDEM, in fact, approve that work plan?

15 A   We received a partial approval, yes.  There was some

16 concern about our Remediation Work Plan being approved because

17 it did not address all facets of the contamination.  It only

18 addressed soil.  So we received what they referred to as a

19 partial approval.

20         MR. GRIGGS:  Can we have Exhibit 1058.

21 BY MR. GRIGGS:

22 Q   Is this a letter addressed to yourself with a re line,

23 "Partial Remediation Work Plan Approval From IDEM,

24 November 2018"?

25 A   Yes, it is.

EILER - DIRECT/GRIGGS                          30

1  Q   Is that the approval that you were referring to a moment

2  ago?

3  A   Yes.

4  Q   In the process of IDEM's review of the RWP, was the

5  Remediation Work Plan made available for public comments?

6  A   Yes, it was.

7  Q   Do you know if anyone made comments regarding the proposed

8  Remediation Work Plan?

9  A   There were no comments.

10  Q   Not even from the defendants in this case?

11  A   No, sir.  There were no public comments from anyone.

12  Q   Did Von Duprin move forward and, in fact, complete the

13  work described in the partial work plan approval?

14  A   Yes, we did.  We finished the work in early April, if you

15  wouldn't count the fact that we had the waste shipped off in

16  April; but the work was completed around the end of March of

17  2019.

18  Q   You mentioned this related to on-site soil; is that

19  correct?

20  A   That's correct.

21  Q   What other media are we concerned about in the plume area

22  besides soil?

23  A   Groundwater.

24  Q   And you mentioned vapor intrusion.  Is that related to

25  groundwater or something else?

EILER - DIRECT/GRIGGS                    31

1  A    It is related to groundwater.

2           MR. BOWMAN:  Objection.  I think now we're getting

3  into an issue of expert opinion from a fact witness.

4           MR. GRIGGS:  The witness has testified that he has

5  experience at numerous chlorinated solvent sites.  How

6  molecules get from groundwater to houses is within his common

7  knowledge in his position.

8           THE COURT:  I'll overrule.

9  BY MR. GRIGGS:

10  Q    So you were saying that it's related to groundwater?

11  A    It is related to groundwater, and groundwater typically is

12  a transport mechanism for chlorinated solvents contamination.

13  If they get into the groundwater, then they are able to move

14  to other locations downgradient; and once they're in that

15  particular media, then they have the potential to off-gas into

16  structures -- we call them preferential pathways.  Those

17  pathways make a short circuit to perhaps a basement or to a

18  city manhole or some other conveyance that will allow the

19  vapors to go into homes, and that's where the vapor intrusion

20  concerns are.  It's related to homes, but it's also related to

21  businesses.

22           And so yes, the indoor air component typically can be

23  remedied short term with mitigation systems but in long term

24  is potentially with some sort of removal process of that -- in

25  the groundwater itself -- to that contaminant in the

EILER - DIRECT/GRIGGS                                    32

 1  groundwater itself.

 2  Q    I want to get back for a moment to the partial Remediation

 3  Work Plan for soil at the former Von Duprin site --

 4  A    Okay.

 5  Q    -- because I want to make this clear for the Court.  Is

 6  Von Duprin seeking to recover in this lawsuit any of the costs

 7  related to the work that it did cleaning up soil at the former

 8  Von Duprin property?

 9  A    No, sir.

10  Q    You believe that that is your responsibility, and that's

11  your cost to bear?

12  A    That's correct, yes.

13  Q    Has Von Duprin received any demands to address soil gas

14  contamination at the Ertel property?

15  A    No, we have not.

16  Q    Or soil at the Ertel property?

17  A    No, we have not.

18  Q    Has Von Duprin received any demand to address soil or soil

19  gas contamination at the Moran property?

20  A    No, we have not.

21  Q    Just to complete the trilogy here, has Von Duprin received

22  any demand to address soil or soil gas contamination at the

23  Zimmer Paper property?

24  A    No, we have not.

25  Q    What has your role been related to the financial aspects

EILER - DIRECT/GRIGGS                     33

1  of Von Duprin's environmental response in the plume area?

2  A   With respect to consultants or IDEM or any waste, I'm the

3  person that approves the invoices.  So the process starts

4  with -- especially with consultants, that we would receive --

5  we have a need, and then we would ask for a proposal.  The

6  proposal would come to me.  I would review the proposal.  I

7  would submit a request for a purchase requisition or a PO.

8  The requisition itself would ultimately generate a PO.

9          Once the work is completed, the invoice would be sent

10  to me as well; and then I would review it for technical and

11  both compliance as well as to ensure that they would --

12  there's a -- the spend matches what was in the proposal, that

13  they would meet the obligations of the proposal itself and

14  ensure that the invoice was then submitted for payment.

15  Q   Do you have firsthand knowledge of the total environmental

16  cost incurred by Von Duprin related to the plume area?

17  A   Yes, I do.

18  Q   What is it?

19  A   It's -- as of the date that we -- around the end of the

20  time when discovery with respect to this, kind of drawing a

21  line in the sand when we're trying to determine the total

22  damages, if you will, it was around 3.2 million, if I recall;

23  $3.2 million.

24  Q   And just so it's clear in the record, there was a

25  discovery cutoff date in this case after which point we

EILER - DIRECT/GRIGGS                            34

1   stopped producing new documents?

2   A    Um-hum, yes.

3   Q    Do you remember what date that was?

4   A    I think it was the end of March in 2018; March 31st, 2018.

5   Q    So the costs that you're referring to were incurred prior

6   to or up to March 31, 2018?

7   A    Correct, and that's up to -- would include consultants,

8   waste disposal as well as IDEM oversight costs.

9   Q    Does Von Duprin have occasion to engage services of

10  environmental consultants on a regular basis?

11  A    Yes, we do.

12  Q    When you retain environmental consulting services, what is

13  the evaluation or selection process like?

14  A    We have to establish a relationship with a consulting

15  agency or a consulting firm.  I've worked with several

16  throughout the years.  We've worked best with Geosyntec; but

17  our process is that we ensure that they meet our standards,

18  they can agree to our financial terms, that their portfolio

19  shows that they've had experiences in the area that we're

20  looking to accomplish, as well as they need to have the

21  breadth and depth within their ranks in order to ensure that

22  we have the coverage that we need on a project or multiple

23  projects.

24       And typically, we would look at the consultants as a

25  relationship.  We have a relationship with them.  It's a

EILER - DIRECT/GRIGGS                          35

1  professional relationship, but it's also we have to get to

2  know each other and so we have to work well together from that

3  perspective.

4  Q    Does the company have its own technical staff?

5  A    We do.

6  Q    And what role does the in-house technical staff play in

7  this evaluation and selection process?

8  A    We review both the qualifications of the company as well

9  as qualifications of individuals that may work on the project.

10 We look at past experiences; and we ensure that we're going to

11 get the best bang for our buck, if you will.

12 Q    Has the company worked with Geosyntec at any other sites

13 besides the one at issue in this case?

14 A    We have.  I had previously worked with Geosyntec when we

15 were owned by a different company.  We had a different parent

16 company; and I had worked with Geosyntec on different sites

17 throughout the U.S.

18        So when we spun from the other parent company and

19 became our own standalone, Allegion, we also inherited some

20 other consulting firms.  So at that time, we needed to make

21 some changes because we weren't getting the kind of service

22 that we needed or we deserved or we had been used to.

23        So we had transitioned a couple of projects to

24 Geosyntec prior to this Von Duprin facility, and so I had

25 worked with Geosyntec in the past.  And I think this was

EILER - DIRECT/GRIGGS                    36

1  our -- Von Duprin was our third project for them as Allegion

2  itself.

3  Q    Did Geosyntec issue invoices for the work that it was

4  performing for Von Duprin at the site and in the plume area?

5  A    Yes, they did, usually monthly.

6  Q    Did you or anyone else at Von Duprin review these invoices

7  before they were paid?

8  A    Yes, I did.

9  Q    And can you describe what that process involved?

10 A    I typically take the invoices and review them from a total

11 cost perspective, look for the hours that were worked or

12 billed against the project.  I would look for invoices and

13 make sure that any expenses were marked up accordingly or any

14 contractors -- we have two different markups for two different

15 types of costs.  So I would ensure that those prices seemed

16 reasonable and then ensure that the markups were accurate and

17 that the hours worked matched the hours expected and then, of

18 course, the billing rates were appropriate.

19         Once those were reviewed -- once the invoices were

20 reviewed, then I would process them for payment.

21 Q    Did anyone else review these invoices prior to payment?

22 A    Prior to payment, yes and no.  There was -- we do review

23 these projects on a quarterly basis with our senior

24 management.  The controller has a visual snapshot of what we

25 spend on these projects, particularly, this project.  The vice

1  president and general counsel, who is our in-house attorney,

2  keeps his thumb on the pulse with respect to costs, and then

3  our business units have an eye for this.  So we do -- and of

4  course, my immediate supervisor reviews the overall spends,

5  not necessarily the individual invoices.  So --

6  Q    Prior to receiving the individual monthly invoices, were

7  you aware of what work was being performed during that month

8  or the prior month or did you have to see it on the invoice?

9  A    Yes, I was aware.  I have weekly calls with Geosyntec, and

10  we discuss projects.  This is one that we discuss.  I also

11  stay in constant contact with our consultants.

12       In addition to that, Geosyntec is -- quite frequently

13  joins us in our meetings with IDEM, as well as -- whether it

14  be an in-person meeting or a teleconference.  So they will

15  join in on that.

16       Then we have regular touch points related to -- the

17  results come back.  I'll get a phone call or we'll have a

18  discussion related to the results of an investigation, yes.

19  Q    And if -- Geosyntec I believe you said began work in

20  August of 2014?

21  A    July, yes.

22  Q    July of 2014?

23  A    Correct.

24  Q    You have a pretty big stack of invoices from them by now?

25  A    I do, yes.  Well, there's a lot of invoices because

EILER - DIRECT/GRIGGS                    38

1   there's a lot of months; but there's also several projects

2   involved.  We typically try to maintain good granularity by

3   having individual POs for different projects.  So I might get

4   eight invoices for this project that I'm on.  It's very rare,

5   but there's been upwards of eight, I think; but that allows me

6   to give it a focus.

7            And then the reason they're voluminous is because all

8   expenses and all contractual agreements that they have with

9   other subs, if you will, they have to -- they're required to

10  attach supporting documentation.  So --

11            MR. GRIGGS:  Can we have Exhibit 1017, please.

12            This may take a second to load.

13            Faster than I thought.

14  BY MR. GRIGGS:

15  Q   This is Exhibit -- Joint Exhibit 1017.  It is 2,683 pages

16  long.  So we're going to go through it page by page --

17  actually, we're not.

18            THE COURT:  I know you're not.

19  BY MR. GRIGGS:

20  Q   Mr. Eiler, did you, in fact, do a summary of these

21  invoices to make it easier to understand what the Court's

22  looking at here?

23  A   We did.  I did not personally; but yes, I was involved in

24  the summary.

25  Q   Did you review the summary to make sure that it was

EILER - DIRECT/GRIGGS                    39

1    accurate?

2    A    It appeared accurate.  Yes, I did review it.

3              MR. GRIGGS:  Let's look at Exhibit 107.

4              This is not a joint exhibit.  This is a

5    demonstrative for Von Duprin.

6              Let's scroll down to the bottom if we can.

7    BY MR. GRIGGS:

8    Q    This is three pages long.  The columns don't repeat.

9              MR. GRIGGS:  I'm sorry, David.  I'm going to have to

10   ask you to go back to the top.

11   BY MR. GRIGGS:

12   Q    Mr. Eiler, can you look at the headers, the tops of these

13   columns, and explain what it is that we're seeing here and how

14   it relates to the Joint Exhibit 1017?

15   A    Yes.  So invoice numbers are -- typically begin with the

16   year -- project rather.  So when we look at some of these

17   project -- it starts with the invoice number.  The second

18   column is the date of the invoice.

19             Then we've broken it out into it looks like four

20   different categories.  Legal support, that's services

21   performed in support of the trial, as I recall; then

22   professional services, communication fees, and then

23   reimbursable expenses.

24             The total of those actually turns into the sixth -- I

25   guess it would be the seventh column, which is the current

1  invoice total; and then the Bates number is at the end.

2  Q   Okay.  The first four entries here all appear to have the

3  same invoice date, April 15th, 2017.  Why is that?

4  A   As I indicated earlier, there were different projects

5  within the project.  So we would have -- we try to maintain

6  some kind of sanity when it comes to looking through the

7  invoices.

8       So we put them in buckets because if there's something

9  going on, whether it be groundwater delineation that may have

10 been occurring, or perhaps it could have been a vapor

11 intrusion mitigation system at a residence, or it could have

12 been working on a summary -- pardon me -- as a summary of

13 whatever we're working on with respect to the legal support,

14 those were three different buckets that we tried to keep

15 separate.  So therefore, they have different POs.

16      So in order to make sure that we have some clarity on

17 what's being spent, those invoices are all submitted on a

18 monthly basis, but one PO per invoice.  So we keep those

19 separate for that reason.  They all have different invoice

20 numbers, but they do have the same date; and we don't list the

21 PO number here, but the purchase order number would be

22 different for each one.

23 Q   The current invoice total I think is pretty clearly --

24      MR. GRIGGS:  I need those headings a little longer.

25

EILER - DIRECT/GRIGGS                                    41

1  BY MR. GRIGGS:

2  Q   That's the amount that's the bottom line on the invoice,

3  right?

4  A   That's correct.  That's the sum of the previous four

5  columns.

6  Q   Is it the previous four or the previous three?  I'm not

7  great at math on the fly, but it looks like --

8  A   It would be the previous three.  The legal support amount

9  is left out of the total.  You're right.

10  Q   Because it's already included in one of the other columns;

11  is that correct?

12  A   Yes.

13  Q   It was pulled out for reasons I'm sure the defendants will

14  be happy about.

15         MR. GRIGGS:  Let's go to the bottom.

16  BY MR. GRIGGS:

17  Q   Can you find on the spreadsheet what the total amount of

18  the Geosyntec invoices that Von Duprin had paid through

19  March 31 of 2018?

20  A   $3,165,690 -- I'm sorry.  I read that wrong.

21         $3,165,960.88.

22  Q   And when you testified earlier approximately $3.2 million,

23  this is the number that you were thinking of?

24  A   Yes.  Yes.

25         And the date -- you'll notice the invoice dates.

EILER - DIRECT/GRIGGS                       42

1  Perhaps some of them say invoice date of 4-15.  That's because

2  we end the month, and then 15 days later is the date of the

3  invoice.  So these are past March 31st, but the invoice date

4  is April 15th; but the work was through March 31st.

5  Q   And we caught those April 15th invoices in our production?

6  A   That's correct.

7  Q   The column third from the left, the "Legal Support"

8  column, that's totaled out separately.  Can you tell the Court

9  why?

10 A   It is, because as I understood, it could be construed as

11 legal fees; and it would not be reimbursable in a lawsuit.

12 Q   So did you do a subtraction from the 3.165 million to get

13 a lower number?

14 A   Yes, we did.  It's $2,477,610.63.

15 Q   Is that the total amount paid to Geosyntec, less legal

16 support fees?

17 A   Through March 31st, 2018, yes.

18 Q   Okay.  Thank you.

19       And does it include some of the costs that are related

20 to the work that Von Duprin did at the Threaded Rod site

21 concerning soil and soil gas?  This is everything that you

22 paid them, right?

23 A   Yes, I believe so.  Yes, it is.

24 Q   And so to get to the amount, did you do some sort of

25 analysis or have some sort of analysis done to try and back

EILER - DIRECT/GRIGGS                    43

1  out the costs related to the Threaded Rod soil and soil gas?

2  A   Yes, we did.  I believe so.

3  Q   And did you come up with a number less than the

4  2.477 million that relates to the groundwater investigation,

5  both upgradient and downgradient, and the soil -- sorry -- the

6  vapor intrusion mitigation work?

7  A   Yes, but I don't have that number committed to memory.

8  Q   Did you also receive invoices from IDEM related to this

9  project?

10 A   I did, yes.

11         MR. GRIGGS:  If we can get Exhibit 1018, please.

12 BY MR. GRIGGS:

13 Q   Did those also come on, roughly, a monthly basis?

14 A   A little less frequent, but yes, they did.  They

15 typically -- there were gaps in the invoicing due to

16 communications with IDEM or that may have not been there for a

17 month.  Traditionally, they were monthly invoices, yes.

18         MR. GRIGGS:  Can we get that any bigger on the

19 screen?

20         Thank you.  Perfect.

21 BY MR. GRIGGS:

22 Q   Mr. Eiler, is that what a typical invoice from the

23 state -- or Indiana Department of Environmental Management

24 looks like?

25 A   Yes, it is.

                    EILER - DIRECT/GRIGGS                    44

1  Q    And this one looks to be relatively small.

2  A    Yes, it does.

3  Q    And looks like there are approximately 70 pages in this

4  exhibit?  Does that sound about right?

5  A    It does.

6  Q    Did you also assist in compiling a summary of these

7  invoices?

8  A    Yes, I did.

9          MR. GRIGGS:  Let's look at 108, please.

10 BY MR. GRIGGS:

11 Q    I think this is a little simpler than the earlier

12 spreadsheet that we looked at, just four columns.  Can you

13 describe what we're seeing here?

14 A    These are the invoices from IDEM related to oversight for

15 the project.  The first column is "Invoice Number," then

16 second column, "Invoice Date," "Invoice Total"; and then

17 finally, the last column is the Bates number.

18 Q    And these are all the invoices that Von Duprin had

19 received and paid up through the discovery cutoff in this

20 case?

21 A    That's correct.

22 Q    And can you tell the Court what the total is for those

23 invoices?

24 A    $38,945.80.

25 Q    Has Von Duprin continued to receive invoices from IDEM for

EILER - DIRECT/GRIGGS                          45

1   IDEM's work?

2   A   Yes, we have.

3   Q   And have you continued to receive invoices from Geosyntec

4   after March 31, 2018?

5   A   Yes, we have.

6   Q   And since those costs were not includable in the past cost

7   number because of the discovery cutoff, those would be

8   considered either an interim or future cost as far as this

9   suit is concerned?

10  A   Yes, that's correct.

11  Q   But you're still going to seek those?

12  A   That's correct.

13  Q   Is Geosyntec still incurring costs to address soil gas in

14  the plume area?

15  A   Yes, they are.

16  Q   That's not done?

17  A   It's not done.

18  Q   Has Von Duprin also incurred legal fees related to the

19  former Von Duprin property and the plume area?

20  A   Yes, we have.

21  Q   Do you know whether the company regularly engages outside

22  legal services?

23  A   Yes, we do.

24  Q   But you do have in-house legal counsel, correct?

25  A   Correct.

EILER - DIRECT/GRIGGS                    46

1   Q    Why do you hire outside legal counsel?

2   A    In-house legal counsel typically would handle the

3   one-offs, the -- maybe a project; but when they get into

4   larger projects such as this one -- I would call this a large

5   project -- then they would need to seek the advice of outside

6   counsel or the support of outside counsel because there is not

7   enough bandwidth in that person's day.  We don't have a

8   significant or a large in-house legal team, but we do have

9   some specific expertise; and we would -- that particular lead

10  in-house counsel would then become, if you will, a project

11  manager for this case or a case manager.

12         The external or the out-of-house legal team would then

13  report to that in-house counsel.

14  Q    So is litigation one of the special skill sets that you

15  outsource?

16  A    Yes.

17  Q    Are you aware or involved in any fashion in the review

18  process for legal invoices?

19  A    I am not.  I'm aware of the process, but I am not part of

20  the process itself.

21  Q    So you're not the one approving a legal invoice.  That

22  goes to somebody else?

23  A    That is correct.  I am not involved.

24  Q    Let's talk about -- you mentioned in the early part of

25  your testimony that there was a lawsuit brought by Threaded

EILER - DIRECT/GRIGGS                    47

1   Rod against Von Duprin; is that correct?

2   A    That is correct.

3   Q    Can you recall what Threaded Rod was seeking to recover

4   from Von Duprin?

5   A    In terms of dollars?

6   Q    Just why were you being sued?

7           MR. BOWMAN:  Objection.  Foundation, hearsay.

8   Complaint will speak for itself.

9           MR. GRIGGS:  Exhibit 1088 -- Joint Exhibit 1088.

10          This is probably obvious, Judge Pratt.  All the

11  four-digit exhibits are the joint ones.

12          THE COURT:  Okay.

13          MR. GRIGGS:  Anything with three digits is not a

14  joint exhibit.

15          THE COURT:  We need it bigger.

16  BY MR. GRIGGS:

17  Q    We lost the caption, but we got the first paragraph.

18          Can you tell from what's on the screen or what you saw

19  on the screen before this got blown up what this is?

20  A    This is a lawsuit brought by Threaded Rod Company against

21  several insurers:  IDEM, Moran Electric, Ingersoll Rand,

22  Paramount Hardware and Von Duprin LLC.

23  Q    And are you familiar with this amended complaint?

24  A    Yes, I am.

25  Q    Can you generally describe what it is that Threaded Rod

EILER - DIRECT/GRIGGS                              48

1  was seeking with respect to Von Duprin?

2  A    Threaded Rod alleged at the time that they did not, nor

3  had never used any chlorinated solvents; and as the seller of

4  the property, that Von Duprin had liability to defend them in

5  a lawsuit related to environmental contamination, and

6  Von Duprin was brought into the suit because we were the

7  seller of the property.

8  Q    So we're talking about which piece of property?

9  A    I'm sorry, the Von Duprin property, 1929 Columbia Avenue.

10  Q    The one that was in green on Exhibit 1001?

11  A    That's correct.

12  Q    What relationship did Threaded Rod have to that property?

13  A    Threaded Rod was at the time the current owner of that

14  property.  They had purchased the property from Von Duprin

15  back in 1986, closing date on or about 1987, in that area; and

16  they were the current owner at the time the lawsuit was

17  brought.

18  Q    Were they alleging that the property had been

19  contaminated?

20  A    Yes.

21  Q    And that Von Duprin had something to do with that?

22  A    Yes.  I'm sorry.  Could I get some water, please?

23  Q    Sure.

24            MR. GRIGGS:  May I approach?

25            THE COURT:  Yes.

1        I think your microphone fell off.

2        MR. GRIGGS:  Thank you.

3   BY MR. GRIGGS:

4   Q   Good?

5   A   Yes, thank you.

6   Q   We've talked about the reason that Threaded Rod wanted to

7   recover from Von Duprin.  Do you know what amount of money

8   they wanted to recover?

9   A   I believe it was around $3.1 million.

10  Q   Just because you used to own the property?

11       MR. BOWMAN:  Objection.  Hearsay.

12       MR. GRIGGS:  I'll rephrase.

13       THE COURT:  You may rephrase.

14  BY MR. GRIGGS:

15  Q   Did -- were you told --

16  A   Yes.

17  Q   -- and have firsthand knowledge of what the basis was for

18  them asking you to pay millions of dollars?

19  A   Yes.

20  Q   What was that?

21  A   Past costs, damages, and attorneys' fees, as I recall.

22  Q   So they had paid for something?

23  A   Yes.  They had received the notice -- a special Notice of

24  Liability in 2009, as I indicated; and so IDEM had demanded

25  that they do investigations.

1          And so they had established a well network.  They had

2    indicated -- I think they had installed roughly 44 wells --

3    monitoring wells that had been sampled on a regular basis --

4    an ongoing basis to monitor the plume.

5    Q   So this is the work that had been done that you talked

6    about before you got -- before Von Duprin got involved, some

7    work had already been done?

8    A   Correct.

9    Q   And that had been done by Threaded Rod?

10   A   Yes, that's correct.

11   Q   Were you asked to review any of the evidence or

12   documentation of these alleged costs that Threaded Rod wanted

13   Von Duprin to pay?

14   A   Yes.  I did review those.

15   Q   And again -- don't want to get too deep into the weeds

16   here -- generally, what did you learn from those documents?

17          MR. BOWMAN:  Your Honor, I have to object to this.

18   We're talking about documents in a prior lawsuit with basis of

19   alleged damages.  So my formal objection is one of foundation,

20   lack of foundation for this witness, and supporting documents

21   for these alleged damages.

22          MR. GRIGGS:  Your Honor, we're talking about

23   technical documents which this witness has shown that he has

24   competence to review and evaluate.  That was part of his job

25   for his company, and he carried it out.  We would like him to

1  be able to describe what he learned.

2          THE COURT:  Could you establish a foundation -- a

3  stronger foundation?

4          MR. GRIGGS:  I can try.

5          THE COURT:  Let's see if you can do that.

6  BY MR. GRIGGS:

7  Q   Were you asked by your company in your role as a technical

8  manager of environmental projects to review certain

9  documentation and evidence that Threaded Rod alleged they had

10 incurred in investigating the site and the surrounding area?

11 A   Yes.

12 Q   And what did you learn from that investigation?

13         MR. BOWMAN:  Objection.  Foundation.  Again, the

14 concern is -- I have a concern over foundation.  He's talked

15 about documents that this witness has seen as a fact witness

16 talking about -- I don't know whether we're talking about

17 environmental.  I don't know if we're talking about invoices.

18         Clearly, the effort is to get all of those

19 discussions relating to this prior lawsuit in; and at least at

20 this point, I don't think we have those documents available.

21 So we have this gentleman is going to summarize documents that

22 he reviewed that we don't have in front of us.

23         THE COURT:  Do you have the documents, Mr. Griggs?

24         MR. GRIGGS:  The documents are not part of the

25 record in this case.

1              THE COURT:  Okay.

2              MR. GRIGGS:  I believe that the amount that was paid

3    as part of the settlement is of record.

4              I think there's a better way to ask the question

5    that avoids the foundation objection.

6              THE COURT:  All right.  Why don't we try that.

7    BY MR. GRIGGS:

8    Q    After a settlement was reached between Threaded Rod and

9    Von Duprin, did Von Duprin have access to and ownership rights

10   in any of the work that had been performed by Threaded Rod?

11   A    Yes, we did.  That was part of the settlement agreement.

12   Q    What did you get?

13   A    We received ownership of the wells, ownership of the data

14   from past sampling events, and ownership of any knowledge that

15   was related to the past investigations, which included

16   reports.

17   Q    Did that -- did having those wells and having that data

18   have any benefit to Von Duprin?

19   A    Yes.  It was done -- it absolutely did.  There were wells

20   that were installed that didn't necessarily have to be done

21   again.  So that was a cost avoidance.  We basically bought the

22   wells, so we didn't have to install additional wells.  Those

23   wells will be used throughout the coming years when it comes

24   to remediation as well as monitoring the remediation itself,

25   doing sampling on a regular basis, depending on what the

EILER - DIRECT/GRIGGS                    53

1    remedy is chosen.  These wells cover a portion -- not a

2    significant portion but a portion of the plume area.

3           So yes, the benefit was there.  We were able to use

4    the data that was received in the past, and we were able to

5    use those in a final investigation report.

6    Q   Had IDEM provided oversight and approval of the

7    installation of the wells that Threaded Rod did?

8    A   Yes, they did.

9    Q   And subsequent -- once you acquired -- Von Duprin acquired

10   ownership of those wells, did IDEM continue to accept those

11   wells as providing valid data useful to the investigation?

12   A   Yes, they did.

13   Q   How much money did Von Duprin pay to Threaded Rod to

14   acquire the wells and sampling data?

15   A   Approximately $1.5 million.  In fact, I think it was

16   exactly $1.5 million.

17   Q   Was Von Duprin the only one to benefit from having these

18   wells and this data available?

19   A   No.

20   Q   Have others used that data and those wells or data from

21   those wells?

22   A   I think overall, we've used the data to define the

23   commingled plume and to monitor the plume and will continue to

24   do so in the future, so yes.

25   Q   Has IDEM relied upon the information from those wells?

EILER - DIRECT/GRIGGS                    54

1  A   Yes, IDEM has relied upon it.

2  Q   Does that well network I guess you would call it -- does

3  it extend both upgradient from Von Duprin and downgradient

4  from Von Duprin?

5  A   Yes.

6  Q   Did Von Duprin have to install wells of its own?

7  A   Yes, we did.

8  Q   So despite having obtained these wells from Threaded Rod,

9  there was still investigation to be done?

10 A   There was still investigation to be done, but there was

11 also the need for additional wells to define the boundaries of

12 the plume.  I believe there are a total of 52 wells in our

13 monitoring network that we'll call it, and 44 of those -- 44

14 were used -- 44 were purchased and 44, I believe, are being

15 used in that monitoring network.

16         MR. GRIGGS:  Your Honor, I have no further questions

17 for this witness on direct examination but may have additional

18 redirect or cross-examination questions at a later time.

19         THE COURT:  All right.  You may.  Do you want to

20 take a break?  Let's take ten minutes, and then we'll do

21 cross-examination.

22         COURTROOM DEPUTY:  All rise.

23     (A recess was taken.)

24         THE COURT:  You may be seated.  We're back on the

25 record.

*EILER – CROSS/BOWMAN*                              55

1          Counsel, you may come on up, Mr. Bowman, and begin

2    your cross-examination of the witness.

3          MR. BOWMAN:  Thank you, Your Honor.

4                    **CROSS-EXAMINATION**

5    BY MR. BOWMAN:

6    Q    Mr. Eiler, Glenn Bowman, counsel for Moran Electric.

7    A    Good morning.

8    Q    For the benefit of the Court, these questions are based

9    upon your investigation and knowledge but your investigation.

10         It is indeed the case that we're talking about

11   chlorinated solvents, correct?

12   A    That's correct.

13   Q    That's our constituent of concern.  There are two kinds of

14   chlorinated solvents generally used historically, as you found

15   at Von Duprin, one being tetrachlorethylene?

16   A    Correct.

17   Q    And we sometimes call that PCE, correct?

18   A    Yes, with a P.

19   Q    And there's also trichloroethylene or ethene I think it

20   may be.

21   A    Trichloroethylene or trichloroethene, they are the same

22   chemical.

23   Q    Okay.  And that is sometimes called TCE?

24   A    TCE, with a T, correct.

25   Q    And as you've conducted your investigation --

*EILER – CROSS/BOWMAN*                    56

1   investigations for Von Duprin, you understand that these

2   chlorinated solvents were used to clean metal, correct?

3   A   Correct.

4   Q   A term that's sometimes used, they were degreasers?

5   A   Correct.

6   Q   And as you found at Von Duprin -- we'll get into that --

7   there could be different machines that used these degreasers

8   to degrease the parts, is that right?

9   A   That is correct.

10          MR. GRIGGS:  Objection, Your Honor.  I want to

11   object that I believe these questions are beyond the scope of

12   direct.  I'm wondering if Mr. Bowman has transitioned into his

13   direct examination of this witness.

14          THE COURT:  Have you, Mr. Bowman?

15          MR. BOWMAN:  I believe that my questions were within

16   direct and his examination, which is why I said "examination."

17   That's a good point.

18          Do you want me to limit this at this point to just

19   cross-exam questions?

20          THE COURT:  You're allowed to do both.  Do you want

21   to start with your cross or do you want to just start with

22   your direct?

23          MR. GRIGGS:  I believe until he designates he's now

24   asking direct exam questions, he's limited to what was asked

25   on direct.

EILER - CROSS/BOWMAN                    57

1              MR. BOWMAN:  Then this will be cross.

2              THE COURT:  When you're ready to switch over, you

3    may.

4              MR. BOWMAN:  Thank you.

5              MR. GRIGGS:  I'm sorry.  Was there a ruling on the

6    objection as to the question that he asked that was beyond the

7    scope of direct?

8              THE COURT:  Well, what was the question?

9              So your objection, counsel was -- you really didn't

10   object.

11             The question was, "What relationship did Threaded

12   Rod have to that property" -- maybe I'm at the wrong spot.

13   Okay.  Here we go.

14             MR. BOWMAN:  Can I respond, Your Honor?

15             THE COURT:  You may.

16             MR. BOWMAN:  The witness testified he conducted an

17   investigation.  I was going to ask him about that

18   investigation, believing it was within cross.  Anything he did

19   as part of his investigation I thought was covered in direct.

20   I may go farther than you did, but he conducted an

21   investigation.  I was going to talk about that

22   investigation -- ask him about that.

23             MR. GRIGGS:  (Inaudible.)

24             COURT REPORTER:  Excuse me, Mr. Griggs.  Your

25   microphone is not on.

EILER - CROSS/BOWMAN                    58

1          THE COURT:  We don't have that question.  So ask a

2    new question, and we'll see if he objects to the new question.

3          And you're cross-examining?

4          MR. BOWMAN:  Right.

5    BY MR. BOWMAN:

6    Q    Okay.  Let's go to Exhibit 1010.  This was a Special

7    Notice of Liability letter you've testified regarding earlier,

8    Mr. Eiler, correct?

9    A    That's correct.

10   Q    And you saw this letter?

11   A    Yes, I did.

12   Q    I won't bring it up, because we don't need to go through

13   that; but you testified that in 2010, the Threaded Rod

14   complaint was filed; and that was your first involvement; is

15   that correct?

