1          UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF INDIANA
2              INDIANAPOLIS DIVISION

3
   VON DUPRIN, LLC,              )
4                                ) CAUSE NO.
          Plaintiff,             ) 1:16-cv-1942-TWP-DML
5                                )
          -vs-                   )
6                                ) Indianapolis, Indiana
   MORAN ELECTRIC SERVICE, INC.) July 23, 2019
7  MAJOR HOLDINGS, LLC,          ) 8:30 a.m.
   MAJOR TOOL AND MACHINE,       )
8  INC. and ZIMMER PAPER         ) VOLUME 2
   PRODUCTS INCORPORATED,        )
9                                )
          Defendants.            )
10

11

12

13                 **BEFORE THE**
             **HONORABLE TANYA WALTON PRATT**
14

15         OFFICIAL REPORTER'S TRANSCRIPT OF

16                 BENCH TRIAL

17

18

19

20

21 Court Reporter:    Cathy Easley Jones, RDR, FCRR
                      Official Court Reporter
22                    46 East Ohio Street, Room 290
                      Indianapolis, IN  46204
23

24

25         PROCEEDINGS TAKEN BY MACHINE SHORTHAND
              COMPUTER-AIDED TRANSCRIPTION

# A P P E A R A N C E S

FOR VON DUPRIN, LLC:  Edward S. Griggs
             Alexandra Robinson French
             BARNES & THORNBURG
             11 South Meridian Street
             Indianapolis, IN  46204


FOR MORAN ELECTRIC   Glenn D. Bowman
SERVICE, INC.:      Marc A. Menkveld
             STOLL KEENON OGDEN, PLLC
             201 North Illinois Street
             Suite 1225
             Indianapolis, IN  46204

             Bruce L. Kamplain
             NORRIS CHOPLIN & SCHROEDER LLP
             101 West Ohio Street
             Ninth Floor
             Indianapolis, IN 46204


FOR MAJOR HOLDINGS   Angela Pease Krahulik
and MAJOR TOOL AND   Samuel B. Gardner
MACHINE, INC.:      ICE MILLER
             One American Square
             Suite 2900
             Indianapolis, IN  46282

Vol. 2 - 267

1                    I N D E X   O F   W I T N E S S E S

2                                                           PAGE

3    For Von Duprin:

4    RYAN GROVES (CONTINUED)
     Cross-examination by Mr. Menkveld .............269
5    Cross-examination by Ms. Krahulik ............318
     Redirect examination by Mr. Griggs ...........334
6    Recross-examination by Mr. Menkveld ..........345

7    ROBERT FERREE
     Direct Examination by Mr. Griggs .............348
8    Cross-examination by Mr. Bowman ..............429
     Cross-examination by Ms. Krahulik ............463
9    Redirect examination by Mr. Griggs ...........465
     Recross-examination by Mr. Bowman ............467

10
     RYAN FIMMEN
11   Direct Examination by Ms. French .............468
     Cross-examination by Mr. Bowman ..............500

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Vol. 2 - 268

1            I N D E X   O F   E X H I B I T S

2                                                 PAGE
   Plaintiff's Exhibit No.:
3
   107 .........................................506
4  108 .........................................506

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*GROVES - CROSS/MENKVELD*          Vol. 2 - 269

1    *(In open court)*

2         THE COURT:  Good morning, everyone.  We are back on

3    the record.  This is Von Duprin LLC versus Moran Electrical

4    Service, Major Holdings LLC, Major Tool and Machine, Inc.

5    Zimmer Paper was defaulted; and we are here, lawyers, for

6    continuation, day two of our bench trial.

7         The witness is present.  Why don't you stand, and

8    I'll swear you in for the day.

9    *(Witness sworn.)*

10        THE COURT:  You may be seated.

11        Mr. Griggs, when we adjourned for the evening, I

12   believe you had not quite completed your direct examination of

13   the witness; is that correct?

14        MR. GRIGGS:  I believe I had completed it 20 minutes

15   earlier than we had expected.

16        THE COURT:  That's right.  So we're ready for

17   cross-examination.

18        Mr. Menkveld, you may examine the witness.

19        **RYAN GROVES, PLAINTIFF'S WITNESS, SWORN**

20              **CROSS-EXAMINATION**

21   BY MR. MENKVELD:

22   Q   Good morning, Mr. Groves.

23   A   Good morning.

24   Q   We'll start this morning by reacquainting you with the

25   project area that we've been looking at in this lawsuit; and

*GROVES - CROSS/MENKVELD*          Vol. 2 - 270

1  what we've been using to do that is Exhibit 1001.

2           MR. MENKVELD:  If you would please pull that up.

3  BY MR. MENKVELD:

4  Q   Mr. Groves, you obviously are familiar with this area,

5  correct?

6  A   Yes.

7  Q   And you'll see -- you've identified these properties

8  yesterday.  The Ertel property is toward the top, in this

9  area, correct?

10 A   Yes.

11 Q   Then the Zimmer Paper parcel, which is how we've been

12 referring to it, is this property; is that correct?  Or excuse

13 me.  There we go.  This property?

14 A   Yes, that's correct.

15 Q   And then the Moran property is here, right?

16 A   Correct.

17 Q   And then the Von Duprin property is right there; is that

18 correct?

19 A   Correct.

20 Q   And you've been working in this area, I believe you

21 mentioned yesterday, since approximately 2004; is that right?

22 A   2003 was when I first looked at the Ertel property.

23 Q   And your work in this area has not been solely in your

24 capacity as an employee with IDEM; is that right?

25 A   That's correct.

*GROVES - CROSS/MENKVELD*          Vol. 2 - 271

1  Q   You worked for a company named EnviroForensics in 2006 and

2  2007; is that right?

3  A   That's correct, 2006.

4  Q   2006?

5  A   Um-hum.

6  Q   Now, when you worked for EnviroForensics, you did some

7  work on behalf of Major Tool, one of the defendants in this

8  case; is that right?

9  A   That's correct.

10 Q   And you were contacted to perform a Phase I environmental

11 investigation of the Ertel property; is that correct?

12 A   That's correct.

13 Q   And you were the primary person who performed that Phase I

14 for Major Tool and Machine; is that correct?

15 A   That's correct.

16 Q   And a report was generated -- a Phase I report was

17 generated at that time, right?

18 A   That is correct.

19     MR. MENKVELD:  Pull up Exhibit 1166, please.  Page

20 54, the PDF.

21 BY MR. MENKVELD:

22 Q   Mr. Groves, you'll see a signature on this page, which I

23 pointed to here.  Is that your signature?

24 A   Yes, it is.

25 Q   Now, this is a Phase I environmental report.  If you could

*GROVES - CROSS/MENKVELD*          Vol. 2 - 272

1   briefly explain to us what a Phase I environmental report is.

2   A    A Phase I environmental report is basically a property

3   historical search and report on environmental conditions or

4   potential environmental conditions that are associated with a

5   particular property, and a Phase I environmental site

6   assessment report is typically done for -- under the

7   Brownfields Program for property transfer prior to property

8   transfer.

9   Q    Now, would this report take into consideration neighboring

10  properties?

11  A    It might, yes.

12  Q    What is the purpose of doing that in a Phase I?

13  A    To let the person contracting the report know that there

14  might be other contaminant issues that might be affecting

15  their property.

16  Q    Other contaminant issues in the vicinity of the property

17  being studied, correct?

18  A    Not a specific vicinity, yes but neighboring, adjacent

19  usually.

20  Q    Now, you left EnviroForensics to go back to IDEM, correct?

21  A    That's correct.

22  Q    That happened in 2007; is that right?

23  A    That's right.

24  Q    You became the project manager when you went back to IDEM

25  of the properties that we saw in Exhibit 1001, correct?

1   A    For the State Cleanup Program, yes.

2   Q    Now, yesterday, you mentioned that you began looking at

3   the Moran property in 2009; is that right?

4   A    That's correct.

5   Q    Now, there was some testimony and questioning yesterday

6   pertaining to IDEM sometimes having to compel potentially

7   responsible parties to perform cleanup action.  Do you

8   remember that line of questioning?

9   A    Yes, I do.

10   Q    Now, in 2009, IDEM did not require Moran to perform any

11   environmental work; is that correct?

12   A    That's correct.

13   Q    In 2009, IDEM also did not require Major Tool to perform

14   any work; is that correct?

15   A    Major Tool was already performing work at the property

16   under our Brownfields Program at that time.

17   Q    Excuse me.  IDEM did not require Major Tool to perform

18   work at the Moran property at that time; is that correct?

19   A    No.

20   Q    Now, as the project manager for the Moran site, you're

21   aware that soil borings were advanced across the entire Moran

22   property; is that correct?

23   A    I'm aware, yes.

24   Q    And you're also aware that soils were excavated from the

25   Moran property; is that correct?

*GROVES – CROSS/MENKVELD*                Vol. 2 - 274

1   A   Yes.

2          MR. MENKVELD:  Please pull up Exhibit 1112.

3   BY MR. MENKVELD:

4   Q   Mr. Groves, have you seen this report before?

5   A   Yes, I have.

6   Q   This is a further site investigation report that was

7   performed by Heartland for Major Tool and Machine on the

8   former Moran Electric property; is that correct?

9   A   That is correct.

10  Q   Now, you'll see on page 10 of the PDF, please --

11         You will see where soil borings were advanced across

12  the Moran property.  Do you see where I circled?

13  A   Yes.

14  Q   And you've reviewed the data that was obtained as part of

15  obtaining those soil borings; is that correct?

16  A   I have reviewed the data, yes.

17  Q   Now, on page 21 of this exhibit, we'll see the results.

18  We'll have to rotate it for you here.

19         MR. MENKVELD:  Let's scroll -- or zoom it out a

20  little bit so we can see the whole exhibit.

21  BY MR. MENKVELD:

22  Q   Now, Mr. Groves, if you will -- and we can blow up parts

23  as necessary.

24         Do you see any soil data within the 2- to 4-foot

25  interval showing the presence of contamination above

1   industrial default closure levels?  Actually, I'll withdraw

2   that question.

3            If you look at the bottom of this page of the exhibit?

4            MR. MENKVELD:  If you could scroll down, please.

5   One more page.  Zoom into this portion here, please.

6   BY MR. MENKVELD:

7   Q   Is it your understanding in this report, Mr. Groves, that

8   these data were expressed in parts per billion?

9   A   That is correct.

10  Q   And these data are also expressed in terms of default

11  residential and default industrial closure levels, correct?

12  A   That is correct.

13  Q   Now, tell us the difference between default industrial

14  versus residential closure levels.

15  A   It's basically the difference in exposure formula,

16  exposure scenario.  So the residential would have a lower

17  screening level or closure level, meaning that there might be

18  a higher risk there, more direct contact.  The typical

19  scenario is in residential, the people are on the property

20  more.  They come in contact with the soil more often or

21  longer.  So then, therefore, the closure level is lower.

22  Q   And industrial levels, as the name suggests, is typically

23  used for industrial areas or industrial facilities?

24  A   Typical, yes.

25            MR. MENKVELD:  Now, if we could scroll back up to

*GROVES - CROSS/MENKVELD*          Vol. 2 - 276

1  the previous page, please.

2  BY MR. MENKVELD:

3  Q    These are the soil borings we looked at previously.  If

4  you can look at the results for trichloroethylene, which we've

5  referred to as TCE in this case, and let me know if you see

6  any impacts at the 2- to 4-foot interval that exceed

7  industrial levels.

8           MR. MENKVELD:  And I have a paper copy, if I could

9  approach?

10          THE COURT:  That would probably help.

11 A    Can you repeat your question?

12 BY MR. MENKVELD:

13 Q    Yes.  At the 2- to 4-foot interval, do you see any

14 concentrations of TCE above the industrial default closure

15 level?

16 A    There are detections in the 2 to 4 but not above those

17 levels.

18 Q    Now, Mr. Groves, this work was performed at the Moran

19 property without IDEM demanding that work to be performed;

20 isn't that correct?

21 A    It's my understanding that work was performed under our

22 Brownfields Program oversight but not State Cleanup Program

23 oversight.  So there was no demand for that work to be done,

24 no.

25 Q    Now, you're familiar with the terms "vadose zone" and

*GROVES - CROSS/MENKVELD*          Vol. 2 - 277

1   "smear zone"; is that right?

2   A   Yes.

3   Q   Correct me if I'm wrong, but vadose zone is where soils

4   are not affected or influenced by groundwater?  Is that a fair

5   statement?

6   A   That's correct.

7   Q   And the smear zone is the area where soils are affected by

8   the rise and the fall of groundwater; is that correct?

9   A   Potentially, yes.

10  Q   Now, a 2- to 4-foot interval would be in the vadose zone

11  not affected by groundwater; is that correct?

12  A   That would be vadose zone unsaturated soil, yes.

13  Q   On this site in particular, correct?

14  A   Yes.

15  Q   At the Moran property, you are not aware of any soil

16  impacts, contamination in soil that is in the vadose zone that

17  is above industrial default closure levels; is that correct?

18  A   Not from any of the reports that I've reviewed, no.

19  Q   Now, static water level in a monitoring well is a reliable

20  way to measure depth to groundwater; is that right?

21  A   Yes.

22  Q   And that's typically done by using a water level

23  indicator?

24  A   Yes.

25  Q   And if you'll explain to the Court how a water level

*GROVES - CROSS/MENKVELD*              Vol. 2 - 278

1  indicator is used by a consultant.

2         MR. GRIGGS:  I just want to make an objection that I

3  don't believe that these areas were part of the direct

4  examination.  I was curious if Mr. Menkveld had crossed over

5  into his direct exam.

6         MR. MENKVELD:  No, this is cross-examination, Your

7  Honor.

8         MR. GRIGGS:  Then it's outside the scope of direct,

9  and I object to this line of questions.

10         MR. MENKVELD:  Yesterday, Your Honor, there was a

11  lot of testimony going to IDEM having to compel people to do

12  work.  There was testimony as to the commissioner's order.

13  Your Honor asked if the commissioner's order is an agency

14  order, and there's certainly an implication that that had to

15  be done; and so these questions go exactly to that issue, Your

16  Honor.

17         MR. GRIGGS:  How to measure static water levels in

18  wells is not the same as the topic that he's just described.

19         MR. MENKVELD:  Foundation question.

20         THE COURT:  I'll overrule and give him some leeway.

21         You may answer the question.

22  A   Can you ask again, please.

23  BY MR. MENKVELD:

24  Q   Yeah.  If you could for context describe to the Court how

25  a water level indicator is used to measure depth to

*GROVES – CROSS/MENKVELD*          Vol. 2 - 279

1   groundwater.

2   A   A water level indicator meter is -- basically, it has a

3   probe on the end of it that has a current that flows through

4   it, so -- and basically two probes to run that current

5   through.  And then it's got a foot indicator so you can

6   measure length of casing or whatever that you're trying to

7   measure.

8         So you lower that probe down into the water; and when

9   you interface that static water, then the current connects;

10  and it sends a charge back through, and it beeps and sends you

11  that audible message that you've indicated that water level.

12  And then you can measure from the top of the casing where

13  you've surveyed, and you have a survey elevation.  You can

14  measure that depth then.

15        MR. MENKVELD:  Please turn to page 31, the PDF 31,

16  please.

17  BY MR. MENKVELD:

18  Q   Mr. Groves, please take a second to review this document.

19  What I want you to look at off to the left, it's the third

20  column from the left right here.  You'll see a column that

21  says, "Depth To Groundwater."  Just let me know if you can

22  read that okay.

23        THE COURT:  Can you make it bigger?

24        MR. MENKVELD:  Can you blow that up, please.  Then

25  if you could move it over to the right so we can read the text

*GROVES - CROSS/MENKVELD*                Vol. 2 - 280

1  to the left.  A little more, please.

2  BY MR. MENKVELD:

3  Q   Now, looking at this column, Depth To Groundwater, and

4  then this column here showing the monitoring wells, would it

5  be your understanding that the depth to groundwater here is

6  reflected for the monitoring wells shown over here?

7  A   That would be correct, yes.

8  Q   Now, you don't have any reason for thinking that

9  Heartland, who performed this report, depth-to-groundwater

10 analysis, is unreliable, do you?

11 A   No, not to my knowledge.

12          MR. MENKVELD:  Now, if we go to page 18 of this PDF,

13 please.  You have to rotate it.

14 BY MR. MENKVELD:

15 Q   You will see --

16          MR. MENKVELD:  And if we could blow up this portion

17 here, please.

18 BY MR. MENKVELD:

19 Q   You will see where monitoring wells 200 shallow and deep,

20 201 shallow and deep, and 202 shallow are located.  Can you

21 see those?

22 A   Yes.

23 Q   Am I correct when I say those monitoring wells are located

24 in the right-of-way just west of the Moran property?

25 A   They appear to be, yes.

*GROVES – CROSS/MENKVELD*          Vol. 2 - 281

1  Q   Again, these are monitoring wells 200, 201 and 202 shallow

2  and deep.

3       Now, if we go back to PDF 31.  And we saw the depth to

4  groundwater previously.  Can you tell us what the depth to

5  groundwater is for monitoring wells 200 -- withdraw the

6  question.

7       The depth to groundwater for monitoring wells 200

8  shallow, 200 deep, 201 shallow, 201 deep, and 202 shallow are

9  in the range of 9.5 feet to 10.5 feet; is that correct?

10 A   That is correct.

11 Q   Now, there are four boring locations --

12       MR. MENKVELD:  If we can go to the previous page --

13 excuse me -- page 21 of the PDF.  Let's scroll to the right,

14 please.

15 BY MR. MENKVELD:

16 Q   Mr. Groves, you may want to look at your paper copy for

17 this.

18       There are four boring locations on this figure that

19 show TCE above industrial default closure levels, right?

20 A   That's correct.

21 Q   And that is at a depth of 12 to 14 feet; is that correct?

22 A   That is correct.

23 Q   And if we -- you can look at your paper copy.  Can you

24 identify those boring locations, please, the numbers?

25 A   B2, B3, looks like B6, and B7.

*GROVES - CROSS/MENKVELD*          Vol. 2 - 282

1  Q   B2, B3, B6 and B7, correct?

2  A   That's correct.

3  Q   Given what we know about depth to groundwater, those

4  samples could have been taken from the smear zone that's

5  influenced by groundwater, correct?

6  A   From what I know, that would be within the groundwater

7  zone, yes.

8  Q   Now, if you go to PDF page 19, is it your understanding,

9  Mr. Groves, that the area that I'm circling is the excavation

10 area on the Moran property?

11 A   That's my understanding, yes.

12 Q   And the four borings that we just looked at showing TCE

13 concentrations above industrial levels are located entirely

14 within that excavation area; is that correct?

15 A   Appears correct, yes.

16 Q   Now, IDEM discussed this excavation with personnel from

17 Heartland; is that correct?

18 A   That's my understanding.  Their Brownfields Program did,

19 yes.

20 Q   And IDEM did not issue a Notice of Liability or any other

21 demand for that excavation to occur, correct?

22 A   No.

23 Q   But it was done anyway, wasn't it?

24 A   Yes.

25 Q   And you don't dispute that the excavation actually

*GROVES - CROSS/MENKVELD*          Vol. 2 - 283

1  occurred, as you sit here today?

2  A   No.

3  Q   Now, this report is dated June 6 of 2011.  After the

4  excavation at Moran occurred, did IDEM issue any Notice of

5  Liability to Moran or to Major Tool and Machine?

6  A   We did, but not until a few years later, yes.

7  Q   I'll be more specific.  In 2011, IDEM did not issue a

8  Notice of Liability to Major Tool and Machine or to Moran; is

9  that correct?

10 A   No, not at that time.

11 Q   In 2012?

12 A   No.

13 Q   IDEM did not issue a Notice of Liability or a demand or

14 Major Tool and Machine or to Moran; is that correct?

15 A   That's correct.

16 Q   Now, yesterday, there was some discussion about whether

17 IDEM likes to see global resolutions to contaminated areas

18 like the one we're dealing with here; is that right?

19 A   Yes.

20 Q   To achieve that resolution, PRPs can enter into a program

21 that is known as the Voluntary Remediation Program; is that

22 right?

23 A   That is correct.

24 Q   And that program is a place where people can go and work

25 with IDEM and volunteer to investigate and remediate their

*GROVES - CROSS/MENKVELD*          Vol. 2 - 284

1  properties with IDEM's oversight; is that right?

2  A   That's correct.

3  Q   You're aware that Moran and Major Tool jointly submitted

4  an application to enter into the VRP program; is that right?

5  A   Yes, I am.

6  Q   That application was submitted to IDEM on April 7, 2018.

7  Does that sound right?

8  A   That sounds right, yes.

9          MR. MENKVELD:  Let's pull up Exhibit 1194, please.

10  BY MR. MENKVELD:

11  Q   I was a little unfair asking you for a date from memory;

12  but does this confirm for you that the joint application was

13  submitted on April 7th of 2018?

14  A   That's the date on that letter, but that's not when it was

15  received by the agency.

16          MR. MENKVELD:  Now, let's go to PDF page 6.

17  BY MR. MENKVELD:

18  Q   You'll see here, Mr. Groves, don't you, that Natalie Weir

19  signed this application for Major Tool and Machine, correct?

20  A   That's correct.

21          MR. MENKVELD:  If you go to the next page, please,

22  PDF 7.

23  BY MR. MENKVELD:

24  Q   You'll see actually that Mr. Bowman signed this

25  application for Major Tool and Machine; is that right?

GROVES – CROSS/MENKVELD          Vol. 2 – 285

1  A   For Moran Electric.

2  Q   Excuse me, for Moran.   Thank you.

3       Now, this application was submitted after soil

4  excavation was performed on the Moran property, correct?

5  A   That would be correct, yes.

6  Q   Now, a little more than two months later, IDEM issued a

7  commissioner's order to Moran and Major Tool; is that right?

8  A   That would be correct, yes.

9       MR. MENKVELD:  Let's pull up Exhibit 1032, please.

10 BY MR. MENKVELD:

11 Q   You've reviewed this document, Mr. Groves?

12 A   Yes.

13 Q   And go to -- scroll down one page.  Up one page, please.

14 There's a signature on the bottom of the cover letter of the

15 commissioner's order.  Is that your signature?

16 A   Yes, it is.

17 Q   After this commissioner's order was sent, IDEM then denied

18 Major Tool's and Moran's VRP application; is that right?

19 A   That's correct.

20      MR. MENKVELD:  Pull up Exhibit 1228, please, and go

21 to PDF page 12.

22 BY MR. MENKVELD:

23 Q   Mr. Groves, have you seen this letter denying Moran and

24 Major Tool's VRP application?

25 A   I have, yes.

GROVES - CROSS/MENKVELD          Vol. 2 - 286

1  Q    And it's dated June 20 of 2018, correct?

2  A    That's correct.

3  Q    As grounds for denying Major Tool and Moran's VRP

4  application, IDEM cited the issuance of the commissioner's

5  order; is that correct?

6  A    I believe so, and the completeness of the application, as

7  I recall.

8  Q    I'm sorry, the completeness of the application?

9  A    Yes.

10         THE COURT:  You mean the application was incomplete?

11         THE WITNESS:  Yes.  There were parts of it -- I am

12  not in charge of that program, and I did not make that

13  decision; but that's what the program manager told me, that

14  that was part of their denial of application was completeness

15  of that.

16  BY MR. MENKVELD:

17  Q    So you can't sit here and say if those technical

18  corrections were performed, Moran and Major Tool would be

19  admitted to the VRP program, yes?

20  A    Because of the commissioner's order, they would not have

21  been, no.

22  Q    Now, the VRP application was submitted before the

23  commissioner's order was issued; isn't that right?

24  A    That's right.

25         MR. MENKVELD:  Now, let's look at Exhibit 1032,

*GROVES - CROSS/MENKVELD*          Vol. 2 - 287

1  please.  Go to page 5 of the PDF.  Zoom in on paragraph 4.

2  BY MR. MENKVELD:

3  Q   Now, Mr. Groves, in the commissioner's order, IDEM cited

4  some data from a report performed by Allied Environmental.

5  You're aware of that data, correct?

6  A   Yes.

7  Q   And that data was taken in 1996 at the Moran property; is

8  that right?

9  A   Yes.

10  Q   Now, I reviewed this commissioner's order; and I have seen

11  no other data pertaining to the Moran property; is that right?

12  A   I don't specifically recall whether we cited it or not.

13  Q   Well, if you want to take a look at it, Mr. Groves, you're

14  free to double-check.

15       Are you aware of any other data that was cited in this

16  commissioner's order besides the Allied data?

17  A   No, not to my knowledge.

18  Q   Now, again, there was data available for the Moran

19  property that Heartland took, correct?

20  A   Yes.

21  Q   There was a soil excavation that occurred on the Moran

22  property, correct?

23  A   Yes.

24  Q   And there was confirmation sampling after that soil

25  excavation occurred, correct?

GROVES - CROSS/MENKVELD          Vol. 2 - 288

1  A   I believe, yes.

2  Q   Including side wall samples?

3  A   I believe so, yes.

4  Q   Would you like to see a document to refresh your memory as

5  to whether there were side wall and bottom samples taken?

6  A   No, that's fine.

7  Q   Are you confident that that did occur?

8  A   Likely, yes.

9  Q   Now, the data -- all that data taken at Moran was not

10 referenced in this commissioner's order, was it?

11 A   No.

12 Q   Now, what IDEM referenced here is the presence of TCE --

13 if you want to review that paragraph before you answer this

14 question -- TCE in the pits that were believed to hold

15 degreasers at one point or another; is that right?

16 A   Yes.

17 Q   Now, Mr. Groves, those pits were made of concrete; is that

18 correct?

19 A   That's my understanding, yes.

20 Q   Concrete pits are not soil, are they?

21 A   No.

22 Q   Concrete pits are not groundwater, right?

23 A   No.

24 Q   Concrete pits are containment features on the property; is

25 that right?

*GROVES - CROSS/MENKVELD*          Vol. 2 - 289

1   A    They're supposed to be, yes.

2   Q    Now, the commissioner's order cited TCE found in a

3   concrete pit; but it does not reference TCE found in soil or

4   TCE found in groundwater; is that correct?

5   A    No, it doesn't reference TCE found in groundwater.

6   Q    Now, IDEM would want to see data to determine whether

7   contamination from pits would be released to the environment.

8   That would be the next logical step, wouldn't it be?

9   A    We would; and while we didn't cite it in here, we already

10  had that data in our files.

11  Q    Well, if releases of TCE from pits 3 and 4 occurred,

12  wouldn't you expect to see soil or groundwater data showing

13  that?

14  A    If a release occurred there, yes.

15  Q    Now, as the project manager for the Moran site, you've

16  reviewed the Allied report referenced in the commissioner's

17  order, right?

18  A    Yes.

19          MR. MENKVELD:  Turn to Exhibit 1109, please.  Go to

20  PDF page 8.

21  BY MR. MENKVELD:

22  Q    Mr. Groves, if you need to take a second to read this

23  page, please do.  The question is:  Are there five pits

24  referenced on this page of the report?

25  A    I see reference to four but not five.

*GROVES - CROSS/MENKVELD*          Vol. 2 - 290

1  Q   Do you need to scroll down at all?

2         MR. MENKVELD:  Let's go to PDF 16.  There's a little

3  better figure here.  Let's scroll up.  If we can zoom in a

4  little, Ashley; Ms. Hill.

5  BY MR. MENKVELD:

6  Q   You'll see a location here of pit 1, correct?

7  A   Yes.

8  Q   Pit 2.  You see that?

9  A   Yes.

10 Q   Pit 3?

11 A   Yes.

12        MR. MENKVELD:  If you could scroll up, please.  The

13 other way.

14        A little more, please.

15 BY MR. MENKVELD:

16 Q   And you have pit 4 and pit 5.  Do you see those?

17 A   Yes.

18 Q   Now, you're aware that soil data taken from directly

19 beneath pit 1 showed no detections or even negligible

20 detections of TCE or other contaminants?  Are you aware of

21 that?

22 A   Yes.

23 Q   Now, that soil data is not referenced in the

24 commissioner's order, is it?

25 A   No.

GROVES – CROSS/MENKVELD          Vol. 2 - 291

1  Q   You're aware that soil data taken from directly beneath

2  pit 2 showed no detections or negligible detections of TCE or

3  other contaminants, correct?

4  A   According to the report, yes, that's correct.

5  Q   And that soil data also isn't referenced in the

6  commissioner's order; is that right?

7  A   Right.

8  Q   Are you aware, Mr. Groves, that Allied reported

9  recommending against drilling through pits 3 and 4?

10 A   I don't recall that in the report.

11 Q   Well, as the project manager for the Moran property, are

12 you aware that Allied reported that the remaining pits are in

13 good shape?

14 A   That's my understanding, yes.

15 Q   And that the pits that were drilled through were actually

16 3 feet thick?

17 A   That's referenced in the report, yes.

18         THE COURT:  So which ones were 3 feet thick, 1 and

19 2?

20         MR. MENKVELD:  One and 2 were drilled through, Your

21 Honor.

22         THE COURT:  Let me ask the witness.

23         One and 2 were drilled through, and they were

24 3 feet?

25         THE WITNESS:  No, no.  I think he is referencing the

GROVES – CROSS/MENKVELD          Vol. 2 - 292

1  pits more on the southern part of the property were 3 feet

2  thick.

3            THE COURT:  Three, 4 and 5?

4            THE WITNESS:  Right and they were not drilled

5  through is my understanding.

6            THE COURT:  Okay.

7            MR. MENKVELD:  Let's go to page 8 of this PDF,

8  please.

9  BY MR. MENKVELD:

10 Q   Mr. Groves, look at the second paragraph, the first

11 sentence, and just read that.

12 A   Paragraph that starts "As stated"?

13 Q   It starts with "Four 2-inch soil borings."

14 A   You want me to read that paragraph?

15 Q   I'll read it for you.

16       It says, "Four 2-inch soil borings were drilled

17 through approximately 3 feet of concrete into the bottom of

18 pits 1 and 2 of the motor shop."

19       Does that comport with your recollection?

20 A   Yes.

21 Q   And then pits 3 and 4 were not drilled through, correct?

22 A   Yes.

23 Q   And I believe you stated that Allied recommended against

24 drilling through those pits because they were in good shape

25 and showed no fissures through which a release can occur,

GROVES – CROSS/MENKVELD          Vol. 2 – 293

1  correct?

2  A    According to the report, yes.

3  Q    Now, in 1996, IDEM did not issue any sort of Notice of

4  Liability or demand letter to Moran; is that right?

5  A    That's right.

6  Q    Now, if we go to Exhibit 1073, Mr. Groves you're aware

7  Geosyntec is one of the consultants that's working in this

8  area in general?

9  A    Yes.

10  Q    Have you seen this report?

11  A    Yes.

12  Q    So you're aware Geosyntec in September of 2015 took soil

13  and groundwater samples directly from the spots where pits 3

14  and 4 were located, correct?

15  A    As far as we could discern, yes.  They collected them.

16  Q    And pits 3 and 4 are the pits that were referenced in the

17  commissioner's order; is that right?

18  A    I don't recall if they were specifically referenced.

19  Q    Now, Allied did not report -- the Allied report did not

20  show that TCE in soil or groundwater in the areas of pits 3

21  and 4 were detected, right?

22  A    They did not sample them, no.

23  Q    Now, let's take a look at page 47 of this exhibit, which

24  is figure 2.

25          MR. MENKVELD:  If you could scroll down, please.  A

*GROVES - CROSS/MENKVELD*                Vol. 2 - 294

1  little more, please.  Right there.

2  BY MR. MENKVELD:

3  Q   You can see, Mr. Groves, that pit 3 -- soil data for pit 3

4  is reported as SBU110; is that correct?

5  A   Can you zoom in, please?

6          MR. MENKVELD:  You may have to blow that up.

7  A   What was your question, again, please?

8  BY MR. MENKVELD:

9  Q   You can see that pit 3 -- the soil boring at pit 3 is

10 reported as SBU110; is that correct?

11 A   Yes.

12 Q   And then pit 4 is reported as SBU113; is that right?

13 A   That's correct.

14 Q   Now, please turn your attention to the soil analytical

15 data -- we'll just stay with pit 4 here.  My question to you,

16 Mr. Groves, is if you see detections in the soil right in the

17 area of pit 4 showing concentrations of TCE or PCE above any

18 IDEM screening level?

19 A   On this report?  In this report?

20 Q   In that table, SBU113.

21 A   The table that's on this figure that's in front of me?

22 Q   That's right.

23 A   There is none, but it's at depth.

24 Q   You'll have a chance to explain that; but just focus on my

25 question, Mr. Groves.

1          For TCE and PCE, do you see detections above any IDEM

2   screening level, be it residential or industrial?

3   A    No.

4   Q    Now, for pit 3, same question.  Do you see concentrations

5   of PCE or TCE above any IDEM screening level?

6   A    No.

7             MR. MENKVELD:  Please go to page 48 of the PDF.

8   BY MR. MENKVELD:

9   Q    This is figure 3 of the report, Mr. Groves.  You've

10  reviewed this before, correct?

11  A    Correct.

12  Q    Now, this figure shows groundwater analytical data for

13  pits 3 and 4.

14  A    That would be correct, yes.

15            MR. MENKVELD:  If you could scroll down, please,

16  Ms. Hill.  Right there.

17  BY MR. MENKVELD:

18  Q    Now, on these figures, sometimes we'll have pit 3 here;

19  and then we have a line that goes to the data table down here.

20  Do you see that?

21  A    Yes.

22  Q    So pit 3 is reported as VAP110, right?

23  A    That's correct.

24  Q    And then we have pit 4 here; and then we have the data

25  table here, which was reported as VAP113; is that right?

GROVES - CROSS/MENKVELD          Vol. 2 - 296

1   A   Yes, that looks correct.

2   Q   Now, VAP means vertical aquifer profiling; is that

3   correct?

4   A   That is correct.

5   Q   And VAP is a method to get distinct groundwater samples at

6   different depths to determine groundwater contamination at

7   different depths, correct?

8   A   That's correct.

9   Q   Now, please look at the VAP results for pit 3, which is

10  shown in VAP110.

11  A   Okay.

12  Q   Now, the readings for both PCE and TCE are expressed at

13  less than 5 parts per billion, correct?

14  A   That is correct.

15  Q   Now, when you see a number expressed as less than 5 parts

16  per billion, doesn't that mean that it's nondetect?

17  A   When it's reported as such in this report, it is thought

18  to be nondetect, yes.

19  Q   Nondetect means the equipment couldn't pick up any

20  detections of that contaminant at all; is that right?

21  A   The laboratory analytical equipment, yes.

22  Q   Now, look at the results for pit 4, which are expressed at

23  VAP113.

24  A   Okay.

25  Q   And you will see, Mr. Groves, one detection of TCE at 5.8

*GROVES - CROSS/MENKVELD*          Vol. 2 - 297

1  parts per billion, correct?

2  A    Correct.

3  Q    Does that exceed IDEM's industrial screening levels?

4  A    No.

5  Q    In the year 2015 after these data were taken, IDEM did not

6  require Moran to perform additional work on the Moran

7  property; is that correct?

8  A    That's correct.

9  Q    And in 2015, IDEM did not require Major Tool to perform

10  any additional work on the Moran property; is that correct?