16   A    That is correct.

17   Q    From 2010 until the Special Notice of Liability letter was

18   received, did Von Duprin conduct through itself or through

19   Geosyntec any investigation at the former Von Duprin property?

20   A    No, we did not.

21   Q    This Special Notice of Liability letter triggered an

22   investigation; and at that time, was your effort to determine

23   whether Von Duprin used chlorinated solvents?

24   A    Yes, it was.

25   Q    Did that investigation include an effort to determine

1  whether Von Duprin used TCE versus PCE?

2  A   Yes, it did.

3  Q   Did you attempt to determine when those chlorinated

4  solvents were used?

5  A   Yes, we did.

6  Q   The effort was to determine where within the former

7  Von Duprin facility the chlorinated solvents might have been

8  used?

9  A   Yes, that's correct.

10  Q   Did you attempt to determine what kind of equipment was

11  used by Von Duprin --

12        MR. GRIGGS:  Objection, Your Honor.  These questions

13  are clearly leading.  He's still on cross.  If he wants to

14  move to direct and ask leading questions, I think he needs to

15  indicate that.

16        THE COURT:  Well, on cross he can ask leading.  So

17  that objection is overruled.

18        Go ahead.

19  A   I'm sorry.  Could you repeat the question?

20        THE COURT:  Your last question was, "Did you attempt

21  to determine what kind of equipment was used by Von Duprin?"

22        THE WITNESS:  Yes, we did.

23  BY MR. BOWMAN:

24  Q   And your investigation did indeed uncover facts confirming

25  that Von Duprin used chlorinated solvents at the former

*EILER – CROSS/BOWMAN*                          60

1  Von Duprin property, correct?

2  A   There were no indications confirming that.

3  Q   No evidence?

4  A   There was no indications that were concrete that we used

5  at the facility.  There were no process maps.  There were no

6  work instructions that were found.  There were no documents.

7  There were no witnesses that were deposed that could state

8  that other than one, other than one person.

9  Q   Who was that?

10 A   Michael Fye.

11 Q   F-Y-E?

12 A   Correct.

13 Q   Former employee of Von Duprin?

14 A   Correct.

15 Q   Before we move on from Exhibit 1010, while this Notice of

16 Liability letter came in in August of 2013, I believe your

17 testimony is Geosyntec was not retained until 2014?  Is that

18 the case?

19 A   That is correct.

20 Q   As part of your investigation, did you determine when

21 Von Duprin started operations at the former Von Duprin

22 property?

23 A   Yes.  The Special Notice of Potential Liability letter

24 also included a request for information, and that request for

25 information yielded a report that gave the corporate history

*EILER – CROSS/BOWMAN*                               61

1   for Von Duprin.  So yes, we were able to determine when we

2   started operating.

3   Q    What report was that?

4   A    It was the report that was submitted as a response to the

5   request for information.

6   Q    Okay.  Report by Geosyntec provided that?

7   A    It was a report by counsel.

8   Q    Okay.  And when did Von Duprin start operations at the

9   former Von Duprin property?

10  A    1965.

11  Q    And what were the precise -- as you conducted this

12  investigation, what were the operations that you learned were

13  conducted there?

14  A    The operations varied over the years.  Early on, it was

15  machining and some assembly.  It's not exactly clear as to

16  what went on at that facility for a number of years because

17  unfortunately, there was two locations.  So a lot of memories

18  have been crossed over, mixed up, kind of clouded.

19        But those -- there was machining and stamping; and as

20  time passed, they added additional operations at the facility

21  itself at 1929 Columbia Avenue.  There was painting,

22  electroplating, and then some assembly.  The assembly was

23  later moved, and there were other processes brought in as

24  expansions occurred.

25  Q    Doors were manufactured by Von Duprin there, correct?

EILER – CROSS/BOWMAN                              62

1  A    Actually, no; door openers or exit devices, hardware.

2  Q    Hardware for doors?

3  A    Yes, correct.

4  Q    And you learned that those parts were fabricated there?

5  A    Yes, some.  Some parts were purchased, yes.  There was

6  some fabrication.

7  Q    And you learned that parts were painted there, correct?

8  Correct?

9  A    That is correct.

10 Q    Did you determine how the parts were prepared to be

11 painted and cleaned prior to being painted?

12 A    Not directly.  I know that there was a cleaner that was

13 used.  I don't know -- through the depositions, through the

14 people that I knew that had worked at the previous facility.

15 I don't know exactly.

16        There was a testimony under deposition by Michael Fye

17 that there was a solvent that was used.  He was not clear on

18 which solvent it was, and I know that there was a painting

19 operation that was wet paint.  So there was solvent that was

20 used in the application of the paint as well.

21 Q    Did you uncover documents that shows that a Detrex,

22 D-E-T-R-E-X, degreaser was used?

23 A    There was a document that was uncovered that showed that

24 there was a Detrex degreaser that was being sent off for

25 waste, if I recall.

*EILER – CROSS/BOWMAN*                                    63

1  Q   Relating to the former Von Duprin property, correct?

2  A   That's correct.  I know there were no documents uncovered

3  that showed any process maps or any process steps.

4  Q   Do you know when the operations fund for Von Duprin ceased

5  at the former Von Duprin property?

6  A   Around August of 1986.

7  Q   Thank you.

8       MR. BOWMAN:  I would like to pull up Exhibit 1051,

9  please.

10 BY MR. BOWMAN:

11 Q   This is a memorandum, Geosyntec to Michael Anderson, Ryan

12 Groves at IDEM, relating to summary of residential vapor

13 intrusion assessment sampling and results 1929 Columbia

14 Avenue, Indianapolis, Indiana.

15      Have you seen that before?

16 A   Yes, I believe so.  It's been several years.

17 Q   In the second paragraph, it says that, "Von Duprin

18 retained Geosyntec in July of 2014 and requested assistance

19 with the vapor intrusion assessment and mitigation of five

20 residential houses southwest of the site."

21      Do you see that?

22 A   Yes, I do.

23 Q   This clarifies some of your previous testimony, but I

24 bring that forward to be clear.

25      Geosyntec was involved at this time to simply look at

EILER - CROSS/BOWMAN                        64

1   vapor in homes downgradient of the Von Duprin property,

2   correct?

3   A    That is correct.

4   Q    At this time, you had not tasked Geosyntec to try to

5   determine the nature and extent of impacts from the

6   contamination of Von Duprin property, correct?

7   A    Not at this time, that's correct.

8           MR. BOWMAN:  I would like to pull up Exhibit 1104.

9   BY MR. BOWMAN:

10  Q    This is -- do you recognize this letter?

11  A    Yes, I do.

12  Q    I believe -- if you scroll down to the end, I think you

13  may be shown as a recipient.  The last page.  You may be a

14  recipient on this.  Not last page; last page of the letter.

15  A    There, yes.

16  Q    I think you were a recipient of this letter, right?

17  A    This letter is addressed to me, yes.

18          MR. BOWMAN:  Go back to the first page, please.  If

19  you scroll down a little bit, please.

20  BY MR. BOWMAN:

21  Q    What this letter says is that -- well, I'll ask you.

22          What did you understand this letter to say to

23  Von Duprin?

24  A    Initially, when we received this letter, I had received

25  the letter in, I think, September of 2010, indicating that the

*EILER – CROSS/BOWMAN*                                65

1  corrective action complete final decision was finished.  This

2  is the recision letter, and it indicated to us that they had

3  found additional information.

4  Q    So while Von Duprin had received a closure under the

5  federal Resource Conservation Recovery Act --

6  A    Correct.

7  Q    -- what the letter says -- if you look at the third

8  paragraph, it says, "It has come to my intention that this

9  site, also known as Threaded Rod, conducted an environmental

10 investigation, the site being conducted by current owner,"

11 correct?

12 A    That's correct.

13 Q    They then cite a number of reports that are the basis for

14 the recision of the prior agency action, correct?

15 A    Correct.

16 Q    One of those reports is the Mundell report, Columbia

17 Baseline Assessment Report, December 29, 2008, with a VFC

18 number.  Do you see that?

19 A    Yes, I do.

20 Q    And this letter cites that Mundell report relating to soil

21 and groundwater contamination attributable to the Von Duprin

22 Threaded Rod site, correct?

23 A    I can't answer that question.  I don't have the report in

24 front of me.

25 Q    It says, "The following documents accessible via IDEM's

EILER – CROSS/BOWMAN                    66

1  virtual file cabinet" -- I'm, Mr. Eiler, basically reading the

2  letter -- "provide information relating to soil and

3  groundwater contamination attributable to the

4  Von Duprin/Threaded Rod site"; and then they cite Mundell?

5  A   That's correct.  They do cite Mundell.

6  Q   Did you at the time you received this letter pull up and

7  look at the Mundell report?

8  A   I don't recall if I did at the time.  At some point, I had

9  reviewed the Mundell report, yes.

10  Q   It cites an EnviroForensics report from 2011.  That's

11  No. 2 on the list.  Did you pull that up and look at it?

12  A   At some point, I'm sure I've reviewed that as well.

13  Q   Okay.  How about the August Mack report that is the third

14  on the list, the further site investigation, did you pull that

15  up and look at it?

16  A   Potentially, yes.

17  Q   Well, we'll go into those; but on this letter, did

18  Von Duprin challenge this agency action?

19  A   Yes.

20  Q   How did you challenge it?

21  A   We called a meeting and requested explanation further to

22  this.

23  Q   Did Von Duprin file any sort of an administrative action

24  challenging this agency action?

25  A   Not to my knowledge.  The explanation that was given to

*EILER – CROSS/BOWMAN*                        67

1  us, that when this was closed, because Threaded Rod had

2  changed the address from 1925 as it was when it was sold to

3  Threaded Rod, to 1929, there was an error in closing the RCRA

4  corrective action because of the -- because the two addresses

5  didn't line up.  So there was no understanding that there was

6  any other additional information out there.

7  Q    My point is by this letter, IDEM had revoked that

8  agency -- prior agency action, cited environmental reports

9  relating to, as it says, contamination attributable to

10 Von Duprin?

11 A    And Threaded Rod.

12 Q    Yeah.  And Von Duprin didn't challenge that in any sort of

13 an administrative action in any way, correct?

14 A    To my knowledge.

15          MR. BOWMAN:  Page 2.

16 BY MR. BOWMAN:

17 Q    At the top of 2, it said, "These documents show that

18 releases of PCE, TCE and 1,1,1-TCA have occurred at the site,

19 resulting in groundwater and contamination plume."  Do you see

20 that?

21 A    Yes.

22 Q    Did Von Duprin take any actions to challenge that

23 administrative conclusion?

24 A    Not to my knowledge.

25 Q    At the time of this letter, Von Duprin was still looking

1  to Threaded Rod to conduct the environmental investigation

2  requested by IDEM related to the former Von Duprin site; isn't

3  that correct?

4  A   Yes.

5         MR. BOWMAN:  I would like to pull up Exhibit 1105,

6  please.

7  BY MR. BOWMAN:

8  Q   This is from Virtual File Cabinet at IDEM.  IDEM has their

9  public records available by VFC at 69712766.  Do you recall

10 seeing this letter as part of your investigation?

11 A   Yes.

12 Q   Okay.  This is a -- do you know -- as you investigated,

13 did you come to learn who Jack Cornpropst was?

14 A   I did.

15 Q   And who was he?

16 A   He was the chemical engineer in the Von Duprin facility.

17        MR. BOWMAN:  Can you scroll to the top, please,

18 Ms. Hill.

19 BY MR. BOWMAN:

20 Q   So this is a Von Duprin letter, lists 400 West Maryland

21 Street; but you believe this related to the Columbia Avenue

22 facility?

23 A   I do believes so, yes.

24        MR. BOWMAN:  Can you scroll down, Ms. Hill.

25

*EILER – CROSS/BOWMAN*                               69

1   BY MR. BOWMAN:

2   Q    So he's writing to the State Waste Section we see there,

3   discussing disposal specifically of trichloroethylene, TCE,

4   correct?

5   A    Correct.

6   Q    And it was both unused and used, correct?

7   A    Correct.

8   Q    He's saying that the facility transitioned from

9   trichloroethylene, TCE, to a different version, the

10  1,1,1-trichloroethane it appears in 1980, correct?

11  A    Yes, that's correct.

12  Q    So from this letter, it's true, isn't it, Mr. Eiler, that

13  TCE was used in the Von Duprin property in October of 1980,

14  correct?

15  A    Yes, according to this letter, yes.

16  Q    And based on what you know in your investigation, this

17  tells you that a degreaser was indeed used at the Von Duprin

18  property in this time period, correct?

19  A    It does tell me that.  However, it's very small

20  quantities, and I don't know whether it was used in

21  production.  So yes, it does say that it's used; and it has

22  used and unused, but I also see that 300 gallons is not a

23  significant quantity.

24  Q    We can let others discuss that.  Our purpose today right

25  now is pretty simple, I think.

1          You know the operations that Von Duprin engaged in.

2     That was part of what you did.  We know in 1980, there was

3     chlorinated solvent used.  You now know, it's true, isn't it,

4     that Von Duprin used a degreasing agent at the former

5     Von Duprin property, at least in 1980, correct?

6     A    Yes.  Whether it was used in operations, I have no record.

7     I have no knowledge.  We painted at the new facility wet paint

8     with a nonvolatile organic compound as a degreaser.

9     Q    Okay.

10          MR. BOWMAN:  Turn to Exhibit 1106, please.  For the

11    record this is another IDEM document, Virtual File Cabinet

12    No. 69712877.

13    BY MR. BOWMAN:

14    Q    Mr. Eiler, have you seen this letter before?

15    A    Could you scroll to the top, please?

16          I don't recall seeing this one; but I've seen a lot of

17    documents, unfortunately.

18          MR. BOWMAN:  Can you scroll through.

19    BY MR. BOWMAN:

20    Q    Not look familiar?

21    A    Not necessarily, but I'm sure I've seen it at some point.

22    I will concede that.

23    Q    We've had lots of documents?

24    A    Yes, we have.

25          MR. BOWMAN:  Could you scroll to the top, Ms. Hill.

1  BY MR. BOWMAN:

2  Q   This letter is, again, to Jack Cornprobst, project

3  engineer of Von Duprin, 400 West Maryland Street, correct?

4  A   That's correct.

5           MR. BOWMAN:  If you'll scroll down a little bit.

6  BY MR. BOWMAN:

7  Q   This actually involved disposal of the following chemicals

8  as listed and it's advising -- scroll to the top, please.  It

9  was response to Jack Cornpropst regarding disposal of those

10 chemicals, correct?

11 A   Yes.

12 Q   Point number 9 actually --

13          MR. GRIGGS:  Objection, Your Honor.  Somehow we went

14 afield.  I don't know how this relates to the investigation

15 that Mr. Eiler testified to on his direct.  That's -- that was

16 the explanation Mr. Bowman gave for this line of questioning.

17 I don't see the connection.

18          THE COURT:  Tell us, Mr. Bowman.

19          MR. BOWMAN:  Well, he conducted an investigation.  I

20 understand that counsel was selective about what he put in

21 front of Mr. Eiler.  I know from our discovery the documents

22 came out as part of that investigation, and I'm putting them

23 in front of Mr. Eiler to see how they were part of his

24 investigation or not.

25          MR. GRIGGS:  The investigation being discussed on

1  direct was an environmental investigation of pollution.  What

2  he's talking about is a completely different kind of

3  investigation.  They're not the same.

4          THE COURT:  What's this an investigation of?

5          MR. BOWMAN:  It's an investigation of how

6  constituents of concern were used and then potentially

7  released; and those investigations by nature involve an

8  investigation of who used what, where, when, how.

9          THE COURT:  I'm going to allow the questions.  Do

10  you want him to switch to -- if you don't believe they're in

11  response to direct, he can switch to his direct.

12          MR. BOWMAN:  I can do that also.  I'm really not

13  trying to create difficulty, but recognizing I can go to

14  direct too --

15          THE COURT:  And it's information that the Court

16  needs to hear.

17          MR. GRIGGS:  If he wants to go to direct, I have no

18  problem with this line of questioning.

19          THE COURT:  Now, where can I find it in my book

20  because it's hard to read on the screen?

21          MR. BOWMAN:  Well, it would be Exhibit 1106 and I --

22          THE COURT:  It'll be easier.

23          MR. BOWMAN:  I'll say right now I think for all

24  counsel, we're a little concerned about these environmental

25  reports have small figures and small tables.  I think we're

1  just going to have to work cooperatively to make this work.

2          THE COURT:  I agree, lawyers, because it's

3  admissible evidence.  You've got to get it to me, so we need

4  to figure out the easiest way.  We're looking at 1106?

5          MR. BOWMAN:  1106.  It's a letter from Southwest

6  Management to Cornpropst.

7          THE COURT:  Can you see the screen?

8          THE WITNESS:  Not very well.

9          THE COURT:  You might want to pull your book out

10 too.

11         1106.

12         MR. BOWMAN:  Could you go to the last page?

13         THE COURT:  All right.  This is the right book.  You

14 may continue.

15         MR. BOWMAN:  I'll wait, Your Honor.

16         THE COURT:  I can see why it's hard to see on the

17 screen.  It's hard to see it in person.

18 BY MR. BOWMAN:

19 Q   So if you look at page 2, it is from the Solid Waste

20 Management Section, Division of Sanitary Engineering, directed

21 to --

22         MR. BOWMAN:  Scroll to the top.

23 BY MR. BOWMAN:

24 Q   -- Cornpropst at Von Duprin, Inc., correct?

25 A   That's correct.

*EILER – CROSS/BOWMAN*                          74

1    Q   Did Mr. Cornpropst have responsibility for the Columbia

2    Avenue location that we're calling Von Duprin?

3    A   As I understood it.  I've learned very little about

4    Mr. Cornpropst.  He passed many years ago.

5    Q   As you looked at this letter, you had no reason to

6    correlate these chemicals to any other location other than

7    Von Duprin on Columbia Avenue, did you?

8    A   I did not.

9    Q   So you relate these to the Columbia Avenue facility?

10   A   That's correct.

11   Q   So if you look at point No. 9, it talks about Detrex

12   perchloroethylene is why I mentioned what I did.  Based on

13   your investigation, your knowledge, Detrex is a form of a

14   degreaser, isn't it?

15   A   Detrex, as I understood, is a manufacturer.

16   Q   Of degreasing equipment?

17   A   Correct.

18   Q   And also provided the chlorinated solvent for degreasing,

19   correct?

20   A   As I've learned, yes.

21   Q   So from this letter, we know --

22        MR. BOWMAN:  Scroll to the top.

23   BY MR. BOWMAN:

24   Q   -- as of October 1978, there's evidence that Von Duprin

25   used Detrex degreaser and perc at the former Von Duprin

*EILER - CROSS/BOWMAN*                          75

1  property on Columbia Avenue, correct?

2  A   According to this letter, there's a disposal.

3  Q   If it was disposed, it was used; wouldn't you agree?

4  A   In my experience, it's possible; but it's not definitive.

5  Q   As part of your investigation, did you confirm that there

6  was an area within the building that was where parts were

7  washed and then painted?

8  A   Potentially, due to some soil and groundwater -- or

9  specifically soil area that was excavated that I think we

10 spoke of.

11 Q   And that's more the southern part of the building?

12 A   Yes.

13 Q   We'll look at that later; but while we have this here, I

14 thought I would put it up.  We've got some maps otherwise.

15         MR. BOWMAN:  If you would pull up Exhibit 1108.

16 BY MR. BOWMAN:

17 Q   I believe -- does this document look familiar?

18 A   It does not.

19 Q   I actually thought these may have been located by you as

20 part of the Threaded Rod lawsuit actually.  Is that not the

21 case?

22 A   It's possible.  Again, I mentioned that was nine years

23 ago.  It does not look familiar.  It doesn't mean I haven't

24 seen it.

25 Q   Well, it is difficult to read; but if you'll see the third

1  line, it says, "waste information."  Third line appears to be

2  a reference to perchloroethylene, correct?  Do you see that?

3  You do?

4  A   It's --

5  Q   You can't see it?

6  A   I can't read this.

7          THE COURT:  I see it.

8          MR. BOWMAN:  Okay.  Okay.

9          Make it smaller and scroll through those, Ms. Hill.

10  Go back.

11  BY MR. BOWMAN:

12  Q   The importance of the second page is it's actually

13  transported to Von Duprin at 1925 Columbia Avenue, correct,

14  this page 2?  That's what it says.

15  A   "Reported by," that's correct.

16  Q   Then at the bottom of that page, we reference Cornpropst

17  again, right, 1981?

18  A   Correct.

19  Q   And then right up above, it says, "Waste display

20  oil-perchloroethylene," correct?

21  A   Correct.

22          MR. BOWMAN:  I would like to go to Exhibit 1107.

23          And Your Honor, as we have practiced this, I will

24  tell you this is -- this will have resolution issues, so we'll

25  deal with it the best we can.  I've done all I can to get this

1   in front of everyone.  It's an older report.

2   BY MR. BOWMAN:

3   Q   This is the Mundell Baseline Report.  Have you seen that

4   before?

5   A   Yes.

6   Q   As you said, you don't remember when; but you've seen it

7   as part of your investigation, correct?

8   A   Correct.

9   Q   This was referenced in the recision letter.

10  A   Correct.

11          MR. BOWMAN:  Please pull up 36 of 57, please.

12          So, Your Honor, this is a figure; and in these

13  environmental reports, they don't number the pages.  It's a

14  figure -- and you might be able to see it on here.  It shows

15  the Von Duprin property --

16          If you'll make it smaller, Ms. Hill.

17  BY MR. BOWMAN:

18  Q   That's the general picture of the Von Duprin property,

19  correct?

20  A   That's correct.

21  Q   Okay.  You remember seeing this in the Mundell report?

22  A   Yes, I believe so.

23          MR. BOWMAN:  And then if you zoom in at the bottom

24  part of that figure, Ms. Hill --

25

1  BY MR. BOWMAN:

2  Q   You'll see there's an area that's called "Former Painting

3  and Plating Area."  Do you see that?

4  A   Yes, I do.

5  Q   As part of your investigation, is that what you confirmed

6  is an area within the former Von Duprin property where

7  painting and plating occurred?

8  A   Yes.  Among the section to the north of that as well, yes.

9  Q   So if we go to PDF page 39 of 57 --

10         Your Honor, it should just be three pages following.

11  This is an important --

12         MS. KRAHULIK:  Not to interrupt you, this isn't an

13  objection; but there are Bates numbers on the document as well

14  if that would help.

15         THE COURT:  That would help.

16         MR. BOWMAN:  Ms. Hill, could you scroll on this

17  figure so we can find a Bates stamp number at the bottom

18  right?  It would be at the bottom right, Ms. Hill.

19         There it is.  0779.

20         Thank you, Ms. Krahulik.  It's figure 6, Your Honor.

21         THE COURT:  I've got it.

22         MR. BOWMAN:  You have it?

23         THE COURT:  I do.

24  BY MR. BOWMAN:

25  Q   Mr. Eiler, do you remember seeing this report, this

1  particular page?

2  A   I've seen this one and probably several since.  I think

3  I've seen this one.  It's difficult to read.

4  Q   Yeah, it is.  As you've looked at many of the

5  environmental reports as part of this investigation as well as

6  others, what's typically done is in this report, there's a

7  text section where they have text, correct?

8  A   Yes.

9  Q   And then they have figures in which they report different

10 data?

11 A   Correct.

12 Q   And then there's tables quite often, correct?

13 A   Correct.

14 Q   So we're looking at one of the figures.

15        If you'll scroll to the bottom, this figure shows soil

16 analytical map, correct?

17 A   Yes.

18 Q   And if you look at soil boring 6B26, soil boring 26 -- and

19 the number is off to the right there.  So soil boring 26 is

20 right above the former plating and plating area, correct?  Do

21 you see that?

22 A   I do not.

23        MR. BOWMAN:  Can you zoom in further on that.

24 BY MR. BOWMAN:

25 Q   That's a 26.  Do you see that?

EILER – CROSS/BOWMAN                                      80

1  A   Yes, I do.

2  Q   Now, the other thing that they do that I think you

3  understand is if you look -- the data box is off to the left

4  or the data they collected, correct?

5  A   Yes.

6  Q   And for soil boring 26 -- this is soil.  Somebody went in

7  and took a soil sample; and it's been sent off to be analyzed,

8  correct?

9  A   That's correct.

10  Q   So they actually list depth.  You see there it says depth,

11  2 to 4 feet and then 12 to 14 is in the blue box -- or 10 to

12  12 is in the blue box, correct?

13  A   I have to take your word for it.  I can't read that.

14  Q   It's a little clearer there.  2 to 4, 10 to 12?

15  A   I would be agreeing.  I can't read it.

16  Q   We'll go to the table.  For right now, you agree with me

17  then a soil sample at 2 to 4 feet found PCE at 13,000 -- or 13

18  parts per million or 13,000 parts per billion, correct?

19  A   I would have to look at the legend in the table to confirm

20  that.  Is it milligrams per kilogram?

21  Q   Results are reported in MG/KG.  Do you see that?

22  A   I do not.

23  Q   Bottom right, "note," right in here?

24  A   Note.

25  Q   Soil concentrations reported in MG per KG --

EILER – CROSS/BOWMAN                        81

1   A    Yes, I do.

2   Q    So that's PPM?

3   A    That is parts per million.

4             MR. BOWMAN:  Your Honor, this is part of the

5   technical part; but we're going to discuss parts per billion.

6   BY MR. BOWMAN:

7   Q    So if we'll go back to the table, that number in parts per

8   billion is 13,000 parts per billion PCE at 2 to 4 feet,

9   correct.

10  A    Can you zoom?

11            MR. BOWMAN:  Can we zoom into that more?

12  BY MR. BOWMAN:

13  Q    It's 13 something.  I'll go to the table, but it's 13

14  something.  Do you agree with me?

15  A    I believe so.  The resolution's not there.

16  Q    Yes, this is one of our only challenging reports; but if

17  it's 13, it's 13,000 PPB, correct, parts per billion?

18  A    Correct.

19  Q    Again, that's a soil sample 2 feet below the surface at

20  the Von Duprin property just north of the plating area,

21  correct?

22  A    Four feet, yes.

23  Q    Two to four.

24            Then we have 14,000 -- I read that as 14.8.  We'll go

25  to the tables.  So in PPB, there's 14,800 parts per billion of

*EILER - CROSS/BOWMAN*                              82

1   TCE, 2 to 4 feet below the Von Duprin property, correct?

2   A   Correct.

3            MR. BOWMAN:  So here's the challenge.  Let's go to

4   43, and we'll look at the actual table.  We'll need to turn

5   it.  Oh, I need to clear --

6            THE COURT:  What's the Bates number for us?

7            MR. BOWMAN:  573, Your Honor.  Threaded Rod 573 is

8   the Bates stamp.

9            Ms. Hill, if you'll go to the bottom -- go up and

10  zoom in a little bit for 26 --

11           THE WITNESS:  I don't think that's correct, the

12  Bates number.  0783.

13           MR. BOWMAN:  0783.  Sorry.

14           Stay down there, Ms. Hill.

15           THE COURT:  Okay.

16  BY MR. BOWMAN:

17  Q   You see over there that we've got soil boring 26 at 2 to

18  4 feet.  See that over there?

19  A   Two to four, yes.

20  Q   Okay.  Now, we're going to scroll over, try to stay in

21  line and look at that.  Soil boring --

22           MR. BOWMAN:  Zoom in on that.

23  BY MR. BOWMAN:

24  Q   Is that 14.8 --

25           MR. BOWMAN:  Zoom over farther, Ms. Hill.  Zoom in.

1   BY MR. BOWMAN:

2   Q   That's 14.8 and that's 13, correct?  That confirms our

3   numbers.  It's 14.8 of -- let me get this right -- of the TCE

4   and 13,000 PCE or 13 PCE, correct?

5   A   I can't follow this.  If you could put this table in front

6   of me, I might be able to answer the questions.

7            THE COURT:  Do you want to look at mine?

8            MR. BOWMAN:  Thank you, Your Honor.

9            THE COURT:  Just put it close to your face.  It's

10  hard to read.

11  A   What was your question again?

12  BY MR. BOWMAN:

13  Q   We were trying to confirm the numbers.  At 2 to 4 feet in

14  soil boring 26, the results are 13,000 PPB for PCE, correct?

15  A   Correct.

16  Q   And 14,800 PPB for TCE?  14.8 for TCE?

17  A   Correct.

18  Q   Okay.  Thank you.  If you'll return that back to the

19  judge, I appreciate it.

20            THE WITNESS:  Thank you.

21            MR. BOWMAN:  Pull up Exhibit 1110, please.

22  BY MR. BOWMAN:

23  Q   This is the application that Von Duprin filed with IDEM to

24  enroll in a Voluntary Remediation Program, correct?

25  A   Yes, it is.

*EILER - CROSS/BOWMAN*                                84

1          MR. BOWMAN:  And I did not find a file stamp on

2    this.  If you'll go to page -- scroll to 2 or 3 I think it is.

3    Q   Your signature actually appears maybe on page 3 as signed,

4    June of --

5          MR. BOWMAN:  Keep scrolling.

6    BY MR. BOWMAN:

7    Q   June of 2016, correct?

8    A   Correct.

9    Q   That's your recollection when this was submitted?  There

10   it is.  June of 2016?

11   A   Correct.

12   Q   At the time this application was filed with IDEM, you had

13   data indicating a release of chlorinated solvents at the

14   former Von Duprin property, correct?

15   A   I'm not sure what you're asking.

16   Q   At the time this application was filed with IDEM, you had

17   evidence that there had been a release of chlorinated solvents

18   at the former Von Duprin property?

19   A   I had evidence that there was contamination in soil.

20   Q   And at the time this was filed, you had evidence

21   indicating Von Duprin's use of chlorinated solvents, correct?

22   A   I had evidence that Von Duprin disposed of solvents.

23   Q   If you go to page 4 of 58 of the PDF, as you enrolled this

24   site into the Voluntary Remediation Program, there's certain

25   questions you had to answer, correct?

EILER - CROSS/BOWMAN                          85

1   A    Correct.

2   Q    And if you look at page 4 of 58, it says, "Has the extent

3   of groundwater contamination been defined to residential

4   screening levels?"  There you said, "Yes"?

5   A    Yes.

6   Q    Is that the case, that that had occurred at that time?

7   A    Yes.

8   Q    By that time, it then says, "Is groundwater contamination

9   known or suspected to have migrated off-site."  That time, you

10  said, "Yes"?

11  A    Correct.

12  Q    You knew at that time that impacts were migrating off of

13  the Von Duprin property, correct?

14  A    Correct.

15  Q    If you then scroll down under, "Potential For Human

16  Exposure, Does contamination from the site have potential for

17  human exposure"; and at that time, you said yes?

18  A    Correct.

19  Q    And what you have there -- and I'm not going to read all

20  of it; but you discuss -- probably the best line to pull out

21  is this, "Residential vapor intrusion mitigation systems have

22  been installed at five addresses where indoor air screening

23  levels were exceeded."  Do you see that?

24  A    Yes, I do.

25  Q    So at the time that the application was submitted by

1  Von Duprin to IDEM, Von Duprin knew that contamination

2  migrating off of Von Duprin was -- had the potential for vapor

3  intrusion problems, correct?

4  A    Correct.

5  Q    And made addressing the vapor in that residential

6  properties part of its VRP application, correct?

7  A    Correct.

8  Q    So it was the intention of Von Duprin when dealing with

9  downgradient property -- pardon me.

10        So it was the intention of Von Duprin in filing the

11 application with the VRP that Von Duprin would be dealing with

12 these downgradient properties, correct?

13 A    That's correct.  We were the only ones doing anything

14 about it.

15 Q    You specifically reference the homes on Yandes, I believe,

16 correct?

17 A    I don't recall specifically.

18 Q    It just says "residential properties"?

19 A    Yes.

20 Q    It says "residential properties."  Thank you.

21        MR. BOWMAN:  If you can pull up Exhibit 1012,

22 please.

23 BY MR. BOWMAN:

24 Q    When a site is enrolled in the Voluntary Remediation

25 Program, it means just what it says, right?  The party that

*EILER – CROSS/BOWMAN*                                     87

1   comes in voluntarily agrees to undertake certain actions,

2   correct?

3   A   Correct.

4   Q   And it's your understanding that those commitments are

5   memorialized within a Voluntary Remediation Agreement executed

6   between that responsible party and the agency, correct?

7   A   Yes.

8   Q   And in this case, Von Duprin did enter into a voluntary

9   remediation agreement with IDEM, correct?

10  A   Correct.

11  Q   Is this, this Exhibit 1012 -- is that the Voluntary

12  Remediation Agreement?

13  A   It appears to be the cover page, yes.

14  Q   Did you review this document before you signed it -- I'm

15  sorry.

16        Did you review this document before it was signed by

17  Von Duprin?

18  A   Yes.

19  Q   If you look at page 20 of 25, you're actually listed as

20  the project manager for Allegion plc, Schlage Lock on this

21  project, correct?

22  A   Yes.

23  Q   Let's go back to page 2 of 25, top of the page.  The first

24  "Whereas."

25        "The purposes of entering the agreement is for

*EILER – CROSS/BOWMAN*                                        88

1   purposes of remediating the release of hazardous substances

2   and petroleum at the 1929 Columbia Avenue site," correct?

3   A    Yes.

4   Q    That was your understanding of this agreement as it was

5   entered into?