11  A    That's correct.

12           MR. MENKVELD:  Go to figure 1001, please.

13  BY MR. MENKVELD:

14  Q    Mr. Groves, earlier we identified the Zimmer Paper parcel,

15  which is right here, correct?

16  A    Correct.

17  Q    Now, you're aware at the Zimmer Paper parcel, there was a

18  large UST removed at some point; is that right?

19  A    Yes.

20  Q    You're also aware that soil excavation occurred at the

21  Zimmer Paper parcel, correct?

22  A    Correct.

23  Q    You're further aware that Major Tool constructed a

24  building over the Zimmer Paper and the Ertel site, correct?

25  A    In part, yes.

GROVES - CROSS/MENKVELD        Vol. 2 - 298

1  Q   Now, let's first get into the UST that was removed from

2  the Zimmer parcel.

3         Now, you're aware, Mr. Groves, that the UST removed

4  from the Zimmer parcel was reported to be 16,000 gallons; is

5  that right?

6  A   I don't recall specifically the size.

7  Q   If you're able to look at your old testimony that you've

8  given in related cases, would that refresh your recollection?

9  A   Possibly, yes.

10 Q   Now, Mr. Groves, you've provided testimony in depositions

11 and hearings a number of times with respect to this particular

12 area, right?

13 A   Yes.

14 Q   And were you deposed on July 22nd, 2010, as part of the

15 lawsuit filed by the City of Indianapolis against Ertel

16 Manufacturing Corporation?

17 A   I believe so, yes.

18 Q   Now, what I'll just ask you to do here, Mr. Groves, is

19 just read actually the entire page 51.  Just let me know when

20 you're done, please.

21 A   Okay.

22 Q   Does that refresh your recollection as to the size of the

23 UST that was removed from the Zimmer parcel?

24 A   Yes.

25 Q   Was it 16,000 gallons?

*GROVES – CROSS/MENKVELD*          Vol. 2 - 299

1   A    Yes.

2   Q    At the time this tank was removed, you were involved with

3   the investigation and remediation of the Ertel property and

4   the Zimmer parcel; is that correct?

5   A    Yes.

6   Q    Now, when that UST was removed, do you recall that there

7   were approximately 3,200 gallons of residual product in the

8   UST?

9   A    That was what was reported, yes.

10  Q    And there was a release from that UST when it was removed

11  from the ground; isn't that correct?

12  A    That's our understanding, yes.

13  Q    Was it also your understanding, Mr. Groves, that when the

14  UST was removed, it was leaking solvent and sludge?

15  A    I don't know if I recall that or not when it was removed.

16  I will say I remember it having holes in the bottom of it, so

17  it probably likely was.  That would be evidence of the

18  release.

19  Q    And do you know who the owner of the Zimmer parcel was

20  when that release occurred?

21  A    My understanding Zimmer Paper packaging was.

22  Q    Are you sure about that or is that just your understanding

23  today?

24  A    That's my recollection.

25          MR. MENKVELD:  Pull up Exhibit 1094, please.

                           *GROVES - CROSS/MENKVELD*          Vol. 2 - 300

 1  BY MR. MENKVELD:

 2  Q   Mr. Groves, this is the closure report for the removal of

 3  that 16,000-gallon storage tank.  Do you see who it's prepared

 4  for?

 5  A   Major Tool and Machine.

 6  Q   Is it still your belief that Zimmer Paper owned that

 7  property at the time that release occurred?

 8  A   Like I said, that was my understanding; but I don't recall

 9  specifically.

10  Q   Now, Mr. Groves --

11          MR. MENKVELD:  Turn to page 15 of this PDF, please.

12  BY MR. MENKVELD:

13  Q   You've seen this figure before, right?

14  A   Yes, yesterday.

15  Q   And you identified this as the Zimmer parcel; is that

16  correct?

17  A   Correct.

18  Q   Now, there's a building up here on the Zimmer parcel.  Do

19  you recall that building being referred to as a "little blue

20  building" or "building K"?

21  A   Not so much "building K," but I've heard the "little blue

22  building" before.

23  Q   Now, was it IDEM's understanding that there was a separate

24  release of chlorinated solvents near the little blue building?

25  A   I don't recall.

*GROVES – CROSS/MENKVELD*          Vol. 2 - 301

1   Q   Let's go back to your deposition here, and I'm going to

2   want you to read, Mr. Groves, page 55, line 11 through 56,

3   line 3.  Again, 55, 11 through 56, 3.

4   A   Okay.

5   Q   Are you finished?

6        Mr. Groves, after reading your deposition transcript,

7   does that refresh your recollection as to whether IDEM

8   believed there was a release from the little blue building or

9   the little blue building was the source of a release?

10  A   Yes.

11  Q   Is that, in fact, the case?

12  A   Appears to be, yes.

13  Q   Now, soils were excavated from the Zimmer parcel, correct?

14  A   Correct.

15  Q   They were excavated from the area where the UST was

16  removed; is that right?

17  A   Correct.

18  Q   And there is no confirmation soil sample data for the

19  excavation just around the UST; is that right?

20  A   That's my understanding.

21  Q   But there is confirmation sampling data for the excavation

22  area; isn't that correct?

23  A   Correct.

24  Q   And after that excavation occurred, IDEM did not require

25  further excavation; is that right?

*GROVES - CROSS/MENKVELD*          Vol. 2 - 302

1  A   I believe they did go back and do some additional

2  excavation in certain small areas.

3            MR. MENKVELD:  Go to Exhibit 1102, please -- excuse

4  me -- 1101.  PDF 83.  Scroll down.

5  BY MR. MENKVELD:

6  Q   Mr. Groves, you've seen these data before, haven't you?

7  A   Yes.

8  Q   At the bottom, you will see this is "Soil Excavation

9  Confirmation Analytical Results"; and this is for VOCs in

10 soil, correct?

11 A   Correct.

12 Q   Now, when we say VOCs, contained within VOCs is TCE and

13 PCE, right?

14 A   That is correct.

15            MR. MENKVELD:  Actually, go to the next page,

16 please.  If you will zoom in here, Ms. Hill, to this area.

17 BY MR. MENKVELD:

18 Q   You'll see, Mr. Groves, bottom sample 1; is that right?

19 A   Correct.

20 Q   "BS-" stands for bottom sample, right?

21 A   That is correct.

22 Q   You'll see an excavation -- or excuse me -- a sample date

23 here, 912 of 2007, right?

24 A   That's correct.

25 Q   And then you'll see a second date here of 9-18-2007; is

*GROVES - CROSS/MENKVELD*          Vol. 2 - 303

1  that right?

2  A   That's correct.

3  Q   Now, when you say further excavation was done, was it done

4  again on September 18th just to go deeper in that area?

5  A   My -- I don't know exact dates when things occur; but that

6  was my understanding is that when excavation occurred, they

7  went deeper, closer to the water table, into the water table.

8  Q   So there was an excavation event, right?

9  A   Yes.

10  Q   And then in some areas, there was further excavation,

11  right?

12  A   That's my understanding, yes.

13  Q   But that was all within the same time period of

14  approximately within a month that happened?

15  A   Yes, it would have been.

16  Q   And after that period, there was no further soil

17  excavation done on the Zimmer parcel; is that right?

18  A   Can you zoom out for me, please?

19  Q   Yes.

20  A   I want to clarify that BS-1 is on the Ertel property, not

21  on the Zimmer property.

22  Q   Sure.  And that's fair.

23       Let's go to BS-10 here then.  Actually, this is a good

24  example here, Mr. Groves.  You'll see BS-10 on the Zimmer

25  parcel; is that right?  That's on the Zimmer parcel?

*GROVES – CROSS/MENKVELD*              Vol. 2 - 304

1  A   Yes.

2  Q   And then you'll see a sample date of September 24, 2007?

3  A   Yes.

4  Q   And then you see one the very next day, September 28,

5  2007; is that right?

6  A   Right.

7  Q   And so is that illustrative of how this excavation event

8  occurred?

9  A   Yes.

10 Q   And then after this particular excavation event, there was

11 no other excavation done at the Zimmer or the Ertel sites; is

12 that right?

13 A   Not that I'm aware of, no.

14 Q   Now, if we look at confirmation sampling -- I'll withdraw

15 that question.

16        Confirmation sampling is sampling that's done after an

17 excavation, correct?

18 A   Correct.

19 Q   And what it shows us is data of concentrations of TCE or

20 PCE in this case that remains after excavation occurred?

21 A   That's fair, yes.

22 Q   And the only way to excavate or remove soils that were

23 left after excavation is to perform another excavation, right?

24 A   Yes.

25 Q   If it's feasible, right?

GROVES – CROSS/MENKVELD          Vol. 2 - 305

1  A    Right.

2  Q    Now, the confirmation samples that we see in Exhibit 1101

3  indicates the contamination that were left in the ground at

4  those properties after excavation occurred; is that right?

5  A    That would be accurate, yes.

6  Q    Now, there was no No Further Action letter issued for the

7  Zimmer parcel; is that correct?

8  A    That is incorrect.

9  Q    Okay.  Explain that to me, please.  This is new to me.

10 A    We issued a No Further Action letter for the Ertel parcel

11 and the Ertel property, not for Zimmer, not for the Zimmer

12 parcel.  It was not included.

13 Q    It's possible I misstated my question.

14       The question was there was no No Further Action letter

15 issued for the Zimmer parcel, correct?

16 A    That is correct.

17 Q    Now, a No Further Action letter, so the Court has some

18 context, is that a letter that IDEM issues for a particular

19 property saying at this time, no further environmental

20 response has to be done?

21 A    That's partly accurate.  We would basically say in the

22 review of the data that no risk exposure exists at that time.

23 So therefore, we're closing that; and no further remedial

24 action is necessary.

25 Q    Now, the Zimmer property was not placed into an IDEM

1  program in 2007 when the soil excavation was going on; is that

2  right?

3  A    That's correct, yes.

4  Q    And it's your understanding that the Zimmer parcel and the

5  Ertel site were actually being remediated together; is that

6  correct?

7  A    That's correct.

8  Q    Part of the reason for that is because there is a

9  redevelopment project happening on those two properties; is

10  that right?

11  A    That was correct, yes.

12  Q    And that redevelopment project was undertaken between

13  Major Tool and the City of Indianapolis; is that correct?

14  A    That's my understanding, yes.

15  Q    You're aware that Major Tool constructed a building over

16  the Ertel site and the Zimmer parcel; is that right?

17  A    That's right.

18  Q    Now, IDEM did not require any additional remediation of

19  the Ertel or the Zimmer parcel -- or the Ertel site or the

20  Zimmer parcel before Major Tool constructed its building on

21  those properties; is that right?

22  A    That's right.

23  Q    IDEM did not demand or request that any sort of

24  groundwater treatment be done before that building was

25  constructed; is that right?

GROVES – CROSS/MENKVELD          Vol. 2 - 307

1   A    That's correct.

2   Q    Mr. Groves, you testified yesterday as to groundwater

3   flow?

4   A    Yes.

5   Q    Is it your understanding in this area in general --

6        MR. MENKVELD:  If you could go to figure 1101,

7   please.

8   BY MR. MENKVELD:

9   Q    The groundwater flow in this area is generally south to

10  southwest; is that correct?

11  A    It's generally west to southwest.

12  Q    Mr. Groves, I'm going to hand you your deposition.  Please

13  read page 170, lines 6 through 9, please.

14       At least at this time, Mr. Groves, this deposition was

15  taken, it was your belief that groundwater flow was south to

16  southwest; is that correct?

17  A    I did not say "south."  I said "southwest" in that

18  deposition.

19  Q    So then the groundwater flow is southwest then; is that

20  right?

21  A    Yes.

22  Q    Now, if you look at the Zimmer parcel, what direction from

23  the Zimmer parcel is the Moran parcel?

24  A    South to southwest.

25  Q    Now, the Major Tool building that is there today has a

*GROVES – CROSS/MENKVELD*          Vol. 2 - 308

1   vapor mitigation system below it; is that correct?

2   A   Yes.

3   Q   And that system is passive today, meaning that it's not

4   running; is that correct?

5   A   That's correct.

6   Q   And IDEM doesn't require that it runs today; is that

7   right?

8   A   We have confirmation data that they collected to show that

9   it can be passive at this time.

10  Q   Now, Mr. Groves, we're going to turn to the Ertel site

11  here.

12       Now, yesterday, you were shown some pretty scary

13  pictures of the Ertel site before it was remediated.  Do you

14  remember those pictures?

15  A   Yes.

16  Q   There were barrels spread across the Ertel site, correct?

17  A   I wouldn't say "spread across," but there were barrels.

18  Q   And you saw pictures with sludge on the floor within the

19  Ertel site?

20  A   Yes.

21  Q   Now, to be clear, you have no personal knowledge or

22  evidence that Moran ever owned the Ertel site, right?

23  A   Correct.

24  Q   And you have no personal knowledge or evidence that Moran

25  had their operations at the Ertel site, right?

*GROVES – CROSS/MENKVELD*          Vol. 2 - 309

1  A   Correct.

2  Q   And to be clear, IDEM has never considered Moran a

3  potentially responsible party for the Ertel site; is that

4  right?

5  A   That is right.

6  Q   Now, Mr. Groves, you are well aware that Ertel, the

7  company, Manufacturing, was actually sued by the City of

8  Indianapolis and by IDEM, right?

9  A   Yes.

10 Q   And there was a settlement --

11 A   Yes.

12 Q   -- that resulted from those lawsuits, right?

13 A   Correct.

14 Q   And you're also aware that there was an escrow account set

15 up that held approximately $860,000, right?

16 A   That's correct.

17 Q   When that escrow account was set up, that $860,000 was

18 earmarked --

19         COURT REPORTER:  I'm sorry.  Please repeat your

20 question.

21 BY MR. MENKVELD:

22 Q   You're further aware that the escrow account was set up

23 and allocated for performing further work at the Ertel

24 property, if necessary, right?

25 A   That was the initial intent, yes.

1  Q   Now, in the summer of 2012, you were the project manager

2  for the Ertel site; is that right?

3  A   Yes.

4  Q   And you actually developed a scope of work to perform

5  additional investigation into groundwater contamination at the

6  Ertel site; is that right?

7  A   That would be accurate, yes.

8  Q   That scope of work was not implemented, was it?

9  A   That's correct.

10 Q   The city [sic] of Brownfields coordinator at the time was

11 Steven Meyer; is that right?

12 A   That's correct.

13 Q   And Steven Meyer resisted that work being done; isn't that

14 right?

15 A   I would say that's accurate, yes.

16          MR. MENKVELD:  Pull up Exhibit 1223, please.  If you

17 can zoom out so we can see the whole thing, please.

18 BY MR. MENKVELD:

19 Q   Mr. Groves, this was a letter that was sent to you, right?

20 A   Yes.

21 Q   And it was sent to you by Mr. Meyer; is that correct?

22 A   That's correct.

23 Q   Now, the date of this letter -- am I correct when I say

24 it's June 6, 2012?

25 A   Yes, that's correct.

GROVES - CROSS/MENKVELD          Vol. 2 - 311

1  Q   And you'll see that the subject of this letter is,

2  "Request For No Further Action Status," right?

3  A   Yes.

4  Q   Is it your understanding that Mr. Meyer in June of 2012

5  was requesting that IDEM issue a No Further Action letter for

6  the Ertel property?

7  A   Yes.

8          MR. MENKVELD:  Turn to Exhibit 1123, please.

9  BY MR. MENKVELD:

10  Q   Mr. Groves, have you seen this letter before?

11  A   Yes.

12  Q   Now, this is a letter from Heartland Environmental; is

13  that right?

14  A   That's correct.

15  Q   Directed to you?

16  A   Yes.

17  Q   And it's dated May 30 of 2012; is that right?

18  A   Yes.

19  Q   And this is a letter at approximately the same time from

20  Heartland requesting that IDEM issue a No Further Action

21  letter for the Ertel property; is that right?

22  A   That's correct.

23          MR. MENKVELD:  Scroll to the bottom, the signature

24  line of this letter.

25

GROVES - CROSS/MENKVELD          Vol. 2 - 312

1  BY MR. MENKVELD:

2  Q   You'll see a signature on here, Mr. Groves.  Is that

3  Mr. Nivas Vijay who signed this letter?

4  A   Yes, it is.

5  Q   And Mr. Vijay was acting as the Heartland's project

6  manager for which properties at this time?

7  A   My understanding was for the Ertel property.  He had also

8  worked on the Moran property and at a time at QEPI and I think

9  even a little bit with Heartland for the Zimmer parcel.

10 Q   A lot of experience with the area, right?

11 A   Yes.

12 Q   Now, Mr. Nivas Vijay was working on whose behalf in

13 writing this letter?

14 A   City of Indianapolis.

15 Q   Who else did Mr. Vijay work for?

16 A   My understanding, Major Tool and Machine as well.

17 Q   At that time?

18 A   Yes, contemporaneously.

19 Q   Now, you responded to Mr. Meyer, correct, the letter that

20 he sent?

21 A   Yes.

22 Q   And you informed him that at least in your opinion, a No

23 Further Action letter couldn't be issued at that time, right?

24 A   Yes.  That was my opinion, that we hadn't fully looked at

25 risk and exposure and evaluated that.

*GROVES - CROSS/MENKVELD*          Vol. 2 - 313

1  Q   And you received an e-mail back from Mr. Meyer; is that

2  right?

3  A   Yes.

4           MR. MENKVELD:  Pull up Exhibit 1124.

5           Actually, if you could exit out of this document.

6  BY MR. MENKVELD:

7  Q   So Mr. Meyer sent you an e-mail after he sent -- after you

8  sent your e-mail to him, right?

9  A   Yes.

10 Q   And he did things like accuse you of being unfamiliar with

11 the site; is that right?

12 A   I don't recall specifically what he said in his e-mail.

13 Q   Do you recall him saying that he told IDEM that the scope

14 of work was entirely unnecessary?

15 A   Yes.

16 Q   And according to Mr. Meyer, IDEM agreed to issue a No

17 Further Action status for groundwater before groundwater

18 results were even returned.  Do you recall Mr. Meyer saying

19 that?

20 A   I don't recall specifically, no.

21 Q   Now, did IDEM agree that the closure assessment for the

22 Ertel site would be limited to the footprint of the Ertel site

23 itself?

24 A   I don't recall agreeing to that, no.

25 Q   Do you recall Mr. Meyer discussing a redevelopment partner

*GROVES - CROSS/MENKVELD*          Vol. 2 - 314

1   having the option to purchase property?

2   A   Yes.

3   Q   And that that option would expire by a certain point?

4   A   I recall being told that, yes.

5   Q   And do you recall being told that to exercise that option,

6   a No Further Action letter would have to be issued for the

7   Ertel property?

8   A   I don't recall if I was specifically told that or not.

9   Q   Now, the redevelopment partner for this property is who?

10  A   What I know now is Major Tool and Machine.

11  Q   Now, after Mr. Meyer --

12          MR. MENKVELD:  Go to Exhibit 1124, please.

13  BY MR. MENKVELD:

14  Q   After Mr. Meyer sent the e-mail, there was another No

15  Further Action request letter on October 15 of 2012; is that

16  right?

17  A   Yes.

18  Q   And that's shown in Exhibit 1124, correct?

19  A   Correct.

20  Q   Again, it's directed to your attention; is that right?

21  A   Yes.

22  Q   Now, had any further groundwater testing been done from

23  the first request to the second request at the Ertel property?

24  A   I don't believe so.

25          MR. MENKVELD:  Now, pull up Exhibit 1099, please.

GROVES - CROSS/MENKVELD          Vol. 2 - 315

BY MR. MENKVELD:

Q    This is the No Further Action letter that was issued by
IDEM for the Ertel site, correct?

A    That's correct.

         MR. MENKVELD:  Go back to 1124 quickly.

BY MR. MENKVELD:

Q    So the date of 1124 is October 15 of 2012; and the No
Further Action letter, 1099, was issued a little more than a
month later on November 19th of 2012; is that correct?

A    That's correct.

Q    No part of the $860,000 set aside to remediate the Ertel
property was spent to actually perform that remediation; is
that correct?

A    Well, it was not meant necessarily for additional
remediation.

Q    You can explain that later, Mr. Groves.  My question to
you is no part of the $860,000 in the escrow account was used
for actual remediation of the Ertel property; is that right?

A    That's right.

Q    Now, you are well aware, Mr. Groves, that Moran Electric
has been challenging the issuance of this No Further Action
letter for years; is that right?

A    That's correct.

Q    And you're aware that as of today, the Marion County
Superior Court has ruled that IDEM should not have issued the

*GROVES — CROSS/MENKVELD*                    Vol. 2 - 316

1  No Further Action letter because the cleanup standards in an

2  agreed order were not met; is that right?

3          MS. LASHBROOK:  Objection.  He's asking for a legal

4  conclusion, and the Court can read the decision of the Marion

5  County court for itself.

6          THE COURT:  All right.

7          MR. MENKVELD:  I'm asking for a fact, whether he is

8  aware that Marion County, as the project manager of this site,

9  has said that the cleanup terms of the agreed order were not

10 met, Your Honor.  It's well within his knowledge.  It's not a

11 legal conclusion.

12         THE COURT:  I don't think it's asking for a legal

13 conclusion, so I will overrule your objection and allow the

14 witness to answer the question.

15         The question was:  "Are you aware that as of today,

16 the Marion County Superior Court has ruled that IDEM should

17 not have issued the No Further Action letter because the

18 cleanup standards in an agreed order were not met?"

19         THE WITNESS:  I'm aware of a court decision.  I

20 don't really know the specifics of the judge's ruling.

21         THE COURT:  Thank you.

22 BY MR. MENKVELD:

23 Q   Now, last line of questions, Mr. Groves.  And this goes to

24 the timing component of soil removals in this particular area.

25         Now, soil contamination was discovered on the Ertel

*GROVES — CROSS/MENKVELD*          Vol. 2 - 317

1   and Zimmer parcels in approximately the 2006 to 2007 time

2   frame; is that right?

3   A   I would say more 2005 to '7, yes.

4   Q   And by the end of 2007, soils were actually excavated from

5   those two properties; is that right?

6   A   Yes.

7   Q   Now, soil contamination was found in the smear zone on the

8   Moran property in 2010; is that right?

9   A   Yes.

10  Q   And those soils were excavated by the end of 2011; is that

11  right?

12  A   Yes.

13  Q   Now, soil contamination was discovered on the Von Duprin

14  property in what year?

15  A   We began to understand soil releases and soil

16  contamination, I would say, in 2009 when that came to the

17  agency.

18  Q   And when were soils excavated from the Von Duprin

19  property?

20  A   Late last year, early this year was when the plan was

21  implemented.

22  Q   Does April 2019 sound correct?

23  A   Yes.

24  Q   So approximately ten years later?

25  A   Yes.

*GROVES – CROSS/KRAHULIK*               Vol. 2 - 318

1          MR. MENKVELD:  I'll pass the witness.

2          THE COURT:  Who is going to cross on behalf of the

3    Major defendants?

4          Ms. Krahulik, you may.

5                          **CROSS-EXAMINATION**

6    BY MS. KRAHULIK:

7    Q    Good morning.

8    A    Good morning.

9    Q    When IDEM considers closure of a site, any site, is it

10   concerned in particular with the levels of contaminants that

11   are emanating from that site?

12   A    Yes.  We would look at that and evaluate that against risk

13   and exposure that they might be presenting.

14   Q    And why is the concern more with contamination levels

15   leaving the site than it is with those remaining on-site?

16   A    Adjacent property owners may be residential.  There may be

17   vapor impacts.  The site itself typically, whether it be a dry

18   cleaner or manufacturing facility, is more of a commercial

19   industrial facility.  So the risk exposure on the site or

20   source of release is typically different than off-site

21   properties.

22   Q    And isn't it also true that it is easier to control

23   through vapor barriers or other means exposures that remain on

24   a site?

25   A    Well, I would say that the responsible party or the person

*GROVES – CROSS/KRAHULIK*          Vol. 2 - 319

1  implementing the remediation has better control in a source

2  site.  So yes, you can control the risk much easier.

3  Q    I'm going to ask you to look at Exhibit 1027.

4          THE COURT:  I don't think anybody can read that.

5          MS. KRAHULIK:  Can we zoom in on that, please, just

6  the title of the document.

7  BY MS. KRAHULIK:

8  Q    Mr. Groves, can you tell the Court what this document is?

9  A    It's entitled -- or the subject is "Supplemental Soil and

10 Groundwater Investigation At JTV Hill Park."

11 Q    And this was directed to you at IDEM?

12 A    Yes.

13         MS. KRAHULIK:  Can we go to figure No. 2 to this

14 document, please?

15         There we go.  And then zoom in a little bit there on

16 the table.  So scroll -- move the document down, please.

17 BY MS. KRAHULIK:

18 Q    What was the purpose of this memorandum that was submitted

19 to IDEM?

20 A    As I recall, the boring that's shown on this figure had

21 significant concentrations of PCE and TCE.  There were some --

22 when that data was first collected by a consultant previous to

23 Geosyntec, there were some issues with how it was collected.

24 So they went back and recollected data.

25 Q    And what did that data show at the northern boundary of

*GROVES - CROSS/KRAHULIK*          Vol. 2 - 320

1  JTV Hill Park?

2  A   It still had significantly high PCE and TCE

3  concentrations.

4  Q   At all depths?

5  A   Yes, according to the table, yes.

6  Q   How do those levels of PCE and TCE at that property

7  boundary compare with those, for example, at the Moran

8  Electric property boundary?

9  A   Comparing just the TCE, if you look at the numbers,

10 anywhere from a thousand to 5,000, those are of similar

11 concentration to what was at the western boundary of the Moran

12 property.

13        As far as PCE concentrations, they are higher than

14 what we saw at the Moran property.

15 Q   And we talked about this yesterday, but TCE doesn't become

16 PCE.  PCE can degrade to TCE but not the other way around?

17 A   Correct.

18 Q   So if you have a high concentration of PCE, it indicates a

19 release of that constituent, if you have it at a shallow

20 level?

21 A   Yes.  They likely used that compound in their operations,

22 yes.

23 Q   And you said that the levels at the property boundary for

24 Moran were similar?

25 A   Yes.

GROVES - CROSS/KRAHULIK          Vol. 2 - 321

1   Q    I believe the highest concentrations we saw at the

2   property boundary for Moran for TCE were in the, like, 1.8

3   parts per million range.

4   A    If you look at the commissioner's order and some of the

5   data that's out there at one point, there are some of the

6   wells that have over 6,000 PPB.

7   Q    From 1996?

8   A    From 1996?

9   Q    Right.

10  A    Are we talking as a whole --

11  Q    The Allied report was cited in the commissioner's order

12  from 1996 pre-excavation.

13  A    Those were sludge samples that we cited from the pits

14  themselves, not groundwater.

15  Q    And where did IDEM look for groundwater data for Moran?

16  A    That was in some of the work that Heartland had put

17  together and then also the work that Geosyntec had collected

18  in the upgradient report.

19         MS. KRAHULIK:  Let's take a look at Exhibit 1030.

20  BY MS. KRAHULIK:

21  Q    This is a status or comfort letter request from Heartland

22  to Brownfields, and it has to do with the Moran property,

23  right?

24  A    That's correct.

25  Q    I think you said this earlier, but I just want to be clear

GROVES - CROSS/KRAHULIK          Vol. 2 - 322

1  for the Court.  Those activities were overseen by IDEM in

2  connection with its Brownfields Program?

3  A   That's correct.

4        MS. KRAHULIK:  Will you pull up Exhibit 1137.

5  BY MS. KRAHULIK:

6  Q   Mr. Groves, do you recognize this letter?

7  A   Vaguely, yes.

8  Q   I think this is a letter that you wrote to counsel for

9  Threaded Rod when they were requesting information on what

10 would be required for closure of the former Von Duprin

11 property; is that right?

12 A   Yes.

13 Q   And that this letter was sent in February of 2013?

14 A   That's the date, yes.

15       MS. KRAHULIK:  Will you scroll to the chart in this

16 letter, please.

17 BY MS. KRAHULIK:

18 Q   It looks like here you set out a comparison between the

19 Ertel site, which had received an NFA, and the former

20 Von Duprin property as to various activities and testing

21 results; is that right?

22 A   Yes.

23 Q   And you said, as to Ertel, there had been 37,000 tons of

24 contaminated soil removed.  There was a subslab VI system,

25 which was installed by Major Tool in the building it

GROVES – CROSS/KRAHULIK          Vol. 2 - 323

1   constructed on that property, right?

2   A   Yes.

3   Q   That soil contamination had been vertically and

4   horizontally delineated, right?

5   A   Yes.

6   Q   As had groundwater?

7   A   Yes.

8   Q   And that there had been quarterly groundwater monitoring,

9   correct?

10  A   Yes.

11  Q   And the highest PCE and on-site groundwater at Ertel was

12  271 parts per billion and showing a declining trend?

13  A   That's correct.

14  Q   The highest TCE and on-site groundwater at the former

15  Ertel site was 267 parts per billion and declining?

16  A   That's correct.

17  Q   And then Ertel also had a restrictive covenant prohibiting

18  the excavation and use of groundwater, correct?

19  A   That is correct.

20  Q   However, at the Von Duprin property, 1929 Columbia Avenue,

21  there had been no removal of soil, no vapor barrier,

22  incomplete delineation of soil and groundwater.  Quarterly

23  monitoring had not begun.  The highest PCE in on-site

24  groundwater was 3,390 parts per billion.  The highest TCE was

25  2,190 parts per billion, and that was in 2013.

*GROVES - CROSS/KRAHULIK*          Vol. 2 - 324

1   A    That's correct.

2   Q    And I believe higher concentrations have been seen on that

3   site as to both PCE and TCE since that time?

4   A    PCE at least, yes.

5          MS. KRAHULIK:  Well, let's look back at Exhibit

6   1027.  I know it's hard to -- give me one second here.

7          Actually, let me look at Exhibit 1120.  Pull up the

8   first page of that, please, Ms. Woods.

9   BY MS. KRAHULIK:

10  Q    What is this document?

11  A    The subject -- it's a memorandum -- "Groundwater and Soil

12  Gas Investigations, 1929 Columbia Avenue, Indianapolis,

13  Indiana."

14  Q    And this is directed to you and some others at IDEM?

15  A    That is correct.

16  Q    And it's from Ryan Fimmen, David Bertrand, Rob Ferree of

17  Geosyntec?

18  A    Correct.

19  Q    There is a header on this document that says, "Privileged

20  and Confidential Settlement Communication."  Why would IDEM be

21  receiving a privileged and confidential settlement

22  communication from a consultant?

23  A    I don't know, other than my recollection is there might

24  have already been some legal actions between the parties.

25  Q    And IDEM would be part of the settlement communications?

*GROVES - CROSS/KRAHULIK*          Vol. 2 - 325

1  A   I don't know, Angela.

2  Q   I would like to look at some of the results reported in

3  this memo; and specifically, we can look at what is marked as

4  figure 6.

5        I believe this is the report of some groundwater

6  analytical data; is that right?

7  A   Yes.

8  Q   I want you to specifically look at the sampling location

9  labeled HPT06.

10 A   Can you zoom in for me, please?

11 Q   Yes.  That particular sampling location is at the southern

12 boundary of the Von Duprin property.

13 A   Can she scroll up, please?

14 Q   Sure.  Down?

15 A   Down, sorry.

16 Q   There.  Right?

17 A   Yes, it is.

18        MS. KRAHULIK:  And go back to the table, please.

19 BY MS. KRAHULIK:

20 Q   And what levels of TCE were detected in that particular

21 location?

22 A   Throughout the boring, looks like the highest

23 concentration was 7,320 parts per billion.  The lowest was

24 2,320 parts per billion.

25 Q   And at 17 feet, it's 5,450 parts per billion, right?

*GROVES - CROSS/KRAHULIK*          Vol. 2 - 326

1   A    That's correct.

2   Q    So there have been higher concentrations detected related

3   to the Von Duprin site since that letter you wrote to

4   Mr. Temple, right?

5   A    Yes.

6            MS. KRAHULIK:  Can you please go to figure 8, which

7   is two pages away.

8   BY MS. KRAHULIK:

9   Q    What does figure 8 show?

10  A    That is soil gas data that they collected on the

11  Von Duprin facility and in -- within JTV Hill Park.

12  Q    I would like you to take a particular look at TSGP12,

13  which is in a similar spot to that HPT06 we were just looking

14  at.  Wouldn't you agree?

15  A    Yes.

16  Q    What sort of soil gas results are shown at that location

17  smack in the middle of the Von Duprin property boundary?

18  A    In that, it reports at 13 feet concentration of

19  39,000 micrograms per cubic meter.

20  Q    For TCE?

21  A    Yes.

22  Q    And then what about for PCE?

23  A    PCE is 64,000 micrograms per cubic meter.

24  Q    Are those significant levels?

25  A    Yes.

1  Q    Now, we talked about Von Duprin has submitted an RWP; and

2  IDEM has approved that in part, right?

3  A    Yes.

4  Q    Does IDEM typically approve something -- a RWP partially?

5  A    We have before, yes.

6  Q    How many times?

7  A    Not often, but probably 15 or 20 times from my

8  understanding from the VRP program.

9  Q    Wouldn't you agree with me, though, that the terms of a

10 VRA do require a full Remediation Work Plan?

11 A    Yes, that's why we partially approved it.

12 Q    And while the soil removal has been carried out -- about

13 200-some-odd tons of soil were removed, right?

14 A    That's my understanding.  I haven't seen the report.

15 Q    How does that compare in the volumes of soil that were

16 removed upgradient on Ertel, Moran and Zimmer?

17 A    I don't specifically recall the number on Moran; but as to

18 Ertel, it's much lower.

19 Q    Ertel is 37,000 tons, I believe?

20 A    Yes.

21 Q    And you haven't seen the reports or the evaluation of that

22 soil removal at Von Duprin yet, right?

23 A    No.

24 Q    I'm sorry I'm jumping around.  I'm trying to go back and

25 pick up things here and there.

*GROVES - CROSS/KRAHULIK*          Vol. 2 - 328

1        We talked a little bit earlier about the Marion County

2   Superior Court asking IDEM to reconsider the Ertel NFA and

3   determine whether it comported with the risk guidance that was

4   in effect at the time the agreed order was entered, as well as

5   the Remediation Closure Guide guidance, which IDEM had already

6   determined the Ertel NFA comported with, right?

7   A    Yes.

8   Q    Has IDEM done that analysis at this point?

9   A    You'll have to restate your question.  I'm not sure if I

10  understand --

11  Q    Has IDEM taken another look at the agreed order for Ertel

12  to make sure that it also complies with risk guidance?

13  A    I don't know that we've gone back and reevaluated it

14  further other than the legal actions that we've been involved

15  with.

16  Q    I would like to look at Exhibit 1124.  This is a letter

17  from Heartland directed to you from October 15 of 2012, right?

18  A    Correct.

19  Q    And it's entitled, "Exposure Pathway Risk Analysis and No

20  Further Action Request Letter, Former Ertel Manufacturing

21  Facility," right?

22  A    Correct.

23  Q    This, I believe, was written to you by a consultant for

24  the city asking for the issuance of that No Further Action

25  letter on the Ertel property; and I just want you to take a

GROVES - CROSS/KRAHULIK          Vol. 2 - 329

1  look at figure 1 to this letter.