6   A    Correct.

7   Q    Let's look at page 12 of 25.  As part of these, this

8   agreement actually listed a scope of work to be conducted,

9   correct?  Do you remember that?

10  A    Yes.

11  Q    The second paragraph says, "requires expeditious progress

12  toward site closure in accordance with timelines set forth

13  below," correct?

14  A    Yes.

15  Q    So as part of this agreement, you actually agreed to a

16  scope of work, plus timelines, correct?

17  A    That's correct.

18  Q    Task B --

19         MR. BOWMAN:  Actually, if you'll scroll down,

20  Ms. Hill.

21  BY MR. BOWMAN:

22  Q    Actually involved submission of -- within 180 days --

23  applicant to, quote, third line, "fully determine the nature

24  and extent of the actual and threatened release of petroleum

25  and hazardous substances."  Do you see that?

*EILER – CROSS/BOWMAN*                                89

1    A    Yes, I do.

2    Q    What was your understanding, is your understanding of the

3    term, phrase "determine the nature and extent of the actual

4    and threatened release"?

5    A    How much and how far has the contaminant traveled.

6    Q    Task C involves remediation work plan, correct?

7    A    I'm reviewing it.

8         Yes.

9    Q    RWP, the fourth line, fifth line, Your Honor -- "RWP" is

10   shorthand for Remediation Work Plan.  The remediation work

11   plan is what you're going to do to clean it up, right?

12   A    Right.

13   Q    In direct, you were shown the partial remediation work

14   plan.  That related to just soils, correct?

15   A    Correct.

16   Q    And those soils were not removed until 2019, correct?

17   A    That's correct.

18        MR. BOWMAN:  For the record, I am now officially

19   doing cross, so -- if that matters.

20   BY MR. BOWMAN:

21   Q    You referenced $3.2 million of costs, correct?

22   A    That's correct.

23   Q    And I want to be clear about those costs.  Those costs --

24   and there was checks written to Geosyntec for 2.4 I think?

25   A    Plus.

1  Q   Yeah, plus.  Did that involve costs to investigate soil

2  impacts contamination at Von Duprin?

3  A   I believe so, but I believe they were also -- on-site work

4  was taken out later.

5  Q   Well, I -- for our purposes and for purposes of the Court,

6  I think we need to be clear about what's in and out; and I

7  have some confusion.

8       So the 2.4 would include cost to investigate any soil

9  contamination at Von Duprin, if I understand your testimony?

10 A   Yes.

11 Q   That 2.4 includes efforts to determine vapor intrusion

12 from contamination into the Von Duprin facility, correct?

13 A   Yes, I believe so.

14 Q   Those costs include delineating the nature and extent of

15 shallow groundwater impacts at the former Von Duprin property?

16 A   Yes.

17 Q   We can bring up reports -- Geosyntec looked into the

18 history -- Geosyntec helped you look into the history of the

19 operations at Von Duprin, didn't they?

20 A   I don't recall that.

21 Q   The costs include delineation of groundwater downgradient

22 of the Von Duprin property?

23 A   Yes.

24 Q   Do those costs have any distinctions between

25 investigations of shallow groundwater versus deep groundwater?

1  A    Distinctions?

2  Q    As you made the -- it's 2.4 million.  Is it your

3  understanding that the cost for Geosyntec to investigate

4  groundwater downgradient of the Von Duprin property -- do

5  those costs include investigating shallow groundwater as well

6  as deep groundwater?

7  A    Yes.

8  Q    You went through the Geosyntec invoices, and we appreciate

9  that.  Do you recall ever writing down a Geosyntec invoice,

10  paying less than what was invoiced, ever?

11  A    Yes.

12  Q    What were the circumstances in which you paid less than

13  what Geosyntec invoiced you?

14  A    There were errors maybe in a markup or an hourly rate.

15  Q    Any other reasons to mark down?

16  A    No.

17  Q    You referenced the Threaded Rod settlement, saying it was

18  1.5 million.  Do I understand your testimony you believe that

19  title to the groundwater wells was actually transferred?

20  A    Yes.

21  Q    Was there a written document confirming that title

22  transfer?

23  A    I believe so.  If it's not complete, it's in process but

24  yeah.

25  Q    As Geosyntec conducted investigations, were those

1  investigations put in report form?

2  A   Yes.

3  Q   Were those reports filed with the Indiana Department of

4  Environmental Management?

5  A   Yes, within a timely manner.  I don't know that they've

6  all been submitted.  I think there's one that's still

7  outstanding but yes.

8  Q   Are you aware of the fact that IDEM has an Internet portal

9  I think is the right term called the Virtual File Cabinet?

10  A   Yes.

11  Q   The beauty of that is that we can actually look at IDEM

12  records through the Internet?

13  A   I am aware, yes.

14  Q   It is indeed the case, isn't it, that the Geosyntec

15  reports relating to the Von Duprin property filed on Virtual

16  Filing Cabinet have the data as part of those reports,

17  correct?

18  A   Yes.

19  Q   So that data is publicly available, correct?

20  A   Right.

21  Q   Part of the -- last line of questions; last line of

22  questions.

23        The 1.5 million, how much of that was allocated to

24  payment for the wells?

25  A   1.7 was for investigation and well infrastructure.  It was

*EILER - CROSS/BOWMAN*                                    93

1   negotiated down.

2   Q    Okay.  1.5 million was paid?

3   A    Yes.

4   Q    Was there a specific allocation in the agreement as it was

5   paid to Threaded Rod?

6   A    As I recall, there were at least two buckets.  I think

7   there was a third bucket.  I can't recall what the third

8   bucket was.  One of the buckets was legal fees, and that was

9   removed from the total payout.

10  Q    Then down to 1.5?

11  A    Then it was down to approximately 1.7 or close to 2, and

12  then it was negotiated down to 1.5 complete.

13  Q    Okay.  And so let's just talk about the 1.5.  I don't want

14  to know about negotiations.  Okay.

15        Of the 1.5, was that -- the portions of that allocated

16  to pay for certain things or was it just one lump sum payment?

17  A    It was a one lump-sum payment.  Threaded Rod wanted their

18  money back.

19  Q    So to sum that up, for the 1.5, there's no allocation

20  that's paid to Threaded Rod for any particular item.  It was

21  just 1.5 million lump-sum payment?

22  A    As negotiations go, that's correct.  "Here's what we

23  want"; and the negotiation and back and forth was, "Here's

24  what you're gonna get."  They accepted.

25        MR. BOWMAN:  Thank you, Mr. Eiler.

*EILER – CROSS/KRAHULIK*                              94

1        THE WITNESS:  Thank you, Mr. Bowman.

2        THE COURT:  All right.  Ms. Krahulik, you may

3   cross-examine and direct the witness when you make that

4   designation.

5        MS. KRAHULIK:  I think I'm going to need these

6   glasses.

7                   **CROSS-EXAMINATION**

8   BY MS. KRAHULIK:

9   Q   Going third, you'll have to bear with me.  I'm -- at the

10  advantage I don't have to ask so many questions; but I have to

11  jump around in my topics, so --

12       You were just talking with Mr. Bowman about the

13  settlement with Threaded Rod; and you said it was a lump sum

14  payment of $1.5 million, right?

15  A   That's correct.

16  Q   And for that, you got access to the groundwater monitoring

17  wells?

18  A   Possession, yes.

19  Q   And to information in environmental reports?

20  A   Correct.

21  Q   Right?  And a lot of those were already available on the

22  Virtual File Cabinet?

23  A   All of the data, correct.

24  Q   You also got a release of claims by Threaded Rod, I

25  assume, release of claims against Von Duprin?

*EILER – CROSS/KRAHULIK*                              95

1   A    I don't know the legal terms.

2   Q    The lawsuit was dismissed?

3   A    Yes.

4   Q    So that was over?

5   A    Correct.

6          MS. KRAHULIK:  Would you please pull up

7   Exhibit 1164.

8   BY MS. KRAHULIK:

9   Q    I'll give you a minute to look at this, and tell me if you

10  recognize it.

11  A    Yes.

12  Q    Is this a document you found in your research regarding

13  the Von Duprin facility?

14  A    It is.

15  Q    And what is this document?

16  A    This is a Resource Conservation Recovery Act, RCRA as we

17  refer to it.  It's a closure plan.  It's how we plan to close

18  the existing hazardous waste management units that exist at

19  Von Duprin.  This was from 1986 era from when we moved out of

20  the facility.

21  Q    And if you look at -- it's page 2 of the document, but

22  it's Bates-labeled Von Duprin 000284 in the lower right-hand

23  corner.

24  A    Too far.

25          MS. KRAHULIK:  Too far.  Back it up.  That one.

*EILER – CROSS/KRAHULIK*                               96

1  Please scroll down to the bottom of that.  Actually scroll up

2  just a little bit farther.

3  BY MS. KRAHULIK:

4  Q   It says, "Von Duprin moved into the area in 1955."  Is

5  that actually the year they started operations at Columbia

6  Avenue?

7  A   No.  Vonnegut Industrial Products operated there prior to

8  1965.

9  Q   So this report's not correct?

10  A   Correct.  It is not correct.

11       MS. KRAHULIK:  Scroll down to the last paragraph of

12  this page, please.

13  BY MS. KRAHULIK:

14  Q   It says, "Process operations, including painting,

15  electroplating, polishing, tumbling, machining, washing,

16  assembling, stripping, paint strip and chrome strip."

17       I think you said earlier there was a lack of

18  information about the processes that occurred at that

19  property.  Do you agree that all of these things occurred?

20  A   I indicated that there was a lack of knowledge over time.

21  Yes, I agree that these look accurate.

22       MS. KRAHULIK:  Would you please go to the page that

23  is Bates-numbered Von Duprin 000290.

24  BY MS. KRAHULIK:

25  Q   This is a page that talks about evaluation of Von Duprin's

1 hazardous waste storage area, and it says, "At times" -- and

2 this is toward the end of that paragraph under that heading.

3          "At times during excessive rainfall, the water

4 overflows the curbing and drains to the northeast, following

5 sloped contours into the storm drain.  Because of the

6 potential of contamination being carried beyond the storage

7 area, a 6-foot by 14-foot area will be included as part of the

8 storage area evaluation."

9          What do you know about that overflow from the

10 storage -- hazardous waste storage area?

11 A   I know what I've read.  I know nothing more.

12 Q   Do you know if any additional activities were ever

13 conducted to evaluate contamination in that area as part of

14 the 1986 abandonment of the property?

15 A   I don't know the answer.  I don't know whether there was

16 or was not.

17          MS. KRAHULIK:  And let's go to the page that is

18 Bates-numbered Von Duprin 000321.

19 BY MS. KRAHULIK:

20 Q   Is this a document you recall seeing in your review of

21 documents related to the Columbia Avenue property?

22 A   No, it doesn't look familiar; but there was about 16,000

23 documents that I've reviewed that I have electronically.  So,

24 I mean, it's very possible I have seen this.

25 Q   This appears to me to be an IDEM interoffice memo from

*EILER - CROSS/KRAHULIK*                                    98

1   Daniel Derheimer in the compliance monitoring section

2   regarding an inspection at Von Duprin that occurred in August

3   of 1986.  Would you agree with that?

4   A    I do.

5   Q    And the second paragraph says, "Von Duprin is a captive

6   metal finisher manufacturing six different product lines of

7   panic exit door hardware.  Finishing processes include

8   degreasing, alkaline washing, electrostatic painting, hand

9   painting, nickel chrome plating, copper and brass plating and

10  alkaline zinc plating.  The following hazardous wastes are

11  generated:  Butyl acetate, paint waste, methyl chloride,

12  degreasing solvents, nickel sulfate sludge, chromic acid,

13  cyanide, zinc hydroxide sludge, nitric and hydrochloric acid

14  and a 10B solution used in stripping."

15       Would you agree with this document that those

16  processes and solvents were used at the property?

17  A    Yes, based upon the letter.

18       MS. KRAHULIK:  Please go to Exhibit 1186.  Of that

19  document, I would like to first take a look at what is

20  Bates-numbered Moran.MTM053719; and Ms. Woods, it is about the

21  fifth page of the document.

22  BY MS. KRAHULIK:

23  Q    I'm looking down at the bottom of that document.  This

24  document again says that Von Duprin began operating there in

25  1955; is that right?

*EILER - CROSS/KRAHULIK*                                    99

1    A    No.  It's not correct.  It does say that, yes; but it's

2    not correct.

3    Q    I've seen several documents that say that.  Do you have

4    information that puts the operations at 1965 instead?

5    A    Yes.

6    Q    And what is that information?

7    A    The information that was found in the original Special

8    Notice of Liability letter and the request for information.

9    There was a history completed for the facility at that time in

10   November of 2013.  It was submitted to IDEM, indicating that

11   Von Duprin as it exists did not operate there at the time

12   until 1965.  It was purchased on December -- or actually the

13   facility was sold to Schlage Lock Company LLC I think, at

14   least Schlage Lock -- we'll call it that -- and its successors

15   on December 30th, 1964; and then it was sold to -- as Comark,

16   and then it was reincorporated as Von Duprin, Inc. in 1966.

17   Q    In any event --

18   A    Prior to that, it was Vonnegut.

19   Q    -- your gathering of information to respond to the Special

20   Notice of Liability --

21           COURT REPORTER:  Excuse me.  Please slow down.

22           MS. KRAHULIK:  I'm sorry.

23   BY MS. KRAHULIK:

24   Q    -- makes you believe that operations actually commenced by

25   Von Duprin in 1965?

1  A    Correct.

2  Q    Take a look at page 6 of this document, which is Bates

3  No. 053727.  I'm looking at the second paragraph that begins

4  with "Occasionally."  The second sentence says, "Solvent-based

5  painted parts were placed in a three-stage stripping operation

6  that included a methylene chloride strip tank, a drag-out tank

7  and a water rinse tank."

8          Do you see that?

9  A    I do.

10  Q    Do you agree that occurred at the site?

11  A    I have no reason to doubt it the way it's written.

12  Q    Then on page 8 of the document, which is Bates 053729,

13  it's a table as to solid waste management units.  The second

14  one referenced is a solvent recovery system.  Are you familiar

15  with the solvent recovery system at the site?

16  A    No.

17          MS. KRAHULIK:  Finally, please go to -- it's page 31

18  of the document, Bates 053752, table 3.  053752.

19  BY MS. KRAHULIK:

20  Q    At the bottom of that document --

21          MS. KRAHULIK:  Can you scroll down, please?  There

22  you go.

23  BY MS. KRAHULIK:

24  Q    There was a recommended further action at the time of this

25  report to analyze soil to further define and characterize

*EILER – CROSS/KRAHULIK*                                101

1  contaminants and remediate if necessary.  Von Duprin didn't do

2  that in 1993 when it received this report, did it?

3  A   I don't know the answer to that.

4         MS. KRAHULIK:  Please pull up Exhibit 1114.

5  BY MS. KRAHULIK:

6  Q   Do you recognize this document, Mr. Eiler?

7  A   Yes, I do.

8  Q   What was the purpose of obtaining this limited Phase II

9  investigation?

10  A   I don't know the answer to that.  I wasn't involved in

11  requesting it.  This was a Threaded Rod document.

12  Q   Do you agree that this document showed demonstrated soil

13  and groundwater concentrations of PCE and TCE above the risk

14  default closure levels?

15  A   I haven't seen the document in years.  If you want to show

16  me --

17  Q   Do you want to take a look?  I believe the pages that are

18  most relevant to that question are figure 3 and figure 4.

19  A   Too far.

20  Q   The document, I think, speaks for itself.

21         After -- this was in 2008.  When did Von Duprin first

22  do any source removal at its former property?

23  A   1986.

24  Q   1986.  No, any soil removal.

25         MR. GRIGGS:  Objection, argumentative.

1          THE COURT:  Well, I'll sustain.  He said one year,

2     and you gave him another.

3     BY MS. KRAHULIK:

4     Q   What did you do in 1986?

5     A   There was cleanup at the facility that was referenced in

6     the previous documents.  There was a source area removal in

7     the drum storage area.

8     Q   It was removal of asphalt?

9     A   The document was on the screen, yes.

10    Q   Was there ever any soil excavation?

11    A   I don't know whether the asphalt included soil.  I don't

12    know whether there was any others.  The document is full of

13    other information related to what was done as part of the RCRA

14    closure.

15    Q   Do you believe there was any soil excavation and disposal

16    as part of the RCRA closure?

17    A   I do.

18    Q   Okay.  Let's take a look at that.  That's Exhibit 1164.

19    A   Is there anything in particular you would like me to look

20    at?  I'm at the mercy --

21    Q   No.  You mentioned that there was -- you believed there

22    was soil disposal connected with this RCRA closure.  I want

23    you to point me to where in this report it talks about that.

24    If you need to see any particular section, let us know.

25    A   I don't have access to the report, so I need to see it all

*EILER - CROSS/KRAHULIK*                                103

1  in order to answer your question.

2           MS. KRAHULIK:  May I approach and hand him my copy?

3           THE COURT:  You may.

4           THE WITNESS:  Thank you.

5           This is not the final report.  This is the RCRA

6  closure plan, so it only references what would be cleaned up.

7  And it indicates here waste types that would be generated

8  during the closure, including contaminated soils.

9           There were soils that were on the property.  I have

10 an e-mail from -- at the time, it was a letter because of the

11 age; but I have a document that indicates that Harry Branson

12 had wrote a letter to Von Duprin and asking when they're going

13 to clean up their final soils -- piles that were remaining on

14 the property so they could complete their move-in.

15 BY MS. KRAHULIK:

16 Q   Do you know if there was confirmation sampling after that

17 work was done?

18 A   I don't believe there was.  I don't know that for a fact,

19 but I don't believe there was.

20 Q   In relation to the August of 2013 Special Notice of

21 Liability to Von Duprin, you've testified earlier that

22 Von Duprin did a soil excavation in 2019?

23 A   I did, yes.

24 Q   How many tons of soil were excavated?

25 A   I believe it was 212.

*EILER - CROSS/KRAHULIK*                                      104

1    Q    And to what depth?

2    A    I don't have the Final Investigation Report.

3    Q    About 5 feet?

4    A    I think it was slightly more.

5    Q    Was it excavated --

6    A    Less than 10.

7    Q    Was it excavated to groundwater?

8    A    No.  The sampling that occurred didn't necessitate

9    sampling -- excuse me -- excavating to groundwater.

10   Q    In order to apply to the Voluntary Remediation Program,

11   IDEM required that Von Duprin do vapor mitigation -- or vapor

12   intrusion testing and mitigation at the five homes, right?

13   A    Yes.  As part of the application, it was indicated that,

14   yes.

15   Q    As far as the Geosyntec invoices submitted earlier, how

16   much of the amount of those invoices relates to work on

17   Von Duprin's own contamination?

18   A    Can you elaborate on what you're referring to as

19   "Von Duprin's own contamination"?

20   Q    Not really.  I mean, how much of the total of those

21   invoices relates to characterizing, investigating or

22   remediating Von Duprin's contamination that it caused on its

23   property?

24   A    None.  None of those costs are related to --

25   Q    None of the Geosyntec's?

*EILER – CROSS/KRAHULIK*                                   105

1   A   Correct.

2   Q   So you're saying the vapor intrusion and mitigation

3   invoices aren't related to any contamination emanating from

4   Von Duprin's property?

5   A   No.  I misunderstood the question.  I understood the

6   question to be related to -- on Von Duprin's property.  So

7   could you repeat it?

8   Q   Sorry.  Of the Geosyntec invoices that you were discussing

9   with Mr. Griggs earlier, what number of those invoices or what

10  percentage relates to contamination at or emanating from the

11  Von Duprin property?

12  A   I don't know the percentage.  I don't know that we have a

13  percentage.

14  Q   You haven't tried to identify that?

15  A   We have, but it's -- it's one witness against another.

16  We're looking at allocation maybe.  I'm not sure that I can

17  give you a percentage.  I'm not sure that's my area of

18  expertise.

19  Q   Are you aware of any evidence or reports indicating that

20  Major Tool and Machine or Major Holdings have caused any of

21  the contamination at the sites they now own?

22  A   Other than the removal of the underground storage tank

23  that caused the leak --

24  Q   So they removed contamination and soil?

25  A   And caused the tank to leak.  I'm not aware of any other.

*EILER - REDIRECT/GRIGGS*                              106

1   Q   Are you aware that they used that tank?

2   A   No, I'm not.

3            MS. KRAHULIK:  Thank you.

4            THE COURT:  All right.  Mr. Griggs, do you have any

5   redirect or cross-examination on their direct?

6            MR. GRIGGS:  I have one or the other.  I'm not sure

7   how it will be characterized.  Why don't I just combine it all

8   into one, and that will make things simpler.

9                   **REDIRECT EXAMINATION**

10  BY MR. GRIGGS:

11  Q   Mr. Eiler, you testified regarding soil that was excavated

12  from the former Von Duprin property in 2019.  I believe you

13  said it was approximately 212 tons; is that correct?

14  A   I believe that's correct.  I have been mixing up the tons

15  and cubic yards, so --

16  Q   In addition to soil, was a underground storage tank also

17  removed at that time?

18  A   Yes.

19  Q   And were confirmatory samples taken of the side walls and

20  bottom of the excavation?

21  A   Yes.

22  Q   And is that what determined how much -- how deep you went

23  in excavating that soil?

24  A   Yes, that's correct, in addition to the preliminary

25  scoping, if you will.  That helped us determine; but yes, the

*EILER – REDIRECT/GRIGGS*                                    107

1   side wall confirmation and bottom confirmation said how deep.

2   Q    You testified, I believe, when you were asked by

3   Mr. Bowman regarding the Threaded Rod claim that -- I believe

4   you estimated $1.7 million was related to investigation work

5   that they had performed; is that correct?

6   A    Investigation and installation of wells, that's correct.

7   Q    And the amount -- the settlement amount that was

8   ultimately paid did not cover even those costs.  It was only

9   $1.5 million?

10  A    Correct.

11  Q    You've been asked regarding the separation or split

12  between Geosyntec costs related to on site versus off site.  I

13  think there may have been some confusion in the last question

14  about whether you were being asked to allocate costs among the

15  parties; and obviously, as you stated, you're not qualified to

16  do that.

17        But with respect to the Geosyntec costs that have been

18  paid, they do fall into two buckets, right, work that was done

19  on site that you're not seeking recovery for and work that was

20  more general, broader that encompassed the entire plume area,

21  correct?

22  A    Correct.

23  Q    And you have not been asked to go through those invoices

24  line by line to try and separate one from the other; is that

25  correct?

*EILER – RECROSS/BOWMAN*                                    108

1   A    That's correct.  I am not.

2   Q    The five homes that were mentioned specifically in the VRA

3   process application and eventually the Voluntary Remediation

4   Agreement -- were those ultimately mitigated?

5   A    Yes, as I recall, from five years ago.  Yes, I recall.

6   Q    And those are a part of the costs that are included in the

7   Geosyntec invoices?

8   A    Yes.

9           MR. GRIGGS:  Thank you.

10          THE COURT:  Okay.  Do you have any -- I guess yours

11  would be redirect or recross?

12          MR. BOWMAN:  Yeah, I don't know which it is,

13  Mr. Bowman.

14                    **RECROSS-EXAMINATION**

15  BY MR. BOWMAN:

16  Q    Just one line of questioning, Mr. Eiler.

17          You were aware that Moran was a defendant in the

18  Threaded Rod lawsuit, correct?

19  A    Yes, I am.

20  Q    First time you and I met actually.

21  A    That's correct.

22  Q    Are you aware that Moran settled that lawsuit with

23  Threaded Rod?

24  A    I don't think I was, but I probably should have been aware

25  logically because the suit's gone.

*EILER - RECROSS/BOWMAN*                          109

1  Q   The case is gone?

2  A   The case is gone, yes.

3           MR. BOWMAN:  Thank you.

4           THE COURT:  Ms. Krahulik, do you have any questions

5  on either of their questions?

6           MS. KRAHULIK:  No, I don't.

7           THE COURT:  All right.  Thank you, Mr. Eiler.  You

8  may return to your seat.

9           THE WITNESS:  Thank you.

10    *(Witness excused.)*

11           THE COURT:  Do you want to go ahead and start a

12  witness?  Who will be your next witness?

13           MR. GRIGGS:  The next witness will be John McInnes.

14  I haven't been able to step out.  I assume he's in the waiting

15  room next door.

16           THE COURT:  Sir, if you would come up to the witness

17  stand.  We're going to get you started before we take our

18  lunch break.  And if you would remain standing and raise your

19  right hand, please.

20    *(Witness sworn.)*

21           THE COURT:  You may have a seat.

22           Mr. Griggs, you may examine your witness.

23

24

25

1    **JOHN WILLIAM MCINNES, PLAINTIFF'S WITNESS, SWORN**

2                     **<u>DIRECT EXAMINATION</u>**

3    BY MR. GRIGGS:

4    Q    Please state your name for the record.

5    A    John William McInnes.

6    Q    And who is your current employer?

7    A    I work for a company called Stantec.

8    Q    What is the nature of Stantec's business?

9    A    We're an architecture and engineering company.  I work in

10   the Environmental Services Division.

11   Q    Do you work on a statewide basis, regional basis, national

12   basis?

13   A    I work throughout the country, but most of my work is in

14   Indiana.

15   Q    What is your current position or title?

16   A    My title, I'm a senior principal geologist.

17   Q    And what are your job responsibilities?

18   A    So day to day, my job responsibilities are I lead teams

19   that are engaged in investigating or remediating environmental

20   contaminated sites, work on a variety of compounds, many of

21   which are chlorinated solvents.

22   Q    How long have you been doing work in the environmental

23   consulting field?

24   A    Over twenty-nine years now.

25   Q    Have you ever served as an expert witness before?

1  A   Yes, I have.

2  Q   Is expert witness work a significant portion of your

3  annual work?

4  A   I wouldn't call it a significant part.  I do some most of

5  the time, but I would say it's not more than 10 or so percent

6  of my work.

7  Q   Have you been accepted as an expert witness by this court

8  in previous cases?

9  A   Yes, I have.

10 Q   Do you remember which cases those might be, just the name

11 of a party or something?

12 A   Yeah.  There was two matters related to SMI in Princeton,

13 Indiana; and there was another matter in Martinsville,

14 Indiana.

15 Q   When did you first become involved with the Dr. Andrew J.

16 Brown corridor area?

17 A   For this project, in March of 2017.

18 Q   And what are the contaminants of concern in the plume area

19 around Dr. Andrew J. Brown?

20 A   Primary contamination is chlorinated solvents, which

21 consists mainly of PCE, TCE, cis and trans, dichloroethylene

22 and vinyl chloride.

23 Q   Those are a lot of words there.  I think the Court may

24 have heard PCE before.  What's the common name for that

25 acronym?

1  A   Well, PCE stands for perchloroethylene.  It's also known

2  as tetrachloroethylene.  Sometimes people might call it perc.

3  It's a pretty common dry cleaner solution.

4  Q   How about TCE?

5  A   TCE is trichloroethylene.  Whereas the

6  perchloroethylene/tetrachloroethylene refers to four

7  chlorines, trichloroethylene refers to three chlorines on the

8  molecule.

9  Q   I think you said trans or cis-DCE?

10  A   Yeah, trans and cis-1,2-DCE, those are two different kinds

11  of chlorinated solvents that TCE will break down into; and

12  those in turn have --

13           COURT REPORTER:  I'm sorry, sir.  Please slow down a

14  little bit.

15           MR. GRIGGS:  He's got a lunch appointment or

16  something.

17           THE COURT:  Can you spell "trans" or "cis-DCE"?

18           THE WITNESS:  Yeah.  So "cis" is C-I-S; and then

19  usually it's 1, 2-DCE, dichloroethene.

20  BY MR. GRIGGS:

21  Q   I think you also mentioned -- is it VC?

22  A   Yeah, also known as vinyl chloride.

23  Q   Are these chlorinated molecules that you've just

24  described -- are they naturally occurring or are they

25  man-made?

MCINNES - DIRECT/GRIGGS                              113

1   A   No.  They're synthetic, man-made.

2   Q   Have you worked on chlorinated solvent sites before the

3   one in this case?

4   A   Yes, I've worked on many.

5   Q   Approximately how many?

6   A   Several dozens of chlorinated solvent sites.

7   Q   How many of those dozens of chlorinated solvent sites have

8   been in Indiana?

9   A   I would say more than half.

10  Q   How many chlorinated solvent sites would you say you're

11  working on right now?

12  A   I would say more than a dozen active sites right now.

13  Q   Does a chlorinated solvent plume have specific

14  characteristics that are the same from site to site?

15  A   Yes, they do.  We rely on these to be able to investigate

16  them and understand them.

17  Q   What are some of the general characteristics of a

18  chlorinated solvent plume?

19  A   I think some of the characteristics that you can rely on

20  with a chlorinated solvent plume is that when you've had a

21  release is that it will leave a pattern behind; and it will

22  migrate vertically through the soil column from the surface,

23  into the deeper soils, often called the vadose zone soils.

24          If there's enough material there, it will continue to

25  migrate vertically even further until it gets into the

1   groundwater table; and that's saturated soil below the vadose

2   zone.

3           Once it gets into the groundwater, then it will start

4   to migrate horizontally with the flow of groundwater.

5   Q   We're talking about general characteristics of chlorinated

6   solvent plumes.  You mentioned that it moves horizontally with

7   groundwater?  Is that what I heard?

8   A   Yes, that's correct.

9   Q   Does it have a direction?

10  A   It will go in the direction the groundwater is flowing.

11  So at this particular site, it flows toward the southwest.

12  Q   Can it go up the other way?

13  A   Well, no, it wouldn't flow against the direction of

14  groundwater flow.

15  Q   Like a gravity principle, down is always down?

16  A   Yes, down is always down.

17  Q   Does -- do chlorinated solvents pose any particular

18  challenges because of either their ability to separate in or

19  sink in water?

20  A   Yeah.  That's one of the big challenges with chlorinated

21  solvents is that they're denser than water.  So they tend to

22  sink when they get into water, which drags them deeper.  If

23  there's enough material released, it will drag deeper into the

24  subsurface before it starts to migrate horizontally.  So that

25  makes it particularly challenging to investigate and to clean

1   up.

2   Q   You mentioned that these chlorinated solvents have

3   different numbers of chlorine molecules; is that correct?

4   A   That's correct.

5   Q   The process of moving from one of these chemicals to the

6   other, is it predictable?

7   A   Yes.  It follows a similar pattern.

8   Q   And in layman's terms, can you explain this degradation

9   among these chlorinated solvent molecules?

10  A   Yeah, I can.  The process by which you get degradation is

11  called reductive dechlorination.  So we talked about the

12  different molecules that exist in PCE or tetrachloroethylene

13  is one where you have two carbon atoms, and it's surrounded by

14  four chlorine atoms.  That's where the tetra, meaning four,

15  comes from.

16          Under the right conditions, you can replace one of

17  those carbon atoms with a hydrogen; and then it would no

18  longer be tetrachloroethylene or PCE.  It would now be called

19  TCE --

20          COURT REPORTER:  I'm sorry, sir.  I really need you

21  to slow down.

22          THE WITNESS:  Okay.  The chlorine comes off, and

23  then there's now three chlorine atoms there.  That would make

24  it trichloroethylene.

25          You take it another step.  Another hydrogen replaces

1   a chlorine.  You're down to two chlorine atoms on the

2   molecule, and then that's dichloroethylene.  There's two

3   different types of that, cis-dichloroethylene and

4   trans-dichloroethylene.

5           Then again, if you take the fourth -- or the third

6   chlorine atom off, it goes down to ethene, which is -- or

7   vinyl chloride.  So you would have one chlorine on there with

8   the vinyl chloride.

9           And then the last step is to take that off, and it

10  would degrade to ethene.  So you have the sequence of hydrogen

11  replacing chlorine atoms sequentially as it breaks down in the

12  subsurface.

13  Q   Does that same process or pathway apply whether you start

14  with PCE with four chlorines or if you start with TCE with

15  three?

16  A   The same process applies.  It's just different where you

17  start.

18  Q   Is it always a reduction?  You talked about it going from

19  four to three to two to one to zero.  Can a chlorine molecule

20  like TCE with three -- can it find another chlorine and become

21  PCE?

22  A   No, that doesn't happen.  It always goes in one direction.

23  Q   How quickly does a chlorinated molecule undergo this

24  breakdown process?

25  A   That depends on a number of factors.

1  Q    What would those factors be?

2  A    So you have to have relatively specific conditions in

3  order for these synthetic molecules to break down.  So we know

4  that there has to be anaerobic conditions, which means no

5  oxygen.  Has to be reducing conditions, which they tend to --

6  you have oxidation reduction.  Oxidation is one direction.

7  Reduction is another.  We need to have reducing conditions in

8  order for that to happen.

9          And you don't always see these things on site.

10 Sometimes you have a real aerobic condition, and you won't see

11 any degradation at all.  Sometimes you'll have more reducing

12 conditions, and you'll start to see degradation and so forth.

13 So it really depends on what the subsurface conditions are at

14 the site.

15 Q    Can you change those conditions or factors to improve the

16 rate of dechlorination?

17 A    Yeah.  There are a number of techniques that people use to

18 try to improve those conditions.