2       My understanding is that the footprint of the property

3  for which Heartland is requesting an NFA is shown in kind of

4  the peach color there; is that right?

5  A   That's what they put on the figure, yes.

6  Q   And they included in that the Zimmer Paper building and

7  what we've called earlier today the "little blue building"?

8  A   Yes.

9  Q   And so when Heartland requested the No Further Action

10  letter, it did include Zimmer?

11  A   They did not specifically request that.  They put the

12  Ertel facility as the subject line on the building, but they

13  included those buildings in the figure.

14  Q   And so if the NFA had been issued consistent with their

15  request, it should have included the Zimmer Paper?

16  A   It would have included, but we did not choose to do that.

17  Q   I don't believe IDEM made a specific determination about

18  not issuing it to Zimmer.  I believe the City of Indianapolis

19  omitted it from the request.

20  A   We didn't have specific discussion over that.  It was

21  always about Ertel in our discussions; and if you look at the

22  NFA letter, it cites the property, the property parcel number;

23  and that's where the ERC was placed.

24  Q   And that paperwork was prepared by the city?

25  A   The restrictive covenant?

*GROVES - CROSS/KRAHULIK*               Vol. 2 - 330

1  Q   Yes.

2  A   Yes, is my understanding.

3  Q   Under the project agreement between the city and Major

4  Tool and Machine, they were required to obtain closure on the

5  Zimmer parcel?

6  A   I don't know that, Angela.  I've never seen that

7  agreement.

8  Q   It's in evidence.

9        Let me make sure I don't have any further questions.

10        You said yesterday that when IDEM is issuing special

11  notices of liability to parties, it notifies all responsible

12  parties who had a hand in contaminant usage or contaminant

13  releases.

14        As you sit here today, do you have any knowledge or

15  information that Major Tool and Machine used contaminants or

16  released contaminants at either Moran, Zimmer, or Ertel?

17  A   No, but they were included on the notice letter as a

18  property owner without -- in our mind without BFPP

19  protections.

20  Q   So are you -- you don't believe that Major Tool and

21  Machine had BFPP protection for which parcel?

22  A   For Moran and the Zimmer parcel.  We weren't aware that

23  they did anyway.

24  Q   Were you aware of Phase I studies being performed on those

25  properties by Major Tool and Machine?

*GROVES – CROSS/KRAHULIK*          Vol. 2 - 331

1  A   Not at the time of my notice letter, no.

2  Q   Are you now aware of those?

3  A   I've seen copies of them.  I don't know to what extent I

4  reviewed them.  I think they're up for debate still in other

5  litigation, so I don't necessarily have an opinion.  I'll

6  leave that to my attorney.

7  Q   If a party performs a Phase I before acquiring a property,

8  that's typically one of the prerequisites for a BFPP status,

9  right?

10 A   That is.  Under CERCLA law, it's a self-implementing

11 program.  So as long as the Phase I is done within six months

12 of the property transfer acquisition, as long as it meets all

13 appropriate inquiries, then it provides them some form of

14 liability protection.

15 Q   You also talked yesterday about how IDEM looks at things

16 like vapor intrusion; and you said, "If a party sees a risk,

17 we check it out; and if there's a problem, it's addressed"?

18 A   Yes, that's our intent.

19 Q   Has Major Tool and Machine performed investigations at

20 IDEM's request?

21 A   Major Tool and Machine recently, with some of the houses

22 on Alvord Street, I would say yes, that they've funded that at

23 least and hired Geosyntec is my understanding.

24        Previous to that, some work has been done on the Moran

25 property and in specific request to state cleanup, they've

*GROVES - CROSS/KRAHULIK*          Vol. 2 - 332

1  looked at Saint Rita and assessed vapor.

2  Q    And there were no indoor air issues detected there?

3  A    Not as far as the data has shown, no.

4  Q    IDEM told Major Tool and Machine to go ahead and apply for

5  the VRP and that it would be accepted into the VRP, despite

6  the fact that there was a liability notice letter, and that

7  you would be the project manager?

8  A    I don't recall specifically having that conversation.

9  Q    Then after that, IDEM denied the application?

10 A    Like I said, I don't remember having that conversation

11 with them.  An application was submitted.  We had previously

12 sent notice letters and demand letters and hadn't gotten the

13 appropriate response we were looking for previous to the VRP

14 application.

15 Q    You talked a little bit about this tank removal at Zimmer.

16 Should Major Tool and Machine have left the tank in the

17 ground?

18 A    No.

19 Q    So they removed it, and then they excavated all of the

20 soil around and under it?

21 A    Yes.

22 Q    Were you there at the time of the removal?

23 A    I was out at the site and had walked the site and looked

24 at the removal action.  A lot of that work was being reviewed

25 by our common tech support.  I don't know that I specifically

*GROVES - CROSS/KRAHULIK*          Vol. 2 - 333

1  was out there when the tank was coming out of the ground and

2  looked specifically at the Zimmer parcel excavation.

3  Q    And no one ever sampled the contents of that tank?

4  A    That I don't know.  I would say some of it would have had

5  to have been sampled for disposal, but I don't know

6  specifically.

7  Q    And you never saw the tank leak or release anything?

8  A    I am aware that it had holes in the bottom of it, but I

9  don't recall being out there seeing product flowing out of it.

10 Q    And you believe those holes would have existed

11 pre-excavation?

12 A    Yes.

13 Q    Did Major Tool and Machine to your knowledge ever use that

14 tank?

15 A    Not to my knowledge.

16 Q    Who operated on the Zimmer property that -- from your

17 history and knowledge of the site?

18 A    When we looked at the history to put together our Notice

19 of Liability letter, Zimmer Paper packaging had operated it

20 most recently prior to Major Tool and Machine ownership; and

21 then prior to that was Moran Electric Service.

22 Q    Do you know the period of time that Moran operated on that

23 property?

24 A    1960s, as I recall to early '80s, I believe.

25 Q    Kind of a final thing.  There was some talk yesterday that

*GROVES – REDIRECT/GRIGGS*          Vol. 2 - 334

1  no one ever does environmental work voluntarily or something

2  to that nature; but Major Tool and Machine, Major Holdings did

3  do a whole lot of work voluntarily in the redevelopment of

4  Ertel and the excavation at Zimmer and Moran?

5  A    I would agree that a lot of work has been done for their

6  redevelopment, and that's not been at a specific request by

7  IDEM at all times.

8          MS. KRAHULIK:  That's all I have.  Thank you.

9          THE COURT:  Okay.  Why don't we go ahead and take

10  our morning break; and then when we resume, Mr. Griggs, if you

11  have any redirect, you can do it at that time.  So we'll take

12  about ten minutes.

13     *(A recess was taken.)*

14          THE COURT:  You may be seated.  We're back on the

15  record.

16          Mr. Griggs, you may cross, redirect; and if there

17  was any direct, you may cross-examine on those questions.

18     *(A recess was taken.)*

19                      **REDIRECT EXAMINATION**

20  BY MR. GRIGGS:

21  Q    Mr. Groves, you were asked during the cross-examination

22  about a settlement involving the Ertel property.  Do you

23  recall that?

24  A    Yes.

25  Q    And there were some amounts.  $860,000, I think, was

*GROVES – REDIRECT/GRIGGS*          Vol. 2 - 335

1    mentioned?

2    A   Yes.

3    Q   Are you aware of whether or not in exchange for the

4    settlement paid, that Ertel received a contribution

5    protection?

6    A   Yes, I am aware.

7    Q   And did they, in fact, receive a contribution protection

8    from the Marion Superior Court?

9    A   That's my understanding, yes.

10            MR. GRIGGS:  Exhibit 1032, please.

11   BY MR. GRIGGS:

12   Q   This is one of the exhibits that Mr. Menkveld showed you?

13            THE COURT:  What's the number?

14            MR. GRIGGS:  1032.

15            Can we go down to page 5, please.  Let's blow up --

16   BY MR. GRIGGS:

17   Q   Paragraph 4 I think Mr. Menkveld asked you about.  I'm

18   going to ask you about paragraph 6 and then paragraph 10.

19            Can you read that?

20   A   Okay.

21   Q   Are those statements in paragraph 6 and paragraph 10 part

22   of the basis on which this decision was rendered as well as

23   paragraph 4 you were asked about earlier?

24   A   The decision -- what do you mean by "decision"?

25   Q   This document that we're looking at -- let's go back to

GROVES - REDIRECT/GRIGGS          Vol. 2 - 336

1   the first page, I guess, and the subject line.  Does that re

2   line tell you what this is about, or do we need to go to the

3   top of the next page?

4   A   Go to the next page, please.

5          MR. GRIGGS:  Okay.  Next page, please.  Just

6   highlight that text.  It's Mr. Groves' signature there.

7   BY MR. GRIGGS:

8   Q   This is the commissioner's order, right?

9   A   This is the transmittal letter for the commissioner's

10  order, yes.

11  Q   And so the part that we were looking at earlier, those

12  paragraphs are part of the commissioner's order?

13  A   Yes.

14  Q   And if we go back to page 5, I think you were asked about

15  paragraph 4 on your direct examination and the implication

16  being that these numbers were perhaps no longer valid because

17  they were old.  Do you recall that line of questioning?

18  A   Yes.

19  Q   And what I was asking you earlier in looking at paragraphs

20  6 and 10 is if those -- if that represents additional

21  information that IDEM had in addition to paragraph 4 on which

22  you based your decision?

23  A   Yes.  I think the idea was well, we didn't specifically

24  call out every piece of data that we had available to us that

25  we may have reviewed.  We felt based on that data and that

GROVES - REDIRECT/GRIGGS          Vol. 2 - 337

1  groundwater contamination piece that was in paragraph 4, that

2  we had evidence that there was a release at one point; and it

3  was contributing to the groundwater plume.

4  Q   That it was contributing or had contributed to the

5  groundwater plume?

6  A   I would say had and still was.

7            MR. GRIGGS:  Let's look at Exhibit 1073.

8  BY MR. GRIGGS:

9  Q   Again, this was something you were asked to comment on

10 before.

11           MR. GRIGGS:  And figure 3, please.  This is 1073.  I

12 wanted -- that's right.  Figure No. 3.  It's going to be

13 fairly deep in the document past the text.  That's too far.  A

14 little earlier.  Earlier.  A bit earlier.  Not too much

15 earlier than that but a little bit.  That's table 3.  I need

16 figure 3, which is before this in the report.

17           He's really good if I give him the page number.

18           MS. KRAHULIK:  Try page 48.

19           MR. GRIGGS:  Page 48.  How about that, David.

20 Scroll down and make sure that's figure 3 at the bottom.

21 Okay.  And if we can zoom in on maybe the lower half, we're

22 looking for pits 3, 4 and 5.

23           I see pit 4.  I don't think I see pit 3.  I need a

24 bigger view.

25           Go on up.  We found him on the way to the court

GROVES – REDIRECT/GRIGGS          Vol. 2 - 338

1   today.

2   BY MR. GRIGGS:

3   Q   Pit 3 is about at the top of that picture.  Can you see

4   that, Mr. Groves?  You were asked about it, and VAP-110 is the

5   box that's connected to that?

6   A   Yes.

7   Q   You were also asked about pit No. 4.  The box is VAP-113

8   and how those didn't show detections of PCE or TCE?

9   A   Yes.

10  Q   I would like you to look now at pit 5, which is connected

11  to the box labeled VAP-112, center bottom.

12  A   Okay.

13  Q   Do you see detections of TCE at that location?

14  A   Yes.

15  Q   At all the depths that are -- that were sampled?

16  A   Yes.

17  Q   Is there any chance in your mind that that chlorinated

18  solvent contamination came from the west side of Dr. Andrew J.

19  Brown, just hopped over there and snuck under pit No. 5?

20  A   No, not likely.

21  Q   You were asked about a Marion County Court decision

22  related to the Ertel NFA?

23  A   Yes.

24  Q   Are you aware of whether that Marion County Court decision

25  is currently under appeal?

*GROVES – REDIRECT/GRIGGS*          Vol. 2 - 339

1   A    I believe it is.

2   Q    Let's look at Exhibit 1124, please.  Again, this is a

3   document that you were shown earlier.

4            MR. GRIGGS:  I would like to look at paragraph 2.

5   Right there in the middle of the page.  Great.

6   BY MR. GRIGGS:

7   Q    Can you read that?  The sentence I'm interested in is

8   stuck there in the middle, starts with the word "Furthermore."

9            "Furthermore, limited exposure pathways exist for

10  residual impacts remaining at the site."

11           Do you see that?

12  A    Yes.

13  Q    In terms of the exposure pathways at the site, were you

14  able to grant a No Further Action letter?

15  A    Yes.

16  Q    Does this apply to any exposure pathways that might exist

17  somewhere other than the site?

18  A    It says, "at the site," but we had -- I had my technical

19  support risk assessor and geologist review the data that we

20  had at hand and look at potential impacts to off-site

21  properties as well.

22           So primarily for vapor impacts, but we also looked at

23  groundwater and had Heartland evaluate drinking water risk

24  exposure as well.

25  Q    And were you looking at the conditions that existed at the

GROVES – REDIRECT/GRIGGS          Vol. 2 - 340

1   time that you were asked for the NFA in 2012?

2   A   Yes.

3   Q   And this was post the excavation of 37,000 tons of soil?

4   A   Yes.

5   Q   What, if any, analysis did you do in connection with

6   issuing the NFA related to contaminants that might have

7   migrated with groundwater off of the Ertel site years or

8   decades before?

9   A   We didn't have that data years and decades before the soil

10  excavation.  In 2005 when we started doing the site

11  characterization work, that was the first data that we had

12  available to us.

13          MR. GRIGGS:  I would like to look at Exhibit 1120.

14  BY MR. GRIGGS:

15  Q   Just there at the top of the first page, you were asked

16  about --

17          MR. GRIGGS:  The header section would be great, who

18  it's from, who it's to.

19          All the way to the top, Dave.  Start with the word

20  "privileged" and down to that line.  Perfect.

21  BY MR. GRIGGS:

22  Q   At this time, in June of 2015, to your knowledge, was IDEM

23  engaged in any litigation?

24  A   We were litigating the appeal of the Ertel NFA at that

25  point.  Other litigation, I can't remember the status and time

*GROVES – REDIRECT/GRIGGS*          Vol. 2 - 341

1  frame.

2  Q   Was IDEM a party to the Threaded Rod litigation?

3  A   No.

4          MR. GRIGGS:  Figure 8.  Dave, did it stop working

5  for you?  Figure 8, please.  Check 21, please.

6  BY MR. GRIGGS:

7  Q   This is figure 8 that we looked at during your direct.  Do

8  you recall that?

9  A   Yes.

10  Q   You asked to look at some samples along the southern

11  boundary or the northern edge of the ZTV [sic] Hill Park?

12  A   Yes.

13          MR. GRIGGS:  I would like to zoom in on the -- I

14  guess I can point to an area here.  Right in there.  All

15  right, I need the boxes along with the dots, unfortunately, so

16  a little higher up, too.  Higher.  The whole right side would

17  be perfect.  All right.  Let's try that.

18  BY MR. GRIGGS:

19  Q   Let's just look at what's marked as TSGP-6, this one.  Do

20  you see that data point?

21  A   Yes.

22  Q   And where is that located relative to the area -- the

23  properties that we're -- we've been discussing in this case?

24  A   That is -- looks to be on the -- in the easement on the

25  western side of Dr. Andrew J. Brown and the east side of the

*GROVES — REDIRECT/GRIGGS*          Vol. 2 - 342

1   Von Duprin building.  It would be west or southwest of the

2   Moran-Zimmer parcels.

3   Q    And what are the concentrations of TCE reported for that?

4   A    Can you zoom in, please?

5           MR. GRIGGS:  The yellow box.  Zoom that in, please.

6   BY MR. GRIGGS:

7   Q    The TSGP-6, can you read that now?

8   A    The TCE is reported at 22,000 at 12 feet; 16,000 at

9   5 feet.

10  Q    How about the PCE?

11  A    PCE is 18,000 at 12 feet; 8,400 at 5 feet.

12  Q    And if we just move right down that right-of-way to the

13  south, there's a reported TSGP-5.  Do you see that?

14  A    Yes.

15  Q    The sample depth of 3 feet, what's the TCE reading there?

16  A    15,000.

17  Q    And let's go one more, TSGP-7.  Do you see a TCE

18  concentration for that?

19  A    Yes.

20  Q    What's that?

21  A    1,200.

22  Q    Are those significant levels of TCE?

23  A    Those are above our screening levels, yes.

24  Q    What is the screening level for TCE?  Do you remember?

25  A    Is this soil or groundwater?

*GROVES - REDIRECT/GRIGGS*          Vol. 2 - 343

1  Q   Let's go to the lower right-hand corner.

2  A   Soil gas.  For TCE, that would be, I believe, about 910

3  would be the screening level.

4  Q   Something just under a thousand?

5  A   Yes.

6  Q   We've got results as high as 22,000?

7  A   Yes.

8  Q   When you are reviewing site conditions that are reflected

9  in reports and in sampling data in particular, I guess I'm

10 wondering are you able to look at individual data points and

11 draw conclusions from that or are you looking at the entire

12 data set and drawing a conclusion as a whole?

13 A   We try to do both.

14 Q   They work together?

15 A   We do, yes.  We try to evaluate them together.

16 Q   Are there risks in isolating in on a single data point if

17 you don't take the whole data set into account?

18 A   Yes.

19 Q   What would those risks be?

20 A   You draw an incomplete conclusion as to the risk primarily

21 and exposure.  You draw an incomplete conclusion as to the

22 delineation of the nature and extent of the impacts.  Those

23 would be the primary two risks.

24 Q   You had been asked about the recent soil removal or soil

25 excavation at the Von Duprin property?

GROVES - REDIRECT/GRIGGS          Vol. 2 - 344

1  A    Yes.

2  Q    And I think you stated that you had not seen a report for

3  that work?

4  A    That's correct.

5  Q    Have you seen any data related to that work?

6  A    Yes.

7  Q    And what can you tell us about the data you've seen?

8  A    The confirmation data that was shared with me showed that

9  it met our approved levels of completion.

10 Q    Does "confirmation data" have the same meaning as the term

11 that was used earlier of "side wall" and "bottom samples"?

12 A    Yes, that would be the same terminology.

13 Q    You're testing the limits of the excavation you made?

14 A    That would be the same intent, yes.

15 Q    And if you find that you have unimpacted soils, the

16 assumption is that you've excavated all the bad stuff?

17 A    Yes, that would be the conclusion.

18 Q    And what conclusions, if any, can be drawn from the fact

19 that Ertel had 37,000 tons excavated, Zimmer Paper had

20 7,650 tons excavated, Moran had 4,641 tons excavated, and

21 Von Duprin had 212 or 216?

22 A    Well, the most obvious is the amounts are lesser on Moran

23 and Von Duprin; but I will caution I don't know the breakout

24 of the 37,000 tons of Ertel contamination because it wasn't

25 all chlorinated solvent impacted soil or PCBs and metals and

1 some other things that required excavation.  So when you

2 purely compare the numbers, they're smaller.

3 Q   And you did mention in discussing the removal of the UST

4 at the Zimmer Paper that you didn't have data for the material

5 that was in the tank; is that correct?

6 A   I'm not aware of specific data.

7 Q   When a tank is removed, who is responsible for collecting

8 that kind of data?

9 A   It would be whoever the person conducting the removal

10 action would be responsible or the site owner or the

11 responsible party.

12 Q   So if that data doesn't exist, it's because someone didn't

13 choose to collect it?

14 A   I would say that, yes.

15        MR. GRIGGS:  I have nothing further.

16        THE COURT:  Anything on those questions, counsel?

17        MR. MENKVELD:  Brief recross, Your Honor.

18                    **RECROSS-EXAMINATION**

19 BY MR. MENKVELD:

20 Q   Mr. Groves, you were asked a couple questions about work

21 that Major Tool performed, excavation work on the Zimmer

22 parcel and the Moran property; is that correct?

23 A   Correct.

24 Q   Are you aware one way or another of whether Moran actually

25 paid Major Tool for some of that work being done?

GROVES - RECROSS/MENKVELD          Vol. 2 - 346

1   A    I'm not specifically aware, no.

2   Q    You were also asked a question about that 16,000-gallon

3   UST that was removed from the Zimmer property?

4   A    Yes.

5   Q    And I may have misunderstood your answer, but you're not

6   aware that Moran ever used that tank at any time; is that

7   right?

8   A    I am aware that Moran owned the property; but no, I'm not

9   aware if or how they may have used the tank, no.

10  Q    In fact, isn't it the case that nobody really knows who

11  used that tank?

12  A    I would say that's the case, yes.

13  Q    Now, on Exhibit 1032 --

14       MR. MENKVELD:  If you would pull that up, please.

15  BY MR. MENKVELD:

16  Q    This again, Mr. Groves is the commissioner order.  You

17  were asked about paragraph 6 about releases of the -- the

18  first sentence says "PCE."  Now, you're not aware, are you, of

19  Moran using any PCE in its operations at all; is that right?

20  A    We had information -- if you look at paragraph 4, we

21  referenced waste manifests that listed F001 and F002 waste.  I

22  don't know exactly the mixture that was in that.  So there

23  could be PCE.  There may not be PCE.

24  Q    F001, 002 waste, that could be TCE, right?

25  A    Could be TCE.  That's generally a mixture -- a solvent

*GROVES - RECROSS/MENKVELD*          Vol. 2 - 347

1   mixture.

2   Q   Okay.  So those are reference numbers that are used to

3   report uses of certain hazardous substances to EPA; is that

4   right?

5   A   Right, general waste codes.

6   Q   And so by looking at those waste codes, you can't

7   determine which item within that waste code was actually being

8   used; is that right?

9   A   That's right.  Usually in my knowledge, it's usually a

10  percentage of solvents.

11  Q   But as you're sitting here today, you have no knowledge

12  that Moran actually used PCE in its operation --

13  A   I don't have any direct information or evidence, no.

14          MR. MENKVELD:  Pass.

15          MS. KRAHULIK:  No further questions.

16          THE COURT:  No questions on those.

17          Thank you very much, sir.  You may be excused, and

18  you may also, counsel, be excused.

19          MS. LASHBROOK:  I'll be back tomorrow.

20      *(Witness excused.)*

21          THE COURT:  All right, plaintiff, who do you have

22  next.

23          MR. GRIGGS:  Our next witness will be Rob Ferree.

24          THE COURT:  If you would come on up to the witness

25  stand right over here.  If you would please remain standing

Vol. 2 - 348

1   and raise your right hand.

2       *(Witness sworn.)*

3               THE COURT:  You may have a seat.

4               You may address your witness, counsel.

5           **ROBERT FERREE, PLAINTIFF'S WITNESS, SWORN**

6                   **DIRECT EXAMINATION**

7   BY MR. GRIGGS:

8   Q    Good morning.

9   A    Good morning.

10  Q    Please state your name for the record.

11  A    Robert Alan Ferree.

12  Q    Who is your current employer?

13  A    Geosyntec Consultants.

14  Q    What position or title do you hold there?

15  A    I am a senior principal; and I also manage the Ann Arbor,

16  Michigan office.  It's an office of about nine people.

17  Q    What responsibilities do you have in that position?

18  A    Making sure that our office is fully staffed, making sure

19  projects are met -- project goals met.  We have an annual plan

20  that we meet for revenue.  I supervise proposals, site remedy

21  outlines, a variety of technical and administrative roles.

22  Q    Are you involved in individual projects?

23  A    Yes, I am.

24  Q    Are you involved in the Von Duprin site project?

25  A    Yes, I am.  I am the program manager for the Von Duprin

FERREE - DIRECT/GRIGGS            Vol. 2 - 349

1  site.

2  Q   What does a program manager do?

3  A   Good question.  In this role, I help develop strategy for

4  the site investigation work.  I make sure we assemble the

5  appropriate team to go and do the work.  I work with our

6  client, work with IDEM, make sure the work's implemented, make

7  sure work plans are prepared, work plans are followed, reports

8  prepared, all of those technical roles.

9  Q   You make sure the client gets billed?

10 A   Yes.

11 Q   That too?

12 A   Invoices are prepared, submitted, make sure we're paid.

13 Q   Do you hold any professional licenses?

14 A   Yes.  I am a nationally certified geologist with American

15 Institute of Professional Geologists.  I have a state

16 geology -- professional geologist with state of Kentucky, and

17 I'm a licensed professional geologist in Indiana.

18 Q   How long have you been working in the environmental

19 consulting field?

20 A   I have been working in the field since 1985.

21 Q   So over 30 years?

22 A   Over 30 years.

23 Q   What about your educational background?

24 A   I have both an undergraduate and a master's degree in

25 geology from the University of Cincinnati.

FERREE - DIRECT/GRIGGS                Vol. 2 - 350

1   Q   What is your past experience with chlorinated solvent

2   sites?

3   A   Well, I actually started my early career on chlorinated

4   solvent sites.  I started off as a field geologist; and as a

5   field geologist, I started by installing soil borings,

6   monitoring wells, a multitude of field investigative

7   activities, sampling monitoring wells, everything one would

8   do.

9         And as my career progressed, as I moved along in my

10  career, I moved up into management and to program management

11  and at that point started working on remedial strategies,

12  working with clients to develop approaches that were cost

13  effective, taking those approaches through work plans, as I

14  said earlier, to state agencies, working with those state

15  agencies to get approvals and then implementing that work.

16  Q   How many chlorinated solvent sites have you worked at?

17  A   Over my career, it's been over 30.

18  Q   Are there unique considerations or characteristics that

19  you need to be aware of when you're working at a chlorinated

20  solvent site?

21  A   There are physical characteristics of chlorinated solvents

22  that are a little bit different than a gasoline site, for

23  instance, just a different suite of contaminants, different

24  analytical methods for those compounds.  You just have to be

25  aware of those particular compounds that you're interested in

FERREE - DIRECT/GRIGGS          Vol. 2 - 351

1  investigating, how they behave, make sure that you're

2  collecting the samples properly.

3  Q   How many chlorinated solvents sites would you say you're

4  working on right now?

5  A   Currently, I'm working on seven.

6  Q   And is the Von Duprin site, the plume area around it, one

7  of those sites?

8  A   Yes, it is.

9  Q   But that just counts as one site of the seven?

10  A   Yes.

11  Q   And I take it that you are familiar with the plume area in

12  which the Von Duprin property is situated?

13  A   I am very familiar.

14        MR. GRIGGS:  Let's look at Exhibit 1002, please.

15  I'm going to want to look at page 140.

16  BY MR. GRIGGS:

17  Q   This is your Final Investigation Report.  Are you familiar

18  with that?

19  A   Yes, I am.

20  Q   I want to look at the left side of this picture, I guess

21  the top one there.

22        Can you identify for the Court -- we've been looking

23  at a different figure that has the property locations.  Are

24  you able to point to, say, the Von Duprin site?

25  A   Sure.  I can, but I don't know how --

FERREE - DIRECT/GRIGGS          Vol. 2 - 352

1            THE COURT:  Let me get my big book out.  It's hard

2   to see the screen.

3   A   The Von Duprin property is at the southwest corner of the

4   intersection of AJ Brown and 19th Street.

5            MR. GRIGGS:  Don't help him.

6            THE COURT:  Can he do it himself?

7            MR. GRIGGS:  I think if he touches the screen, it

8   will come up itself.

9   A   Right there.  Takes a little practice I think.

10  BY MR. GRIGGS:

11  Q   So there's a street that runs north and south?

12  A   Right.

13  Q   What street is that?

14  A   That's AJ Brown.

15  Q   And there's a street about -- that runs east and west.  Do

16  you know street that is?

17  A   That's 19th.

18  Q   And so how is Von Duprin situated with respect to the

19  intersection of 19th Street and Dr. Andrew J. Brown?

20  A   So that would be at the northwest corner.

21  Q   Northwest corner.  And who -- what property sits on the

22  northeast corner of that intersection?

23  A   That would be the Moran property.

24  Q   And if we go north of Moran, still on the east side, what

25  property is that?

FERREE - DIRECT/GRIGGS          Vol. 2 - 353

1  A    That is the Major Tool property, formerly known as the

2  Ertel property.

3  Q    Formerly Ertel.  And a little bit to the east off of

4  Dr. Andrew J. Brown, what site is that that's tucked in there?

5  A    That would be the Zimmer Paper property.

6  Q    Is there a way to make that pink stuff all go away?

7  A    Yeah, I'm sorry.  Bottom left.

8          MR. GRIGGS:  Let's zoom in on that oblong shape.  I

9  think that got it.  That's a little bigger.  I can see it a

10 little better.

11 BY MR. GRIGGS:

12 Q    Can you see on this screen that there are three different

13 colored lines?

14 A    Yes, I can.

15 Q    What does a line represent on this picture?

16 A    A line on this picture represents a contour interval based

17 upon data collected from the monitoring wells and soil borings

18 that are depicted with the dark black indications, the blue

19 indications, the triangular indications; and they indicate

20 lesser concentration of 10 at the outside ring, 100 being the,

21 to me, orange color; and then the darker color in the center,

22 brown or red, is 1,000 part per billion, of, in this case,

23 TCE.

24 Q    And the very colorful little bull's-eyes and triangles and

25 black-and-white hatched circles, what do those represent?

FERREE - DIRECT/GRIGGS                Vol. 2 - 354

1  A    The black and white are monitoring wells.  The blue

2  cross-hatched target symbols are soil borings.  The triangles

3  are another symbol for monitoring wells.

4  Q    So -- I don't want to oversimplify, but we're talking

5  about data?

6  A    Correct, yes.

7  Q    Those are locations that data has been collected?

8  A    Yes.

9  Q    And the data was plotted how to get these lines?

10 A    Sure.  We use a program, Surfer; and it automatically

11 contours.

12 Q    The program draws the line?  You don't have to draw it

13 yourself?

14 A    No.

15 Q    And is this configuration where the largest shape or

16 contour, I think, as we're calling it, is the lowest

17 concentration; and then the higher concentrations are

18 concentrated into a smaller area?

19 A    Yes.

20 Q    That's what you would expect to see?

21 A    Yes.  It's showing an intensity, if you would like to

22 describe it that way, where it's going from higher to lower.

23 Q    And that high-intensity area extends beyond and off of the

24 Von Duprin property; is that correct?

25 A    Correct.  It extends down to the intersection of 17th

FERREE - DIRECT/GRIGGS           Vol. 2 - 355

1  Street and Yandes and Alvord Streets generally, in that area.

2  Q    In conducting work at this site, did you have a hands-on

3  role?

4  A    Yes, I did.  I helped to develop a strategy for

5  investigating the groundwater at the site, as well as soil

6  sampling and soil gas sampling approaches.

7  Q    When did you first get involved in this site?

8  A    I started in late July, early August of 2014.

9  Q    So five years?

10 A    Just about.

11 Q    Have you worked with any governmental entities during that

12 five-year period?

13 A    Sure.  We've worked with IDEM, Indiana Department of

14 Environmental Management, staff from the very beginning.  They

15 were integral in asking us and our client to start to do the

16 work along Yandes Street, which I guess I can continue to

17 point, which is right there.  And they -- we've been engaged

18 with them ever since.

19       We would conduct sampling, report that result to the

20 project manager and other technical staff at IDEM.  We would

21 then -- they would identify data gaps, and we would then

22 proceed to develop a plan to fill those data gaps; and we

23 continued to go on in a stepward manner with them hand in

24 hand, open discussions, meetings, telephone conferences, a

25 variety of communications with them.

FERREE - DIRECT/GRIGGS          Vol. 2 - 356

1  Q   And when Geosyntec became involved back in 2014, had there

2  been work that had been performed before your involvement?

3  A   Yes, there had been substantial work done before we

4  started.

5  Q   And did you make use of that work and the data that had

6  been previously collected?

7  A   Yes, we did.  We used that data to help inform some of our

8  early decisions; help us understand the site geology; help us

9  understand the potential exposures in the neighborhood; help

10  us to understand where contaminants were present; helped us

11  even understand what media was affected, soil, soil gas,

12  groundwater; really helped us get up and running very quickly

13  to understand the risk to the human health and environment in

14  this area.

15  Q   Were there -- let's ask it this way.

16       Were there technical reports that were available for

17  this area?

18  A   There were a lot of technical reports available to us and

19  provided to us as part of the legal actions that were ongoing.

20  We -- some of the more important ones we used were the Alt &

21  Witzig report.  There was a Mundell baseline report.  There

22  was another Mundell Phase I that was done; and then the

23  further site investigation reports -- there are two of them --

24  by August Mack Environmental; and all of those documents were

25  very, very useful for us to be able to get our foundation laid

FERREE - DIRECT/GRIGGS          Vol. 2 - 357

1   in understanding history, previous work, geology setting.

2   Q   And you mentioned that one of the early things that

3   Geosyntec was involved in had something to do with Yandes.

4   Tell us more about that.

5   A   Sure.  When we entered into the project, one of the most

6   important things that was ongoing was gaining access in order

7   to sample indoor air at homes along Yandes Street that had

8   been identified by IDEM as critical sampling efforts.

9        So we were able to gain access to five homes along

10  Yandes, and then we collected indoor air samples; and then

11  upon receiving the results of the indoor air samples, indoor

12  air samples indicating that these homes needed to be

13  mitigated.

14       We worked with IDEM, explained to them what we were

15  going to do, proceeded to hire a contractor and installed

16  mitigation systems in these five homes.

17       After we installed the mitigation systems, we then

18  collected confirmatory samples that indicated that the

19  mitigation systems were effective and then reported that

20  information back to IDEM.  That was our first large effort

21  that we undertook.

22  Q   You mentioned that this particular task was -- I think you

23  used the word "critical."  Did you have any understanding of

24  why this was considered to be important or more important than

25  other things you could have done?

FERREE - DIRECT/GRIGGS          Vol. 2 - 358

1    A    Well, at this particular point, there were people living

2    in these homes; and the previous data had indicated that the

3    indoor air concentrations exceeded the IDEM screening levels

4    for indoor air, for TCE in particular.  Based upon that, we

5    needed to do something to protect the people in these homes.

6    It was Von Duprin's act to go forward and protect these folks.

7    Q    These screening levels, are those publicly available?

8    A    Yes, they are.  They're part of the remediation --

9    Q    Is there a numerical value for a particular substance?

10   A    Yeah.  There's a series of tables that have compounds and

11   then the different media, soil, soil gas, groundwater and

12   their risk table that says what the concentrations are for

13   each of those thresholds for thousands of compounds.

14   Q    Who publishes that table?

15   A    IDEM does, the risk assessment department.

16   Q    So these are governmental established values that you

17   compare your sample results to that value in the table?

18   A    Yes.

19   Q    And what if you're under the value in the table?

20   A    At that point, you've achieved delineation or showing that

21   that particular residence or soil sample, whatever media it

22   is, doesn't exceed that threshold; and you document that it

23   does not, and then it allows you to focus your work on areas

24   where you have exceedances.

25   Q    And by collecting enough data points, you're able to find

FERREE - DIRECT/GRIGGS                Vol. 2 - 359

1   the limits of where the data says that you have issues and

2   where you no longer have issues; is that correct?