19 Q    And these are the techniques that you use in working on

20 sites that you're responsible for?

21 A    That's right.  When we try to go out and remediate these

22 kinds of chemicals in place, you might add some constituents

23 to the groundwater to try to make the process happen more

24 rapidly.

25 Q    How long would it take nature to clean up a chlorinated

1  solvent plume without some outside intervention?

2  A   Well, again that really depends on the native conditions

3  that exist there.  Typically, without outside help, these

4  kinds of plumes would persist for decades without any kind of

5  attention.

6  Q   Have you seen examples of sites where conditions exist

7  today, and there hasn't been any kind of involvement or

8  operational history for a long period of time?

9  A   Yeah.  I've seen many sites where these plumes have

10 persisted for many decades.

11 Q   Can you give us an idea of what size -- or maybe area is

12 the right word -- that the chlorinated solvent plume here

13 covers?

14         MR. BOWMAN:  Objection.  I believe this testimony is

15 beyond the limits of the disclosed expert report and expert

16 opinions.

17         THE COURT:  He said he can give us an idea.  His

18 answer was yes, he has an idea.

19         MR. BOWMAN:  The disclosed opinions involve areas of

20 release.  There was not a disclosure of opinion regarding the

21 nature and extent of the plume.  That involves expert

22 analysis.  It doesn't involve -- there was no opinion

23 regarding A impacting B or how long degradation would last.

24         I'm trying to be careful; but I want to stay within

25 the area of the disclosure, which was along the lines of where

MCINNES - DIRECT/GRIGGS                    119

1  were the areas of release.  Expert opinion did not get into

2  where the plume was going and how long it is.

3            THE COURT:  Your response.

4            MR. GRIGGS:  I would like to ask a foundational

5  question, if I may.

6            THE COURT:  Okay.

7  BY MR. GRIGGS:

8  Q   We're going to jump ahead.  Did you review any data

9  related to this site?

10 A   I did.

11 Q   And did that data include data beginning at what we refer

12 to as the upgradient area as well as in the downgradient area?

13 A   Yes.

14 Q   Was it a comprehensive data set as far as you know?

15 A   Yes.  There were many reports that covered soil and

16 groundwater conditions throughout this area.

17 Q   And obviously, it's been a while since you did your report

18 and you were deposed; but as of that time, understanding there

19 may be things that have happened since, was the data that you

20 reviewed complete?

21 A   Well, it gave a comprehensive view of what was going on at

22 the site, yes.

23 Q   And from that data and your vast experience with

24 chlorinated solvent sites, can you tell the Court how big a

25 plume we're talking about here?

MCINNES - DIRECT/GRIGGS                    120

1   A    Yes.  The data that was in the reports that I read showed

2   that the plume originated kind of to the northeast of the

3   Von Duprin property on the Zimmer property; and it extended a

4   long distance to the southwest, reaching out towards College

5   Street, something about three-quarters of a mile long.

6   Q    Does the plume area in this case, based on the data that

7   you've seen, have a shape?

8   A    Yes.  I guess it's what we would call a plume shape.  It

9   usually starts at a smaller point and extends out almost like

10  a teardrop shape.

11  Q    Why isn't it -- and this is probably a dumb question.  Why

12  isn't it as wide as it is long?

13  A    Well, because we're talking about the extent of these

14  chemicals in groundwater, and the groundwater flows in one

15  direction.  The primary transport is in the direction of

16  groundwater flow.  It might go a little left or right by

17  diffusion, but it doesn't extend a long ways.  So it primarily

18  will extend straight downgradient and moving slightly

19  crossgradient, but it doesn't go upgradient.

20  Q    So is that the typical shape you see, longer but not as

21  wide?

22  A    Yes.

23  Q    You said the word "diffusion."  Tell us what that is.

24  A    Well, diffusion is more just the molecular movement of the

25  materials through there, whereas we would talk about --

1   another term is advection, and that is the primary direction.

2   So it's advecting.  It's flowing with the flow of groundwater,

3   and it's mechanically moving in that direction; and then the

4   chemicals might diffuse slightly off to the side as they're

5   moving downgradient.  So it's a minor component of the

6   migration of the chemicals.

7   Q   The groundwater flow direction I think you said was to the

8   southwest.  Should we be picturing in our minds like a pipe

9   and that's the only way it goes, or is that the overall

10  direction?

11  A   That's the overall direction.

12  Q   And so there are -- what's the right word?  If you were to

13  look at one molecule in the groundwater on one particular day,

14  could it actually be moving in a slightly different direction

15  from southwest?

16  A   It could be, but the overall direction of travel would be

17  to the southwest.

18  Q   So when you look at all the molecules together, southwest

19  is the direction?

20  A   Yes, that's correct.

21  Q   But individual molecules might occasionally move on a

22  different vector?

23  A   Right.

24  Q   And that's how you get a little width to the plume?

25  A   Yes.

MCINNES - DIRECT/GRIGGS                    122

1  Q   Based on your experience, how long does it take for a

2  plume, I think you said, three-quarters of a mile long to be

3  created?

4  A   It can take decades.  It depends on the rate at which it

5  flows through the subsurface, which is a function of what the

6  subsurface is made of.  You know, in this case, the flow of

7  groundwater has been estimated to -- it would take more than a

8  decade just for the water to flow from the Zimmer site down to

9  College Avenue, but the chemicals don't move at exactly the

10  same speed as the water.  They move a little bit slower.  So

11  it would take even longer for the chemicals to get down there.

12  For this whole situation to have established itself, we're

13  talking decades of time.

14         MR. GARDNER:  Your Honor, I think we're both in

15  agreement here.  Our objection isn't necessarily to his

16  qualifications to testify --

17         THE COURT:  You're not allowed to object, unless --

18  is this your witness?

19         MR. GARDNER:  I'm taking this witness.

20         THE COURT:  You're not allowed to object.

21         MR. BOWMAN:  I'm with the Major defendants, and he's

22  with Moran.

23         THE COURT:  All right.  So you're going to cover

24  this witness on behalf of Moran?

25         MR. GARDNER:  No, I'm on behalf of the Major

1  Defendants.

2            THE COURT:  All right.  So what is your objection?

3            MR. GARDNER:  We're both in agreement that it's not

4  necessarily a challenge to his qualifications to testify about

5  how long a plume would be but it's that it wasn't included in

6  his disclosed expert report.  So the opinions that he's

7  offering here today, this is the first time that we've heard

8  them as part of the defendants.

9            THE COURT:  You agree?

10           MR. BOWMAN:  Yeah.  This is all good information

11  about how chlorinated plumes can act.  It's all separate -- it

12  can be very site specific.  We talk general.

13           If we're going to get specific as to how long this

14  plume might take to degrade or how long ago the release

15  occurred, that is an expert opinion and should have been

16  disclosed.  Getting into this now is a brand new expert

17  opinion for us.  It's extremely prejudicial.

18           THE COURT:  Your response?

19           MR. GRIGGS:  I don't believe that we're eliciting

20  from him an expert opinion; but merely his evaluation of the

21  data and the information regarding the shape of plumes and

22  whether it's consistent with what he's seen at other sites

23  isn't expressing an opinion about this particular site but

24  about whether it fits the general pattern of all chlorinated

25  solvent sites.  Really we're asking whether this site is in

MCINNES - DIRECT/GRIGGS                    124

1  some way unique.

2            THE COURT:  All right.  Well, the objection was not

3  really to a question because he had already answered the

4  question.  So keeping in mind their objection, what is your

5  next question?

6  BY MR. GRIGGS:

7  Q   My next question is what is the Indiana Department of

8  Environmental Management?

9            THE COURT:  He's moved on.

10            MR. GRIGGS:  There's more than one way to skin a cat

11 here.

12 A   It's known as IDEM.  It's the regulatory agency that

13 oversees the investigation or remediation of sites like this.

14 BY MR. GRIGGS:

15 Q   Does IDEM, if we use that term, have jurisdiction

16 throughout the entire state of Indiana?

17 A   Yes, they do.

18 Q   In your experience, what is IDEM's position regarding

19 chlorinated solvent sites?

20 A   Well, if you have a chlorinated solvent site, IDEM would

21 expect you to investigate it and then put into place some sort

22 of remedy to make sure that you don't have adverse effects to

23 receptors or ecological receptors.

24 Q   Have you had any success at the sites you've worked on in

25 convincing IDEM to just look the other way on this one and

1   move on?

2   A    No.  They expect action on all of these sites.

3   Q    And why is that?  What concerns do they have?

4   A    Well, there's a potential threat for exposure to people or

5   things to chlorinated solvents.  They're toxic by a number of

6   different routes.  They're toxic by direct contact, so if you

7   touch it with your skin.  It's toxic by ingestion.  So if you

8   drink water with chlorinated solvents in it, it could be toxic

9   by that one.

10          Probably the pathway that's most important is what's

11  known as the vapor intrusion pathway.  These volatile organic

12  compounds, chlorinated solvents, are volatile.  So they're

13  like gasoline in that they evaporate.  So when you pump

14  gasoline and you smell the gasoline, that's the

15  volatilization.

16          So these chlorinated solvents behave the same way; and

17  if they're in groundwater near a building, the vapors

18  migrating up from that plume can get into the building.

19  That's really what is the primary driver for many chlorinated

20  solvents is that particular pathway.

21  Q    Those concerns -- those exposure concerns that you just

22  talked about, are those the kind of concerns that we have in

23  this case?

24  A    Yes.

25  Q    Does IDEM provide any kind of assistance or guidance in

1   deciding what levels of chlorinated solvents are safe?

2   A    Yes, they do.  They publish screening levels that are just

3   default levels that you can look at, and they also will

4   evaluate any kind of a risk-based approach to these kinds of

5   sites.

6   Q    And how does IDEM provide this?  What form does it come

7   in?

8   A    Well, there's a number of different programs that you can

9   be in.  A site like this would most likely be in the Site

10  Remediation Program or the Voluntary Remediation Program.  You

11  would have a project manager at IDEM who would also have a

12  technical staff of geologists, chemists that would be looking

13  at the data.  So you would submit reports.  They would review

14  the reports.  They would provide comments.

15  Q    We talked about some data earlier a little out of turn.

16  In order to perform your expert witness work in this case, did

17  you have access to a database of soil and groundwater data?

18  A    I did.

19  Q    What was the process where you came to have access to this

20  data?

21  A    Well, it was provided to me by counsel.  I believe that

22  the database originated with Geosyntec, a consultant who had

23  been working on the project who had compiled data from the

24  multiple sites here into one database to be used for analysis.

25              MR. GRIGGS:  I would like Exhibit 1054, if I could.

1  Can you expand that at least a few lines for us.

2  BY MR. GRIGGS:

3  Q   Mr. McInnes, is this something you recognize?  Can you

4  tell us what this is we're looking at?

5  A   Yeah.  This looks like the database that we were provided.

6  Q   Do you know if this is the data for soil or groundwater?

7  A   This -- what you have highlighted there is for soil.

8          MR. GRIGGS:  Can we take a look also at 1055?

9  BY MR. GRIGGS:

10 Q   And how about this?  Do you know what we're looking at

11 here?

12 A   Yes.  This looks like the groundwater database.

13 Q   And did you consider all of the data in Exhibits 1054 and

14 1055 in forming your opinions in this case?

15 A   Yes, I did.

16 Q   What time period is covered by the data set?

17 A   It covered a pretty wide time period.  There was some

18 early data from the '90s or even earlier that went up till

19 2017, but most of the data was from the last ten years.

20 Q   Would you say that the data was evenly distributed?

21 A   No.  It's distributed irregularly, both spatially around

22 the site but also over time.

23 Q   Is it true that some locations were sampled multiple

24 times, and some were only sampled one time?

25 A   That's correct.

1  Q   Why would that be?

2  A   A couple of different reasons.  The primary one is

3  sometimes when you're taking groundwater samples, you put in a

4  monitoring well; and that monitoring well is there for a long

5  period of time, and you can go back to that monitoring well

6  and take samples over and over again over time.

7       Other times, you would go and collect what they call a

8  grab sample where you put some tooling down into the

9  subsurface; and you get one sample, and you take that out and

10  have it analyzed; but there isn't any means to go back and get

11  that sample again.  So you would only get one sample from that

12  location.

13  Q   What would be the point of sampling the groundwater

14  multiple times?

15  A   To be able to understand changes in the groundwater

16  conditions over time.

17  Q   Are we talking about sampling it, like, today and tomorrow

18  or are we talking about today and next year?

19  A   Well, typically, people think of sampling quarterly.

20  That's maybe the standard amount of time between samples,

21  three months in between samples.  Sampling more frequently

22  than that doesn't really tell you very much because the

23  groundwater moves so slowly.

24  Q   And do you actually see changes over time?

25  A   Yes.

1    Q    Within a particular well?

2    A    Yes.

3    Q    Did you see that in this data set?

4    A    Yeah.  You could see there were changes in data over time.

5    Q    I think you may have used the word attenuation in an

6    earlier answer; but if not, why don't you tell us what soil

7    attenuation is.  I suspect it will come up.

8    A    Soil attenuation is something we talk about when you would

9    have a spill of, say, chlorinated solvents near the surface;

10   and as it migrates down vertically through the soil column,

11   some of that contaminant will stick to the soil.

12         And depending on how much contaminant is in place and

13   the properties of the soil, that determines how much the

14   migration attenuates.  So if the soil has a high attenuation

15   capacity, you would say it can hold back more of the material

16   as it migrates through.

17         And then -- but as you continue to add material, it'll

18   ultimately overcome the attenuation capacity of the soil; and

19   it will continue to migrate vertically and ultimately make it

20   to the groundwater if there's enough material to get that far.

21   Q    Do the different chlorinated compounds that we've talked

22   about all have the same soil attenuation value or rate?

23   A    No.  They all migrate a little bit differently.  You know,

24   TCE tends to migrate a little bit faster than PCE.  So they're

25   not exactly the same with respect to how rapidly they migrate

MCINNES - DIRECT/GRIGGS                    130

1    in the subsurface.

2    Q    What does that difference in rate mean in a practical way?

3    A    It just means if they start in the same spot, they won't

4    necessarily get to the same end point at the same time.  So

5    they'll be as you're moving downgradient, the rate at which

6    their relative positions will change over time because the TCE

7    will go a little faster.

8    Q    What is surface tension?

9    A    Surface tension is the -- it's a property of a liquid as

10   to how well it stays together into, like, a bead.  And when

11   you have -- if you spill a chlorinated solvent into the

12   subsurface, it goes in as that liquid that's chlorinated

13   solvent.  It will sit in the subsurface; and if you have

14   enough of it pushing down, it will overcome the surface

15   tension of that material and start pushing deeper into the

16   subsurface and into the pore spaces down below.

17        So as the mass of the material being introduced

18   overcomes the surface tension of that material, it migrates

19   vertically as kind of the pure chlorinated solvent liquid.

20   Q    When we're looking at the risk posed by the contamination

21   in this case, which chlorinated molecules should we focus on?

22   A    TCE tends to be the one that causes the most problems.

23   It's the most toxic and the most mobile of the more

24   chlorinated compounds, the PCE and TCE.

25        So if you look at those two, TCE tends to be the one

MCINNES - DIRECT/GRIGGS                    131

1  that's most persistent and toxic and causes the most problems.

2          MR. BOWMAN:  I'm going to object to this line of

3  questioning.  He's getting into discussions of relative risk

4  of harm and his opinion of TCE versus PCE.  That, again, is

5  not a part of his expert report.  That, again, is an opinion

6  that requires scientific analysis.  It again involves

7  analytical review of data, and that was not done in this case;

8  and this is extremely prejudicial if we're getting into now

9  today an analysis of PCE versus TCE because it was not part of

10  his original report.

11          MR. GARDNER:  We would join that objection.

12          THE COURT:  Your response?

13          MR. GRIGGS:  I believe that what he's been asked is

14  common knowledge.  These are published values.  They're

15  available on the Internet.  Everyone has access to them, and

16  he's merely stating that one is higher or lower than the

17  other.

18          THE COURT:  All right.  I'll allow the answer that

19  he's given but instruct you to move on, counsel, if this is

20  not an area of his expert testimony.

21  BY MR. GRIGGS:

22  Q   You used the term, I believe, earlier "vadose."  Can you

23  explain what vadose is?

24  A   So when you think of the subsurface underground, there's

25  the water table that's down a depth where there's groundwater

MCINNES - DIRECT/GRIGGS                    132

1  in the material and it's saturated; and above that, the

2  material isn't saturated.  That's what's called the vadose

3  zone.  So it's the area where you don't have water that will

4  flow into a well up above the water table.

5  Q   Are you saying that vadose soil does not come in contact

6  with groundwater?

7  A   Well, a vadose zone is above the groundwater; but

8  materials in the vadose zone can migrate vertically out of the

9  vadose zone and into the water table.

10            THE COURT:  Could you spell "vadose" for us, please?

11            THE WITNESS:  V-A-D-O-S-E.

12            THE COURT:  Thank you.

13  BY MR. GRIGGS:

14  Q   Can the vadose soil come in contact with the water from,

15  say, precipitation?

16  A   Yes.

17  Q   So it's not that it can't contact water.  It just can't

18  contact groundwater?

19  A   Correct.

20  Q   Can you tell the Court what a smear zone is?

21  A   So a smear zone is a term to use -- used to define -- or

22  to describe the zone kind of between where the saturated

23  conditions and water are and the vadose zone, because that

24  water surface will move up and down throughout the year; and

25  it tends to smear contaminants up and down through that smear

1   zone.  So that smear zone is the range between high water

2   level and low water level in that particular area.

3   Q    And this changing groundwater level, is that affected by

4   seasons or seasonality?

5   A    Yes.

6   Q    How much rain we've had in a given time?

7   A    Yeah.  It's more like a climate-type thing than a

8   weather-type thing.  So it tends to vary over the years.

9   Q    And why do we care about this smear zone?  What effect

10  does it have on the work that you do?

11  A    Well, you tend to see contaminants right at that smear

12  zone just because you have -- it's a combination of materials

13  that have come down from the surface and that have also

14  migrated horizontally.

15  Q    Did you prepare an expert report in this case?

16  A    Yes, I did.

17  Q    And did you express the opinion in that report that

18  multiple sites along the Andrew J. Brown Avenue corridor had

19  experienced releases of chlorinated solvents during their

20  operational history?

21  A    Yes, I did.

22           MR. GRIGGS:  If we can pull up Exhibit 1001, please.

23  BY MR. GRIGGS:

24  Q    Can you see on this exhibit the sites that you evaluated

25  in your expert report?

1   A    Yes.

2   Q    And can you just identify them by name for the Court?

3   A    Sure.  The site to the north is the Ertel property.  It's

4   on the east side of Andrew J. Brown Avenue.  If you move south

5   of there, there's the Zimmer Paper property, which is kind of

6   the inside corner of the Ertel property.  If you continue

7   straight south of that, that's the Moran property there; and

8   then moving west across Andrew J. Brown is the Von Duprin

9   property.

10  Q    Thank you.  How did you determine which of these sites had

11  a chlorinated solvent release that impacted groundwater?

12  A    So I looked at the reports for each of the individual

13  sites.  The first thing I looked at was just the historical

14  operating information that they had; and there was some

15  information about each of these sites that showed that they

16  used chlorinated solvents or had the likelihood of using

17  chlorinated solvents at some point in the past.

18        That's just the first step of the analysis to try to

19  get an idea of what the operations were like there at the site

20  and whether or not they could have used chlorinated solvents,

21  and I found that all of these were consistent with some sort

22  of chlorinated or likely chlorinated solvent use in the past.

23        The more important part of the analysis then moves

24  into looking at the subsurface data and looking at, first, the

25  surface soil samples and looking for places where you see

 1   detections of chlorinated solvents in the surface soil.

 2        The reason we're interested in the surface soil is

 3   that you really can't explain the presence of those

 4   contaminants there, except for actual use very close by to

 5   that area.  So when you see impacts in the surface soil, you

 6   get a very good idea that you're close to a source area.

 7        Now, this doesn't tell you anything about how big the

 8   plume might get to be at some point in the future; but it does

 9   tell you that there is source matter in the surface soil, and

10   so it must have come from that location.

11        Then we look to see if, well, is there more of a

12   pattern here, because when you see a release in one area in

13   the surface soil, you look into the deeper soil below that.

14        In the case of all four of these sites, we saw surface

15   soil impacts overlying deeper vadose zone soil impacts.  So

16   you get deeper into the ground, and you see -- you still see

17   contamination.  Then that contamination extends even deeper

18   and down into the groundwater.

19        And so when I would see this pattern of historical

20   operations that are consistent with the use of chlorinated

21   solvents, surface soil impacts exhibiting chlorinated solvents

22   overlying deeper vadose zone soil that has chlorinated solvent

23   impacts overlying groundwater, that is a signature of you have

24   a local source there; and I saw evidence of that in all four

25   of these sites.

1  Q   Surface soil, does that literally mean what it sounds

2  like?  Is that the top of the ground?

3  A   Well, it can be the top of the ground; but we usually look

4  down 2 to 4 feet into the subsurface, depending on where the

5  data was collected and what's right at the surface, because

6  sometimes you'll have at the very surface concrete and then a

7  little bit of gravel and then some soil underneath that.  So

8  we might not be at the zero.  We might be at one or two when

9  we're looking at surface soil.

10 Q   What specific data supports your conclusion that there was

11 a chlorinated solvent release at the former Ertel property?

12 A   Well, in my expert report, I listed out a number of

13 borings or monitoring well locations that exhibited surface

14 soil contaminations, vadose zone contamination and groundwater

15 contamination.  So I think the locations where we specifically

16 saw this signature is listed in the report.

17 Q   Off the top of your head, can you tell me which wells were

18 the specifics ones for the Ertel site?

19 A   I would have to review the report, but that would refresh

20 my memory I would think.

21 Q   If I were to ask you the same question about the Zimmer

22 Paper property, the Moran property, and the Von Duprin

23 property, is your answer the same, that the specific borings

24 are in the report; but you haven't memorized them for us?

25 A   That's correct.

MCINNES - DIRECT/GRIGGS                    137

1  Q   Were the -- did the data for the four sites reflect that

2  they had a release or did you find detections of TCE or PCE or

3  both?

4  A   Both.

5  Q   Every site?

6  A   Every site.

7  Q   Did the reports that you reviewed indicate that there were

8  any other chlorinated solvent releases in this same geographic

9  area?

10  A   Yes.  We noticed that downgradient of the four sites on

11  the other side of JTV Park, there was an area of PCE

12  contamination that was not connected to any of the other

13  plumes.  It was probably an old dry cleaner down there; but

14  there was another plume down south around Yandes and I think

15  17th Street or Alvord and 17th Street, in that area, where

16  there was another plume down there that wasn't related to any

17  of these sites.

18  Q   Other than that one dry cleaner, were there other current

19  or former businesses that were identifiable in the reports

20  that would have used chlorinated solvents?

21  A   There were other locations, but that was the one that

22  stands out in particular.

23  Q   Why did you focus on releases that impacted groundwater?

24  A   Well, because those are the ones that will move; and those

25  are the ones that will move towards a receptor and will also

MCINNES - DIRECT/GRIGGS                    138

1  get mixed in with other plumes when they run together.  So

2  those are the most important parts to be looking at.  It's the

3  part that would drive the risk at the site and what would be

4  the part that you would focus on in terms of any kind of a

5  remedy.

6  Q   Were you -- were you able to ignore --

7        What role, if any, did soil contamination play in your

8  evaluation that resulted in the opinions you've offered in

9  this case?

10 A   The soil contamination was primarily what pointed you to

11 each site having their own separate source.

12 Q   And once you identified that as contributing to

13 groundwater, it was all about groundwater?

14 A   Right.  Then it was groundwater.

15 Q   When in your report you refer to a commingled plume, what

16 does that mean?

17 A   So a commingled plume is what we refer to as when you have

18 one source area that creates its own plume and intersects with

19 another plume, and those contaminants become mixed at that

20 point.  So we would call that commingled.

21 Q   And were you able to see in the data individual plumes for

22 each of the four sites?

23 A   Well, we could see individual source areas; but they very

24 quickly merged into one large commingled plume that I couldn't

25 separate.

MCINNES - DIRECT/GRIGGS                    139

1    Q    I'm not sure what you mean by "quickly."

2              MR. BOWMAN:  Objection.  Beyond the scope of his

3    disclosed report.  He advises their source.  He advises they

4    commingled.  There is no opinion regarding how quickly

5    contaminants move or don't move or how quickly they commingle.

6    That's an environmental science analysis that this gentleman

7    did not do.

8              MR. GARDNER:  We would join in that objection, Your

9    Honor.

10             THE COURT:  Do you have a response?

11             MR. GRIGGS:  Well, he did talk about the releases

12   commingling.  Maybe I can find a better way to ask the

13   question.

14             THE COURT:  I'll sustain the objection to the last

15   question.  You may ask a new question.

16   BY MR. GRIGGS:

17   Q    In looking at Exhibit 1101, particularly the geographic

18   orientation of the four sites that we're talking about --

19             THE COURT:  We're looking at 1001, correct?

20             MR. GRIGGS:  Sorry, 1001.  Thank you.

21   BY MR. GRIGGS:

22   Q    It looks like the Ertel site adjoins the Zimmer Paper

23   property; is that true?

24   A    Yes.

25   Q    And it looks like both of those adjoin the Moran property?

1  A    Yes.

2  Q    Then there's a road to the west, but the next property

3  west of the road is the Von Duprin property?

4  A    That's correct.

5  Q    If we went and looked at your report to find the specific

6  data points on which you based your conclusion that the Ertel

7  property had a release, do you know approximately where on the

8  Ertel property that was?

9  A    Well, they had work done throughout the property that

10  exhibited impacts; but towards the south end of the property,

11  there was more.

12  Q    And what about the Zimmer Paper property?

13  A    Zimmer was kind of central southwest.

14  Q    And Moran's a little larger geographically.  Any idea

15  where the data was for the Moran property?

16  A    I believe that was on the -- kind of more northwesterly

17  part of the Moran property.

18  Q    So the northern part of Moran, the southern part of Ertel,

19  and you said the central --

20  A    And western part of Zimmer.

21  Q    Central and western part of Zimmer.  It looks on the map

22  that they're very close together.

23  A    Yeah.  They're not far apart.

24  Q    Once two or more separate plumes come together, is it

25  possible to tell after that fact -- is it possible to tell

1  where a particular molecule came from?

2          MR. BOWMAN:  Objection.  This expert did not opine

3  upon allocation.  He provided no opinion on allocation.  What

4  this is is an effort to try to suggest that such an allocation

5  is not possible; and if that was the opinion they wanted to

6  get, they should have proffered one.

7          MR. GARDNER:  We would again agree with that

8  objection, Your Honor.

9          THE COURT:  Do you want to respond to this one?

10          MR. GRIGGS:  Yes, I do.

11          First of all, I haven't asked a question anywhere

12  close to what he suggested.  I merely asked if once these

13  plumes get together, you can separate a molecule as coming

14  from a particular site.  That is not expressing an opinion

15  about allocation.  It's merely asking the common knowledge of

16  do each of the molecules look the same or can they be traced

17  back to where they originated.

18          THE COURT:  Do you object to that question?  That's

19  a little different than the last one.

20          MR. BOWMAN:  I object to where I know that it's

21  going; and we had some testimony where the general became

22  specific, and we believe that contributions can be allocated,

23  obviously.  And so I think the question is getting into a

24  question of whether it's allocable.

25          MR. GRIGGS:  I'm happy to have that debate, and we

1  will have it because the idea that because it's impossible to

2  express an opinion you have to say in your report it's

3  impossible to express an opinion, that's not true.  You

4  express positive opinions, which he's done; and I do plan to

5  ask him at a later time why it was impossible to express an

6  opinion of the type that Mr. Bowman is so concerned about.

7           THE COURT:  All right.  Well, the second question

8  that you asked I'll allow, and that was -- you merely asked if

9  once these plumes get together, you can separate a molecule as

10 coming from a particular site.  Not expressing any allocation

11 but whether that's possible.

12 BY MR. GRIGGS:

13 Q   Do you understand the question?

14 A   Could you state it again for me, please?

15 Q   I'll try.

16       When the plumes come together, they bring their own

17 molecules.  Once they're together in the commingled plume, can

18 you point to a molecule and say that one came from somewhere?

19 Can you identify where it came from?

20           MR. BOWMAN:  I'll lodge the same objection.

21           THE COURT:  I'll let him tell me that.

22           Yes or no?

23 A   No, you can't.

24 BY MR. GRIGGS:

25 Q   They don't wear little pompoms saying, "I'm from Ertel"?

MCINNES - DIRECT/GRIGGS                    143

1  A   No.

2  Q   "I'm from Moran"?

3  A   No, they don't.

4  Q   They're all the same, right?

5  A   Yes.

6  Q   A TCE molecule is a TCE molecule?

7  A   That's right.

8        THE COURT:  Any other questions?

9        MR. GRIGGS:  I'm going on.

10 BY MR. GRIGGS:

11 Q   In your report, did you reach any conclusions about the

12 relative contributions of these four properties to the overall

13 groundwater contamination?

14 A   I did not.

15 Q   You did not reach a numerical conclusion, correct?

16 A   That's correct.

17 Q   Did you express a qualitative opinion?

18 A   Well, I thought that they were all significant sources.

19 All of them contributed to the commingled plume, and none of

20 them were insignificant or de minimus.

21 Q   Why didn't you give a quantitative allocation?

22 A   I didn't think that there was sufficient data.

23        MR. BOWMAN:  Objection.  It misstates the expert

24 opinion as disclosed, which made no effort to quantify the

25 volume, made no effort to assign relative contribution.  He is

MCINNES - DIRECT/GRIGGS                    144

1  trying to get in an expert opinion that he did not get and did

2  not provide to us prior to trial.

3          THE COURT:  All right.  I'll sustain.  If you would

4  ask a more specific question.  Mr. Griggs.

5          MR. GRIGGS:  Yes.  Exhibit 104, please, page 6.

6          I don't think that's the page.  I want one more

7  page.  Thank you.

8          Can you blow up the bottom third or something of

9  this page?

10 BY MR. GRIGGS:

11 Q   Do you see a big, bold heading there in your report,

12 Mr. McInnes, that says, "Relative Contributions"?

13 A   Yes.

14 Q   Did you below that heading offer an opinion qualitatively

15 about the contributions from the four sites?

16 A   Yes.

17 Q   And is it consistent with the testimony you just gave that

18 each facility -- let's see the exact words here.  They're at

19 the top of the next page, the exact words.

20         You list the four sites and then say, "All contributed

21 significantly to the commingled plume, and none can be

22 considered de minimus."

23         Did I read that correctly?

24 A   Yes.

25 Q   Is that still your opinion here today?

MCINNES - DIRECT/GRIGGS                    145

1   A    Yes, it is.

2   Q    And in that --

3           MR. GRIGGS:  Let's go back to the bottom of 6,

4   please.

5   BY MR. GRIGGS:

6   Q    Under this same heading, you indicated that you made no

7   effort to quantify the volume of chlorinated solvent release

8   by each facility or to assign relative contribution of each

9   facility to the commingled solvent plume, correct?

10  A    That's correct.

11  Q    And my question to you which drew an objection was why

12  didn't you?

13          MR. BOWMAN:  I object to that.

14          THE COURT:  I'll let him tell me why.

15  A    I didn't think they had sufficient data to be able to

16  make that kind of a determination.  The plumes are the same

17  types of materials.  They've run together.  The data is spread

18  out irregularly over time.  They did a number of big

19  excavations on these sites that would have changed groundwater

20  conditions after that.  So there just wasn't enough

21  information to be able to say how much came from which.

22  BY MR. GRIGGS:

23  Q    At other sites, not this one -- at other sites, have you

24  done that kind of volume or separation of source areas?

25  A    We sometimes try to separate source areas, but it's a very

1  difficult thing to do just because of the inherent complexity

2  of what's in the subsurface, the fact that it's a dynamic

3  situation that changes over time.  The compounds degrade at

4  different rates, and you can't really reliably track them back

5  to differing sources because they came from similar sources.

6          MR. BOWMAN:  Your Honor, I have to object to this

7  line of questioning.  We are now receiving for the first time

8  an expert opinion regarding the degree to which the

9  contributions of plume and harm can be allocated.  I disagree

10 completely with this and would love to have known this before;

11 and I would cross-examine him, might even have an opposing

12 expert on it -- on this particular issue.

13         It is very interesting to me that he said he made no

14 effort.  And we'll get into this on cross, but this is

15 extremely prejudicial to face a new expert opinion at trial.

16         MR. GARDNER:  We join that objection, Your Honor.

17         THE COURT:  Do you want to respond?

18         MR. GRIGGS:  First, I don't think that there is a

19 question --

20         THE COURT:  I think he wasn't responsive to the

21 question.  The question was, "At other sites, not this one --

22 at other sites have you done that kind of volume or separation

23 of source areas?"

24         And it could have been a yes or no.

25         MR. BOWMAN:  That's the kind of question --

1         THE COURT:  -- rather than the explanation.  Go

2   ahead.

3         MR. BOWMAN:  That's the kind of question in which

4   you would through an expert report figure out whether the

5   science allows you to do this.  We've done it.  They now at

6   the last part of trial want to say it can't be done.  Would

7   have loved to have gone into that before.  So he just starts

8   with a general question about other sites.  That's what

9   expertise is about.  How did you apply your expertise?