3   A    Sure, yeah.  As we use these computer programs to do the

4   contouring, then we compare the contours to the cleanup

5   criteria; and then that defines the extent.

6   Q    And that extent is defined by the data?

7   A    Yes.

8   Q    And what if you don't have enough data to accomplish that?

9   Then what?

10  A    So that is what I would call a data gap.  At that point,

11  then we would develop additional sampling downgradient or

12  upgradient or side gradient to be able to put additional

13  borings in, collect additional samples and fill those holes or

14  data gaps in order -- and then if you again compare the data

15  to the criteria, if you exceed, you know you have to continue

16  to do work.  If you are less than the criteria, then you know

17  you've completed that area.

18       As you can see from the one map that's on the screen,

19  there's a multitude of borings.  We did this in an adaptive

20  approach.  We collect data, get the result, step out until we

21  are able to have the entire plume defined to meet the

22  standard.  In this case, it was for drinking water is what we

23  were asked to delineate to by IDEM.

24  Q    And when you became involved, were there still data gaps,

25  as you call them, that needed to be filled, despite the work

FERREE - DIRECT/GRIGGS          Vol. 2 - 360

1  that had been done previously?

2  A    Yes.  And they acknowledged that in the reports, that

3  extent of contamination had not been defined downgradient of

4  Yandes Street at that particular time.

5  Q    And did Geosyntec, in fact, continue that investigation

6  until it reached a point that it had -- it believed it had

7  filled those data gaps?

8  A    Yes.  That was the process that we utilized to delineate

9  further downgradients not on our figure here; but like I said,

10 installed soil borings, collected groundwater samples, just

11 kept stepping downgradient to the length of the plume,

12 collecting groundwater from surface down to the base of the

13 water table or the water-bearing unit, and just continued

14 stepping out until we had completed that delineation.

15 Q    Did Geosyntec also conduct sampling in the -- what's

16 called the upgradient area?

17 A    Yes.  As part of the complete investigation of the site,

18 you know, there was information that led us to believe that

19 there were other sources upgradient.  So we looked up that

20 way; and again, that was based on information that was in

21 those previous reports.  And we needed to understand and

22 refine those areas of impact.  So we went upgradient and

23 looked on adjacent upgradient properties.

24 Q    This Final Investigation Report -- we can go back to the

25 first page.

1        What role does the Final Investigation Report play in

2   the work that Geosyntec has done?

3   A   Sure.  So when we started, the program was in the

4   voluntary program.  And then we moved into a Voluntary

5   Remediation Agreement.  And as part of that agreement, we had

6   to delineate the extent of contamination and then prepare a

7   document that summarized all of the work that had been

8   conducted to date; and that included all the work that we had

9   done up to -- all that site investigation work installing the

10  permanent monitoring well network and collecting samples from

11  that monitoring well network.  This huge document had all that

12  description of all that work that was conducted.

13          MR. GRIGGS:  Can we take a quick look at 1003?

14  BY MR. GRIGGS:

15  Q   This says, "Appendix A, Long-Term Monitoring Network Well

16  Construction Logs."  In fact, the Final Investigation Report

17  with its appendices was so big, we broke it into two exhibits;

18  is that right?

19  A   Correct.

20  Q   But they're all part of a single document?

21  A   Right.  This exhibit is all of the well logs, soil boring

22  logs, laboratory reports, field testing, all the stuff that we

23  used to evaluate the data.

24  Q   Would it be fair to characterize what's in the appendices

25  as kind of the detailed backup of what's in the report?

FERREE - DIRECT/GRIGGS              Vol. 2 - 362

1   A    Sure.  The report tries to have a high-level summary of

2   the information; and then if you need to look at the

3   specifics, where a sample is collected, what day it was

4   collected, what media was it collected in, you would go to

5   these appendices and look at the details.  The boring log --

6   well, in this case, it's a well construction log -- would say

7   where the well screen was placed --

8           MR. GRIGGS:  Let's go one more page, Dave, on this;

9   and that way he's talking about something that we're actually

10  seeing.

11  BY MR. GRIGGS:

12  Q    What is that that we're looking at right there?

13  A    This is a well construction diagram.  So it shows the

14  construction of a well, which is PVC pipe.

15  Q    Does it say which well?

16          MR. GRIGGS:  Zoom in top left.

17  BY MR. GRIGGS:

18  Q    I just want to give the Court a feel for what level of

19  detail is available in these reports.

20  A    Sure.  So this is 108 deep, and then "R" is replacement

21  because it is replacing a well that was destroyed in this

22  case.  So it has an R to differentiate it from the original

23  1018.

24  Q    That's a lot of information to get from an R.

25  A    Well, it's very important.  The label of a well tells us

FERREE - DIRECT/GRIGGS          Vol. 2 - 363

1   where it is, a lot of very, you know, descriptive information.

2         So in this case, you can see the driller -- the

3   drilling company -- excuse me -- the driller himself, our

4   geologist, and what unit was the well installed.  So we know

5   this is a deep well in the lower sand unit.  A lot of

6   information here.

7         You have to know measuring points for when we collect

8   groundwater depth to water measurements, and the top of the

9   well pipe has an elevation; and that's indicated in the box

10  over on the right.

11        There's a lot more information further on the

12  right-hand side that says the length of the well screen, the

13  thickness of the well sand pack that you place around the well

14  screen, the thickness of the bentonite seal.  Everything you

15  need to know about how that well was built is present on that

16  well log.

17  Q   And that was information that was known and recorded

18  contemporaneous with the work being done?

19  A   Correct.  All of this information was written down by the

20  field geologist as that well was constructed.

21  Q   And these field geologists, you are one of those, right?

22  A   These, yes.

23  Q   You guys have little notebooks that you have special names

24  for, right?  What do you call them?

25  A   Field notebooks.

FERREE - DIRECT/GRIGGS          Vol. 2 - 364

1  Q   Field notebooks.  And everything gets written down?  Is

2  that the policy?

3  A   Yes.  If it's not written down, it didn't happen.

4  Q   So in addition to what's here on a well construction log,

5  there's even further backup information because we keep those

6  little field books, right?

7  A   Correct, yeah.  The field notebook -- I hate to use the

8  word but a diary of what happened that day.  When did I get

9  on-site?  When did I do my health and safety briefing?  Which

10  driller is on-site?  Who did I talk to that day?  Do we have

11  visitors on-site that day, be they IDEM or in this case the

12  owner, Major Tool on the property?  So perhaps we had

13  oversight by another contractor; and if I ran into any

14  problems, it's just the entire day, weeks, months, the

15  entirety of the entire project.  You could go through all of

16  our field notebooks.

17  Q   So if monitoring well 108 deep replacement had been

18  sampled on a particular day, how close to the time that sample

19  was taken could you tell me from that field log?

20  A   I could tell you precisely when it was collected.

21  Q   To the minute?

22  A   To the minute.

23  Q   This represents one monitoring well, what we were looking

24  at.  How many monitoring wells in total are involved in the

25  plume area?  Do you have an idea -- a rough idea?

FERREE - DIRECT/GRIGGS          Vol. 2 - 365

1  A   As part of the long-term monitoring network, there are 50

2  wells.

3  Q   Fifty?

4  A   But all told, all the wells from the upgradient property

5  to the Von Duprin property to downgradient, there's 75 or 80

6  wells that we use; but then there are other sites of

7  investigation that have other wells.  In this area between AJ

8  Brown and College Avenue, there could be currently 150 wells

9  in that general vicinity because there's a lot of other sites

10  present there.  So it's a very well-investigated area.

11  Q   And the ones which we're concerned about for this case, I

12  think you said that the monitoring well network had 50 or so?

13  A   Yes.

14  Q   But there may be more, 75 total?  Why are some wells in

15  the monitoring well network and some are not?

16  A   Some of the wells are duplicative.  They overlap.  Some of

17  the wells are outside of the contour and have been shown to

18  have, let's say, nondetect or below criteria for ten or more

19  years.

20       So we made the decision, working with IDEM, that let's

21  concentrate on the -- what we call the perimeter of

22  compliance.  Let's look where that footprint -- put wells

23  around the outside of that footprint of that contour interval

24  and monitor those as well as wells that go down the center or

25  the spine of the plume so we can see if anything is moving or

FERREE - DIRECT/GRIGGS                    Vol. 2 - 366

1  retracting over time and not have to collect samples that are

2  going to indicate nondetect again and again and again.

3  Q    Because there's a cost to collecting that sample, right?

4  A    Yes, absolutely.

5  Q    And is it financially more advantageous to be able to use

6  a smaller number of wells than a larger number of wells?

7  A    It is, yes.

8  Q    There's also a cost in installing these wells, right?

9  A    Oh, yeah.  The wells can be very, very expensive to

10 install.

11 Q    I don't want you to give away any trade secrets of

12 Geosyntec, but you installed some wells after you got on the

13 project.  Do you remember how many wells that were installed?

14 A    We installed ten as part of the long-term monitoring

15 network.

16 Q    Those were in addition to what was already present?

17 A    In addition to what was already present, yes.

18 Q    Just in terms of giving the Court an idea of what things

19 cost in this area, what did it cost to install ten wells?

20 A    It cost about $115,000 just for that task of hiring the

21 driller and supervising.

22 Q    But you didn't collect any data.  That's just to drill the

23 well, right?

24 A    Correct.  That was without any laboratory analyses.

25 Q    Sometimes I think I'm in the wrong business.

FERREE - DIRECT/GRIGGS          Vol. 2 - 367

1          So it's not an inexpensive area; and there are ongoing

2     costs, right?  This monitoring well network has to be

3     periodically sampled?

4     A    Correct.

5     Q    Or will be in the future periodically sampled?

6     A    In the future, yes.

7     Q    Does that actually -- does the installation of these wells

8     and the monitoring of these wells and the network -- does it

9     actually change the conditions in the groundwater, say?

10    A    No.  The purpose of a monitoring well is to go back and

11    repeat a sampling event to be able to go back and document or

12    continue to show that the footprint of that plume, the

13    contours are similar.

14    Q    How big is a groundwater sample?  What's the volume that

15    you collect to send to the lab?

16    A    Well, for a volatile sample is -- it's a little vial,

17    40 milliliters.

18              THE COURT:  Can you hold it higher?

19              THE WITNESS:  About that big around.

20    BY MR. GRIGGS:

21    Q    Forty milliliters?

22    A    Forty milliliters.  You collect three of those.

23    Q    Collect three of those because the lab needs three

24    different vials?

25    A    Oh, sure.  The lab may drop one.  It may break on the way

1  to the laboratory when it's being shipped via courier or

2  Federal Express or some other overnight.  So you want to have

3  more than that one sample.

4  Q   I guess what I'm trying to get at, for the benefit of the

5  Court, is collecting those three little vials is not really

6  changing the amount of contamination in the groundwater.  It's

7  not an effective way to treat the groundwater?

8  A   No, no.  The way you collect the sample is called low flow

9  sampling, and that's so you don't pull a lot of water in.  You

10 collect with a pump running at a low flow, 100,

11 150 milliliters per minute, so very, very slow.  So you're

12 just sipping, basically, on a straw, to simplify it, and fill

13 your bottles after -- you make sure that you're getting

14 groundwater that's coming into the well.  Sorry.  I'm using my

15 hands.

16        And we use instruments to measure dissolved oxygen,

17 specific conductants, pH, so that we know the water when we

18 started.

19        After a while, you will see changes; and then

20 eventually, it will start to even out, and it will be

21 statistically within 10 percent; and we'll know at that point

22 we're drawing water into the well, and then we'll use that

23 data then to say that's when we collect our samples.

24        When you asked me about how do I know, we time that

25 every 10 minutes; and we record all that information, whether

 1    it's by hand or sometimes we'll rent equipment that digitally

 2    records all of that information.

 3         And then when it stabilizes, we collect the sample.

 4    We write the date.  We write where we are and what analyses

 5    are being collected on a chain of custody, and then that

 6    document can tell me exactly when that sample was collected.

 7    Q   So when you have an existing monitoring well, we shouldn't

 8    be picturing -- it is a hole in the ground, right?

 9    A   It's a hole in the ground; but if you've been to a gas

10    station, you've seen a monitoring well.  It's a flat surface

11    with a circular color, usually has a triangle on it, bolts on

12    it; and it says "monitoring well."  Beneath that is the pipe.

13    Q   And when you want to get a sample from that, what do you

14    have to do?

15    A   First thing -- well, let's just take the long-term

16    monitoring network.  So just think if we did this throughout.

17         We first went to every single well in those 51 wells,

18    and we measured the depth to water.  That way we knew that on

19    one day, we had collected water levels from the entire well

20    network so we knew that day groundwater flow was this way.

21         We measure elevation, as I said earlier, on that

22    monitoring well form.  So we know the height of the

23    groundwater.  We know the bottom of the well.  So we know how

24    much water is in the well screen; and then we, as I said, put

25    our equipment down, our pumps, collect our sample at that

FERREE - DIRECT/GRIGGS                    Vol. 2 - 370

1   point.

2   Q    So there's not a tap at the top.  You just turn on, hold

3   your bottle under it; and you're done in 15 seconds?

4   A    You have to use a pump to extract the groundwater.

5   Q    Do you keep these wells locked?

6   A    Yeah, they have -- if they are flush mount, flush mount

7   being flush to the ground, there's an expandable cap that's

8   inside that when you close it, it expands; and then a lock is

9   placed on that.  They're all keyed the same so that any of the

10  folks that work on the project have that key.  They can open

11  up the well and get into it.  If they're above grade, they

12  have a casing on the outside, again, with a lock and a cap

13  inside the casing and they're secured.

14  Q    But if you don't have a key and tried to get in there, it

15  would be obvious it was tampered with?

16  A    Correct, it would.

17  Q    And you wouldn't use the results from a well that had

18  obviously been tampered with?

19  A    No.  At that point, we would talk to the state.  We would

20  talk with our client, and we would probably redevelop that

21  well, probably extract more groundwater out of that well, and

22  show it returned to similar conditions to the last time we

23  sampled it.

24  Q    One more question along this line.  When you go out to

25  sample the network, I assume you're not sampling one well but

FERREE - DIRECT/GRIGGS                    Vol. 2 - 371

1  multiple wells in a given day; is that true?

2  A    Sure.  We would have a team of staff working in pairs, and

3  they would sample the -- the wells are nested.  Some are

4  shallow.  You look at the water table.  Some are deeper, down

5  deeper in the aquifer.  One could sample the shallow well.

6  One could sample the deep well or somebody could work on two

7  and be in eyesight of the other team member working on another

8  one.  But we try to work in twos and do as much as we can.

9  Q    For planning purposes, how much time do you allow for the

10 sampling of each monitoring well?  How long does it take?

11 A    From the time you set up until the time you're done,

12 probably about two hours on a good day and if everything works

13 right.

14 Q    Is that a single person or do you need multiple people to

15 accomplish that in two hours?

16 A    One person at one well.

17 Q    So two hours per well total?

18 A    Yes.

19 Q    If you wanted to sample 20 wells today, you would need to

20 have 40 hours of manpower to get that done?

21 A    Yes.

22 Q    These wells that already existed, you've mentioned that

23 Geosyntec installed ten.  Are you still using some of the

24 wells that were already there?

25 A    Yes.

FERREE - DIRECT/GRIGGS          Vol. 2 - 372

1  Q   And is there any significant difference in your mind

2  between the wells that already existed and the ones that you

3  installed in terms of their usefulness?

4  A   No.  They're all very useful.

5  Q   Could you have delineated the plume area with just your

6  ten wells?

7  A   No.

8  Q   But those ten wells were still needed to do the final

9  delineation that's reflected in the report?

10 A   Sure, but the process we use to get to the point of

11 installing the wells was the adaptive investigation that I

12 described where we did vertical profiling, found where the

13 contamination was; and then rather than set wells every time,

14 we used the process to sample the aquifer, fill in the data

15 gaps that were missing.  And at the end, talking with IDEM,

16 showing the delineation, then we selected where those wells

17 were to be placed.  So they were at the end to document the

18 delineation was complete.

19 Q   If before you started work for -- before Geosyntec started

20 work, I think Threaded Rod had a contractor out doing work in

21 the area, when you're finished with a monitoring well,

22 project's over, don't need it anymore, is there a process

23 whereby you close the well?

24 A   Sure.  After we would get a No Further Action where the

25 state tells us we're complete or in some other fashion, you

1  abandon that well.

2  Q   That doesn't sound good.  You abandon it.  What's that

3  mean?

4  A   You remove the well -- well, let's put it this way.  You

5  pump grout into the bottom of the well, and you fill the well

6  casing with cement; and then you remove the top 3 feet of the

7  well itself, and you cut that and physically remove that.

8          Then you're left with a stick of concrete, basically;

9  and then you backfill the service.  If it's grass, it'll just

10  be grass.  If it's out in the roadway, you remove that and

11  replace the asphalt, replace the concrete, whatever the

12  surface is.  So there's no longer a way to sample from that

13  well or for it to be a future conduit for infiltration.

14  There's no need for them after that.  It's just a liability at

15  that point.

16  Q   You're physically and intentionally making that well

17  unusable?

18  A   Yes.

19  Q   Is that a regulatory requirement?  Does the state require

20  that wells be abandoned?

21  A   Yes.

22  Q   You just can't leave it the way it is?

23  A   No.

24  Q   And there is, again, a cost involved in that abandonment

25  process?

FERREE - DIRECT/GRIGGS                 Vol. 2 - 374

1  A    Yes.  You have to retain a driller.  You have to have

2  someone oversee and document that that was done, take

3  photographs.

4  Q    If the existing wells that were present when Geosyntec

5  began working had not been available, didn't exist, had been

6  abandoned, were somehow otherwise vandalized, would you have

7  needed to install more than ten wells?

8  A    Oh, yes, absolutely.

9  Q    And does it cost more to install ten wells or to install

10 50 wells?

11 A    There is some economy of scale when you go to a larger

12 network, but you still have to have a driller drill a hole.

13 You still have to have a geologist log the hole, describe the

14 soil samples, watch the construction of the well.  So they all

15 cost.  There's a cost.  They don't generally get cheaper.

16 I've heard my client tell me that all the time, that they

17 never seem to get cheaper.

18 Q    So in your mind, was there a real cost savings in being

19 able to use the existing well network?

20 A    Oh, absolutely.

21 Q    And by avoiding installing those wells yourself, above the

22 ten you did need to install, that was a cost you didn't have

23 to pass on to your client, Von Duprin?

24 A    Correct.  We probably saved $150,000 or more being able to

25 use those -- there were ten sets of shallow and deep wells

1  that we utilized.

2  Q   Once you had these wells in place, did you, in fact,

3  collect data from them?

4  A   Yes.  That's the sampling we conducted at the end that was

5  in the Final Investigation Report out of the long-term

6  monitoring well network.

7  Q   In talking about the well construction diagram that was up

8  on the screen, you were describing well construction; and I

9  guess what I want to be sure I understand is the description

10 you gave about how a monitoring well is made or constructed,

11 is that unique to Geosyntec?

12 A   No.  No.  That's every -- I wouldn't say every consultant

13 but most consultants build wells the same way.  IDEM has a

14 standard that says, "This is how you're going to build the

15 well"; and that's how you do it.

16 Q   So it's not unique -- every consultant does well

17 construction, or is supposed to, the way that you do it?

18 A   Yes.

19 Q   You mentioned vertical aquifer profiling.  I'm not sure

20 we've encountered that term, at least not with somebody who

21 can explain what it is.

22     Can you in layman's terms, please, try and describe

23 what vertical aquifer profiling is?

24 A   Sure.  So there are several types of drill rigs.  I won't

25 go into all the drill rigs; but for vertical aquifer

1  profiling, we use a geoprobe rig or a direct push drill rig.

2  If you think about a log splitter -- you've seen one of those

3  basically up on the end; and it pounds a rod into the ground.

4       At the end of that rod is a screened interval, so

5  perforated like a monitoring well screen.  It's a tool that

6  you can press down.  We know where the water table is, 18 to

7  23 feet generally.  A driller measures down, push it to that

8  depth.  You pull the outer rod back, and an inner screen is

9  exposed.  The groundwater is able to enter into that screen,

10  and then we can put tubing down into that pipe and then use a

11  pump to extract groundwater from that.

12       And then we collect that sample, as I described

13  earlier.  We pull that rod set out of the ground.  We move

14  over a couple feet, and we take another clean set; and we

15  would advance down -- in our case, we went every 5 feet.  So

16  we went every 5 feet and exposed the tool.  Some of the tools

17  had 3-foot screens.  Some had 4-foot screens, depended on the

18  manufacturer that we were using; and then we proceeded again

19  to collect that sample.

20       Pulled that out, drill a new hole to the next 5-foot

21  depth; and we repeated that until we hit the basal clay at the

22  site.  It's a very large regional clay.  It's very hard.  When

23  you hit it, you know you've hit the bottom.  Then we would

24  take our last sample right on top of that, basically.

25       And we repeated that, each of those steps.  That was

1   the approach we used to be able to then collect five or seven,

2   perhaps eight or nine, depended on how thick the aquifer was;

3   and we had those discrete samples that allowed us to look at a

4   vertical profile at those 5-foot depths from the top of the

5   water table to the bottom.

6   Q    So in terms of -- you're checking depths, right?  That's

7   the vertical you're talking about?

8   A    Yes.

9   Q    On the diagram we were looking at earlier that had all

10  those little monitoring wells and all the little boring

11  locations, would the vertical -- looking for the term here --

12  vertical aquifer profiling, it would just represent one of

13  those points?

14  A    Correct.

15  Q    But you're really drilling into the page, so to speak, as

16  we were looking at the picture, and collecting multiple

17  samples at different depths?

18  A    Correct.  It would be impossible to have a map that you

19  could show that intensity and make sense.  And also the scale

20  of a map, if you look at that circle, it could be 30 feet

21  wide.  We have precision as to where the boring was collected

22  because we measured them and surveyed them in; but yeah, the

23  drawing doesn't show how we walked around that location to

24  advance those borings.

25  Q    That all sounds very fancy.  I guess what might be

FERREE - DIRECT/GRIGGS                Vol. 2 - 378

1   interesting to the Court is why would it be important to be

2   able to take discrete samples at discrete depths?

3   A    Sure.  Our purpose is to start at the top of the water

4   table and then to know that as we advance deeper into the

5   aquifer, we have clean equipment; and we're not carrying any

6   contamination down with us as we proceed down.

7          And that way each sample is independent, collected on

8   its own with its own set of tools.  And it's not closed,

9   pressed down again, reopened, collected a sample, pressed

10  down, reopened.  You could have contamination draw down with

11  you.  If you encountered a substantially impacted portion of

12  the aquifer and you use that same tool and push down again, it

13  might yet have some lingering contamination from shallower;

14  and then you would drag that down with you.  So we didn't want

15  to do that.  We wanted to make sure that we had clean

16  samples -- not clean samples but samples collected from

17  decontaminated equipment.

18  Q    What you're describing there is what's sometimes referred

19  to as cross-contamination?

20  A    Yes.

21  Q    What you're saying is you took steps to avoid that

22  happening?

23  A    Yes, we did.

24  Q    Can you get samples from the vertical aquifer profile --

25  you're getting what we consider a grab sample, right?

FERREE - DIRECT/GRIGGS          Vol. 2 - 379

1  A    Right.  It's a one-time.

2  Q    You can't go back three months later and collect that

3  sample again?

4  A    Not without drilling --

5  Q    You would start over?

6  A    Start all over.

7  Q    That's contrasted with a monitoring well, which is

8  designed to allow you to get a sample and come back later and

9  get another sample, correct?

10 A    Correct.

11 Q    And that's -- is the sample you take the second time in

12 the same general location as the one the first time?

13 A    Yes.

14 Q    The hole hasn't moved, right?

15 A    Correct.

16 Q    But what is it about -- what is it in the subsurface that

17 defines where you're collecting your sample from?

18 A    Using the low flow sampling protocol, you measure the

19 amount of water that's standing in the well; and you put the

20 intake of your pump at that midpoint.

21 Q    Why is there water in the well if the well is a pipe?

22 A    There's a well screen.

23 Q    A screen?

24 A    At the bottom of the well that's in most cases 10 feet

25 long, and that allows the water to enter into the pipe.

FERREE - DIRECT/GRIGGS                    Vol. 2 - 380

1  Q   And the sample you're collecting is from that screened

2  area?

3  A   Correct.

4  Q   So if you install the screen between 20 and 30 feet in a

5  well, every sample you get from that well is going to be from

6  the 20 to 30-foot zone?

7  A   Correct.

8  Q   And if you made a well next to it that had a screen at 50

9  to 60 feet, the samples from that well would be from that 50

10 to 60 area?

11 A   Correct.

12 Q   And I'm trying to make sure that we get in the concept of

13 a nested well.  As opposed to the VAP that you've described

14 very well, what is a nested well or nested well set?

15 A   Sure.  So what we did here was to put a well at the top of

16 the water table to have the shallow impacts.  And then we

17 drilled down, sampled the -- described the geology.  I have to

18 use my words properly.  And then when we hit the base of the

19 aquifer generally around 60 feet, 60 to 70 feet, we then set

20 the next well at the base of the water-bearing unit at the

21 bottom -- at the top of that clay unit; put a 10-foot screen

22 in there.  So then at that location, you had a shallow well

23 and a deep well; and you could compare concentrations across

24 those two well sets.

25 Q   Are they actually two different holes?

FERREE - DIRECT/GRIGGS                Vol. 2 - 381

1    A    Yes.

2    Q    And if we -- I think I saw somewhere the first well tends

3    to be an "MW" with a number?

4    A    Yes.

5    Q    Right?

6         And if we're talking about a deeper well, you put a D

7    at the end of it?

8    A    Yes, either the shallow well will just be the number, or

9    it may have an S; and the deep well will always have a D to

10   define it as deep.

11   Q    So if the S is not there, you assume it is shallow.  Only

12   if the D is there we know it's deep?

13   A    Correct.

14   Q    Did I see somewhere in the data set that there are

15   actually some with a DD?

16   A    Yes.  Some of the earlier wells, for instance, the six --

17   or in the nine-well set has a nine.  A 9D and a 9DD.  In that

18   case, the DD is the deepest; and in this case, the D is about

19   a midpoint between the top of the water table and the top of

20   the basal clay.

21   Q    But that set of three wells, the number with the D and

22   maybe a number with a DD, is a nested well set?

23   A    Correct.

24   Q    Has Geosyntec carried on since it got involved in the site

25   in 2014 with the investigative work that had already begun?

FERREE - DIRECT/GRIGGS          Vol. 2 - 382

1  A    Yes.  We -- as I said earlier, we knew that there was the

2  vapor intrusion risks.  So we proceeded to work with the

3  state, identify the data gaps that needed to be done, answered

4  the question that IDEM may have asked us, preferential

5  pathways, upgradient sources, downgradient residential

6  impacts, extent of the groundwater contamination.  So we

7  worked, as that one figure indicated, a very large area to

8  define the extent of contamination.

9  Q    How much of the investigation work that Geosyntec had done

10 went into that Final Investigation Report?

11 A    All of our work was utilized.

12 Q    So up to the point that that report was complete, you were

13 describing everything that you had done?

14 A    Correct.

15 Q    And has there been additional work or effort since the

16 Final Investigation Report?

17 A    Yes, there has.

18 Q    But in terms of a single-source shopping, if we went to

19 Exhibit 1002 and its attached parts 1003, that kind of tells

20 us everything that you knew up to that point in time?

21 A    Right, up till that report was submitted.

22 Q    Did you submit that Final Investigation Report to IDEM for

23 review?

24 A    Yes, we did.

25 Q    And did they, in fact, carry out a review of that?

FERREE - DIRECT/GRIGGS          Vol. 2 - 383

1  A   Oh, yes, they did.

2  Q   And did they have comments for you?

3  A   A few, none of them substantial.  But in the letter, they

4  sent us a letter that said, "Here are your findings."

5  Summarized the findings.  "Here's a couple of issues, concerns

6  we have but not consequential where we had to revise the

7  document"; and then they accepted the document as complete in

8  defining the extent of contamination.

9  Q   And what does it mean that the document's been accepted?

10 A   At that point, it's put into the public record as evidence

11 that the scope of work that we said we were going to do we

12 completed and it's available.

13 Q   But it's not the end.  You've still got things to do?

14 A   Sure.

15 Q   It's a milestone?

16 A   Right.  As part of the Voluntary Remediation Agreement, we

17 needed to get the delineation of the groundwater completed;

18 and then we had to prepare a work plan to continue the work to

19 remediate the source.

20         MR. GRIGGS:  Let's take a quick look at 1020,

21 please, page 5.

22 BY MR. GRIGGS:

23 Q   Let's look at the cover here for a second, "Vertical

24 Aquifer Profiling Groundwater Investigation and Soil Boring

25 Work Plan."  Are you familiar with this?

FERREE - DIRECT/GRIGGS                Vol. 2 - 384

1   A    Yes.

2   Q    It's got your company's name on it?

3   A    Yes.

4   Q    Let's look at page 5.  At the bottom of that page, there

5   is a heading that says, "Vertical Aquifer Profiling."  If we

6   blow that up, maybe you can see that a little better.

7         Is this a description in writing along the lines of

8   what you've just testified to?  Are you explaining what

9   vertical aquifer profiling is?

10  A    Yes.  This is the documentation of how it should be done.

11  In this case, it's a work plan.

12  Q    So this was part of the work plan where you were telling

13  everybody, "This is how we're going to do the vertical aquifer

14  profiling"?

15  A    At JTV Hill Park, yes.

16  Q    Let's look also at 1027.  This is a technical memoranda.

17  Looks like it's from Rob Ferree and Ryan Fimmen.  Do you see

18  that?

19  A    Yes.

20  Q    And it was to Ryan Groves and several other people.  Can

21  you see the date on that?  Is it clear enough for you?

22  A    March 21st, 2017.

23  Q    Let's look down at page 6.  Can you tell us what this

24  technical memoranda -- and it was for the JTV Hill Park

25  property as well.  What is it that's being conveyed here?  Are

FERREE - DIRECT/GRIGGS                    Vol. 2 - 385

1   you again describing the work that you did?

2   A    Sure.   The particular page that you have up on the

3   right-hand side where his cursor is is describing the results

4   of soil samples that we collected, and we depict those in

5   tables and figures, as you can see; and then the lab reports

6   are seen.   And then there's a description of where we

7   collected the samples and then the screening criteria --

8   sorry.   It's hard to read -- that we're using.   Then below

9   that then, we describe the compounds individually,

10  tetrachlorethylene, trichloroethylene, and then the results of

11  the samples.

12          MR. GRIGGS:  Go down to page 10.  I think that's a

13  similar thing for -- this is -- can we blow up that text a

14  little bit.  I can't --

15          Let me forget that for a minute.

16  BY MR. GRIGGS:

17  Q    What was the idea behind this memorandum?  Why did you

18  submit it to IDEM?  What did it accomplish?

19  A    We were going to a very particular spot in JTV Hill Park.

20  It was the previous boring called B332 that had some anomalous

21  readings or data -- I should use that word -- and didn't agree

22  with what we had found in our investigation so far.  So we

23  were curious --

24          THE COURT:  Do you have an objection, counsel?

25          MR. BOWMAN:  I have an objection.

FERREE - DIRECT/GRIGGS          Vol. 2 - 386

1          THE COURT:  What is your objection?

2          MR. BOWMAN:  This is precisely the kind of entry

3   that I have some concern about.  The objection is a fact

4   witness providing expert opinion -- I'm sorry -- a fact

5   witness opining and providing expert opinion.

6          Can I elaborate on that?

7          THE COURT:  Sure.

8          MR. BOWMAN:  This gentleman is doing a very good job

9   and will this afternoon continue to talk about his data

10  collection processes.  It is extremely important, and we'll

11  get into that.

12          Interpretation of that data is for expert analysis

13  when you're interpreting it, and I am aware of this particular

14  document and was waiting.  There is a result in an area that

15  the witness has already testified seemed anomalous, and so

16  they went in and got a different data point.

17          I'm okay that the record is, "We got this data

18  point, and there's this data point."  How to explain that, to

19  me, is expert testimony.  That's probably longer than we need

20  to be, but I'm hoping -- data is data.  Explaining the data is

21  for experts.  Thank you.

22          MR. GRIGGS:  I didn't have him comment on the

23  conclusion because I was sharing that concern, but I think him

24  saying that they did this work because they had encountered

25  what they deemed to be an anomaly was important to get in the

FERREE - DIRECT/GRIGGS              Vol. 2 - 387

1   record.  I've asked all I want to ask about that.

2            MR. BOWMAN:  Thank you.

3            MR. GRIGGS:  I am about to start into a very lengthy

4   discussion of Exhibit 102 [sic].  I don't know if this is

5   where you want to take lunch or I can go another hour and we

6   can --

7            THE COURT:  No, you know everybody needs to eat.  We

8   don't want to go another hour.  It's a little bit after 12,

9   12:07.  So yes, this is a good time to take our lunch break.

10  We'll be in recess, and we'll start up about five after one.

11           MR. GRIGGS:  Thank you, Your Honor.

12           THE COURT:  Enjoy your lunch, everyone.

13       *(A lunch recess was taken.)*

14

15

16

17

18

19

20

21

22

23

24

25

FERREE - DIRECT/GRIGGS          Vol. 2 - 388

1          **A F T E R N O O N   S E S S I O N**

2      *(In open court)*

3          THE COURT:  Good afternoon.  We are back on the

4  record.  The witness is back on the stand.  You may be seated.

5  You are still under oath.

6          Counsel, you may continue with your examination of

7  the witness.

8          MR. GRIGGS:  Thank you, Your Honor.

9  BY MR. GRIGGS:

10 Q   Mr. Ferree when we left off, we were about to talk about

11 Exhibit 1002.  This is the Final Investigation Report.  Can

12 you just briefly describe what the purpose of the FIR is?

13 A   Yes.  Sure.  The purpose of the Final Investigation Report

14 is to summarize all of the work that was conducted as part of

15 the Voluntary Remediation Agreement, starting with the

16 background, the site history, the geology, area of affected

17 parties, extent of contamination in soil, soil gas,

18 groundwater, records as you showed earlier all of the

19 appendices, the soil boring logs, combine that all into a

20 final document that summarized concisely that the extent of

21 contamination of the plume area had been defined.

22 Q   And in preparing this report, did you utilize data from

23 all sources or just the data that Geosyntec had collected?

24 A   No.  We utilized data that was available, information from

25 the August Mack, for the site investigation reports, from Alt

FERREE - DIRECT/GRIGGS          Vol. 2 - 389

1  & Witzig documents, from the Mundell documents, from other

2  publicly available documents that we could see for other sites

3  that were downgradient of the property -- the Von Duprin

4  property as well as the upgradient information.

5  Q   We looked at a diagram earlier from this report that had a

6  lot of sampling locations indicated on it.  Do you have an

7  idea of how many grab samples were collected as part of the

8  plume area investigation?

9  A   Part of our investigation, we advanced approximately 98

10 soil borings and all of those vertical aquifer profiling

11 samples, so not the groundwater samples, about 343, including

12 duplicate samples.

13 Q   So do you add those two together?  One is -- or is -- or

14 does one include the other?

15 A   Ninety-eight locations, 343 discrete samples.

16 Q   To the south of the Von Duprin property, there is a public

17 park; is that correct?