10        We have an expert that applied the expertise and

11  allocated.  They now on the first day of trial are going to

12  bring forward the idea that it's not allocable; and that's a

13  brand new opinion, whether you're talking about other sites or

14  this one.

15        THE COURT:  All right.  He's answered the question,

16  so I'm going to allow the answer and overrule your objection;

17  but counsel, please be careful to make sure you're only asking

18  questions relative to his areas of expertise.

19        MR. GRIGGS:  Okay.

20  BY MR. GRIGGS:

21  Q   Did you become aware in reviewing the data and reports in

22  this case that soil had been removed at some of the sites you

23  were considering?

24  A   Yes.

25  Q   Was soil removed from the Ertel site?

MCINNES - DIRECT/GRIGGS                                    148

1   A    Yes.

2   Q    Do you remember the quantity of material that was removed?

3   A    If I remember correctly, it was like 37,000 tons.

4   Q    And that's reflected in one of the reports that you relied

5   upon?

6   A    That's correct.

7   Q    And I believe that number is also in your expert report?

8   A    I believe so.

9   Q    What about at the former Zimmer Paper property?  Was any

10  soil removed there?

11  A    Yes, there was.

12  Q    And how about at Moran?

13  A    Yes, there was also soil removed from Moran.

14  Q    And in each case, we're talking about thousands of tons?

15  A    That's correct.

16  Q    As it relates to the opinions that you've expressed in

17  this case, that each site had a release, are those soil

18  removal events significant?

19  A    Well, yes, I think so.  Number one, I think they confirm

20  the fact that there were releases and source areas on each of

21  these sites.  Then they also -- by removing the soil, it also

22  will have an impact nearby on the groundwater concentrations.

23  Q    You had testified earlier that releases at the surface

24  penetrate vertically and then horizontally when they reach

25  groundwater.  Did I remember that correctly?

1  A    Yes, that's correct.

2  Q    Is it possible to have a release that's so small that it

3  never gets through the soil to the groundwater?

4  A    Yes, that's possible.

5  Q    You've seen that at other places?

6  A    Yes.

7  Q    I shouldn't have to be concerned about a drop of gasoline

8  off the pump at the gas station, that that's going to hurt

9  somebody in the groundwater?

10  A    One's probably not enough; but you get enough of those

11  drops, and it would be enough.

12  Q    A thousand drops might be enough?

13  A    Maybe.

14  Q    Did you review the report that Dr. Love presented in this

15  case?

16  A    Yes, I did.

17  Q    For a particular boring or sampling location, did Dr. Love

18  use a discrete sample result or did he average the samples for

19  that boring location?

20         MR. BOWMAN:  I'm going to object.  There was not a

21  rebuttal expert opinion ever provided.  We have Mr. McInnes'

22  expert report.  We have Dr. Love's expert report.  So now,

23  what counsel is going to try to do is get in again for the

24  first time an expert's review of my expert's report; and this

25  will be the first time I've ever heard it.

MCINNES - DIRECT/GRIGGS                    150

1          MR. GARDNER:  We would join, Your Honor, in that

2     objection.

3          MR. GRIGGS:  I think I asked the witness if he knew

4     how another expert in this case handled the data in his -- in

5     the other expert forming his opinions.  I'm not asking him for

6     his own opinion.

7          MR. BOWMAN:  It's clearly an analysis of our

8     expert's opinions and protocols and processes, and this has

9     never been provided before.  Mr. McInnes simply opined upon

10    where are areas of release.  He provided no opinions regarding

11    our expert.  We could have provided for that.  We could have

12    provided for rebuttal opinions.  We didn't have any of that.

13    So this would be our first time to see whether Mr. McInnes

14    agrees or disagrees with the methodology or protocols followed

15    by Dr. Adam Love, and that's just extremely difficult for us.

16          THE COURT:  The question is, "Did Dr. Love use a

17    discrete sample result or did he average the samples for that

18    boring location?"  So I'll let him tell me that.

19    A   I'm not sure we could tell.  In an early version of the

20    report, it said he averaged them.  I think he changed that in

21    a response later.  In some places, it was an individual

22    sample.  So I can't quite tell.

23          THE COURT:  Okay.  Next question.

24    BY MR. GRIGGS:

25    Q   Can you --

 1          THE COURT:  Counsel, is this a good time to take a

 2   lunch break, because the court reporter's been going for over

 3   two hours.  It's time to take a break.

 4          MR. GRIGGS:  I will just have a short conclusion

 5   when we get back.

 6          THE COURT:  Very good.

 7          Then you'll be prepared for your cross-examination.

 8   All right, lawyers.  It's 12:37.  Let's come back at 1:30.

 9   We'll resume at 1:30.  So get through security, and we'll get

10   started then.  Is that fine?

11          MR. GRIGGS:  Yes.  We moved along faster with Eiler

12   than we thought.  I don't know what the cross will be with

13   Mr. McInnes.  We have arranged for our third witness to come

14   this afternoon.  He is a state employee, so we're taking him

15   away from his job.  If we're definitely not going to get to

16   him, I would not want to keep him.

17          THE COURT:  We'll --

18          MR. BOWMAN:  We'll get to him.

19          MR. GRIGGS:  So you have very few questions for

20   John?

21          MR. BOWMAN:  We'll get through it.

22          THE COURT:  So have him here.

23          MR. GRIGGS:  He's on his way.

24          THE COURT:  Let's go ahead and take our lunch break.

25   We'll resume at 1:30.

1            COURTROOM DEPUTY:  All rise.

2        *(A lunch recess was taken.)*

MCINNES - DIRECT/GRIGGS                    153

1              A F T E R N O O N   S E S S I O N

2         (In open court)

3              THE COURT:  You may be seated.  We're back on the

4    record.  And the witnesses is still under oath.

5              Counsel, you may continue with your examination of

6    the witness.

7              MR. GRIGGS:  Thank you, Your Honor.

8    BY MR. GRIGGS:

9    Q   Mr. McInnes, are you familiar with a chemical compound

10   called methylene chloride?

11   A   Yes, I am.

12   Q   Is that a chemical in the degradation pathway for PCE or

13   TCE?

14   A   No, it is not.

15   Q   Did you see any indication in the data that you reviewed

16   for this case that methylene chloride has anything to do with

17   the chlorinated solvent --

18             MR. BOWMAN:  Objection.  Again, this is testimony

19   beyond the scope of his expert report.  He did not get into an

20   analysis of different constituents there or not there.  He

21   simply considered TCE and PCE.

22             MR. GARDNER:  We join that objection, Your Honor.

23             THE COURT:  Do you want to respond?

24             MR. GRIGGS:  We are merely trying to alert the Court

25   that methylene chloride has nothing to do with the chemicals

MCINNES - DIRECT/GRIGGS                    154

1  that are being testified about in this court, although they

2  were spoken of on direct examination with the previous

3  witness -- or cross-examination with the previous witness.

4          MR. BOWMAN:  Again -- Your Honor, can I address

5  that?

6          THE COURT:  You may.

7          MR. BOWMAN:  Again, the issue of what's happening

8  now is that the effort will be to try to find some sort of

9  different markers or distinctions that would modify this

10 gentleman's expert opinion and get into an analysis of

11 different constituents of concern.

12         And what you'll see is there was no analysis of

13 different constituents of concern other than TCE and PCE.

14 That's the extent of his report.

15         MR. GRIGGS:  That's speculation, and it's not

16 correct.

17         THE COURT:  I'll overrule the objection.  I'll allow

18 the question, and you can ask him on cross.

19 A   What was the question again, please?

20 BY MR. GRIGGS:

21 Q   Is methylene chloride -- or did you see anything in the

22 data to suggest that methylene chloride is connected with,

23 associated with the chlorinated solvent releases at issue in

24 this case?

25 A   I didn't see anything that looked like chlorinated solvent

1   was a significant constituent here.

2   Q    Is the chlorinated solvent contamination underneath the

3   Von Duprin site the result of migration from the surface

4   through the soil or is it migration from upgradient properties

5   via groundwater?

6          MR. BOWMAN:  Objection.  He is now asking this

7   witness to opine on groundwater modeling.  You'll hear he is

8   not an expert in groundwater modeling.  He has not modeled

9   groundwater.  He has not analyzed the extent to which

10  groundwater contaminants have or have not migrated.  He simply

11  said that they went into a commingled plume.  There's been no

12  analysis of migration by this expert.

13         MR. GARDNER:  We would again join in that objection,

14  Your Honor.

15         THE COURT:  Your response?

16         MR. GRIGGS:  Yes.  There was testimony by this

17  witness already that the groundwater flows to the southwest.

18  All I'm asking is the data -- the resulting sampling data

19  beneath the Von Duprin site, the downgradient site, whether it

20  came through the soil or whether it came through the

21  groundwater.

22         MR. BOWMAN:  Your Honor, letting the witness talk

23  about the groundwater flow direction at the site is completely

24  different than determining whether a release at a certain

25  point is or is not impacting Von Duprin.  That it is a key

MCINNES - DIRECT/GRIGGS                    156

1   causation issue upon which Von Duprin could have put forward

2   an expert and did not.

3            THE COURT:  I'll sustain the objection to that

4   particular question.

5            Next question.

6   BY MR. GRIGGS:

7   Q   You testified earlier regarding certain soil excavations

8   that occurred at Ertel, Zimmer Paper and Moran.  Do you recall

9   that?

10  A   Yes.

11  Q   Did those soil excavations, based on the data, stop the

12  migration of chlorinated solvents completely?

13           MR. BOWMAN:  Objection.  Your Honor, I apologize for

14  this; but again, this witness opined upon whether sources of

15  contamination did or did not exist within an area.  He

16  provided no opinion regarding migration.  He provided no

17  opinion regarding the degradation rate.  These are very

18  hypertechnical environmental science evaluations that need to

19  be vetted and provided in an expert report.

20           So now we're going to get into whether a release on

21  such and such property could impact Von Duprin.  That would

22  have been an expert report.

23           MR. GARDNER:  We again agree with that objection,

24  Your Honor.

25           THE COURT:  Mr. Griggs, what's your response on this

*MCINNES - CROSS/BOWMAN*                                    157

1   one?

2           MR. GRIGGS:  I don't believe that was the question

3   that was asked.  It seems that there's a certain prophetic

4   process going on here where someone imagines that six

5   questions from now, I'm going to ask something that is

6   objectionable.  I only have six questions left.

7           I merely asked did the data after the excavations

8   still show impacts to the groundwater.

9           MR. BOWMAN:  And I'll object.  That's beyond his

10  expert opinion.

11          THE COURT:  Is that within your expert opinion?

12          THE WITNESS:  I didn't write about the changes in

13  groundwater contamination after the excavations in my expert

14  opinion.

15          THE COURT:  All right.  Then I'll sustain the

16  objection.

17          MR. BOWMAN:  Thank you, Your Honor.

18          MR. GRIGGS:  I'll reserve my remaining questions for

19  cross-examination.

20          THE COURT:  All right.  Mr. Bowman.

21                      **CROSS-EXAMINATION**

22  BY MR. BOWMAN:

23  Q   Mr. McInnes, I would like to go ahead and bring up his

24  expert report, which is 104.  Okay.  Thank you.  We'll have it

25  available if you need it.

*MCINNES - CROSS/BOWMAN*                                    158

1          In your area of practice -- you're an environmental

2    scientist, right?

3    A    I'm a geologist in the environmental business, yes.

4    Q    Thank you.  I knew that, geologist.  There is such a thing

5    as groundwater modeling, right?

6    A    That's true.

7    Q    Do you know what groundwater modeling is?  Can you explain

8    to the Court what that is?

9    A    Yes.  Groundwater modeling is where you would use any one

10   of many different computer programs to simulate the flow of

11   groundwater underneath a site.

12   Q    What you can use groundwater modeling for is determine the

13   rate at which contaminants at point A can get to point B,

14   correct?

15   A    That is one of the things that can be done with the model.

16   Q    Right.  You can model whether impacts on point A are

17   actually impacting point B, correct, with groundwater

18   modeling?

19   A    You can learn about the direction the groundwater would

20   flow, and the time it might take to get there from a model.

21   Q    Modeling of groundwater in my experience includes an

22   analysis of degradation of chlorinated solvents if you are

23   modeling chlorinated solvents, correct?

24   A    It can, yes.

25   Q    So you talked about how chlorinated solvents degrade; but

*MCINNES - CROSS/BOWMAN*                                159

1  the reality is degradation changes from site to site, doesn't

2  it, degradation rate?

3  A   Yes, it can, depending on the characteristics of the site.

4  Q   So we know that because if one does a groundwater model

5  determining to what extent a constituent may move and then

6  degrade, you have to decide within the model what kind of

7  degradation rate to use, correct?

8  A   I don't know if that characterizes how we would use a

9  model.  A model is just a tool to evaluate your data.  So the

10  data tells you a lot about what's going on out there, and you

11  don't necessarily have to overlay a model to understand

12  degradation and flow direction and flow rates and things like

13  that.

14  Q   Well, maybe we get to this point.  You're not an expert in

15  groundwater modeling, are you?

16  A   I'm not personally an expert in groundwater modeling, but

17  I lead teams that use groundwater models routinely.

18  Q   My question is:  Are you an expert in groundwater

19  modeling?

20  A   I am not personally an expert in groundwater modeling.

21  Q   And as part of your expert report in this case, neither

22  you or anybody else at Stantec did groundwater modeling, did

23  they?

24  A   I did not, and no one at Stantec did a model for this

25  site.

1    Q    You referenced other sources, but my understanding is you

2    made no attempt to define the universe of every single release

3    that might be contributing to this commingled plume; is that

4    right?

5    A    That's correct.

6    Q    So not coming to the Court and saying you looked at it

7    all.  There could be other sources, right?

8    A    There could be other sources.  The data isn't perfect.

9    Q    You covered this, but I think it's worth repeating.

10   Shallow soil impacts of chlorinated solvents indicates a

11   potential for release in that area, right?

12   A    I think it's a very strong indicator of a release in that

13   area, more than just the potential.

14   Q    Right.  And you look at other lines of evidence in

15   analyzing that?

16   A    That's correct.

17   Q    And you did that?

18   A    Yes.

19   Q    Right.  And you found four distinct areas of release,

20   correct?

21   A    We found clear evidence on each of the four sites that you

22   had this pattern of shallow to deeper groundwater

23   contamination vertically integrated in a similar area.

24   Q    Isn't it the case that you found evidence of four distinct

25   areas of release, correct?

1   A   We found evidence that there was a release on each of

2   these sites.  Whether or not it was down to a single pinhole

3   down or a general area, I didn't try to divide it that finely.

4   Q   The word "distinct" is important.  It was important when I

5   talked to you before.  I'll try it the last time.

6          There are four distinct and separate areas of release;

7   and you confirmed that, correct?

8   A   Each of the four properties had a release on them.

9   Q   I call that distinct.  Would you disagree with my term

10  distinct?

11          MR. GRIGGS:  Objection.  Argumentative.

12          THE COURT:  I'll sustain.

13          Next question.

14  BY MR. BOWMAN:

15  Q   There are separate areas of release, correct?

16  A   Yes, I would say so.

17  Q   You made no attempt to define the specific limits of any

18  specific area of release, correct?

19  A   No.  I did not try to determine how far the plume migrated

20  from each source.

21  Q   You made no effort to quantify the volume of the solvent

22  released at each facility?

23  A   Yeah, there wasn't sufficient data to do so.

24  Q   You made no effort to assign relative contribution of each

25  facility to the commingled plume, correct?

MCINNES – CROSS/BOWMAN                                    162

1   A   Again, the data was insufficient to do so.

2   Q   You made no effort to assign relative contribution to the

3   commingled plume, correct?

4   A   I don't think that that characterizes what I said.  I

5   looked at the data to determine whether or not the data was

6   specific enough to do that kind of analysis.  I didn't think

7   there was enough data that -- there wasn't sufficient data to

8   make that analysis, so I made no effort to do that analysis.

9           MR. BOWMAN:  Well, I move to strike as

10  nonresponsive?

11          THE COURT:  He was responsive.

12          Next question.

13  BY MR. BOWMAN:

14  Q   You were deposed on June 26th, 2018, correct?

15  A   That sounds right.

16  Q   I would ask that you read --

17          MR. BOWMAN:  Approach, please.

18          THE COURT:  You may.

19  BY MR. BOWMAN:

20  Q   Page 28, lines 8 to 10 of your deposition.

21      Have you had a chance to read that?

22  A   Eight to 10?

23  Q   Eight to 10 on page 28.

24  A   Yes, I read that.

25  Q   My question was:  "And you made no effort to assign

1  contribution either by facility or by party?"

2         What was your answer?

3  A    The answer was, "No."

4  Q    Thank you.

5         You've offered no opinion regarding whether any

6  particular upgradient property is or is not impacting the

7  Von Duprin property, correct?

8  A    Yeah, I offered an opinion that all of these properties

9  had sources on them.

10  Q    That contributed to a commingled plume?

11  A    That's correct.

12  Q    So you made no opinion regarding whether any particular

13  property upgradient -- there are three -- was or was not

14  impacting the Von Duprin property, correct?

15  A    My opinion was all of these properties contributed to the

16  commingled plume, which is under the Von Duprin property and

17  farther downgradient.

18  Q    Is part of your expert report, you actually never even

19  conduct -- you did a single calculation, correct?

20  A    I don't understand the question.

21  Q    In preparing your report, in your opinions, did you have

22  to do a calculation of any sort?

23  A    The opinions there weren't based on specific mathematical

24  calculations.  They're based on a pattern that's observable in

25  the data.

*MCINNES - CROSS/BOWMAN*                                    164

1   Q   Okay.  So my question is:  Did you create or conduct any

2   calculations as part of your expert opinions?

3   A   I can't think of any calculations that were inherent in

4   the opinions.

5   Q   So no, you did not?

6   A   Correct.

7   Q   Based on your review of the data, you did find evidence of

8   release of PCE at the former Von Duprin property, correct?

9   A   Yes.

10  Q   As part of your opinions, you did not express -- as part

11  of your expert report, you did not express any opinions

12  regarding the relative concentrations of PCE or TCE at each

13  property?

14  A   That's correct.

15  Q   In your report, I believe you found evidence of TCE in the

16  shallow soil at Moran, correct?

17  A   Yes.  There was TCE in the shallow soil at Moran.

18  Q   TCE?

19  A   TCE.

20  Q   There was no evidence of PCE in shallow soil at Moran,

21  correct?

22  A   I don't recall specifically in shallow soil, but there was

23  PCE on all four of the properties that we looked at.

24  Q   Well, I heard you say that; but if we turn to page 5 of

25  your report -- it starts on 4 and goes to 5.  The bottom of 4

1   talks about Moran, talks about TCE in parts washers.

2          If you go to the top of the next page, 5, further

3   discussion of that and as you go down to the end of that

4   section on Moran -- scroll down further -- your opinion is,

5   "The observed pattern of TCE present in shallow soil, TCE

6   present in the underlying vadose zone soil, and TCE present in

7   the underlying shallow groundwater zone demonstrate that TCE

8   was released at the former Moran facility," correct?

9   A   Yes --

10  Q   That's your opinion?

11  A   If you'll go up higher in there, you can see I call out

12  that there was PCE detected in each of those intervals as

13  well.

14  Q   Well, as part of your opinions, you've not opined upon the

15  rate of degradation of chlorinated solvent at this site,

16  correct?

17  A   That's correct.

18  Q   And you've offered no opinions regarding the rate of

19  migration of any contaminant at this site, correct?

20  A   That's correct.

21          MR. BOWMAN:  Thank you very much.

22          THE COURT:  Before you begin, Mr. Bowman, did you

23  offer 104 into evidence?  You did not.  Do you want to?

24          MR. BOWMAN:  Yes, I do.  I mean, it was brought by

25  them.  I guess I had an assumption that when he brought up 104

1    but I guess he didn't move to admit.  So I would.

2            THE COURT:  No one's moved to admit it.  Anybody

3    have any objection?

4            Mr. Griggs, 104?

5            MR. GRIGGS:  No objection.

6            MR. BOWMAN:  It's the Stantec report.

7            THE COURT:  The witness has testified to it twice

8    regarding his report.  It's been displayed to the Court twice.

9    If there's an appeal, they're going to say, "What's 104?"

10   We've referred to it.  No one objected when it was referred to

11   and displayed to the Court.

12           Mr. Gardner?

13           MR. GARDNER:  Are we going to enter all the expert

14   reports if all the experts testify to them, Your Honor?

15           THE COURT:  If you offer them.

16           MR. GARDNER:  Okay.  Then I think -- no objection,

17   Your Honor.

18           THE COURT:  Exhibit 104 is admitted into evidence

19   without objection.

20       *(Plaintiff's Exhibit 104 was received in evidence.)*

21           MR. GARDNER:  Ms. Hill, can you leave 104 up on for

22   now?

23                        **CROSS-EXAMINATION**

24   BY MR. GARDNER:

25   Q   Mr. McInnes, my name is Sam Gardner.  I think we met

1  during your deposition, but that was a long time ago.  I

2  represent the Major Holdings and Major Tool defendants in this

3  matter.  I'm going third today, so I may be jumping around a

4  little bit; but I will try to be relatively brief for you.

5          First, in forming your opinions in this case -- well,

6  let's back up.

7          There are hundreds of documents relating to the

8  operations and contamination on these properties, right?

9  A    I understand there's many documents, yes.

10 Q    Maybe even thousands?

11 A    Could be.

12 Q    In forming your opinions in this case, you relied on only

13 12 of those documents, right?

14 A    In terms of looking at historical operations, right.  We

15 only looked at a limited subset of the documents, mainly

16 because that was not a key technical point in the lines of

17 evidence that I was putting forth.

18 Q    So the 12 documents that you cite in your report that you

19 relied upon, those are just documents you relied upon for

20 determining what operations were going on on the properties?

21 A    That's correct.  I think they illustrated to me

22 sufficiently that these were areas that likely had chlorinated

23 solvents, and then I relied on the actual soil and groundwater

24 data from there on out.

25 Q    You didn't collect any data of your own, right?

*MCINNES - CROSS/GARDNER*                                    168

1  A    No.

2  Q    With regard to your opinion specifically, you're not

3  claiming that Major Holdings or Major Tool ever used any

4  chlorinated solvents in their operations, right?

5  A    That's correct.

6  Q    And you're not claiming that they ever stored any

7  chlorinated solvents in the course of their operations, right?

8  A    That's correct.

9  Q    And you're not claiming that Major Holdings or Major Tool

10 ever released any chlorinated solvents in the course of their

11 operations, right?

12 A    That's correct.

13 Q    And you're not claiming that Major Holdings or Major Tool

14 ever caused or contributed to any of the contamination at

15 issue in this case, right?

16 A    That's right.

17 Q    And you're not offering an opinion that any specific

18 percentage or portion of this commingled plume is somehow

19 attributable to a particular party, right?

20 A    That's correct.

21 Q    Now, you didn't do any relative comparison between the

22 degree of contamination on each of the properties, did you?

23 A    No, I did not.

24 Q    So, for instance, you couldn't -- you didn't compare the

25 contamination on the Ertel property against the contamination

1  on the Von Duprin site to determine which was more or which

2  was less, right?

3  A   That's correct, but there had also been substantial

4  excavations on some of these properties.  So we didn't have

5  data to look at kind of an apples-to-apples type of a

6  comparison.

7  Q   But you didn't do that apples-to-apples type of

8  comparison, right?

9  A   That's correct.  One couldn't be done.

10 Q   But you did form some opinions regarding which parties'

11 operations or which entities' operations were consistent with

12 the use of chlorinated solvents on these properties, right?

13        MR. GRIGGS:  I'll object.  That's not part of the

14 expert report, and we established on direct that we're not

15 going to have new expert opinions.

16        MR. GARDNER:  Can we go to page --

17        THE COURT:  Well, let me rule on the objection.  Are

18 you withdrawing the question?

19        MR. GARDNER:  I can withdraw it and establish a

20 foundation for it.

21        THE COURT:  Question is withdrawn.  Next question.

22        MR. GARDNER:  Let's go to page 3 of his report, if

23 you could, Ms. Hill.

24        THE COURT:  Which document are we looking at?  You

25 need to say the number for the record.

1          MR. GARDNER:  Exhibit 104.

2          If you'll scroll down to the actual page 3 of his

3   report.  Keep going.  Keep going.  Okay.  Right here.

4   BY MR. GARDNER:

5   Q   So under the bullet point -- or under No. 2, you say, "The

6   reported manufacturing processes conducted by Ertel were

7   consistent with historical use of chlorinated solvents,

8   including TCE."  Do you see that?

9   A   Yes.

10  Q   So it was Ertel's operations that were consistent with the

11  historical use of chlorinated solvents, including TCE, right?

12  A   Yes, the ones that we read about in those documents.

13         MR. GARDNER:  Ms. Hill, if you'll scroll down just

14  one more page, towards the bottom, if you would.  Thank you.

15  BY MR. GARDNER:

16  Q   And then for the Moran property, you say, "The reported

17  manufacturing processes conducted by Moran were consistent

18  with historical use of chlorinated solvents, including TCE,"

19  right?

20  A   Yes, that's what it says.

21  Q   For the Zimmer Paper parcel, you didn't --

22         COURT REPORTER:  Excuse me.  Please slow down.

23         MR. GARDNER:  Sorry.  I can slow down.

24  BY MR. GARDNER:

25  Q   For the Zimmer Paper Parcel, you didn't identify any

*MCINNES - CROSS/GARDNER*                                171

1   particular party whose operations on that property were

2   consistent with the use of chlorinated solvents on that

3   property, right?

4   A   I would have to look at that part of the report.

5           MR. GARDNER:  Will you scroll back up to I think

6   it's page 2 maybe or 3.  Right there.  Thank you.

7   BY MR. GARDNER:

8   Q   You just say the reported manufacturing process --

9   A   I --

10          THE COURT:  You can't talk at the same time.

11  BY MR. GARDNER:

12  Q   Go ahead.

13  A   I talked about the manufacturing processes on that piece

14  of property.

15  BY MR. GARDNER:

16  Q   And when you're talking about the reported manufacturing

17  processes, you reference a 16,000-gallon underground storage

18  tank.  Do you remember that?

19  A   Yes.

20  Q   That was removed from the property in 2007?

21  A   Correct.

22  Q   Now, there was no evidence demonstrating that this tank

23  actually contained any chlorinated solvents, was there?

24  A   I don't recall the specific evidence around that tank.

25  Again, as I said before, my analysis was primarily related on

*MCINNES - CROSS/GARDNER*                                172

1    what we saw in the soil and groundwater data.

2    Q   So you don't know whether there were any documents at all

3    that showed that that tank contained chlorinated solvents?

4    A   I don't recall what the document said about the contents

5    of that tank.

6    Q   What about the contents of the 55-gallon drums on the

7    property that you were referencing in this report?  Do you

8    know of any documents that say that the drums contained

9    chlorinated solvents?

10   A   There was information about them being solvents-containing

11   drums and so forth.  I don't know that I have specific data

12   about them containing PCE or TCE.  It's just an example of the

13   kinds of operations that were on that property.

14   Q   It just says "solvents," right?

15   A   Solvents and silicones or something like that.

16   Q   Are you aware that Moran operated on the Zimmer property

17   in addition to the Moran property?

18   A   Yes.

19   Q   And it's your at least opinion offered in your report that

20   Moran's operations on the Moran property were consistent with

21   historical use of chlorinated solvents, including TCE,

22   correct?

23   A   I believe that was in the report, yes.

24   Q   Okay.  Now, if we scroll down --

25            MR. GARDNER:  Ms. Hill, could you scroll down to I

1  believe it's No. 4.  It would be page 5 of Exhibit 104.

2  Scroll up.  We just passed it.  You can stop right there.

3  Thank you.

4  BY MR. GARDNER:

5  Q   You note, "The reported manufacturing processes conducted

6  by Threaded Rod were consistent with historical use of

7  chlorinated solvents, including TCE."

8         Now, would you agree that the historical use of

9  chlorinated solvents is also demonstrated by the documents

10 that you saw relating to Von Duprin's manufacturing processes

11 on the Von Duprin site?

12 A   I don't have a specific recollection of who was using what

13 at different times.  My analysis was much more focused on

14 materials being used in a physical geographic area, not who

15 was using it.

16 Q   But are you aware that Von Duprin used degreasers and

17 handled a variety of commercial chemical solvents, including

18 chemical solvents, during the time it owned and operated the

19 Von Duprin site?

20 A   I know they used chlorinated solvents when they were

21 there, yes.

22 Q   Now, you've testified --

23         MR. GARDNER:  And Ms. Hill, actually, could we

24 scroll down just to the last opinion that he offers.  It's

25 No. 5, I believe.  Scroll up just a little bit, if you could.

*MCINNES - CROSS/GARDNER*                              174

1   Thank you very much.

2   BY MR. GARDNER:

3   Q    There's been a lot of back and forth about this section of

4   your particular report, and I do want to ask you a few

5   questions about it.

6         You've testified that based on the magnitude, extent,

7   and pattern of impacts observed on all four of these

8   properties, that contamination from all four contributed

9   significantly to the commingled plume; is that right?

10  A    That's correct.

11  Q    Now, your use of the term "significantly" here, it's not

12  based upon the contamination being above any particular

13  threshold, right?

14  A    Well, there were concentrations above a number of

15  different regulatory thresholds out there.  All of the sites

16  exhibited high concentrations in soil and in groundwater.

17  Q    But, for instance, you didn't say any site that's showing

18  TCE hits above this level is considered significant; is that

19  right?

20  A    I didn't say that, no.

21  Q    So was it just whatever you subjectively determined was

22  significant?

23  A    These were concentrations in the part per million range,

24  which are significant concentrations.  They're well above the

25  IDEM migration-to-groundwater criteria.  So when you're

*MCINNES - CROSS/GARDNER*                              175

1  looking at soil concentrations, migration to groundwater is

2  the criteria used.  All these sites had concentrations above

3  migration to groundwater in the soil.

4  Q   You referenced the extent and magnitude of contamination

5  on each of those properties.  So to say that they're all

6  contributing significantly to the commingled plume, first, you

7  had to determine what the extent and magnitude of the

8  contamination on each of these sites was, correct?

9  A   We certainly looked at the extent and magnitude of

10 concentrations in the soil on each site and in the

11 groundwater.

12 Q   So, for instance, what's the magnitude and extent of

13 contamination on the Zimmer property?

14 A   Well, I pointed out in my report a number of places where

15 there were high concentrations within the pattern of a source

16 area that I described so I could walk through some of those

17 borings that are recorded in the report.

18 Q   But it's all based on whatever is in the boring logs?

19 That's how you determined the magnitude and extent?

20 A   Yes, in the boring logs and in the analytical results.

21 Q   Okay.  To determine whether a contamination on a

22 particular piece of property is contributing significantly to

23 a commingled plume, you have to know more than that there's

24 just a release on the property, right?

25 A   That's correct.

1    Q    And you have to do more than determine what the level of

2    contamination is on that particular property, right?

3    A    You have to at least understand that you have got

4    concentrations getting down to groundwater and high

5    concentrations in the groundwater.

6    Q    Okay, because even if there was a release on the

7    contamination, it's not necessarily true that it would migrate

8    to another property, right?

9    A    Not necessarily true; but in the case of all of these

10   sites, you had a clear pattern of a release near the surface

11   migrating vertically through the soil column and into

12   groundwater at high concentrations.

13   Q    But what matters then in terms of whether they're

14   contributing significantly to this commingled plume is what's

15   actually migrating off the site, right?

16   A    That's true.

17   Q    Do you also -- well, let me phrase it this way.

18           To know if it's contributing significantly, you also

19   need to know how far the contamination is migrating, right?

20   A    I can't tell you how far each individual one of these is

21   migrating --

22   Q    Hold on.  Let me rephrase my question.  I'm not asking

23   necessarily if you can tell me.  I'm just saying to know

24   whether it's contributing significantly to the plume, you have

25   to know how far the contamination from a particular piece of

MCINNES – CROSS/GARDNER                    177

1  property is migrating, right?

2  A   I just need to know that it's migrated until it's gotten

3  into the next one because all you can see is the vertical path

4  to groundwater; and then you look at the groundwater

5  downgradient of that, and it's all impacted until you get into

6  the next area where there's source.  So how far it went beyond

7  that, you can't tell because it's mixed with the other plumes.

8  Q   So, for instance, you couldn't say that any contamination

9  from Ertel was necessarily -- necessarily ever made its way

10 down to the Von Duprin site, right?

11 A   There was high concentrations getting down to groundwater

12 and migrating directly downgradient --

13          COURT REPORTER:  Excuse me.  I need both of you to

14 please slow down.

15 BY MR. GARDNER:

16 Q   My question -- and I can rephrase it -- is you can't tell

17 necessarily that any contamination from the Ertel property

18 ever actually made its way down to the Von Duprin site or any

19 other property downgradient, right?

20 A   There's no evidence between the Ertel and the Von Duprin

21 properties that the plume stopped.