18 A   Yes.  It's the JTV Hill Park.

19 Q   During the course of Geosyntec's investigation of the

20 plume area, did you identify any risk associated with the JTV

21 Hill Park?

22 A   Previous sampling by August Mack had indicated that there

23 was vapor intrusion present in that building.  The data

24 indicated that concentrations of indoor air exceeded the IDEM

25 indoor air screening level.  So we knew that there was the

FERREE - DIRECT/GRIGGS          Vol. 2 - 390

1   need for further investigation and eventual mitigation of that

2   building.

3   Q    What particular contaminant was it that exceeded the

4   screening levels?

5   A    Trichloroethylene, TCE.

6   Q    And what did Geosyntec and Von Duprin do to address that

7   exposure risk?

8   A    Sure.  So the first thing we did was recollected samples

9   to confirm that there was an exceedance.  We did confirm that.

10          And then we tried to understand how was that

11   happening.  So the first thing you can do, a simple way for

12   mitigation is to change the air handling equipment in the

13   building, so the air conditioning and heating.  In this case,

14   it was the air conditioning time of year, the cooling season.

15   And we increased the flow rate of the air conditioning, and

16   that basically causes the building to put more air in than

17   what it can take out.  So you pressurize the building; and,

18   therefore, vapor intrusion isn't as likely to occur.

19          We collected samples again, and we still found that

20   the indoor air exceeded the residential screening levels.

21   Perplexed us.  So then we did a thorough building inspection

22   to look for areas, perhaps cracks in the floors or something

23   that was allowing the vapors to enter the building; and what

24   we found in the center of the basketball court were volleyball

25   stanchions where you place the volleyball nets into the floor.

1  It's a basketball floor.  You can play basketball.  And those

2  pipes that held the volleyball nets actually went through the

3  concrete floor of the building to the bare soil and was

4  allowing vapors to come up into the building.  We took a photo

5  ionization detector, and we were seeing volatile organic

6  compound detections on that meter.

7         So that led us to believe that that was an area

8  perhaps where vapors were entering the building.  So we sealed

9  that, using an industrial floor sealer caulk; and then we

10  sampled again.  And again, we found that that hadn't solved

11  the problem.

12         So it became apparent at that point we were going to

13  have to put a mitigation system in in order to prohibit vapors

14  from entering into the building.

15  Q   And what is a vapor mitigation system?  What are we really

16  talking about here?

17  A   Sure.  A vapor mitigation system is a series of pipes that

18  go below the floor of a building in this case, or a home; and

19  you reduce the pressure.  So you draw a vacuum.  Think of a

20  fan, a vacuum, like a fan in your bathroom or your kitchen,

21  moves a lot of air out, removes in this case the vapors from

22  beneath the floor and puts them out from beneath the floor up

23  into the atmosphere where they're diluted.

24         But it causes a vacuum beneath the floor that's at a

25  lower pressure than the indoor air space.  Therefore, the

1  vapors will not come into the building.  They will be captured

2  by that vacuum.  It's basically a big fan, very simple.

3  Q    How big a fan was it at JTV Hill?

4  A    Oh, it probably -- I forget the model number right now.

5  It was capable -- step back for a minute.  We had to install

6  four fans there because the building was very large.  It had

7  a -- part of the building was the office space where their

8  activities were held; and then we had the gymnasium, which is

9  a very large, almost -- one-and-a-half-story building, a lot

10 of air space.

11         So we put one fan with three suction points, one fan

12 connected to a network of piping, two pipes that went through

13 the floor, three different areas in the office area.  And then

14 we had originally planned to put three fans on the east and

15 west and north wall and put the piping through the foundation.

16 I'll use my hands, the floor of the -- the flat area of the

17 foundation, and they have a foundation wall.  We were going to

18 drill through that wall and put an extraction point that would

19 be able to reach underneath the entirety of the floor.

20         We did that; but when we turned the fans on, we could

21 not measure a vacuum underneath the floor of the basketball

22 court.  We did measure vacuum underneath the building, the

23 office portion.  So we knew we were able to draw a vacuum in

24 that part.

25         What we found with working with the City of

1   Indianapolis, who operates that facility, they removed some

2   side boards -- moldings I guess is the best way to describe

3   them, and the floor had separated from the foundation; and

4   there was a very large crack, almost an inch or more, present.

5   And that was allowing -- the vacuum was broken by that.

6           So then we tried to seal those, tried the fans again.

7   That didn't work.  So at that point, we adapted our

8   installation; and we put a system above the concrete floor but

9   beneath the actual playing surface of the basketball court as

10  elevated above the concrete floor, and then we depressurized

11  the space below the basketball court on the east and west

12  sides.  The north side we were able to get limited vacuum, so

13  we left that fan running, and then we had the one fan with the

14  three suction points on the south side in the office location.

15  Q   I hope this story ends with a happy ending.  How did that

16  turn out?

17  A   After we took that lengthy installation time, we were able

18  to get concentrations below the indoor air -- residential

19  indoor air screening levels.

20  Q   And has that system that you installed been operational

21  ever since?

22  A   It has been.  We've had a couple minor -- we've had some

23  broken pipes we've had to go back and mend; but we go back

24  annually, make sure the system is running.  It has an alarm on

25  it so if it turns off, each of the fans will sound an alarm.

FERREE - DIRECT/GRIGGS          Vol. 2 - 394

1  They all have manometer pipes on them with red fluid so

2  somebody can make an inspection and see that they're running.

3        We have trained the city not to turn off the light

4  switches like they used to and turn off our fans.  Now, they

5  know what they're doing; and we go back every year, and we

6  check that they're operational and we also collect annual

7  samples.

8  Q   Is the alarm a local alarm or is this an alarm that

9  reaches out to somebody away from the site?

10 A   No, it's an alarm in the building; and the building has

11 been well-informed.  They have a booklet, who to call, what to

12 do when that alarm goes off, which fortunately, it hasn't gone

13 off.

14 Q   Do you have any idea what the work that was done at JTV

15 Hill Park to address this vapor intrusion -- what it cost?

16 A   It cost approximately $120,000.

17 Q   Did you also find that some private residences had the

18 potential or were actually suffering vapor intrusion?

19 A   Yes.  Those were the first homes that we investigated.

20 Q   And where were those homes located?

21 A   On Yandes Road, from north to south.  They're spread out

22 from the north side to the south side.  There are five houses.

23 Q   Is Yandes the north-south street that borders JTV Hill

24 Park to the west?

25 A   Yes.

FERREE - DIRECT/GRIGGS                 Vol. 2 - 395

1  Q   You've mentioned five private residences initially?

2  A   Yes.

3  Q   Can you describe what the process is when you're concerned

4  about vapor intrusion in a residence?  What do you do?

5  A   Sure.  So the first thing that you need to do is gain

6  access, ask the homeowners' permission to do the work.  The

7  first step is to collect a sample and determine whether or not

8  you exceed the screening level, as you asked me earlier.  If

9  the home did not exceed the screening level, then we sent them

10 the data and told them that their home did not require any

11 other work.

12       If the sample came back exceeding the screening level,

13 then we worked with them to sign a mitigation agreement, which

14 was the agreement to physically install a fan and collect

15 further samples after we install the mitigation system to make

16 sure that it was operational.  And then also, that would allow

17 us to come back in the future and collect confirmatory samples

18 from that home to document that the mitigation system has been

19 effective.

20 Q   Okay.  I want to put a finger there on the private

21 residential.

22       MR. GRIGGS:  Can we bring up 1029?

23 BY MR. GRIGGS:

24 Q   Is this the cover page for the vapor intrusion mitigation

25 work plan for the JTV Hill center building?

FERREE - DIRECT/GRIGGS          Vol. 2 - 396

1  A   Yes, it is.

2  Q   And is this the plan that you submitted to IDEM saying,

3  "This is how we propose to address vapor intrusion mitigation

4  at JTV Hill Park"?

5  A   Yes.  Then we had met with IDEM prior, placed a conceptual

6  approach out to them, and then prepared the work plan that

7  outlined what our approach was.

8           MR. GRIGGS:  1089, please.

9  BY MR. GRIGGS:

10  Q   Did IDEM review that plan and, in fact, approve that plan?

11  A   Yes.  Michael Anderson at IDEM looked at the work plan and

12  gave it his approval.

13           MR. GRIGGS:  Go to the next page here.

14  A   I guess Ryan actually approved it, but Michael Anderson

15  was key in reviewing it.

16  BY MR. GRIGGS:

17  Q   It sounds like you're familiar with what we're looking at

18  here.  Is this an e-mail approving the work plan that we just

19  looked at, 1029?

20  A   Correct.  Ryan would either write us a letter, or he would

21  send us an e-mail with authorization.

22           MR. GRIGGS:  And just to close the loop, 1026,

23  please.

24  BY MR. GRIGGS:

25  Q   We may have looked at this earlier.  I won't get into the

1  conclusion, but is this the technical memorandum that you

2  submitted to IDEM after you did the work describing what had

3  been done and the results?

4  A   Yes, it is.

5  Q   And these five private residences, you mentioned that you

6  had verified at JTV Hill Park the results that had indicated

7  there might be a concern.  Why bother to do a verification

8  when you've already got results that say you might have a

9  problem?

10 A   Just because I'm sitting here, I would much rather rely on

11 my own data and -- not that that data was good, bad or

12 otherwise; but it was data that we collected.  We knew how it

13 was collected, had confidence in the collection.

14 Q   Since we're going to talk about private residences, are

15 there other sources of chlorinated solvents that can be

16 detected within a home that don't come from a -- a pollution

17 source?

18 A   Absolutely.

19 Q   So there are household products that contain some

20 chlorinated solvents that can be detected?

21 A   Sure.  If I'm a repairman, automotive repair person, if I

22 make models in my home, if I store Christmas tree ornaments in

23 my home, household cleaning products.  All things have minute

24 quantities of chlorinated solvents or they're degradation

25 products.

1  Q   And when you do a test in a private home, how do you know

2  that you're not detecting those kinds of ubiquitous common

3  household things versus actually detecting what you're looking

4  for, and that is, is there pollution coming into the home from

5  outside?

6  A   The first thing we would do is speak with the homeowner.

7  Again, after we've gained the access, always say hello.  Then

8  we -- we don't inspect.  We would do a site inspection with

9  them of their home and ask them.  "Do you smoke?"  That's

10 another common contaminant for indoor air pollution.  "Have

11 you received new carpeting lately?  Have you painted your

12 home?  What are your hobbies?"  And there's a very thorough

13 checklist that we use -- that the company has developed that

14 we use, and we go through that with the homeowner before we

15 start.  And that way, we understand.

16         And if we find substantial amounts of hobby materials

17 or, you know, automotive cleaners, we will ask the homeowner

18 if we can remove them from the home.  Perhaps they have an

19 exterior garage or somewhere to place it outside of the home,

20 outside of the occupied breathing area so that we know we're

21 not having, again, cross-contamination from noncontaminant

22 groundwater or soil contamination issues, pollution.

23 Q   So based on the household inventory survey, you try and

24 get rid of -- at least for a short time.  You're not asking

25 them to permanently change, but in order for you to conduct

FERREE - DIRECT/GRIGGS          Vol. 2 - 399

1    the 24-hour test --

2    A    Correct.  The indoor air samples are 24 hours.

3    Q    So at these private residences, were you indeed successful

4    in getting access to those properties?

5    A    Not to all of the properties on Yandes Street.  There were

6    some homeowners that didn't want to talk to us.  There were a

7    couple that were rental homes, and we couldn't find the

8    landlord; but we were able to gain access to five.

9            MR. GRIGGS:  I want to pull up 1002, the Final

10   Investigation Report again.  I believe it's page 128.

11           What I hope is going to come on the screen is a

12   picture that will help you to describe what you're talking

13   about.  If we can zoom in on that area of colored rectangles

14   kind of in the lower left area.  Yes, something like that.  If

15   we can make that bigger.

16   BY MR. GRIGGS:

17   Q    All right.  Almost in the dead middle of the picture,

18   there is a black-roofed building.  Do you know what building

19   that is?

20   A    That is the JTV Hill Park building.

21   Q    That's the building you've just described that you

22   installed a mitigation system at?

23   A    Yes.

24   Q    And what are these colored rectangles down the left side

25   of Yandes?

FERREE - DIRECT/GRIGGS          Vol. 2 - 400

1  A    The colors -- now, I have to admit --

2  Q    What are they?  Before you talk about the colors, what are

3  those rectangles?

4  A    Those are properties.  With -- all of those have

5  property -- have homes built on them.

6  Q    Okay.  And were you interested in all of those homes that

7  are shown there?

8  A    We were interested -- the contour line that you see, the

9  yellow line, is the groundwater contour for vapor intrusion

10 screening level that above that concentration, there's a

11 likelihood of indoor air impacts.

12        So we utilized that, and IDEM also utilizes a 100-foot

13 setback.  So we knew that the homes downgradient or here of

14 the plume could likely be impacted, and we needed to assess

15 those properties to continue to validate the groundwater

16 presence of that contamination above criteria and whether or

17 not those homes had any potential risk for vapor intrusion.

18 Q    Okay.  I think there's a lot there that you've thrown

19 together.  This contour line that we're looking at, do you

20 know what concentration that line represents?

21 A    Yes.

22 Q    What is that?

23 A    Nineteen parts per billion.

24 Q    What does 19 parts per billion have to do with anything?

25 A    That's a site-specific number that we calculated with IDEM

FERREE - DIRECT/GRIGGS                    Vol. 2 - 401

1  that indicates that the likelihood of vapor intrusion is more

2  likely in the areas within that plume, within that contour,

3  inside the contour than outside the contour.  So this is the

4  footprint of the likely exposure from groundwater.

5  Q   And when you mentioned a hundred-foot setback, are you

6  saying that a hundred feet outside this contour line, IDEM

7  wants those structures to be checked too for a safety margin?

8  A   That is correct.

9         THE COURT:  So are you telling me the plume is this

10 big?

11        THE WITNESS:  I'm sorry, ma'am?

12        THE COURT:  Is the entire area -- is the plume the

13 entire yellow in the area?

14        THE WITNESS:  Yes, ma'am.

15        THE COURT:  It's a huge plume.  Okay.

16 BY MR. GRIGGS:

17 Q   The 19 is a value that was calculated based on this

18 specific site?

19 A   Correct.

20 Q   And you had to get acknowledgment or approval of that 19

21 from IDEM?

22 A   Yes.  That was part of the documents that we submitted in

23 the meetings that we had with Ryan and his technical team; and

24 we proposed that number, showed the calculations, and they

25 approved it.

                          FERREE - DIRECT/GRIGGS          Vol. 2 - 402

1    Q    And if the number had been different, particularly if the

2    number had been smaller and your contour line was, say, 5,

3    what would have been -- well, how would that have affected

4    this picture?

5    A    Sure.  The contour would have been larger, larger

6    footprint.

7    Q    Got it.  And so which of the five residences are we --

8    were you able to get access to there among the several on

9    Yandes?

10   A    So the ones -- to me -- I was about to say earlier.  I

11   have color-blind issues.  So I see different colors.

12   Q    What color do you see?

13   A    I see green.

14   Q    I see green too, but I may be color blind.  I don't know.

15   A    There are two to the south of the southern portion of the

16   plume.  And then there's one about in the center and then two

17   to the north.

18           MR. GRIGGS:  Can we blow up just the rectangle a

19   little bit so he can read the numbers on them?  I want to make

20   sure we're talking about the right ones in case we are color

21   blind.

22   BY MR. GRIGGS:

23   Q    Can you see the numbers now?

24   A    Yes.

25   Q    Which numbers are the five that we are talking about?

FERREE - DIRECT/GRIGGS          Vol. 2 - 403

1  A    Sure.  1714, 1724, 1742, 1816 and 1820.

2  Q    Were you not able to contact the other people or did the

3  other people say, "No"?

4  A    One -- some people were able to sample.  The golden color,

5  1704, 1710, 1720, 1730, those homes we were able to sample

6  where others had sampled, and they did not have vapor

7  intrusion issues.  So they were less than IDEM vapor intrusion

8  screening level.

9  Q    But they were checked?

10 A    But they were checked.

11      The homes with the vertical line, 1736, and 1738, we

12 were unable to gain access at the time that we completed the

13 Final Investigation Report.

14 Q    Have you continued to try and get access since then?

15 A    Yes.

16 Q    Have you been successful?

17 A    We have been successful.  1738 we were able to contact.

18 It was a new landlord -- excuse me -- new owner of the

19 building, went from a rented property, was renovated; and then

20 a duplex home was constructed there.

21      We were able to get access and sample that, and that

22 home did not exceed -- indoor air from that home did not

23 exceed indoor air.

24      And just recently as part of recent work, we've been

25 able to gain access to 1736; and that home also, indoor air

                    FERREE - DIRECT/GRIGGS              Vol. 2 - 404

1  samples and crawl space -- that home is built on a crawl

2  space -- were also below the residential screening levels.

3  Q    So the fact that a structure is within the footprint only

4  means it's suspect?  It doesn't guarantee that they're going

5  to have a problem?

6  A    Correct.  What we have found is the construction of the

7  home may lead to vapor intrusion.  For instance, as I said,

8  1736 is a crawl space home.  Its foundation only goes down

9  about 3 feet.  It does have bare soil.  Then the home is built

10 above that.  Crawl spaces allow air to move through a lot

11 easier, so we don't see vapors accumulating in homes with

12 crawl spaces.

13       Homes with basements may or may not allow vapors to

14 enter.  The homes at 1714, '24, 1742, 1815 and 1820 had sumps

15 in their basement to collect water from the drainage ways

16 around their house.  I'm sure everybody has a sump, and they

17 have sump pumps; and the lids on those sump pumps were loose.

18       And once we -- as part of the mitigation of these

19 homes, we also sealed those sumps with a lid with sealant and

20 screwed them down; and once we removed that infiltration route

21 into the home, we found our mitigation to be very successful.

22 So a mix of construction and adaptations to the home

23 foundations later can lead to vapor intrusion.

24 Q    And you already mentioned some efforts that Geosyntec made

25 in contacting the homeowners and trying to get their

FERREE - DIRECT/GRIGGS          Vol. 2 - 405

1  cooperation.  Did IDEM also have a role to play in that?

2  A   Oh, absolutely.  1736 -- I'll refer to the owner,

3  Ms. Germany -- would not answer our phone calls.  We asked

4  IDEM to become involved.  They actually wrote some letters.

5  Ryan himself -- Ryan Groves, excuse me -- went to the home and

6  tried to knock on the door to contact the owner.  Wasn't

7  successful either.

8  Q   And is that the one that wasn't successful at the time but

9  you've now had success?

10 A   Correct.

11 Q   And turned out there wasn't an issue?

12 A   Correct.

13         MR. GRIGGS:  I want to see table 11 of this.  I

14 wrote down page 79, but I think I was wrong; but if we can

15 start at 79.  Can you show me the heading of that so I can see

16 what it says.

17         Just to make sure, let me see the page before this,

18 make sure we're at the start of No. 11.  That's the page I

19 think we want to start on.  Maybe not.

20 BY MR. GRIGGS:

21 Q   Are you familiar with table 11 in the Final Investigation

22 Report?

23 A   Yes.

24 Q   You tell me what part of this we should blow up so we can

25 have you describe what we're looking at.  Start on the left

FERREE - DIRECT/GRIGGS          Vol. 2 - 406

1    half?

2         First of all, tell us what we're looking at; and we'll

3    go from that.

4    A   It's a complicated table.  The parcel ID number is the

5    farthest left-hand column.  The physical street address is the

6    next column.  The owner name is the next column; and then the

7    next three columns are our attempts to contact that particular

8    owner, the date of which our contact or action was, and then

9    what we did and then what happened.

10   Q   Okay.  The title of this report I think says, "Residential

11   VI Investigation Outreach Efforts"; is that right?

12   A   Correct.

13   Q   Is this, in fact, a record of all the steps that were

14   taken for each of the properties, residential -- and I think

15   JTV Hill's on here as well -- to be in contact with the owner

16   or resident of the structure about the vapor intrusion

17   problem?

18   A   Yes, it is.

19   Q   So if we look at the first -- let's see.  Is there a

20   particular property that might be most helpful in

21   understanding the kinds of things that you were doing?

22   A   I think it might -- if you wanted to see one that went

23   through mitigation, one on the next page would be better.

24         MR. GRIGGS:  One page down.

25

FERREE - DIRECT/GRIGGS          Vol. 2 - 407

1  BY MR. GRIGGS:

2  Q    What property address?

3  A    1714.  That's the southernmost; 1714 Yandes.  Or maybe

4  it's the next --

5  Q    I think it will be one more page.

6  A    Yes.  I don't know my table as well as you do.

7  Q    It looks like 1704 is at the very bottom.

8  A    We're getting close.

9         There we go.

10 Q    If I had known which one you were going to pick, I would

11 have been better prepared.

12 A    There we go.

13 Q    Tell us what this -- tell us what we see here.  You don't

14 have to read it word for word, but just give a description of

15 what this is about.

16 A    Sure.  So this is the home of Jennifer Mann at 1714

17 Yandes.  This is a particular house where there was previous

18 sampling that occurred.  So we knew that on June 10th of 2014,

19 Arcadis had collected samples here.

20        MR. GRIGGS:  Let's blow up the right-hand columns,

21 can you make those bigger.

22 BY MR. GRIGGS:

23 Q    Did that help at all, Rob?  Can you read that?

24 A    I can read that.  Can you read that?

25 Q    I'll get my glasses if I can't.  Go ahead.

FERREE - DIRECT/GRIGGS          Vol. 2 - 408

1   A   So then after that, you can see that we were able to gain

2   access to her home in August.  And then we had a sampling

3   event.  And the -- contemporaneous with mitigation system

4   install.  So that occurred on August 12th.

5         And then you can see below that, we sampled a

6   one-week, one-month when we submitted letters to the owner;

7   and we also copied IDEM and then six-month, again, the letter

8   and then the annual sampling that we had conducted at that

9   home while the continued investigation was occurring in the

10  plume area.  That documented all the activities for that

11  property up till the submittal of the report.

12  Q   And the rest of this table 11 has similar actions and

13  descriptions for the other properties that you have looked

14  into for vapor intrusion?

15  A   Correct.

16        MR. GRIGGS:  Since we've talked about 1714 Yandes,

17  Exhibit 1035.

18  BY MR. GRIGGS:

19  Q   You mentioned or the table 11, I think, said something

20  about a mitigation agreement.  Is this the document that that

21  refers to?

22  A   Yeah.  This is our standard mitigation agreement that we

23  use.

24  Q   There's the owner's name and information.

25        MR. GRIGGS:  How about the bottom half of that page,

FERREE - DIRECT/GRIGGS                    Vol. 2 - 409

1    Dave.

2    BY MR. GRIGGS:

3    Q    That's who you are and how to get ahold of you, and then

4    there's some legal terms about what you're going to do and

5    what responsibilities you're taking on for the homeowner?

6    A    Correct.  As I said, it allows us access to their home to

7    install the system itself, access to come back to collect

8    confirmatory samples and then to come back annually for a

9    period of five years.  This has a five-year life to it.

10   Q    How much do you charge the homeowner for the initial

11   24-hour test?

12   A    Nothing.

13   Q    It's not free to do that test, is it?

14   A    No, but our client paid to install the system, do all the

15   sampling.  The homeowner had no cost to them.

16   Q    And so you're providing a service to the homeowner.

17   They're not paying for it?

18   A    Correct.

19   Q    And because it's related to the pollution coming off of

20   the groundwater plume, Von Duprin is the one who actually paid

21   for this?

22   A    Yes, they did.

23   Q    And that's part of the costs that you have billed

24   Von Duprin for, right?

25   A    Yes.

FERREE - DIRECT/GRIGGS          Vol. 2 - 410

1           MR. GRIGGS:  1036.

2    BY MR. GRIGGS:

3    Q   This is again related to 1714 Yandes.  What is this

4    document?

5           MR. GRIGGS:  Make that big, Dave.  Perfect.

6    A   This is a system summary, and we provided this to the

7    homeowner and also to IDEM; and it just documents everything

8    that we did at the property, how it was prepared consistent

9    with IDEM's approval.  And then the bullets, as they continue

10   on, identify when we had the access agreement, when it was

11   installed, what contributes -- the mitigation system in this

12   case.  There's also air filters in the home; and then there's

13   again your point, no cost to the owner.

14          But then there's just bullets of everything that we

15   did.  There's a table attached to this that has the

16   confirmation -- the initial sampling after mitigation and then

17   confirmation sampling.  So this was the record for the

18   homeowner.

19   Q   And this was a report, a communication to the homeowner

20   that they got regardless of what you found, right?

21   A   Yes.

22   Q   Pro or con, they were going to get a report that told them

23   what happened in their house?

24   A   Sure.  Yes.

25   Q   You said this was a report to IDEM or that IDEM was aware

FERREE - DIRECT/GRIGGS          Vol. 2 - 411

1  of this; but this really went to the homeowner, right?

2  A   Correct.

3  Q   If we go down to the bottom, I think that's true.  And

4  1051 I think is -- this says, "Summary of Residential Vapor

5  Intrusion Assessment Sampling and Results."  And does this

6  cover actually several residential properties that you're

7  giving a summary to Michael Anderson about and Ryan Groves?

8  A   Those are the five houses.

9  Q   So this covers those five that we saw in green?

10  A   Correct.

11  Q   Including 1714 Alvord?

12  A   Correct -- no, Yandes.

13  Q   Excuse me.  You're correct, 1714 Yandes.

14       If we took the time, are there mitigation agreements,

15  summaries to homeowners, and some kind of report to IDEM for

16  each of the residential properties that you have been involved

17  in related to this project?

18  A   Yes.

19  Q   And since all of those are part of the joint stipulated

20  exhibits, I'm not going to go through those with you; but this

21  is typical of what you would see, that there's a mitigation

22  agreement, there's something to the homeowner communicating

23  what happened, and there's a report to IDEM?

24  A   Correct.

25  Q   After these five, were you done?

FERREE - DIRECT/GRIGGS                Vol. 2 - 412

1  A    No.

2  Q    When did the next residential issues pop up?

3  A    The next residential issues happened after we had

4  completed the Final Investigation Report and about December

5  time frame.  The area's in a very vibrant neighborhood I would

6  guess is the best way to describe it, and there's a lot of

7  redevelopment occurring.  So there's homes being built.

8         And we noticed that there were for-sale signs on

9  Alvord Street; and, in fact, perhaps a foundation had been

10 dug.

11        And at that point, we realized that there was likely

12 development occurring.  We went to the website of the very

13 large sign that was present there, called the developer, asked

14 him what his plans -- their plans.  There were two developers.

15 Then we quickly contacted IDEM and let them know that there

16 were other homes being planned for the neighborhood, and we

17 put together a sampling investigation plan to investigate each

18 of the vacant properties before a house was built.

19 Q    The footprint that we looked at that has that

20 isoconcentration, I think you said it was 19 parts per

21 billion?

22 A    Yes.

23 Q    That didn't move, right?

24 A    Correct.

25 Q    That stayed in place, but people kept building homes in

FERREE - DIRECT/GRIGGS                 Vol. 2 - 413

1   the area that were within either the contour or the

2   hundred-foot buffer outside the contour?

3   A   That's correct.

4   Q   And that is what required you to do additional

5   investigation of additional residences?

6   A   Correct.

7   Q   And you mentioned a couple developers.  I don't know that

8   the names of them -- I seem to remember that there may have

9   been a -- another builder.  Habitat for Humanity, did they

10  build in this area, too?

11  A   They have as well.  There were two developers, David

12  Weekly Homes and The Re-Development Corporation.  They built

13  homes on Alvord Street; and then Habitat for Humanity, that

14  group, constructed three homes north of 19th Street on Yandes.

15  Q   And when you became aware that either lots were for sale

16  or that foundations were under construction in this area, you

17  mentioned that you tried to contact -- I think you said there

18  was a big sign.  You reached out to somebody.

19          Did you warn these developers that there were -- there

20  was contamination in the area, and you needed to be involved

21  in some way?

22  A   We did.  We reached out to them, and they then gave us

23  access to investigate the groundwater and soil gas situation.

24  Q   They didn't agree to not build the house there?

25  A   No.

1  Q   Were you able then to address any issues that might exist

2  at those locations?

3  A   Yeah.  We collected a groundwater grab sample and two soil

4  gas samples from each of the properties to be developed, and

5  then we reported all that information to the home builder and

6  also to IDEM; and we informed the builder that more than

7  likely, homes in this area may require mitigation in the

8  future.  They said, "Thank you."

9  Q   How many residential structures in total would you say

10 that you've had some -- have had some connection with the

11 plume area?  What are you up to?

12 A   Thirty-eight or 40 homes.

13 Q   And are you still doing work on some residential

14 structures right now?

15 A   Yes.

16 Q   In fact, did you do something last week?

17 A   Yes.  Last Monday at 1737 Alvord -- the numbers are very

18 similar -- we were able the week before to collect indoor air

19 samples, and the indoor air samples indicated that they

20 exceeded the residential screening criteria.  So last Monday,

21 we installed a mitigation system of a fan in the basement.

22      In this case, the developer had actually put piping --

23 PVC riser pipe through the floor and up through the home,

24 through the attic and into the roof; and we were able to put a

25 fan up in the attic.  And then we also put two -- temporarily

FERREE - DIRECT/GRIGGS          Vol. 2 - 415

1   put two air filters into the home; and again, this was all

2   done after discussions with IDEM.

3          We will remove those air filters after ten days, wait

4   two days; and then we'll collect our confirmation samples to

5   check for the effectiveness of that system.  So that'll be

6   roughly the end of July, early August.  Homeowner's on

7   vacation.  So we have to coordinate with the family when they

8   return to collect those samples again.

9   Q   Okay.  Thank you.

10         You indicated these activities related to vapor

11  intrusion and residential structures, that the cost was billed

12  to Von Duprin, correct?

13  A   Yes.

14  Q   Were you asked by Von Duprin to try and identify which

15  costs among all of your costs were specific to the residential

16  vapor intrusion?

17  A   Yes, I was.

18  Q   Were you also told that you had to cut that off because of

19  our discovery cutoff at March 31 of 2018?

20  A   Yes.

21  Q   And were you able to go back and look at the invoices that

22  you had sent to Von Duprin and isolate the costs related to

23  residential vapor intrusion?

24  A   Yes, I was.

25  Q   And what was that cost total for all the residences

FERREE - DIRECT/GRIGGS                    Vol. 2 - 416

1   together up to that time?

2   A   Approximately $465,000.

3   Q   How does -- just to kind of put a bigger framework here,

4   what does -- what does Geosyntec include in the costs that

5   they charge to a client like Von Duprin?

6   A   Well, we get paid by the hour.  So we have a fee schedule

7   that's based on an hourly rate; and each of our employees

8   tracks their time, bills their time to the client for project

9   work either in the office or out in the field doing active

10  sampling work.

11          We retain subcontractors, drillers, laboratories,

12  other vendors, the radon mitigation firms; and we bill the

13  client that but with a small handling charge.

14          And then we also have expenses, rental equipment,

15  rental cars, gloves, all the things that you need to collect

16  samples with; and we also charge our clients for that.

17          And then on top of that, we have a small fee that's a

18  percentage of labor.  It's 3 percent of our labor that covers

19  telephones and fax machines back when people charged for

20  faxes, covers shipping so we don't have to bill our client for

21  every FedEx package that we deliver to the regulator or to

22  them.

23  Q   Were all those types of costs included in this project?

24  A   Yes.

25  Q   And you mentioned hourly rates.  Are there different rates

FERREE - DIRECT/GRIGGS          Vol. 2 - 417

1  charged by different people within Geosyntec?

2  A   Yes.

3  Q   And is that rate commensurate with their job

4  responsibilities, so to speak?

5  A   Correct.

6  Q   You mentioned that there was a rate schedule.  Is that

7  provided to the client?

8  A   Yes.

9  Q   They know how much a staff engineer costs and how much --

10  I don't know -- senior principal I think is what you said your

11  title was?  They know what you cost per hour?

12  A   Yes, they do.

13  Q   Are those -- is that schedule of rates the standard price

14  you charge to any client?

15  A   We have set rates that change every year; but for our

16  client Von Duprin, they asked us to consider rate reductions

17  as part of our negotiations of our contract with them.

18  Q   And did they -- did you come to agreement for a rate

19  reduction?

20  A   Yes, we did.

21  Q   Do you remember what that was?  Was it a specific number?

22  A   It was about 8 percent.

23  Q   And you mentioned some markups.  I think you said a markup

24  for expenses.  What is Geosyntec's typical markup for expense

25  items?

FERREE - DIRECT/GRIGGS          Vol. 2 - 418

1  A    Typically, it's 15 percent.

2  Q    And did you charge Von Duprin that amount or --

3  A    No.  We negotiated down to 5 percent.

4  Q    What about on the subcontractors?  You mentioned

5  laboratories and drilling companies.  What's the normal markup

6  for that?

7  A    Typically 15 percent as well, but we were 5 1/2 -- excuse

8  me -- 6 1/2 percent.

9  Q    And is that, you know, reflective of the relationship you

10 have with Von Duprin, that you would agree to those discounts

11 for this project?

12 A    Yes, and it carried on to other work that we might gain

13 from them as a client.  They're a valued client.

14         MR. GRIGGS:  Let's look at 1017, please.

15 BY MR. GRIGGS:

16 Q    Does that look familiar?  There's 2,000 -- over 2,000

17 pages in this exhibit.  What are we looking at there?

18 A    This is a standard invoice cover sheet that summarizes for

19 this particular month, which I can't quite tell you which

20 month it is.

21         MR. GRIGGS:  Make it a little bigger here.

22 A    So this is the month of August 2016; and it has our

23 professional services, which is the hours charged by the staff

24 for that month, the 3 percent communication fee on that; and

25 then it lumps reimbursable expenses, which would be the

FERREE - DIRECT/GRIGGS          Vol. 2 - 419

1  subcontractors and expenses into a line and then gives a total

2  for that month.

3  Q   There's a project name here.  Can you see what that says?

4  A   Yeah.  It's the "2016 Residential VI," vapor intrusion,

5  "Mitigation."

6  Q   And among those costs that you reported earlier, the total

7  residential vapor intrusion mitigation cost, would this be one

8  of the invoices that would make up that number that you gave

9  us?

10 A   Yes.

11 Q   And if we scroll down past the cover page to the next

12 page, I just want to get a feel for what we have in these

13 invoices.  Is this the summary?

14        MR. GRIGGS:  Can you flip that table on its side and

15 then make it a little bigger?

16 BY MR. GRIGGS:

17 Q   What are we looking at here?  It says, "Project Tracking

18 Sheet."  What is that?

19 A   Sure.  So it shows the project number at the top, and we

20 have different phases of work.  So the project number has a

21 "D."  So we just know that's sequentially what was happening.

22 It's got the name.

23        And then there are phases or people would also say

24 tasks.  There's indoor air sampling and carbon replacement,

25 1738 Yandes air sampling, property owner letters, electrical

FERREE - DIRECT/GRIGGS                    Vol. 2 - 420

1    reimbursements and project management; and it gives a budget,

2    how much we've spent, how much remains, and then have we

3    completed the task or not and how much of the budget has been

4    spent, sort of an easy way for the client to look at how we're

5    doing both from a budget and scope completion snapshot.