22 Q   Thank you.  In determining that each of the properties

23 contribute significantly to the commingled plume, you didn't

24 differentiate necessarily between the amount of PCE or TCE

25 releases on the sites, right?

*MCINNES – CROSS/GARDNER*                              178

1   A    That's correct.

2   Q    As you sit here today, can you say whether there is any

3   historical data from any time that shows that the levels of

4   TCE or PCE in the shallow groundwater on any of the upgradient

5   properties ever exceeded the levels of TCE or PCE in the

6   shallow groundwater on the Von Duprin property?

7   A    I would have to look at the data to be able to answer that

8   question.  That's a pretty specific question, and I don't have

9   the data memorized.

10  Q    Okay.  But from what you can recall, you didn't see

11  anything that said the contamination in the shallow

12  groundwater, whether it be PCE or TCE, was higher coming from

13  the upgradient properties as it was migrating to the

14  Von Duprin property?

15          MR. BOWMAN:  My only concern here -- I object.  I

16  believe it's beyond the scope of his expert opinion.

17          THE COURT:  I'm going to sustain.  He said he didn't

18  study the concentrations.

19  BY MR. GARDNER:

20  Q    Now, you offered some testimony earlier when Mr. Griggs

21  was questioning you that there was an individual plume

22  underneath each property.  You didn't offer that opinion in

23  your expert report, did you?

24  A    No.

25  Q    I believe Mr. Bowman asked you about it; but just so we

 1  can clarify and as my final question, it's not your testimony

 2  that these four properties are the only four properties that

 3  could possibly be contributing to the commingled plume, right?

 4  A   That's correct, but all of them contributed.

 5          MR. GARDNER:  No further questions at this time,

 6  Your Honor.

 7          THE COURT:  Okay.

 8          Mr. Griggs.

 9                    **REDIRECT EXAMINATION**

10  BY MR. GRIGGS:

11  Q   In response to one of the cross-examination questions, you

12  mentioned PPC -- sorry -- PPM levels in groundwater.  Can you

13  give us what that would be in parts per billion?

14  A   Well, 1 part per million is a thousand parts per billion.

15  Q   Do you happen to recall what the IDEM standard is for TCE

16  in drinking water?

17  A   It's 5 parts per billion.

18  Q   So we're talking about levels coming off of the upgradient

19  properties that are 200 times the state regulatory limit?

20  A   Yes, or more.

21  Q   Can you tell from the data that you have reviewed how much

22  mass was being contributed to the groundwater by the Ertel

23  property in 1950?

24          MR. BOWMAN:  Objection.  His opinion -- he says he

25  made no calculations of mass or volume.

1          MR. GRIGGS:  I didn't ask him to make a calculation.

2    I asked him if the data gave any information about what

3    happened at a specific site in 1950.

4          MR. BOWMAN:  The objection stands.  He said in his

5    report that he made no opinions regarding volume.

6          THE COURT:  And I'll overrule.  I don't think he

7    asked for an opinion.  He just asked him --

8          MR. GRIGGS:  What does the data show or not show.

9          THE COURT:  Was that in the data about 1950.

10   A   The data doesn't tell me anything about 1950.

11   BY MR. GRIGGS:

12   Q   There's no data from that time; is that right?

13   A   That's right.

14   Q   Is there any data from the 1960s for any of the upgradient

15   properties?

16   A   None that I've seen.

17   Q   Any from the 1970s?

18   A   No.

19   Q   Once the contaminants enter the groundwater from

20   individual releases, I believe you said that they form a

21   commingled plume?

22   A   Yes.

23   Q   And once they have merged together -- I think you

24   described it in your direct testimony as a merging.  I like

25   that word -- can you then determine how far a single molecule

1   is going to go?

2          MR. BOWMAN:  Objection.  I asked him whether he is

3   an expert in groundwater modeling.  He said he is not.

4          MR. GARDNER:  We would join that objection, Your

5   Honor.

6          MR. GRIGGS:  We're not talking about groundwater

7   modeling.  Modeling is a tool to predict behavior.  This is

8   merely a question about whether the individual molecules

9   retain a specific character.  I think he testified about it

10  before.  It's a blob.

11         MR. BOWMAN:  He is not an expert in groundwater

12  modeling.  He's done no analysis of groundwater modeling.

13  This is a question that gets to the heart of groundwater

14  modeling and whether constituents at point A can be calculated

15  for point B.  He's asking him a question beyond the area of

16  his report, and it's actually an area that's beyond his area

17  of expertise.

18         THE COURT:  Is this beyond your area of expertise?

19         THE WITNESS:  No.

20         THE COURT:  You can answer this?

21         THE WITNESS:  I have to hear the question again.

22         THE COURT:  What he's asking is -- let's see.

23         "And once they have merged together -- I think you

24  described it in your direct testimony as a merging.  I like

25  that word -- can you then determine how far a single molecule

MCINNES – REDIRECT/GRIGGS                            182

1   is going to go?"

2           And I'm going to sustain on the question of how far.

3           So rephrase, counsel, because that's not what you

4   said in your comments.

5   BY MR. GRIGGS:

6   Q   Mr. McInnes, based on your experience and your knowledge

7   of the data related to this case, does the amount of time that

8   a chlorinated solvent molecule spins in the commingled plume

9   have any relationship to how far it can go?

10          MR. BOWMAN:  Objection.  That is a question beyond

11  his expert report; and that is, Your Honor, groundwater

12  modeling.  That is a fundamental question about groundwater

13  modeling.

14          MR. GARDNER:  We would join that objection, Your

15  Honor.

16          THE COURT:  Is that within your expertise?

17          THE WITNESS:  Yes, definitely.

18          THE COURT:  I'll let him answer it.

19          THE WITNESS:  The longer the molecule is in the

20  groundwater, the farther it can go.

21  BY MR. GRIGGS:

22  Q   One last question.  Mr. Gardner raised this issue, and

23  then I don't believe you got a chance to fully answer the

24  question.

25          Are you -- in reviewing the data, in evaluating the

1  data, did you find that -- I'm trying to think of the right

2  word.  There's probably a technical word for it.

3         Did you find -- I guess -- one last try.

4         The groundwater impacts leaving each of these four

5  properties, is there any data that you have seen that would

6  allow you to show that any of the sites have a separate plume

7  to itself?

8         MR. BOWMAN:  Objection.  Beyond the scope of his

9  expert opinion.  That is a collateral attack on Adam Love's

10  opinion, which if they wanted to provide they could have

11  provided.  He defined simply that there are separate areas of

12  release, and he went no way into analyzing and even says he

13  made no effort to analyze the extent to which those releases

14  migrated or moved.  He made no effort.

15         MR. GARDNER:  I would just join; but I would also

16  add that I think my question to him was, had he offered any

17  expert opinion about a plume being underneath each property,

18  and he said that he had not.

19         THE COURT:  I think what he's trying to get at, was

20  there any data to help him make that type of expert analysis.

21         MR. BOWMAN:  Well, and the issue there is, Your

22  Honor, Adam Love believes that there is sufficient data.

23  You're going to hear where others believe that there isn't.

24         This is now on the first day of trial an effort to

25  say the data is insufficient to do that.  We don't agree with

1   that.  This is an attack on Adam Love with a separate expert

2   opinion that's never been proffered.

3              MR. GRIGGS:  Mr. Love will have a chance to speak

4   for himself.  What Mr. McInnes has already testified to is

5   that this is a commingled plume.  By definition, you cannot

6   have a commingled plume that includes separate and distinct

7   plumes.

8              MR. BOWMAN:  And that's wrong.  We'll hear from Adam

9   Love --

10             COURT REPORTER:  One at a time, please.

11             THE COURT:  Sit down, gentlemen.  I'm going to let

12  him answer the question.

13             Did you have that data available?

14             THE WITNESS:  What was the first part of the

15  question?

16  BY MR. GRIGGS:

17  Q   Was there anything in the data set that allowed you to

18  define a separate or distinct plume for any one of the four

19  sites?

20  A   No.  There was one big commingled plume with separate

21  sources.

22             MR. GRIGGS:  That's all I have.

23             THE COURT:  I'll let your expert explain it to me

24  also.  Okay?

25             MR. BOWMAN:  Thank you, Your Honor.

1          THE COURT:  You're just going to have dueling

2     experts.

3          Any other questions for Mr. McInnes?

4          All right.  Thank you, sir.

5       *(Witness excused.)*

6          THE COURT:  Call your next witness.

7          What's your witness's name?

8          MR. GRIGGS:  The next witness is Ryan Groves from

9     the Indiana Department of Environmental Management.

10         THE COURT:  Mr. Groves, if you would come up here to

11    the witness stand.

12         MR. GRIGGS:  Mr. Groves has with him his personal

13    attorney, an attorney for the Indiana Department of

14    Environmental Management, Ms. April Lashbrook.

15         MS. LASHBROOK:  I'm appearing only to protect any

16    privileges that might be raised.

17         THE COURT:  Do you want to sit in the jury box so

18    you can see him?  Is that what you're asking?

19         MS. LASHBROOK:  If I could sit here.

20         THE COURT:  Okay.  We'll let you sit there.

21         Your name, counsel?

22         MR. LASHER:  Sure, yes, Your Honor.  My name is

23    April Lashbrook.  I'm an attorney with the Indiana Department

24    of Environmental Management, and I am admitted to the Southern

25    District of Indiana.

1      THE COURT:  And you're here today to do what,

2  counsel?

3      MR. LASHER:  To represent the Indiana Department of

4  Environmental Management and protect any privileges that might

5  be raised so that I could object, if necessary.

6      THE COURT:  Okay.  Go ahead and have a seat.

7      Sir, would you raise your right hand?

8   *(Witness sworn.)*

9      THE COURT:  You may examine your witness, counsel.

10         **RYAN LOUIS GROVES, PLAINTIFF'S WITNESS, SWORN**

11                    **DIRECT EXAMINATION**

12  BY MR. GRIGGS:

13  Q   Good afternoon.  Please state your name.

14  A   Ryan Louis Groves.

15  Q   Who is your current employer?

16  A   The Indiana Department of Environmental Management.

17  Q   What is your current position with the IDEM?

18  A   I am a section chief for the State Cleanup Program in the

19  Office of Land Quality.

20  Q   Have you held other positions at IDEM at well?

21  A   I have.

22  Q   What were those?

23  A   I was an environmental manager in our site assessment

24  program and a environmental manager in the State Cleanup

25  Program and a senior environmental manager in the State

GROVES - DIRECT/GRIGGS                    187

1   Cleanup Program prior to where I'm at now.

2   Q   Has your experience at IDEM made you familiar with the

3   protocols, policies, requirements connected with remediation?

4   A   Yes.

5   Q   What are your current job responsibilities as section

6   chief for State Cleanup Program?

7   A   I manage a staff of 12 project managers that manage

8   cleanup of approximately 650 contaminated sites across the

9   state of Indiana.

10  Q   How long have you worked at IDEM?

11  A   Nineteen plus years.

12  Q   And how long have you been working in the environmental

13  field overall?

14  A   Approximately 23.

15  Q   What's your educational background?

16  A   I have a bachelor's degree in biology from Colorado State

17  University and a master's degree in environmental science from

18  Indiana University in Bloomington.

19  Q   When did you first become involved in the Dr. Andrew J.

20  Brown corridor area?

21  A   The first time that I looked at that area was 2003.  We

22  were investigating the neighborhood area for another site for

23  lead contamination, and that brought us to looking at the

24  Ertel Manufacturing property for potential contamination and

25  potential impact from that lead contamination from the other

GROVES - DIRECT/GRIGGS                              188

1  site.

2  Q    Was the Ertel site in operation when you first became

3  aware of it in 2003?

4  A    No, it was not.

5  Q    Does IDEM have programs in place to deal with Indiana

6  sites that have been impacted by contamination?

7  A    Yes.

8  Q    And can you briefly describe what those programs are?

9  A    We have a State Cleanup Program for which I'm the manager

10  for that program.  We have our Voluntary Remediation Program.

11  That's kind of a sister program to the State Cleanup Program,

12  and our Brownfields Remediation Program.

13  Q    Have you done work or managed sites in each of those

14  programs?

15  A    I have.

16  Q    As the section chief, do you still have direct

17  responsibility for cleanup sites or is your job now all

18  managerial?

19  A    I have some sites that I maintain as the project manager.

20  Really, the Von Duprin site, which is part of this litigation,

21  and the Moran Electric site and the Zimmer parcel are all

22  under my name as project manager still.

23  Q    Is there still a project manager assigned for the Ertel

24  site?

25  A    No, there's not, because it's a closed site as far as the

1  agency is concerned.

2  Q   Were you the last project manager for that site?

3  A   Yes.

4  Q   Are you familiar with IDEM's Remediation Closure Guide?

5  A   I am, yes.

6          MR. GRIGGS:  Can we pull up Exhibit 1210, Dave.

7  BY MR. GRIGGS:

8  Q   On your screen, can you see the document that's been

9  displayed there?

10 A   Yes, I can.

11 Q   And is this the Remediation Closure Guide that you

12 referred to?

13 A   Yes, it is.

14 Q   Looks like it says, "With corrections through July 9,

15 2012."

16         Is that the latest version of this document, or is

17 there something more recent?

18 A   There's additional corrections or additions.  Closure

19 levels and screening levels for different contaminants get

20 changed on an annual basis or every six-month basis and put

21 out there; but this is the bulk of the document, the newest

22 version.

23 Q   So some updates from time to time?

24 A   Yes.

25 Q   Are you also familiar with what I believe is called the

GROVES - DIRECT/GRIGGS                    190

1   Remediation Program Guide?

2   A    I am, yes.

3          MR. GRIGGS:  Let's look at 1209.

4   BY MR. GRIGGS:

5   Q    Is the document that you see on the screen here -- is that

6   the cover page for the Remediation Program Guide?

7   A    It is, yes.

8   Q    These are, in fact, two separate documents?

9   A    That's correct.

10  Q    Despite the similarity in their names?

11  A    Yes.  They are two separate documents.

12  Q    Does the Remediation Program Guide provide any information

13  about the purpose and scope of the State Cleanup Program?

14  A    Which document were you referring to?

15  Q    Remediation Program Guide.

16  A    It's more administrative information on how each section

17  functions, not technical guidance on cleanup.

18         MR. GRIGGS:  Can you get us to Section 6.1, please.

19  Put that on the screen.

20  BY MR. GRIGGS:

21  Q    There's a big heading -- he's going to blow this up and

22  make it a little easier to read, I hope.

23         Do you see what's displayed on the screen, the purpose

24  and scope?  Is that a fair description of the State Cleanup

25  Program?

GROVES - DIRECT/GRIGGS                    191

1   A   Yes.

2   Q   Did you have a role in creating or writing the Remediation

3   Program Guide for IDEM?

4   A   I wrote this section.

5   Q   So according to this document, what is the purpose and

6   scope of the State Cleanup Program?

7   A   The State Cleanup Program manages cleanup, oversight of

8   cleanup of sites that are contaminated, mostly with hazardous

9   substances, also with petroleum that are not subject to NCP --

10  or I should say Superfund listing under the NCP.

11  Q   So does that mean that petroleum sites have their own

12  program somewhere else?

13  A   Not at this time.  Most of those -- everything that's not

14  a regulated underground storage tank, the petroleum release is

15  managed by the State Cleanup Program.

16  Q   Is the State Cleanup Program modeled or based on any other

17  program?

18  A   I'm not sure if I understand your question.  Other state

19  programs?

20  Q   I wanted to keep it open-ended.  Is it similar to other

21  programs in the state, similar to programs in other states,

22  similar to federal programs?

23  A   The State Cleanup Program was the first remediation

24  program that the agency had.  It's loosely modeled after the

25  federal Superfund.

GROVES - DIRECT/GRIGGS                     192

1  Q   What is the role of the RPG and RCG documents with respect
2  to cleanup of sites in Indiana?
3  A   The program guide, the RPG, like I said, was more of a --
4  meant to be an administrative type of document to tell people
5  what sites each program manages, what they look at, what laws
6  they use to require cleanup or manage oversight.
7        The closure guide, the RCG, was meant to be the
8  technical specifications for cleanup and investigation and
9  closure of a given release or a contaminant event.  So they're
10  really administrative versus technical is the difference.
11  Q   Does IDEM expect that parties or consultants working on
12  sites in Indiana will follow the RCG and the RPG?
13  A   That's our expectation, yes.
14  Q   Are there consequences if your expectations are not met?
15  A   Yes.
16  Q   In your experience, do most environmental firms working on
17  Indiana cleanup sites understand that they are supposed to and
18  must follow the RCG and RPG documents?
19  A   Consultants and attorneys in the state of Indiana that
20  work primarily in the state of Indiana seem to understand
21  those after seven years of having it as our guidance, yes.
22  Q   Do you still find occasionally that somebody isn't up to
23  speed, and you have to kind of get them up to speed?
24  A   Occasionally.  It's more the rarity these days, but there
25  are those times.

GROVES - DIRECT/GRIGGS                    193

1  Q    Is it IDEM's intention or policy that these state

2  guidelines will meet applicable federal requirements as well?

3  A    That's our expectation; but I won't say that every program

4  that the federal government has available to it, that it meets

5  all those; but our expectation is when you're done following

6  the guidance and meet the closure levels that we specify in

7  there, that you would meet most federal remediation

8  requirements that are out there.

9  Q    Is there any kind of formal understanding between the

10 State of Indiana and the U.S. EPA with regard to that?

11 A    We have some different policy documents, agreements for

12 our federal oversight program that manages more the EPA lead

13 Superfund sites.  We've had occasion where we've had

14 alternative cleanups that they've been in agreement that if

15 they follow our technical guidance, then that will meet their

16 standards as well.

17        I think the RCRA program -- our RCRA corrective action

18 program has similar agreements in place, because they're

19 really a federal program that they're implementing.  And in

20 some way, the TSCA program, but it's got some of its own --

21        COURT REPORTER:  Excuse me.  Could you repeat that

22 word?

23        THE WITNESS:  TSCA, T-S-C-A, that has some

24 additional requirements in federal law that goes beyond --

25 from a permit standpoint that goes beyond RCG.

GROVES - DIRECT/GRIGGS                              194

1  BY MR. GRIGGS:

2  Q   I want to show you a document and see if it's a document

3  that you recognize.  It's on IDEM letterhead, so I think you

4  might.

5       Do you know what this document is?

6  A   It's a Memorandum of Agreement between IDEM and the U.S.

7  EPA for our Voluntary Remediation Program.

8  Q   And is the Von Duprin site in the Voluntary Remediation

9  Program?

10  A   Yes, it is.

11  Q   Does this Memorandum of Agreement apply to that site?

12  A   Yes, it would.

13  Q   What are the contaminants of concern in the Dr. Andrew J.

14  Brown corridor area?

15  A   Primarily chlorinated solvent, chlorinated organic

16  compounds that were remnant of manufacturing operations that

17  were used for degreasing and cleaning of parts and different

18  things in some of those manufacturing operations.

19  Q   Are there specific compounds within the broad term

20  "chlorinated solvents" that IDEM has been concerned about?

21  A   Yes.  There's specific named compounds that we would be

22  concerned about.

23  Q   What are those?

24  A   Perchloroethylene and trichloroethylene.  Those are the

25  primary two.

GROVES - DIRECT/GRIGGS                      195

1  Q   Are those sometimes referred to as PCE and TCE?

2  A   Yes.

3  Q   Are those two compounds found in nature or are they

4  man-made?

5  A   My understanding is they're man-made.

6  Q   Have you worked on chlorinated solvent sites before these

7  four sites?

8  A   Yes.  That's the majority of the work that we do.

9  Q   How many chlorinated solvent sites have you personally

10  worked on?

11  A   Over a hundred to 200, somewhere in that range.

12  Q   How many chlorinated solvent sites would you say you work

13  on at one time?

14  A   All of our project managers have anywhere from 35 to 40

15  projects.  Ninety to 95 percent of those are chlorinated

16  solvent sites.  We have a few other oddball chemical

17  contaminated sites and petroleum sites, but the majority of

18  them are chlorinated solvent sites.  So out of our active 650

19  or so projects in our program in state cleanup, I would say

20  90 percent of those -- 75 to 90 percent of those are

21  chlorinated solvent sites.

22  Q   You indicated that your first connection with the area was

23  the Ertel property I believe you said in 2003; is that

24  correct?

25  A   That's correct.

1  Q   Beyond that first involvement, what happened next?

2  A   We went out to look at the Ertel property as part of the

3  other investigation.  When we went out and looked at it,

4  myself and a couple of other folks at IDEM, to potentially do

5  some sampling, we saw quite a bit more.  The facility was

6  vacant.

7       When we went closer -- we didn't go inside at that

8  point; but when we went closer, we saw that there were still

9  some drums that were shrink-wrapped and looked like they were

10 ready to be taken for disposal but hadn't; and there were some

11 other vats and different things inside that had some chemicals

12 still in it.

13      The building was not in very good shape.  It looks

14 like it hadn't had a lot of maintenance done to it.  So it was

15 already having some structural issues.  It looked like the

16 power was off.

17      So at that point we went back -- I was a senior

18 environmental manager at that point.  So we had a discussion

19 with my management chain about whether we wanted to do some

20 sampling.

21      We decided at that point to look and see who the owner

22 was because we didn't know at that point who it was and try to

23 get access to the property.  So that was our first next step

24 with that, which we found that the company that had bought

25 Ertel, Dynagear, was bankrupt.  There was a bankruptcy trustee

GROVES - DIRECT/GRIGGS                    197

1  that the Court had appointed.  So we moved forward to getting

2  access through that bankruptcy court trustee.

3           Before we could move forward with sampling, we got a

4  call from Marion County Health Department; and I don't know

5  how that came in but they called us.  They wanted us to come

6  out and look at the facility because some of the transformers

7  that were live on the pole outside to run the power to the

8  facility -- even though it had been cut off from those

9  transformers into the plant, somebody had climbed the pole and

10 pulled those transformers down while they were alive and

11 cracked them open to try to get the copper out of them.

12          So Marion County had concerns over PCB contamination

13 from those transformers.  So we did some sampling of soil

14 there.

15          Then after that, we went through; and we walked the

16 facility, got some pictures, got some better information on

17 how much waste might be left behind; and then we made a

18 referral to the EPA to their Superfund Removal Program.

19 Q   I'm going to be very careful about asking you open-ended

20 questions.  That was quite an answer, but thank you.

21          You mentioned some pictures; and I think we have some

22 of those, starting with 1229.

23          Do you see that on the screen?

24 A   Yes.

25 Q   Do you know what that's a picture of?

1   A    That's -- I don't know what part of the facility anymore,

2   but that was the inside of the Ertel facility.

3   Q    Do you recall -- do you recall who took this picture?

4   A    I do not.

5   Q    This picture came off of the IDEM Virtual File Cabinet --

6   A    Okay.

7   Q    -- out of the Ertel site folder.

8           MR. GRIGGS:  Let's look at 1230.

9   BY MR. GRIGGS:

10  Q    And can you tell us what this is a picture of?  Is it

11  still the Ertel site?

12  A    Looks to be, yes.

13  Q    What do you see in this picture?

14  A    Looks like there's a storm drain or floor drain with

15  standing water on top of that drain.

16          MR. GRIGGS:  1231.

17  BY MR. GRIGGS:

18  Q    Now, that's a little dark on my screen.  Can you tell what

19  we're looking at there?

20  A    There's a ladder looks like with a subsurface pit or some

21  kind of utility.

22  Q    Is that a white bucket at the bottom of the ladder?

23  A    Looks to be.

24  Q    You weren't using that to sample that water, were you?

25  A    No.  No, sir.

GROVES - DIRECT/GRIGGS                          199

1              MR. GRIGGS:  1232.

2    BY MR. GRIGGS:

3    Q    How about that?  Does that look familiar?

4    A    Yeah, that's in the Ertel facility as well.

5    Q    Can you tell in looking at this picture, is the tank two

6    colors or are we seeing a liquid level in that tank?

7    A    The bottom third or so looks like it's a little bit

8    darker.  There might be a line of demarcation there.  It's

9    very hard to tell, but it looks like there might be.

10             MR. GRIGGS:  Whichever number is next, 1233.

11   BY MR. GRIGGS:

12   Q    How about that?

13   A    That's also inside the Ertel facility.  Those are some of

14   the drums that we saw when we first came on the site.

15   Q    You said they had been shrink-wrapped like they might be

16   being shipped, but they were still there?

17   A    Our assumption was with the bankruptcy, that somebody

18   had -- they knew that they needed to get rid of some of the

19   waste materials or some of the material that they had.  I

20   won't say it's waste material.  I don't actually know what was

21   inside those drums, but they had put them on a pallet and

22   shrink-wrapped them like they were going to take them for

23   disposal.

24   Q    What happened to those drums?

25   A    EPA ended up coming in and taking those for disposal.

GROVES - DIRECT/GRIGGS                    200

1    Q    Did they characterize those drums?

2    A    They did, yes.

3    Q    Is that data available somewhere with IDEM or EPA?

4    A    It should be with EPA, yes.

5    Q    1234, how about that?

6    A    That's -- looks like the kind of central to northern part

7    of the Ertel facility.

8    Q    What do you see in that picture that we ought to be aware

9    of?

10   A    It looks like some standing water.  I will say at least --

11   which we did have -- when EPA did the removal, there was some

12   sludge on the floor, different operations in the near ground.

13   Q    I don't see any, like, manufacturing equipment.

14   A    No, there's none in this picture.

15   Q    Was it removed or was it never there?  Do you know?

16   A    From the time that I walked in there, I never -- I didn't

17   see any in certain parts of the plant.  So really, other than,

18   you know, what turned out to be a vapor degreaser in the

19   northern part of the building, in that northern third to

20   northern half of the building, there was no machine in there.

21   Some of the equipment that was left behind -- some of it was

22   already pulled outside the building by the scrap salvage folks

23   that were trying to get access to the building.

24          What I did see was more in the middle to southern part

25   of the facility, had a few machines that looked like still

GROVES - DIRECT/GRIGGS                    201

1   left behind.

2            MR. GRIGGS:  I think we have one more picture, 1235.

3   BY MR. GRIGGS:

4   Q   How about that?

5   A   That's the -- would be the east side of the Ertel

6   facility, what we call the courtyard.

7   Q   Is that water on the ground, big puddle?

8   A   That is, yes.

9   Q   And what's the time period?  What vintage are we talking

10  about here?

11  A   That's pre-removal as far as I can remember, so that would

12  be anywhere from 2003 to 2005.

13  Q   And do the pictures that we've just gone through -- are

14  those consistent with your own personal memory of what the

15  site looked like in the 2003 to 2005 time period?

16  A   Yes.

17  Q   And I believe you said that -- in the end of your previous

18  answer -- that you had contacted EPA and asked them to do

19  something.  Can you tell us more specifically what it was EPA

20  was to do?

21  A   When we run into a facility that has drums left behind and

22  like that plastic tote of material, that becomes more than the

23  agency can deal with financially.  So oftentimes, we make a

24  referral to the EPA to the removal program.

25            In this case, we weren't sure we had a responsible

1   party at the time.  We just knew it was a bankrupt facility

2   with a bankrupt company that owned it.

3          So when we do that, our expectation is that EPA will

4   come in.  They'll do what's called a removal site assessment.

5   So they'll come in, and they'll bring their contractor in.

6   They'll sample drums, do a waste characterization on the

7   material.  They'll bulk material together that's compatible,

8   and they'll find disposal locations and ship that off for

9   disposal.

10          In the case of this, they came in; and they sampled

11   some sludge on the floor and one of those basement areas that

12   you showed, not that particular one as I remember but another

13   one.  That was one I had to sample because we were aware that

14   another scrap salvage guy came in and tried to pull

15   transformers out and scrap those and dump the oil down in that

16   lower basement.  It was really a utility-type basement, and it

17   had water in it.  So we sampled that.  It had PCBs.  So EPA

18   backed that water out and took it off for disposal.  So they

19   do things like that to try to get rid of surface waste in

20   hopes that the site doesn't get worse.

21          In the case of guys coming in to scrap things out, it

22   would have been real easy for them to dump the drums over and

23   scrap the transformers and do the things that they were doing.

24   So we didn't want to have things get any worse.  EPA fills

25   that role for us.

1   Q    Does IDEM or EPA have a term for that kind of cleanup

2   work?

3   A    As far as I know, it's just called a Superfund removal

4   action.

5   Q    Is it intended to be the last thing done at the site?

6   A    No, hardly ever.

7   Q    Is it designed to make the site safe or safer in the short

8   term?

9   A    Yes.  That's an accurate depiction, yes.

10  Q    So once EPA did that work and got rid of some of the

11  drummed waste and standing liquids, liquids in tanks maybe,

12  did IDEM take back over that site or responsibility for that

13  site?

14  A    We did.  We often on these removal actions get them

15  referred back to us from EPA, and we've got a tracking system

16  for that.  They will refer them back to us, and we will do

17  additional assessment and try to determine if subsurface soils

18  and groundwater need additional cleanup.

19  Q    When you first saw the Ertel site, was it physically

20  secure?  Were there fences or was the building locked?

21  A    There was a fence.  It had been breached.  As I recall,

22  the doors along the front that face Dr. A.J. Brown were

23  locked; so you couldn't get in through those, and those hadn't

24  been breached.  But it looked like a lot of the scrap salvage

25  operators were coming in through the back and breaching the

1   fence.

2        As you can see from this picture that's on the screen,

3   that was the way it was when I went there in 2003.  Some of

4   those doors were open.  That roll-top door had been pushed off

5   the hinges, you know, to get equipment out.  So I don't know

6   whether when the facility stopped operating if that's the way

7   it was or if vandals came in there and caused that.  It was

8   easily accessed from this back courtyard.

9   Q   And are there other reports that provide descriptions

10  regarding the conditions at the Ertel site?

11  A   EPA through their removal has a series of what are called

12  pollution reports, so, you know, there's -- as the removal

13  progresses, on a periodic basis, they put those reports

14  together.

15       After the removal was finished, there's a final

16  pollution report that would give you volumes and what were in

17  the drums and different waste streams that went out of there

18  and what work EPA did and even what their costs were on the

19  removal action, what they incurred.

20       Beyond that IDEM and our Brownfields programs -- so

21  our state cleanup and our Brownfields program and the City of

22  Indianapolis work together on finding money to do additional

23  assessment.  So we came in and did additional soil and

24  groundwater investigation on the site.  There's reports and

25  data in our file for that as well.

GROVES - DIRECT/GRIGGS                                205

1            MR. GRIGGS:  I don't think we need to spend a lot of

2    time, but if we can have 1236 up on the screen.

3            Can you make, like, the heading part of that a

4    little bigger so he can read who it's to and who it's from.

5    BY MR. GRIGGS:

6    Q    December 28, 2004, is that a document that you would be

7    familiar with, site investigation summary report, Ertel

8    facility?

9    A    I recall having seen it, yes.

10           MR. GRIGGS:  How about 1166?  Scroll down a page and

11   let's see if there's a header.

12   BY MR. GRIGGS:

13   Q    Okay.  Can you see that well enough to tell what site

14   that's related to and what the date might be?

15   A    A Phase I Environmental Site Assessment, Former Ertel

16   Facility, September 2006.

17   Q    Are you at least generally aware of that document?

18   A    I'm aware of it, yes.

19           MR. GRIGGS:  Exhibit 1187.

20   BY MR. GRIGGS:

21   Q    This is another Phase I.  Looks like it might have been

22   done for the city or the Metropolitan Development Commission.

23   The date looks to be March 2008?

24   A    Looks correct, yes.

25   Q    Does that look like a document you are aware of at least?

GROVES - DIRECT/GRIGGS                    206

1   A    I'm aware of, yes.

2              MR. GRIGGS:   And there's one more of Phase I, I

3   think 1191.

4   BY MR. GRIGGS:

5   Q    Is this again related to the Ertel Manufacturing facility?

6   A    It appears to be, yes.

7   Q    And January 17th, 2013?

8   A    That's correct.

9   Q    What regulatory program was the Ertel site enrolled in?

10  A    Starting out, it was in the State Cleanup Program.  As we

11  progressed through the investigation, it transferred more to

12  the Brownfields Program because they had a greater bulk of

13  funding with the City of Indianapolis to do more assessment on

14  the site and then look at redevelopment interests.

15             So as they worked through that and some of the cleanup

16  aspects, it was still in the State Cleanup Program but also in

17  the Brownfields Program.  We worked oftentimes together on

18  projects like that as the site progressed through remediation,

19  and we looked at other sites around it and closure of that

20  one; and then it came back to State Cleanup to issue the final

21  NFA, because we also had cost recovery concerns for our time

22  and effort that we had spent on it and the investigation in

23  the State Cleanup Program.  So the decision was made

24  internally to come back to the State Cleanup Program when

25  Brownfields was done with the redevelopment.

GROVES - DIRECT/GRIGGS                    207

1   Q   In the investigations that were conducted by IDEM, did you

2   find that there were soil impacts of chlorinated solvents at

3   the Ertel property?

4   A   Yes.

5   Q   What about in the groundwater beneath the property?

6   A   Yes, there were impacts.

7   Q   Of chlorinated solvents?

8   A   Yes.

9   Q   Were the levels of chlorinated solvents significant enough

10  to require a cleanup action to be taken?