6    Q    And so while the invoice reflects the costs that were

7    incurred during a specific calendar month, the project or --

8    may have taken much longer than just one month?

9    A    Correct.

10   Q    And it may be billed in increments over many months?

11   A    Correct.

12   Q    In order to put Humpty Dumpty together so that we could

13   isolate the costs for JTV Hill that you've already spoken of,

14   the cost for residential structures, did you have to go

15   through these invoices page by page to do that?

16   A    I went through every invoice that we issued from August of

17   2014 until March of 2018; and I had to look at each and every

18   line and determine, based on looking at the proposal, what

19   each of these tasks entailed and developed a percentage of

20   on-site, off-site, was it a residential, what bucket did it go

21   into; and I totaled them all up on one big, giant spreadsheet.

22   Q    Somebody had to do it.

23         So if we look through the rest of this exhibit, would

24   we see typically the same thing, a monthly -- a calendar

25   month's worth of work reported for a specific project?

FERREE - DIRECT/GRIGGS                Vol. 2 - 421

1   A    Correct.

2   Q    And is it possible if multiple projects were ongoing at

3   once that there would be more than one invoice in a given

4   month?

5   A    Yes.  We've had multiple purchase orders for multiple

6   different aspects of this project running concurrently and the

7   client could receive three or four invoices.

8   Q    All related to work in the plume area but for different

9   pieces of it; is that right?

10  A    That is correct.

11  Q    And I noticed that a lot of these invoices are the 15th of

12  the month.  Why is that?

13  A    We have an off-cycle billing with Allegion, both to make

14  it easier for us to produce the invoice as well as for Russ

15  Eiler to receive the invoice and process it outside a normal

16  end-of-the-month calendar cycle.

17  Q    So if the invoice covers a calendar month, do you have a

18  certain number of days then to send that to them after the end

19  of the month?

20  A    Oh, sure.  It has to be to Russ by the 15th if we want to

21  get paid.

22  Q    And that's why the 15th shows up on a lot of the invoices?

23  A    That is correct.

24  Q    Did you create or review a summary of all these invoices?

25  A    Yes.

1          MR. GRIGGS:  Let's pull up 107.

2   BY MR. GRIGGS:

3   Q   Does that look familiar from a first glance there?

4   A   Yes.

5          MR. GRIGGS:  And if we can just see the heading so

6   he can kind of orient himself.

7   BY MR. GRIGGS:

8   Q   Can you see the kind of information that is included in

9   each of these columns?

10  A   Yes.

11  Q   And is this, in fact, a summary of the Geosyntec invoices

12  that are in Exhibit 1017 that we just looked at?

13  A   Yes, they are.

14  Q   And if we go to the bottom, the last page -- I think there

15  are three pages -- there are some totals.

16         MR. GRIGGS:  Go down to the very end.

17  BY MR. GRIGGS:

18  Q   Can you see that well enough?  In the column that has the

19  heading "Current Invoice Total" -- I think it's the second

20  number from the bottom.  There's a pretty big number there.

21  What does that number represent?

22  A   That's the -- all -- complete invoice total from the

23  beginning of the project to the end in March of 2018.  It's

24  $3,165,960.88.

25  Q   And that's everything, right, up to that time?

FERREE - DIRECT/GRIGGS          Vol. 2 - 423

1   A   Correct.

2   Q   And part of the efforts that Geosyntec made related to

3   what is called "Legal Support Amount," which is the third

4   column here -- do you see that?

5   A   Yes.

6   Q   And that was considered not to be related to the technical

7   investigation and remediation, and did that get subtracted

8   out?

9   A   Yes, it did.

10  Q   So if you subtract that column out, do you get the number

11  at the very bottom, 2.477?

12  A   Yes.

13  Q   But that still has some things in it that Von Duprin

14  didn't feel belonged; is that right?

15  A   Correct.

16  Q   Some things that were specific to work at the Threaded Rod

17  site?

18  A   Correct, to the Von Duprin property.

19  Q   You talked about the buckets.  Was one of the things you

20  were asked to do was to identify things that were specific to

21  site soil investigation, site soil excavation eventually,

22  those kind of things, and set those aside?

23  A   Sure.  Everything that we did on the Von Duprin property

24  was what we considered on site, and we separated that out.

25  Q   Were there ever any costs that kind of spanned -- that may

FERREE - DIRECT/GRIGGS          Vol. 2 - 424

1   have been -- sorry -- on the Von Duprin property but were

2   really related to the plume area investigation?  What did you

3   do about, like, monitoring wells that happened to be on

4   Threaded Rod?

5   A   If they were used in the long-term monitoring network, I

6   split those costs in half on site and off-site because that

7   went into the overall report.

8   Q   So you were making that -- that fine of a distinction

9   between the costs that you were putting in bucket A or bucket

10  B?

11  A   Sure.  If we had a drilling program that was on the

12  property in streets, right-of-ways, east or west or south,

13  downgradient, I was able to by percentages, number of borings,

14  how many were on the property, divide by, get a percent; and I

15  applied that percentage and separated that into on site and

16  off site.

17  Q   You've already mentioned the amount that you found that

18  was spent at JTV Hill.  You also mentioned the amount that was

19  spent on the private residences up to this point.  I think

20  that there was also a bucket for -- oh, you did some bench and

21  pilot testing leading towards or evaluating potential

22  groundwater remedies; is that right?

23  A   Yes, we did.

24  Q   And is all that work completed?

25  A   Yes.  It has been completed.

FERREE - DIRECT/GRIGGS                Vol. 2 - 425

1  Q   Were you able to isolate the amount of money associated
2  just with the bench and pilot test?
3  A   Yes.
4  Q   How much was that?
5  A   Approximately $365,000.
6  Q   And -- so there's three buckets.  Let's -- of the 2.477
7  that covered everything, less legal support, how much did you
8  find was related to off-site work versus the on-site work?
9  A   Approximately $1.7 million.
10 Q   And the difference, whatever that is, $777,000, would be
11 for the on-site portion?
12 A   Correct.
13 Q   And of the 1.7, we've talked about JTV Hill Park.  We've
14 talked about the pilot test and bench test for groundwater
15 remedy.  We talked about private residences, and the other
16 thing is investigation costs.  How much are those, other than
17 just saying the difference?  Do you remember what the number
18 was?
19 A   It'll come to me.
20     600,000 --
21 Q   It's 1.7 minus the other numbers, and you'll get to it?
22 A   Correct.
23 Q   Where are we at currently in the cleanup?  You said you
24 were still doing some work at certain structures for VI.  I
25 believe that there's been some soil excavation done that is

FERREE - DIRECT/GRIGGS          Vol. 2 - 426

1  not part of the claim in this suit, but it occurred.  Where

2  are we at in terms of the process?  What comes next?

3  A   We wrote a Remediation Work Plan for the Von Duprin

4  property, and that was the soil excavation that you referred

5  to.  We have completed that work, and we are preparing the

6  report that summarizes the activities on the property.  The

7  next aspect is to write the groundwater work plan for the

8  plume area.

9  Q   And that will have to be reviewed and approved by IDEM?

10 A   Correct.

11 Q   And that will also be subjected to public comment?

12 A   Public comment and approval.

13 Q   The specific status related to the residential work that

14 you said is still ongoing, are there properties that you've

15 now completed the sampling and you're waiting for systems, or

16 are all the systems you know that need to be in, are they in?

17 A   No.  We're still trying to gain access to several homes on

18 Alvord Street.  There are three homes remaining on Alvord

19 Street, three -- excuse me -- two on Yandes.  Then we have

20 access to a home on 17th Street, but it's not completely built

21 yet.  When that one's complete -- we have access to that.

22       We're communicating with these homeowners.  When we --

23 for instance, when we went to 1737 last week, we went and

24 knocked on the doors again, delivered letters again, tried to

25 communicate.  We have been able to reach several of them, but

FERREE - DIRECT/GRIGGS                Vol. 2 - 427

1   they haven't signed an access agreement.  So we've contacted

2   them, but we don't have an agreement to go in and sample their

3   homes.  That's our next step.

4   Q    Throughout this project, both in the State Cleanup Program

5   and the Voluntary Remediation Program, has IDEM provided

6   oversight for the work you've done?

7   A    Absolutely.

8   Q    And did you seek and obtain approval from IDEM for the

9   different types of work that you did?

10  A    Sure.  As we discussed earlier, the first work we did was

11  the vapor intrusion.  That provided us with some information

12  about the homes.  Then logical questions were:  Where was the

13  contamination present?  That's when we started the

14  downgradient investigations.

15       And every time we had a data package come together

16  that we had outlined with IDEM, we went and met with them,

17  "them" being Ryan Groves and his technical team; and we would

18  have an open discussion about what we had found.  They would

19  make recommendations to us.

20       We would go back, meet with our client, prepare a work

21  plan, submit that back to IDEM, again have discussions,

22  eventually have that approved, do the work; and we repeated

23  that multiple times, much to Russ's dismay that we had to keep

24  going back out, until we had satisfied their overall goal,

25  which was a delineation of the plume.

FERREE - DIRECT/GRIGGS          Vol. 2 - 428

1  Q   And do you expect that that situation, that relationship

2  between yourself and Von Duprin and the state agency, will

3  continue for the remaining work?

4  A   Absolutely.  That has been our instruction from our

5  client, to engage IDEM frequently, to communicate with them

6  openly.

7          When we were actively working, I would talk with Ryan

8  weekly, or a team member -- which would be Ryan Groves, excuse

9  me.  I would speak with Ryan Groves.  When we were doing data

10 evaluation, we would check in.  He would ask us how we're

11 doing on the schedule.  He probably has my cell phone blocked

12 on his cell phone.  Very frequent communication.

13          MR. GRIGGS:  Thank you.

14          THE WITNESS:  Thank you.

15          THE COURT:  Are you ready or do you want to take a

16 break.

17          MR. BOWMAN:  I'm ready, and I have more than 15

18 minutes.

19          THE COURT:  We can take a break now.  That's fine.

20 Everybody probably needs a little coffee.  All right.  We'll

21 take about 15 minutes, and then we will reconvene.

22          COURTROOM DEPUTY:  All rise.

23   (A recess was taken.)

24          THE COURT:  You may be seated.  You may return to

25 the witness stand.  We're all refreshed after our break.

*FERREE – CROSS/BOWMAN*          Vol. 2 - 429

1          Come on up.  Mr. Bowman, you can do your

2     cross-examination of the witness.

3          MR. BOWMAN:  It has been a long day.

4                    **CROSS-EXAMINATION**

5     BY MR. BOWMAN:

6     Q   So I'll say initial question, Mr. Ferree, my

7     understanding -- Glenn Bowman, Stoll Keenon Ogden for Moran.

8          My understanding is you're in supervision, plus

9     occasionally, you go into the field to take samples?

10    A   Yes.

11    Q   Would you agree with me that for a person of -- in your

12    circumstances, it's much more likely for you to go in the

13    field and take a sample on a beautiful day like this than if

14    it's February and 10 degrees?

15    A   Sure, but if you have to go out in February, you do.

16    Q   I want to start with Exhibit 1002 and page 128.  This is

17    the Final Investigation Report that Mr. Griggs was showing

18    you.  This is an interesting plume map, and I wanted to focus

19    on it.

20          As I understand, this is a representation of the plume

21    with 19 PPB as the boundary as it appears as of the date of

22    this representation; is that right?

23    A   Yes.

24    Q   Okay.  So it doesn't take historical data.  That's a

25    representation of today of what the numbers are?

FERREE - CROSS/BOWMAN          Vol. 2 - 430

1    A    Then.

2    Q    At that time.  2017?

3    A    Right.

4    Q    So what you've done here, which is very, very helpful --

5    it shows the properties as well as the older buildings, now

6    gone; and I want to point some of those out so that it's

7    clear.

8          I have pointed right there -- let's move it over.  Let

9    me clear it.

10         This is the former Ertel -- main Ertel building,

11   correct?

12   A    Yes.

13   Q    So today, over the southern part of Ertel, there's still

14   19 PPB in shallow groundwater, right?  This is shallow.

15   A    Yes.

16   Q    This is the little blue building.  You see that there?

17   We've called that building K, the little blue building?  Do

18   you know what I'm talking about, that little structure?  Do

19   you know anything about that?

20   A    I don't know that building, Glenn.  Mr. Bowman, excuse me.

21         THE COURT:  Are these ones in gray no longer

22   standing?  Is that what that means?

23         THE WITNESS:  Yes, they've been demolished.

24   BY MR. BOWMAN:

25   Q    Yes, let's go back.  This is a good figure, Your Honor.

FERREE - CROSS/BOWMAN          Vol. 2 - 431

1  Thank you.

2       That's the former Ertel building, now demolished; but

3  Major Tool's on top of part of it?

4  A   Yes.

5  Q   But the good representation of it is as we consider Ertel

6  and Ertel contamination -- and again, this is 19 PPB today;

7  but right now, 19 PPB is still on the southern property

8  boundary of Ertel?

9  A   Yes.

10 Q   We still have 19 with -- that's the former Zimmer Paper

11 building, correct?

12 A   Yes, it is.

13 Q   Where we've talked about -- there's an underground storage

14 tank I think there may have been some discussion?

15 A   May have been, yes.

16 Q   It's been a blurred two days.  I didn't remember

17 whether -- you're aware there's a UST there?

18 A   I believe there was one there.

19 Q   So that's Zimmer.  Today based on the data you're still

20 getting, you have 19 PPB even northeast of the Zimmer Paper

21 parcel, correct?

22 A   Yes.

23 Q   And our groundwater flow, which I'll look at -- well, I'll

24 leave that for -- I've got a map to show you.

25       This right there is -- this right there -- you see

FERREE - CROSS/BOWMAN          Vol. 2 - 432

1  that -- that is the northern Moran building, correct?

2  A    Correct.

3  Q    So today, the 19 PPB runs through what was the northern

4  building for Moran?

5  A    Correct.

6  Q    Then this -- this is the southern -- this is the southern

7  Moran building, correct?

8  A    Yes.

9  Q    And then, of course, this area here is the former

10 Von Duprin?

11 A    Yes.

12 Q    And I think even this northern area is still Von Duprin,

13 correct, was a part of the Von Duprin operations, the northern

14 area there?

15 A    Yes.

16       MR. BOWMAN:  Okay.  I'm going to keep Ms. Hill on

17 her toes.

18 BY MR. BOWMAN:

19 Q    As part of the Final Investigation Report, you have what

20 are called groundwater flow maps, correct?

21 A    Yes.

22       MR. BOWMAN:  I'll keep her on her toes.  I need

23 Exhibit 1120 and page 31.

24 BY MR. BOWMAN:

25 Q    Does this look familiar to you?  This is the Geosyntec

FERREE – CROSS/BOWMAN          Vol. 2 - 433

1   Technical Memorandum Groundwater and Soil Gas Investigation,

2   June 18th of 2005, correct?

3   A   I think so.  It came up pretty quickly.

4           MR. BOWMAN:  Give us the first page.

5   A   I'm sorry.

6           Okay.  Thank you.

7   BY MR. BOWMAN:

8   Q   So then page 31.  There was earlier testimony regarding

9   how groundwater flow is determined.  I believe it was another

10  witness; but it's based upon measuring depth to groundwater

11  within monitoring wells, correct?

12  A   Correct.

13  Q   You just take that data and put it into a system that

14  shows you groundwater flow based on that data?

15  A   Yes.

16  Q   And for this particular report, the groundwater flow shows

17  that it's from northeast to southwest; but there is at times

18  and in areas -- in areas just south of Von Duprin -- that's

19  Von Duprin that goes directly south on that particular

20  monitoring, correct?

21  A   At that particular time, yes.

22  Q   Yeah, okay.

23  A   Glenn, is this the --

24          THE WITNESS:  Can I ask him a question?

25          THE COURT:  No, you're not allowed.  Sorry.

FERREE - CROSS/BOWMAN              Vol. 2 - 434

1            MR. BOWMAN:  I know his question.

2            Go to the first page.

3    BY MR. BOWMAN:

4    Q   Was the monitoring done around June 18 of 2015, the

5    gauging?

6    A   No.  I was going to ask you a different question, a

7    clarifying question.

8            THE COURT:  What do you want to ask him?  I'll let

9    you know if you can ask.

10           THE WITNESS:  I didn't know if that was the shallow

11   portion of the aquifer or the deep portion of the aquifer

12   because there's different measurements for different events.

13           THE COURT:  Do you want to clear that up,

14   Mr. Bowman?

15           MR. BOWMAN:  Yeah.  Go to the bottom.  Keep going

16   down.

17   BY MR. BOWMAN:

18   Q   That's the deep.

19   A   Thank you.  Thank you.

20   Q   I think as part of the Final Investigation Report, we also

21   had a groundwater flow determined, correct?

22   A   Yes, correct.

23           MR. BOWMAN:  So -- sorry, that's back to 1002.  Go

24   to the first page to help Mr. Ferree.  That's the Final

25   Investigation Report.  So then we need 117.

*FERREE - CROSS/BOWMAN*          Vol. 2 - 435

1  BY MR. BOWMAN:

2  Q   So this is another what we call the technical term --

3        MR. BOWMAN:  Scroll to the bottom so that Mr. Ferree

4  can see it --

5  BY MR. BOWMAN:

6  Q   May 2017 potentiometric map for shallow aquifer.  Again,

7  that is groundwater.  That's another big word for groundwater

8  flow?

9  A   Correct.

10       MR. BOWMAN:  If you will zoom, Ms. Hill, up to the

11  top right that's over Ertel, monitoring well 203S.

12  BY MR. BOWMAN:

13  Q   That's actually on the former Zimmer Paper parcel,

14  correct?

15  A   Correct.

16  Q   And 105S is in the western part of Ertel?

17  A   Yes.

18  Q   And I'm not exactly sure -- monitoring well 200S is to the

19  west of Moran, but the point is right at what we've been

20  calling the -- I think we call it the 20th Street corridor.

21  The line between Ertel and Moran, right, it's actually -- on

22  this day, groundwater flow was directly from Ertel to Moran

23  subsurface, correct?

24  A   It appears that way, yes.

25  Q   Well, that's what the data says.

1   A   Yes.

2   Q   Okay.  Let's stay on -- we're on 1002.  Geosyntec started

3   determining the full nature and extent of contamination in

4   2014?

5   A   Started in July of 2014.

6   Q   As part of that work, the effort is to get soil samples,

7   in part, within shallow soils, correct?

8   A   Correct.

9   Q   And again, I should have been listening -- I was

10  listening, but we've talked about vadose zone with other

11  people.  I don't know if we talked with you about it; but the

12  vadose zone, V-A-D-O-S-E, is the area above groundwater in

13  which -- subsurface but above groundwater where if I get a

14  soil sample, it's likely not under the influence of

15  groundwater, correct?

16  A   Correct.

17  Q   So as you collected your samples, you and your team were

18  on notice or concerned about am I taking a sample within the

19  vadose zone, or underneath that there is a -- what's the term

20  you use?

21  A   Saturated.

22  Q   Saturated or smear zone?  What do you like to use?

23  A   Below the water table would be saturated.  The area

24  directly above the water table where the water table can

25  fluctuate seasonally is called the smear zone.

FERREE – CROSS/BOWMAN          Vol. 2 – 437

1  Q    Smear zone.

2         So then let's look at page 14 of this report.  You see

3  the fourth full paragraph, second sentence.  Right here.

4  "Static water levels" -- this is your report -- "measured at

5  the property range from approximately 11 to 16 feet" --

6         MR. BOWMAN:  "BGS" is below ground surface, Your

7  Honor.

8  BY MR. BOWMAN:

9  Q    As you gathered your data and looked at flow maps and all

10 of that, you're saying, quote-unquote, static water levels are

11 between 11 to 16 feet, correct?

12 A    Correct.

13 Q    What is that telling me regarding what your thoughts are

14 on the depth of the vadose zone or the smear zone?

15 A    It could range from anywhere, depending on where you were,

16 starting 11 feet to 16 feet.

17 Q    So 11 to 16 feet would be smear zone?

18 A    It could be.  This is a general.  So at the property,

19 which at this time we were using the property being the

20 entirety of the plume, there's a wide range of water levels

21 across the entirety, as you can see from that map you showed

22 me.

23 Q    Well, that was one of the questions that I had.  This

24 representation you said was 11 to 16 feet below ground surface

25 for, in your opinion, the entirety of the investigation site,

1  which would include Ertel, Zimmer Paper, Moran and Von Duprin,

2  correct?

3  A   And further to the west.

4  Q   And we have time for this, but we'll go through it

5  quickly; but I think it will be helpful to get this in.

6          MR. BOWMAN:  Go to the citations to exhibits for

7  depth of groundwater.  And for your benefit, I would like to

8  pull up Exhibit 1112, 1112.

9  BY MR. BOWMAN:

10  Q   Thirty-one -- look at it first.  This -- have you seen

11  this -- I should let you see these reports, shouldn't I,

12  Mr. Ferree?

13          This is a Further Site Investigation Report, Heartland

14  Environmental, June 2011 to Natalie Weir relating to Major

15  Tool and the former Moran property, correct?

16  A   Yes.

17  Q   And while I'm not going to hold you to pulling out data

18  and saying it's in here, but part of your efforts were to pull

19  out some of this historical data and make sure that it ended

20  up in your analysis, right?

21  A   Correct.

22  Q   So let's look at page 31 of this PDF.  And turn it to the

23  right.  And way over on the left -- and we'll zoom into it --

24  there are monitoring wells 200 to 203D that were on the Moran

25  property -- and we'll go to a figure later if you want to look

*FERREE - CROSS/BOWMAN*          Vol. 2 - 439

1  at it; but depth to groundwater at Moran was anywhere -- it's

2  as shallow as 9.9 to as deep as 13.45, right, from that?

3  A   Yes.

4  Q   Now, I would argue that that's consistent -- largely

5  consistent with what you found.  Would you agree?

6  A   Yes.

7  Q   There are times within -- seasonally, it can be shallow or

8  it can be deep; but if we kind of put the smear zone at 10 to

9  14, 11 to 14, somewhere in there for this site is probably

10 good size?

11 A   Probably; but again, that area that I'm talking about, 11

12 to 16, I don't believe we have 5-foot variation normally

13 across the site.

14 Q   I think what's more important to me is the top number,

15 just like your blood pressure.  I don't know which one we're

16 supposed to care about.  But 10 feet?  The start might be

17 10 feet, 11 feet?

18 A   I would think that's a little high.  I would tend to be

19 the 15, 16 feet when we were investigating.

20 Q   Well, we've got water at 9 feet on Moran.

21 A   In 2011.

22 Q   Right.  And your own report says 11 feet in the site

23 property.  Are you moving back from that today?

24 A   No, but I can see your point.

25 Q   Well, let's pull up 1107.  This is the Mundell baseline

*FERREE - CROSS/BOWMAN*               Vol. 2 - 440

1    report you talked about.  You referenced it.  You're glad you

2    have it.  Page 19, second full paragraph.

3           Depth to groundwater for Mr. Mundell is 11.82 to

4    15.42.  That's what he found, correct?

5    A    Correct.

6    Q    Any reason to dispute his data?

7    A    No.

8    Q    Let's keep the Mundell report up.

9           So you have reviewed the Mundell report; and you used

10   the data in your investigation to determine nature and extent,

11   correct?

12   A    Correct.

13   Q    On page 13 of 57, in the third full paragraph --

14          MR. BOWMAN:  Scroll up, Ms. Hill.  The third full

15   paragraph.

16   BY MR. BOWMAN:

17   Q    The boring locations --

18          MR. BOWMAN:  Scroll down, sorry.

19   BY MR. BOWMAN:

20   Q    "The boring locations were chosen based on potential for

21   soil and groundwater impacts based on a review of the

22   available historical documents which generated selected areas

23   of potential interest most likely to have impacts based on

24   historical operations."

25          Do you see that?

FERREE - CROSS/BOWMAN          Vol. 2 - 441

1   A    Yes.

2   Q    Then point 6, he referenced -- Mr. Mundell or the Mundell

3   individuals reference current and former plating areas.  Do

4   you see that?

5   A    Yes.

6   Q    As part of your investigation, did you attempt to

7   determine where within the Von Duprin facility painting or

8   plating may have occurred?

9   A    We utilized these documents that indicated where those

10  activities occurred.

11  Q    And did you take the boring locations that Mr. Mundell had

12  and match it up and feel comfortable that he had taken some

13  borings within that area of the former -- I apologize.  I

14  missed one.  No. 3 is the former parts washer area.  Do you

15  see No. 3?

16  A    Yes.

17  Q    Did you find in the location what you considered to be the

18  former parts washer area?

19  A    We tried to verify to the best of our ability that his

20  borings were in the right -- those parts of the buildings.

21  Q    And where is or was the former parts washing location

22  within Von Duprin?  Was it the southern part of the building?

23  A    I would have to look at a map, Glenn -- excuse me --

24  Mr. Bowman.

25  Q    Okay.  Here we go.  So let's look at page 39 of 57.

*FERREE - CROSS/BOWMAN*                    Vol. 2 - 442

1            We have already discovered, Mr. Ferree, that this is

2    one of the worst reports that we have available.  I have a

3    paper copy of this that I printed this morning in color.

4            MR. BOWMAN:  Can I hand this to him?

5            THE COURT:  You may.

6            And he means worse in terms of legibility.

7            MR. BOWMAN:  What did I say?

8            THE COURT:  One of the worst reports we've had.  One

9    of the worst reports we've had.  In legibility only.

10            MR. BOWMAN:  Thank you, Your Honor.  Keep me on my

11   toes.

12   BY MR. BOWMAN:

13   Q   We can start with this.  There was a soil boring 26, which

14   if we blow up, you'll see is there if you look to your left.

15   And I have --

16            MR. BOWMAN:  Can I approach again?

17            THE COURT:  Yes.

18   BY MR. BOWMAN:

19   Q   I marked it for you.  It's the best I can do.  I'll also

20   tell you I have this data that you tabulated if we need to get

21   it; but I believe what we've got is at 2 to 4 feet in the

22   Von Duprin property at this time, which is 2008, there was PCE

23   at 13.00 parts per million, correct?

24   A   Correct.

25   Q   And there was TCE at 2 to 4 feet on the former Von Duprin

*FERREE – CROSS/BOWMAN*          Vol. 2 - 443

1   of -- it's 14.8, and I'll confirm that.  Does that look like

2   an 8 to you?  I can confirm it for you.

3   A    Those seem familiar to me.

4   Q    Yeah, and that seems familiar.  So 14.8 PPM is actually --

5   and let's go to the legend at the bottom to confirm.   I

6   believe it says that "concentrations reported in MG per KG."

7   Do you see that?

8   A    Um-hum.  Yes.

9   Q    So that's parts per million?

10  A    Parts per million.

11  Q    And I want to change these into parts per billion because

12  that's what we tended to use in these reports.  So that's

13  14,800 parts per billion of TCE and 13,000 parts per billion

14  of PCE, correct?

15  A    Correct.

16          MR. BOWMAN:  Tanesa, can I have the document camera?

17  I'm going to do the best I can to write this.

18  BY MR. BOWMAN:

19  Q    So we have 14,800 PPB of TCE on Von Duprin at 2 to 4 feet.

20  So this is vadose zone, right?

21  A    Correct.

22  Q    Agree with me?

23          And we have 13,000 PPB of PCE 2 to 4 feet at

24  Von Duprin sampled in the vadose zone, correct?

25  A    Correct.

FERREE – CROSS/BOWMAN          Vol. 2 - 444

1  Q   We also know that this report is dated -- is it 2008?

2  A   December 29th, 2008.

3          MR. BOWMAN:  Okay.  Thank you.  We'll go back to the

4  other system.  Thank you.

5  BY MR. BOWMAN:

6  Q   At the time of this sampling, IDEM had a program called

7  the Risk Integrated Site Closure Program, correct?

8  A   Correct.

9  Q   And it was called RISC?

10 A   Correct.

11 Q   And within the RISC, they would set industrial and

12 residential default cleanup levels by media?

13 A   Correct.

14 Q   And so these numbers for PCE and TCE and soil are above

15 the numbers set by IDEM in RISC for industrial default cleanup

16 levels, correct?

17 A   Correct.

18         MR. BOWMAN:  Let's go to Exhibit 1115.

19 BY MR. BOWMAN:

20 Q   This is an August Mack report that I know you referenced

21 in your further -- I won't call it "further" -- your Final

22 Investigation Report of 2017.  I think you've already talked

23 about it already, and you've talked about the August Mack

24 wells.  So do you remember seeing this report?

25 A   Yes.

*FERREE - CROSS/BOWMAN*                Vol. 2 - 445

1  Q   If you look at the second page of the PDF, very early on

2  in the letter --

3           MR. BOWMAN:  Just scroll down a little bit,

4  Ms. Hill.

5  BY MR. BOWMAN:

6  Q   -- they say their purpose is to "evaluate soil conditions

7  within historic and current operational areas to identify

8  potential on-site sources," correct?

9  A   Correct.

10 Q   And they were also evaluating overall groundwater

11 conditions.  So that was a goal that they had, correct?

12 A   Correct.

13 Q   And you understood that from viewing the report?

14 A   Yes.

15 Q   So if we'll look at figure 10, which is 28 of 107, August

16 Mack had a result from boring 203.  You see 203.  You see

17 where 203 is there?

18           MR. BOWMAN:  Go down further a little bit.

19 BY MR. BOWMAN:

20 Q   Is 203 near where you recall the former parts

21 washing/painting area to be?

22 A   That area is -- that area is -- looks like it's closer to

23 the former plating area.

24 Q   And was the parts washing just a little bit north of

25 there, closer to 205?  I have a map from Mundell that I should

*FERREE - CROSS/BOWMAN*                 Vol. 2 - 446

1  have gone to, if you have that.  I can tell you're looking at

2  it.

3          MR. BOWMAN:  Go back to 1107.  I apologize.  I'm

4  going to go back to 1107.  Start scrolling up.  Scroll up.

5  There's a map in there -- there we go.  Zoom in on that.

6  BY MR. BOWMAN:

7  Q   Will you look at the screen?  We finally gave you what you

8  were looking for.

9          So there was a former painting and plating area.  Then

10 they have plating and finishing area above that.  Does that

11 confirm with what you recall were the areas that were

12 identified?

13 A   Correct.

14 Q   And former parts washers at the top right there?

15 A   Yes.

16 Q   Thank you.  We'll take that down.

17         So back to the August Mack report, so we've got -- the

18 dialogue box or the -- dialogue box -- the data box is off to

19 the left for soil boring 203.

20         MR. BOWMAN:  And if Ms. Hill can zoom into that.

21 BY MR. BOWMAN:

22 Q   Do you remember seeing this data?

23 A   Yes.

24 Q   Now, in this particular case, they show the soil at 0 to

25 2 feet in the sampling area under the floor of the former

*FERREE – CROSS/BOWMAN*                    Vol. 2 - 447

1   Von Duprin property, correct?

2   A   Yes.

3   Q   And in this case, at 0 to 2 feet in 2013, they had PCE at

4   45.1 PPM, correct?

5   A   Correct.

6   Q   That's 45,100 PPB, isn't it?

7   A   That is correct.

8   Q   And the TCE was 12.8 PPM, 12,800 PPB, correct?

9   A   Yes.

10          MR. BOWMAN:  If I can have the document camera,

11   please.

12   BY MR. BOWMAN:

13   Q   So at PCE we have 45 -- now, we have 45,100 PPB in PCE,

14   and we have 12,800 PPB in Von Duprin, right?

15   A   Yes.

16   Q   Let's finish that column so we can stop annoying the

17   Court.

18          When were those soils removed?

19   A   June of 2019.

20   Q   Okay.  Thank you.  We'll go back to the --

21          Now, let's look at Ertel and Zimmer, Exhibit 1130.

22   This is a Limited Subsurface Investigation Report, northern

23   portion of the former Ertel.

24          MR. BOWMAN:  If you'll scroll down, some, please.

25

1  BY MR. BOWMAN:

2  Q   It's QEPI from September of 2007.  Do you remember seeing

3  this?

4  A   I'm sure I looked at it, yes.

5  Q   This is part of the abundance I think is the term that's

6  been used -- abundance of data that we have for these sites?

7  A   Correct.  Yes.

8  Q   I would like to look at page 5 of 173, the last paragraph.

9        As you see there, it says, "Based on the results of

10 this subsurface investigation and review of previously

11 collected data, it appears impacted soils represent a

12 potential source of chemical impacts to groundwater at the

13 site and surrounding properties.  As a result, excavating

14 soils throughout the northern and southern portions of Ertel

15 facility, coupled with excavating a majority of the soil

16 located within the footprint of the main Zimmer building would

17 be necessary."

18        Did I read that relatively successfully?

19 A   Yes.

20 Q   Right.  And you're here for data, and I want to be very

21 clear about that.  But as you were gathering this data and saw

22 this, your understanding was the soil was taken out to get rid

23 of source, correct?

24 A   Yes.

25 Q   Taking out soils that are impacted takes out source?

*FERREE - CROSS/BOWMAN*                    Vol. 2 - 449

1   A   Correct.

2   Q   That's what was done at Von Duprin.

3        Okay.  So if we go to page 27 -- page 27 PDF, which is

4   figure 3, and it's SB274 way at the top.

5        Now, the Court's already heard this, but it's

6   important, that this is a boring pre-excavation, correct?

7   A   Correct.

8   Q   I think we'll look at some post-excavation samples where

9   the confirmatory samples actually represent the soils that

10  remain.  This is one that it's a result from pre-excavation

11  investigation, correct?

12  A   Yes.

13  Q   So SB274, QEPI put a boring in the ground in this area of

14  Ertel and 2 to 4 feet down.  Now, we're on PPB.  They got

15  40,000 of PCE tetra at 2 to 4 feet, correct?

16  A   Correct.

17  Q   Would you agree with me that 12 to 14 may very well be the

18  smear zone in that area?

19  A   I would think so, yes.

20        MR. BOWMAN:  I'll hold off so I don't have to bother

21  the Court.

22        Unfortunately, I need to bother the Court.

23  BY MR. BOWMAN:

24  Q   So on Ertel, we have 40,000 PPB in Ertel; and you would

25  agree with me that that 2 to 4 feet is vadose zone, correct?

FERREE - CROSS/BOWMAN              Vol. 2 - 450

1   A    Correct.

2   Q    And -- thank you -- this is a discovery in 2007, correct?

3   A    Yes.

4   Q    Is that your recollection?  It was around 2007 that

5   additional soil impacts were found at Ertel?

6   A    Yes, based on that report, yes.

7   Q    Thank you.  We'll go back to the -- so now we need

8   Exhibit 1101.

9         So now we're going to remove the soils.  We remove the

10  soils.  This is a Soil Remediation Completion Report, Former

11  Ertel, QEPI -- scroll down -- we've got a date.  May 29 of

12  2008, correct?

13  A    Yes.

14  Q    Do you remember looking at this?

15  A    Yes.

16         MR. BOWMAN:  Unfortunately, we need to get into this

17  a little bit.  We need to look at page 4 of the PDF, the third

18  paragraph, last sentence.