11  A   They were above our industrial level, so it was decided

12  that they -- our best interests for the redevelopment and

13  future risk in the groundwater was to remove those soils.

14  Q   Remove the impacted soils?

15  A   Yes.

16  Q   And do you know, was that ultimately done?

17  A   Yes, it was.

18  Q   Do you happen to recall when that occurred, a year or --

19  A   Approximately 2007.

20  Q   And do you recall how much material was actually removed?

21  A   The number that was in the different reports is

22  37,000 tons of soil.

23  Q   And that fact is reflected in a contemporaneous report at

24  that time, correct?

25  A   That's correct.

1         MR. GRIGGS:  I don't think we've seen 1101.  Let's

2   put it up.  Maybe we did.  Let's make sure everybody knows

3   what we're talking about.

4   BY MR. GRIGGS:

5   Q   Can you see that cover page well enough to identify

6   whether that's the soil remediation completion report for

7   Ertel?

8   A   Yes, that's correct.  That's the report.

9   Q   You're familiar with that document?

10  A   Yes.

11  Q   And did IDEM provide oversight for that soil excavation

12  work that was done?

13  A   Yes, we did.

14  Q   From the data that you had collected -- IDEM had

15  collected, was chlorinated solvent contamination migrating off

16  the Ertel site prior to the soil excavation?

17        MR. MENKVELD:  Objection, Your Honor.  We understand

18  that Mr. Groves knows a lot about these properties.  We don't

19  dispute that he would be qualified to give that opinion, but

20  he's here to testify about facts as he knows them in his role

21  with IDEM.  He's not here to give expert testimony as to

22  whether contaminants have migrated.  He's not been disclosed

23  as an expert.  He hasn't been deposed as an expert.  He has no

24  expert opinions in this case.  Migration of contaminants is an

25  opinion that requires a thorough expert analysis.

GROVES - DIRECT/GRIGGS                    209

1          MS. KRAHULIK:  Major Holdings and Major Tool and

2   Machine join in that objection.

3          THE COURT:  Your response?

4          MR. GRIGGS:  Does the data show?  That's what he was

5   asked, not for an opinion, not for where it went, not for how

6   far it went, nor for how fast it went; just whether the data

7   showed that it was leaving.

8          MR. MENKVELD:  "Leaving" is another word for

9   migrating, Your Honor, which requires an expert opinion.

10          MR. GRIGGS:  It does not require an expert opinion.

11   This is something that consultants in Indiana deal with every

12   day at 90 percent of the 650 sites in this state.  The idea

13   that everything that happens every day of the week can only be

14   performed by experts is wrong.

15          MR. MENKVELD:  Your Honor, I don't dispute anything

16   Mr. Griggs just said.  If they wanted Mr. Groves to provide

17   that testimony as to what he knows, as to what IDEM has done

18   on this particular case, Mr. Groves specifically, then he

19   could have been disclosed as an expert.  We could have treated

20   him as such during litigation, and then we would know how to

21   respond and perhaps even have an expert to come up here to

22   rebut.

23          THE COURT:  I'm going to overrule the objection and

24   allow him to answer that particular question.

25          From the data that you collected, sir, was

*GROVES – PRELIMINARY/MENKVELD*                    210

1  chlorinated solvent contamination migrating off the Ertel site

2  prior to the soil excavation?

3           THE WITNESS:  We believe it was.  Whether it was

4  migrating above our screening levels is a different

5  discussion; but I would say in some certain areas, yes, there

6  was some contamination that was leaving the site.

7  BY MR. GRIGGS:

8  Q   Based on the environmental reports that were performed

9  both by IDEM and others related to the Ertel site, are you

10 able to tell what the groundwater flow direction is?

11          MR. MENKVELD:  Your Honor, same objection.

12 Groundwater flow direction requires an analysis of a

13 hydrogeologist to determine from the data which direction

14 groundwater is flowing.

15          And if I may ask a preliminary question, Your Honor.

16          THE COURT:  You may.

17                    **PRELIMINARY EXAMINATION**

18 BY MR. MENKVELD:

19 Q   Mr. Groves, you're a geologist; is that correct?

20 A   I'm not.

21 Q   What's your background?

22 A   I have a biology degree and a master's degree in

23 environmental science.

24 Q   You have no degree in geology or hydrogeology?

25 A   No.

*GROVES - PRELIMINARY/MENKVELD*                    211

1  Q   Now, when you assess groundwater flow direction, is that

2  more of an artistic rendition that consultants perform?

3  A   It should be based on groundwater elevation data you

4  collect from permanent wells.  How that's mapped, in some way

5  it could be; but it's based on actual data, not somebody's

6  crayon drawing of it.

7  Q   Am I correct when I say environmental consultants take

8  groundwater data, and then they use that groundwater data to

9  determine a groundwater flow direction?

10 A   They should, yes.

11 Q   Is that something a layperson could do, Mr. Groves?

12 A   There are programs out there that you could collect that

13 data.  A layperson, no.

14        A person such as myself, I can collect that data and

15 understand what it means; and there are modeling programs I

16 can put it into, and it will show me a flow direction.

17        MR. MENKVELD:  Your Honor, this is opinion that is

18 taken from data.  Datas [sic] are facts.  Groundwater flow is

19 opinion from facts.  Again, this just was not an expert

20 opinion that was disclosed as part of this lawsuit.

21        THE COURT:  Well --

22        MR. GRIGGS:  Back to the original question.

23        THE COURT:  Let's see if he can answer yes or no

24 before he tells us what the opinion is.

25        The question was just based on the environmental

GROVES - DIRECT (Continued)/GRIGGS                212

1    reports that were performed -- that's the next question.

2              Based on the environmental reports that were

3    performed both by IDEM and others related to the Ertel site,

4    are you able to tell what the groundwater flow direction is?

5    Yes or no.

6              THE WITNESS:  Yes.

7              THE COURT:  All right.  I'll let him answer.

8              You may answer.

9              THE WITNESS:  From the data that we had in permanent

10   wells and borings when we measured groundwater elevation, it

11   looked always more of a west to southwest groundwater flow

12   direction.

13                      **DIRECT EXAMINATION** (CONTINUED)

14   BY MR. GRIGGS:

15   Q    And with respect to the Ertel property, is that

16   groundwater flow direction toward or away from the Von Duprin

17   property?

18   A    Because of the Ertel facility or property size, as far as

19   our relationship to the Von Duprin facility, I would have to

20   say we're looking at the southern half to southern third of

21   the facility; and in some parts, again, it's more of a

22   westerly flow.  In some parts, when you get more to the

23   southern end of it, it's more of a southwesterly flow.  If

24   we're talking more of a southwesterly flow, that would put it

25   towards the Von Duprin facility.

GROVES - DIRECT (Continued)/GRIGGS          213

 1  BY MR. GRIGGS:

 2  Q   Were there any specific actions related to the chlorinated

 3  solvent impacts at the Ertel property that had to be taken

 4  other than the soil excavation you've already spoken about?

 5  A   Beyond the soil excavation, the only other actions that

 6  were taken were monitoring of that groundwater.  We didn't see

 7  extremely high levels of groundwater impact; and especially

 8  when looking at some of the other facilities surrounding it,

 9  we didn't feel levels higher than some of the other facilities

10  were contributing.  So we monitored that, but we didn't do any

11  remediation or treatment of the groundwater to decrease those

12  numbers.

13  Q   When you use the word "monitoring the groundwater," that

14  may not be a familiar term to everybody.  Can you specify

15  exactly what you're talking about?

16  A   Usually, monitoring of the groundwater is collecting

17  samples from the monitoring wells that are more permanent; and

18  you'll do that on a periodic basis.  In most cases, it's on a

19  quarterly calendar-year basis.  So the intent is to try to

20  collect groundwater elevation data so you can continue your

21  modeling and understand your groundwater flow direction and

22  collect contaminant concentration data from those wells to see

23  whether you've got an upward or downward trend or stable trend

24  or increasing trend or what's going on there.

25          So really, to summarize, it's a quarterly sampling

GROVES - DIRECT (Continued)/GRIGGS          214

1   event that you do and then quarterly reporting on those

2   trends.

3   Q   Who besides IDEM was involved in the cleanup efforts at

4   the Ertel property?

5   A   Are you asking about regulatory agencies or --

6   Q   Regulatory or private, governmental.  I'm not sure.  I'm

7   not sure who they are, so I need to ask you.

8   A   Well, EPA doing the removal action.  The City of

9   Indianapolis was highly involved.  They provided the ability

10  to get grant money through our Brownfields program; the Marion

11  County Health Department.  Major Tool and Machine I believe

12  was aware or at least aware, if not involved, with certain

13  parts of it.  That's it to my knowledge off the top of my

14  head.

15  Q   Were you ever able to obtain the access you wanted from

16  the -- I think it was Dynagear bankruptcy trustee?

17  A   The Dynagear bankruptcy trustee gave us access; and then

18  at that point, once we had kind of that blanket agreement

19  access, that's the last involvement I had with Dynagear and

20  their bankruptcy trustee.

21  Q   What about Ertel Manufacturing?

22  A   Ertel -- we were not aware that Ertel was still an entity

23  when we first started dealing with the contamination and we

24  got EPA involved.  Later through the City of Indianapolis, we

25  found out that they were still a viable entity.  They were

GROVES - DIRECT (Continued)/GRIGGS                215

1   listed as administratively dissolved in our Secretary of

2   State's database.

3         So at a later point -- and I don't remember exactly

4   when it was -- but we became aware that Ertel still was a

5   viable entity, and the officers were still around.  And so

6   through the city, we came in contact with them or actually met

7   them on the site, some of the Ertel officers and their

8   attorney; and we walked through the site, and the intent was

9   to find insurance policies that they knew they had that would

10  pay for the cleanup action.

11  Q   So the word I think you used a couple times was "viable."

12  You're not suggesting that they were still in operation

13  somewhere, either at this site or somewhere else, just they

14  were not formally dissolved as a legal matter?

15  A   That's right.  To my recollection, when we looked at

16  Dynagear, how they purchased the Ertel operations, they

17  purchased the facility.  They purchased the property but not

18  necessarily the corporation.  So for whatever reason, Ertel,

19  the corporation, was administratively dissolved as their

20  listing; but it looked like they still had assets.  And like I

21  said, they still had officers; and it looked like they were a

22  separate potentially responsible party to us.

23  Q   Among the parties that became involved or that IDEM looked

24  to to address the conditions at the Ertel property, was

25  Von Duprin ever one of those parties?

GROVES - DIRECT (Continued)/GRIGGS                216

1  A   For the Ertel facility?

2  Q   For the Ertel facility.

3  A   No, they were not.

4  Q   The excavated soil that you talked about, was it treated

5  on site or taken to an off-site facility?

6  A   It was taken to South Side Landfill here in Indianapolis.

7  Q   Was the soil removal or soil excavation successful in

8  reducing concentrations of chlorinated solvents in the soil at

9  the Ertel site?

10  A   Yes.

11  Q   And were the concentrations of chlorinated solvents in

12  groundwater at the Ertel property different after the soil

13  excavation work?

14  A   When we did our initial assessment and put in our

15  permanent wells, the highest solvent concentrations that we

16  had -- and I don't remember.  I believe it was PCE -- those

17  were 2- to 300 PPB; and during our monitoring, they didn't

18  seem to change a lot.

19        So prior to the excavation, that's what they were --

20  where they were at; and afterward, they didn't seem to change

21  a lot.  They might have degraded slightly but not

22  significantly.

23  Q   How recently have you checked those?

24  A   Not since 2012 or 2013, whenever the last monitoring was

25  completed.

GROVES - DIRECT (Continued)/GRIGGS          217

1  Q   What was your first involvement with the Zimmer Paper

2  property?

3  A   Are we talking about the Zimmer parcel?

4  Q   Zimmer Paper parcel.

5  A   All right.  In 2003 when I went and looked at the Ertel

6  facility, I knew there was a pole building there on that

7  property; but we didn't really look at it that closely.  My

8  awareness of that didn't really start until really about 2005,

9  2006 we started doing assessment on Ertel; and we got some

10 groundwater data.

11        Later on, when the city decided to demo the Ertel

12 building and complete the removal of the soil, they included

13 that parcel into that 37,000 tons of soil.  That 37,000 tons

14 wasn't all Ertel-contaminated soil.

15        So still, my awareness of -- that wasn't in our

16 regulatory program.  So my awareness of data wasn't as great

17 as it was Ertel, but that's when I became aware of the Zimmer

18 parcel was about 2005.

19 Q   I just want to make sure I understand you.  You just said

20 that Zimmer Paper parcel was not in your program, but I think

21 you had said earlier that you were the project manager for all

22 four sites.  Are we -- was your answer about a specific period

23 of time that later changed?

24 A   Today I'm the project manager for all four.  After getting

25 some of that data back and the removal taking place and

GROVES - DIRECT (Continued)/GRIGGS                218

1    looking at the groundwater, then -- and realizing that Moran

2    Electric had also operated there, we sent notice letters to

3    Zimmer and Moran for that property.  It was not to my

4    knowledge in the regulatory program.  The city had done that

5    as part of their Brownfields cleanup on Ertel, for whatever

6    reason.

7    Q   And did testing of the Zimmer Paper, as you call it,

8    parcel -- I think we've been calling it Zimmer Paper property,

9    but that's the same location.  Was data eventually collected

10   in soil and groundwater at that site?

11   A   Yes.  We did -- like I said, we did our investigation of

12   the Ertel facility as far as soil and groundwater

13   investigation.  The city had collected additional data with

14   Brownfields assessment grant money for Zimmer parcel or Zimmer

15   Paper property.  And that led to the soil removal on both

16   properties.

17          And that included -- and after that removal took

18   place, there was a lot of confirmation soil sampling that the

19   city's contractor had collected to show that the removal met

20   its goals.

21   Q   Did you at any point become aware that an underground

22   storage tank and something over 7,000 cubic yards of soil was

23   removed from the Zimmer Paper parcel?

24   A   I was aware, yes.

25   Q   Were you involved in that process?

GROVES - DIRECT (Continued)/GRIGGS          219

1   A   That was under the direction of the City of Indianapolis

2   in our Brownfields Program.

3   Q   Do you remember who the contact or responsible person was

4   for the Brownfields Program for that site?

5   A   At that time in 2007, it was Chris Harell was the

6   Brownfields coordinator.

7   Q   Would Chris Harell in the Brownfields Program have

8   provided state government oversight for the work being

9   performed at the Zimmer Paper property?

10  A   Well, let me clarify.  Chris Harell was the Brownfields

11  coordinator for the City of Indianapolis.  If you're asking

12  about state involvement, that was Kyle Hendricks; and Kyle --

13  he's a project manager in our Brownfields Program.  So he

14  would have provided oversight, along with some technical

15  support folks.

16  Q   And do you recall, was a closure report eventually

17  submitted to IDEM related to the UST closure and the soil

18  excavation?

19  A   Not to my knowledge.  A lot of people have asked, and I've

20  never seen a copy of it.

21  Q   The missing document.

22       You don't recall even later -- I mean anytime up till

23  now, you still haven't seen the document?

24  A   No.  The only document I'm aware of is what's on the

25  screen, the soil completion report.

GROVES - DIRECT (Continued)/GRIGGS                220

1              MR. GRIGGS:  Let's put up 1094, please.  I think we

2   need all the text, not just that top part.  Let's put it all

3   up there, including the date.

4   BY MR. GRIGGS:

5   Q   Does this look familiar at all?

6   A   I don't recall having seen it, no.

7              MR. GRIGGS:  Let's go back a couple pages, maybe the

8   table of contents.

9              You'll have to go back to full screen.

10  BY MR. GRIGGS:

11  Q   Is QEPI a consultant that you're familiar with?

12  A   Yes.

13  Q   Is there any part of the report that would stick with you

14  if you had seen this before?

15  A   I would hope so.

16  Q   I mean, do you normally focus on the figures, the data

17  tables, the summary, executive summary section?

18  A   Usually, the tables and the figures.

19             MR. GRIGGS:  Let's go back a little further.  Looks

20  like there's only three figures.  Maybe the visual will help.

21  They're going to be after all the texts, so several pages to

22  go through.

23             All right.  Next one.  That's a pretty standard one.

24  Let's go to the next one.

25

GROVES - DIRECT (Continued)/GRIGGS                221

1  BY MR. GRIGGS:

2  Q   How about that?

3  A   Okay.

4  Q   Any familiarity with that?

5  A   Well, I hadn't -- and I don't know if I recall seeing this

6  figure or just discussion that -- you know, that was always

7  certain knowledge that that underground storage tank was below

8  that pole building that I referenced when I first saw the site

9  in 2003.

10       Not until whenever this -- 2007 when this was put

11  together?  And at that point, that building gets demolished

12  along with some of the other Ertel buildings; and then the

13  soil excavation occurred.  So that's probably when they

14  uncovered that UST.  Like I said, I think at that point, just

15  because everybody knew that's where the UST came from, after

16  everything was demolished and we started the soil removal, I

17  have a recollection it was underneath the building.

18  Q   How did the Zimmer Paper property come back to State

19  Cleanup from the Brownfields Program?

20  A   Well, it was never -- according to our Brownfields

21  Program, never really part of their program.  Nobody asked for

22  a closure determination.  Nobody asked for a comfort letter

23  for liability determination.  Nobody asked for a site status

24  letter to my knowledge.

25       So it, for whatever reason, like I said, got rolled

GROVES - DIRECT (Continued)/GRIGGS            222

1   into the Ertel removal action of the soil; and then the UST

2   gets uncovered and dealt with; but from what I've heard from

3   Brownfields, it was never technically a site of theirs, had a

4   site number, not that I'm aware of.

5          So it didn't, I guess, come back.  It was one of those

6   things that the agency decided, "Hey, we need to make a

7   closure determination.  We need to look at the groundwater

8   more closely and decide what's going on here."

9          So Brownfields being done with the oversight of the

10  redevelopment and the Brownfields grant that paid for a lot of

11  this work, we decided, hey, it needs to be a State Cleanup

12  site because Brownfields is done with it.  They're done with

13  their operations.  So that's what we did.

14  Q   If you had never been provided or seen Exhibit 1094, where

15  did you -- what data or information did you have available to

16  you about the Zimmer Paper property?

17  A   Through the different assessments.  There was some soil

18  and groundwater data that was collected prior to the soil

19  removal.  So we would have had some of that available to us.

20  Brownfields was -- because of their grant work, they were

21  reviewing and looking at that data more closely than State

22  Cleanup was.

23  Q   What was your first involvement with the Moran property?

24  A   I got involved in the Moran property after getting the

25  Von Duprin facility as one of my sites and looking at the

GROVES - DIRECT (Continued)/GRIGGS                223

1  data, and we started looking at offsite contamination from the

2  Von Duprin facility and putting some additional wells in and

3  looking at doing more thorough investigation of groundwater

4  impacts in JTV Hill Park.

5          We realized that it looked like there was some

6  oncoming contamination from upgradient, so I got with our

7  Brownfields Program manager for that site, Ken Coad and talked

8  to Ken a little bit, and we looked at the groundwater data

9  that they had.

10         Then at that point we made a determination that we

11 needed to conduct additional investigation and get a remedial

12 plan from that facility because they had never submitted one.

13 They -- Major Tool and Machine had conducted some soil

14 removal, but they hadn't gone offsite to look at the

15 groundwater.  They didn't have any offsite groundwater data.

16 So we sent a Notice of Liability letter to Moran.  That was

17 really my first involvement with that property.

18         THE COURT:  All right.  Next question.

19         MR. GRIGGS:  He's just stretching in my peripheral

20 vision.  It's like a jumping jack over there.

21 BY MR. GRIGGS:

22 Q   When you first became involved with the Moran site through

23 I guess the Von Duprin site, how would you describe the site?

24 Was it operating?

25         MR. MENKVELD:  The objection I'll have here, Your

GROVES - DIRECT (Continued)/GRIGGS          224

1  Honor, what Mr. Griggs just added, I think, makes the question

2  not objectionable; but I can see what we're getting into here

3  is a line of questioning that will call for a narrative answer

4  that will contain a whole lot of testimony that would be

5  subject to a motion to strike if we start getting into the

6  issue of causation.  But that question is fine.

7          THE COURT:  Okay.  You can answer that question.

8          Was Moran operating?

9  A    No, they were not.  It was just an open field basically.

10 The buildings were gone.

11 BY MR. GRIGGS:

12 Q    So you never saw the site with the buildings in place?

13 A    I guess now that you jogged my memory, I didn't know it to

14 be Moran at that point.  I previously testified that I met

15 some of the managers for the Ertel operations at the site.

16 They were looking for insurance.  They had stated to me that

17 they had policies that were kept in locked file cabinets that

18 were in their office on the Ertel building.

19          And at that point, we were also walking the site with

20 the environmental manager for Major Tool and Machine; and he

21 said, "Well, some of the office equipment had got moved over

22 to this other building," which was across the street.

23 Happened to be Moran.  I didn't know it at that point.  This

24 was 2005 or '6, whatever it was.  I think it was 2005.

25          So I guess I stepped foot on the Moran property then.

GROVES - DIRECT (Continued)/GRIGGS            225

1   I didn't know it to be Moran.  I knew it to be Dynagear at

2   that point.

3        So I was inside one of the buildings.  I don't really

4   have a real good recollection of what was inside that building

5   other than looking for these file cabinets that they were

6   interested in.

7   Q   Did the Moran property -- was it ever subjected to any

8   kind of investigation of the soil and groundwater?

9   A   Yes.  It's my understanding that Major Tool and Machine

10  had conducted some soil and groundwater testing prior to

11  removing soil.

12  Q   Are you aware of any testing that may have occurred in

13  connection with the work being done by Geosyntec and

14  Von Duprin at the Von Duprin property?

15  A   When I became involved with the Von Duprin site and we --

16  like I said, we looked at the soil and groundwater data; and

17  we looked at groundwater data for the JTV Hill Park, and we

18  kind of had a collective realization that there might still be

19  some oncoming contamination from upgradient properties; i.e.,

20  mainly, the Moran facility --

21       MR. MENKVELD:  Objection, Your Honor.  I'll move to

22  strike this witness's testimony.  This now very -- gets

23  specifically into the issue of causation, whether the

24  contaminants on the Moran property -- alleged contaminants on

25  the Moran property, are migrating all the way down to JTV

1    Hill.

2              Mr. Groves is not an expert who can testify to this.

3    That expert opinion was not disclosed.  We have no rebuttal

4    expert to this.  We had no opportunity to cross-examine

5    Mr. Groves as part of this lawsuit on this issue.  This is

6    prejudicial to us, Your Honor.  We don't even have a rebuttal

7    expert to talk about this.

8              THE COURT:  I'll strike it because he was not

9    responsive.  The question was, "Are you aware of any testing

10   that may have occurred in connection with the work being done

11   by Geosyntec and Von Duprin at the Von Duprin property?"

12             Were you?

13             THE WITNESS:  At the Von Duprin property, yes.

14             THE COURT:  He didn't even ask about Moran.

15   BY MR. GRIGGS:

16   Q   In this case, he's right to anticipate, because the next

17   question is whether the work done by Von Duprin and Geosyntec

18   encompassed areas within the plume area that were off of the

19   Von Duprin property?

20             MR. MENKVELD:  And I object --

21             MR. GRIGGS:  Just asked if he had seen it.

22             MR. MENKVELD:  Same objection, Your Honor.

23             MR. GRIGGS:  I haven't asked any opinion about it.

24             THE COURT:  If you would just answer the question

25   that's been asked.

GROVES - DIRECT (Continued)/GRIGGS            227

1  A   Yes.

2  BY MR. GRIGGS:

3  Q   Is it your job to look at data reports like that and to

4  make decisions about what else needs to be done?

5  A   Yes.

6  Q   And that's your job at 650 contaminated sites in Indiana?

7  A   Yes.

8  Q   Does that include the Moran property?

9  A   Yes.

10 Q   Does that include Zimmer Paper?

11 A   Yes.

12 Q   Does that include Ertel?

13 A   Yes.

14 Q   Does that include Von Duprin?

15 A   Yes.

16 Q   Did you at any time become aware of data anywhere in the

17 plume area that caused you concerns related to potential vapor

18 intrusion?

19 A   Yes.

20 Q   Where?

21 A   The first data I saw that gave me concern was when we got

22 to the west side of JTV Hill Park, and we were near some of

23 the residences and the recreation facility.  Those were

24 exceeding our screening levels.

25 Q   Were you seeing this data in groundwater or in soil gas or

GROVES - DIRECT (Continued)/GRIGGS                228

1   somewhere else?

2          MR. MENKVELD:  Your Honor, my objection -- I'll make

3   the same objection.  If he wants to answer with respect to

4   what was seen on JTV Hill, that's fine; but if he tries to

5   establish a causal link between JTV Hill and any upgradient

6   property, then I object.

7          THE COURT:  Well, let's see if he does that.

8          MR. GRIGGS:  Your Honor, a lot of anticipatory

9   objections here.  He needs to wait until there's something

10  objectionable and then stand up.

11         MR. MENKVELD:  Unfortunately, Your Honor, we're

12  having a lot of narrative testimony.  It's a little too late

13  when he's giving narrative testimony to stand up and object to

14  the question.  That's why I anticipate the objection.

15         THE COURT:  Well, let's don't do the anticipatory

16  objections.  It is a bench trial.  So you can stand up and

17  raise your hand and I'll stop him.

18         MR. GRIGGS:  I can switch to leading questions.

19         THE COURT:  No, I don't want you to lead.

20  BY MR. GRIGGS:

21  Q   Do you remember the question?

22  A   Can you ask again, please?

23  Q   I knew he would say that.

24         All right.  Let me see where I'm at.

25         We were talking about did you at any time become

GROVES - DIRECT (Continued)/GRIGGS                229

1   concerned about vapor intrusion; and you said as you got to

2   the west side -- I think you said near some residences and a

3   recreational building?

4   A   That's correct.

5   Q   And I was wanting to ask what -- after you had this

6   concern, what happened next?

7   A   We looked at the groundwater data that was above our

8   screening levels, and we requested soil gas and preferential

9   pathway investigation; and the soil gas was exceeding our

10  screening levels as well.

11  Q   Who did you request do that work?

12  A   Von Duprin did that work.

13  Q   Because you asked them to?

14  A   Yes.

15  Q   Which came first, the recreational building or the private

16  residences or were they at the same time?

17  A   The private residences came first.

18  Q   Just for the Court's benefit, what are the concerns that

19  IDEM has when its screening levels are exceeded with respect

20  to shallow groundwater and soil gas?

21  A   PCE and TCE have a tendency, especially in shallow

22  groundwater, if geologic conditions are accurate or good, for

23  that to off-gas, basically volatilize back off that

24  groundwater; and the homes or a building in particular with a

25  basement tend to act as a -- almost like a chimney and pull

GROVES - DIRECT (Continued)/GRIGGS                230

1  those vapors up and in.  And if there's a preferential pathway

2  for them to get inside the home, then it causes a vapor

3  contamination event inside the building, so an exposure.

4  Q   Is IDEM generally concerned about off-gassing from shallow

5  groundwater that, say, goes out through a parking lot?

6  A   We may ask for some testing to take place, but there's not

7  going to be any exposure there generally.  So not as big a

8  concern, no.

9  Q   So it's really these contaminants collecting in a

10 structure that people live in that's a concern?

11 A   Correct.

12 Q   And does IDEM believe that there is a real health risk

13 from these particular contaminants?

14 A    If they're above our screening levels, yes.

15 Q    So there are safe levels?

16 A    Yes.

17 Q    Some of these compounds are ubiquitous in nature?

18 A    Yes, and some could be due to something inside the home

19 too; but we assess that.

20 Q    Based on your experience across the state, is it true that

21 many dry cleaners at one time in this state used PCE as their

22 cleaning solvent?

23 A    Yes.

24 Q    So if the conditions in the shallow groundwater and

25 perhaps the soil gas tip you off that there's a concern, how

GROVES - DIRECT (Continued)/GRIGGS                231

1  do you go about deciding whether you really have a concern or

2  if this is just something you don't have to worry about?

3  A   Well, that's where we look at the groundwater; and if it's

4  exceeding our screening levels, we'll ask for soil gas.  And

5  then the scenario that there might be a basement, you know, or

6  slab for that building or that structure and then we'll ask

7  for sub-slab gas to be collected.

8        So when you put those three or four lines of evidence

9  together that you exceed in your groundwater, you exceed in

10 the soil gas, you exceed in the sub-slab and then you get

11 detections in the indoor air, that means it's a real

12 exposure --

13 Q   Stop there for just a minute.  You mentioned indoor air,

14 and I think that was where I was going is once the conditions

15 external to the structure exist, you really have to go inside

16 and do a separate test?

17 A   That's correct.

18 Q   How do you do that when these are private homes?

19 A   First of all, you have to get access from the homeowner

20 and talk to them and try to explain to them what the situation

21 is and why we think they're exposed and what kind of negative

22 health impacts that could cause for them.

23       So it kind of starts there.  And then after you are

24 able to get access, if you're able to get access, then we can

25 do the testing.  That's really the first thing.

GROVES - DIRECT (Continued)/GRIGGS                232

1    Q   I notice you say, "We can do the testing."  In this

2    instance, you're having somebody else go do those tests,

3    right?

4    A   That's correct.

5    Q   Is that typical when there's a responsible party, that you

6    have them conduct the tests, then you review the results?

7    A   Most often, yes.

8    Q   Do they also play a role in approaching these homeowners

9    about getting access?

10   A   Yes.

11   Q   And when they have difficulty, if they have difficulty, do

12   they sometimes come back to you and ask for your help in

13   trying to convince someone to let testing be done?

14   A   Yes.

15   Q   The testing that we're talking about, is this -- is it

16   instantaneous?

17   A   No.  It's usually a 24-hour sample collection period, and

18   then you have to get the lab to analyze it after that.

19   Q   Okay.  So just from a homeowner's perspective when someone

20   comes to my door or sends me a letter or telephones or however

21   they contact me, what exactly are they asking to be allowed to

22   do?

23   A   They're -- so the responsible party or IDEM, whoever is

24   going to do the testing, there would be a request for access

25   just to try to tell them what the exposure scenario is, you

GROVES - DIRECT (Continued)/GRIGGS            233

1  know, what the contaminant is, try to give them some

2  background, and then tell them exactly what they would be

3  doing and how often.  So that's the request, when they get the

4  results back and how they would be told about the results and

5  whether they have to pay for it or not, because it's always --

6  at least when IDEM is doing it, it's a free sample.  The

7  homeowners always have concern that they're going to have to

8  be responsible for the cost.

9  Q    And in this instance, was someone else bearing the cost

10 for these homeowners down along Alvord and Yandes?

11 A    As far as I'm aware, one of the responsible parties was,

12 yes.

13 Q    You said a 24-hour test.  Are you describing the

14 canister-type test where a device is set inside the home, and

15 it periodically takes in ambient air from the house; and you

16 send the whole thing off to be tested?

17 A    Not periodically.  Yes, it's a canister, and it's got a

18 vacuum on it; so it pulls that constant sample over a 24-hour

19 period.

20 Q    So continuous but over a long period of time?

21 A    Correct.

22 Q    Once that has been tested at the lab, I assume those

23 results go back to whoever requested the test?

24 A    Yes.

25 Q    And is the homeowner made aware of the results of that

1 test?

2 A   They should be.  As far as I can -- from what I've seen on

3 every site, yes.  Everybody does a good job of letting them

4 know.

5 Q   Pro or con, I mean whether they got a hit or it was no

6 problem, they're still to be told?

7 A   Yes.

8 Q   If there's a problem -- and I define "problem" hopefully

9 how IDEM defines "problem."  It exceeds a level that IDEM has

10 said can't be exceeded?

11 A   Yes.

12 Q   What's the next step?

13 A   Then that data should get sent to us.  We'll do a pretty

14 quick review usually and then correspond back that mitigation

15 is required.  So some kind of system needs to get installed on

16 that home that precludes those vapors from entering.

17 Q   And I don't want to get into the details about those

18 systems.  We may have somebody do that later; but in general,

19 you're trying to find a way to move any contamination

20 molecules that have entered the house outside the house again?

21 A   Really, typically what you're trying to do is keep those

22 out to begin with.  So seal up any preferential pathways or

23 create a vacuum underneath the slab of the building so that

24 they don't enter in the first place.  That's the typical.

25 Q   So would one example be if you had a house on a slab and

GROVES - DIRECT (Continued)/GRIGGS                235

1  the slab had cracks in it, that you might patch up and fill

2  those cracks to try and keep gases from coming in?

3  A    That's one example, yeah.

4  Q    Sump pumps, do those provide some access opportunities for

5  soil gas?

6  A    Yes.

7  Q    I think you mentioned that basements are notorious because

8  they sit below the ground.  It's almost like a magnet

9  attracting these contaminants.

10  A    Seems to be, yes.

11         MR. GRIGGS:  I think we've been going a little over

12  two hours.

13         THE COURT:  We have.  We'll go ahead and take a

14  ten-minute break.  We're in recess.

15     *(A recess was taken.)*

16         THE COURT:  You may be seated.  We're back on the

17  record, and you may continue your examination.

18         MR. GRIGGS:  Judge, one administrative point, if I

19  might.