19  BY MR. BOWMAN:

20  Q    The purpose was to remediate impacts previously identified

21  during the subsurface investigation and remove potential

22  sources to groundwater impacts.  Do you see that?

23  A    Yes.

24  Q    Do you agree that that was what was done?

25  A    Yes.

*FERREE - CROSS/BOWMAN*                 Vol. 2 - 451

1  Q    If you then go to page 10 of the PDF and top of the page,

2  second sentence, what they designed was to remove impacted

3  soils throughout the nature to a maximum depth of 15 feet

4  below ground surface.

5        And then let's go on to the fifth full paragraph.

6  We've got to read this closely because I'll tell you, we're

7  figuring out -- I'll just tell you right now.  We're figuring

8  out where he took his side wall samples.  It's very

9  unfortunate.  He doesn't say that.

10       Excavation samples were collected at a rate of one

11 side wall sample collected at a distance of one-half the depth

12 of the excavation for every 20 lineal feet of excavation.  And

13 they took 101 side wall samples and then they took bottom

14 samples.

15       So we have them reported that they're going to try to

16 excavate to 15 feet, right?

17 A    Yes.

18 Q    Which you would agree is into the smear zone, groundwater

19 level?

20 A    Yes.

21 Q    And then about halfway down, they took their side wall

22 samples?

23 A    That's what it appears, yes.

24 Q    Have you ever engaged in this activity?  I believe the

25 QEPI side wall samples were at 7 feet.  Have you ever engaged

FERREE - CROSS/BOWMAN                Vol. 2 - 452

1   in this exercise before?

2   A   Yes, I have.

3   Q   Did I do it right?

4   A   Yes, you did.

5   Q   All right.  And I went to Indiana University.

6        So let's go to page -- page 28 is our results.  And at

7   the very top of the figure, we have ESW19; ESW19.  That is a

8   side wall sample that -- he doesn't say it, but I think it's

9   about 7 to 8 feet down; and there's still PCE on the former

10  Ertel at that site at 28,700, correct?

11  A   Yes.

12  Q   Okay.  Now, we'll get more of that.

13       So then let's go to page 31.  And off to the right, we

14  have side wall samples D, SW18 and 15.  18 way at the top

15  right, right here.  We've got trichlor, TCE at 5,270, right,

16  PPB, right there?  Do I need to zoom it more?

17  A   No, I can see it, at 18.

18  Q   And 15 was at 4,900.  See that?

19  A   Yes.

20  Q   So again, in '07, side wall samples, excavations occurred.

21  We still have impacts in this area of TCE above industrial

22  default cleanup levels by significant numbers, correct?

23  A   Correct.

24            MR. BOWMAN:  I'll need the camera then.

25

FERREE - CROSS/BOWMAN          Vol. 2 - 453

1  BY MR. BOWMAN:

2  Q   So yeah, this gives us the TCE numbers.  We've got -- we

3  had -- ESW19 had 28,700 PPB, right?

4  A   Yes.

5  Q   So this is 28,700 PPB, and our TCE numbers for Ertel were

6  5,270 and 4,900.  And these soils are removed in 2007,

7  correct?

8  A   I think so.  2008?

9  Q   Okay.  Let's put '8, and then we'll go back to the soil

10 report.  Let's go back to that soil report.  1101.  1101.

11        First page -- well, the side wall samples were

12 September 2007.  I'll leave it at '8.

13 A   Sorry about that.

14 Q   That's all right.

15        Now, let's look at Zimmer, Exhibit 1100.

16        This is a Limited Subsurface Investigation, QEPI, from

17 August 2007 for the former Zimmer Paper parcel.  Do you

18 remember seeing this?

19 A   Yes.

20 Q   Are you aware of the fact that --

21        MR. BOWMAN:  Well, let's look at page 12.  We're

22 here.  Let's do this.  Page 12 of the PDF, the bottom.

23 BY MR. BOWMAN:

24 Q   Again, QEPI is recommending soil excavation to remove

25 impacted soils to eliminate a potential source of impacts to

*FERREE - CROSS/BOWMAN*                    Vol. 2 - 454

1  groundwater, right?

2  A   Correct.

3  Q   If you go to 42 of the PDF, we have soil boring 115.  It's

4  near the bottom of the table, 2 to 4 feet.  We'll zoom this as

5  best as we can.

6            MR. BOWMAN:  Zoom into 115.

7  BY MR. BOWMAN:

8  Q   If you look at this, do you remember seeing at -- an

9  82,900 PPB for TCE on that property?

10 A   Yes.

11 Q   Do you recall that?

12 A   Yes.

13 Q   Okay.  It's 12,000 -- if you go over a little bit, it's

14 12,000 for PCE.  PCE is reported first -- or excuse me.  Yeah,

15 PCE is reported first, the 12,000.  And then 82,900 TCE;

16 12,000 PCE, correct?

17 A   Correct.

18 Q   At 114 -- soil boring 114, there's actually 66,200 of PPB

19 for -- in PPB for TCE, correct?

20 A   Correct.

21            MR. BOWMAN:  Let's open up Exhibit 1094.

22 BY MR. BOWMAN:

23 Q   This is a QEPI underground storage tank report from

24 December of 2007.  Do you remember seeing that?

25 A   Yes.

FERREE - CROSS/BOWMAN          Vol. 2 - 455

1  Q   Do you remember that as part of the removal of the

2  underground storage tank, they actually removed soils in

3  addition to that?

4  A   Apparently, yes.

5  Q   Apparently, yes.  It's not the greatest report.  They

6  removed some soils.

7        So we get these figures on our board then.

8        So we're on Zimmer.  We actually had 82,900 PPB for

9  TCE there.  We also had a 66,200 hit, correct?

10 A   Correct.

11 Q   And then we had a 14 -- we had a 14,400 of PCE, correct?

12 A   Yes.

13 Q   And we have discovery in around 2007?

14 A   Correct.

15 Q   And removal in 2007, correct?

16 A   Correct.

17        MR. BOWMAN:  All right.  Now, let's look at Moran.

18 We need 1093, 1093.  This is a Soil Remediation Completion

19 Report.  If you'll give us the full picture so he can see it.

20 BY MR. BOWMAN:

21 Q   At this time, it's Heartland.  QEPI transitioned to

22 Heartland, correct?

23 A   I believe so.

24 Q   It's January of 2012?

25 A   Yes.

*FERREE - CROSS/BOWMAN*                    Vol. 2 - 456

1  Q   And do you remember seeing this report and using this

2  data?

3  A   Yes.

4  Q   On page 6 of this PDF, Mr. Vijay -- I'm sorry.

5          MR. BOWMAN:  We need to go to page 5.  Page 5 of the

6  PDF, third full paragraph.

7  BY MR. BOWMAN:

8  Q   He says subsurface investigations occurred in December of

9  2010 and May of 2011 that confirmed these impacts and the

10 need -- and the need for excavation, correct?  He says --

11 A   Correct.

12 Q   "Subsurface investigations discovered December 2020 [sic]

13 and May 2011 resulted in advance" -- oh, I'm sorry.

14 "Assessment activities conducted by Heartland December 2010 to

15 May 2011, it was confirmed that" --

16 A   I see that.

17 Q   So that's our date of discovery, 2010, agree?

18 A   Sure.

19 Q   Well, do you agree?

20 A   Yes.  I'm sorry.

21 Q   So let's go to 22 --

22         Well, before we do that, I believe that Mr. Vijay and

23 Heartland followed the same sampling protocols on side wall

24 and bottom in this report, that they're around 7 to 8 feet.

25 Do you want to see that language?  I have it.

*FERREE − CROSS/BOWMAN*          Vol. 2 − 457

1  A   If you have it, I would like to see that, Glenn.   Excuse

2  me.   Mr. Bowman.

3  Q   Page 6 of 27.   Six of 27 at the top, he talks about the

4  bottom samples at 15 feet?

5  A   Um-hum.   Yes, I see that.

6  Q   And then 10 of 27 -- page 10 of 27, second full paragraph.

7  That's that language where he talks about 20 lineal feet

8  collected halfway down?

9  A   So the math still works.

10  Q   We think these are samples 7 to 8 feet in the vadose zone.

11  They're comparable to what we've brought out so far?

12  A   Correct.

13  Q   Let's look at 22 of 27 for our results.   You know there

14  was an excavation area on Moran?

15  A   Yes.

16  Q   And you've looked at that before.   And we have bottom

17  samples, but we have side wall samples; and what I did looking

18  on figures 22 and then 26 --

19         MR. BOWMAN:   Scroll to the next page.   Scroll to the

20  next page.   Yeah, we've got different numbers, but scroll back

21  to 22 and zoom in.

22  BY MR. BOWMAN:

23  Q   I tried to find the highest side wall sample that I could.

24  On this page, I see trichlor at 146 over -- the SW side wall

25  24.

*FERREE - CROSS/BOWMAN*                    Vol. 2 - 458

1   A   146, yes.

2   Q   Yes, 146.

3        That's not PPM.  That's PPB, right?

4   A   If I could see the legend.

5   Q   Parts per billion?

6   A   Thank you.  Yes.

7   Q   So it's 146 when they excavated at Moran, correct, in PCE,

8   right?

9   A   TCE.  That's 146 parts per billion.

10  Q   In TCE.  There's my chart.

11       MR. BOWMAN:  Go to page 26.

12  BY MR. BOWMAN:

13  Q   I'm trying to find the highest number.  So that's the

14  actual table.  SW1 -- that's kind of hard to read.  SW1, side

15  wall 1, if you look at that, I found a PCE number of 16

16  point -- or tri number of -- tetra of 16.8.  Do you see that?

17  Do we need to zoom in more?

18  A   I can see that.

19  Q   Trying to find the worst number in shallow soil on each

20  site, I actually found a 23.9 of PCE in 2 to 4 feet.  Let's

21  get rid of that.  I found 146 side wall.  I found a 23.9 PCE.

22  The problem with the PCE numbers, they're low enough, he

23  reports them on a table rather than a figure.

24       We've got discovery in 2010 and removal in 2011,

25  correct?

FERREE – CROSS/BOWMAN              Vol. 2 - 459

1  A   Yes.

2  Q   Are these numbers consistent with your investigation

3  results of highest levels of PCE and TCE in vadose zone across

4  these four sites?

5  A   Across the four sites, but I'm not sure you wrote down the

6  highest number for TCE on the Moran property.

7  Q   In vadose zone?

8  A   In vadose zone.

9  Q   What sample are you thinking about that would be 10 feet

10 or above?

11 A   There was a side wall sample.  I need to go back to your

12 one figure.

13 Q   Okay.  We need -- do you have the figure?  It's soil

14 removal, 1112 -- no, I'm sorry.  So it's 1093, page 22 -- oh,

15 we need the -- so we need Exhibit 1093.

16        So the numbers that are highlighted are bottom

17 samples, correct?

18 A   That is correct.

19 Q   So again, you would agree with me that if you look at the

20 shallow soil samples in Moran, you're looking at two -- at

21 least two times order of magnitude higher shallow soil

22 impacts, whether you're looking at Zimmer or Ertel or

23 Von Duprin, correct?

24 A   Comparative, yes.

25        MR. BOWMAN:  Exhibit 1120.

*FERREE – CROSS/BOWMAN*                    Vol. 2 - 460

1  BY MR. BOWMAN:

2  Q   This is your report --

3            MR. BOWMAN:  Go to the first page, please.

4  BY MR. BOWMAN:

5  Q   This is the Geosyntec Technical Memorandum Groundwater and

6  Soil Gas Investigation Report from June 18, 2015?

7  A   Yes.

8  Q   This is your report?

9  A   Yes.

10 Q   If you go to figure 6, which is 27, I believe you talked

11 about this.  This is profiling of the water column, correct?

12 A   Correct.

13 Q   Okay.  So HPTO6 is right at the southern boundary of the

14 former Von Duprin property; correct?

15 A   Correct.

16 Q   And at 17 feet -- this is in 2017 -- or 2015, correct?

17 A   Yes.

18 Q   2015.  There is TCE 17 feet below ground there at 5,450

19 parts per billion?

20 A   Yes.

21 Q   There is still PCE at 2,340 at 22 feet down, correct?

22 A   Correct.

23 Q   If you scroll up then, I would note that if you look at

24 HPT08 at 16 feet, there's nondetect for PCE and TCE.  Would

25 you agree that that was your result?

*FERREE - CROSS/BOWMAN*          Vol. 2 - 461

1   A   Yes.

2   Q   That's direct.  So now I'm going to get through cross, and

3   I'm going to get done.

4       We need some clarification on damages.  Residential VI

5   is $465,000 from your calculation?

6   A   Yes.

7   Q   Off-site investigation is a total of 1.7 million?

8   A   Yes.

9   Q   That includes bench and pilot tests of 365,000?

10  A   Correct.

11  Q   120,000 for VI for JTV Hill?

12  A   Correct.

13  Q   And then other off-site was 1,315,000?

14  A   No, those were lumped together.  770 was the off-site --

15  I'm sorry -- excuse me.  750 -- $750,000.  And then

16  residential was 465,000 for residential VI.

17  Q   And then JTV Hill at 120?

18  A   120,000, yes.

19  Q   Well, I don't do great math because I did go to IU, but I

20  get about 1.2, 1.3 for that.  When I add 750 -- it's not 1.7.

21      Anyway, those are your numbers.  750, 465 and 120?

22  A   But --

23      MR. GRIGGS:  Objection, Your Honor.  He specifically

24  mentioned a moment ago the 365, and then he left it out of the

25  computation.

1          THE COURT:  Could you check your computation?

2   BY MR. BOWMAN:

3   Q    Bench test of 365 -- or 120; and then you're saying of the

4   1.3 million, that is actually broken into --

5   A    Off-site, 770.

6   Q    I see.  Okay.  Now, I do understand.

7          In your work as an environmental consultant in the

8   state of Indiana, you do acknowledge that reports relating to

9   the Von Duprin site as well as any of these sites that are

10  filed with IDEM are available -- the reports and the data are

11  available through IDEM's Virtual File Cabinet, correct?

12  A    Yes.

13  Q    Including the Mundell and August Mack report, correct?

14  A    Yes.

15  Q    Did Von Duprin write down any invoice that was submitted

16  by Geosyntec to Von Duprin?

17  A    Excuse me?

18  Q    Did they write it down?  That's a bad term.

19         Did they dispute any invoice that was submitted to

20  Von Duprin?

21  A    Not that I'm aware of.

22  Q    You talked about the benefit of the Mundell and August

23  Mack wells, but I just want to be clear.  You have no idea

24  what was charged for installation of those wells, correct?

25  A    Yes.

*FERREE – CROSS/KRAHULIK*          Vol. 2 - 463

1   Q   I noticed in some of the invoices your rate -- your

2   individual rate for -- that you charged Von Duprin is $213 an

3   hour?

4   A   Yes.

5   Q   Is that your current rate?

6   A   No.

7   Q   What's your current rate?

8   A   I believe it's 218.

9   Q   And what are you charging to be here today?

10  A   While I'm sitting here, it's double that rate.

11  Q   Double.  So 450 because I'm so mean.  It's 450 per hour

12  for today?

13  A   Thank you.

14  Q   Is it?

15  A   436.

16          MR. BOWMAN:  Thank you very much.  Appreciate your

17  time.

18          THE WITNESS:  Thank you.

19          THE COURT:  All right.  Ms. Krahulik.

20                    **CROSS-EXAMINATION**

21  BY MS. KRAHULIK:

22  Q   You're really going to like me because I'm going to be

23  very brief.

24          MS. KRAHULIK:  Can you pull back up Exhibit 1002 and

25  in particular, that page that had the contour lines?  I didn't

*FERREE – CROSS/KRAHULIK*          Vol. 2 – 464

1  write down the page number, sorry.

2          THE COURT:  Does someone remember the page number?

3          MS. KRAHULIK:  Try 128, please.

4  BY MS. KRAHULIK:

5  Q   Mr. Ferree, we were talking earlier about this figure that

6  represents the, quote-unquote, plume area, right?

7  A   Correct.

8  Q   It's not a representation of groundwater impacts.  Rather,

9  it is a representation of the line of risk for vapor intrusion

10 to structures, right?

11 A   From groundwater.

12 Q   From groundwater.  So it's actually depicting the area

13 that it's believed soil gas impacts would be detected?

14 A   Correct.

15 Q   You also talked a little bit earlier about how this was

16 created.  You talked about a program called Surfer that you

17 use; and of course, Surfer and it's -- the lines that it draws

18 here are dependent on the input.  So it's intuitive, but it

19 depends on the quality of the data that's inserted?

20 A   The amount of data, yes.

21 Q   We also talked about the vapor intrusion testing

22 mitigation and other activities that Geosyntec has performed

23 on behalf of Von Duprin at JTV Hill and at the residences,

24 right?

25 A   Yes.

*FERREE – REDIRECT/GRIGGS*          Vol. 2 - 465

1  Q   You mentioned there was no cost to the homeowners to do

2  that and that Von Duprin funded that work, correct?

3  A   Correct.

4  Q   And you know that Major Tool and Machine has agreed to

5  fund some of that work as well recently?

6  A   Yes.

7  Q   Von Duprin didn't agree to fund that work just out of

8  charity or goodness.  It's because it was required to do so

9  under an agreement with IDEM, right?

10 A   Yes.

11          MS. KRAHULIK:  That's all I have.  Thank you.

12          THE COURT:  That was brief.

13          Do you have any redirect or recross on the direct?

14          MR. GRIGGS:  I think I can be even briefer than

15 Ms. Krahulik.

16          Exhibit 1093, please.  And page 22.

17          THE COURT:  Mr. Griggs, go get your microphone.

18 Thank you.

19          MR. GRIGGS:  Are we still on the document viewer?

20                    **REDIRECT EXAMINATION**

21 BY MR. GRIGGS:

22 Q   Mr. Ferree, my question here is related to the data

23 reflected on this figure.

24          THE COURT:  What number is that, counsel?

25          MR. GRIGGS:  Figure 5B.

1          THE COURT:  On Exhibit 1093?

2          MR. GRIGGS:  On 1093, correct.

3   BY MR. GRIGGS:

4   Q   And there are results for BOT2, BOT4 and BOT6; and those

5   are what are in this part considered bottom samples, correct?

6   A   Correct.

7   Q   And the depth at which those samples were taken is

8   indicated in the text of the report as 14 or 15 feet?

9   A   Correct.

10  Q   Are these soil samples or are these water samples?

11  A   Those are soil samples.

12  Q   Is there any indication that you remember in this report

13  of those samples being saturated?

14  A   There was no discussion of that in the report.

15  Q   Would there have been discussion if these samples had been

16  taken out of a saturated soil condition?

17         MR. BOWMAN:  Objection.  Calls for speculation.

18  BY MR. GRIGGS:

19  Q   In your experience.

20         THE COURT:  Okay.  You were going to rephrase it.

21  Go ahead.

22  BY MR. GRIGGS:

23  Q   In your experience, if you encounter saturated conditions,

24  do you include that in the report?

25  A   Yes.  If I had excavated this and encountered the water

*FERREE – RECROSS/BOWMAN*          Vol. 2 - 467

1  table, I would have indicated somewhere on the figure that

2  surface of the groundwater had been exposed; and I would not

3  have collected a soil sample from that area.

4          MR. GRIGGS:  Thank you.

5          THE COURT:  Mr. Bowman, do you have any questions on

6  those?

7          MR. BOWMAN:  Yes, if we can go to that same report.

8  page 6 of the PDF.  Very top.

9                    **RECROSS-EXAMINATION**

10 BY MR. BOWMAN:

11 Q   It says, "Furthermore, soil bottom confirmation samples

12 were collected from a depth of 15 feet below ground surface

13 located at the groundwater saturated zone," correct?

14 A   That's what it says.

15 Q   So that's what happened here.  The bottom samples are in

16 the saturated zone.  That's what it says?

17 A   That's what it says.

18          MR. BOWMAN:  Thank you.

19          THE COURT:  Ms. Krahulik, do you have any questions

20 on those?

21          MS. KRAHULIK:  I do not.  Thank you.

22          THE COURT:  Thank you very much.  You may be

23 excused.

24          THE WITNESS:  Thank you, ma'am.

25     *(Witness excused.)*

Vol. 2 - 468

1          THE COURT:  Mr. Griggs, can you call another

2   witness?

3          MS. FRENCH:  Yes, Your Honor.  Von Duprin calls Ryan

4   Fimmen.

5          Mr. Fimmen, if you would come right up here.  You're

6   Dr. Fimmen, right?

7          THE WITNESS:  Ryan's fine.

8          THE COURT:  I see a Ph.D. on there.

9      *(Witness sworn.)*

10         THE COURT:  You may have a seat.

11         MS. FRENCH:  Good afternoon.

12         **RYAN FIMMEN, PLAINTIFF'S WITNESS, SWORN**

13              **DIRECT EXAMINATION**

14  BY MS. FRENCH:

15  Q   Please state your full name for the record.

16  A   Ryan Lee Fimmen.

17  Q   Who is your current employer?

18  A   Geosyntec Consultants.

19  Q   What's your current position or title with Geosyntec?

20  A   I'm principal scientist and department manager.

21  Q   What job responsibilities do you have in those roles?

22  A   I help conduct site investigation work, feasibility

23  studies, remedial investigations --

24         COURT REPORTER:  Excuse me.  Please slow down.

25         THE WITNESS:  Feasibility studies, investigations

FIMMEN - DIRECT/FRENCH            Vol. 2 - 469

1    into remedial technologies for the remediation of contaminated

2    soils and groundwater, implementing bench scale and field

3    scale studies for the implementation and evaluation of those

4    technologies.

5    BY MS. FRENCH:

6    Q    What professional licenses do you hold?

7    A    In the state of Ohio, I'm a certified professional, which

8    allows me to conduct voluntary remediation programs through

9    their voluntary program, which requires a license in the state

10   of Ohio.

11   Q    Does that require a license in the state of Indiana?

12   A    No, it does not.

13   Q    How long have you been working in the environmental

14   consulting field?

15   A    I've been consulting for a little over eleven years now.

16   Before that, I was a post-doctoral research fellow at The Ohio

17   State University.

18   Q    What's your educational background?

19   A    I have a bachelor in arts from Carleton College in

20   chemistry.  I have a master of science in chemistry from the

21   University of Wisconsin Madison, and I have a Ph.D. in

22   geochemistry from Duke University.

23   Q    I'm going to remind you again for the benefit of the court

24   reporter to make sure you slow down just a tick.

25   A    Thank you very much.

FIMMEN - DIRECT/FRENCH          Vol. 2 - 470

1  Q   Are you familiar with the plume area in which the

2  Von Duprin property is situated?

3  A   I am.

4          MS. FRENCH:  Could we pull up Exhibit 1001, please.

5  BY MS. FRENCH:

6  Q   Have you been involved in environmental consulting work in

7  that plume area that's displayed on Exhibit 1001?

8  A   Yes, I have.

9  Q   And what work have you been involved in?

10 A   Several phases and aspects of the work broadly

11 encompassing vapor intrusion screening and solution of

12 mitigation systems where appropriate, and investigation

13 delineation of soil and groundwater impacts.

14 Q   Have you engaged in investigative work at all of the

15 properties which are highlighted on 1001?

16 A   Yes, I have.

17 Q   How long have you been working at this particular site?

18 A   We began our work in late July of 2014.

19 Q   And does this particular site consume a lot of your time?

20 A   It has, yes.

21 Q   What are the contaminants of concern at the plume area?

22 A   The contaminants of concern in the plume area fall into

23 the category of chlorinated volatile organics or CVOCs and

24 specifically, perchloroethylene or PCE; trichloroethylene,

25 TCE; cis-1,2-dichloroethylene or cis-DCE and vinyl chloride.

1  Q   What documentation have you prepared concerning the work
2  you performed in the plume area?
3  A   We've prepared technical reports and submitted them to
4  IDEM, describing each phase and progression of the
5  investigative work that we've done.
6  Q   How often did you submit these technical reports to IDEM?
7  A   Fairly regularly.  We submitted technical reports at the
8  conclusion of each investigative round of work, either the
9  vapor intrusion work, the groundwater or soil investigative
10  work; and through that process, we're also submitting more
11  informal e-mail updates specifically about the vapor intrusion
12  work.
13  Q   What were some of the key reports from your perspective
14  that were submitted to IDEM?
15  A   The first scope of work was to do the residential vapor
16  intrusion screening and installation of systems along Yandes
17  that began late -- like I said, late July of 2014.  We
18  submitted a summary report in November of 2014 describing that
19  work and describing the community outreach efforts that we
20  made and the installation of four vapor intrusion mitigation
21  systems.
22          Following that, in I think it was January of 2015 or
23  February of 2015, we submitted a preferential pathways
24  investigation; and then in October of 2015, November of 2015,
25  we submitted a report describing the results of the upgradient

FIMMEN - DIRECT/FRENCH          Vol. 2 - 472

1  investigation as well as interim measures for vapor intrusion

2  mitigation that we conducted at the former Von Duprin

3  property.

4      Then in 2016, we submitted an additional downgradient

5  delineation report that covered a vapor intrusion assessment

6  downgradient of the former Von Duprin property.

7      MS. FRENCH:  Just for the benefit of the Court, so

8  it's a little bit easier to identify some of these reports in

9  our voluminous joint exhibits, Dave, could you bring up

10  Exhibit 1077, please.

11  BY MS. FRENCH:

12  Q   I believe you mentioned the preferential pathway work may

13  have been done in January.  It looks like this is a work plan,

14  Exhibit 1077, from February 2015.  Is that timing consistent

15  with your recollection?

16      THE COURT:  Can you make it bigger for him?

17  A   Yes.  The work plan for that was submitted in February of

18  2015.  That's correct.

19      MS. FRENCH:  We'll pull up Exhibit 1120.  Dave,

20  could you enlarge the memo block there?  Thank you.

21  BY MS. FRENCH:

22  Q   Is this technical memorandum, Exhibit 1120, the report

23  regarding the preferential pathways investigation that

24  Geosyntec performed?

25  A   Yes, that's correct.

FIMMEN - DIRECT/FRENCH          Vol. 2 - 473

1  Q   Could you briefly kind of explain what work went into that

2  particular piece of the work?

3  A   Yes, absolutely.

4        So on the heels of our initial round of vapor

5  intrusion investigation at not just the residences along

6  Yandes but also the former Von Duprin property, IDEM raised

7  the question --

8        COURT REPORTER:  I'm sorry.  Could you please slow

9  down?

10       THE WITNESS:  I apologize.

11       Following the vapor intrusion investigation work

12  along Yandes, as well as on the property -- the former

13  Von Duprin property, IDEM suggested that the subsurface

14  utility corridors could be behaving as preferential pathways,

15  essentially facilitating the upward migration of vapors

16  through the subsurface and into anterior spaces where they

17  could represent an inhalation hazard.  We undertook this

18  investigation to see if the subsurface utility corridors were

19  indeed facilitating vapor transport.

20  BY MS. FRENCH:

21  Q   And did you find that they were?

22  A   No, they were not.

23       MS. FRENCH:  Next we'll go to Exhibit 1073.

24  BY MS. FRENCH:

25  Q   I believe this is the Upgradient Delineation Investigation

FIMMEN - DIRECT/FRENCH          Vol. 2 - 474

1  Report from the fall of 2015.  Could you briefly explain the

2  upgradient delineation work in which you were personally

3  involved?

4  A   Yes.  We undertook an effort to investigate the presence

5  or absence of CVOCs in the parcels upgradient or to the east

6  of Dr. AJ Brown.

7  Q   And what were the key findings from that investigation?

8  A   We identified the presence of chlorinated volatile organic

9  compounds in the soils and groundwater and the parcels

10 upgradient of the former Von Duprin property.

11          MS. FRENCH:  Next we'll go to Exhibit 1207.

12 BY MS. FRENCH:

13 Q   This is dated November 2015, I believe; and it is an

14 interim vapor intrusion measures report.  Could you briefly

15 explain the work that was associated with this particular

16 report to IDEM?

17 A   Yes.  We evaluated -- I mean we screened for vapor

18 intrusion pathway completeness at the former Von Duprin

19 property in a winter and heating season, sampling events; and

20 we identified one location where the concentration of TCE was

21 above the commercial industrial standard; and we also

22 identified there were potential weaknesses when the slab that

23 couldn't protect the interior spaces from upward migration of

24 vapors.

25          Our interim measures were an effort to seal cracks in

1  the floor and eliminate other weaknesses in the slab that can

2  represent preferential pathways into the interior space of the

3  building, and this report documents those efforts.

4          MS. FRENCH:  Exhibit 1009.

5  BY MS. FRENCH:

6  Q    This, I think, is a second report on interim measures

7  taken at the Von Duprin property; but could you briefly

8  explain the investigative work that was a part of this?

9  A    Yes, building on the first round of interim measures,

10  implementation where we identified what could have been

11  additional let's just say features in the slab that were

12  present that wouldn't prevent the vapors from migrating from

13  beneath the slab into the interior structures, such as

14  improperly sealed monitoring well casings and floating blocks

15  for vibration dampeners for pieces of machinery that were no

16  longer present, but clearly had at one point in time been

17  there.

18  Q    I think I skipped over some work that was happening in the

19  same time as you were doing those interim vapor intrusion

20  measures.  Exhibit 1024.

21  A    Okay.

22  Q    I believe these are sampling results you may have

23  referenced related to JTV Hill.  Could you briefly explain

24  that work?

25  A    Yes.  In between the former Von Duprin property and the

1  affected residences on Yandes is JTV Hill Park, and within JTV

2  Hill Park is a recreational facility.  Being -- overlying part

3  of the commingled plume, we decided that it would be prudent

4  to evaluate the completeness of the vapor intrusion pathway

5  within the structure as well.  I believe this letter to

6  Ms. Elaine Dillahunt, the interim director of Indy Parks,

7  documents our efforts at evaluating that pathway completeness.

8        MS. FRENCH:  Exhibit 1074.

9  BY MR. BOWMAN:

10 Q   I think this is as far as you had gotten in your answer,

11 but this is the additional downgradient investigation report.

12 Could you explain what areas you were investigating and what

13 went into this report?

14 A   Absolutely.  This work was predicated upon our

15 residential -- our efforts to screen residences along Yandes

16 downgradient of the former Von Duprin property for the

17 completeness of the vapor intrusion pathway.

18        Unfortunately, we weren't able to get access to all of

19 the homes in what we identified as the potential affected area

20 in order to evaluate if there might be vapor intrusion.

21        Since we couldn't get access to the indoor spaces, we

22 conducted a groundwater study in the most shallow part of the

23 groundwater as well as soil gas probes downgradient of the

24 former Von Duprin property and along these residences on the

25 public right-of-ways where we could get access.

FIMMEN - DIRECT/FRENCH          Vol. 2 - 477

1        So essentially, this was a delineation of the nature

2   and extent of shallow groundwater impacts and soil vapor

3   downgradient of the former Von Duprin property.

4   Q   Was there an additional addendum associated with this

5   report, which is represented in Exhibit 1121?

6   A   Yes, that's correct.

7   Q   And these homes that you're referencing in Exhibit 1074

8   and 1121 are in addition to homes that you worked on when you

9   first arrived at the Von Duprin site in 2014, correct?

10  A   That's correct.

11        MS. FRENCH:   We'll show Exhibit 1026.

12  BY MS. FRENCH:

13  Q   I believe we've covered the JTV Hill work in some detail

14  today, so could you just briefly explain your personal

15  involvement in the installation of a subslab depressurization

16  system as reported in Exhibit 1026?

17  A   Yes.   In my role as project manager, I oversaw the design

18  and implementation and subsequent sampling -- confirmatory

19  sampling for the subslab depressurization system, which

20  represents an engineered control on the vapor intrusion

21  pathway at the recreational center.

22  Q   Are you familiar with Von Duprin's Final Investigation

23  Report?

24  A   Yes, I am.

25  Q   And what was your involvement in the preparation of that

FIMMEN - DIRECT/FRENCH          Vol. 2 - 478

1   report?

2   A   As the project manager, I was the primary author of that

3   report.

4           MS. FRENCH:  Mr. Bartholomew, if you could bring up

5   Exhibit 1002.

6   BY MS. FRENCH:

7   Q   Is this exhibit a copy of the Final Investigation Report,

8   exclusive of figures and tables?

9   A   Yes.

10  Q   When did you prepare the Final Investigation Report?

11  A   We began preparation of the Final Investigation Report

12  shortly after the VRA -- the Voluntary Remediation Agreement

13  was signed, which I believe was approximately December of

14  2016; and we submitted the final version, which appears here

15  in this exhibit, July of 2017.

16  Q   And how is the timing of the Voluntary Remediation

17  Agreement relevant to the creation of the Final Investigation

18  Report?

19  A   The Final Investigation Report is required as part of

20  scope B under Section A of the Voluntary Remediation

21  Agreement.

22          MS. FRENCH:  Could we show Exhibit 1012 at page 12.

23  And if you could enlarge task B.

24  BY MS. FRENCH:

25  Q   Is this the Final Investigation Report requirement you

1  just referenced?

2  A   Yes, that's correct.

3  Q   Did Von Duprin submit the Final Investigation Report to

4  IDEM pursuant to its Voluntary Remediation Agreement?

5  A   Yes.

6  Q   And what information generally is reported in

7  Exhibit 1002, the Final Investigation Report?

8  A   The nature and extent of impacts to affected media, in

9  this case, soil, groundwater, soil gas, and the vapor

10  intrusion screening assessments.

11  Q   What data is included in that Final Investigation Report?

12  A   The data of the concentration of CVOCs in soil, CVOCs in

13  groundwater, CVOCs in soil gas, CVOCs in residential spaces,

14  including subslab samples from beneath basements -- inside

15  basements, homes.

16  Q   When you say CVOCs, we use that interchangeably with

17  chlorinated solvents, correct?

18  A   That's correct.

19  Q   When you discuss the different types of data just now that

20  are included in the Final Investigation Report, are the types

21  of data only Geosyntec's data or are you using additional data

22  to compile the report?

23  A   Additional data.

24  Q   What particular sections of the Final Investigation Report

25  were you most involved in?

FIMMEN - DIRECT/FRENCH          Vol. 2 - 480

1  A    Sections 4 through 7.

2  Q    What's reported in Section 4 of the Final Investigation

3  Report?  We'll bring up Exhibit 1002, page 23.

4  A    Section 4 describes the approach that we took, the

5  methods, essentially, for how we obtained the data.

6  Q    And what did your investigation activities as reported in

7  Section 4 reveal, in broad terms?

8  A    What's revealed in Section 4 is the approaches that we

9  took for obtaining the data, the approaches that we used for

10 obtaining soil samples, groundwater samples, soil gas samples,

11 et cetera.

12 Q    Does Section 4 also report concentrations of chlorinated

13 solvents in certain media?

14 A    I don't believe so.

15        MS. FRENCH:  We'll advance to the next page of

16 Section 4.  Next page.

17 BY MS. FRENCH:

18 Q    Are your results reported in Section 5 of the report?

19 A    Yes, that's correct.

20 Q    We'll go to Section 5.

21        And what specific information do you report in

22 Section 5?

23 A    The data that were collected from the activities that are

24 described in Section 4.

25 Q    And are there sort of categories of that data or is it

FIMMEN - DIRECT/FRENCH                 Vol. 2 - 481

1   just a dump of lots of data?