20         We're moving well ahead of our original schedule.

21  Mr. Groves is our third witness of six.  He was subpoenaed.

22  He's not a party.  He's not an expert.  We subpoenaed him for

23  tomorrow.  He graciously agreed to come over and begin his

24  testimony today, but he has a commitment, as does his

25  attorney, I believe; and they need to conclude today by five

GROVES - DIRECT (Continued)/GRIGGS          236

1   o'clock.

2          I have spoken to the other counsel.  I believe I can

3   finish my direct examination of Mr. Groves by five o'clock.

4          THE COURT:  Well, I would hope so.  You've been

5   talking to him for hours.

6          MR. GRIGGS:  He gives all these great answers.

7   They're just lengthy.

8          THE COURT:  That's fine.  We'll stop at five.  Then

9   poor Mr. Groves has to come back tomorrow.

10          MR. GRIGGS:  He is local, and I think that's

11   acceptable.

12          THE COURT:  Lawyers, trials always -- 99 percent of

13   the time they go faster than the lawyers believe they will.

14          MR. GRIGGS:  We're learning that.

15          THE COURT:  Have lots of witnesses ready every day

16   because we're going to move faster than you guys think.  Okay.

17   You may not need your full ten days.  Can you believe they

18   needed ten days?  They requested ten days.

19          MR. BOWMAN:  The only thing I would say -- and

20   counsel have agreed -- we will meet afterwards and look at the

21   schedule because they have somebody coming from California.  I

22   have somebody coming from California; and so we will -- and as

23   do you.  So we're going to need to look at our schedules.

24          We are not going to waste the Court's time but

25   understanding that this direct may go -- their case in chief

GROVES - DIRECT (Continued)/GRIGGS                237

1    was going to go three and a half days.  It's been a bit of a

2    curve ball, but I think we can deal with it.  We'll see what

3    we can do.

4              THE COURT:  We'll deal with it.

5              All right.  You may continue your examination so

6    that you can finish by five.

7    BY MR. GRIGGS:

8    Q   Mr. Groves, we were talking about some residential

9    structures and the process whereby they are evaluated and, if

10   necessary, action is taken to prevent exposures.

11             Am I correct that there were five residences initially

12   that were involved that needed to have systems?

13   A   As I recall, yes.

14   Q   Once that work was done, do you recall a report being

15   submitted to IDEM describing all the things that happened

16   there?

17   A   Yes.

18   Q   And did you review that?

19   A   Yes.

20   Q   Have there subsequently been additional residences

21   identified as needing to be checked out?

22   A   Yes.

23   Q   Do you recall how many?

24   A   Not off the top of my head.  More than five we'll say.

25   Q   Why didn't we know there were more than five at the very

GROVES - DIRECT (Continued)/GRIGGS                238

1  beginning?

2  A   Most of it was because of the area -- the next street

3  over, which the first set of homes were on Yandes.  The next

4  street over is Alvord Street.  A lot of those properties were

5  vacant; and then all of a sudden, homes started getting built

6  on those, brand new homes with basements and different things.

7  Q   So earlier, they had been vacant lots?

8  A   That's right.

9  Q   Didn't pose a vapor intrusion risk because there's no

10 structure to catch any of the vapor?

11 A   That's correct.

12 Q   But then someone came in and built a house on top of that

13 lot, and now it's over the plume?

14 A   Right.

15 Q   That happened several times, right?

16 A   Yes.

17 Q   Seemed like a lot.

18      And when those new homes started construction and IDEM

19 became aware of them or perhaps Geosyntec became aware and

20 brought that news to your attention, did you then request that

21 those also be evaluated and, if necessary, action be taken?

22 A   Yes.

23 Q   And just to give the full picture here, very recently, has

24 there been someone in addition to Von Duprin who has agreed to

25 take some steps with respect to specific residences on -- in

GROVES - DIRECT (Continued)/GRIGGS                239

1  the Alvord-Yandes area?

2  A   Yes.  We gave a list of follow-up sampling that needed to

3  occur to the parties, so Von Duprin, Moran, Major Tool and

4  Machine.  It was my understanding that Major Tool and Machine

5  agreed to fund that additional testing.

6  Q   And they may have some questions for you during their

7  examination about that, but I just want to be fair that we

8  haven't done everything ourselves.  Recently, we have been

9  getting some assistance.

10        Let's talk about the -- I think I unintentionally kind

11  of skirted the Von Duprin property.  I didn't intend to.

12        So you talked about Von Duprin officially a little

13  bit; but it was really a vehicle -- "I became aware of the

14  Moran site because of being aware of the Von Duprin site"; but

15  I don't think I ever asked you when did you first begin to be

16  involved with the Von Duprin site itself?

17  A   The first time I was aware of it, we were made aware of a

18  release.  It was reported to us in 2009.  So we then sent a

19  notice letter to the property owner at that time, which was

20  Threaded Rod Company; and they started some investigation.

21        And we later on looked at property history and found

22  that Von Duprin was the previous owner-operator.  We also sent

23  them a notice letter.

24        Eventually, through agreement, Von Duprin took over

25  the labor, doing the investigation and under those Notice of

GROVES - DIRECT (Continued)/GRIGGS                240

1  Liability letters.  So basically at that point, they had hired

2  Geosyntec and did more thorough soil and groundwater

3  characterization, and that's what made us look more closely at

4  Moran in the upgradient areas.

5  Q   You mentioned a -- you were notified of a release in 2009.

6  Can you be more specific about that?  Did you get a tip?

7  A   As I can recall, there was some Phase II that was done;

8  and I don't know if -- as I recollect, Threaded Rod was

9  closing the facility and maybe looking to sell it.  And so

10 there was some Phase II that was conducted, and it was very

11 limited; but they had some soil and groundwater data and saw

12 that there were hits of chlorinated solvents, and so they

13 reported it to the agency.

14 Q   I thought I might have that number, but I don't see it.

15      You mentioned that when you first got that news, you

16 sent a notice letter to the property owner, which was Threaded

17 Rod; is that right?

18 A   That's right.

19 Q   And that later, you acquired new or additional

20 information; and you issued a notice letter to a separate

21 entity, in this case, Von Duprin?

22 A   That's correct.

23 Q   Is that unusual at sites for there to be multiple notice

24 letters issued to multiple parties?

25 A   No.

GROVES - DIRECT (Continued)/GRIGGS            241

1   Q   Why would IDEM issue the second one if it's already got

2   somebody placed on notice?

3   A   From a liability standpoint and CERCLA liability, we try

4   to make sure that we notify all the responsible parties that

5   we think have had a hand in contaminant usage and maybe

6   contaminant release.  So it's not atypical.

7         We try to do that work up front, and for whatever

8   reason on this one -- and it was a project manager prior to me

9   that sent the initial letter on Threaded Rod.  And then

10  because of my work with Ertel, it was given to me; and so when

11  I looked at it and went back and looked at site history, it

12  had a RCRA site history.

13        So I looked through some of those files and found that

14  Von Duprin was still operating and had operated previously to

15  Threaded Rod.  So we went back and sent them a notice letter

16  of being consistent with our policy of trying to identify all

17  the responsible parties that we think have had a hand in

18  contamination.

19        MR. GRIGGS:  If we can get Exhibit 1114 please,

20  Dave.

21  BY MR. GRIGGS:

22  Q   The date is at the bottom of the page.  This looks to be a

23  Phase II investigation for Threaded Rod.  Is this possibly the

24  impetus you were describing that triggered IDEM's interest in

25  the Von Duprin Threaded Rod site initially?

GROVES - DIRECT (Continued)/GRIGGS          242

1   A   Yes.  That's the document that I was mentioning.

2   BY MR. GRIGGS:

3   Q   When -- you've probably seen many more reports than you

4   want to coming out of this area; but the reports that you have

5   seen, do they indicate to you that there had been a release of

6   chlorinated solvents at the Von Duprin property?

7   A   Yes.  There were soil hits in shallow soils, 5 to 6 feet

8   as I recall, and some groundwater sampling that had

9   concentrations above our screening levels.

10  Q   In the work that IDEM does, for at least some of that

11  work, does it bill responsible parties for some of its costs?

12  A   Yes.

13  Q   And are those costs reflected in an invoice that you send

14  to them?

15  A   Yes, we'll send monthly invoices.

16  Q   Is that true -- is that true in the Voluntary Remediation

17  Program?

18  A   Yes.

19          MR. GRIGGS:  1018, please.

20  BY MR. GRIGGS:

21  Q   Does that have the general look to you of what an IDEM

22  invoice -- oversight invoice looks like?

23  A   Yes.

24          MR. GRIGGS:  Go about half the page, Dave.  Right

25  there.  Blow that up.

GROVES - DIRECT (Continued)/GRIGGS          243

1   BY MR. GRIGGS:

2   Q   There's quite a bit of information at the top, invoice

3   number, date.  Then there's who you're billing it to and then

4   a description of the work, at least when the work was done,

5   how many hours were spent; and there's a code buried in there

6   for what that work involved, right?

7   A   Yes.

8   Q   You can flip over the page and match it up with the code.

9   Then there's some instructions at the bottom about where to

10  send the money so it gets properly processed; is that

11  accurate?

12  A   That's accurate.

13  Q   If we scroll down through several more pages, we would see

14  the same IDEM invoice format with a different date and a

15  different amount on it, right?

16  A   Correct.

17  Q   To your knowledge -- and these stop, just so you know,

18  around March 31st of last year because that's when our

19  discovery cutoff happened in this case.  But can you tell me

20  whether or not you're aware of any outstanding invoices that

21  IDEM has sent that have not been paid of that vintage, more

22  than a year old?

23  A   As to the Von Duprin/Threaded Rod site?

24  Q   Yes, that's right?

25  A   I'm not aware of any.

GROVES - DIRECT (Continued)/GRIGGS          244

1  Q   Are there any other sites in this area that you are

2  sending IDEM oversight invoices to anyone?

3  A   Not at this time.

4  Q   In addition to the vapor intrusion work related to private

5  residences, I believe you had started to tell us earlier and I

6  shifted you over to the residential side, that there was at

7  least one recreational structure that needed to be evaluated;

8  is that correct?

9  A   Yes.

10 Q   And is that a structure on the JTV Hill Park property?

11 A   Yes.

12         MR. GRIGGS:  Let's put up 1001.

13         Make that a little bigger.

14 BY MR. GRIGGS:

15 Q   Can you look at that?  I apologize.  It's small; but since

16 you're familiar with the area, can you find the JTV Hill Park

17 property on there?

18 A   It's shown on this figure on the -- in the pink or red,

19 purple.

20 Q   Okay.  In the lower left-hand corner?

21 A   Yes.

22 Q   And that is property that's owned by the City of

23 Indianapolis, correct?

24 A   That's my understanding, yes.

25 Q   And it's a little hard to see in the picture; but there

GROVES - DIRECT (Continued)/GRIGGS              245

1   is, in fact, a building on that property, right?

2   A   Yes.

3   Q   Do you know what that building is used for?

4   A   They have a basketball court, volleyball court in there.

5   There's a few offices is my understanding.  They also have

6   some -- I was told anyway -- I've not seen this; but they have

7   some day care or after-school, I guess, classes or whatever

8   the term is, but kids that were in there utilizing it at

9   certain points.

10  Q   And because it was a structure that was frequented or used

11  by children, that was something you wanted to be checked out?

12  A   Yes.

13  Q   And did someone actually check it out?

14  A   Yes.

15  Q   And do you recall who did that work?

16  A   Geosyntec.

17  Q   And who were they working on behalf of?

18  A   Von Duprin.

19  Q   Do you happen to recall what the results were of that

20  test -- they did, I believe, test indoors, correct?

21  A   They did some sub-slab testing and indoor air testing, and

22  both were exceeding our screening levels.

23  Q   Was a plan put together and submitted to IDEM to address

24  that problem and deal with the exposure issue?

25  A   Yes.

GROVES - DIRECT (Continued)/GRIGGS                    246

1  Q    And did IDEM approve that plan?

2  A    Yes.

3  Q    And as far as you know -- actually, do you know, was that

4  plan, in fact, carried out?

5  A    As far as I know, yes.

6  Q    Do you know whether the -- whether things are being

7  checked periodically to ensure that the system continues to

8  work?

9  A    Yes.  Geosyntec has gone back and done follow-up sampling.

10  Q   Is that how it's supposed to work in your opinion?

11  A    Yes.

12  Q    You see a risk.  You check it out.  If it, in fact, turns

13  out to be a real risk, you address it?

14  A    Yes.

15  Q    Would you like that to be true of every site you have?

16  A    Yes.

17  Q    I don't want to get myself in any trouble, so I'm going to

18  be -- I don't want you to give more of an answer than my

19  question calls for.  How's that?  So try and limit yourself;

20  but because you're involved with all four of these sites, I at

21  least want to ask you and get in front of the Court, is there

22  a commingled plume?

23  A    Yes.

24  Q    And as you understand that term, what does that mean?

25  A    That means multiple sources contributing to the

1  groundwater and those contaminants coming together to

2  contribute to the plume.

3  Q   And once that's happened, does IDEM view that as a -- that

4  plume as a single problem to be addressed or can it be broken

5  into pieces?

6  A   It can be broken into pieces but it's -- from a technical

7  standpoint, it's more efficient if those can all be addressed

8  jointly, if possible.

9  Q   So would IDEM in this case have expressed a preference to

10  any of the parties that they try and find a global solution to

11  the groundwater issue?

12  A   From a technical standpoint, yes; and we did do that.

13  Q   Is that still IDEM's preference if that could be

14  accomplished?

15  A   Yes.

16  Q   If you broke the plume into parts, would you have to

17  sequence the remedial or the cleanup efforts in a certain way

18  or could you just start anywhere and do them?

19  A   It would be better if you addressed in the case of this

20  the upgradient sources to downgradient and sequenced them that

21  way.

22  Q   Why?

23  A   If you tried to address the downgradient first and you've

24  got a significant upgradient source providing mass of

25  contaminant onto that property, the cost of trying to clean up

1   that downgradient property are going to increase

2   significantly.  The time is going to increase significantly

3   because you're going to continue having mass feeding onto that

4   property.  So whatever you try to do would have to be designed

5   up to account for that oncoming mass.

6   Q    So to keep from having dirty areas impacting clean areas,

7   you start upgradient and work down -- downgradient?

8   A    That would be the preference.

9   Q    Is it your experience at the chlorinated solvents that you

10  dealt with that those sites clean themselves up in a few weeks

11  or months?

12  A    No.

13  Q    I thought I could get by with that.

14        What has, in fact, your experience been with

15  chlorinated solvent sites?

16  A    Most of our sites that have significant groundwater

17  impacts with chlorinated solvents have taken ten years or more

18  to get cleaned up, majority.  Every once in a while, we get

19  lucky and you have something that's five years, six years; but

20  the vast majority of them take longer than that.

21        And there's even studies from private consulting firms

22  and consortiums and things that chlorinated solvents, because

23  they're man-made, don't like to degrade, only under certain

24  right conditions; and without some kind of degradation or

25  man-made engineering to make them degrade, they last in the

1   environment for upwards of 40 years to 100 years or more.

2   Q    So the ten-year time frame that you mentioned, that's if

3   somebody is actually working at cleaning it up?

4   A    That's correct.

5   Q    If it's just left to its own, it's going to take a long,

6   long time?

7   A    Yes.

8   Q    Has anybody really --

9        Is anybody really drinking this groundwater?

10  A    No, not to our knowledge.

11  Q    Then why are we cleaning it up?

12  A    Well, as I mentioned, the vapor intrusion scenario is --

13  could be multiple things.  It could be preferential pathway

14  driven to where it's gotten into a sewer and it's migrated,

15  and there's a connection there with the homes.  Could be

16  off-gassing of that contaminant from the shallow groundwater,

17  which is what we're seeing out here.  We've got the soil gas

18  data to show that.  That's why we asked for that investigation

19  so we understood the difference there.

20       So only because of the contaminants lasting in the

21  environment as long as they're going to, only with dealing

22  with sources and engineering some remediation of the

23  groundwater, are you going to get levels below our vapor

24  screening levels, which means you could eventually take those

25  mitigation systems off those homes.

GROVES - DIRECT (Continued)/GRIGGS          250

1          Without that, those mitigation systems are going to

2     have to live on those homes for years; and somebody is going

3     to have to maintain them, either the homeowner or the

4     responsible party or the agency or somebody.

5          So that's the main driver to needing to do groundwater

6     cleanup.  Even though somebody's not drinking it, there still

7     is an impact there that's caused by that groundwater.

8          The deeper groundwater -- because we've got shallow

9     impacts and deeper impacts, 50 to 60 feet -- nobody's drinking

10    that, but we don't know, because of the contaminants lasting

11    for that long, whether they're going to stay inside the box

12    that we've generated through site investigation.  How are we

13    going to know that they stay where they're supposed to be?

14         And so you have two choices there, either to clean

15    them up and get them down to below a safe threshold, or to

16    monitor them for a long period of time in this day and age

17    because the risk needs to be managed, even though somebody's

18    not drinking it right now.  We've had situations where

19    somebody goes in and puts a well in where we didn't previously

20    have it.  That created a new exposure.

21    Q   Or they build a new home on top of the plume?

22    A   Or they build a new home.

23    Q   You mentioned monitoring, and you described that for us

24    earlier.  Even if it were determined that some or all of the

25    groundwater didn't have to be directly addressed with a

GROVES - DIRECT (Continued)/GRIGGS          251

1  cleanup approach, do you have any idea how significant this

2  monitoring might be at this site in particular?

3  A   We've actually had discussions with all the parties in the

4  room over this, and what the agency is moving towards is some

5  kind of long-term monitoring stewardship financial assurance

6  to make sure that's monitored and make sure we understand for

7  the life expectancy of these chemicals, that they stay where

8  they're supposed to be and the risk is managed.

9          With the studies I've seen and the concentrations I've

10  seen in those plumes, I think the initial conversations we had

11  was 30 to 40 years worth of monitoring, either on a semiannual

12  or annual basis.

13          MR. GRIGGS:  Is 1101 still up on the screen?  It

14  backed out on me.

15          We don't need that.

16  BY MR. GRIGGS:

17  Q   The area that the plume occupies, all the reports that

18  you've seen and all of the data you've been provided from all

19  four sites, I think you have a pretty comprehensive idea of

20  what's going on here.

21          It goes quite a ways, right?

22  A   Yeah.  It goes several blocks.

23  Q   Do you have any idea or view on how many of these

24  monitoring wells would be needed to watch a plume that size?

25  Is it one or two?

GROVES - DIRECT (Continued)/GRIGGS                252

1  A   It's probably more in the 15 to 20 ballpark because we've

2  got -- like I said, we've had discussion over needing to do

3  some remediation for the shallow, but you have shallow and

4  deeper wells.  In one area, you may have two wells there.  So

5  it's probably more in the 15 to 20 range minimally.

6  Q   And I think you mentioned 30 to 40 years as a potential

7  time frame.  Would all of those wells have to be monitored

8  that entire period?

9  A   I haven't given that a lot of thought as far as the plan.

10 At the beginning stages, yes.  Later on, possibly not.

11 Q   This sounds expensive, and I'm not going to ask you for a

12 number because I know you don't know; but if a cleanup is not

13 done, it's not going to be a free ride because of the

14 monitoring obligation; is that correct?

15 A   No.  That's why I said the agency's administrative

16 priority right now is to -- if -- if we don't get a remedial

17 plan and there's no immediate risk as to long-term monitoring

18 and financial assurance set aside.

19 Q   Is it correct to say -- and I think I've said almost this,

20 but is it IDEM's position that something is going to have to

21 be done?  We just can't wave at each other and say no harm, no

22 foul?

23 A   Some kind of plan is going to have to be put forth for

24 remediation --

25 Q   Groundwater and vapor intrusion?

GROVES - DIRECT (Continued)/GRIGGS                253

1   A   Yes.

2   Q   And if I understood something you said earlier, you've

3   issued an order to Von Duprin that obligates them to do

4   something?

5   A   We have a -- an agreement through our Voluntary

6   Remediation Program.

7   Q   A VRA?

8   A   Yes.

9   Q   I know there was an earlier order with Threaded Rod, but I

10  think you said that Von Duprin took that over?

11  A   Yes.  We sent Notice of Liability letters to both parties,

12  and then Von Duprin took over the cleanup action.

13  Q   Is that acceptable to the agency if Von Duprin has taken

14  over for Threaded Rod?  You're not after Threaded Rod anymore,

15  are you?

16  A   No.

17  Q   Have you issued orders to anybody else?

18  A   We have a commissioner's order to Major Tool and Machine

19  or Major Holdings and Moran Electric.

20  Q   And just to be clear on the record, those orders have been

21  appealed; is that correct?

22  A   Yes.

23          THE COURT:  Were those administrative orders or --

24          THE WITNESS:  Yes, ma'am.

25

GROVES - DIRECT (Continued)/GRIGGS          254

1  BY MR. GRIGGS:

2  Q   Let's -- I think I'm getting close here, but I want to

3  talk about what your relationship has been like -- let's talk

4  about with Threaded Rod.  What was the relationship between

5  IDEM and Threaded Rod as it related to the environmental work?

6  A   Threaded Rod did fine.  They left the site and the

7  obligations fairly early.  So they did a lot of the early soil

8  investigation and some of the early groundwater investigation

9  primarily on the Threaded Rod/Von Duprin facility property.

10 They didn't do a lot of offsite investigation.  They did a

11 little bit.  So that extended kind of south, southwesterly

12 into the park just a little bit, but the relationship was

13 fine.

14        The consultant, we had some issue with some of the

15 work that they did; but overall, it was fine.

16 Q   And did Threaded Rod ever get past the stage of

17 investigation or are they still in that phase when they kind

18 of handed it off to Von Duprin?

19 A   We were basically in the phase of continuing that

20 investigation; and like I said, they were barely offsite with

21 their work.

22        And then with the additional Notice of Liability

23 letter, we brought in Von Duprin; and then Von Duprin and

24 Threaded Rod got together and discussed it.  There was some --

25 as far as I was aware, some external agreement between the

1  parties; and Threaded Rod left the site, and then Von Duprin

2  came in and took over the investigation and everything else

3  after that.

4  Q   And after Von Duprin took over, did IDEM continue to ask

5  for the same work that it had been asking Threaded Rod to do?

6  A   Yes.

7  Q   And over time, as new information became available, did

8  IDEM give additional instructions that it wanted carried out?

9  A   Yes.

10  Q   And were those sometimes in the form of written

11  instructions?

12  A   Yes.

13  Q   And were those at other times given verbally to either

14  Von Duprin or its consultant?

15  A   Sometimes, yes.

16  Q   E-mail perhaps?

17  A   Yes.

18  Q   How often would you say that you had contact with

19  Von Duprin or its consultant, Geosyntec, over the last five

20  years?

21  A   Many times.

22  Q   Once a month, once a week?

23  A   Sometimes multiple times a week, just depended on the

24  situation and where we were at in the stage of investigation.

25  Q   Did you ever feel like you were not up to speed on what

GROVES - DIRECT (Continued)/GRIGGS                256

1    was happening?

2    A    No, generally not.

3    Q    That you were in the dark and no one was telling you

4    anything, anything like that?

5    A    No.  Geosyntec has always done a good job communicating.

6    Q    Have they on occasion had conversations with you that

7    tried to convince you that maybe what you wanted wasn't the

8    best way, and there might be an alternative?

9    A    A few times, yes.

10   Q    Is that the natural back and forth between the agency and

11   the consultants it works with?

12   A    Fairly common, yes.

13   Q    You've mentioned the VRA with Von Duprin.  We looked at

14   that earlier.  I'm not going to put that up to try and save a

15   little time.

16        Has Von Duprin, in addition to carrying on additional

17   investigation tasks that Threaded Rod had started and doing

18   vapor mitigation activities at both the five residences and

19   JTV Hill -- did they recently also do a soil excavation?

20   A    Yes, they did.

21   Q    And that was written up in a Remedial Work Plan I think

22   it's called?

23   A    Remediation Work Plan, yes.

24   Q    Was that Remediation Work Plan submitted to the agency?

25   A    Yes.

GROVES - DIRECT (Continued)/GRIGGS                 257

1  Q    Did the agency review it?

2  A    Yes.

3  Q    And did you approve it in part?

4  A    In part, yes.

5  Q    What was the part that you approved, and why was it only

6  in part?

7  A    We approved it in part because the -- the Voluntary

8  Remediation Agreement requires a Remediation Work Plan that's

9  basically complete.  That means that it addresses all of your

10  contamination; so in this case, soil and groundwater and any

11  vapor issues on site.  The work plan itself only included a

12  remedy for the soil; so in this case, excavation.  So we all

13  knew that that's valuable.  That's worthwhile.  It needs to be

14  done.  That soil that might be contributing to groundwater

15  needs to be removed, but it didn't include a remedy specific

16  to the groundwater.

17        In our discussions, Von Duprin didn't want to submit

18  that part of it because of their feeling that upgradient

19  contamination was precluding a thorough remediation on their

20  property and maybe increasing the cost and the time and all

21  those kinds of things.  They submitted it as just soil, so we

22  approved it as a partial remedy.

23  Q    And that work did get carried out?

24  A    That's my understanding, yes.

25  Q    I think you're still waiting on the written report --

GROVES - DIRECT (Continued)/GRIGGS                    258

1   A   Yes, confirmation samples.

2   Q   -- for that work.

3        You described that IDEM and Geosyntec communicated

4   often.  I believe you said they had a good working

5   relationship.  What would happen if Von Duprin didn't -- let's

6   say they refused to do the work that IDEM had recommended that

7   they should do.

8   A   We would give them notice that they haven't carried out

9   what we asked.  So we might do that in an e-mail or a letter.

10        If they still don't meet our time frames, then a

11   demand letter comes out.  So that will give kind of a final

12   timeline; and it will also say, "If you don't meet that

13   timeline, then we might move forward with an administrative

14   order"; and then we would issue a commissioner's order or an

15   administrative order.

16   Q   So there's a penalty -- a real penalty for not carrying

17   out the reasonable request that IDEM puts on a responsible

18   party?

19   A   Right.  So that administrative order would have also a

20   monetary penalty associated with it potentially.

21   Q   Okay.  I guess I want to dispel any false belief that

22   people go out and do these things voluntarily.  I mean, really

23   you're compelling them to take these actions, right?

24   A   Right, under CERCLA.

25   Q   You mentioned that at least in the recent past, you have

1    had a response I think you said from Major Tool to help with

2    respect to some of the investigation work in the residential

3    areas.  How involved is IDEM in that process?

4    A   We put the list of properties together based on the data

5    that we think need to be investigated.  We've communicated

6    with the parties, so Von Duprin and Moran and Major Tool and

7    Machine or Major Holdings, and let them know, make them aware

8    of what we want as far as investigation.

9         Generally, everybody's aware of the requirements and

10   the procedures for doing that investigation, and came back --

11   we dictate the time frames for doing that.  Then it came back

12   that the parties were going to work together, and Major

13   Holdings was going to fund that work to be done; and

14   Geosyntec, Von Duprin's consultant, was doing the work is my

15   understanding.  So beyond that, we just review the data.

16   Q   And so as long as IDEM gets a report at the end that says,

17   "This is the work that we did and here's the results we got,"

18   that's really what you care about?

19   A   Well, we get a mitigation system, if necessary.

20   Q   But you'll review the data and help make that decision

21   about what else needs to be done?

22   A   Right.

23   Q   We mentioned Major, and we mentioned Von Duprin.  What

24   about Moran?  Are they in on this cooperative response to

25   these residences, or do you know?

GROVES - DIRECT (Continued)/GRIGGS                    260

1  A    I don't know to what extent they are or aren't.  We had

2  them involved when we -- in specific respect to the recent

3  vapor investigation from some of the homes -- new homes that

4  came up and some of the follow-up sampling on some of the

5  locations that have been mitigated.  We had Moran involved in

6  those discussions; and like I said, it was told to me that

7  Major Holdings would follow through with funding that work;

8  and Von Duprin's consultant -- and I don't know how that

9  agreement worked out, but they were going to do the work.

10         Where Moran falls into the discussion --

11 Q    You just don't know?

12 A    Right.

13 Q    That's fair.

14         What still needs to be done to finish up this plume

15 area in IDEM's view?  What are the next steps, and when should

16 they be done?

17 A    Well, we've asked of all the parties, either through the

18 VRA or the commissioner's order in the notice letters that

19 were sent to all the parties, that a final Remediation Work

20 Plan needs to be put forth for the groundwater.

21         So we can run the mitigation systems on the homes for

22 quite a long period of time; but I think it's in everybody's

23 better interest to put forth a plan to try to remediate those

24 groundwater concentrations so that we don't have to monitor

25 for the next hundred years or however long it's going to be.

1    So that's what is undone here.

2         I think everyone or all the properties have had some

3    form of soil removal implemented; but on all the properties,

4    the groundwater source and mass has not been treated and

5    really made to go in a direction that will give us all some

6    closure at some point.

7         So that's really what needs to happen is that plan --

8    either each property separately and then the plume throughout

9    the neighborhood separately; or collectively, all the sources

10   and the plume throughout the neighborhood, a plan needs to be

11   submitted to us for remediation and long-term honoring.

12   Q   Is the plume defined -- I think somebody called it

13   delineated -- horizontally and vertically in IDEM's view?

14   A   We believe so, yes.

15   Q   And there was a Final Investigation Report, I think 2017

16   sometime, that essentially made that argument?

17   A   I believe that's right, yes.

18   Q   IDEM issued an approval of that Final Investigation

19   Report?

20   A   Yes.

21   Q   So we know how big the problem is, and now somebody needs

22   to address it.  Is that the agency's position?

23   A   That's fair, yes.

24   Q   You appeared today in response to a subpoena.  Are you

25   affiliated with any of the parties in this case other than in

GROVES - DIRECT (Continued)/GRIGGS          262

1   your position and role as a state regulator?

2   A   No.

3   Q   Do you receive any -- other than the $40 that was sent to

4   you along with your subpoena -- and you may have gotten it a

5   couple times.  I don't know.  Are you receiving any other

6   compensation from any party in this case -- let's just stop

7   there -- any compensation from any other party in this case?

8   A   I don't even receive the money for the subpoena.  The

9   state receives that.

10          MR. GRIGGS:  I would be in the same position.  Thank

11  you for coming over today and rushing over, frankly, when we

12  didn't subpoena you until tomorrow.  That's all the direct

13  examination questions that I have.  I apologize that you'll

14  need to come back tomorrow to answer questions from the other

15  attorneys, but thank you for your time.

16          THE COURT:  All right.  Thank you.

17          Do you want to start your cross?  It's 4:35.  You've

18  got about 20 minutes.

19          MR. MENKVELD:  I would rather not, Your Honor, only

20  because it's -- there's quite a bit of cross, and there might

21  be a little direct; and if we get going even on one topic,

22  it's -- there's no topic that will go less than a half an

23  hour.

24          THE COURT:  All right.  Fair enough.  All right

25  lawyers.

GROVES - DIRECT (Continued)/GRIGGS          263

1          Thank you, sir.  You may step down from the witness

2    stand.  We need you back at 8:30 a.m.  We'll start bright and

3    early, you and your lawyer, if you two would return.

4          Lawyers, let's talk about logistics for a moment.

5          The Court did send out a schedule last week.  So

6    we're going to be in trial Monday, Tuesday, Wednesday full day

7    and a half day on Thursday.  And then we're going to be off on

8    Friday; and then I am doing the criminal jury trial on Monday

9    and Tuesday.  It's a very short trial, drug case,

10   methamphetamine.

11         And so then we're going to resume our trial; and you

12   can have Wednesday, Thursday and Friday of next week, and we

13   can do full days.

14         I think I'll give them the full day on Thursday and

15   I'll have the magistrate -- I'll see if Doris Pryor wants to

16   do REACH for me.  And then we can do the -- what time is best,

17   three o'clock?  We can stop at 3 on Thursday.

18         MR. GRIGGS:  Next week?

19         THE COURT:  Next week.

20         MR. BOWMAN:  Half a day this week?

21         THE COURT:  Half a day this week.  Half a day this

22   week.  I have to go get an award.

23         MR. BOWMAN:  It's going to take some efforts on the

24   lawyers to figure out this schedule.

25         THE COURT:  I know.  So tomorrow, plaintiffs, you've

1    got to have enough witnesses to go the full day, okay.

2            Lawyers, since you have out-of-town witnesses, you

3    might want to talk among yourselves about -- you might have to

4    call some experts out of order so we won't have lag time.

5    Okay?

6            MR. BOWMAN:  Okay.  Thank you, Your Honor.

7            THE COURT:  You guys talk.  We had a very good,

8    productive day.  Thank you, and I'll see everyone at 8:30 a.m.

9    Have a good evening.

10           COURTROOM DEPUTY:  All rise.

11           *(The proceedings were adjourned at 4:38 p.m.)*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              <u>CERTIFICATE OF COURT REPORTER</u>

2

3        I, Cathy Jones, hereby certify that the foregoing is a

4   true and correct transcript from reported proceedings in the

5   above-entitled matter.

6

7

8     /s/ Cathy Jones                        August 1, 2019
   _____
9    CATHY JONES, RDR, FCRR
     Official Court Reporter
10   Southern District of Indiana
     Indianapolis Division
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25