2   A   No.  We try to organize it to facilitate review and

3   understanding of the work that we did.

4   Q   Could you describe what those categories are?

5   A   Yes.  So we organize it first by affected media.  So the

6   soil, I believe, is what we describe first; and once we

7   describe the data that were collected for the soil, then we

8   describe the groundwater; and then after the groundwater, we

9   describe the vapor intrusion data.

10  Q   And is the soil and what the site looks like in terms of

11  media something you always investigate as part of this type of

12  report?

13  A   Generally speaking, yes.

14  Q   What geological data in the plume area was important to

15  report to IDEM in this Final Investigation Report?

16  A   The geologic data had a lot to do with the soil type,

17  texture.  The depth to water is a very important one, just the

18  fundamental geologic features such as that.

19  Q   What is the depth to groundwater in the plume area,

20  generally?

21  A   Generally, 10 to 14 feet below ground surface.

22  Q   Is there a particular direction of the flow that you see

23  in the data?

24  A   Yes.  Groundwater flow in this area flows from the

25  northeast to the southwest.

FIMMEN - DIRECT/FRENCH                Vol. 2 - 482

1  Q   What concentrations of chlorinated solvents did you report

2  in Section 5 of the Final Investigation Report?

3  A   We reported concentrations in the affected media;

4  specifically, the soils and the groundwater and the vapor

5  intrusion data.

6  Q   And is that data reported in figure 22 of the Final

7  Investigation Report?

8           MS. FRENCH:  We'll go to 1002, 137.

9  BY MS. FRENCH:

10 Q   Is that the figure in the report which reports the

11 upgradient data related to chlorinated solvent concentrations

12 in groundwater?

13 A   Groundwater, yes.

14 Q   How did these concentrations relate to the IDEM screening

15 levels for TCE?

16 A   They exceed, I believe, all IDEM screening levels.

17 Q   Did Geosyntec undertake any further investigations

18 following the Final Investigation Report?

19 A   Yes, we have.

20 Q   And what are those investigations?

21 A   We continued our investigations with respect to

22 residential vapor intrusion.  They continue today.  They're

23 ongoing.

24          Furthermore, we conducted a soil -- soil vapor as well

25 as groundwater investigation along Alvord in early 2018.

FIMMEN - DIRECT/FRENCH          Vol. 2 - 483

1  Q    You've mentioned sort of interchangeably vapor intrusion

2  and soil gas investigation.  How did those two data points

3  relate to one another in your work?

4  A    That's a great question.  In order to understand if vapor

5  intrusion is a complete pathway, we take a look at the

6  affected media, the source of the vapor intrusion, which is

7  the shallow groundwater and the concentration of the soil

8  vapor above the groundwater, which is in the soil gas.

9          And then the next step is then the -- the vapors

10  entering into breathing spaces, whether it be basements or

11  crawl spaces or homes.  And so soil gas is just one link in

12  the chain that forms the vapor intrusion pathway.

13  Q    And is that investigation of the links in the chain

14  something that's reported in the Final Investigation Report?

15  A    Yes.

16  Q    Is that done through a conceptual site model?

17  A    Yes, that's correct.

18  Q    What is a conceptual site model or CSM?

19  A    A conceptual site model is a description of the

20  characteristics of a site that inform the audience of the

21  document the presence of impacted media -- that would be soil

22  or groundwater -- the nature and extent of that impact, and

23  potential transport pathways by which sensitive receptors

24  could come in contact with that impacted media.

25          Broadly speaking, sensitive receptors can be

FIMMEN - DIRECT/FRENCH          Vol. 2 - 484

1  ecological or human.  In this case, we're talking about human

2  receptors.

3  Q    Does IDEM define what goes into a conceptual site model?

4  A    Yes, they do.

5  Q    Is the conceptual site model required as a component of

6  the Voluntary Remediation Agreement?

7  A    Yes, it is.

8  Q    Has IDEM approved Geosyntec's conceptual site model that

9  was developed in the Final Investigation Report?

10  A    Yes, they have.

11  Q    What work did you do to prepare the conceptual site model

12  for the plume area at the site?

13  A    We synthesized the data that are described in the various

14  reports we have seen here today into a depiction of the

15  overall site that encompasses the upgradient properties, the

16  former Von Duprin properties, and the downgradient area of the

17  global groundwater plume.

18  Q    And what's the goal of that depiction?

19  A    To understand the complete pathways where exposure is

20  likely.

21          MS. FRENCH:  Could we show Exhibit 1002, page 137.

22          Actually, sorry.  Could you go to 172?  My

23  apologies.

24  BY MS. FRENCH:

25  Q    Is this figure shown on Exhibit 1002, page 172, a

FIMMEN - DIRECT/FRENCH                  Vol. 2 - 485

1  component of the conceptual site model you prepared for this

2  site?

3  A    Yes, it is.

4  Q    And what particular component is depicted here?

5  A    This appears to be -- yes, please enlarge it for me.  This

6  is a downgradient portion of the downgradient leading edge of

7  the plume.

8  Q    And for the Court's benefit, what do you mean by that?

9  A    I'll start from the top.  You can see some features at the

10 top that indicate a geographical context.  For example, we see

11 the presence of College Avenue, O'Bannon Soccer Park bounded

12 by College Avenue and East 18th Street.  So this gives a

13 reference point to understand where geographically this is

14 located.

15        Then beneath that, you see an area that's called

16 "unsaturated silty sands and gravel."  This is the soils that

17 lie beneath the ground surface but above the groundwater, so

18 therefore, unsaturated.

19        You see a blue triangle -- inverted blue triangle

20 sitting atop a light blue line.  That indicates the water

21 table.  So below that, it's saturated media.  That's the

22 aquifer.  The area that's depicted here in light blue is

23 unimpacted groundwater.  On the right side where you see a

24 reddish hue on the right side there, that's an area of shallow

25 groundwater impacts.

1    Q   And those shallow groundwater impacts appear to be coming

2    on from the right-hand side of the page.

3            MS. FRENCH:  Could we go to page 171?

4    BY MS. FRENCH:

5    Q   Is this an additional component of the conceptual site

6    model you provided in the Final Investigation Report?

7    A   Yes, it is.

8    Q   Could you describe what's going on in this particular

9    portion of the model?

10   A   Absolutely.  Similarly -- I'll start at the beginning --

11   at the top of the figure to give us a geographical reference

12   point.

13           Most significantly, I think, to help us understand

14   this today is the Yandes Street right-of-way; and adjacent to

15   it on the right side is JTV Hill Park building with the SSDS

16   systems.

17           The same site features exist where we have unsaturated

18   soils that sit above a water table.  In this case, the

19   groundwater that lies beneath the area that we see here at

20   present, JTV Hill, Yandes, is impacted with chlorinated

21   solvents.  That's depicted in the reddish color.

22           Another feature of this figure is the reddish arrows

23   going vertically from the groundwater table up through the

24   unsaturated soils and into basements, crawl spaces, et cetera.

25   Those arrows are meant to indicate the presence of vapor

FIMMEN - DIRECT/FRENCH          Vol. 2 - 487

1   intrusion.

2   Q   And could you explain -- it looks like there's a

3   reddish-bluish band and then a red band and they're separated.

4   Could you explain that a little bit?

5   A   Absolutely.  Our soil borings in this area indicate the

6   presence --

7           MR. BOWMAN:  I'm going to object.  He is eliciting

8   now an expert opinion as a fact witness.

9           Our witness -- expert witness has opined upon

10  whether there is a continuous clay layer.  I have waited to

11  get in as much facts as we can, but I want to make clear that

12  if there's going to be testimony today about whether that

13  continuous clay -- that clay layer -- that intermediate layer

14  is continuous or discontinuous, we have opinion that it's

15  discontinuous; and there's been no opinion expressed prior to

16  this trial by any expert for Von Duprin establishing that that

17  clay layer is continuous.  This would be a new opinion and

18  trial by ambush.

19          THE COURT:  You may respond.

20          MS. FRENCH:  Respectfully, Your Honor, I think the

21  objection is anticipatory.  I don't believe my question went

22  to that particular issue.  I'm merely asking a fact witness to

23  report on the work he performed and the conceptual site model

24  he prepared and submitted to IDEM, which was ultimately

25  approved.

FIMMEN - DIRECT/FRENCH          Vol. 2 - 488

1          MR. BOWMAN:  If I can respond, I really am trying to

2     be as good as I can.  I saw this figure.  I realize he's drawn

3     that clay layer.  As long as he doesn't testify regarding

4     whether he thinks that is continuous or discontinuous, then

5     we're fine, in my opinion.

6          THE COURT:  All right.  And that was not her

7     question.

8          MR. BOWMAN:  Okay.

9          THE COURT:  I'll overrule the objection.  It is

10    anticipatory, and you understand what his objection will be.

11         MS. FRENCH:  Yes, ma'am.

12         THE COURT:  Why don't you reask your question?

13    BY MS. FRENCH:

14    Q   Could you briefly explain the groundwater portion of the

15    conceptual site model on this page?

16    A   Yes.  The depiction here, sometimes called a

17    cross-section, shows the vertical stratification depicting the

18    geology we observed during soil boring -- the collection of

19    soil borings.

20    Q   And I don't want to interrupt you or step on you; but just

21    for the clarity of the Court and for everyone, this is a

22    model -- conceptual site model.  This is not an actual drawing

23    of the exact contours.  That's not what we're showing here,

24    right?

25    A   That's a great point of clarification.  Thank you.

FIMMEN - DIRECT/FRENCH                    Vol. 2 - 489

1          Yes.  For example, you will notice that there is a

2    slope from right to left indicating a downward trajectory; and

3    that exaggeration in the vertical scale is intentional in

4    order to illustrate the direction of groundwater flow.   In

5    reality, the groundwater elevations are fairly subtle.   Water

6    still flows downhill, but it would look rather flat on this

7    scale.  So we exaggerate the vertical only to emphasize the

8    direction of groundwater flow.

9    Q   And consistent with the goals of the conceptual site model

10   of identifying exposure pathways, this level of illustrative

11   detail helps to demonstrate how that's going to work?

12   A   That's exactly right.

13   Q   And I don't know that -- you've explained that the data

14   that you gathered from soil borings is what goes into sort of

15   creating that drawing, but is there data that supports the

16   drawing that you've created here?

17   A   Yes, that's correct.

18   Q   And could you briefly explain the data and why you drew it

19   this way?

20   A   Yes, I can.  In -- the water table is depicted at

21   approximate elevations of where we encountered the water

22   table.  Beneath the water table in the upper portion -- the

23   upper red shaded portion, beneath that is an area of low

24   permeability clay material that really isn't part of the water

25   table; and then there's additional water beneath that.

FIMMEN - DIRECT/FRENCH          Vol. 2 - 490

1  Q   Does the conceptual site model confirm areas of impact all

2  through the plume area?

3  A   I'm sorry.  Could you please repeat the question?

4  Q   Yes.  I'll rephrase.

5       The conceptual site model you've described shows, as

6  you noted, exposure pathways.  Does it also show impacts along

7  the plume area?

8  A   Yes.

9  Q   And what are sort of those impacts in broad terms?

10 A   As we see in this one, the impacts are to the groundwater;

11 and in the previous figure, we saw where the extent of those

12 impacts reach, which was approximately to the O'Bannon Soccer

13 Park.  That's a good example of how the conceptual site model

14 can be used to illustrate our understanding of the overall

15 site impacts and exposure pathways.

16 Q   And the exposure pathway in this case is not to drinking

17 water, correct?

18 A   That's correct.

19 Q   What is the exposure pathway?

20 A   Inhalation due to vapor intrusion.

21 Q   Has Geosyntec performed work to address vapor intrusion in

22 the plume area?

23 A   Yes, we have.

24 Q   Is that work the vapor intrusion mitigation work that you

25 discussed?

FIMMEN - DIRECT/FRENCH          Vol. 2 - 491

1   A    That's correct.

2   Q    Is that a permanent solution to address the exposure

3   pathway concerns for this plume?

4   A    No, it is not.

5   Q    Has IDEM approved remedial work at the Von Duprin

6   property?

7   A    Yes, they have.

8   Q    What remedial work has IDEM approved at the Von Duprin

9   property?

10  A    Soil excavation.

11  Q    Has that remedial work been completed?

12  A    Yes, it has.

13  Q    When was that work completed?

14  A    March of 2019.

15  Q    Will the data from that remedial work be submitted to

16  IDEM?

17  A    Yes, it will.

18  Q    How much soil was removed in that soil investigation?

19  A    296 tons.

20  Q    Did you test the boundaries of the excavation?

21  A    Yes, we did.

22  Q    What were the results?

23  A    The concentrations of CVOCs in the side wall, the

24  boundaries and the bottom boundary were below residential

25  direct contact criteria.

FIMMEN - DIRECT/FRENCH          Vol. 2 - 492

1  Q    Could you put that into layman's terms for us?

2  A    There were no significant impacts.

3  Q    Will this soil excavation be a final remedy for the

4  Von Duprin property?

5  A    No, it won't.

6  Q    If the installation of vapor intrusion isn't a permanent

7  solution and excavation isn't a permanent solution, what would

8  be a permanent solution for the groundwater at the site?

9  A    Groundwater remediation.

10 Q    Have you discussed groundwater remediation with IDEM?

11 A    Yes, we have.

12 Q    Have you discussed the possibility of having a groundwater

13 remedy at just the Von Duprin property but not upgradient?

14 A    We have.

15 Q    What were those discussions?

16 A    We discussed approaches that we might take to treat

17 groundwater in areas where we had access.

18 Q    And what was IDEM's response?

19 A    They prefer a global groundwater remedy.

20 Q    And do you have an understanding as to why that's IDEM's

21 position?

22 A    I believe I do; that the ultimate remediation of

23 groundwater at the former Von Duprin property is not

24 technically feasible, given the concentrations of chlorinated

25 solvents that are continuing to migrate onto the property.

FIMMEN - DIRECT/FRENCH          Vol. 2 - 493

1  Q   Did Von Duprin develop goals for a potential global

2  groundwater remedial solution in the plume area?

3  A   We have.

4  Q   What are those goals?

5  A   Concentrations of TCE that are below the groundwater to

6  vapor intrusion limit.

7  Q   What's that limit?

8  A   We came up with a site specific value of 18 micrograms per

9  liter.

10 Q   And we've been talking a lot in PPB and PPM.  Which of

11 those is that particular measurement?

12 A   I can clarify.  It's parts per billion, or PPB, also

13 micrograms per liter.

14 Q   Has Von Duprin evaluated a particular global groundwater

15 remedial solution for the plume area that would meet those

16 goals?

17 A   Yes, we have.

18 Q   What is that solution that you evaluated?

19 A   Enhanced in situ biological reduction, or ISBR, if I may.

20 Q   And what -- could you explain what ISBR is?

21 A   I would love to, thanks.

22     I'll start by saying that in this particular case, the

23 chlorinated solvents are naturally undergoing dechlorination

24 from PCE to TCE to cis and to vinyl chloride.  Mostly to cis

25 is where the dechlorination process stops naturally.

FIMMEN - DIRECT/FRENCH          Vol. 2 - 494

1          So using the natural processes already at work,

2     enhanced in situ biological reduction specifically means the

3     addition of a consortia of microbes or bacterial culture that

4     actually use chlorinated solvents for food would accelerate

5     the naturally occurring process or enhance it.

6     Q    And how exactly -- so we understand the bacteria are using

7     this stuff as food.  How does that move the degradation

8     process along?

9     A    The degradation process occurs sequentially from PCE to

10    TCE to cis-1,2-DCE to vinyl chloride, and from vinyl chloride

11    to ethene, which is the ultimate innocuous end product.

12    Q    Have you discussed ISBR and other approaches to the

13    groundwater remediation with IDEM?

14    A    We have.

15    Q    And what were those discussions?

16    A    We discussed our observations of the natural degradation

17    occurring and why we felt that this would be a feasible

18    approach.

19    Q    Has the ISBR remedy been formally approved by IDEM?

20    A    No, it has not.

21    Q    Why not?

22    A    We haven't submitted a work plan for that.

23    Q    Has Geosyntec on behalf of Von Duprin conducted studies to

24    determine whether ISBR will work at the site?

25    A    Yes, we have.

FIMMEN - DIRECT/FRENCH          Vol. 2 - 495

1   Q    What are those studies?

2          MR. BOWMAN:  Objection.  Getting into area of expert

3   opinion for a fact witness.  To this point, we've been talking

4   about science and communications with IDEM.  We have not

5   received any expert opinion regarding the efficacy or cost of

6   future remedial work, and that would be an expert opinion

7   relative to options to meet the goals that they've discussed.

8   We've seen none of that kind of an expert opinion from what

9   now is a fact witness.

10          MS. KRAHULIK:  The Major defendants join in that

11  objection.

12          MS. FRENCH:  Your Honor, I will rephrase; but for

13  the good of the Court, we have two joint trial exhibits which

14  address these studies, and I'm asking the fact witness who

15  conducted these studies to discuss the studies in the joint

16  trial exhibits.

17          MR. BOWMAN:  Okay.

18          THE COURT:  I'll overrule, and you may ask the

19  question; and you may answer the question.

20  BY MS. FRENCH:

21  Q    What studies has Geosyntec performed on behalf of

22  Von Duprin with respect to ISBR?

23  A    We have conducted a laboratory bench scale feasibility

24  study as well as a pilot scale field implementation study.

25  Q    Is Exhibit 1071 a copy of the draft work plan for the

FIMMEN - DIRECT/FRENCH          Vol. 2 - 496

1  bench scale study?

2  A   Yes, it is.

3  Q   What was the goal of the bench scale study?

4  A   The bench scale study, the goal is to understand the

5  overall effectiveness of this approach before actually going

6  out into the field.

7  Q   What do you do to conduct a bench scale study?

8  A   We collect site-specific samples.  So in this case,

9  samples specifically from affected areas -- known affected

10 areas at the former Von Duprin property; specifically, the

11 soils and the groundwater, and send them to a laboratory

12 where -- some are held aside as control samples; and others

13 are inoculated with the bacterial cultures in order to

14 understand if this technology will indeed accelerate the

15 natural degradation processes.

16 Q   Has the work described in this plan been conducted?

17 A   Yes, it has.

18 Q   Describe the work that you conducted pursuant to this

19 plan.

20 A   As I just said, we collected the samples of geologic

21 media, the soils and the groundwater.  Some were kept as

22 control.  Some were inoculated with the bacterial cultures

23 known to degrade chlorinated solvents, and we measured the

24 concentrations of the chlorinated solvents in the water of

25 these microcosm samples over time to understand the rate by

FIMMEN - DIRECT/FRENCH          Vol. 2 - 497

1  which the bacterial cultures accelerate the natural

2  degradation processes.

3  Q   What observation did you make during the bench scale

4  study?

5  A   That the addition of the bacterial cultures did indeed

6  accelerate the natural degradation processes.

7  Q   What did you do after completing the bench scale study?

8  A   We planned the pilot scale field scale implementation.

9  Q   Did you discuss the results of the bench scale study with

10 anyone?

11 A   Yes, we did.  We discussed them with IDEM.

12 Q   Is Exhibit 1072 a copy of the draft work plan for the ISBR

13 pilot study that you just referenced?

14 A   Yes, it is.

15 Q   What was the goal of the pilot study?

16 A   The goal of the pilot study is to now evaluate the

17 effectiveness of this approach and implementability of this

18 approach in the field under the specific geological conditions

19 in which we would need to implement the global full-scale

20 remedy.

21 Q   Do you have to get any sort of approvals before you start

22 putting this type of thing into the field?

23 A   Yes, this is true.  That's correct.

24 Q   What approvals did you obtain in order to implement the

25 pilot study?

FIMMEN - DIRECT/FRENCH          Vol. 2 - 498

1   A   We discussed them with IDEM, and we also obtained

2   underground injection control waiver for the injection of

3   these materials into the subsurface.

4   Q   Could you describe the pilot study performed pursuant to

5   this work plan?

6   A   Yes.  We injected a bacterial culture, along with some

7   media that it uses to accelerate its growth to allow it to

8   degrade a greater area of the chlorinated solvents.

9   Q   What were your observations in the pilot study?

10  A   That the materials indeed were able to be injected in the

11  affected areas and that in contrast to one control point which

12  we used to evaluate the groundwater in an upgradient location

13  unaffected by the injections.  In contrast to that, the

14  injected area saw enhanced degradation of these chlorinated

15  solvents.

16  Q   Have your bench scale or pilot studies been submitted to

17  IDEM yet?

18  A   No, they have not.

19  Q   Have you discussed the results of the pilot scale study

20  with IDEM?

21  A   Yes, we have.

22  Q   Have you presented any of the study information to anyone

23  other than IDEM?

24  A   Yes, we have.

25  Q   Who are those people?

FIMMEN - DIRECT/FRENCH          Vol. 2 - 499

1  A   We've presented some of the data to the folks from Major

2  Tool and Moran.

3  Q   Will the bench and pilot scale study data ultimately be

4  made available to IDEM?

5  A   Yes.

6  Q   Have you looked into the scope and cost to implement ISBR

7  in this area?

8  A   Yes, we have.

9  Q   What have you found in that research?

10          MR. BOWMAN:  Objection.  Expert opinion from a fact

11  witness.  This is the issue that we -- that I addressed before

12  and I thought we would get into.  We have not seen any sort of

13  an expert report analyzing what would be an appropriate

14  groundwater remedy or not and what the cost would be.  That

15  would be an expert report.

16          MS. KRAHULIK:  Major defendants join in that.

17          THE COURT:  Is that what you were asking counsel?

18          MS. FRENCH:  Your Honor, I'm asking based on his

19  knowledge of the remedy and his observations in the pilot

20  scale study whether he -- sorry -- what his thoughts are on

21  the cost and scope of a global groundwater remedy.

22          THE COURT:  Your question was just what are those

23  studies?  You asked has Geosyntec -- let me make sure I'm at

24  the right spot.

25          You asked, "Have you looked into the scope and cost

1    to implement ISBR in this area?"  And he says, "Yes we have."

2    And then you asked, "What have you found in that research?"

3              MR. BOWMAN:  And what would then be before this

4    Court are costs of their ideas for remedial strategies, future

5    costs for groundwater; and that's not before this Court.

6    That's an expert opinion.  This would be the first time that I

7    would be dealing with this expert over what the groundwater

8    remedy is, where it occurs, what the costs are.  Those are

9    future costs that in these kinds of cases, that's an expert

10   opinion regarding what should be done because people have

11   different opinions.

12             THE COURT:  And you join?

13             MS. KRAHULIK:  Yes.

14             THE COURT:  All right.  I'm going to sustain the

15   objection to that question.

16             MS. FRENCH:  Nothing further, Your Honor.

17             THE COURT:  Okay.

18             You may cross.

19             MR. BOWMAN:  I'm bringing one piece of paper.

20                        **CROSS-EXAMINATION**

21   BY MR. BOWMAN:

22   Q   Mr. Fimmen --

23             MR. BOWMAN:  If we can pull up 1002.  We have to

24   switch over to -- it bounces around.

25

FIMMEN - CROSS/BOWMAN          Vol. 2 - 501

1   BY MR. BOWMAN:

2   Q    While she's doing that, part of what you did was determine

3   subsurface groundwater flow at this study area, correct?

4   A    That's correct.

5   Q    And you've dug more holes than I have; but my

6   understanding is when you dig a hole, the ground-penetrating

7   backhoe as I call it, you get to see what the subsurface is

8   really like; and depending on the state you're in and the

9   area, as you said, it can be pretty uniform or it can be

10  pretty different subsurface geology, right?

11  A    I don't understand your question.

12  Q    You can have lots of different subsurface geologies when

13  you really get down and look at it?

14  A    Across the United States?

15  Q    Across the United States?

16  A    Yes, there are different geologies.

17  Q    Different geologies in Indiana?

18  A    Yes, there are.

19  Q    You can even have different geologies in this study area,

20  correct?  Within these four sites, the subsurface varies by

21  what the soil columns might look like, correct?

22  A    Um-hum.  Correct.

23  Q    While we want an idea -- and I don't want the Court --

24  this idea that the groundwater flow is from northeast to

25  southwest, it -- like you said, it's not this uniform pancake

*FIMMEN – CROSS/BOWMAN*                    Vol. 2 - 502

1  if you go down there.  The subsurface varies, right?

2  A   Correct.

3  Q   And the other challenge with groundwater flow subsurface

4  is it changes with seasons, right?

5  A   Correct.

6  Q   Changes with the amount of rain that we have?

7  A   Correct.

8  Q   Right now, our groundwater levels are pretty high, aren't

9  they?

10 A   Yes, sir.

11 Q   And you can have subsurface situations that cause the

12 groundwater flow to vary a little bit within 100 feet,

13 correct?

14 A   Correct.

15 Q   So what you do to get good data is to get your monitoring

16 wells in and you take groundwater depth samples at various

17 times -- and in this case, I think you did it quarterly,

18 right?

19 A   I don't think it was done quarterly.

20 Q   Not done quarterly?  But periodically?

21 A   Yes.

22 Q   So let's look at figure 117 -- this is your Final

23 Investigation Report, right?

24 A   Yes, it is.

25 Q   So let's look at 117.  And this --

1              MR. BOWMAN:  If you'll scroll to the bottom,

2    Ms. Hill.

3    BY MR. BOWMAN:

4    Q   -- this is a 2017 potentiometric map, shallow aquifer,

5    correct?

6    A   That's correct.

7    Q   I think you said you were the author of this report

8    really?

9    A   It's a team effort, but I'll take both responsibility and

10   credit.

11   Q   If you zoom in on the top right there, on that particular

12   moment, the groundwater flow, this is the former Ertel

13   property, correct, that I circled?

14   A   Correct.

15   Q   And then monitoring well 205, that's the Moran property

16   there that I'm doing a really poor job of circling, correct?

17   A   I think so.

18   Q   Well -- any doubt?  Can you zoom in more?

19   A   You circled several of them.  I just wasn't sure which one

20   you were reporting to.

21              Yes, that's correct, Glenn.

22   Q   And this is Ertel?

23   A   Yes, correct.

24   Q   So on this particular day, the groundwater flow was nearly

25   north to south from the Ertel property to Moran property,

FIMMEN – CROSS/BOWMAN              Vol. 2 – 504

1  correct?  It certainly wasn't southwest?  It's more south than

2  west, isn't it?

3  A    Between the two points you're specifically talking about?

4  Q    Yes, at that point, you get a 709 and then a 708 that as

5  between those two properties, you've got a potentiometric line

6  there that's suggesting groundwater flow in that area that's

7  more southerly than westerly?

8  A    With all due respect, I'm not sure which two points you're

9  calling into question.

10  Q    Here from Ertel?

11  A    709?

12  Q    To Moran?

13  A    I see now.

14  Q    That's more southerly than westerly, right?

15  A    Between those two points, yes.

16  Q    So on that particular day, groundwater subsurface on Ertel

17  within the area of, say -- well, in the middle of the facility

18  where I've put a line, it's nearly traveling directly south to

19  Moran on that day subsurface?

20  A    Between those two points.

21  Q    Correct?

22  A    Correct.

23          MR. BOWMAN:  Thank you very much.  I appreciate it.

24          THE WITNESS:  You're welcome.

25          THE COURT:  Ms. Krahulik?

*FIMMEN – CROSS/BOWMAN*                Vol. 2 - 505

 1          MS. KRAHULIK:  We have no questions for this

 2   witness.

 3          THE COURT:  Any redirect?

 4          MS. FRENCH:  No, Your Honor; but we do have one

 5   administrative sort of housekeeping issue to address, but I

 6   don't know that we need the witness on the stand for it.

 7          THE COURT:  So then we can excuse the witness?

 8          MS. FRENCH:  Yes, ma'am.

 9          THE COURT:  Doctor, you're excused.  Thank you very

10   much.

11      *(Witness excused.)*

12          THE COURT:  Do you have a thirty-minute witness?

13          MS. FRENCH:  Unfortunately, no, Your Honor.  Our

14   final witness is an expert witness from California who is in

15   transit here, but he will certainly take more than a half hour

16   and is not presently in the state.

17          THE COURT:  Okay.

18          MS. FRENCH:  But he will be here bright and earlier

19   tomorrow morning.

20          THE COURT:  Wonderful.

21          MS. FRENCH:  We did want to quickly address

22   Exhibits 107 and 108.  Those are the two invoice summaries

23   that the Court has seen I think with two separate witnesses

24   and has heard evidence on the accuracy of those two

25   spreadsheets as summaries of the overall invoice exhibits.

Vol. 2 - 506

1          THE COURT:  And those are Von Duprin's exhibits?

2          MS. FRENCH:  Yes, correct.  We simply move to admit

3    those as summaries to prove content under Federal Rule of

4    Evidence 1006.

5          THE COURT:  On behalf of Moran, Mr. Bowman, do you

6    have an objection to 107 and 108?

7          MR. BOWMAN:  No, Your Honor.

8          MS. KRAHULIK:  No objection.

9          THE COURT:  Exhibits 107 and 108 are admitted into

10   evidence without objection.

11     *(Plaintiff's Exhibits 107 and 108 were received in*

12   *evidence.)*

13         MS. FRENCH:  Thank you, Your Honor.

14         THE COURT:  All right.  So anything else for this

15   evening?  Timewise, Von Duprin's going to have their final

16   witness in the morning.  Do you think that witness will just

17   be half a day or -- is that your expert?  Who is it?

18         MS. FRENCH:  That's our expert on NCP compliance,

19   Your Honor.  Dr. -- Mr. Williams, sorry.

20         THE COURT:  So Mr. Bowman, will you have a witness

21   ready tomorrow?

22         MR. BOWMAN:  We will.

23         THE COURT:  Great.  Who will that witness be?

24         MR. BOWMAN:  Well, we have three fact

25   witnesses:  Kim Vedder with the Indiana Department of

Vol. 2 - 507

1  Environmental Management will come over.  We have confirmation

2  from Ms. Lashbrook, who you met.

3           There's a former employee of Moran by the name of

4  Michael Sharkey.  He's retired.  We've spoken with him.

5           And then there's a gentleman by the name of Michael

6  Fye.  I'll never get it right.  He's going to come off the

7  bench and hit me every time I say it wrong.

8           He's a former Von Duprin employee from Kokomo.

9  We've spoken to him.  I'm hopeful.

10          The issue for us then is we have those three

11  witnesses, and our expert is also in California and is

12  planning to be here bright and early and ready to go on

13  Wednesday.

14          So in order to use Thursday -- we have worked

15  cooperatively, Your Honor.  If you don't mind, we may take

16  some Major witnesses so we can keep going because they also

17  have an expert from California that's not going to bounce up.

18          So while it would be great to finish this week,

19  although I don't think we would get it in, what happens is I

20  think we get our fact witnesses done; and then on the 30th and

21  the 1st, we have experts.  The hope would be that would be

22  done and then closing on the 2nd.

23          THE COURT:  That'll work.  That will work.

24          It's fine with the Court as long as the parties have

25  discussed it.  It's fine if you call some witnesses out of

1  order so we don't have dead time.

2       MR. BOWMAN:  I'm sorry.  We all have the same

3  situation.

4       THE COURT:  You all overestimated, all of you.

5  Lawyers always do that.  Criminal lawyers say it's going to be

6  six to eight weeks, Judge; and we do it in two weeks.

7       MR. BOWMAN:  After a long day, I hope you'll

8  appreciate the humor.  He started it.

9       MS. KRAHULIK:  Although I will say, I don't think

10 the only thing -- we may still have some witness testimony

11 Friday morning of next week, but I certainly think we could

12 get done.

13      MR. BOWMAN:  The other part and the benefit is this

14 week, we really will get through most fact witnesses.  It just

15 turns out some very important witnesses for you for whatever

16 reason are in California.  The bad news is no lawyer ever flew

17 to California to depose them.  We had to bring them here.

18 We're bringing them again, and they have their plane flights.

19 So if it works for the Court, that's what we were thinking of

20 doing.  So it would be tomorrow morning for Williams.  He's

21 coming in.

22      MS. FRENCH:  Williams would be here tomorrow.

23      One other -- I think closings have come up once now.

24 We wanted to understand what the Court's expectations are with

25 respect to closing arguments and also remind the Court that we

Vol. 2 - 509

1    have not filed findings of fact and conclusions of law.  I

2    believe we had an order from when we thought this would go in

3    February postponing those until after trial, and we wanted to

4    confirm when you expect those.

5              THE COURT:  After trial.  Proposed findings of fact

6    and conclusions of law after trial.  And we'll give you

7    deadlines and some dates for that.  Start thinking about how

8    long you're going to need.  I don't know if you're going to

9    need transcripts from the court reporters because I think

10   we're going to switch court reporters next week.

11             Cathy is just so kind to help us out while my court

12   reporter is on vacation this week, but I think next week we'll

13   have the other court reporter.  So you all will have to get

14   your transcripts from two reporters.

15             You all can talk with the court reporters about how

16   long they will need to get your transcripts.  Then we can

17   figure out a date for your proposed findings of fact and

18   conclusions of law.

19             MR. BOWMAN:  The PowerPoint will be able to plug in

20   and use the system.  This young gentleman is going to do the

21   closing, and so I know he's been asking me three times to ask

22   you, assuming that the whole day's available or it's a half a

23   day, do you have an idea how long you would like each side?

24             THE COURT:  What's the date -- what do we have on

25   Friday?

1          So August 1 we're going to stop at three o'clock.

2   And then Tanesa said I have two criminal matters Friday

3   morning on the 2nd.  So we'll start at, like, 11.

4          You guys can have as long as you want.  We'll figure

5   it out.  If you want to spend your Friday in this courtroom in

6   the courthouse making your closing arguments, you can, but

7   we'll probably start -- we won't continue those criminal

8   matters.  I'll go ahead and get them out of the way, and then

9   we'll probably start around 11:30.

10          We'll probably start at 11 -- at 11:30 because

11   they're both facing life Tanesa just told me.  They went to

12   trial.  They might take a little bit of time.

13          We'll just work through.  So eat your lunch early;

14   and then we'll start at, like, 11:30; and we can go through

15   until we get everything concluded on Friday, the 2nd.

16          And that's wonderful because we would have to wait

17   for maybe two or three weeks if we had to go past Friday

18   because we have a lot of trials coming up.  Judge McKinney

19   [sic] retired and I had to get more cases.  So we're swamped

20   again.

21          I do appreciate the somewhat efficiency.  You guys

22   are moving much quicker than you had anticipated.  So we'll

23   start at 8:30 in the morning with your witness from

24   California.

25          MS. FRENCH:  Yes, Your Honor.

Vol. 2 - 511

1          THE COURT:  We're adjourned.  Have a good evening

2    everyone.

3          COURTROOM DEPUTY:  All rise.

4          *(The proceedings were adjourned at 4:45 p.m.)*

1                    CERTIFICATE OF COURT REPORTER

2

3          I, Cathy Jones, hereby certify that the foregoing is a

4    true and correct transcript from reported proceedings in the

5    above-entitled matter.

6

7

8       /s/ Cathy Jones                        August 14, 2019
     _____
9       CATHY JONES, RDR, FCRR
        Official Court Reporter
10      Southern District of Indiana
        Indianapolis Division
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25