1              UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF INDIANA
2                 INDIANAPOLIS DIVISION

3
    VON DUPRIN, LLC,              )
4                                 ) CAUSE NO.
           Plaintiff,             ) 1:16-cv-1942-TWP-DML
5                                 )
           -vs-                   )
6                                 ) Indianapolis, Indiana
    MORAN ELECTRIC SERVICE, INC.) July 24, 2019
7   MAJOR HOLDINGS, LLC,          ) 8:30 a.m.
    MAJOR TOOL AND MACHINE,       )
8   INC. and ZIMMER PAPER         ) VOLUME 3
    PRODUCTS INCORPORATED,        )
9                                 )
           Defendants.            )
10

11

12

13                    **BEFORE THE**
              **HONORABLE TANYA WALTON PRATT**
14

15         OFFICIAL REPORTER'S TRANSCRIPT OF

16                    BENCH TRIAL

17

18

19

20

21  Court Reporter:   Cathy Easley Jones, RDR, FCRR
                      Official Court Reporter
22                    46 East Ohio Street, Room 290
                      Indianapolis, IN  46204
23

24

25         PROCEEDINGS TAKEN BY MACHINE SHORTHAND
             COMPUTER-AIDED TRANSCRIPTION

1           **A P P E A R A N C E S**

2

3    FOR VON DUPRIN, LLC:        Edward S. Griggs
                                 Alexandra Robinson French
                                 BARNES & THORNBURG
4                                11 South Meridian Street
                                 Indianapolis, IN  46204
5

6    FOR MORAN ELECTRIC         Glenn D. Bowman
     SERVICE, INC.:             Marc A. Menkveld
7                               STOLL KEENON OGDEN, PLLC
                                201 North Illinois Street
8                               Suite 1225
                                Indianapolis, IN  46204
9
                                Bruce L. Kamplain
10                              NORRIS CHOPLIN & SCHROEDER LLP
                                101 West Ohio Street
11                              Ninth Floor
                                Indianapolis, IN 46204
12

13   FOR MAJOR HOLDINGS         Angela Pease Krahulik
     and MAJOR TOOL AND         Samuel B. Gardner
14   MACHINE, INC.:             ICE MILLER
                                One American Square
15                              Suite 2900
                                Indianapolis, IN  46282
16

17

18

19

20

21

22

23

24

25

Vol. 3 - 514

1             I N D E X   O F   W I T N E S S E S

2                                              PAGE

3   For Von Duprin:

4   DANA WILLIAMS
    Direct Examination by Mr. William ............516
5   Cross-examination by Mr. Gardner .............575
    Cross-examination by Mr. Menkveld ............616
6   Redirect examination by Ms. French ...........629

7   MICHAEL SHARKEY
    Direct Examination by Mr. Menkveld ...........652
8   Cross-examination by Ms. Krahulik ............687
    Cross-examination by Ms. French ..............694
9   Redirect Examination by Mr. Menkveld .........697

10  MICHAEL FYE
    Direct Examination by Mr. Bowman .............698
11  Cross-examination by Mr. Gardner .............727
    Cross-examination by Ms. French ..............728
12
    KIMBERLY VEDDER
13  Direct Examination by Mr. Menkveld ...........729
    Cross-examination by Ms. Krahulik ............750

14

15

16

17

18

19

20

21

22

23

24

25

1

# I N D E X   O F   E X H I B I T S

2
                                                   PAGE
Defendant's Exhibit No.:

3

106 ........................................577

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Vol. 3 - 516

1    *(In open court)*

2          THE COURT:  Good morning everyone.  We are back on

3    the record.  And I'm going to swear the witness in.

4          Would you raise your right hand, sir?

5    *(Witness sworn.)*

6          THE COURT:  You may have a seat.

7          MS. FRENCH:  Thank you, Your Honor.

8          **DANA WILLIAMS, PLAINTIFF'S WITNESS, SWORN**

9                      **DIRECT EXAMINATION**

10   BY MS. FRENCH:

11   Q    Please state your full name for the record.

12   A    Dana Sam Williams.

13   Q    Who is your current employer?

14   A    Geosyntec Consultants.

15   Q    What is your current position or title?

16   A    I'm a senior principal, hydrogeologist.

17   Q    What job responsibilities do you have at Geosyntec?

18   A    I supervise the preparation and implementation of work

19   plans, reports related to state and federal Superfund sites

20   and contaminated industrial sites and things like that.

21   Q    What professional licenses do you hold?

22   A    I have a -- I'm licensed in the state of California as a

23   professional geologist and certified hydrogeologist and also

24   as a certified environmental manager in the state of Nevada.

25   Q    Any other professional licenses or certifications?

WILLIAMS - DIRECT/FRENCH          Vol. 3 - 517

1  A    I'm a qualified storm water pollution prevention plan

2  developer.

3  Q    How long have you been working in the environmental

4  consulting field?

5  A    Almost 35 years.

6  Q    Have you ever served as an expert witness before?

7  A    Yes.

8  Q    What is your educational background?

9  A    I have a bachelor of science degree in geology and a

10 master of science degree in geology, with an emphasis in

11 hydrogeology.

12 Q    Have you taken any other educational courses that are

13 relevant to your testimony today?

14 A    Yes.  I took a class at the University of California, San

15 Diego, related to the regulatory framework for hazardous

16 materials and toxic substances; and then I subsequently taught

17 that course from 1990 to 1999.

18 Q    And what was covered in that particular course?

19 A    All -- well, many environmental regulations, including

20 CERCLA, RCRA, Clean Water Act, and things like that.

21 Q    When were you engaged as an expert witness in this case?

22 A    I believe it was 2016.

23 Q    Did you prepare an expert report in this case?

24 A    Yes.

25 Q    Did you reach an opinion in this case as to whether Von

1  Duprin incurred necessary response costs associated with the

2  releases and threatened releases of hazardous substances at

3  and migrating from the upgradient properties?

4  A   Yes, I did.

5  Q   What was that opinion?

6  A   That they incurred response costs associated with impacts

7  associated with the upgradient properties.

8  Q   What information did you review in order to determine

9  whether those response costs were necessary?

10 A   Numerous reports that had been prepared over many years,

11 most notably probably the Final Investigation Report, which

12 summarized all those historical investigations.

13 Q   In your opinion, what made Von Duprin's incurred costs

14 necessary?

15 A   They were required to define the nature and extent of

16 contamination on their property; and in doing so, they

17 discovered that there was contamination coming onto their

18 property from the upgradient sources.  And in order to perform

19 a CERCLA quality cleanup, they needed to investigate those

20 upgradient properties.

21 Q   Who required Von Duprin to conduct that investigation?

22 A   That was IDEM.

23 Q   What information did you review which confirmed that

24 Geosyntec's specific investigation costs were necessary?

25 A   I reviewed the reports prepared by Geosyntec.

WILLIAMS - DIRECT/FRENCH          Vol. 3 - 519

1  Q   In your experience, what types of costs are considered

2  necessary to achieve a CERCLA quality cleanup?

3  A   Costs associated with site characterization, with removal

4  actions, and with remedial action.

5  Q   What is an example of the type of cost you would consider

6  unnecessary to respond to hazardous substance release?

7  A   If there were building improvements being made that had

8  nothing to do with the actual cleanup of the property.

9  Q   Were all of Von Duprin's response costs in this case

10 necessary to help achieve a CERCLA-quality cleanup?

11 A   Yes.

12 Q   How did you determine that the $1.5 million Von Duprin

13 paid for work performed by other environmental consultants on

14 behalf of Threaded Rod was a necessary cost of response?

15 A   That work consisted of numerous investigations on the site

16 and the surrounding property; and had that work not been

17 collected or performed, it would have represented a large

18 magnitude of work that needed to be done in order to gain the

19 same information that they already had.

20 Q   Were any of Von Duprin's response costs unrelated to the

21 investigation, remediation or removal --

22        COURT REPORTER:  Excuse me.  Please slow down.

23        MS. FRENCH:  I'm sorry.  I'll slow down.

24 BY MS. FRENCH:

25 Q   Were any of Von Duprin's response costs unrelated to the

1  investigation, remediation, or removal of hazardous substance

2  contamination in the plume area?

3  A   Some of the response costs were due to the investigation

4  of their own property, but the bulk of the response costs were

5  associated with the upgradient and downgradient --

6            MR. MENKVELD:  Objection, Your Honor.  This is

7  getting into an opinion that this witness has not disclosed in

8  this case.  There is no allocation performed by this

9  particular expert as to what part of response costs were

10  caused by upgradient versus on site.  This is not part of this

11  expert's opinion.  I would move to strike the answer he just

12  gave, Your Honor.

13            MR. GARDNER:  We would join in that objection or

14  that motion.

15            THE COURT:  Your response?

16            MS. FRENCH:  Your Honor, I don't believe the

17  witness's answer is nonresponsive, and I don't believe it goes

18  beyond the opinions disclosed in his report.  He's merely

19  stating the nature of the response costs that he reviewed and

20  why they're necessary.

21            MR. MENKVELD:  That's the same objection, Your

22  Honor.  He very specifically stated that the bulk of response

23  costs are due to upgradient versus on site.  That's very much

24  an allocation opinion.  This expert has not performed that

25  analysis.  He has not disclosed any expert opinion like that

WILLIAMS - DIRECT/FRENCH                Vol. 3 - 521

1    in this case.

2            THE COURT:  Well, his answer was the bulk of the

3    response costs were associated with the upgradient and

4    downgradient.

5            MR. MENKVELD:  That's right, Your Honor.

6            THE COURT:  You object to that?

7            MR. MENKVELD:  Absolutely, Your Honor.  He can't

8    talk about how much of the response costs are associated with

9    upgradient or downgradient.  That's allocation opinion.  That

10   talks about what contamination came from where and how much it

11   cost to remediate contamination from different areas.  That's

12   not part of his opinion.

13           THE COURT:  So far he hasn't done that.  He's just

14   said that they were associated with both upgradient and

15   downgradient.

16           MR. MENKVELD:  Okay.  Maybe I misheard him, Your

17   Honor.  I thought he said "the bulk" -- the word "bulk."

18           THE COURT:  "Some of the response costs were due to

19   the investigation of their own property.  The bulk of the

20   response costs were associated with the upgradient and

21   downgradient."

22           MR. MENKVELD:  That's the part I would move to

23   strike, Your Honor, when he starts talking about quantity of

24   response costs associated with any particular area.

25           MS. FRENCH:  Your Honor, he's not making a

 1  percentage allocation.  He's not saying who's responsible for

 2  upgradient or downgradient costs.  He's merely stating his

 3  opinion based on the review of the environmental reports he

 4  reviewed in his case.

 5          THE COURT:  I'm going to overrule the objection with

 6  the response that was given.

 7          Next question.

 8  BY MS. FRENCH:

 9  Q   Would Von Duprin have incurred the same cost of response

10  in the overall plume area if not for the risk presented by the

11  commingled plume?

12          MR. MENKVELD:  We would state the objection, Your

13  Honor.

14          THE COURT:  You object to this question also?

15          MR. GARDNER:  We also do, Major defendants, Your

16  Honor.

17          THE COURT:  What's your objection to this question?

18          MR. GARDNER:  The same objection that Marc stated

19  last, in that it's attempting to allocate what costs they've

20  incurred and who was responsible for those costs.

21          MS. FRENCH:  Your Honor, my question goes directly

22  to a matter addressed by the Major defendants in their

23  pretrial brief that they raised related to Mr. Williams'

24  testimony at his deposition.  Merely seeking to get some of

25  that information into the record so that we can have a

WILLIAMS - DIRECT/FRENCH          Vol. 3 - 523

1  meaningful conversation about the nature of his opinions.

2            THE COURT:  Okay.  I'm going to overrule, and I'll

3  let him answer that question also.

4            Do you want to repeat the question for the witness?

5            THE WITNESS:  Please.

6  BY MS. FRENCH:

7  Q   Would Von Duprin have incurred the same costs of response

8  in the overall plume area if not for the risk presented by the

9  commingled plume?

10 A   No.

11 Q   Did you testify at your deposition that Von Duprin would

12 have been required to incur the costs it has incurred if its

13 contamination was the only contamination present on its

14 property?

15 A   Yes.  But I think I also further clarified that because of

16 the upgradient contamination, the amount of the response costs

17 was much greater in the downgradient area because of the vapor

18 intrusion --

19            MR. MENKVELD:  Objection, Your Honor.  We're using

20 words like "bulk," which implies majority.  We're using words

21 like "much greater," which implies majority.  This is not this

22 expert's area.  He's simply supposed to opine as to NCP

23 compliance, whether Von Duprin's costs complied with

24 regulatory standards under the National Contingency Plan, not

25 how much of those costs were necessary as part of any

WILLIAMS - DIRECT/FRENCH          Vol. 3 - 524

1  upgradient or downgradient property.  This is way outside of

2  the scope, Your Honor.

3         MR. GARDNER:  Your Honor, I would only add that it's

4  not an opinion that's expressed anywhere in his expert report.

5  I don't think we had any notice that he was planning on

6  offering this opinion about "the bulk" or "majority."  For

7  that reason, in addition to Mr. Menkveld, we would also

8  object.

9         MS. FRENCH:  Your Honor, my response is the same

10 with respect to this question as it was for the previous

11 question.  Major defendants have specifically raised the issue

12 of whether Mr. Williams opined as to the quantum of costs

13 which are associated with Von Duprin's contamination versus

14 contamination in the plume area overall.

15        I'm merely asking him to clarify that testimony here

16 today for the Court and put it into the record.

17        THE COURT:  Anything further, lawyers?

18        MR. MENKVELD:  Your Honor, I have Mr. Williams'

19 expert report, and maybe what we can do is show Mr. Williams

20 where the opinion he's expressing today is shown in this

21 report.

22        THE COURT:  You're saying it's not in there?

23        MR. MENKVELD:  It's not in there.  No, Your Honor.

24 He's free to flip through it, look at it, point out where he

25 expressed this opinion in his expert report.

WILLIAMS - DIRECT/FRENCH          Vol. 3 - 525

1          THE COURT:  No, he doesn't need to do that.  I'm

2   sure he reviewed his report.

3          What do you want to say?

4          MS. FRENCH:  Your Honor, again, in --

5          THE COURT:  Did he discuss this area in the

6   deposition?

7          MS. FRENCH:  Yes.  This was discussed in his

8   deposition.  He gave a response.  Major Defendants have

9   latched onto one portion of that response.  I'm asking him to

10  provide his entire response for the Court.

11         THE COURT:  Where did they latch onto one portion of

12  his response?  You're saying in the deposition?

13         MS. FRENCH:  In the deposition.  It has come up in

14  the Daubert motions, and it was raised again in the pretrial

15  briefing.  Specifically --

16         THE COURT:  Let's let her finish.  She's looking for

17  something.

18         Lawyers, it is a bench trial; and so I think --

19         MS. FRENCH:  Your Honor, I found the portion.

20         THE COURT:  It appears to be helpful to the Court.

21  So I'm going to --

22         You've found the portion?

23         MS. FRENCH:  Yes, Your Honor.  At pages 14 and 15 of

24  Major defendants pretrial brief, they discuss a section of

25  Mr. Williams' deposition, pages 104, lines 14 through 19,

1  which they argue is his admission that Von Duprin would have

2  incurred the entirety of the costs it now seeks to recover

3  from the Major defendants as a result of Von Duprin's own

4  contamination.  They elicited this testimony at the

5  deposition.  I believe the testimony as given at the

6  deposition is unclear.  I'm providing the witness an

7  opportunity to provide his complete answer.

8          MR. GARDNER:  Just a brief response -- and

9  understanding it's a bench trial, so I'll defer to your

10 discretion; but he did say that at his deposition, that all of

11 the costs that Von Duprin incurred would have been incurred

12 regardless of whether there was contamination on the

13 upgradient properties.  When we brought that out at the

14 summary judgment stage, at the Daubert stage, the first

15 response that we got from Von Duprin was, "Well, this is not

16 an opinion he is offering."  He never attempted to

17 differentiate between the amount they're incurring from their

18 own property or from the upgradient properties, and it seems

19 like we're here today, and he is expressing an opinion on that

20 topic.

21         THE COURT:  Well, it is a bench trial; and I'm going

22 to allow the witness to answer the question; and lawyers, you

23 can cross-examine; and if later you believe I should ignore

24 it, I'll ignore it, okay.  At this point I think it's helpful

25 to the Court to hear the answer.

WILLIAMS - DIRECT/FRENCH          Vol. 3 - 527

1              You have your exact question?

2              MS. FRENCH:  I believe the objection was to the

3    witness's answer?

4              THE COURT:  He was giving clarification.

5              "Did you testify at your deposition that Von Duprin

6    would have been required to incur the costs it has incurred if

7    its contamination was the only contamination present on its

8    property?"

9              The answer was, "Yes."  And then you said, "I think

10   it also further needs to be clarified because of the

11   upgradient contamination, the amount of the response costs was

12   much greater in the downgradient area because of the vapor

13   intrusion."

14             Was that the end of your answer?

15             THE WITNESS:  Yes.

16             THE COURT:  All right.  Next question.

17   BY MS. FRENCH:

18   Q   Has IDEM required Von Duprin to investigate and respond to

19   contamination not caused by Von Duprin's releases?

20   A   Yes.

21   Q   What investigation and response has IDEM required?

22   A   IDEM required the upgradient investigation on the Major

23   Tool and Moran properties.

24   Q   Any other response costs not directly related to

25   contamination at the Von Duprin property?

WILLIAMS - DIRECT/FRENCH          Vol. 3 - 528

1  A    Yes.  There were response costs associated with the vapor

2  mitigation systems installed in the residential and JTV Hill

3  Park properties.

4  Q    Has IDEM reviewed those investigations and responses?

5  A    Yes.

6  Q    Has IDEM approved those investigations and responses?

7  A    Yes.

8  Q    Have you attempted to determine which parties are

9  responsible for each specific cost incurred by Von Duprin?

10 A    No.

11 Q    What is the National Contingency Plan?

12 A    The National Oil and Hazardous Substances Pollution

13 Contingency Plan is also known as the NCP.

14 Q    And what does the NCP say that's relevant to the case?

15 A    It basically -- in the 560-some-odd pages of the NCP, it

16 lays out the procedures for primarily assessing and

17 remediating Superfund sites, CERCLA sites.  It also lays out

18 the cost recovery procedures and what portions of the NCP are

19 relevant for cost recovery by private parties.

20 Q    If I say "NCP," will you know that I mean the National

21 Contingency Plan?

22 A    Yes.

23 Q    Why is NCP compliance important?

24 A    Again, because it spells out a procedure for which

25 sites -- and it specifically talks about Superfund sites --

WILLIAMS - DIRECT/FRENCH          Vol. 3 - 529

1   how they're characterized and remediated.

2   Q   Is this site a Superfund site?

3   A   No, it is not.

4   Q   What type of site is this?

5   A   It's a contaminated site in the state of Indiana being

6   regulated by IDEM under the voluntary program -- Voluntary

7   Remediation Program.

8   Q   What is the standard for determining whether a party's

9   response actions are in compliance with the NCP?

10  A   The standard as spelled out in Section 300.700 of the NCP

11  is substantial compliance with the NCP.

12  Q   Have you worked on other sites where the work was

13  conducted under the NCP?

14  A   Yes.

15  Q   Does the NCP specifically define substantial compliance?

16  A   It does, yes, in that section, .700.

17          MS. FRENCH:  Dave, could we pull up 300.700, page

18  182, in the NCP.

19          Your Honor I have a paper copy of this statute if

20  you would like it.

21          THE COURT:  Is it an exhibit?

22          MS. FRENCH:  It's not an exhibit.  It's a federal

23  regulation that the Court could judicially notice, but I have

24  a paper copy if you would like it.

25          THE COURT:  I can't read that.  He probably needs a

WILLIAMS - DIRECT/FRENCH          Vol. 3 - 530

 1  paper copy.

 2          MS. FRENCH:  I have ones for everybody.

 3          THE COURT:  Nobody can read that.  What's the

 4  citation?

 5          MS. FRENCH:  We're at 300.700, which I am not sure I

 6  tabbed for that one.  It's page 181 of the PDF, but I'm not

 7  sure that the page numbers provided by Westlaw are meaningful

 8  in any respect.

 9          THE COURT:  Okay.  Found it.

10  BY MS. FRENCH:

11  Q   What does 300.700 tell you about the substantial

12  compliance standards, Mr. Williams?

13  A   Starting at -- I believe that is 700(C)(3)(i), "Private

14  party response action will be considered consistent with the

15  NCP if the action, when evaluated as a whole, is in

16  substantial compliance with the applicable requirements of

17  paragraphs 5 and 6 of this section and results in a CERCLA

18  quality cleanup."

19  Q   Do any other portions of 300.700 address substantial

20  compliance?

21  A   Yes.  In 4 of that same section, actions -- I'll just read

22  that.  "Actions under 300.700(C)(1) will not be considered

23  inconsistent with the NCP, and actions under 300.700(C)(2)

24  will not be considered not consistent with the NCP based on

25  immaterial or insubstantial deviations from the provisions of

WILLIAMS - DIRECT/FRENCH          Vol. 3 - 531

1  40 CFR, part 300."

2  Q   Was a different standard for private party response

3  actions ever required for cost recovery?

4  A   Up until the Superfund Amendments and Reauthorization Act

5  of 1986, the requirement for cost recovery was strict

6  compliance with the NCP; but after the SARA, Superfund

7  Amendments Reauthorization Act amendments, the standard for

8  private parties seeking cost recovery was substantial

9  compliance with the NCP.

10 Q   How does the difference between substantial and strict

11 compliance influence the work done by consultants on

12 environmental cleanups in your experience?

13 A   Well, it's a less rigorous standard.  The strict

14 compliance standard is typically held for actions taken by the

15 EPA or contractors for the EPA where they are going to be

16 using fund-financed dollars to facilitate the cleanup and

17 investigation; and in this case, there were no fund dollars

18 used; and in that instance, they followed the substantial

19 compliance standard.

20 Q   And when you use fund dollars, could you just explain what

21 that term means for the Court?

22 A   There is a Superfund.  I don't know -- I don't know if

23 it's fund dollars or not because I think it's sunsetted, but

24 there is a fund that came from a tax on petroleum that created

25 the dollars that EPA used to clean up sites where no

WILLIAMS - DIRECT/FRENCH          Vol. 3 - 532

1   responsible parties could be identified.

2   Q   Approximately how many sites have you worked on that were

3   subject to the NCP?

4   A   Twenty-five or 30 sites.

5   Q   And how many years have you worked on these types of

6   sites?

7   A   Since I began my career in 1985.

8   Q   And 25 to 30 over 35ish years doesn't sound like a whole

9   lot.  Is there a reason for that?

10  A   These sites take a long time.  A Superfund site takes a

11  long time to go from the preliminary assessment to the RIFS to

12  selecting an alternative and implementing that alternative.

13  I've known people who have worked on the same site for over 30

14  years.

15  Q   Have you worked on site subject to the previous strict

16  compliance standard with the NCP?

17  A   Just one site for a short time; and that was the Montross

18  Chemical Superfund site, and that was in Torrance, California.

19  Q   Have you been responsible for assuring substantial

20  compliance with the NCP at cleanup sites after SARA was

21  enacted?

22  A   Yes.

23  Q   Approximately how many sites have you been responsible for

24  that?

25  A   Probably 20 sites.

WILLIAMS - DIRECT/FRENCH          Vol. 3 - 533

1  Q   Have you had occasion to work on any site where a private

2  party's substantial compliance with the NCP was contested in

3  litigation?

4  A   Yes.

5  Q   What was your role -- what was the site?

6  A   The site was the Ryan Aeronautical facility in San Diego,

7  California.

8  Q   What was your role at that site?

9  A   I was the project director.  So I supervised the

10 development of -- and implementation of a remedial

11 investigation feasibility study, the development of community

12 relations plans, sampling analysis plans and quality assurance

13 project plans.

14 Q   So were you working for a private party client on that

15 project?

16 A   Yes.  I was working for Ryan Aeronautical.

17 Q   Did Ryan Aeronautical seek cost recovery for those costs

18 that you supervised?

19 A   Right.  They sought cost recovery from the United States

20 government.

21 Q   What was the dispute concerning Ryan Aeronautical's NCP

22 compliance?

23 A   The government contended that Ryan's work was not

24 performed in accordance with the NCP.

25 Q   Did you serve as an expert witness in that case?

WILLIAMS - DIRECT/FRENCH          Vol. 3 - 534

1  A   I did but not in regards to NCP compliance.

2  Q   You were just responsible for implementing the work?

3  A   Correct.

4  Q   Was that -- sorry.  Did you say that the case was decided?

5  A   The case was decided, yes.

6  Q   Did the Court reach a determination as to whether the work

7  you supervised substantially complied with the NCP?

8  A   Yes.  The Court found on behalf of Ryan Aeronautical.

9  Q   Has cost recovery on any site you have supervised been

10 denied due to a lack of NCP compliance?

11 A   No.

12 Q   When you are tasked with ensuring substantial compliance

13 with the NCP on any project, what do you do to ensure such

14 compliance?

15 A   I review the requirements of the NCP.  I review the

16 guidance documents that are commonly referred to in the NCP

17 and by EPA for preparing an RIFS or a sampling analysis plan

18 or Quality Assurance Project Plan, and I also look at the

19 local requirements.  So what does the local agencies -- what

20 do the local agencies require?

21 Q   Are some portions of the NCP relevant in some

22 circumstances but not others?

23 A   Yes.

24 Q   Can you explain what you mean by that?

25 A   For -- there's primarily three components of -- that are

WILLIAMS - DIRECT/FRENCH            Vol. 3 - 535

1  relevant to the NCP, and they relate to site characterization,

2  to removal actions, and to remedial actions.  For site

3  characterizations, they essentially have I think in essence

4  the lowest bar for compliance with the NCP.

5        For removal actions, there's very specific

6  requirements to implement a removal action, whether it's time

7  critical or not time critical removal.

8        Then for remedial actions, which is the definition of

9  the final alternative for the site, it has the most

10 requirements under the NCP.

11 Q   How does the type of response impact your analysis of

12 whether a particular response action substantially complies

13 with the NCP?

14 A   Well, depending on the type of response, there may be more

15 activities performed.  There may need to be more permits

16 obtained.  So depending on the activity, there may be more

17 public communication required or less, again, depending on the

18 removal or the remedial alternative.

19 Q   What involvement do state agencies have in ensuring

20 CERCLA-quality cleanups of environmental contamination?

21 A   The state agencies typically are the lead agency when EPA

22 is not the lead, and typically EPA only takes the lead on

23 federal Superfund sites; and in some cases, the state has the

24 authorization or jurisdiction to take the lead on behalf of

25 the EPA.

WILLIAMS - DIRECT/FRENCH          Vol. 3 - 536

1          But the lead agencies typically oversee the work.

2     They review the work plans, comment on the work plans.  They

3     approve the work plans and ultimately issue a closure letter

4     for completion of the work.

5     Q    Have you reviewed IDEM guidance documents and how they

6     correlate with the NCP for this case?

7     A    Yes.  I've reviewed the Remediation Closure Guide and

8     Remediation Program Guide.

9     Q    Do either of those documents specifically mention the NCP?

10    A    They do.

11          MS. FRENCH:  Could we bring up Exhibit 1209, page

12    151.

13    BY MS. FRENCH:

14    Q    Does this portion of the RPG discuss the NCP and how it

15    relates to IDEM's remediation protocols?

16    A    Yes.

17    Q    Could you explain what you learned in reviewing this part

18    of this document?

19    A    Yes.  Kind of in the middle of the paragraph there, it

20    says that, "The SCP, the State Cleanup Program, follows

21    aspects of the National Oil and Hazardous Substance Pollution

22    Contingency Plan," which is the NCP, "as well as the

23    Remediation Closure Guide and that the State Cleanup Program

24    has jurisdiction over remediation of petroleum releases, in

25    addition to releases of hazardous substances."

WILLIAMS - DIRECT/FRENCH          Vol. 3 - 537

1          Then, "By applying components of the NCP and the

2    Remediation Closure Guide, the state cleanup program can

3    handle sites of the same environmental magnitude as Superfund

4    program sites using a more streamlined approach."

5    Q    Does Exhibit 1209 also address the level of oversight IDEM

6    provides to Voluntary Remediation Program projects?

7    A    Yes, it does.

8          MS. FRENCH:  Could we go to page 156 of this

9    exhibit?  Thank you.

10   BY MS. FRENCH:

11   Q    How does the Remediation Program Guide address the level

12   of oversight IDEM provides to VRP projects?

13   A    Well, again, it lays out the process and the program by

14   which they go through to essentially oversee the development

15   of remedial alternatives.

16   Q    Does Exhibit 1209 also address the relationship between

17   Superfund sites and VRP sites?

18   A    It does.

19         MS. FRENCH:  Can we go to page 176 of the exhibit?

20   A    Specifically on this page, it describes a Memorandum of

21   Agreement -- this is the third bullet shown there -- between

22   IDEM and the U.S. EPA for the Indiana Voluntary Remediation

23   Program, which is dated December 4, 1995.

24   BY MS. FRENCH:

25   Q    Did you review that Memorandum of Agreement?

WILLIAMS - DIRECT/FRENCH          Vol. 3 - 538

1   A    I did, yes.

2   Q    What does the Memorandum of Agreement say?

3   A    Basically authorizes IDEM to work on behalf of the EPA,

4   and it also recognizes that the Voluntary Remediation Program

5   developed by IDEM is consistent with EPA's requirements.

6        Can you bring up a copy of the MOA?  Is that an

7   exhibit?

8           MS. FRENCH:  Yeah.  We can bring the MOA up.

9           Next page.

10          THE COURT:  Is that an exhibit?

11          MS. FRENCH:  It's referenced in the Remediation

12  Program Guide.  It's linked.

13          THE COURT:  To which exhibit number?

14          MS. FRENCH:  1209.

15          I think the next page, Dave.

16  A    In the bottom of that page, "Several operational factors

17  are important and will complement the mutual objectives of

18  both IDEM and Region 5."

19  BY MS. FRENCH:

20  Q    And Region 5 is Region 5 of the EPA?

21  A    Yes.  Thank you.  I'm sorry.

22       And it recognizes that IDEM has successfully operated

23  a VRP program since '93, that Region 5 and IDEM find that the

24  VRP provides for response actions that are protective of human

25  health and the environment, and very specifically, Region 5

WILLIAMS - DIRECT/FRENCH          Vol. 3 - 539

1  and IDEM find the VRP provides adequate opportunities for

2  public involvement and technical assistance.

3  Q    Does Geosyntec in particular have its own processes or

4  procedures in place to ensure CERCLA-quality cleanups?

5  A    Yes, we do.

6  Q    What are those policies or procedures?

7  A    We have standard operating procedures.  We have -- we've

8  done this so many times throughout the company that we have

9  libraries of sampling analysis plans, quality assurance

10 project plans, RIFS scoping documents.  I don't know if I said

11 community relations plans.  And those are templates by which

12 we develop and implement on almost all of our projects.

13 Q    Have you reached an opinion in this case regarding whether

14 Von Duprin's response in -- response costs in the plume area

15 were incurred consistent with the NCP?

16 A    Yes.

17 Q    What is that opinion?

18 A    That they were consistent with the NCP.

19 Q    What did you do in order to determine whether Von Duprin's

20 response actions taken as a whole substantially complied with

21 the NCP?

22 A    I reviewed the documents and work plans prepared by

23 Geosyntec and others that Geosyntec relied upon, and I

24 compared them to the specific requirements specified in

25 Section 300.700 of the NCP for substantial compliance with the

WILLIAMS - DIRECT/FRENCH          Vol. 3 - 540

1  NCP.

2  Q    Approximately how many documents did you review to reach

3  this opinion?

4  A    Dozens, if not tens -- many documents.  I don't know.  A

5  hundred documents in total?

6  Q    Are there particular provisions of the NCP which apply to

7  Von Duprin's response actions in this case?

8  A    Yes, there are.

9  Q    What are those provisions?

10  A    Those provisions are spelled out in my expert report.

11  Q    Would reviewing your expert report refresh your

12  recollection as to the list of particular sections of the NCP

13  which apply to this site?

14  A    Yes.

15        On page 10 of my expert report, I lay out the

16  provisions of the NCP that I feel were relevant for

17  demonstrating substantial compliance with the NCP.

18  Q    What are those provisions?

19  A    Section 300.150 as it relates to worker health and safety;

20  300.160, the section's entitled "Documentation and Cost

21  Recovery"; 300.400(C)(1), (4), (5) and (7); and the section's

22  entitled "Determining The Need For Fund Finance Response

23  Actions"; 300.400(C) -- I'm sorry -- (E) as it relates to

24  permit requirements; 300.400(G) related to the identification

25  of appropriate or relevant and appropriate requirements, also

WILLIAMS - DIRECT/FRENCH          Vol. 3 - 541

1   known as ARARS; 300.410 and 415 related to removal and site

2   evaluations -- I'm sorry -- removal site evaluations and

3   actions; 300.420, referring to remedial site evaluation;

4   300.430 as it relates to remedial investigation/feasibility

5   study and remedy selection; 300.435 for remedial design,

6   remedial action, also known as RDRA and operation and

7   maintenance; and then lastly, 300.155.415 and .430 related to

8   public participation and community relations.

9   Q   I'm going to go through some of these.  Let's start with

10  300.160, documentation and cost recovery.  What are the

11  requirements to comply with 300.160 of the NCP?

12  A   The requirements, there's essentially five areas; and

13  that's to identify the source and circumstances of the

14  release, identify the responsible parties, identify the

15  response actions, evaluate the accounting of costs associated

16  with response actions, and evaluating impacts and potential

17  impacts to human health and the environment.

18  Q   At what point do the requirements in 300.160 need to be

19  satisfied for a party's response actions to be consistent with

20  the NCP?

21  A   I think for -- to be compliant with document -- I'm

22  sorry -- Section .160, it needs to look at the whole -- the

23  body of work as a whole.  So all of the documentation of all

24  the information put forth for this requirement.

25  Q   So you don't show up at the site on the very first day and

WILLIAMS - DIRECT/FRENCH          Vol. 3 - 542

1   have all five of those boxes checked?

2   A    That's correct.  That's correct.

3   Q    Must each of the provisions of Section 300.160 be

4   satisfied -- hang on -- strike that.

5         Does the private party have to perform every piece of

6   work that goes into satisfying 300.160 itself?

7   A    No.

8   Q    Could you explain that response?

9   A    Well, if we -- we start at the source and circumstances of

10  releases.  What was done in this instance was all of the

11  historical investigations were evaluated and summarized, and

12  the data collected from those investigations were utilized in

13  understanding the overall picture of the nature and extent of

14  the contamination at the site.

15        So going back as far as the first investigation -- and

16  as an example, if a consultant went out and collected ten

17  groundwater samples, they would not be required to have a

18  Sampling Analysis Plan.  They wouldn't be required to have a

19  Quality Assurance Project Plan, but they would follow

20  essentially standard procedures that are used in the industry.

21        They -- and this work typically is done in accordance

22  with the local standard.  In this case, it's IDEM; and IDEM

23  has laid out for a long time what are their standards for

24  performing environmental investigations on contaminated sites.

25  Q    Is there adequate documentation as defined by the NCP to

WILLIAMS - DIRECT/FRENCH          Vol. 3 - 543

1   provide the basis for Von Duprin's cost recovery?

2   A   Yes.

3   Q   What documents did you rely upon in determining that

4   Von Duprin satisfied the requirements in 300.160 that the

5   source and circumstances of release be described?

6   A   Again, I looked at the historical investigations and

7   it's -- I think the important thing is that I can guarantee

8   you that every single historical investigation was not NCP

9   compliant, but it's the body of work as a whole where the data

10  was evaluated and the data was accepted by IDEM and also by

11  the defendants.  There's -- none of the data that's been

12  collected in this matter has ever been disputed, whether that

13  data was collected NCP compliant or not; but in terms of this

14  requirement, it's the documentation.  It's compiling the

15  documentation.  It's not that every single document needs to

16  comply with the NCP.  This specific requirement is that the

17  documentation needs to be there to identify the sources and

18  circumstances of the release.

19  Q   Are there any particular documents that specifically

20  address this requirement?

21  A   Well, I think the summary document was the Final

22  Investigation Report, the FIR.

23          MS. FRENCH:  Could we pull up Exhibit 1002?

24  BY MS. FRENCH:

25  Q   What about this particular report satisfies the

WILLIAMS - DIRECT/FRENCH          Vol. 3 - 544

1  requirement that sources and circumstances of release be

2  adequately described under 300.160?

3  A   Well, it summarizes all of the historical investigations;

4  and it brings them essentially into one place and -- where the

5  data can be compiled and evaluated and in one location.

6  Q   Approximately how many investigations took place in this

7  plume area?

8  A   I recall seeing something that over 400 borings were

9  drilled and over 1,500 soil and groundwater samples were

10  collected.

11  Q   Did other documents also support your conclusion that the

12  source and circumstances of release were adequately described?

13  A   Yes.  Yes.

14  Q   What were those documents?

15  A   Again, this FIR, Final Investigation Report and the

16  historical investigations performed at the site.  They were

17  done by EnviroForensics, by Quality Environmental

18  Professionals, by Heartland Environmental and investigations

19  performed by Geosyntec.

20  Q   Do any other -- do any of the specific Geosyntec reports

21  help establish that the circumstances of release are

22  adequately described?

23  A   Yes.  The Upgradient Delineation Investigation Report, the

24  Groundwater and Soil Investigation Technical Memorandum.

25          MS. FRENCH:  Let's go to Exhibit 1073, the

WILLIAMS - DIRECT/FRENCH        Vol. 3 - 545

1   Upgradient Delineation Investigation Report; and we'll go to

2   the table of contents.

3   BY MS. FRENCH:

4   Q   What about this document supports your opinion that

5   Von Duprin adequately described sources and circumstances of

6   release in the plume area?

7   A   Can you expand that a little bit?  I can barely read that.

8          This document essentially summarizes all the

9   investigations that were performed in the upgradient area.  So

10  this is the upgradient report; is that correct?

11  Q   Um-hum.

12  A   And so it goes through the discussion of characterizing

13  each of the media, being soil, soil gas, and groundwater, and

14  the procedures that were followed, essentially, to do that

15  investigation.

16         MS. FRENCH:  And we'll go next to Exhibit 1120, the

17  Groundwater and Soil Gas Investigations Technical Memo.

18  BY MS. FRENCH:

19  Q   What about this document supports your opinion that

20  Von Duprin adequately described sources and circumstances of

21  release in the plume area?

22  A   Again, it describes the investigations done in the

23  downgradient area, the groundwater samples that were collected

24  and describes essentially the nature and extent of

25  contamination.

WILLIAMS - DIRECT/FRENCH            Vol. 3 - 546

1  Q   Has identification of responsible parties been completed

2  in compliance with Section 300.160?

3  A   Yes.  I believe that's been recognized by IDEM as well.

4  Certainly, Von Duprin is one of the responsible parties; and

5  then they are working voluntarily with IDEM and understanding

6  that Major and Moran are working with IDEM or being ordered

7  through IDEM by IDEM to do their work.

8  Q   Section 300.160 also requires response actions.  What

9  response actions has Von Duprin performed in the plume area?

10 A   They've performed removal actions in the form of

11 installing vapor mitigation systems at residential properties

12 and at the JTV Hill Park property.

13 Q   You mentioned 300.160 also requires an accurate accounting

14 of costs associated with response actions.  What information

15 did you review to determine whether this element of 300.160

16 was satisfied here?

17 A   I reviewed specific Geosyntec invoices, and I reviewed a

18 summary of invoices for historical investigations.

19 Q   Do invoices exist which appropriately document and account

20 for the costs incurred for Geosyntec's work in the plume area?

21 A   Yes.

22 Q   What did your review of Geosyntec's invoices and a summary

23 of costs from other consultants tell you about the accounting

24 of costs in this case?

25 A   I think that the -- the costs are well documented; and

WILLIAMS - DIRECT/FRENCH          Vol. 3 - 547

1   with respect to Geosyntec specifically, I'm familiar with

2   Geosyntec's accounting procedures, how we prepare proposals,

3   how we obtain approval from our clients, how we invoice our

4   clients, and the documentation associated with that.

5         And I'm also familiar with Von Duprin's procedures for

6   reviewing our invoices, for authorizing us to perform the

7   work, as well as approving our invoices for payment.

8   Q   The last component of 300.160 that you described was the

9   requirement that impacts and potential impacts to human health

10  and the environment be assessed and described.

11        What information did you review to determine whether

12  this element of Section 300.160 was satisfied?

13  A   I reviewed -- again, contained within the reports is the

14  evaluation of the soil, soil vapor, and groundwater samples,

15  and comparing them to IDEM's screening levels to evaluate

16  potential threat to human health and the environment.

17  Q   We'll move next to 300.400(C) and the four subsections of

18  that provision which apply to determining the need for fund

19  finance response actions.

20        Did you consider whether Von Duprin's response actions

21  in the plume area complied with Section 300.400(C),

22  Subsections 1, 4, 5 and 7, which relate to the need for fund

23  finance response actions?

24  A   Yes, I did.  The title of that is a little misleading,

25  determining the need for fund finance response actions.

WILLIAMS - DIRECT/FRENCH          Vol. 3 - 548

1  There's a requirement to comply with this section; but to be

2  clear, there were no fund dollars that paid for the

3  reimbursement of any costs in this.

4        The relevant Sections 1, 4, 5 and 7 are to -- that

5  parties need to conduct a prompt response.  That's one; be

6  sensitive to public concerns, that's No. 4; consider treatment

7  technologies, that's No. 5; and share the technology in the

8  industry with other experts, that's No. 7.

9  Q   Let's break that down a little bit.  Did Von Duprin

10 conduct a prompt response?

11 A   In my opinion, yes.  They've performed a prompt response;

12 and looking as an example at the response actions associated

13 with the residential installation of vapor mitigation systems,

14 from the time it was discovered in I believe June of 2014,

15 there was a vapor mitigation system installed during August to

16 October 2014 for those directly affected parties.

17 Q   Were Von Duprin's response actions sensitive to public

18 concerns?

19 A   Yes.  I think they were extremely sensitive to public

20 concerns; and again, pointing to the example of the

21 residential vapor mitigation systems, they started off with

22 obtaining an access agreement and communicating directly with

23 the affected parties.

24       These were residences that sat over the top of the

25 contamination plume.  They obtained an access agreement.  They

WILLIAMS - DIRECT/FRENCH          Vol. 3 - 549

1  went into their homes and collected indoor samples in some

2  instances.  Where they didn't have access, they collected

3  samples outdoors.

4       They submitted those results individually to the

5  homeowners.  They communicated what those results meant in

6  terms of did it represent a threat to human health and the

7  environment.

8       IDEM was working with Geosyntec and the property

9  owners on this.  IDEM prepared a fact sheet that talked about

10 the specific activities that would be performed to mitigate

11 potential vapor intrusion.  They -- "they" being Geosyntec --

12 obtained a mitigation agreement from the individual property

13 owners where it was discovered that the contamination exceeded

14 the screening levels for IDEM.

15      They implemented the remedial alternative with the

16 property owners' consent.  They did post-mitigation monitoring

17 to confirm that the mitigation was working, and then they had

18 subsequent reports from -- on either a semiannual or annual

19 basis, again, where they came into the home, collected

20 samples, and then submitted the results with an explanation of

21 what the results meant, and at the same time copied IDEM on

22 that.

23 Q   You mentioned a couple times in your response that they

24 obtained access agreements, mitigation agreements.  What was

25 the process that Geosyntec went about to actually obtain that

WILLIAMS - DIRECT/FRENCH          Vol. 3 - 550

1   agreement from the property owners?

2   A    They would -- several methods of contact.  They would

3   either e-mail them.  They would call them.  They would send

4   them -- they would put notes on their doors.  They would knock

5   on their doors and try to gain -- try to communicate with the

6   directly affected property owners.

7   Q    Has Von Duprin considered treatment technologies?

8   A    Yes, they have.  In the broader terms of this requirement

9   and for future cleanup and the identification of a final

10  remedial alternative, they have looked at innovative remedial

11  technologies such as in situ bioremediation --

12          THE COURT:  Why don't you spell that.

13  A    I-N dash S-I-T-U, bioremediation.  This is a technology in

14  which -- you guys didn't talk about this earlier?

15          THE COURT:  Nope.

16          THE WITNESS:  Where they inject bacteria --

17  specially formulated bacteria and it breeds -- basically

18  degrades the contamination in the groundwater.  It's an

19  innovative technology.  It's recognized by EPA and has been

20  for well over a decade.  So they considered that technology in

21  their feasibility study.

22          They also looked at the options for vapor intrusion

23  mitigation, such as a subslab depressurization system.

24  BY MS. FRENCH:

25  Q    We'll move to Section 300.415, removal actions.

WILLIAMS - DIRECT/FRENCH          Vol. 3 - 551

1          Has Von Duprin performed any removal actions in the

2    plume area which are subject to NCP Section 300.415?

3    A    Yes.   That's specifically what we have been talking about,

4    the mitigation systems in the residential property as well as

5    the JTV Hill Park property.

6    Q    What NCP requirements under 300.415 apply to removal

7    actions?

8    A    There are subsections of -- that specifically point to

9    determining if a removal action is appropriate; conducting an

10   engineering evaluation cost analysis or equivalent; if a

11   planning period of at least six months exists before on site

12   activities must be initiated; preparing sampling analysis

13   plans and the quality assurance project plans if samples are

14   to be collected as part of the removal action; and then it's

15   to make provisions for post-removal site control to the extent

16   practicable.

17   Q    What does a party need to do generally to comply with

18   these provisions of the NCP?

19   A    Well, they need to, essentially, go through this process

20   and prepare the appropriate work plans and approvals of the

21   regulatory agencies to do this.

22   Q    How is a removal action different from a remedial action?

23   A    A removal action is essentially something that's done

24   faster because there's a more immediate threat to the human

25   health and the environment, whereas a remedial action takes

WILLIAMS - DIRECT/FRENCH          Vol. 3 - 552

1  much longer -- it's the final remedy for a site.

2          As I stated earlier, sometimes it takes 30 years to

3  pick a final remedy for a site.  So removal actions are done

4  to move the process along much faster.

5  Q   What removal actions has Von Duprin performed for which

6  Von Duprin seeks to recover its response costs?

7  A   That's the off-site residential vapor mitigation, as well

8  as the JTV Hill Park vapor mitigation.

9  Q   Is it your opinion that the vapor mitigation at JTV Hill

10  Park substantially complied with the requirements of the NCP

11  for removal actions?

12  A   Yes.

13  Q   What did you rely on to reach that opinion?

14  A   I reviewed the mitigation system installation memo and the

15  work plan for the vapor mitigation system.

16          MS. FRENCH:  Let's pull up Exhibit 1026, the JTV

17  Hill Park building subslab depressurization installation memo.

18  BY MS. FRENCH:

19  Q   Does Exhibit 1026 appear to be a copy of the memo you

20  referenced you relied on in forming your opinions?

21  A   Yes.

22  Q   What portions of this particular document support your

23  opinion that the removal actions at JTV Hill Park

24  substantially complied with the NCP?

25  A   Well, I think it was already determined that a removal

WILLIAMS - DIRECT/FRENCH          Vol. 3 - 553

1  action was appropriate, that it was identified that through

2  indoor air sampling and subslab sampling that there were vapor

3  concentrations exceeding screening levels for IDEM.

4       In this case, they had -- looking at the requirements

5  of a removal action, I think they prepared the equivalent of

6  an engineering evaluation cost analysis; and they had a

7  planning period that was greater than six months.

8  Q   Could you discuss what the equivalent of an engineering

9  evaluation cost analysis was for this project?

10 A   Yes.  For -- we'll call it an EE/CA -- E-E slash C-A.

11 There's several components for a complete EE/CA.  The first is

12 it needs to summarize the site characterization; and in the

13 process of doing that, they do a streamlined risk assessment.

14 So the site characterization was the sampling around and over

15 the plume, knowing what the vapor concentrations were; and the

16 streamlined risk assessment was they compared the vapor

17 samples to IDEM screening levels.  So I would say they checked

18 that box for an EE/CA requirement.

19      The second was they needed to define a remedial

20 alternative.  So in this, they identified the remedial

21 alternative of subslab depressurization.

22      Then an EE/CA requirement is to do a detailed cost

23 analysis of remedial alternatives.  In this instance for vapor

24 mitigation of an existing building, the domain of

25 possibilities or alternatives is extremely limited; and it's

WILLIAMS - DIRECT/FRENCH          Vol. 3 - 554

1   almost the only option is subslab depressurization with some

2   minor adjustments such as sealing cracks in the slab and

3   adjusting the HVAC system; but there's not a large amount of

4   opportunities -- and the other alternative is to get rid of

5   the building.  That's not an option.  Move everybody out of

6   the building.  That wasn't an alternative.  So there wasn't a

7   need or an appropriateness to do a detailed analysis of

8   remedial alternatives or removal action alternatives.

9   Q    Did Exhibit 1026 also address the sampling and quality

10  assurance steps taken by Geosyntec?

11  A    Yes.  In my opinion, that the work plan as well as the

12  installation memo laid out what I feel is equivalent to a

13  Sampling Analysis Plan and Quality Assurance Project Plan.

14  There wasn't a specific document that said SAP or QAPP, but

15  these very specific elements are spelled out within the

16  document.

17       A Sampling Analysis Plan essentially describes how

18  samples are going to be collected, where they're going to be

19  collected, what they're going to be analyzed for.  That is all

20  described in these documents.

21       The Quality Assurance Project Plan describes what are

22  the data quality objectives.  Why are we collecting this data?

23  What QAQC procedures are going to be put in place so that the

24  samples -- the integrity of the samples can be used for it to

25  make decisions on?  What laboratories are being used?  Are the

WILLIAMS - DIRECT/FRENCH          Vol. 3 - 555

1  laboratories certified in this state?  These are all things

2  spelled out in the Remediation Program Guide, and I think

3  they're also described in these two documents.

4  Q   I think we used a couple acronyms there that we maybe

5  haven't said before.  SAP is the acronym for Sampling and

6  Analysis Plan?

7  A   Yes.

8  Q   And a QAPP is a Quality Assurance Project Plan, correct?

9  A   Yes.

10  Q   What post-removal site controls were imposed following the

11  removal action at JTV Hill?

12  A   That essentially they come back and do post-installation

13  monitoring on a frequent basis to confirm that the system is

14  operating as designed and anticipated.

15  Q   Page 3 of Exhibit 1026 references interim measures

16  performed at JTV Hill prior to the installation of the subslab

17  depressurization system.  Were these interim measures

18  considered removal actions separate from the subslab

19  depressurization system we've discussed?

20  A   Well, in the broad terms, they could be considered a

21  removal action.  In terms of the NCP, they can go as broad as

22  to say fencing a site is a removal action because it removes

23  the public from exposure, I guess.

24         So in this instance, by sealing a crack in the

25  flooring and by adjusting the HVAC system, in the same sense,

WILLIAMS - DIRECT/FRENCH          Vol. 3 - 556

1  you are removing those substances from exposure to the public.

2  Q    Page 4 of 1026 references a draft vapor intrusion work

3  plan.  Did you review this work plan?

4  A    Yes.  Yes, I did.

5           MS. FRENCH:  We'll pull up Exhibit 1029, which is

6  the referenced work plan.

7  BY MS. FRENCH:

8  Q    How does this exhibit support your opinion that

9  Von Duprin's removal actions at JTV Hill substantially

10  complied with the NCP?

11  A    Can we go to the table of contents, please?

12  Q    Certainly.

13  A    Okay.  In the background section, it essentially describes

14  the purpose of a removal action.  It goes into great detail

15  some of the activity that they performed to make sure that

16  they installed the system correctly.  They looked at

17  electricity consumption and reimbursement to the property

18  owner.  So that was a component of the public communication

19  with JTV Hill.

20       They evaluated the permitting requirements.  So this

21  is -- which we haven't talked about yet, but it's an

22  appropriate relevant requirement.  It's an ARAR, sorry.

23       Then they described the monitoring that was going to

24  be performed after the system was going to be installed.  So

25  it has all of the components laying out essentially what

WILLIAMS - DIRECT/FRENCH          Vol. 3 - 557

1  samples were going to be collected and how they were going to

2  be handled and what measures were being taken that the system

3  was designed appropriately.

4  Q    Was this work plan approved by IDEM?

5  A    Yes.

6  Q    How does IDEM's approval of the JTV Hill Park Removal

7  Action Work Plan impact your opinion regarding whether those

8  removal actions substantially complied with the NCP?

9  A    Again, going back to what we discussed earlier today and

10 IDEM's role as the lead agency according and as authorized by

11 the EPA, I think that underscores the importance that this was

12 consistent with the NCP, substantial compliance with the NCP.

13 Q    Is it your opinion that Von Duprin substantially complied

14 with all applicable provisions of the NCP with respect to the

15 removal action at JTV Hill?

16 A    Yes.

17 Q    Moving to the downgradient residential vapor intrusion, is

18 it your opinion that the vapor intrusion mitigation systems

19 installed at downgradient residences were removal actions

20 performed in substantial compliance with the NCP?

21 A    Yes.

22 Q    What documents did you rely upon to reach that opinion?

23 A    This was the Downgradient Soil Vapor and Groundwater

24 Investigation Report and the Vapor Mitigation Resident --

25 Residential Vapor Mitigation Work Plan.

WILLIAMS - DIRECT/FRENCH          Vol. 3 - 558

1  Q    Did you also review any documents related to

2  communications with affected homeowners?

3  A    Yes.  As I testified earlier, there was a multitude of

4  communication and documentation related to communication with

5  the downgradient homeowners.  It's described in my expert

6  report.  It's described in table 11 of the Final Investigation

7  Report, and it's described in detail in the Community

8  Relations Plan.

9  Q    Let's go to Exhibit 1052, which is a copy of the

10 Residential Vapor Intrusion Sampling Work Plan.  And we'll go

11 to the table of contents.

12       How does this work plan support your opinion that the

13 downgradient vapor intrusion mitigation work complied with the

14 NCP?

15 A    Again, it describes, in essence, what the plan is, how

16 they were going to collect the samples, how they were going to

17 gain access to do that work; and it describes the QAQC

18 procedures that were going to be employed for the collection

19 of the samples and characterization of the waste that was

20 generated.

21 Q    Was this work plan submitted to IDEM?

22 A    Yes, it was.

23 Q    Did IDEM approve the work plan?

24 A    Yes.

25 Q    How does the submission of this work plan and its approval

WILLIAMS - DIRECT/FRENCH          Vol. 3 - 559

1  by IDEM impact your analysis of whether the removal actions

2  complied with the NCP?

3  A   Again, as I testified previously, IDEM operating as they

4  were under the RPG and under the Voluntary Remediation

5  Program, which was consistent with EPA's requirements.

6  Q   We've been discussing the downgradient residential work,

7  which as I understand, it happened in some phases sort of as a

8  whole rather than for each individual homeowner.  Is that how

9  you considered this work in preparing your opinions for this

10 case?

11 A   Yes.

12 Q   Why is that?

13 A   Again, there was a lot of work being done simultaneously.

14 You can't look at one investigation.  I think you need to look

15 at the body of work for the entire investigation.  That work

16 was summarized in the FIR, and I think that was one of the

17 primary components of moving forward.

18 Q   Were there other removal actions performed by Von Duprin

19 in the plume area that we have not discussed?

20 A   There were removal actions on the 1929 Columbia property

21 that were not -- that we're not seeking cost recovery for.

22 Q   What at the Von Duprin property was a removal action?

23 A   There was a SSD system put in.

24 Q   Has Von Duprin performed any remedial actions?

25 A   They have done remedial action at their property, again,

WILLIAMS - DIRECT/FRENCH          Vol. 3 - 560

1  the 1929 Columbia Street property, soil remediation.

2  Q    To perform that remedial action, did Von Duprin develop a

3  Remediation Work Plan?

4  A    Yes, they did.

5  Q    Was that work plan submitted to and approved by IDEM?

6  A    Yes, it was.

7  Q    How does the Remediation Work Plan submitted related to

8  the soil remediation work substantially comply with the NCP as

9  part of Von Duprin's overall response?

10 A    I think the Remediation Work Plan which was prepared in

11 accordance with the Voluntary Remediation Agreement lays out

12 very specifically what IDEM was requiring for the remediation

13 plan, but it also spells out some of the very specific

14 requirements that are in substantial compliance with the NCP.

15        This is the Remediation Work Plan only for the soil,

16 while all the parties or at least Von Duprin is working with

17 IDEM for the remedial alternative for the groundwater.  And

18 seeing the level of detail included in the soil RWP for

19 Von Duprin, I can expect that that same process and level of

20 detail will be provided in the Groundwater Remediation Plan.

21 Q    And will the IDEM requirements for the Remediation Work

22 Plan for groundwater be the same as they were for the soil

23 remediation?

24 A    Yes, I would expect so.

25 Q    What specific provisions of the NCP are satisfied by the

WILLIAMS - DIRECT/FRENCH          Vol. 3 - 561

1   Remediation Work Plan?

2   A    There's a Sampling Analysis Plan.  There's a Quality

3   Assurance Project Plan.  There's a Community Relations Plan.

4   I believe there's a Data Management Plan included with that as

5   well.

6   Q    Is there a Health and Safety Plan?

7   A    There is a Health and Safety Plan requirement, yes.

8   Q    We'll move to a discussion briefly of remedial

9   investigations and feasibility studies.

10          What is a remedial investigation as that term is used

11  in NCP?

12  A    It's an investigation essentially to define the nature and

13  extent of contamination, as well as to collect data that will

14  be used to evaluate potential risks to human health in the

15  environment and to evaluate remedial alternatives.

16  Q    What NCP provisions are applicable to remedial

17  investigations?

18  A    There is quite specifically the scoping that's .430(B).

19  The remedial investigation itself, which is Section D; Section

20  E, the feasibility study; and the F, the remedy selection.

21  Q    What remedial investigations have been performed by

22  Von Duprin for which it seeks to recover its costs?

23  A    Well, I think there's been a multitude of remedial

24  investigations performed as early as 1987; and it's that body

25  of work for all those investigations that were compiled into

WILLIAMS - DIRECT/FRENCH          Vol. 3 - 562

1  the Final Investigation Report.  I feel -- it's my opinion

2  that the Final Investigation Report is equivalent to a

3  remedial investigation.

4          MS. FRENCH:  We'll display Exhibit 1002.

5  BY MS. FRENCH:

6  Q   How does Exhibit 1002, the Final Investigation Report,

7  inform your opinion as to whether Von Duprin's remedial

8  investigation work in the plume area substantially complied

9  with the NCP?

10  A   Can we go to the table of contents, please?

11          Excluding the RCRA corrective action, which Von Duprin

12  is not seeking cost recovery for, it lays out the specific

13  requirements or components of -- that would be included with

14  the remedial investigation.  So the site background, what's

15  the history, what are the exposure pathways, what are the

16  potentially exposed populations.

17          It describes the study area investigations that have

18  gone on in terms of soil, groundwater, vapor intrusion

19  investigations; and then it evaluates -- prepares the site

20  conceptual model and describes remediation efforts that have

21  been done to date.

22          It also includes a baseline risk assessment, which

23  essentially goes towards what needs to be done to mitigate

24  potential risk to human health.  I believe there's a second

25  page to this, too.

WILLIAMS - DIRECT/FRENCH          Vol. 3 - 563

1  Q   Would you like to see the second page?

2  A   Yes, please.

3       This is broader.  It evaluates the ecological risk, of

4  which I don't think there's any; and then it summarizes and

5  conclusions [sic] and essentially provides the baseline

6  information that is needed to perform the feasibility study,

7  which is the next step in the process.

8  Q   Were there any work plans associated with the Final

9  Investigation Report?

10 A   Yes.  There was a final Remedial Investigation Work Plan

11 that led in part to the production of this document.

12 Q   We'll show Exhibit 1237, Supplemental Remedial

13 Investigation Work Plan.  Is this the work plan that you were

14 referencing just now?

15 A   Yes.

16 Q   What was important about Exhibit 1237 in your analysis of

17 whether Von Duprin's remedial investigation work substantially

18 complied with the NCP?

19 A   Again, if we could go to the table of contents, please.

20      Again, it laid out what was going to be done.  In

21 this, it was very specific to some additional monitor wells

22 that were being installed.  So that description of the monitor

23 wells that were going to be installed, how they were going to

24 be installed, what samples were going to be collected.  Those

25 are to me elements of a sampling and analysis plan.

WILLIAMS - DIRECT/FRENCH          Vol. 3 - 564

1          And then the discussion of the data quality objectives

2   at Section 2.6 from 2.61 to 2.66, those are all components of

3   a Quality Assurance Project Plan.

4          And then actually, subsequent to the preparation of

5   this document, a QAPP was prepared by Von Duprin.

6   Q    And was that QAPP prepared in conjunction with the

7   Remediation Work Plan that we discussed?

8   A    Yes.

9   Q    Are there any other remedial investigations Von Duprin

10  performed in the plume area for which it seeks to recover its

11  costs in this action?

12  A    Not that I can recall.

13  Q    Did Von Duprin perform any feasibility studies for which

14  it seeks to recover its costs in this action?

15  A    Yes.  What I described earlier, they performed the in situ

16  bioremediation feasibility study.

17  Q    Is in situ bioremediation sometimes referred to as ISBR?

18  A    Yes.

19  Q    Did you evaluate those feasibility studies in forming your

20  opinions?

21  A    Yes.

22  Q    Moving to Sections 300.410 and 420 of the NCP, have

23  removal and remedial site evaluations been completed in the

24  plume area consistent with those two sections of the NCP?

25  A    Yes.

WILLIAMS - DIRECT/FRENCH          Vol. 3 - 565

1  Q   What satisfies those requirements in your review?

2  A   One of the components of the site evaluation for removal

3  actions and remedial actions is that a preliminary assessment

4  needs to be performed, and a preliminary assessment is

5  essentially a desktop study.  It involves no field work.  It

6  involves the evaluation of existing data to determine the

7  scope.

8        And there have been -- this is -- a preliminary

9  assessment is extremely analogous and similar to what's known

10  in the industry as a Phase I Environmental Site Assessment and

11  there's been at least 8 Phase I environmental assessments

12  performed on and surrounding or within the study area.

13  Q   Can 300.410 and 420 be satisfied through reliance on data,

14  information, and reports obtained from others?

15  A   Yes.

16  Q   Could you explain that response?

17  A   Well, again, there were numerous Phase Is performed for --

18  in the study area, including reports by EnviroForensics, by

19  Alt Witzig, W-I-T-Z-I-G, Heartland, by Mundell, by PRC and by

20  QEPI, as well as Tetra Tech during the removal, on site

21  assessment.

22  Q   Moving to worker health and safety, you testified that

23  Section 300.150 of the NCP applies to Von Duprin's response

24  actions.  Can you elaborate on the requirements of 300.150?

25  A   Yes.  This requirement is to prepare Health and Safety

WILLIAMS - DIRECT/FRENCH          Vol. 3 - 566

1  Plans for any response action performed at the site.  The --

2  or a site.

3          The requirement is spelled out in 29 CFR 1910.120 of

4  OSHA, and this spells out the requirements of preparing and

5  implementing Health and Safety Plan at a hazardous waste site.

6  These have been required since at least 1990; and any

7  consultant performing work on a hazardous waste site needs to

8  have their staff trained, which is at least a 24-hour class,

9  sometimes a 40-hour class, with an annual 8-hour refresher.

10  And this is very common in the industry for any consultant

11  working on a hazardous waste site.

12  Q   What documents confirm for you that worker health and

13  safety was adequately protected during Von Duprin's work in

14  the plume area?

15  A   I looked specifically at Geosyntec's Health and Safety

16  Plans that they had prepared and confirmed that they existed

17  and were implemented.

18  Q   Was there any other information you reviewed that

19  influenced your decision that Von Duprin substantially

20  complied with those requirements?

21  A   Just my understanding of, again, the OSHA requirements.

22  Q   We'll move to permit requirements, Section 300.400(E).

23  What is the goal of Section 300.400(E), which requires private

24  parties to obtain appropriate permits to perform investigation

25  and response actions?

WILLIAMS - DIRECT/FRENCH          Vol. 3 - 567

1  A   Well, the goal is to make sure they've acquired all the

2  appropriate permits to perform their investigations.

3  Q   How does a consultant comply with that requirement?

4  A   They apply for and obtain the permits either with the

5  assistance and guidance or approval from IDEM as well as the

6  permitting agency.

7  Q   Did Von Duprin meet the goals of identifying and obtaining

8  required permits for its response actions in this case?

9  A   I believe they did.  They obtained permits such as

10 encroachment permits, traffic control plans, right-of-way

11 entry permits and things like that.

12 Q   What is the goal of Section 300.400(G) requiring

13 identification of applicable or relevant and appropriate

14 requirements, sometimes referred to as ARARs, A-R-A-R?

15 A   The requirement for this section of the NCP really looks

16 at three things.  It looks at the chemicals.  It looks at the

17 response action, and it looks at the location.  Those are the

18 three evaluations that need to be evaluated for an ARAR -- for

19 ARARs evaluation.

20        In terms of chemicals, it evaluates -- or typical

21 ARARs are what are the cleanup goals for soil gas.  What are

22 the cleanup goals for the constituents in soil?  What are the

23 cleanup goals for the constituents in groundwater?  Those are

24 very specific ARARs.

25        For an action, for a response action -- and just as an

WILLIAMS - DIRECT/FRENCH          Vol. 3 - 568

1  example, if I am going to do SSD, subslab depressurization, do

2  I need an air permit?  It makes the consultant or the party go

3  through that process to evaluate if they need an air permit.

4        Do I need an encroachment permit?  So permits are a

5  component of response actions.

6        If I'm going to pump groundwater out, do I need a

7  waste discharge permit?  Do I need an NPDES permit?  So those

8  are things that need to be considered.

9        Then in terms of location, what are the specific

10  requirements for my facility?  Do I need to comply with fire

11  code?  Do I need to comply with a building code?  Do I need to

12  comply with a specific Indiana or City of Indianapolis

13  requirements for a specific response?

14  Q   What is the lead agency's role in developing ARARs on a

15  site?

16  A   The lead agency reviews, they comment and provide input on

17  the ARARs, basically.

18  Q   Did Von Duprin meet the goals of identifying ARARs in its

19  response actions in this case?

20  A   There is not a specific document that says ARARs; but in

21  my opinion, yes, they have met the intent of the

22  identification of the ARARs.

23  Q   Could you explain what information you relied on to reach

24  that opinion?

25  A    I reviewed the Remediation Work Plan, and I reviewed the

WILLIAMS - DIRECT/FRENCH          Vol. 3 - 569

1  Final Investigation Report that describes the activities that

2  were undertaken to perform their investigations, as well as

3  the response plans or the removal actions.

4  Q   And what about those documents convinced you that

5  Von Duprin had satisfied the requirement of identifying ARARs?

6  A   It -- essentially, it describes or lists the specific

7  activities that they did to comply with the ARARs.

8  Q   Discussing public participation, which I believe is

9  covered by several provisions of the NCP, most importantly

10 300.155, 300.415 and 300.430, have Von Duprin's actions

11 complied substantially with the public information and

12 community relations requirements of the NCP?

13 A   In my opinion, yes.

14 Q   When the NCP refers to public relations, who is the

15 relevant public?

16 A   The most relevant public are those that are directly

17 affected by the release or the impacts.

18 Q   Would the public include the owners of real property if

19 that property were impacted by contaminants?

20 A   Yes, it would be real property owners, people living --

21 maybe they don't own the property but they're living in it.

22 So people directly exposed -- potentially exposed.

23 Q   Can other potentially responsible parties be considered

24 part of the public?

25 A   Yes.

WILLIAMS - DIRECT/FRENCH          Vol. 3 - 570

1  Q   Were the owners of JTV Hill Park and individual homeowners

2  made aware of the threats to their properties posed by vapor

3  intrusion?

4  A   Yes, they were.

5  Q   How were they made aware of those threats?

6  A   That was through direct communication.  They were provided

7  copies of the reports, and they had specific communication

8  with Geosyntec and IDEM.

9  Q   Were Moran and Major also provided information concerning

10 the ongoing removal actions at the park and the residences?

11 A   It's my understanding they were, yes.

12 Q   Is it your belief that the most directly affected members

13 of the public have been given the information required by the

14 NCP for conducting removal or other response actions?

15 A   Yes.

16 Q   In what way?

17 A   As I testified earlier, there were numerous points of

18 contact or points in time where the affected residents were

19 contacted through the request to gain access, access

20 agreement, through providing them -- through sampling.  That's

21 very direct communication when people come in your house and

22 collect a sample; through getting the results provided to them

23 by Geosyntec directly; by having a fact sheet submitted to

24 them by IDEM when there was going to be vapor mitigation

25 performed on their property; by negotiating a mitigation

WILLIAMS - DIRECT/FRENCH          Vol. 3 - 571

1  agreement and then the subsequent submittal or sampling in

2  their property and submittal of the results to them directly.

3  Q   What is the goal of the public relations requirements in

4  Sections 300.155, .415 and .430 of the NCP?

5  A   In generic terms, the goal is to keep the public informed

6  and provide them an opportunity for -- to provide input on the

7  remedial alternative.

8  Q   Are there circumstances in which a written Community

9  Relations Plan is required under the NCP?

10 A   Yes.

11 Q   And at what point is a Community Relations Plan or CRP

12 required as a specific individual document?

13 A   The -- primarily, the Community -- well, in this instance,

14 a Community Relations Plan was prepared prior to the

15 finalization of the Remediation Work Plan, and this was a

16 requirement; and the timing of that requirement was specified

17 by IDEM.

18 Q   Did IDEM specify the timing in the Remediation Program

19 Guide, Exhibit 1209?

20 A   Yes, yes.

21       MS. FRENCH:  Let's pull that up at page 178.  And if

22 you could just blow up the flow chart portion.  I don't know

23 that I need all the heading.  Hopefully that will make it big

24 enough.

25       THE WITNESS:  Maybe the top part.

WILLIAMS - DIRECT/FRENCH          Vol. 3 - 572

1        MS. FRENCH:  Yeah, maybe just to the second black

2   arrow.  That way we can look at it a little closer.  Thank

3   you.

4   BY MS. FRENCH:

5   Q   Are you familiar with this flow chart from the Remediation

6   Program Guide?

7   A   Yes.

8   Q   Could you briefly explain what the Court is seeing on this

9   particular exhibit?

10  A   The flow chart through which sites in the voluntary -- or

11  under a Voluntary Remediation Agreement, the process that they

12  go through.

13       The first step is actually after signing the

14  agreement, they perform a site investigation similar to what

15  we've been calling a remedial investigation.  Then they

16  prepare a Remediation Work Plan, and then it's at that point

17  after the Remediation Work Plan is prepared that the work plan

18  goes out for public notice and comment.

19       And in this instance, IDEM directed Von Duprin to

20  prepare a Community Relations Plan just slightly before the

21  Remediation Work Plan, if my timing is correct on the

22  documents.

23  Q   And to clarify, I believe you testified earlier regarding

24  EPA's evaluation of this particular process?

25  A   Right.  Right, that EPA has reviewed the Voluntary

WILLIAMS - DIRECT/FRENCH          Vol. 3 - 573

1  Remediation Program that IDEM has; and they felt the level of

2  public communication was adequate.

3  Q   Are there certain circumstances in which public

4  participation requirements can be satisfied in a different way

5  than by having a written CRP?

6  A   In my opinion, yes.  I mean, it's direct communication

7  with the affected property owners or parties.

8  Q   What is the lead agency's role in public participation

9  throughout the life of an environmental cleanup?

10 A   The lead agency essentially steers and determines the

11 process it goes through.  If there were an incident where it

12 was very political, they could have very frequent public

13 meetings.  If it's a fairly simple process, they can do

14 essentially the bare bones; and the bare bones is where the

15 final remedy is selected, and they get public comment on it

16 before it's approved by IDEM.

17 Q   Did Von Duprin meet the goals of public participation in

18 its response to actions in this case?

19 A   Yes.

20 Q   In what way?

21 A   They, I thought, had a very rigorous communication program

22 with the affected parties that I've described previously.

23 Q   You briefly mentioned SAPs earlier in your testimony.

24 What is the goal of Section 300.415's requirement that a SAP

25 be prepared for response actions?

WILLIAMS - DIRECT/FRENCH          Vol. 3 - 574

1  A    That prior to performing a response action, a Sampling

2  Analysis Plan be prepared.

3  Q    What does that SAP do for the consultant performing the

4  work?

5  A    The SAP essentially consists of two components.  The first

6  component is a field sampling plan, and that is -- describes

7  how the samples would be collected, how many samples, whether

8  it's soil or groundwater samples, and how they're going to be

9  analyzed.

10         The second component of a SAP is the Quality Assurance

11  Project Plan.  The QAPP describes the data quality objectives;

12  and then it describes the QAQC procedures for the samples,

13  duplicate samples, replicate samples and then very specific

14  procedures for the laboratories performing the analyses.

15  Q    Did Von Duprin meet the SAP and QAPP goals that you just

16  discussed?

17  A    In regards to their response actions and removal actions,

18  it's my opinion, yes, they did.

19  Q    Could you explain that?

20  A    They, again, prepared work plans that described in detail

21  what samples were going to be collected, how they were going

22  to be analyzed, how they were handled; and they also described

23  in detail the quality assurance, quality control procedures

24  that were going to be in place, while at the same time

25  describing why they were collecting the samples.  In essence,

*WILLIAMS - CROSS/GARDNER*          Vol. 3 - 575

1  what were the data quality objectives?  Those were described

2  in those work plans.

3          MS. FRENCH:  Pass the witness.

4          THE COURT:  Why don't we take our morning break, and

5  then we will resume in about 15 minutes for the

6  cross-examination.  So we're in recess.

7          COURTROOM DEPUTY:  All rise.

8      *(A recess was taken.)*

9          THE COURT:  You may be seated.  We are back on the

10  record.  And who is going to do the cross-examination for

11  Moran?

12          MR. MENKVELD:  I am, Your Honor.  I know Major Tool

13  wanted to go first this time.  I don't know if we can do that.

14          THE COURT:  That's fine.  That is fine.

15          Mr. Gardner?

16          MR. GARDNER:  Yes, Your Honor.

17          THE COURT:  You may.

18                      **CROSS-EXAMINATION**

19  BY MR. GARDNER:

20  Q   Mr. Williams, my name is Sam Gardner.  We met during your

21  deposition, but it's been some time.  So as a reminder, I

22  represent the defendants Major Tool and Machine and Major

23  Holdings LLC in this lawsuit.

24          MR. GARDNER:  Ms. Woods, can we pull up

25  Mr. Williams' expert report, please?

*WILLIAMS – CROSS/GARDNER*          Vol. 3 - 576

1          THE COURT:  What's the exhibit number?

2          MR. GARDNER:  Well, we're not offering it as an

3    exhibit yet, although I do believe Von Duprin has included it

4    as Exhibit 106.

5          MS. FRENCH:  Your Honor, if counsel's intention is

6    to present the exhibit to the Court on the screen, I think

7    it's appropriate for it to be entered into evidence.

8          MR. GARDNER:  We don't have an objection to that,

9    Your Honor.

10          106 I believe is the number.  I don't know if ours

11   has their exhibit number on it.  We have paper copies we can

12   give the Court, if that's easier; but I know that it was

13   included on their exhibit list, Von Duprin's.

14          THE COURT:  Do you have a paper copy?

15          MR. GARDNER:  Sure.

16          THE COURT:  It's very difficult to read the little

17   print.

18          Wouldn't you agree?

19          THE WITNESS:  I agree.  It's very hard to see, and

20   I've got good glasses.

21          THE COURT:  So you've offered 106?

22          MR. GARDNER:  Yes, although I would say this is not

23   labeled 106.

24          THE COURT:  Any objection?

25          MS. FRENCH:  No objection, provided the report copy

*WILLIAMS - CROSS/GARDNER*          Vol. 3 - 577

1  is complete and contains all appendices, which it appears to

2  do so.

3          MR. MENKVELD:  No objection.

4          THE COURT:  Exhibit 106 is admitted into evidence

5  without objection.

6      *(Plaintiff's Exhibit 106 was previously received in*

7  *evidence.)*

8  BY MR. GARDNER:

9  Q   Mr. Williams, you testified at the outset this morning

10 that you had served as an expert before; but this is the first

11 time you've ever offered an expert opinion on the topic of NCP

12 compliance, right?

13 A   Yes.

14 Q   And you have never reviewed a single response cost

15 incurred by a party in litigation to determine whether that

16 cost was incurred consistent with the NCP, right?

17 A   Correct.

18 Q   And in forming your first expert opinion on this topic,

19 you did not review any literature from the EPA or otherwise to

20 help you understand what the NCP requires, did you?

21 A   Well, I did review the NCP.

22 Q   You reviewed the NCP itself; but you didn't review any

23 other literature from the EPA or otherwise, right?

24          MS. FRENCH:  Objection, Your Honor.  The questioning

25 is inconsistent with the witness's prior testimony.

*WILLIAMS - CROSS/GARDNER*          Vol. 3 - 578

1          THE COURT:  I'll overrule.  He can answer.

2  A    I did review guidance documents related to

3  nontime-critical removals.  I reviewed guidance documents

4  related to sampling analysis plans and QAPPs and IRFSs and

5  things like that.

6  BY MR. GARDNER:

7  Q    Mr. Williams, do you remember being deposed in this

8  matter?

9  A    Yes.

10  Q    Do you remember that occurred on June 29, 2018?  Does that

11  sound about right?

12  A    That sounds about right.

13  Q    Do you remember being under oath at the time?

14  A    Yes.

15  Q    And you had an opportunity to review your transcript and

16  to make any changes to it after your deposition was over,

17  right?

18  A    Yes.

19  Q    And do you remember during that deposition, you were

20  asked:  "So outside of reviewing the regulations themselves,

21  have you reviewed any of the literature that helps you

22  understand what the National Contingency Plan requires?"

23          And your response was, "Not specifically."

24          And, in fact --

25          THE COURT:  Let him answer does he remember that.

*WILLIAMS - CROSS/GARDNER*          Vol. 3 - 579

1          Do you remember that?

2    A   Vaguely, I remember that; but that was well over a year

3    ago as well.

4          MR. GARDNER:  May I approach, Your Honor?

5          THE COURT:  Yes.

6    BY MR. GARDNER:

7    Q   In case we need to reference it again, here is a copy of

8    your deposition.

9          And, in fact, Mr. Williams, you didn't even review the

10   entire NCP before offering your opinion on NCP compliance,

11   right?

12   A   I didn't review the entire NCP.  I reviewed the NCP

13   related to substantial compliance requirements.

14   Q   So the first and only expert opinion that you've offered

15   on this topic is that work that your employer performed was

16   compliant with the NCP, right?

17   A   I'm sorry.  Could you repeat the question?  I'm sorry.

18   Q   Sure.  The first and only expert opinion that you have

19   offered on NCP compliance is at least, in part, that the work

20   that your employer, Geosyntec, performed was compliant with

21   the NCP, right?

22   A   I'm having trouble with the "first and only" part of your

23   question.

24   Q   So earlier just minutes ago, I asked you if you had ever

25   offered an opinion on -- an expert opinion on NCP compliance.

WILLIAMS – CROSS/GARDNER          Vol. 3 - 580

1  Do you remember that?

2  A  Yes.

3  Q  And you said this was the first time you had done so?

4  A  Correct.  Correct.

5  Q  So just to clarify for the Court, this first opinion that

6  you're offering on this topic is that your employer's work was

7  compliant with the NCP, right?

8  A  I'm confusing -- when you say "first opinion" with the

9  first opinion in my expert report.  So if you said "first

10 time," I would agree with you.

11 Q  The first time you've offered an opinion on this topic in

12 general --

13 A  That's correct.

14 Q  And to clarify also for the Court, Geosyntec is not just

15 your employer.  You also have an ownership interest in

16 Geosyntec, right?

17 A  A very minor ownership, yes.

18 Q  Now, you testified -- well, you were asked questions about

19 whether costs from any site that you had ever supervised were

20 deemed to be not in compliance with the NCP.  Do you remember

21 that?

22 A  Yes.

23 Q  And you did not supervise the costs that were incurred on

24 these properties, did you?

25 A  No, I did not.

*WILLIAMS - CROSS/GARDNER*          Vol. 3 - 581

1  Q   So if we looked at the invoices that were in the record

2  from Geosyntec, we wouldn't find your name anywhere in those,

3  right?

4  A   You will, yes.

5  Q   So what work, other than this expert work, did you perform

6  in supervising the costs related to this site?

7  A   I reviewed some of the documents commencing in 2016, the

8  draft Remedial Investigation Work Plan, the Final

9  Investigation Report.  So yes, I did review those documents

10 during their preparation phase.

11 Q   Okay.  You testified about contamination on upgradient

12 properties, just briefly.  You weren't aware of any operations

13 conducted by Major Holdings or Major Tool that would have

14 caused or contributed to any of the contamination at issue in

15 this lawsuit?

16      MS. FRENCH:  Objection Your Honor.  Outside the

17 scope of direct and outside the witness's -- scope of his

18 opinions.

19      MR. GARDNER:  Your Honor, he was asked questions,

20 albeit over our objections, about the contamination from these

21 upgradient properties.  I want to make clear that he's not

22 testifying that any of that contamination came from my

23 clients, Your Honor.

24      THE COURT:  I'll allow the question.  Overrule the

25 objection.

*WILLIAMS – CROSS/GARDNER*                    Vol. 3 - 582

1   A    I have not gone through the process as to who specifically

2   caused the contamination on the upgradient properties.

3   BY MR. GARDNER:

4   Q    Okay.  Now, the first opinion you offered this morning and

5   that you also offered in your report --

6             MR. GARDNER:  And we can turn to page 8 of the

7   report, Ms. Woods.

8   BY MR. GARDNER:

9   Q    So the first opinion that you've offered here is that

10  Von Duprin incurred necessary response costs for site

11  investigation and remediation activities associated with the

12  release and threatened release of hazardous substances on the

13  defendants' properties, right?

14  A    Yes.

15  Q    As you're using it here, what does the term "necessary

16  response costs" mean?

17  A    They've performed site investigations and removal actions.

18  Q    And these necessary response costs that you're referring

19  to, these include costs both from Geosyntec or that were

20  incurred by Geosyntec and other consultants, right?

21  A    Yes.

22  Q    Let's start with the costs incurred by the other

23  consultants.  So these would be costs incurred, at least by my

24  count, by Arcadis, Alt & Witzig, August Mack, EnviroForensics,

25  and Mundell & Associates; is that right?

*WILLIAMS - CROSS/GARDNER*          Vol. 3 - 583

1  A    Yes.

2  Q    Did I miss any?

3  A    I'm not sure if you missed any.  I wasn't keeping score on

4  who you listed and who you didn't.

5  Q    But at least those all sound correct to you, right,

6  Mr. Williams?

7  A    Yes.

8  Q    As you sit on the stand today, you can't think of costs

9  incurred by any other consultant other than Geosyntec that

10 Von Duprin is seeking to recover in this lawsuit?

11 A    Again, I would have to go back and look at every single

12 consultant and what their work consisted of.  I haven't done

13 that.  So with that caveat, yes.

14 Q    So with regard to those consultants that I listed, you did

15 not review any of the invoices for the work performed by those

16 consultants, right?

17 A    That's correct.

18 Q    You only reviewed cost summaries for that work, right?

19 A    Correct.

20 Q    Because the invoices were not available to you, right?

21 A    That's right.

22 Q    And the cost summaries that you reviewed, those were

23 prepared by Von Duprin's counsel, correct?

24 A    I'm not sure who prepared them.

25 Q    And you don't know then what process the person who did

1  create them used to create those cost summaries; isn't that

2  right?

3  A    That's correct.

4  Q    So you don't know what information they decided to include

5  on the cost summaries or what information they decided to

6  exclude from the cost summaries, right?

7  A    That's right.

8  Q    But you do know that the cost summaries did not contain as

9  much information as the Geosyntec invoices that you reviewed,

10 correct?

11 A    Correct.

12 Q    For instance, the cost summaries did not list the

13 individual people that were working on the projects.  They

14 didn't list the hours that they were working, and they didn't

15 describe the activities that they were undertaking, right?

16 A    That's right.

17 Q    You also did not conduct an independent analysis of the

18 costs incurred by those consultants to determine if those

19 costs were consistent with the NCP, right?

20 A    That's right.

21 Q    So as you sit here today, you can't say whether any

22 specific costs billed by those consultants complied or did not

23 comply with the NCP, right?

24 A    That's right.

25 Q    And to clarify for the Court, these costs were actually

WILLIAMS - CROSS/GARDNER          Vol. 3 - 585

1  costs that were incurred by a different entity, Threaded Rod,

2  in a different litigation, right?

3  A   Correct.

4  Q   Von Duprin did not pay any of those consultants itself,

5  right?

6  A   That's my understanding.

7  Q   But then Von Duprin settled with Threaded Rod; and now it

8  wants to recover the costs that it paid in that settlement

9  from the parties in this lawsuit, right?

10 A   That's my understanding, yes.

11 Q   Now, you never reviewed any settlement agreement between

12 Von Duprin and Threaded Rod, did you?

13 A   No.

14 Q   So you don't personally know how that settlement agreement

15 relates to any of these costs for the consultants, right?

16 A   Correct.

17 Q   And you don't know how much the work that was performed by

18 these consultants actually costs, right?

19 A   Well, there was a summary of what that actual work cost,

20 yes.

21 Q   But you don't know how much the actual work performed

22 costs?

23        MS. FRENCH:  Objection, Your Honor, asked and

24 answered.

25        THE COURT:  It's cross-examination.  He may answer

*WILLIAMS - CROSS/GARDNER*          Vol. 3 - 586

1   the second question.

2          Ask your question again.

3   BY MR. GARDNER:

4   Q   I'm merely trying to figure out -- the settlement

5   agreement you have not reviewed, and the cost summaries you

6   reviewed don't describe the actual work performed.  So you

7   can't say how much the cost of the actual work performed was

8   for these five consultants, right?

9   A   I had the summary of what the total was.

10  Q   To be clear, the NCP does not address costs paid through

11  settling litigation, does it?

12  A   No, it does not.

13  Q   Let's turn then to the costs relating to Geosyntec's work.

14          MR. GARDNER:  Ms. Woods, if we can pull up

15  Exhibit 1017, please.

16  BY MR. GARDNER:

17  Q   Okay.  Now, there have been, I think, more than 2,600

18  pages of invoices from Geosyntec produced in this case.  Have

19  you reviewed all of those invoices?

20  A   No, I have not.

21  Q   So which invoices did you review specifically?

22  A   I can't remember which specific invoices I reviewed, but I

23  probably looked at three or four invoices and with the sole

24  intent of confirming that the invoicing procedures out of our

25  Ann Arbor office were consistent and similar to the invoicing

*WILLIAMS - CROSS/GARDNER*          Vol. 3 - 587

1  procedures that we do out of my office.

2  Q   So you can't really testify then to costs that are

3  included in any of the invoices other than the four or five

4  that you actually reviewed, right?

5  A   Well, I can testify that I have an understanding of our

6  invoicing procedures; and I wouldn't expect them to be any

7  different beyond those four and five for the other invoices

8  submitted.

9  Q   Sure, but you can't testify as to the content of any of

10 those invoices, right, because you didn't review them?

11 A   I can testify to the content that it includes the people,

12 how many hours they worked on, and what tasks they were

13 working on.

14 Q   But that's -- well, you can't even really testify to that

15 because you haven't reviewed them.  So how can you

16 definitively say that those --

17         MS. FRENCH:  Objection, Your Honor, argumentative.

18         THE COURT:  I don't think he's being argumentative.

19         Go ahead and ask your question.

20 BY MR. GARDNER:

21 Q   My point is only that if you didn't review the hundreds of

22 invoices that were included here, you cannot testify as to the

23 content of those invoices, right, because you have not

24 reviewed them?

25 A   I can testify that I know our invoicing procedures.  I

*WILLIAMS - CROSS/GARDNER*          Vol. 3 - 588

1  know our invoicing procedures with Von Duprin, and that the

2  three to four invoices that I did look at were very specific

3  as to who was working on the project, what the tasks they were

4  doing; and therefore, all of the other invoices would likely

5  be consistent with that invoicing process.

6  Q   Okay.  Let's take a look at one then.

7        MR. GARDNER:  Ms. Woods let's keep it here.  Can you

8  zoom in at the invoice date on the top of this page, please?

9  BY MR. GARDNER:

10 Q   Do you see here, Mr. Williams, where it says -- it

11 includes an invoice date of January 16th, 2017?

12 A   Yes.

13 Q   That's before you offered your expert opinion in this

14 case, right?

15 A   That's correct.

16        MR. GARDNER:  Ms. Woods, could we then go to page 5

17 of this document.  Right here.  Thank you.

18        If we can zoom in at the top there where it says

19 "Phase IV."  Thank you.  That's good, Ms. Woods.

20 BY MR. GARDNER:

21 Q   So we see here that there are, I'll agree, names of people

22 working on the projects; and there are hours describing,

23 presumably, the amount of time they spent on the project; but

24 here at the top we have something that says "Phase" and then

25 it says, "04 Project Management."

*WILLIAMS - CROSS/GARDNER*          Vol. 3 - 589

1         Now, that's the only description of the work that they
2    were performing that's included in this invoice, right?
3    A    Right.
4    Q    There's no narrative to describe the actual work that they
5    are performing?
6    A    Correct, on this invoice.
7    Q    And in reviewing the invoices that you did review, you saw
8    that not all of the costs that Geosyntec had incurred were
9    necessary response costs, right?
10   A    Could you say that again?  I'm sorry.
11   Q    Yeah.  You reviewed four or five invoices you testified
12   today; and in reviewing those invoices, you saw that not all
13   of the costs that Geosyntec incurred in this case were
14   necessary response costs, right?
15        MS. FRENCH:  Objection, Your Honor.
16   Mischaracterizes the witness's testimony.
17        MR. GARDNER:  Can I rephrase, Your Honor?
18        THE COURT:  Rephrase.
19   BY MR. GARDNER:
20   Q    Let me ask it this way.  Were all of the costs that
21   Geosyntec incurred in this case necessary response costs?
22   A    In the matter of the Von Duprin site, not all were
23   necessary response costs, nor -- they weren't costs that we're
24   seeking cost recovery for -- that Von Duprin is seeking cost
25   recovery.

WILLIAMS — CROSS/GARDNER          Vol. 3 - 590

1      The response costs associated with this matter that we

2 sit here today, yes, I think they were all necessary response

3 costs.

4 Q   Let's turn to your deposition then.  On page 16 -- I

5 believe you've got a condensed exhibit there.  I think it's

6 page 13 of your document maybe.

7      Do you remember during that deposition, Mr. Williams,

8 you were asked, "Have you concluded that 100 percent of the

9 work that Geosyntec performed complied with the National

10 Contingency Plan?"

11      And your response was, "No."

12      Do you remember that?

13 A   Yes.

14 Q   I'm going to return --

15 A   That's a different question.

16 Q   Understood.  Understood.  That's not the question I'm

17 asking.  So I'm going to return to the question I am asking,

18 which is which costs then were you referring to when you said

19 that they were costs that had not been incurred with the

20 National Contingency Plan?

21 A   That's two different questions.  First, you state, "Have

22 you concluded that 100 percent of the work that Geosyntec

23 performed complied with the National Contingency Plan"; and I

24 said I had not concluded that.

25 Q   Okay.  And so my question now is what work that Geosyntec

*WILLIAMS – CROSS/GARDNER*          Vol. 3 - 591

1  did perform did not comply with the National Contingency Plan?

2  A   That's different.  I just said -- I hadn't made the

3  conclusion.

4  Q   Mr. Williams, I understand it's a different question than

5  what was asked in your deposition.  I'm asking you here today

6  what's the difference?  What portion of those costs were not

7  consistent with the National Contingency Plan?

8  A   I don't know.

9  Q   And is it also then fair to say that you don't know

10  whether all of the work that Geosyntec performed -- strike

11  that.

12       Is it also fair to say that not all of the costs

13  incurred by Geosyntec were necessary response costs?

14  A   I think all the costs incurred by Geosyntec related to the

15  upgradient and downgradient plume area are necessary response

16  costs.

17  Q   What's the total amount of those costs then?

18  A   I don't know.

19       MR. GARDNER:  Ms. Woods, if we could just briefly go

20  to page 1335 of this exhibit.

21  BY MR. GARDNER:

22  Q   We see the date here January 16th, 2017.  Do you see that,

23  Mr. Williams?

24  A   Yes.

25       MR. GARDNER:  Ms. Woods, could we go to the

1   following page?  You may need to rotate it so it's right side

2   up.  Back up.  1336 is what we're looking for.  Thank you.  We

3   can zoom in around the middle of the page there and just a

4   little bit higher where it says 5.09.  Okay.

5   BY MR. GARDNER:

6   Q   You see, Mr. Williams, where it says "mediation support"?

7   A   Yes.

8   Q   You see under the amount spent column where it says

9   "$416,933"?

10  A   Yes.

11  Q   That's not a necessary response cost, is it?

12  A   Nope.

13  Q   So there are other costs in these invoices that are

14  similarly not necessary response costs, right?

15  A   That's correct.

16  Q   So if we return then to your first opinion --

17          MR. GARDNER:  Ms. Woods, can we go back to his

18  report, please?

19  BY MR. GARDNER:

20  Q   When you say, "Von Duprin has incurred necessary response

21  costs," which costs specifically are you referring to?

22  A   The costs for environmental investigations and removal

23  actions.

24  Q   And that's it?

25  A   It doesn't include mitigation costs.  It doesn't include

WILLIAMS - CROSS/GARDNER          Vol. 3 - 593

1   RCRA costs on the site itself, correct.

2   Q   And you don't know the total amount of those necessary

3   response costs, right?

4   A   No, I do not.

5   Q   You didn't differentiate between site investigation

6   activities and remediation activities, did you?

7   A   Removal action activities, no, I did not distinguish

8   between those.

9   Q   And you didn't do any analysis to determine whether a

10  particular cost relates to a release or even a threatened

11  release from a particular property, right?

12  A   Could you repeat the question, please?

13  Q   Sure.  You did not do any analysis to determine whether a

14  particular cost relates to a release or even a threatened

15  release from a particular property, right?

16  A   I looked at the specific activity and not the individual

17  cost.

18  Q   So then is the answer to my question, "Correct"?

19  A   Correct.

20  Q   So, for instance, you can't say that any of Von Duprin's

21  costs relate to a release or a threatened release on the Ertel

22  facility, for instance, right?

23  A   Not individually to the Ertel facility.

24  Q   And you can't say -- and you cannot say that any cost

25  incurred relates to a release or a threatened release that was

*WILLIAMS – CROSS/GARDNER*          Vol. 3 - 594

1  caused by Major Holdings or Major Tool, right?

2  A   Correct.

3  Q   And Von Duprin would have been required to incur the same

4  costs that it incurred if its contamination was the only

5  contamination present on its property, correct?

6         MS. FRENCH:  Objection, Your Honor, mischaracterizes

7  the witness's prior testimony.

8         THE COURT:  Your response.

9         MR. GARDNER:  We can go to his deposition now.  I

10 would like to hear his answer first; but if we need to skip

11 ahead to his deposition, we can.

12        THE COURT:  Why don't you do that.

13 BY MR. GARDNER:

14 Q   Mr. Williams, can you please turn to page 104 of your

15 deposition, line 14?

16        Do you remember being asked, "Would Von Duprin have

17 been required to incur the costs that you're testifying it has

18 incurred if its contamination was the only contamination

19 present on its property?"

20        And your response was, "Yes."

21        Do you remember that?

22 A   Correct.

23 Q   Let's discuss the second opinion you offered.

24        MR. GARDNER:  Ms. Woods if we could scroll down in

25 his report, please.  Right there.  Thank you.

*WILLIAMS — CROSS/GARDNER*          Vol. 3 - 595

1  BY MR. GARDNER:

2  Q   Now, in this title here and I believe in your testimony at

3  points today, you've referred to "site investigation

4  activities"; but this opinion that you're offering here today

5  and in your report addresses removal actions, as that phrase

6  is used in the NCP, right?

7  A   Correct.

8  Q   And you identified all of the preliminary assessment or

9  site investigation activities in Section 5.6 of your report,

10 correct?

11         MR. GARDNER:  Ms. Woods, could we skip ahead to 5.6?

12 I believe it starts on page 16 of the report.

13 BY MR. GARDNER:

14 Q   If we read from it, Mr. Williams, in the first sentence

15 there you state, "Sections 300.410 and 420 require preliminary

16 assessments, (PA), and potentially site inspections (SI) for

17 initial evaluation of site conditions."

18        Do you see that?

19 A   Yes.

20 Q   And then in the following paragraph -- the last sentence

21 of the following paragraph, you say, "The PAs/SIs," meaning

22 the preliminary assessments and potentially site inspections,

23 "and Phase Is prepared for the source area include," and then

24 on this page --

25         MR. GARDNER:  And then, Ms. Woods, if we could

*WILLIAMS – CROSS/GARDNER*          Vol. 3 – 596

 1  scroll down to page 17 at the top.

 2  BY MR. GARDNER:

 3  Q   -- you list the PAs and SIs that have been performed in

 4  this area, right?

 5  A   Yes.

 6  Q   So the other actions that you referenced, those are

 7  considered removal actions under the NCP, right?  Anything not

 8  included in this section, the other -- the activities that

 9  you've described today, those are considered removal actions,

10  correct?

11          MS. FRENCH:  Objection, Your Honor, mischaracterizes

12  the witness's prior testimony.

13          THE COURT:  I'll let the witness answer.  He can

14  tell us if that's mischaracterizing his testimony.

15  A   I'm confused by the question.

16  BY MR. GARDNER:

17  Q   I don't mean to confuse you.  I will try to make it simple

18  as I can.  I'm trying to make some sense of the report as

19  well.

20          So --

21          THE COURT:  I'm going to strike your commentary from

22  the record.  It's not appropriate.

23          MR. GARDNER:  Sorry.

24  BY MR. GARDNER:

25  Q   In this section, 5.6, you describe the PAs and SIs that

*WILLIAMS - CROSS/GARDNER*          Vol. 3 - 597

1  have been performed in the source area, correct?

2  A   Yes.

3  Q   Okay.  And I'm merely trying to figure out are there other

4  PAs and SIs that are not listed in this section of your report

5  that you are claiming are PAs or SIs in this case?

6  A   No.  These are the primary PAs and SIs.

7  Q   So if it's listed in that section, that's the extent of

8  the PAs and SIs that are relevant to the source area?

9  A   Yes, that's my understanding.

10  Q   To determine whether these activities complied with the

11  NCP, you have to evaluate multiple sections of the NCP,

12  correct?

13  A   Yes.

14  Q   Okay.  And you listed a bunch of them in a row.  I don't

15  need to focus on all of them, but I do want to make sure that

16  the ones I'm focusing on are sections that you believe apply

17  to the actions that are performed in this case.

18       So have you determined that the following sections

19  that I will list are applicable:  400 CFR Section 300.150,

20  300.160, 300.400(C), 300.400(G), 300.415, 300.430 and 300.155?

21  Do all of those apply to the actions that were taken in this

22  case?

23  A   You missed some and added one.

24  Q   Well, let's talk about the one I added.  Which one did I

25  add that you don't believe applies in this case?

1  A   What was your last one?

2  Q   I said 300.155?

3  A   I misheard you.  Okay.  I have that then.  That's fine.

4  Q   Sorry.  Just so I'm clear, all of those provisions that I

5  listed, those are sections of the NCP that the actions that

6  were undertaken in this case need to comply with to comply

7  with the NCP, right?

8  A   Correct.

9  Q   Let's discuss then the first one I listed.  That's

10 Section 300.150.  We don't need to pull it up because I don't

11 think my questions will relate to the text of it necessarily;

12 but just generally, this section requires a OSHA compliant

13 Health and Safety Plan or what's known as a HASP, right?

14 A   Yes.

15 Q   And a HASP is required for all response actions under the

16 NCP, correct?

17 A   Yes.

18 Q   Here a HASP was not created for any of the work before

19 August of 2014, right?

20 A   I don't know that for a fact.

21 Q   Are you aware of any HASP that was created for work that

22 was performed before August 2014?

23 A   I'm aware of the August 2014 HASP that Geosyntec prepared;

24 but as I testified earlier this morning, that because of

25 29 CFR 1910.120, that was the industry standard for all

*WILLIAMS – CROSS/GARDNER*          Vol. 3 - 599

1  consultants working in hazardous waste sites since at least

2  1990 that they have a HASP for their work.

3          So maybe it's a broad assumption; but it is an

4  industry standard for consultants working in the industry,

5  especially under the jurisdiction -- some of it was under the

6  jurisdiction and supervision of IDEM.  They would have had a

7  Health and Safety Plan.

8  Q   But as you sit here today, you cannot identify any HASP

9  that was created for any of the work before August 2014,

10 right?

11 A   As I testified previously, I have not reviewed any HASP

12 for the work prior to 2014.

13 Q   And you have not reviewed any HASP for any consultant

14 other than Geosyntec, correct?

15 A   That's correct.

16 Q   Let's move on to Section 300.160.  Now, as part of the

17 requirements in this section, it requires private parties to

18 keep an accurate accounting of costs associated with response

19 actions, right?

20 A   Yes.

21 Q   Okay.  And as we discussed, you did not review any actual

22 invoices for any consultant other than Geosyntec, right?

23 A   That's correct.

24 Q   And the cost summaries that you did review for the other

25 consultants did not indicate the work that was being performed

*WILLIAMS - CROSS/GARDNER*          Vol. 3 - 600

1  or who was performing the work, right?

2  A   That's correct.

3  Q   And Geosyntec's invoices, at least the four or five that

4  you did review, do not contain narratives describing the work

5  that was performed, right?

6  A   Not on the invoices, no.

7  Q   Let's go to Section 300.400(C).  This particular

8  subsection requires private parties to be sensitive to local

9  community concerns, correct?

10 A   Yes.

11 Q   (C)(4), that is?

12 A   Yes.

13 Q   And your opinion today is that this requirement was

14 satisfied because Von Duprin or Geosyntec performed activities

15 directly with homeowners and residents of the downgradient

16 properties; is that right?

17 A   That's correct.

18 Q   But the being sensitive to local community concerns under

19 the NCP means more than just communicating with owners and

20 residents of affected properties, doesn't it?

21 A   In some instances in time, yes.

22 Q   Okay.  The NCP doesn't define the local community only to

23 be affected parties, correct?

24 A   They point primarily to the affected parties, but they

25 also specify the timing as to when those affected parties or

*WILLIAMS – CROSS/GARDNER*          Vol. 3 - 601

1  the public as a whole is informed and communicated with.

2         And as I testified previously, and with EPA's

3  concurrence and IDEM's policy, the time that the entire

4  community is informed and communicated with and public comment

5  is sought is right after the Remediation Work Plan is

6  prepared.

7  Q   We will discuss that; but for right now, I only want to

8  focus on Section 400(C)(4), which requires that the parties be

9  sensitive to local community concerns.  And so my question to

10 you is simply the local community consists of more than just

11 affected owners and residents, correct?

12 A   I think the most relevant are the exact people that are

13 being affected.

14 Q   But the regulation speaks to the entire community,

15 correct?

16 A   Maybe we should open up and look at the regulation

17 language exactly.  As I recall it, it is to be sensitive to

18 public concerns.

19         MR. GARDNER:  Ms. Woods, then can we pull up

20 Section 300.400.  It would be in a separate document.  I think

21 it's maybe the fifth one down.

22         Okay.  If you could scroll down just a little bit,

23 please.  You just passed it.  Okay.

24         This is Section (C)(4) at the top, Ms. Woods.  Can

25 we scroll in?

*WILLIAMS – CROSS/GARDNER*          Vol. 3 – 602

1  BY MR. GARDNER:

2  Q   It says, "Be sensitive to local community concerns,"

3  right?

4  A   Yep.

5  Q   Being sensitive to local community concerns requires more

6  than just performing work in accordance with IDEM's schedules,

7  right?

8  A   Yes.

9  Q   So you could perform all your work in accordance with

10  IDEM's schedules; but you still wouldn't necessarily be

11  sensitive to local community concerns, correct?

12  A   Well, in this instance, as I testified earlier this

13  morning, we were sensitive to the public concerns; and we

14  contacted directly the people over the plume and communicated

15  with them directly, the public community.

16  Q   Well, hold on.  Just so I'm clear, you referenced -- you

17  said you referenced the directly affected property owners; and

18  at the tail end of the answer there, you said you also

19  contacted the public community.  So which is it?  Did they

20  contact the public community or was it only the directly

21  affected residents?

22  A   The directly affected residents and the public community

23  over the plume area.

24          MR. GARDNER:  Ms. Woods, we can keep that up for

25  now.  Let's turn to Section 300.400(G).  Ms. Woods, could you

*WILLIAMS – CROSS/GARDNER*          Vol. 3 - 603

1  scroll down a little bit so we have it in front of us to

2  Section G?  I believe that's D.  Keep going.  There's E.

3  There's F.  Right there.  Thank you very much.

4  BY MR. GARDNER:

5  Q   This section requires identification of all applicable

6  requirements or relevant and appropriate requirements for

7  release or anticipated response actions, correct?

8  A   Yes.

9  Q   As it's used in this section, what does the term

10  "applicable requirements" mean?

11  A   Applicable to the response action.

12  Q   And as the term -- well, what does the term "relevant and

13  appropriate requirements" mean as it's used in this section?

14  A   Requirements, again, related to what responses were going

15  to be implemented.

16  Q   So then what's the difference between applicable

17  requirements and relevant and appropriate requirements?

18  A   I struggle with those terms myself because they all

19  essentially seem to mean the same thing.

20  Q   Okay.  The EPA provides guidance for the process of

21  identifying ARARs, right?

22  A   Yes.

23  Q   And you did not review that guidance before offering your

24  opinion in this case, did you?

25  A   No, that's not true.

WILLIAMS – CROSS/GARDNER        Vol. 3 - 604

1  Q    That's not true?

2  A    That's not true.

3  Q    So your testimony is now that you did review the EPA

4  literature?

5  A    I have reviewed the EPA literature relevant to the

6  development of ARARs.

7  Q    Would that have been listed in your expert report under

8  your references section, do you think?

9  A    No.

10  Q    So you reviewed it, but you didn't put it in your report?

11  A    Correct.

12  Q    You're not aware of any ARARs that were spelled out in any

13  document for the work performed in this case, correct?

14  A    As I testified earlier today, there's no document that's

15  entitled "ARARs" but --

16  Q    That's my question.  Thank you.

17       If the person performing the work does not document

18  their consideration of ARARs, then how can you know that they

19  actually identified the ARARs and determined that those

20  requirements did or did not apply?

21  A    By looking at the requirements that were satisfied and

22  implemented during the execution of that work.

23  Q    Well, I would agree with you in part that I think that

24  would tell you maybe some of the requirements that they found

25  did apply; but if they don't list them specifically, how do

WILLIAMS – CROSS/GARDNER          Vol. 3 - 605

1   you know which ones they considered and which ones they didn't

2   consider?

3   A   I don't know.  You're right.

4   Q   Now, applying IDEM's screening levels is not the same

5   thing as identifying all ARARs, right?

6   A   It's one component of ARARs.

7   Q   Sure, but there are other ARARs that should be considered

8   that don't have anything to do with the IDEM screening levels,

9   right?

10  A   Correct.

11  Q   Let's turn to Section 300.415.

12          MR. GARDNER:  And, Ms. Woods, maybe it would be

13  helpful if we pulled this up as well.  It would be a different

14  document.  Okay.  We can keep it here for now.  If we need to

15  reference it, let me know; and we can zoom in on any

16  particular portion.

17  BY MR. GARDNER:

18  Q   Among other things, 300.415 requires a private party to

19  conduct an engineering evaluation/cost analysis or what I

20  understand is called an EE/CA, correct?

21  A   Yes.

22  Q   And the EPA provides guidance for developing EE/CAs,

23  correct?

24  A   Yes.

25  Q   Did you review that guidance before you performed your

WILLIAMS – CROSS/GARDNER          Vol. 3 - 606

1   opinion in this case?

2   A    In the process of forming my opinions, yes.

3   Q    But that reference, that guidance, that document is not

4   referenced anywhere in your report, is it?

5   A    Not specifically, no.

6   Q    Now, there is no EE/CA that was spelled out for any of the

7   work that was performed here, is there?

8   A    As I testified earlier, there is no document that is

9   entitled "EE/CA" --

10  Q    Thank you.

11  A    -- for this matter.

12  Q    The section also requires a Sampling and Analysis Plan or

13  what is referred to as a SAP and a Quality Assurance Project

14  Plan or a QAPP, right?

15  A    Correct.

16  Q    Both the SAP and the QAPP are also required under

17  Section 300.430, right?

18  A    I can't remember the exact citation.  I'll trust you on

19  that.

20  Q    A SAP was required to be created for the work that was

21  performed here, correct?

22  A    For the response action, yes.

23  Q    And you're not aware of any document where a SAP is

24  spelled out, are you?

25  A    As I testified earlier, the components of the SAP are

*WILLIAMS - CROSS/GARDNER*          Vol. 3 - 607

1  spelled out in the documents; but there is no specific

2  document entitled "SAP."

3  Q   And a QAPP was also required to be performed for the

4  work -- I think you said the response actions that were taking

5  place here; is that correct?

6  A   Yes.

7  Q   And, in fact, a QAPP is required under both the NCP

8  guidance and IDEM's Remediation Closure Guide, correct?

9  A   Correct.

10  Q   And here, a QAPP was prepared by Geosyntec in May of 2017,

11  right?

12  A   Correct.

13  Q   So Geosyntec knew how to create a QAPP, right?

14  A   Yes.

15  Q   But Geosyntec did not create any QAPP before May of 2017;

16  isn't that right?

17  A   Correct.

18  Q   And you're not aware of any other QAPPs created by anybody

19  before May of 2017; isn't that right?

20  A   But as I testified earlier, the components of the QAPP

21  were within the documents of the work plans that were prepared

22  in this matter.

23  Q   Just so I have an answer to my question, you're not aware

24  of any other QAPPs created before May of 2017, right?

25  A   Correct.

*WILLIAMS - CROSS/GARDNER*          Vol. 3 - 608

1  Q   And the removal actions that you testified were performed
2  here, those were performed before May of 2017, right?
3  A   Yes.
4  Q   Final sections, these all relate to community involvement
5  requirements; so I'll lump them together as Von Duprin's
6  counsel did.
7       300.155, 300.415 and 300.430, all of those contain
8  community involvement requirements, correct, Mr. Williams?
9  A   Yes.
10 Q   For instance, if we were to -- here, we can use this one.
11      MR. GARDNER:  Ms. Woods, can you go down to Section
12 (N)(4).  Keep going.
13 BY MR. GARDNER:
14 Q   Either way, (N)(4) specifies the minimum public comment
15 and review requirements for removal actions, right?  Do you
16 need Ms. Woods to pull it up?  We can do that for you if you
17 want, Mr. Williams.
18      MR. GARDNER:  Ms. Woods, 415, so just the tab over
19 to the left.  That one.  And we are looking for section
20 (N)(4).  That's fine right here.
21 BY MR. GARDNER:
22 Q   So here we've even got (N)(2), (N)(3) as well as (N)(4);
23 but these describe generally the community actions that are
24 required, right?
25 A   Yes.

*WILLIAMS – CROSS/GARDNER*          Vol. 3 - 609

1  Q   Okay.  And as some of those requirements, there's a

2  requirement that they include a formal Community Relations

3  Plan, right?

4  A   Yes.

5  Q   And there are certain days allocated for the submission of

6  written or oral comments, right?

7  A   Yes.

8  Q   And there's a section that requires them to prepare

9  written responses to significant comments, right?

10 A   Yes.

11 Q   And there is a requirement that relates to publishing

12 certain documents in a local newspaper, right?

13 A   Yes.

14 Q   And the work that Von Duprin -- the work that was

15 performed for Von Duprin was required to comply with each of

16 these provisions, right?

17 A   Well, I would argue that the Memorandum of Understanding

18 and the authority that EPA Region V gave to IDEM through the

19 Voluntary Remediation Program, that that would govern over the

20 individual specific requirements and that those requirements

21 were essentially satisfied through the Community Relations

22 Program and planning as spelled out in the Remediation Program

23 and Closure Guide.

24 Q   Okay.  Let's start then with the Memorandum of

25 Understanding.  That you were asked about during your

WILLIAMS - CROSS/GARDNER          Vol. 3 - 610

1  questioning earlier this morning.  It's a Memorandum of

2  Understanding between IDEM and the EPA, right?

3  A   Yes.

4  Q   And that document doesn't reference the National

5  Contingency Plan anywhere, does it?

6  A   Oh, but it does, yes.

7  Q   You think it does?

8  A   Yes.

9  Q   Okay.  We can address that later if we need to.

10       Let's return to the question here.  The NCP itself,

11  does it spell out that if actions are taken in accordance with

12  that Memorandum of Understanding, that they will then be

13  consistent with all these community requirements?

14  A   It does not.

15  Q   And it's your opinion that community outreach performed by

16  Von Duprin or on behalf of Von Duprin was sufficient to comply

17  with all of these community relations requirements, right?

18  A   Yes.

19  Q   But as we discussed earlier, those interactions were

20  limited to the downgradient property owners who are affected

21  by the plume, correct?

22  A   Yes.

23  Q   Now, IDEM's requirements for response actions are not the

24  same as the NCPs, are they?

25  A   I think they're generally consistent but they are not the

*WILLIAMS - CROSS/GARDNER*          Vol. 3 - 611

1  same.

2  Q   For instance, a Community Relations Plan requirement is

3  different, right, for -- for IDEM, it's required when the RWP

4  is created; but for the NCP, it's required much earlier, isn't

5  it?

6  A   Yes.  The NCP does spell out that it's the implementation

7  of the Community Relations Plan, and community relations as a

8  whole is at the discretion of the lead agency.

9  Q   Okay.

10       You've referenced IDEM's oversight of the actions that

11  were taken in this area; but you don't know which actions were

12  taken with IDEM's oversight and which were not, do you?

13  A   I'm sorry.  Could you repeat the question?

14  Q   Sure.  So you've referenced IDEM's oversight, essentially

15  that IDEM has overseen the activities that were taken in this

16  area, correct?

17  A   Yes.

18  Q   But you don't know which activities IDEM has overseen and

19  has not overseen, correct?

20  A   I don't think that's correct.

21  Q   Okay.  Let's turn to page 48 of your deposition,

22  Mr. Williams.  The very last paragraph of page 48, starting on

23  line 22.  "Of all the work that Geosyntec has performed that

24  resulted in costs that have been incurred by Von Duprin, has

25  any of the work been done without IDEM's oversight?"

*WILLIAMS — CROSS/GARDNER*          Vol. 3 - 612

1        And if you turn the page onto 49, your response was,
2   "I don't know."
3        And if we skip down to line 8, you were asked:  "Of
4   all the work that Geosyntec performed in the study area, did
5   you determine whether that work was performed with IDEM
6   oversight or if it was performed without IDEM oversight?"
7        Your response was:  "It is my understanding that the
8   vast majority of the work was performed with IDEM oversight.
9   There may have also been some tasks performed without IDEM
10  oversight, but I can't spell out specifically which those
11  tasks were."
12       Then you were asked:  "At what point did you perform
13  that analysis though?"
14       And your response was, "I really didn't."
15       You've also referenced IDEM as being the lead agency,
16  correct?
17  A   Yes.
18  Q   Is it your opinion that IDEM's -- that it's IDEM's
19  responsibility to fulfill the community relations obligations
20  in this case?
21  A   I think it's collectively IDEM and Von Duprin.
22  Q   The term "lead agency," when the party involved is a
23  private party and not a governmental entity, does that term as
24  it's used in the NCP relate or refer to the private party or
25  to a lead agency?  Do you know?

WILLIAMS - CROSS/GARDNER          Vol. 3 - 613

1  A    I don't know exactly.  It does distinguish between private

2  parties and lead agencies.  So when it uses the term "lead

3  agency" in the NCP, I'm assuming it refers to the actual lead

4  agency.

5  Q    Okay.  You testified that the EPA approved the community

6  relations requirement required by IDEM for parties in the VRP.

7  Do you remember that?

8  A    Yes.  I think you kind of misstated what I said.

9  Q    Correct me then.  Sorry.  I didn't mean to misstate it.

10 A    I'm not sure what you're asking me to testify to.

11 Q    Well, tell me what in my statement was incorrect.

12 A    Can you repeat your statement?

13 Q    Sure.  I said -- and again, if I'm wrong, please let me

14 know -- you testified that the EPA approved the community

15 relations requirements that are required by IDEM for parties

16 in the VRP?

17 A    And what I testified to was that IDEM and EPA agreed that

18 the community relation -- or that the community relations

19 components of the VRP was adequate.

20 Q    Sorry.  I did not mean to mischaracterize your testimony.

21      My question, though, is the removal actions that were

22 taken here were taken before Von Duprin was in the VRP,

23 correct?

24 A    I'll have to recall when the JTV Hill remediation

25 occurred; but certainly, the residential mitigation or removal

*WILLIAMS – CROSS/GARDNER*          Vol. 3 - 614

1   action was done before they were enrolled in the VRA.

2          MR. GARDNER:  Briefly, Ms. Woods, can we go back to

3   his report, please.  Opinion 3.  Okay.

4   BY MR. GARDNER:

5   Q   Here in the report and also here today, you testified

6   about remedy selection and remediation, correct?

7   A   Yes.

8   Q   You've not determined that any remedial action relating to

9   groundwater was performed in compliance with the NCP, have

10  you?

11  A   No, I have not.  There's been no remediation of

12  groundwater to this point.

13  Q   Sure.  And Section 300.435 of the NCP applies to remedial

14  actions, correct?

15  A   That's right.

16  Q   And you didn't consider that section in forming your

17  opinions today, correct?

18  A   Correct, since there has been no remedial action.

19  Q   And as you sit here today, you can't say whether the costs

20  that Von Duprin will incur in the future will be necessary

21  response costs incurred consistent with the NCP, can you?

22  A   If I heard your question correctly, I'm not sure that's

23  accurate because of the Remediation Work Plan that I testified

24  to earlier for soils on the Von Duprin property, that that

25  sets the framework for the Remediation Work Plan that will

1   also be prepared when it comes to determining the Groundwater

2   Remediation Plan.

3   Q   So I think we agree that there's a remediation -- a

4   partial Remediation Work Plan in place.  My question is that

5   just because that Remediation Work Plan is in place doesn't

6   mean necessarily that Von Duprin is going to incur necessary

7   response costs consistent with the NCP in the future, right?

8   A   I disagree with that because that is the template that's

9   set that's spelled out in the Voluntary Remediation Agreement,

10  which parties and how the parties collectively in this room

11  cooperate to remediate the groundwater, if they do.  That

12  would certainly serve as a template for going forward, and I

13  think that template is substantially consistent with the NCP.

14  Q   One last question, Mr. Williams.

15        Earlier today, you testified that IDEM required

16  Von Duprin to perform upgradient delineation activities on

17  Major Tool and Major Holdings' property.  Do you remember

18  that?

19  A   Yes.

20  Q   In what document did IDEM require that?

21  A   I remember seeing it, and it was one of the documents

22  related to the investigation on the Von Duprin -- I can't

23  remember exactly which document that was.

24        MR. GARDNER:  Your Honor, I have no further

25  questions at this time.

*WILLIAMS – CROSS/MENKVELD*          Vol. 3 - 616

1          THE COURT:  All right.  Thank you.

2          On behalf of Moran, Mr. Menkveld, are you going to

3  do the cross?

4          MR. MENKVELD:  Yes, Your Honor.

5                    **CROSS-EXAMINATION**

6  BY MR. MENKVELD:

7  Q   Good morning, sir.

8  A   Good morning.

9  Q   I am Marc Menkveld.  I will ask you questions on behalf of

10 Moran Electric.

11         First, I want to make sure I understand that you are

12 an employee of Geosyntec; is that right?

13 A   Yes.

14 Q   And you are also a partial owner of Geosyntec?

15 A   A very small owner.

16 Q   Some percentage less than 10 percent?

17 A   Much less than 1 percent.

18 Q   But you are a partial owner nonetheless; is that right?

19 A   Yes.

20 Q   And your job in this case is to assess whether your

21 employer, which is a company that you partially own, complied

22 with a federal regulation; is that right?

23 A   In part, yes.

24 Q   You offered testimony earlier today that you're aware that

25 the NCP requires engaging in a prompt response, right?

WILLIAMS - CROSS/MENKVELD          Vol. 3 - 617

1   A    Yes.

2   Q    And you defined a prompt response meaning without

3   unnecessary delay; is that correct?

4   A    I don't think I used those exact words.

5   Q    How would you define what it means to be prompt?

6   A    I believe I used the term that -- I gave very specifics

7   for the residential vapor intrusion mitigation system, that

8   they were discovered in June; and a mitigation system was

9   installed three to four months later, August to October 2014.

10  Q    So you know your deposition's been taken in this case; and

11  we've worked with it a little bit, correct?

12  A    Yes.

13  Q    Let's just make sure we're on the same page here.  Page

14  69, line 24 and 25 of your deposition.  And you can use the

15  one I'm working with here or your own.  It doesn't matter.  I

16  asked on line 24, "How do you define prompt?"

17       And what was your answer?

18  A    "Without delay."

19  Q    And?

20  A    "And without unnecessary delay."

21  Q    Now, when we're talking about engaging in a prompt

22  response, you're referring to Von Duprin's prompt response,

23  correct?

24  A    Yes.

25  Q    And that response would be a response to a regulator

*WILLIAMS – CROSS/MENKVELD*          Vol. 3 - 618

1  making demands of a potentially responsible party; is that

2  right?

3  A    That could be one, yes.

4  Q    Now, a letter from a regulator could trigger a prompt

5  response; is that correct?

6  A    Yes.

7          MR. MENKVELD:  Pull up Exhibit 1010, please.

8  BY MR. MENKVELD:

9  Q    Mr. Williams, have you seen this exhibit before?

10  A    Yes.

11  Q    Now, was this exhibit worked into your analysis of whether

12  Von Duprin engaged in a prompt response?

13  A    Not specifically, no.

14  Q    Now, if you can tell us, if you recall when Von Duprin

15  actually removed impacted soils at the Von Duprin site.

16  A    There was certainly some earlier this year.  There were, I

17  believe, some tank removals.  I'm not sure the time frame of

18  those.

19  Q    You understand that a release of contaminants to soil

20  leaves contaminated soils in place?

21  A    Yes.

22  Q    Is it your understanding that Von Duprin removed

23  contaminated soils for the first time on the Von Duprin

24  property in 2019?

25  A    No.

WILLIAMS - CROSS/MENKVELD          Vol. 3 - 619

1  Q   Okay.  You don't know whether that occurred or do you

2  dispute that?

3  A   For the first time.  I dispute for the first time.

4  Q   Tell me when Von Duprin first removed contaminated soils

5  from its site.

6  A   I don't remember the exact date.  I'm sorry.

7  Q   Give me an approximate date.

8  A   I thought it was 2015, 2016 time frame.

9  Q   Where a soil excavation was performed on the Moran

10 property?

11 A   Again, I can't remember the exact event or the document

12 that summarizes that.

13 Q   And you can't point me to a document that summarizes that

14 as we're sitting here right now?

15 A   As we're sitting here right now, no.

16 Q   Now, you mentioned earlier that there was some soil

17 removal from the Von Duprin property, right?

18 A   Yes.

19 Q   And that was done in 2019.  Is that what you're referring

20 to?

21 A   Yes.

22 Q   And as part of this case, Von Duprin is not asking Moran

23 or Major Tool for reimbursement with respect to those costs;

24 is that correct?

25 A   That's correct.

WILLIAMS - CROSS/MENKVELD        Vol. 3 - 620

1  Q   Now, you also mentioned earlier just today, Mr. Williams,

2  that Moran and MTM were ordered to clean up their properties,

3  whereas Von Duprin volunteered.  Do you recall that?

4  A   Yes.

5  Q   Are you aware, Mr. Williams, that soil removal was

6  performed on the Ertel property?

7  A   I recall something like that, yes.

8  Q   Are you aware that the soil removal was performed on the

9  Zimmer property?

10 A   Yes.

11 Q   Are you aware that soil removal was performed on the Moran

12 property?

13 A   Yes, and I recall some of that removal was done by the

14 City of Indiana -- or Indianapolis and the EPA, if I recall

15 correctly.

16 Q   Mr. Williams, do you know whether IDEM required that

17 removal to be performed?

18 A   I haven't looked at that specific regulatory record.

19 Q   So you don't know if an order was entered against Major

20 Tool or Moran to perform that soil removal?

21 A   No, I don't.

22 Q   Do you know one way or the other how many millions of

23 dollars were spent doing that removal?

24 A   No, I don't.

25 Q   And do you know whether Moran Electric actually paid for

*WILLIAMS - CROSS/MENKVELD*          Vol. 3 - 621

1   that soil removal?

2   A   I don't.

3   Q   Or for that matter, do you know whether Major Tool

4   actually paid for that soil removal?

5   A   I don't.

6   Q   Do you realize buildings were demolished on those

7   properties?

8   A   I understood they were.

9   Q   And you realize buildings were erected on those

10  properties?

11  A   I believe so.

12          MS. FRENCH:  Objection, Your Honor.  I think we're

13  pretty far afield from the witness's opinions and his earlier

14  testimony.

15          MR. MENKVELD:  Your Honor, he testified that Moran

16  and Major Tool were ordered to do remediation activities, and

17  I'm establishing those activities occurred without an order.

18          THE COURT:  Okay.  I'll overrule.  Next question.

19  BY MR. MENKVELD:

20  Q   Are you aware that Moran and Major Tool jointly

21  volunteered to enter into the Voluntary Remediation Program?

22  A   That's very recent; is that correct?

23  Q   I'm asking you.

24  A   I understood it was a very recent activity.  That was

25  after they were ordered, I believe, in 2018.

*WILLIAMS - CROSS/MENKVELD*          Vol. 3 - 622

1  Q    Okay.  So it's your testimony today that you believe the

2  IDEM order came before the voluntary remediation application.

3  Is that your testimony?

4  A    That's my recollection, yes.  I haven't seen the voluntary

5  agreement, but I did see the order; and I believe the order

6  came prior to my deposition last year, if I recall correctly.

7  Q    Well, if I told you that Major Tool and Moran filed their

8  VRP application before IDEM's order came down, would you

9  dispute that?

10 A    Would I dispute it?  Would I change my opinion if I had

11 saw that document?  Yes, I would change my opinion.

12 Q    Now, there's been some testimony in this case that

13 consultants other than Geosyntec did some work to investigate

14 the study area in general, correct?

15 A    Yes.

16 Q    And some of that work was done on the Von Duprin site

17 itself; is that right?

18 A    Yes.

19 Q    Now, it's your opinion and you understand, don't you, that

20 Von Duprin is actually a responsible party with respect to

21 releases on its own property?

22 A    Certainly, yes.

23 Q    And some of that data that was collected by other

24 consultants was used to investigate that contamination; is

25 that right?

WILLIAMS - CROSS/MENKVELD          Vol. 3 - 623

1   A    Yes.

2   Q    Now, you referenced earlier that Von Duprin did not pay

3   those consultants directly for that data, correct?

4   A    That's my understanding, yes.

5   Q    And that you believe Von Duprin paid money into a

6   settlement, and that's how it obtained access to the data; is

7   that right?

8   A    Yes.

9   Q    Now, you did not review that settlement agreement, did

10  you?

11  A    No.

12  Q    You haven't reviewed any documents showing the transfer of

13  title from -- or of that data from Threaded Rod to Von Duprin,

14  have you?

15  A    No.

16  Q    Do you have any opinion as to whether those data are even

17  transferable without a written agreement, whether they can be

18  transferred without a written agreement?

19  A    Whether the data electronically, physically?  I'm confused

20  by your question.

21  Q    That's a good request for clarification.

22       You have no opinion as to whether the ownership of

23  those data are transferable without a written agreement, do

24  you?

25  A    I have no opinion on that.  You're correct.

WILLIAMS – CROSS/MENKVELD        Vol. 3 - 624

1  Q   Now, you are aware of IDEM's Virtual File Cabinet, aren't

2  you?

3  A   Yes.

4  Q   And the Virtual File Cabinet is a repository -- an online

5  repository where environmental data is put online, right?

6  A   Right.

7  Q   And then members of the public can go and then review that

8  data, correct?

9  A   Yes.

10  Q   And these data would have been put on the Virtual File

11  Cabinet, correct?

12  A   Not necessarily.

13  Q   Well, in this case, weren't these reports actually put on

14  the Virtual File Cabinet from other consultants?

15  A   I don't know if all of them were or not.  I know a lot of

16  the Virtual File Cabinets or electronic databases maintained

17  by state agencies didn't really go into effect until the 2000

18  or 2005 time frame.  So I haven't gone to see if Indiana went

19  back and scanned all their historical records and put them on

20  the file cabinet or not.

21  Q   So you can't tell me which of these data were actually put

22  on the Virtual File Cabinet then; is that right?

23  A   That's correct.

24  Q   Now, would it be necessary to buy data that is available

25  to the public at large?

WILLIAMS - CROSS/MENKVELD        Vol. 3 - 625

1    A    It depends on the format of the data.  If you're obtaining

2    the data in its electronic database, yes, it would be worth it

3    to buy.

4    Q    Well, now, you just said some of those data releases are

5    at the Von Duprin site, right?

6    A    Yes.

7    Q    Are you aware that Moran Electric also paid money to

8    Threaded Rod to settle Threaded Rod's lawsuit?

9    A    No.

10   Q    So you don't know if Moran actually bought some of the

11   data from Threaded Rod?

12   A    I do not know.

13   Q    As a matter of fact, as a responsible party for releases

14   on the Von Duprin property, are you saying that Von Duprin

15   bought data that was used to investigate its own releases?

16   A    No.

17   Q    Well, what part of that data that Von Duprin supposedly

18   purchased was associated with releases at the Von Duprin

19   property?

20   A    I'm really confused by your question.  I'm sorry.

21   Q    You understand there was data taken from the Von Duprin

22   property, right?

23   A    There were samples collected and data generated, yes.

24   Q    You understand there was data taken from upgradient

25   properties, right?

WILLIAMS - CROSS/MENKVELD          Vol. 3 - 626

1   A    Yes.

2   Q    And you understand there's been data taken from

3   downgradient properties; is that right?

4   A    Yes.

5   Q    Do you have any understanding at all as to how much money

6   was paid for data on the Von Duprin property?

7   A    I understood it was $1.5 million.

8   Q    For just the data on the Von Duprin property?

9   A    Oh, I don't know.  It was the domain of all the data

10  associated with the settlement.  Having not read the

11  settlement agreement, I can't really opine on that.

12  Q    And so having not read the settlement agreement, you don't

13  know how much money Von Duprin paid to reimburse Threaded Rod

14  for its costs versus how much was paid to buy data; is that

15  right?

16  A    That's correct.

17  Q    What's the fair market value of a monitoring well --

18  buying a monitoring well?

19  A    I guess the -- what the cost would be to install a

20  monitoring well.

21  Q    Well, the installation of a monitoring well wouldn't be

22  data, right?  That would be work performed that a fee is

23  charged for?

24  A    Well, it requires a driller and a consultant and may

25  require evaluation of ARARs and an EE/CA, depending on what it

WILLIAMS - CROSS/MENKVELD        Vol. 3 - 627

1   is.

2   Q   So how much did Von Duprin pay for the drilling of those

3   wells?

4   A   I don't know.

5   Q   How much did Von Duprin pay for the testing of those

6   wells?

7   A   Which wells are you referring to?

8   Q   Any of the monitoring wells in the area.

9   A   Including the ones that they installed themselves --

10  Q   Any of the wells that -- excuse me.  You can finish your

11  answer.

12  A   Or the ones that the other parties installed?

13  Q   The ones that the other parties installed.

14  A   I don't know.

15  Q   So it's fair to say you have no idea what the breakdown of

16  any payment for data versus other things is for; is that

17  correct?

18  A   That's correct.

19      You do make an important distinction, that it wasn't

20  just the data that they paid for.  They paid for the wells is

21  my understanding, that they were able to retain the wells that

22  were installed by others.  So they didn't have to repeat those

23  costs by installing new wells because the other parties

24  actually could have destroyed them.

25  Q   But you don't know how much they paid for the wells

WILLIAMS – CROSS/MENKVELD          Vol. 3 – 628

1  specifically?

2  A   No, I don't.

3  Q   Part of your opinion in this case is whether costs that

4  Von Duprin incurred were necessary; is that right?

5  A   Yes.

6  Q   Do you understand that assessment to require an analysis

7  of whether releases pose a risk to human health or the

8  environment?

9  A   Yes.

10 Q   And you have not determined whether any releases on the

11 Zimmer Paper parcel pose a risk to human health or the

12 environment, correct?

13 A   Well, there is data that demonstrates that the

14 concentrations in --

15 Q   No, that's not what I asked you.

16      My question is:  You have not determined whether any

17 releases on the Zimmer parcel pose a risk to human health or

18 the environment; is that correct?

19 A   That's incorrect.

20 Q   Okay.  Let's just go through it.  Pull up your deposition,

21 please.  You have a copy.  Let's go through the properties.

22 Turn to page 47, starting with line 2; and we'll go down to

23 line 12.

24      Line 2, you were asked:  "Have you determined whether

25 any release on the Moran property has posed a risk to human

WILLIAMS - REDIRECT/FRENCH        Vol. 3 - 629

1  health or the environment?"  What was your answer?

2  A   "I have not."

3  Q   Next question:  "Have you determined whether release on

4  the Ertel property has posed a risk to human health or the

5  environment?"  What was your answer?

6  A   "No."

7  Q   Next question:  "How about any property identified as the

8  Zimmer property?"  What was your answer?

9  A   "Not independently, no."

10        And to --

11        MR. MENKVELD:  I'll pass the witness.

12        THE COURT:  Ms. French, you may cross -- you may

13  redirect your witness.

14        MS. FRENCH:  Thank you, Your Honor.

15                    **REDIRECT EXAMINATION**

16  BY MS. FRENCH:

17  Q   How does your experience in supervising NCP compliance on

18  site sites inform your analysis in this case?

19  A   Well, I've been involved in a lot of projects; and they've

20  involved numerous releases, different types of chemicals,

21  different types of remedial alternatives; and in the process,

22  we, I guess, go through a very methodical process in the

23  investigation and remediation of those sites, working with the

24  regulatory agencies in the process.

25  Q   So your experience in supervising compliance with the NCP

*WILLIAMS – REDIRECT/FRENCH*          Vol. 3 - 630

1  at other sites provides you with working knowledge and

2  familiarity with the relevant regulations?

3  A    Yes.

4  Q    Did you review the reports from other consultants that

5  were prepared related to the summary of costs you reviewed?

6  A    Some of them, yes.

7  Q    So you're familiar with at least a portion of the scope of

8  work performed?

9  A    Yes.

10 Q    And did that assist you in evaluating the cost summary

11 that you reviewed related to those other consultants' work at

12 the site?

13 A    To some degree, yes.

14 Q    How?

15 A    Well, it was essentially -- it was the body of work as a

16 whole, starting from no samples to a fully characterized site

17 when they were done; and it was essentially having all those

18 data collectively that helped identify the sources on the

19 Von Duprin property, as well as defined the downgradient

20 extent of groundwater contamination, to some degree.  I think

21 further definition was performed after those initial

22 investigations.

23 Q    What do the cost documentation and accounting requirements

24 under the NCP require private parties performing response

25 actions to do?

WILLIAMS - REDIRECT/FRENCH          Vol. 3 - 631

1  A    To have an accurate accounting of the costs.  It's not a

2  line-by-line analysis for NCP compliance.  It's looking at the

3  costs as a whole for the work that was performed.

4  Q    Does the NCP require a private party seeking to recover

5  its costs to redo preliminary assessments that have already

6  been performed in the site?

7  A    No.

8  Q    Did Von Duprin perform additional investigative work after

9  it began working in the plume area in 2014?

10  A    Yes.

11  Q    Does 400 CFR Section 300.400(C)(4) define what the local

12  community scope is?

13  A    Could you provide that reference again?

14  Q    Sure.

15          MS. FRENCH:  Could we pull up 300.400(C)(4)?  Next

16  page, please.

17  A    Specifically, it says, "Be sensitive to local community

18  concerns."

19  BY MS. FRENCH:

20  Q    But that's not further defined in any way?

21  A    No, it's not.

22  Q    Has Von Duprin's partial Remediation Work Plan been

23  submitted for public comment?

24  A    Yes.

25  Q    Does the party have to list every single environmental

*WILLIAMS - REDIRECT/FRENCH*          Vol. 3 - 632

1    statute or regulation and then check the box next to which

2    ones may apply in order to satisfy the ARARs requirement under

3    the NCP?

4    A    I don't think so, no.

5    Q    How would they go about doing that then?

6    A    They go and list off the relevant requirements for the

7    actions that are being taken.

8    Q    But it's not a rule-out, rule-in document where you have

9    to show every single regulation in the world that may possibly

10   apply?

11   A    No.  It can be exhaustive but not every single regulation.

12   Q    What specific requirements of the NCP does the Remediation

13   Work Plan satisfy?

14   A    Well, there's numerous components in that it does satisfy

15   the requirement for QAPP.  I think it outlines the

16   requirements or the intent and scope of a SAP is included in

17   that.  It goes through the specific remedial site evaluation,

18   which is .420.  It includes the Community Relations Plan.  It

19   includes .430, which is the remedy selection phase of that

20   specific line item.

21          It has Health and Safety Plan, which is .150 and --

22   Q    Go ahead.

23   A    -- does a detail documentation, which is .160 of the

24   investigations performed.

25   Q    Does the Final Investigation Report also satisfy several

*WILLIAMS - REDIRECT/FRENCH*        Vol. 3 - 633

1  requirements of the NCP?

2  A    Yes.

3  Q    What are those requirements?

4  A    Similar to what I just said.  Includes .430, which in my

5  opinion is consistent with a remedial investigation.  It

6  describes and evaluates the impact to human health and the

7  environment, defines the nature and extent of contamination.

8  These are all specific NCP requirements.

9        It does describe in great detail the public

10 communication that was performed and I believe table 11 of

11 that document as well.

12            MS. FRENCH:  Could we pull up table 11 of the Final

13 Investigation Report?  Could you zoom in on the first page of

14 that?  And could you include the page numbers at the bottom?

15 BY MS. FRENCH:

16 Q    What does this table tell you about the community

17 relations efforts of Von Duprin and its work in the plume

18 area?

19 A    Well, it's hard to read; but there are six pages.  I can

20 read here on the bottom it's 1 of 6 pages, and this describes

21 the individual outreach to affected community members, in the

22 process of gaining access to their property, to sampling their

23 property, sending them the sample results, and mitigation

24 plans and things like that.  So this is a line item accounting

25 for contact with each one of the individual residential

*WILLIAMS - REDIRECT/FRENCH*          Vol. 3 - 634

1   properties downgradient.

2   Q    Do you still have a copy of your deposition with you up

3   there?

4   A    Yes.

5   Q    Going to deposition page 104, line 14, I believe the

6   question in the deposition says:  "So my question is would

7   Von Duprin have been required to incur the costs that you're

8   testifying that it has incurred if its contamination was the

9   only contamination present on its property?"

10          And your response was, "Yes."

11  A    Yes.

12  Q    What did you mean by that response?

13  A    I meant that if Von Duprin was the only party and

14  responsible for the contamination, then they would have had to

15  investigate the downgradient plume as they had.  But also, the

16  important part that seems to get lost is that the contribution

17  from the upgradient parties has made the plume much larger;

18  and the costs are much higher than what was originally -- or

19  if Von Duprin was the only party.

20  Q    And, in fact, at your deposition, you shortly thereafter

21  actually stated that, didn't you?

22  A    Yes.

23  Q    At 104, line 25, you were asked:  "Are you offering any

24  opinion that Von Duprin has specifically incurred response --

25  necessary response costs as a result of Major Holdings' or

*WILLIAMS - REDIRECT/FRENCH*        Vol. 3 - 635

1   Major Tool's action on any property upgradient of the

2   Von Duprin site?"

3          Line 4, your response, if you would read it for the

4   Court?

5   A   "Von Duprin has performed upgradient investigations on

6   properties of their own in an effort to define upgradient

7   sources, if I understand your question correctly, yes."

8   Q   The next question was:  "Which response costs has

9   Von Duprin incurred as a result of Major Holdings' or Major

10  Tool's actions?"

11  A   "As I testified earlier, I haven't distinguished between

12  Major Tool, Zimmer or Ertel or Moran of the upgradient costs."

13  Q   Later in your deposition at page 122, line 23, you were

14  asked:  "And does the term 'commingled plume' mean to you that

15  there are multiple sources that contribute contamination into

16  that single groundwater plume?"

17          MR. MENKVELD:  Objection, Your Honor.  I'm not sure

18  if we're eliciting witness testimony or if counsel is

19  impeaching the witness here.  I'm not sure if this is proper

20  use of a deposition at trial.

21          MS. FRENCH:  Your Honor, I'm merely allowing the

22  witness to provide his complete responses to the lines of

23  questioning that have been elicited on cross related to page

24  104 of his testimony and the later testimony he offered on the

25  same topic in order to clarify.

*WILLIAMS - REDIRECT/FRENCH*        Vol. 3 - 636

1          MR. MENKVELD:  That's done through asking the

2    witness questions, Your Honor, not reading his prior

3    testimony.

4          THE COURT:  I agree.  Rephrase your questions,

5    counsel.

6    BY MS. FRENCH:

7    Q   Mr. Williams, did you opine that groundwater containing

8    hazardous substances has and continues to migrate from

9    defendants' properties beneath the property and into the

10   downgradient area?

11   A   Yes.

12   Q   And what was your basis for that statement in your report?

13   A   The results -- primarily the results of the upgradient

14   investigation of the defendants' properties.

15          Also, IDEM has recognized -- and it's not disputed --

16   that it's a commingled plume; and that plume is commingled by

17   the fact of multiple contributors to the groundwater plume.

18   Q   So while you were not asked specifically to opine on what

19   percentage of costs were attributable to each upgradient

20   property, your opinion does include that the commingled plume

21   contributes generally to the costs that Von Duprin incurred

22   throughout the plume area?

23   A   That's correct.

24   Q   Was the soil removal completed at the Von Duprin property

25   a remedial action?

WILLIAMS - REDIRECT/FRENCH        Vol. 3 - 637

1    A    Yes.

2    Q    And was that completed following the completion of a

3    remedial investigation?

4    A    The remedial investigation on the Von Duprin property,

5    yes.

6    Q    And is that the typical course of events in performing a

7    remedial action?

8    A    Yes, to basically characterize the site, evaluate the risk

9    to human health and the environment, evaluate remedial

10   alternatives, prepare a Remediation Work Plan, get agency

11   approval, and then implement that work plan, yes.

12   Q    Are Von Duprin's reports and work plans available to the

13   public in the Virtual File Cabinet?

14   A    Yes.

15   Q    Did Von Duprin conduct investigative work between the time

16   in which they received the Special Notice of Liability, which

17   you were showed earlier, in 2019 when the soil removal was

18   performed at the Von Duprin property?

19   A    Yes.

20   Q    Is the NCP a checklist?

21   A    I don't think so, no.

22   Q    How does the NCP work?

23   A    That's a really broad question.  Could you rephrase the

24   question?

25   Q    Sure.  If I'm a consultant trying to perform work at a

WILLIAMS – REDIRECT/FRENCH        Vol. 3 - 638

1  property consistent with the NCP, how should I interact with

2  the NCP's requirements?

3  A   It's, I believe, really up to the lead agency.  It's what

4  the lead agency requires, because nobody wants to do more work

5  than they have to.  So we would follow the guidance; and

6  ultimately, the lead agency is the one who's going to issue

7  closure and some finality to an environmental contamination

8  problem.

9          So they would work with the lead agency, while at the

10  same time making sure they're in substantial compliance with

11  the NCP to satisfy the objectives and achieve a CERCLA-quality

12  cleanup.

13          And I think what gets lost on this site is it is not a

14  Superfund site.  It's not a federal Superfund site.  It's not

15  a state Superfund site.  It's a contaminated site with

16  multiple parties; and there were multiple activities going on

17  simultaneously, including the removal actions, while at the

18  same time they're trying to identify the nature and extent of

19  contamination.

20          MS. FRENCH:  Thank you.

21          THE COURT:  Any recross?

22          MR. GARDNER:  I do not have any, Your Honor.

23          MR. MENKVELD:  No, Your Honor.

24          THE COURT:  All right.  Thank you very much.  You

25  may be excused as a witness.

Vol. 3 - 639

1        *(Witness excused.)*

2              THE COURT:  We'll go ahead and have our lunch break.

3    It's 12:09.  We'll resume at 1:10.  Have a good lunch break

4    everybody.

5              COURTROOM DEPUTY:  All rise.

6        *(A luncheon recess was taken.)*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Vol. 3 - 640

1        **A F T E R N O O N   S E S S I O N**

2        *(In open court)*

3             THE COURT:  You may be seated.  We're back on the

4    record and plaintiffs, you may call your next witness.

5             MR. GRIGGS:  Your Honor, we have called the six

6    witnesses that were on our original witness list.  There are

7    additional nonparty witnesses that are on our list; but per

8    the Court's order, docket No. 209, we were asked and

9    instructed to conduct our examination of such witnesses when

10   they were called.  So we intend to examine those witnesses

11   when they appear next week.

12            THE COURT:  So you have no more witnesses today?

13            MR. GRIGGS:  That is correct.

14            MR. BOWMAN:  Your Honor, we're aware of the Court's

15   instruction in 209, but it's the plaintiff's responsibility to

16   prove their case and to bring their witnesses.

17            I don't believe we need to be in a situation where

18   we're trying to prove negatives.  At some point, the plaintiff

19   rests; and I didn't read 209 or any of our agreements to mean

20   that all of the witnesses would be put in one bowl and that

21   everybody would rest at the end.  That was not my

22   understanding; that there would be a point at which Von Duprin

23   would rest, and then their burden of proof would be

24   questioned.

25            And even in a bench trial, there's issues of whether

1  at the end of plaintiff's case there can be partial findings

2  of fact; and the point of that is without that or that

3  potential, we start the process of trying to prove negatives.

4  So I didn't think that 209 meant how I think Mr. Griggs is

5  interpreting it.

6          THE COURT:  Who will be -- who would have been your

7  next witness?  Which of the plaintiff's -- is it a party?

8          MR. GRIGGS:  These are all nonparty witnesses -- I

9  take that back.  Two are nonparties.  One is a party witness.

10  The additional names on our list are Adam Love, Janice

11  Stathyelich, and Natalie Weir.

12          THE COURT:  And those are your exclusive witnesses?

13          MR. GRIGGS:  No.  These were witnesses that were

14  also on the list of the defendants.

15          THE COURT:  All right.

16          Are any of those persons available?  Are they here?

17          MR. GRIGGS:  Ms. Weir has been the corporate

18  representative, and we understand she may be called tomorrow

19  morning.

20          MR. BOWMAN:  And to be clear, Dr. Adam Love is an

21  expert from Roux and Associates in California coming

22  Wednesday.  So he's our expert.  Janna Stathyelich is an

23  underlying fact environmental consultant who had been an

24  expert in the prior state court cases.  We've chosen not to

25  call because she did none of the sampling that Your Honor has

1  heard about.

2          THE COURT:  So you're not calling her?

3          MR. BOWMAN:  Not calling Stathyelich, and Love would

4  be our expert in our case in chief.

5          THE COURT:  Do you intend to call Janet Stathyelich?

6          MR. GRIGGS:  This is news to us, Your Honor.  She

7  appears on the list in docket 209 as a witness they will call

8  at trial.

9          MR. BOWMAN:  No, we didn't.  I'm looking at what I

10  understood then -- we came for a pretrial and we had an entry

11  on the final pretrial, which I have as 209; and it says that

12  we would call Sharkey -- excuse me -- we withdrew Marsden,

13  Stathyelich.  We withdrew her.

14          MR. GRIGGS:  I see that now.

15          THE COURT:  So who is here, just Ms. Weir?  Correct?

16          MR. GRIGGS:  Yes.

17          THE COURT:  Then you need to call her.

18          MR. GRIGGS:  Will I need to call Mr. Love from

19  California?

20          THE COURT:  Well, you all have told me Mr. Love

21  won't be here until Wednesday, correct?

22          MR. GRIGGS:  Correct.

23          THE COURT:  Well, then I won't make you call

24  Mr. Love because he's not here yet.  That's your final expert?

25          MR. GRIGGS:  That's their expert.

1            MR. BOWMAN:  That's my expert.

2            The question before the Court, I believe is one of

3  scheduling but also a question of when does the plaintiff

4  close its case and the question arises of meeting burden of

5  proof; and, you know, it's frustrating for us because we have

6  tried to balance this and not waste the Court's time.

7            On the other hand, I think there are issues for this

8  Court to consider that can narrow the case as it goes forward;

9  and I think there are witnesses that we may not have to call,

10 depending because it is indeed -- I'll say it a third time --

11 an issue of trying to prove a negative, which I think is why

12 the trial rules are the way they are.  Does a plaintiff meet a

13 burden of proof?  If so, then you respond.  If not, then you

14 strike it off the list.

15           THE COURT:  So you need to call all of your party

16 witnesses.  Ms. Weir is your party representative, correct?

17           MR. GRIGGS:  No, she is a party representative for

18 Major Tool and Machine and Major Holdings.  We called our

19 party representative as our first witness on Monday.

20           THE COURT:  All right.  But Ms. Weir is present?

21           MR. GRIGGS:  She is sitting in the room.

22           THE COURT:  You're Ms. Weir.  All right.  Then you

23 should called Ms. Weir.

24           MR. GRIGGS:  We will pass on calling her in our case

25 in chief.  We still will cross-examine her if she's called by

Vol. 3 - 644

1   another party, which I understand she will be.

2           THE COURT:  And you know they can change their mind

3   and not call her.

4           But you do intend to call her?

5           MS. KRAHULIK:  We will be calling her tomorrow

6   morning.

7           THE COURT:  Do you have anybody left for today?

8           MR. GRIGGS:  Dr. Love is the only one left.

9           THE COURT:  That would be your last witness.

10          MR. GRIGGS:  He will be our last witness.  Just to

11  close the loop here; he was the subject, as you recall, of a

12  Daubert motion.  You decided that the Court wanted to hear

13  from him; and as Mr. Bowman has pointed out, depending on what

14  the Court makes of Mr. Love, it could change the nature of the

15  case in different ways.  So we need to have his appearance so

16  that his qualifications and credibility can be adjudged by the

17  Court.

18          THE COURT:  So he won't be here until --

19          MR. GRIGGS:  Next Wednesday.

20          THE COURT:  First witness Wednesday morning?

21          MR. GRIGGS:  That's our understanding.

22          THE COURT:  Well -- you don't have anyone left to

23  call today?

24          MR. GRIGGS:  That's correct.

25          THE COURT:  So other than Dr. Love, you would rest

1    after Dr. Love?

2             MR. GRIGGS:  That is correct.

3             THE COURT:  Do you have anyone you can call today?

4    Does anyone have anyone they can call today so that we can

5    continue?

6             MS. KRAHULIK:  We have three -- I believe Moran has

7    three witnesses here; correct, Glenn?

8             MR. BOWMAN:  We would rather not call witnesses --

9    these are fact witnesses that may or may not be needed and we

10   would rather not call until they rest.  In particular -- and I

11   don't think we need to disclose trial strategy, but they are

12   fact witnesses we may or may not call.

13            THE COURT:  What about you?

14            MS. KRAHULIK:  Ms. Weir is here and we have other

15   witnesses lined up for next week.  Moran was supposed to go

16   next in order of proof.

17            THE COURT:  Well, Moran's not able to call anyone.

18   They say you may or may not have to call your fact witnesses

19   after we hear from Dr. Love?  Is that what you're saying?

20            MR. BOWMAN:  I really am trying to help the Court --

21   we all are from the standpoint of efficiency, but I struggle

22   within the -- trying to be efficient to suddenly not have an

23   order of proof.  I struggle with that, Your Honor.  I really

24   do.

25            I mean, what are we going to be asking fact

1  witnesses if we think that key points of the plaintiff's case

2  have not been established?  And there will be -- I will tell

3  you, Your Honor, there will be a request of this Court under

4  52 to find -- even though a bench trial, I think there are

5  components of -- remember, the claim isn't brought under the

6  Indiana Environmental Legal Action Statute.  That has a cause

7  and contribute effect.  Then there's a 107 claim --

8          THE COURT:  Right.

9          MR. BOWMAN:  -- where it has different elements, and

10  that's where I'm struggling with this because these are

11  statutory claims, and I had no intention and I don't believe

12  anybody has decided that once Von Duprin's done, there will

13  not be a question of whether they have met those statutory

14  elements.  That has to happen.

15          THE COURT:  If I'm looking at Von Duprin's witness

16  list, they listed 1 through 7; and then they say,

17  "Additionally, Von Duprin may call the following witnesses for

18  the purposes of authenticating exhibits"; and that's when they

19  list Dr. Love.  So you may not call Dr. Love or you intend to

20  call Dr. Love?

21          MR. GRIGGS:  I'm sorry.  Which docket number are you

22  looking at?

23          THE COURT:  I'm looking at docket 182, which is your

24  plaintiff's trial witness list.

25          MR. GRIGGS:  We weren't sure at that point what

1  exhibits were going to come in.  One of the things that did

2  not come in was Dr. Love's expert report.  At that point, for

3  our final witness list that we submitted, the --

4          THE COURT:  What docket is -- 182 is your final

5  witness list.

6          MR. GRIGGS:  Yes.

7          THE COURT:  You removed Michael Marsden.  You intend

8  to either call or cross-examine Eiler, Ferree, Fimmen, Groves,

9  McInnes, Braun and you have Dr. Love.  You have Janna

10 Stathyelich, but you're withdrawing her today, which you're

11 allowed to do and Natalie Weir.

12         MR. GRIGGS:  Correct.  So Love is on the list.  We

13 would have called him this week.  He's not our witness.  We

14 would have had to make the arrangements.  The Court indicated

15 that each witness would be called once.

16         THE COURT:  Was the preference.

17         MR. GRIGGS:  We talked to counsel.  They said they

18 would have him at trial.  They do plan to have him at trial

19 next Wednesday; and if he was here now, we would be happy to

20 examine him, but we did not believe we had to subpoena him

21 when he was definitely going to be called by another party.

22         THE COURT:  And he definitely will be here Wednesday

23 morning?

24         MR. BOWMAN:  He will definitely be here Wednesday

25 morning.

1          To clarify, I really do have concerns, Your Honor,

2   that intentionally, unintentionally, inadvertently, witnesses

3   that we've gone out of our way to identify -- and fact

4   witnesses -- this can be some of the more interesting and

5   important information because we finally get to hear some real

6   fact witnesses; but how much of this Court's time we need to

7   take depends on the plaintiff's case; and I'm really

8   struggling that as counsel for Moran and the commitments I

9   have to my client -- I'll just say it.  I want to be

10  efficient, but I have duties and obligations to my client.  Am

11  I going to go forward and bring in fact witnesses when the

12  plaintiff hasn't rested?  I have real concerns about that.

13         MR. GRIGGS:  Counsel met after court ended yesterday

14  in this very room.  We had a discussion about what other

15  witnesses were going to be called.  We said we would be

16  calling Sam Williams today and that they would then start

17  putting on witnesses to fill the time that the Court had

18  allocated to this case, and that since they couldn't fill all

19  that time without Dr. Love, who couldn't get here from

20  California -- that statement was made -- Moran asked Major if

21  they would help out and put one of their witnesses on for

22  Thursday, which they agreed to do.

23         MS. KRAHULIK:  And we agreed, right.

24         MR. GRIGGS:  I had all this worked out.  This came

25  up five minutes ago.

Vol. 3 - 649

1          MR. BOWMAN:  I never interpreted that as the

2   plaintiff would never rest, whether -- if you rest, if counsel

3   for Major and counsel for Moran do something different, that's

4   one thing.  To have a plaintiff in a civil case like this not

5   rest is pretty significant, and I didn't agree to that.

6          THE COURT:  After Dr. Love, you will be resting.

7          MR. GRIGGS:  Absolutely.  He is the last witness on

8   our list.

9          THE COURT:  Because you don't want to call Natalie

10  Weir?

11         MR. GRIGGS:  No.  We will limit ourself to

12  cross-examination.  We don't think she has anything to add to

13  our affirmative case.

14         THE COURT:  What do you have to say?  You're

15  standing.

16         MS. KRAHULIK:  I just did not want to have to call

17  Natalie until this was resolved.  It sounded like that was the

18  direction we are heading.  We weren't planning on having her

19  testify until tomorrow and only out of convenience to the

20  parties were we going to take her out of order.

21         THE COURT:  Who has a witness available today?  You

22  have some witnesses available, but they're fact witnesses.  Is

23  that what you're telling me, Mr. Bowman?

24         MR. BOWMAN:  They're fact witnesses.

25         THE COURT:  Who are they, Mr. Bowman?

Vol. 3 - 650

1          MR. BOWMAN:  Michael Sharkey, former employee of

2   Moran; Michael Fye, former employee of Von Duprin; and Kim

3   Vedder is not here, but Kim Vedder is an IDEM representative

4   who was involved in one of these sites.

5          THE COURT:  Well, I'm going to have you call -- you

6   need to call a witness.  And I'm sorry.  I know it's a fact

7   witness, but we would waste a whole afternoon if we don't call

8   a witness.  And so it is a bench trial, and you'll have an

9   opportunity to -- plaintiff's going to rest Wednesday morning.

10  We're going to call --

11         Who do you have tomorrow, just Ms. Weir?

12         MS. KRAHULIK:  Yes.

13         THE COURT:  So Ms. Weir will be our only witness

14  tomorrow.

15         MR. BOWMAN:  Can we -- since it is a bench trial,

16  can we draw a line now and say this testimony cannot be used

17  as part of their case in chief on these fact witnesses?

18         THE COURT:  Yes.

19         MR. GRIGGS:  Fine.  No objection.

20         MS. KRAHULIK:  No objection.

21         MR. BOWMAN:  I think that solved it.

22         MS. KRAHULIK:  In fact, I should probably add, Your

23  Honor, Natalie Weir will be our only witness tomorrow,

24  provided we get through the three witnesses today.  I don't

25  know if one of them may end up carrying over till tomorrow.  I

 1  have no idea how long they'll take, but --

 2          THE COURT:  So you just have the one witness?

 3          MS. KRAHULIK:  For tomorrow, yes.  And we're taking

 4  her out of order just to allow Mr. Love to get here from

 5  California.

 6          MR. BOWMAN:  That solves it.  I don't try cases

 7  often.  This does it enough that we have an understanding that

 8  as of 1:30 -- and we're calling Michael Sharkey -- that any of

 9  his testimony cannot be used to establish -- be considered

10  part of your case in chief.

11          MR. GRIGGS:  That's correct.

12          MR. BOWMAN:  Outstanding.  We solved it.

13          THE COURT:  Agreed.  I'm sure your witnesses will

14  appreciate it.  They won't have to come back and sit in that

15  room another day.

16          MR. BOWMAN:  Very distressing to everyone, Your

17  Honor.

18          THE COURT:  I know.  This is going way faster than

19  you all predicted.

20      *(Witness sworn.)*

21          THE COURT:  Before we begin, lawyers, I need to

22  remind you to speak very slowly.  Witnesses, speak very slowly

23  because, Mr. Sharkey, the court reporter is doing stenographic

24  transcription, which means she's taking down every word that

25  you say with her fingers.  I have this transcript right here.

Vol. 3 - 652

1    So we need you to speak slowly.

2            And lawyers, when you relate to terms that are

3    technical or not familiar, the court reporter would

4    appreciate -- if you could spell those words that are not in

5    her dictionary already.  She's got it in her dictionary those

6    words that were in the final pretrial -- that you talked about

7    in the pretrial; and I believe she's gone through some of the

8    pleadings, but there are lots of new terminologies that we're

9    hearing for the first time.  So that we have a good record, do

10   that for us.  Okay.  You may begin.

11           MR. MENKVELD:  Hopefully, we can spell them.

12           THE COURT:  You may begin.

13           **MICHAEL SHARKEY, DEFENDANT'S WITNESS, SWORN**

14                     <u>**DIRECT EXAMINATION**</u>

15   BY MR. MENKVELD:

16   Q   Good afternoon, Mr. Sharkey.

17   A   Good afternoon.

18   Q   Would you please state your full name?

19   A   Michael Francis Sharkey.

20   Q   And spell your last name, please.

21   A   S-H-A-R-K-E-Y.

22   Q   And Michael is the common spelling; is that correct?

23   A   Yes.

24   Q   What is your current address?

25   A   1840 Perkins Avenue.

SHARKEY - DIRECT/MENKVELD          Vol. 3 - 653

1  Q   Mr. Sharkey, are you familiar with a company named Moran

2  Electric Service Inc.?

3  A   Yes.

4  Q   How is it that you're familiar with that company?

5  A   Don Moran was my grandfather.

6  Q   Was there a time when you worked for Moran Electric?

7  A   Oh, yes.

8  Q   And what I'll do with the name Moran Electric is probably

9  shorten it to Moran or Moran Electric.  Is that okay?

10 A   Yes.

11 Q   How long in total did you work for Moran?

12 A   Started in '66 as a helper and part-time job in high

13 school.  In '67; several times in between there, and '79 came

14 permanently -- in 1979 until 19, what, '96.

15 Q   And I believe you said -- correct me if I'm wrong -- that

16 you started for the first time working for Moran in 1966?

17 A   Yes.

18 Q   When you worked for Moran in 1966, what was your job

19 title?

20 A   Everything.  I did everything.  Floor sweeping.  You name

21 it, I did it.

22 Q   How old were you at that time?

23 A   Sixteen.

24 Q   How long in 1966 did you work for Moran?

25 A   The summer.

SHARKEY - DIRECT/MENKVELD          Vol. 3 - 654

1  Q   And after the summer, did you then leave Moran?

2  A   Yes, school.

3  Q   Did you go back to Moran to work?

4  A   1967, summer.

5  Q   And in the summer of 1967, what was your position with

6  Moran?

7  A   Pretty much the same, helper, sweeper.  You name it; I do

8  it.

9  Q   Whatever they needed?

10 A   Yes.

11 Q   At that time, were you a -- an actual employee of Moran?

12 A   A part-time employee under a union permit.

13 Q   Explain, if you will, what it means to have a union permit

14 for Moran.

15 A   Well, you go down to the union hall; and you give them

16 money, and they give you a permit.  If I have to go out on a

17 job as a helper, I can go on a union job as a helper or

18 whatever.  It's a temporary permit basically.

19 Q   And so does the permit authorize you to do work for a

20 company whose work force is unionized?

21 A   Yes, for IBEW.

22 Q   What was the name of the union?

23 A   International Brotherhood of Electrical Workers.

24 Q   Was Moran Electric's workforce unionized?

25 A   Oh, yes.

SHARKEY - DIRECT/MENKVELD          Vol. 3 - 655

1  Q   Now, let's revisit again when you said you went back to

2  Moran after 1967.  Did you back to Moran in 1968?

3  A   No.

4  Q   How about any other year during the 1960s?

5  A   1973 and maybe 1975 maybe.  Almost a year at a time.  In

6  between jobs, and then permanently in January of 1979.

7  Q   So before you went to go work with Moran permanently, what

8  sorts of jobs did you do there?

9  A   Well, I washed cars, went to school for electronics, night

10 school while I washed cars at Crossroads Lincoln-Mercury,

11 stuff like that.

12 Q   And in 1979 when you went back to work for Moran

13 permanently, what job did you occupy then?

14 A   Well, I was still a -- an apprentice and I did -- wound

15 coils for dynamometers, worked on panels for trains --

16 electrical panels, that kind of stuff, motors and what have

17 you.

18 Q   You said that you were an apprentice.  An apprentice to do

19 what type of work?

20 A   To become a shop journeyman electrician, on-the-job

21 training.

22 Q   On-the-job training?

23 A   Yes.

24 Q   Was there a certain apprenticeship-type program that you

25 went through that was structured?

SHARKEY - DIRECT/MENKVELD          Vol. 3 - 656

1   A    No, not really, not an in-shop apprenticeship, no.

2   Q    Did you obtain any training that you used at Moran outside

3   of working for Moran?

4   A    I had an associate's degree in electronics, worked on

5   television, radio, that kind of stuff.

6   Q    Earlier, you mentioned that Moran's workforce is

7   unionized?

8   A    Yes.

9   Q    Do you know why Moran decided to unionize its workforce?

10  A    John Moran never said why.  He just said that's what he

11  wanted.  They had been there since the inception of 481 local.

12  He wanted it in there.  You can get more jobs being union too,

13  so I think that's what he had in mind.

14  Q    When you first went to work for -- are you familiar --

15  withdraw the question.

16       Are you familiar with OSHA safety regulations?

17  A    Oh, yes.  Sure.

18  Q    When you first went to work for Moran Electric, was OSHA

19  in place, to the best of your recollection?

20  A    I never heard of it before, no.

21  Q    Did having a unionized labor workforce contribute at all

22  to how the operations of Moran Electric were run?

23  A    Yes.  If there was any problems, somebody there would

24  gripe.  The union would step in.  That would get it

25  straightened up; and there would be fines to pay, too.  I had

1  never heard of anybody doing it.  If there was anything

2  dangerous there, they would have known.  That's for sure.

3  Q   Did having a unionized work force contribute to safety or

4  anything like that?

5  A   Oh, yeah.  They follow safety rules by union and later on

6  by IOSHA.  They all pretty much meshed together pretty well.

7  Q   When is the last time you visited the property where Moran

8  was located?

9  A   It's been a few years back.  There was nothing there.

10  Grass.  That's all.

11  Q   If you saw an overhead aerial view of where the Moran

12  property was located, would you be able to recognize it?

13  A   Oh, yeah.

14          MR. MENKVELD:  Please pull up Exhibit 1002.  Go to

15  page PDF page 128, please.

16          Now, if you would, Ms. Hill, we're going to scroll

17  down on this a little bit.  I would like you to -- actually,

18  I'm sorry.  Scroll up just a little bit so we can see the

19  buildings that are a little transparent.

20  BY MR. MENKVELD:

21  Q   If you would, Mr. Sharkey, can you point to the Moran

22  property, as you remember it?

23  A   Right there.

24  Q   If you touch the screen, I believe you'll see an arrow.

25  A   Well, it's right here.

SHARKEY - DIRECT/MENKVELD            Vol. 3 - 658

1    Q    It does take a little practice.

2              THE COURT:  One touch.

3    BY MR. MENKVELD:

4    Q    Just one touch.  You just pointed to a building.  Do you

5    remember what that building was at the Moran property?

6    A    That's the motor shop and the offices.

7    Q    I'm sorry.  I didn't hear you.

8    A    I'm sorry.  Motor shop and the offices is that building,

9    yeah.

10   Q    Then are there any other buildings on the Moran property?

11   A    Yeah.  Just south of it was the dynanometer [sic] shop,

12   compressor shop, wiring department; and those were garages.

13   Q    Can you just touch the dynamometer shop?

14   A    (The witness complied.)

15   Q    Was that always referred to by Moran employees as

16   dynamometer or was it shortened?

17   A    Dyn shop is what we called it.  D-Y-N, dyn, lot easier.  A

18   lot of people can't say it.  I can't even say it.  Dynanometer

19   or something.

20   Q    Now, Mr. Sharkey, was there a time that Moran operated in

21   a building to the north of the motor shop?

22   A    Yes.

23   Q    If you could please just touch the building that you

24   remember Moran operating in.

25   A    According to this, what's left of it, it's right there.

SHARKEY - DIRECT/MENKVELD          Vol. 3 - 659

1   Is that it?  Right there.

2   Q    Oops, I just cleared it.

3            THE COURT:  Touch it again for him.

4   BY MR. MENKVELD:

5   Q    Put your finger on the building again.

6   A    (The witness complied.)

7   Q    What did people who worked at Moran call that building?

8   A    Well, we called it the Coleman building.  It was Coleman

9   Manufacturing was in there years back.  We didn't know what

10  else to call it.  They make coolers and things, Coleman, like

11  the camping coolers and stuff.

12  Q    Do you have any understanding of whether Moran ever bought

13  that building?

14  A    Oh, yeah.  Yeah.

15  Q    Do you know when Moran owned that building?

16  A    Late '60s or early '67 maybe is when he bought it.  It was

17  somewhere in there.  I remember it was still empty when I went

18  to work that second summer, and we went in there and was

19  cleaning it up.

20  Q    So that would have been in 1967?

21  A    Yeah, yeah.  Late summer, mid-summer, somewhere in there.

22  Q    Do you know when Moran sold that building?

23  A    It was around '84, somewhere in there.  I remember them

24  tearing it down, but I don't know exactly -- it was around

25  1984, maybe '83.  I don't know.

SHARKEY - DIRECT/MENKVELD          Vol. 3 - 660

1   Q   Now, if we go back to -- actually, you've so far

2   identified the dyn shop, the Moran motor shop, correct?

3   A   Right.

4   Q   And the -- what you call the Coleman building; is that

5   right?

6   A   Yes.

7   Q   Are you familiar with the operations that occurred within

8   those buildings?

9   A   Oh, yeah.  Yes, I am.

10  Q   So let's start here with the dyn shop.  If you could

11  describe for us the operations that occurred in that building?

12  A   Well, the dynanometers [sic], they would come in.  They

13  are to test engine torque and horsepower.  This was done --

14  water dyns was done in this building.  There's two different

15  types, electric and water.  We did the water dyns in this

16  shop.

17         You pull it apart, sandblast, you do everything, clean

18  it all up, undercut the armature and reweld to make it a

19  certain size.  You have certain tolerances.  Make a new

20  coil -- electric coil for it; and you put it in a thousand

21  horse test cell and run the heck out of it, till the bearings

22  fly out.  Then you get to do it all over again.

23  Q   Now, did you ever actually work in the dyn shop?

24  A   Yes, I supervised it.

25  Q   What years did you supervise that shop?

SHARKEY - DIRECT/MENKVELD          Vol. 3 - 661

1  A   '93 to last part of '95.  I just did it for a couple

2  years.

3  Q   Are there any other operations that you recall happening

4  in the dyn shop?

5  A   Well, there was the compressor shop.

6  Q   What was that?

7  A   Rebuild air compressors, rebuild, refurbish, whatever, and

8  service and repair and all that.

9  Q   Are you ready to move on to the motor shop or is there

10 anything else you want to add?

11 A   No, that was pretty much it.  There was a weld shop in the

12 dyn shop, but that was part of the dyn shop.

13 Q   Let's move on now to the motor shop.  And I just put an

14 arrow there.  Am I correct when I say that's the motor shop?

15 A   Yeah, that's it.

16 Q   Now, can you describe for us the operations in the motor

17 shop, please?

18 A   Well, a motor would come in and be tore down.  If it

19 needed degreased, it got degreased.  If it didn't, it got

20 blown off and put into a -- what's called a burn-off oven to

21 burn all the old insulation, all the wire so it could be taken

22 down easier as far as the stater (phonetic) is concerned.

23 Then it would be sandblasted, cleaned, new windings, new

24 bearings, you know, all put back together and painted pretty

25 and tested and sent on its way.

SHARKEY - DIRECT/MENKVELD          Vol. 3 - 662

1  Q   And is there any -- actually, did you work in the motor

2  shop ever?

3  A   Off and on, yeah; for years off and on.  I've wound a

4  couple of motors.  I wasn't that big into that.  I was more

5  into the construction part.

6  Q   What sort of work did you do in the motor shop aside from

7  anything you just said?

8  A   Well, I wound dyn coils for them because the motor shop

9  wound the coils.  And I repaired train panels, which are

10 electrical distribution panels for Amtrak, for trains.

11 Q   And now let's move to the Coleman building.  And I'll tell

12 you, in this lawsuit we've been calling it the Zimmer parcel.

13 So just for everybody's -- did you understand that --

14 A   Zimmer bottom, yeah.

15         THE COURT:  One more thing.  Please don't talk at

16 the same time.  Let the witness finish his answer before you

17 ask the next question and get the whole question in before you

18 begin the answer, please.

19         THE WITNESS:  Okay.

20         THE COURT:  Thank you.

21 BY MR. MENKVELD:

22 Q   So you understand the building I pointed to here to also

23 go by the name of Zimmer?

24 A   Yes.

25 Q   So if I refer to that as the Zimmer parcel, will you

SHARKEY - DIRECT/MENKVELD          Vol. 3 - 663

1  understand what I mean?

2  A   Oh, yes.

3  Q   What sort of operations did Moran conduct in that Zimmer

4  building?

5  A   It was the panel shop I worked in a lot.  We had winders,

6  so I did both panels and winding.

7         There was at one time a mold shop, which made

8  injection molds and repaired them for Richardson and the

9  compressor shop was in there.

10        And then the wire department was on the side.  Where

11  it's shown in gray, that's the only thing left that was left.

12  That was the wiring department at that time.

13  Q   I may have missed something here; but what you see left --

14  I believe earlier you said what's left of the Zimmer parcel?

15  A   Yes.

16  Q   Is that a smaller part of something larger that was there

17  at one point?

18  A   Yes.  The rest of the building was just to the west of it

19  that's real light right there.

20  Q   You can take your finger and just kind of touch where the

21  rest of the building was --

22  A   Yeah, that's where the rest of it -- no, that ain't right.

23  That's Ertel's.

24  Q   Here.  I'll clear it for you.  Go ahead.

25  A   Right there where the end of that pink thing is.

SHARKEY - DIRECT/MENKVELD          Vol. 3 - 664

1  Q   So right here?

2  A   No.

3  Q   Whoops.  Now, I'm doing it.

4        So right here?

5  A   No.  That's still Ertel's -- no, it's not.  You're right.

6  Q   In that open area between --

7  A   Yeah, that's the open area.  You're right.  I see it now.

8  Q   Well, while we're on it, do you see where the Ertel

9  building was located, where Ertel Manufacturing operated?

10  A   Oh, yes.

11  Q   If you could just point to that building.

12  A   All that.  Well, come on.

13  Q   So that building runs all the way down to here?  Is that

14  also Ertel's building all the way to the south?

15  A   Yes, yes.

16  Q   And so am I correct then if when I say the Zimmer building

17  was constructed over to where I'm drawing on the screen, is

18  that correct?

19  A   I don't see your drawing yet.

20         MR. MENKVELD:  May I approach, Your Honor?

21         THE COURT:  You may.

22  A   Where did you go?

23  BY MR. MENKVELD:

24  Q   The green lines.

25  A   Yeah, that was all.  I see what you did.

SHARKEY - DIRECT/MENKVELD          Vol. 3 - 665

1    Q    The portion -- is your testimony that that portion of the

2    Zimmer building was actually torn down?

3    A    Yes.

4    Q    Now, we also see a little -- I believe it's referred to as

5    a shed.  I'm trying to circle it.  Right there.  Do you see

6    what I just circled?

7    A    Yes.

8    Q    Was that building part of the Coleman building?

9    A    No.  That was Ertel's.

10   Q    That was Ertel's building?

11   A    Yeah, pretty sure, according to that map.

12   Q    Now, you've described the operations in these buildings.

13   Do you have knowledge of the types of certain chemicals that

14   were used in some of the operations?

15   A    Yes.

16   Q    Now, let's just start with the Moran motor shop, which is

17   where I pointed to.

18   A    Okay.

19   Q    Now as part of the operations in the Moran motor shop,

20   were there any degreasing operations performed there?

21   A    Yes.

22   Q    Can you describe those for us, please?

23   A    Well, there was a trichloroethylene degreaser.  They would

24   put the parts down in the basket, put it down in there,

25   whatever would fit down in there, let it sit, then bring it

SHARKEY - DIRECT/MENKVELD          Vol. 3 - 666

1  up, hose it off and let it drip dry, and then blew off a

2  little bit, whatever, if there was any left; and it would head

3  for the burn-out oven.  That's pretty much it in a nutshell.

4  Q   When you say "hose it off," what do you mean?

5  A   It would be hosed off with a hose from the degreaser still

6  with the trichloroethylene down in the pit.  It would be hosed

7  off there to get the old insulation off of it as much as you

8  can so it's not flying all over the place, you know, when you

9  take it out of there and try to blow the rest of it off.

10 Q   And so when the parts were blown off, would there be

11 some -- and -- I believe you said trichloroethylene, right?

12 A   Yes.

13 Q   Do you understand trichloroethylene to also be referred to

14 as TCE?

15 A   I guess.  I'm not a chemist.

16 Q   Did you call it by a certain name?

17 A   Just called it trichloroethylene.  That's all I ever heard

18 about it.

19 Q   We'll call it that here then.

20     If there was trichloroethylene on a particular part,

21 when the part was being hosed off, where did the

22 trichloroethylene go?

23 A   They just blow it down and go back into the pit -- or back

24 into the tank.  The tank was in the pit.

25 Q   Into the actual degreaser?

SHARKEY - DIRECT/MENKVELD          Vol. 3 - 667

1  A   Yeah.  It was a tank in a pit.

2  Q   Can you describe for us how these tanks worked, how they

3  ran?

4  A   What I understand, it's a heated -- trichloroethylene is

5  in there.  It's heated and it vaporizes.  As it comes to the

6  top, it's heated.  It cools down and falls back down in.

7  That's the gist I got.

8        And we had a small air conditioner on top to make sure

9  it never got out of the tank, just to make sure it dripped

10 back down.  That worked out pretty good later on.  And so -- I

11 mean -- and it heated up.  Evidently, it was really good.  I

12 mean, you know, it did its job.  And they would hose it off

13 and do whatever; and if it needed to go in the burn-out oven,

14 it would go.  If it didn't, it would just go on to the next

15 mechanic to tear it back down and everything.  It was

16 pretty -- if you think about it, it was a pretty simple

17 process, basically.

18 Q   Now, how much trichloroethylene was used in the degreaser

19 that was in the motor shop?

20 A   Couldn't have been over one drum, 55-gallon maybe.

21 Q   What makes you say that?

22 A   Because that's the only time they ever dumped one in

23 there.  Then they would -- when it got bad, they would -- used

24 or whatever, they would pump it out of there and put it back

25 in the 55-gallon drum.  Whoever -- I don't know who it was --

SHARKEY - DIRECT/MENKVELD          Vol. 3 - 668

1  would come and take it to do whatever it is they do with it.

2  Q   When you say "dump it in there," they would --

3  A   They would --

4  Q   Let me finish, please.  They would dump the drum in where?

5  A   Well, they took the drum and -- they would pump the

6  trichloroethylene into the drum.  They would lid it.  Somebody

7  would write everything down, put the stickers on it; and they

8  would take it outside for maybe two days next to the building

9  until the guy came to get it for hazardous materials people,

10 whoever they were.  I have no idea.

11 Q   So when -- so was TCE delivered in a drum?

12 A   Yes.  It came in a drum.

13 Q   When it was delivered in the drum, was the TCE then put

14 into the degreaser?  Is that how that worked?

15 A   Yeah, yeah.  We didn't keep none around for any length of

16 time.  It was not that often it was changed anyway.  It didn't

17 need it.

18 Q   How often do you think?

19 A   Once every few months for changing, yeah.

20 Q   Now, the degreaser itself, was that sitting on the ground?

21 A   It was sitting in a pit, a concrete pit.

22 Q   And how do you remember that it was sitting in a pit?

23 A   Because I helped dig the hole when I was younger.  It was

24 a big hole.

25 Q   Now, aside from that degreaser sitting in that pit we

1  talked about -- well, actually withdraw that question.

2          Was that pit dug into the soil?

3  A   Yeah, right into the ground.

4  Q   Was the degreaser put directly onto the soil?

5  A   No, no.  It was a poured concrete pit.  It was like a big

6  swimming pool -- not big but it was poured concrete, probably

7  2-, 3-foot thick as far as I know.  I wasn't around when they

8  poured it.  I had to help dig the hole.

9  Q   What's the purpose for putting a degreaser into a concrete

10 pit?

11 A   Well, for containment; safety, containment.

12 Q   Containment of what?

13 A   Well, whatever you're putting in that pit, regardless.  We

14 had a water pit over the dyn shop.  It was just water with a

15 tank in it.  That was it.  I mean, whatever; for containment.

16 Q   And to contain whatever is -- whatever is being --

17 A   Yeah, was being used in that pit.

18 Q   Now, also with respect to the motor shop, were there any

19 other degreasing units being used in the motor shop that

20 you're aware of?

21 A   No.  That was the only degreaser the motor shop had.

22 Q   You only witnessed one degreaser being used there.  Is

23 that your testimony?

24 A   Well, back in '66, it wasn't really a degreaser.  I think

25 it was xylenol or something.  It wasn't trichloroethylene.

SHARKEY - DIRECT/MENKVELD          Vol. 3 - 670

1  You can't see it there, but it was close to the door and

2  everything.  I remember that.  That's one of the first things

3  you see when you pulled in.

4          THE COURT:  What did you say it was?

5          THE WITNESS:  No, it was not trichloroethylene.  It

6  was xylenol, Z-Y-L-O-N-L -- A-L or something.  I don't know

7  even know if I'm saying it right.  It was kind of flammable.

8  You could you put it in your Zippo lighter and it would work.

9          THE COURT:  It was flammable?

10         THE WITNESS:  I saw guys do that.

11 BY MR. MENKVELD:

12 Q   Now, in the motor shop -- have you heard of a chemical

13 called tetrachloroethane or ethylene or PCE?

14 A   No, I don't know what that is.

15 Q   Do you have any knowledge of Moran ever using PCE or

16 tetrachlorethylene?

17 A   No, I've never heard that name.

18 Q   Okay.  Now, let's move on to the -- I'm trying to point

19 the best I can to what we call the Zimmer building.  I want to

20 go very specifically to chemicals used in that building.

21         Now, were there any pits with degreasers in the Zimmer

22 building?

23 A   No, there was not.

24 Q   Were there any degreasers at all in the Zimmer building?

25 A   No, just parts washers.

SHARKEY - DIRECT/MENKVELD          Vol. 3 - 671

1  Q   Explain what these parts washers are.

2  A   It's like a sink that sits on top of a -- between 35- and

3  55-gallon drum, depending on what you rent, almost covered.

4  It just circulates like mineral spirits is what it smelled

5  like.  And you take the parts, and you put them in there and

6  get them wet.  It had a brush with a hose on it so you kept

7  blowing the stuff.  It was filtered and all that good stuff.

8  Clean it all up, blow it off a little bit, let it dry, and put

9  it back on the compressor.

10 Q   Now, at the Zimmer building, did Moran have any degreasing

11 operations like out at the motor shop?

12 A   Not in the Zimmer building, no.

13 Q   In the Zimmer building, do you have any knowledge of

14 whether Moran did or did not use TCE in that building?

15 A   They did not.

16 Q   Do you have any knowledge of whether Moran used PCE or

17 tetrachlorethylene in that building?

18 A   No.

19 Q   You have no knowledge or --

20 A   No, they didn't use anything like that, just two or three

21 of them little -- you rent those things.  The people that --

22 the people you're leasing from come and change the barrels

23 themselves.  It's a big secret formula or something.  I don't

24 know.  Every so often, they just come in, wheel it in, take

25 the old barrel out and away it goes; and you've got good,

SHARKEY - DIRECT/MENKVELD          Vol. 3 - 672

1  fresh cleaner, whatever it is.  Like I say, it smelled like

2  mineral spirits.

3  Q   And is your testimony then that Moran did not use TCE in

4  the Zimmer building?

5  A   Absolutely not.

6  Q   Now, let's go to the dyn shop.

7  A   Okay.

8  Q   Do you know if there are any degreasing operations in the

9  dyn shop?

10  A   For a short period of time, yes.

11  Q   And when was that period?

12  A   I can't tell you the exact year.  About '90 -- I don't

13  know, maybe '89, '90, somewhere in there.

14  Q   Did Moran use TCE in the dyn shop?

15  A   Yeah, for a short period of time.

16  Q   And how did that short period degreasing operations come

17  to happen?

18  A   Well, Mr. Phelps thought it would be nice to have a

19  smaller one over there to help with his smaller motors over in

20  his area.  The only place he could put it was in our area.  So

21  they did.  They liked it and it really didn't pan out for him

22  very good.  So it was closed off, shut down, emptied out, and

23  then later gone.

24  Q   Who is Mr. Phelps?

25  A   He ran the motor shop.

SHARKEY - DIRECT/MENKVELD          Vol. 3 - 673

1   Q   Did you work at the same time Mr. Phelps worked at Moran?

2   A   Oh, yeah.

3   Q   You said it didn't pan out for him --

4   A   Yeah, it didn't work like he wanted it to.

5   Q   Let me just finish, please.  You said it didn't pan out

6   for him to have a degreaser in the dyn shop.  Just explain

7   what happened with that degreaser.

8   A   Well, it didn't work out for him.  He had to travel all

9   the way back and forth with all these little parts, which

10  didn't amount to anything.  The guys that worked -- there were

11  still a few compressors around.  The welders and all them

12  guys, they didn't like the smell.  They didn't like it in

13  there.  He said, "Let's just close it up."  I guess they

14  pumped it out and took it out and that was it.

15  Q   Did TCE have a pretty distinct smell?

16  A   Yeah, yeah.  I can vaguely remember it now; but yeah, you

17  could smell it on certain -- depending on air pressure or

18  whatever.  I don't know how they did that.  You could smell

19  it, not throughout the whole building; but if you were close

20  enough, you would smell it.

21  Q   Now, let's go to -- well, actually, tell us, if you will,

22  Mr. Sharkey, if there were any other degreasing operations in

23  the dyn shop that we haven't discussed.

24  A   No.

25          MR. MENKVELD:  Now, let's go to Exhibit 1109,

SHARKEY - DIRECT/MENKVELD          Vol. 3 - 674

1  please.  We will go to -- actually, leave it here for a

2  second.

3  BY MR. MENKVELD:

4  Q   Mr. Sharkey, throughout your employment with Moran

5  Electric, did you ever see any spills of TCE?

6  A   No, never.

7  Q   Did you ever see any releases of TCE outside at all?

8  A   No, huh-uh.

9  Q   Did you ever see any releases or spills of TCE inside any

10 of the buildings?

11 A   No, huh-uh.

12         MR. MENKVELD:  Now, let's go to PDF page 16, please.

13 Let's just started with a blowup of this area here.

14 BY MR. MENKVELD:

15 Q   Now, do you see on this exhibit, Mr. Sharkey, three pits

16 labeled "pit 1" sort of at the top left?

17 A   Over here?

18 Q   Yeah, you can touch it.

19 A   Yeah, that's it.

20 Q   Then do you see "pit 2," which is off to the right there?

21 A   Yes.

22 Q   Then "pit 3," which is just below that?

23 A   Yeah.

24 Q   Can you explain for us -- we'll start with pit 1, what

25 pit 1 was used for?

SHARKEY - DIRECT/MENKVELD          Vol. 3 - 675

1   A   Well, that was a big vacuum tank.  That was part of that

2   newer building that was built between the -- that was -- that

3   was used -- it was a vacuum tank that was about 2 inches

4   thick.  Called it the bean pot because it looked like a big

5   pressure cooker.  You put coils and bigger stuff in there and

6   vacuumed it.  Takes all the air out.  It varnishes.  It's to

7   penetrate further and then the air and all that.  You release

8   an inert gas into it after that so you don't blow the lid off

9   and slowly bring it up.  It was a big vacuum varnish tank.

10  That's what it was, big one.

11  Q   Now, did that tank use any TCE?

12  A   No, just varnish.

13  Q   So -- I don't want to have to keep asking you whether you

14  used PCE -- and my apologies if I asked you this before, but

15  do you have any knowledge of whether Moran used any PCE or

16  tetrachlorethylene at all at any time?

17  A   No, I never heard or seen any of it.

18  Q   Now, let's look at pit 2, which you identified.

19  A   Okay.  Those are varnish tanks.

20  Q   Pit 2?

21  A   This one right here, pit 2.  It says "pit 2."

22  Q   What was pit 2 --

23  A   Those are varnish tanks.

24  Q   And explain to --

25            COURT REPORTER:  Excuse me.  Can I ask you to please

SHARKEY - DIRECT/MENKVELD          Vol. 3 - 676

1  wait until the question is finished before you answer.

2          THE WITNESS:  I'm sorry.  I'm sorry.

3  BY MR. MENKVELD:

4  Q   If you would, please, just explain what varnish tanks were

5  used for.

6  A   They were for dipping coils and motors for insulation.

7  Varnish is insulation.

8  Q   Now, did the tanks used in pit 2 ever use TCE as far as

9  you know?

10 A   No.

11 Q   Now, let's talk about pit 3, which you identified as being

12 here.  Can you explain to us what pit 3 was used for?

13 A   That's the trichloroethylene tank.

14 Q   So this is the vapor degreaser that we discussed earlier;

15 is that right?

16 A   Yes.  That was it, yes.

17 Q   Now, if you look at --

18          MR. MENKVELD:  If you would scroll up just a little

19 bit, Ms. Hill.  Other way.

20 BY MR. MENKVELD:

21 Q   Do you see any other area in the Moran motor shop here

22 where any other pits were located or any other degreasers were

23 located?

24 A   No, there is none.

25 Q   During your time there, right?

SHARKEY - DIRECT/MENKVELD          Vol. 3 - 677

1  A    Yes.

2  Q    Now, could there have been at some other point when you

3  were not there?

4  A    No, no.

5          MR. MENKVELD:  Now, scroll down to the dyn shop,

6  please.  Let's clear this.

7          Just a little more please, Ms. Hill.

8  BY MR. MENKVELD:

9  Q    Now, you'll see two pits referenced here in the dyn shop,

10  Mr. Sharkey.  You'll see one called "pit 5."  Can you see

11  that?

12  A    Yes.

13  Q    Can you touch that so we can identify it.

14  A    (The witness complied.)

15  Q    Thank you.  And do you see another pit just below that?

16  A    Yeah, right there.

17  Q    That's pit 4.  Can you describe for us what pits 5 and

18  pits 4 were used for.  Pit 5 -- let's start with pit 5.

19  A    Pit 5 was a water tank down in a pit, and it was our

20  catch-up water for testing water dyns because city water could

21  not keep up.  Uses a lot of water when you're running a dyn

22  and everything.  So it was a catch -- H2O, water, that's all

23  it was.

24  Q    And was there ever any, to your recollection, TCE used in

25  pit 5?

SHARKEY - DIRECT/MENKVELD          Vol. 3 - 678

1   A    No.

2   Q    Were there any degreasers in pit 5?

3   A    No.

4   Q    Now, pit 4, please describe for us what pit 4 was used

5   for.

6   A    That must be the little -- the small degreaser, the

7   trichloroethylene.

8   Q    And again, how long do you think that degreaser was in

9   place at the Moran dyn shop?

10  A    Could have been in place several months, but it was only

11  used two or three.

12  Q    Two or three months?

13  A    As far as I know, yeah.

14  Q    Now, earlier, Mr. Sharkey, I believe you testified that

15  Moran used 55 gallons of TCE at a time approximately?

16  A    I believe so, yeah.

17  Q    Are you aware of Moran using -- well, first of all, do you

18  know what an underground storage tank is?

19  A    Oh, yes.

20  Q    Are you aware of Moran ever using an underground storage

21  tank to store TCE?

22  A    No.

23  Q    Are you aware of Moran ever using an underground storage

24  tank to store any sort of solvents?

25  A    No.

SHARKEY - DIRECT/MENKVELD          Vol. 3 - 679

1  Q   Are you aware of underground storage tanks on the Moran

2  property?

3  A   Oh, yes.

4  Q   Let's start with -- well, tell us what you know about

5  underground storage tanks on the Moran property.

6  A   Well, the big ones are mostly there for the boilers.

7  They're oil-fired boilers.  It was fuel oil.  There was a

8  20,000-gallon -- they say 10,000, but I don't think so.  Maybe

9  8,000-gallon, and that was for -- that took care of both dyn

10 and motor shop boilers.

11 Q   And these are -- and what did those tanks hold in them?

12 A   Pardon?

13 Q   What did those tanks hold in them?  What did they store?

14 A   Oh, they stored fuel oil for the boilers.

15 Q   And I believe you said the sizes of the tank.  Are there

16 two separate tanks that you're referring to?

17 A   Yes, but they were tied together with a pipe.  So you

18 wound up, like, almost 30,000 gallons, give or take.

19 Q   So why would any operation want 30,000 gallons of fuel oil

20 to run boilers?

21 A   Boilers take a lot of fuel oil.  These were steam boilers.

22          MR. MENKVELD:  If you could go back to Exhibit 1002,

23 please, PDF page 128.

24 BY MR. MENKVELD:

25 Q   Now earlier, Mr. Sharkey, we identified this as the Zimmer

SHARKEY - DIRECT/MENKVELD                    Vol. 3 - 680

1  building.  Are you aware of any underground storage tanks on

2  that property?

3  A    None that I have ever heard of or seen, no.

4  Q    When did you stop working for Moran again?

5  A    '90 -- had to be '96 or '95; '96 I believe.

6  Q    Why did you stop working there?

7  A    Because the bank closed us up.

8  Q    Explain to us a little more.  What do you mean by that?

9  A    Well, they closed my dyn department, first of all.  They

10 let the motor shop stay open for a while longer to finish

11 their Amtrak stuff.  Other than that, everybody went home.  A

12 lot of them went to Horner.

13           THE COURT:  Who closed you up?

14           THE WITNESS:  The bank.

15           THE COURT:  The bank.

16           THE WITNESS:  Yeah.

17 BY MR. MENKVELD:

18 Q    If you want to explain what you mean by the bank closed

19 you up, you can tell us the story behind that.

20 A    My mother, when she took over as CEO, had to get a

21 million-dollar loan from the bank to pay off one of her

22 brother's wives -- ex-wives I should say.  So she did.  That

23 was fine.  There was nothing wrong with that.  Payments were

24 only 23,000 a month.  Big deal.  That's one AR10 out of the

25 motor shop.

SHARKEY - DIRECT/MENKVELD          Vol. 3 - 681

1        Well, they decided to tell us that Amtrak was closing,

2   which was not true.  They decided well, you know -- they

3   closed us up; wouldn't allow us to pay our union dues, just

4   everything.  Closed my shop up, and I had two years of work

5   waiting to come in the door.  That was it.

6        So they sold -- had an auction, sold everything,

7   emptied the buildings.  Then called my mother and said, "Well,

8   we can't sell the buildings because that would be against the

9   law."  And she said, "Well, it was against the law for you to

10  close them."  That was nice.

11       But anyway, that's how, you know -- that's what

12  happened.  She sold the buildings to Dynagear for practically

13  nothing since the bank was going to take it anyway; and that

14  was it.  All done.

15  Q   What did Moran do with the things that were located in the

16  buildings?

17  A   The bank auctioned them off, everything, lock, stock and

18  barrel.

19  Q   After that happens, did you still have access to the

20  buildings?

21  A   I did.  I had keys to it still.  I was in charge of the

22  keys.

23  Q   At that time, did you work for anybody in the area?

24  A   I was working down at Job Corps; Atterbury at Job Corps at

25  the time as an electrician.

SHARKEY - DIRECT/MENKVELD          Vol. 3 - 682

1  Q   What was the purpose for you having keys to the Moran

2  buildings?

3  A   I was head of maintenance, and I was also in charge of all

4  the keys.

5  Q   Earlier, I believe you mentioned the buildings were sold

6  to Dynagear; is that right?

7  A   Yes.

8  Q   Did you have any involvement with that process?

9  A   Yes.  I showed them the buildings.  Since I was the only

10 one that had keys, they wanted to look at the building.  So I

11 met them there one day with my mother and my brother, and I

12 took them all through the buildings because I could get into

13 them.

14 Q   When you say you took them all, who did you take through

15 the buildings?

16 A   Bob Green, the owner of Dynagear, and one of his

17 engineers.

18 Q   Who is Bob Green, and why was he looking at these

19 buildings?

20 A   Because he owned Dynagear that just bought Ertel's.

21 Dynagear was out of Chicago.  He bought Ertel because Ertel's

22 wouldn't do his gears.  So he said, "I'll buy you and that'll

23 be it; and you'll do my gears."

24 Q   Do you remember Bob Green's full first name by chance?

25 A   Just Robert Green.

SHARKEY - DIRECT/MENKVELD          Vol. 3 - 683

1  Q   When you showed Mr. Green around the Moran buildings, what

2  condition were the Moran buildings in?

3  A   Actually, better than I thought they would be because they

4  had been empty for a couple years.  They weren't leaking.  It

5  was in pretty good shape actually for two years old -- you

6  know, for sitting idle for two years.

7  Q   Did you have a chance to look in the pits when you looked

8  through those buildings?

9  A   Yeah, I looked in them, glanced down in them.  The one in

10 the motor shop looked pretty clean.  Of course, the one over

11 on the other side, I guess it was all right.  I didn't pay

12 that close attention to them.  I do remember the one in the

13 motor shop, looking down in it, because I thought, boy, you

14 know, that stuff's got to really tear the concrete up but it

15 didn't.  Didn't do anything to it.  Looked a little discolored

16 maybe.  That was it.

17 Q   Were the pits in the dyn shop still there?

18 A   The water pit was.  I remember that.  I didn't go over to

19 the other corner where the other one was.  It probably was.

20 After Dynagear took it, they tore that test cell down --

21 building and filled that in.  The other one was filled in.

22 They used it for warehousing.  That area was used for

23 warehousing.

24 Q   Now, you worked in this area from 1966 off and on to 1979;

25 is that right?

SHARKEY - DIRECT/MENKVELD          Vol. 3 - 684

1   A    Yeah.

2   Q    And then permanently from 1979 to 1993 or '95

3   approximately?

4   A    '95 or '6 I'm sure.

5   Q    Now, during that time did you witness the operations of

6   other companies in the area?

7   A    Yeah.  We did a lot of work at Major Tool, a lot of

8   electrical.  They were constantly building on and building.

9   We did all their electrical.

10  Q    Who did the electrical for Major Tool?

11  A    Moran Electric did.  Well, I helped.

12  Q    Were you involved in that work?

13  A    Yes, uh-huh.  I worked out of the wiring department.

14  Q    Did you personally see the operations of Ertel

15  Manufacturing?

16  A    Yeah.  Oh, yeah.  Yes.

17  Q    Just describe for us, if you will, what you were able to

18  observe when you looked at the Ertel building.

19  A    Well, they made valve guides.  The foundry would mold --

20  make molds and pour the shots.  They go through a grinder.

21  After that, they get a million of them.  Go through a grinder.

22       Then they go to what's called a gang drill that

23  drilled a hole in the center -- the first hole.  Then they go

24  through a chamfering machine.  Then they go to what was called

25  a turntable that did other machining parts, you know,

SHARKEY - DIRECT/MENKVELD          Vol. 3 - 685

1   machining on it.  They wound up -- I don't know what they

2   cleaned it in, to tell you the truth; but whatever they did

3   wound up in a big bin.

4   Q    Was there ever a time where there was a concern about

5   Ertel's industrial hygiene?

6   A    Oh, yeah.  John Moran was always on them about that.

7   Q    I'm sorry.  Who was on them?

8   A    John Moran.

9   Q    Tell us again who John Moran is.

10  A    Was my grandfather, owner of Moran Electric.

11  Q    Why was John Moran on them about that?  Tell us that

12  story.

13  A    Because they kept leaching over into our area.  The

14  cutting oils and everything, everything, whatever they used

15  just leaching out the windows, down the blocks.  It was

16  everywhere.  It was pretty bad.

17  Q    And so what was John Moran's problem with that happening?

18  A    He said, "You were messing up the soil."  There was a very

19  narrow part between the Zimmer building and them.  It was just

20  getting on that narrow part.  It was just getting everywhere.

21  Q    And John Moran had a problem with that?

22  A    Well, yeah.  Gave him something to gripe about.

23  Q    Now, do you know if Ertel Manufacturing was -- had a

24  unionized workforce?

25  A    No.  They were nonunion.

SHARKEY - DIRECT/MENKVELD          Vol. 3 - 686

1   Q   Now, did you personally witness the operations of a

2   company named Von Duprin?

3   A   Very shortly.  I was in there a couple times just to

4   deliver fans.

5   Q   Well, let's look at the exhibit that we have up here.  Can

6   you point to where the Von Duprin building was located?

7   A   Yeah, right here.

8   Q   Touch it one more time so we can try to get an arrow.

9   A   (The witness complied.)

10  Q   It's within that area of where you pointed?

11  A   Yeah.

12  Q   Now, if you would, please, just continue telling us the

13  story about the time you delivered fans.

14  A   Well, the fans would come in.  They were pedestal fans,

15  big pedestal fans.  We would clean them up.  A lot of times

16  the motor would be ate up, would have to put a new motor on

17  it, put new blades on it, whatever it took and then take them

18  back over there working.  We would just carry them over there

19  because they were right across the street.

20  Q   How long would you say you were actually in the Von Duprin

21  building?

22  A   No more than 10, 15 minutes at a time if we could help it.

23  Q   Why do you say that?

24  A   Because it was nasty in there.  I don't know how people

25  could work in there, could see in there.  That's what I

SHARKEY – CROSS/KRAHULIK          Vol. 3 – 687

1  remember.  That was back years ago.

2  Q   So when you walked in there, describe for us what you

3  actually saw.

4  A   Haze, a lot of haze.  Sometimes it would burn your nose.

5  They did plating in there, so a lot of haze; a lot of guys

6  with yellow hands, you know.  We were kids.  We were 16, 17

7  years old.  We just didn't want to go in there anymore.

8  Q   Do you know whether Von Duprin had a unionized workforce?

9  A   Oh, I don't think they did.

10 Q   Let me ask you this question.  How is it that you would

11 know whether a company has a unionized workforce?

12 A   Well, there was a lot of reasons.  They would have made

13 good money.  They would have cleaned up their act, stuff like

14 that.  That's why we know Ertel's didn't either.

15 Q   As a member of the union, would you look to go work for

16 companies that were unionized?

17 A   Well, as customers, it didn't matter if they were

18 unionized or not.  We couldn't hire out of the union.

19          MR. MENKVELD:  Understood.

20          I'll pass the witness.

21          THE COURT:  Okay.  You will go next, Ms. Krahulik.

22                    **CROSS-EXAMINATION**

23 BY MS. KRAHULIK:

24 Q   Mr. Sharkey, I'm Angela Krahulik.  I represent Major Tool

25 and Machine and Major Holdings in this lawsuit.  I met you

*SHARKEY – CROSS/KRAHULIK*          Vol. 3 - 688

1  years ago when you were deposed, but I wasn't the one asking

2  you the questions; so you probably don't remember me.

3          You said a minute ago that you had an opportunity to

4  do work for Major Tool and Machine at some point in your

5  career?

6  A   Yes.

7  Q   And Major Tool and Machine was a clean operation, right?

8  A   Oh, yes, yes.  They were good.

9  Q   We also talked a little bit about Mr. Phelps, who worked

10 in the motor shop with you.  Mr. Phelps is unfortunately

11 deceased now, isn't it?

12 A   Yes, uh-huh.

13 Q   And he would be the best person to rely on for a

14 description of the degreasing operations in the motor shop?

15 A   Yeah.  Yes.

16 Q   And I guess in the dyno shop, too?

17 A   It was his baby, too, yes.

18         MS. KRAHULIK:  Can we pull up Exhibit 1002, please;

19 and I think it was page 128, that map we were looking at?

20         There we go.  Can you zoom in just a little bit on

21 that to kind of get rid of the left side more so than

22 anything.  There we go.

23 BY MS. KRAHULIK:

24 Q   You showed us several of the buildings on this map

25 earlier, and you talked about an area outside the motor shop

*SHARKEY - CROSS/KRAHULIK*          Vol. 3 - 689

1  where drums would be stored until they could be picked up.

2          MR. MENKVELD:  Objection.  Misstates his testimony.

3  He did not say "drums."

4          MS. KRAHULIK:  I think he said 55-gallon drums were

5  stored there when they were waiting to be picked up.

6          THE COURT:  Do you recall?

7          THE WITNESS:  Yeah.  They would be.  I mean, that's

8  where they would put them alongside there so the truck was

9  easy in the back gate to come and get them.

10  BY MS. KRAHULIK:

11  Q   Can you just show us where that was in relation to the

12  motor shop?

13  A   Right along this side right here -- well, my fingernail --

14  right there.

15  Q   So -- on the north side?

16  A   No.  That would be the east side.

17  Q   The east side.  So it was on the east side of the building

18  over there?

19  A   Yes.

20  Q   And that's where drums of spent TCE would be stored for a

21  time?

22  A   Well, for a day or two.  They wouldn't be there long.

23  Q   Where were drums with new TCE stored until they were used?

24  A   As far as I know, they were brought -- when they came to

25  pick up the used, they brought the new one.  So they wouldn't

*SHARKEY - CROSS/KRAHULIK*          Vol. 3 - 690

1  be there long.

2  Q   You said they were changed out every couple months?

3  A   Two or three months.  Depends on how busy they've been.

4  Q   Okay.  You mentioned parts washers; and you said there

5  were several, two north of the alley at what we've called the

6  Zimmer Paper building, right?

7  A   Yes.

8  Q   And then several in the dyno shop and the motor shop?

9  A   Motor shop didn't have any.  It was the Zimmer building

10 had two of them.  One for the compressor shop, and I think the

11 mold shop used one of them rarely.  And there was -- in the

12 dyn shop -- there was one in the dyn shop while the compressor

13 shop was in there.

14 Q   And you said that the operations at the building north of

15 the alley -- the Zimmer Paper building we're calling it but

16 that Moran operated from like 1967 to '83 or '84?

17 A   Yeah.

18 Q   Those operations included wiring, compressor repair,

19 injection mold, and panel shop, right?

20 A   Yes.

21 Q   And --

22 A   And some dyn winding.

23 Q   When you were deposed, you described those processes --

24 and I just want to see if you still agree with me.

25        As far as the panel operation, you said you would take

*SHARKEY – CROSS/KRAHULIK*          Vol. 3 - 691

1  all the components off the panel, go through them, measure

2  them, make sure everything was okay, clean them up, replace

3  what needed to be replaced, and then ship them back to Amtrak;

4  is that right?

5  A    Pretty much it in a nutshell.

6  Q    More or less?  Yeah.

7         And as far as the molds for the mold department, you

8  said they would be repaired; and the machinists would repair

9  them, remachine them, clean them up, and send them back,

10  right?

11  A    For the most part, yes.

12  Q    And then as far as air compressors in that building, you

13  said they would be overhauled, rebuilt; and you guys did air

14  compressors of all types?

15  A    Yes.

16  Q    And you would have to break them down, clean them up, and

17  then repair them?

18  A    Yes.

19  Q    Then I think we've covered everything except wiring in

20  there.  What wiring operations were conducted in that

21  building?

22  A    Outside wiring, construction, electricians, running pipe,

23  pulling wire, putting in lighting, outside wiring.

24  Q    So in that building north of the alley, that was going on?

25  A    Well, the department was in that, yes.

*SHARKEY – CROSS/KRAHULIK*          Vol. 3 - 692

1  Q   So that's where the outside electricians were sent out of?

2  A   Yeah, your traveling journeyman electricians.

3  Q   Got it.  Thank you.

4       Now, you worked in or at Moran summer of '66, summer

5  of '67 and then maybe a couple of year stints in '73 and about

6  '75?

7  A   Yeah, after I got out of the Navy.

8  Q   And you came there permanently in '79 until it was closed?

9  A   Yeah.

10 Q   So I think by my calculation, if Moran owned that property

11 north of the alley that we've called the Zimmer Paper parcel,

12 from '67 to 84, they owned it for approximately 21 years?

13 Does that sound about right?

14 A   Sounds good.

15 Q   And you were there for about eight of those years?

16 A   Okay.

17 Q   And so what was going on there during the other time, you

18 wouldn't know?

19 A   Well, it would be -- when the compressor department and

20 everybody moved in there, I was there; and they were still

21 there when I came back.  So they were doing the same thing --

22 Q   But you weren't there on a day-to-day basis --

23 A   No, no, no, no, no.

24 Q   Gotcha.

25      Now, earlier today, you said that the parts washers

*SHARKEY - CROSS/KRAHULIK*          Vol. 3 - 693

1  that were used in the Zimmer Paper building did not utilize

2  TCE?

3  A   No, they did not.

4  Q   Now, when you were deposed -- and I'll tell you the date

5  of that -- back in August of 2016.  It was the 12th of August,

6  2016.  Mr. Thomas asked you on behalf of Major Tool -- and I'm

7  reading from page 128, line 11 of your deposition -- or line

8  10 of your deposition as to the parts washer.

9         "What would they put in the barrel"; and you said, "I

10 have no idea what their chemical is."

11        Mr. Thomas said, "But it's some sort of chemical"; and

12 you said, "Oh, yeah, like I said, you use it at home in your

13 garage, but just one of those small ones.  That's what they

14 needed."

15        Do you recall that?

16 A   Yes.

17 Q   So you can't identify what specific chemical was used in

18 the parts washer?

19 A   No, but I wouldn't think you could have it in your home.

20 Q   Because it was used industrially?

21 A   It was used in every garage in the country.  Any mechanic

22 knows what it is.

23 Q   It's used to wash parts?

24 A   People came and changed that oil or whatever it was, you

25 know.  You didn't mess with it.  All you did was call them.

1  It's sludgy.  Let's get a new one.

2  Q   And you used it to clean parts?

3  A   Yeah, just a common cleaner.

4          MS. KRAHULIK:  Thank you.  No further questions.

5          THE COURT:  Ms. French, you may.

6          MS. FRENCH:  Thank you, Your Honor.

7                    **CROSS-EXAMINATION**

8  BY MS. FRENCH:

9  Q   Mr. Sharkey, I don't believe that we've met.  My name is

10 Alex French.  I'm an attorney for Von Duprin LLC in this

11 lawsuit.

12         What year did Moran begin operating in the area that

13 you've described on Exhibit 1002?

14 A   You're talking the whole street?

15 Q   Yes.  When did they first begin operating in the area?

16 A   1931, I believe.

17 Q   When did you begin working there full time?

18 A   In '66; 1966.

19 Q   And then you left for a time.  Came back in the '70s?

20 A   Went to school.  I was in high school.

21 Q   Then you left for a time after you worked there in the

22 late '60s?

23 A   Yes.  I went in the Navy.

24 Q   Came back for a brief time in the '70s?

25 A   Yeah.

*SHARKEY - CROSS/FRENCH*          Vol. 3 - 695

1   Q   And came back for a longer period of time beginning in the

2   late '70s, early '80s --

3   A   Came back permanently --

4              COURT REPORTER:  I'm sorry.  One at a time, please.

5   BY MS. FRENCH:

6   Q   Came back permanently --

7   A   1979 --

8              THE COURT:  Okay.  You did it again.

9              Ask your question.

10  BY MS. FRENCH:

11  Q   Came back permanently in the late '70s early, '80s?

12             THE COURT:  You may answer.

13  A   Came back in January of 1979.

14  BY MS. FRENCH:

15  Q   Thank you.

16             How long was pit 3 operated as a vapor degreaser?

17  A   Pardon me?

18  Q   How long was pit 3, which you discussed earlier, operated

19  as a vapor degreaser?

20  A   I'm trying to think.  Somewhere in the '70s.  I was there

21  for a short period of time, and that's when I helped dig the

22  hole.  So it wasn't long after that, evidently.

23  Q   Did you ever see the varnish vacuum tank cleaned?

24  A   The varnish vacuum tank?

25  Q   You discussed a vacuum tank --

*SHARKEY – CROSS/FRENCH*          Vol. 3 - 696

1   A   Oh, the big vacuum tank.  No.  It didn't get used that

2   often.  It was pretty new when we got closed up.

3   Q   You mentioned you mainly worked in construction for Moran.

4   Where did you do that work?

5           MR. MENKVELD:  Objection.  Misstates his testimony.

6           THE COURT:  Your response?

7           MS. FRENCH:  Your Honor, I believe he was discussing

8   what operations he observed in certain buildings; and he said

9   he mainly worked in construction.

10          THE COURT:  And what's your question?

11  BY MS. FRENCH:

12  Q   Where did you perform construction work on behalf of

13  Moran?

14          THE COURT:  I'll allow him to answer the question

15  and overrule your objection.

16  A   All over town.

17  BY MS. FRENCH:

18  Q   So that work was performed elsewhere than at the Moran

19  property?

20  A   Yes.

21  Q   Did you ever observe Von Duprin dumping any chemicals?

22  A   No.

23          MS. FRENCH:  Nothing further.

24          THE COURT:  Okay.

25          MR. MENKVELD:  Very short redirect, Your Honor.

*SHARKEY– REDIRECT/MENKVELD*        Vol. 3 - 697

1              THE COURT:  You may.

2                    **REDIRECT EXAMINATION**

3   BY MR. MENKVELD:

4   Q   Mr. Sharkey, you were asked about 55-gallon drums that

5   were stored outside of the motor shop, right?

6   A   Yes.

7   Q   Did Moran use -- ever use more than one 55-gallon drum of

8   TCE at a time?

9   A   Not that I'm aware of.

10  Q   Now, you were also asked a question about what chemicals

11  or materials were in the parts washers.  Do you recall being

12  asked that?

13  A   Yes.

14  Q   And I believe you testified -- now, you couldn't ID

15  exactly what was in that parts washer; is that right?

16  A   No.

17  Q   But could you say for sure that it was not TCE?

18  A   Oh, yes.

19              MR. MENKVELD:  Pass the witness.

20              THE COURT:  Any questions on those?

21              MS. KRAHULIK:  No.

22              THE COURT:  None?

23              All right.  Thank you, sir.  You may be excused.

24        *(Witness excused.)*

25              THE COURT:  Go ahead and call your next witness.

Vol. 3 - 698

1     MR. MENKVELD:  Yes, Your Honor.  We'll call Mr. Fye.

2  *(Witness sworn.)*

3     THE COURT:  Mr. Bowman, you may examine your

4  witness.

5     MR. BOWMAN:  Thank you.

6     **MICHAEL FYE, DEFENDANT'S WITNESS, SWORN**

7     <u>**DIRECT EXAMINATION**</u>

8  BY MR. BOWMAN:

9  Q   Would you please state your name for the record, please?

10 A   My name is Michael E. Fye, F-Y-E.

11 Q   What is your current address?

12 A   2339 East County Road 100 North, Kokomo, Indiana, 46901.

13 Q   I appreciate you appearing today.  We issued a subpoena;

14 and you were kind enough to call me and then appear, correct?

15 A   Yes, after some rescheduling, yes.

16 Q   I believe you may have also talked to counsel at -- for

17 Major.  I realize you were trying to understand who called

18 you.

19     But before today, you and I have not met, correct?

20 A   That is correct.

21 Q   And we have not really had a chance to talk about the

22 testimony you're about to give; is that correct?

23 A   That is correct.

24 Q   Just a few ground rules to help you.  You will not be very

25 long, but you have not given a deposition in this case.  So to

FYE - DIRECT/BOWMAN                    Vol. 3 - 699

1  be clear, we have a court reporter who is being very kind to

2  make sure we have a good record.

3  A    Okay.

4  Q    And the one rule that we are constantly breaking that you

5  and I will not break is that I will ask you a question, and

6  wait until I'm done before you answer it; and I will not

7  interrupt you until you're done with your answer; is that

8  fair?

9  A    Yes.

10 Q    And she likes yeses and noes and no head nods.  Okay?

11 Ready to do this?

12 A    I am.

13 Q    What do you currently do today?

14 A    I am retired.

15 Q    When did you retire?

16 A    Retired the first time in 2010 from Delphi Electronics.

17 Retired the second time doing consulting for a plastics

18 company called RTP located here in Indianapolis.

19 Q    And tell us about your educational background.

20 A    Okay.  I graduated from Clay Township High School in 1963.

21 Q    Clay Township?

22 A    Clay Township High School.  Consolidated, it would be

23 Maconaquah near Bunker Hill, Indiana.  I left, went to IU in

24 the fall of 1963.  Started out -- was going to major in art.

25 Decided that I would probably starve to death if I was going

FYE - DIRECT/BOWMAN                    Vol. 3 - 700

 1   to do art.

 2         I switched to biology and then switched to biology in

 3   education school because my French was horrible.  I didn't

 4   have to have a language.

 5         I attended for three semesters.  It was a time of

 6   political activity.  My grades were not very good, and I came

 7   home to Kokomo at the end of fall 1964 semester.

 8         I started working at an inn at a company called Union

 9   Carbide Stellite, and I starting learning how to be a

10   machinist.

11   Q   That was 1964?

12   A   Yes.  When I started would be '65.

13   Q   '65?

14   A   '65.

15   Q   I do want to clarify.  There's a lot of legal machinations

16   here that you're not aware; but you did give a deposition --

17   and I didn't meet you at the time -- in another case related

18   to your work at Von Duprin, correct?

19   A   That is correct.

20   Q   Okay.

21   A   That was in 2015, I believe.

22   Q   Okay.  And the reason I mention that is I did read it

23   before today.  I don't know that we'll need it; but I remember

24   and want to sum up in the early '60s, mid-'60s, you kind of

25   bounced back and forth between IU Bloomington and IU Kokomo --

FYE - DIRECT/BOWMAN                    Vol. 3 - 701

1  A    Correct.

2  Q    -- and did some studies in I think it was biology?

3  A    Correct.

4  Q    Then after that, you went to Union Carbide.

5  A    I'm sorry.  That was between IU Bloomington and going back

6  to IU Bloomington I was at Union Carbide Stellite.  Okay?

7  Q    When did you cease any of your university studies?

8  A    Early '70s.

9  Q    What did you do -- you did not end up with a degree?

10 A    I did not.  I had lots of master's hours, but the

11 scheduling never worked.

12 Q    As I remember, you had some biology in addition to art?

13 Is that the area of study?

14 A    I did switch to biology, okay?  Since I had a -- somewhat

15 of a skill, I worked a lot at the chemistry department on --

16 while I went to school basically managing the student machine

17 shop.

18 Q    You did have -- come out of school with some experience

19 with manufacturing and some exposure -- some work with

20 manufacturing?

21 A    Right.

22 Q    And some exposure -- work with chemicals?

23 A    Yes.

24 Q    At some point, did you then start working for a company

25 called Von Duprin?

FYE - DIRECT/BOWMAN                    Vol. 3 - 702

1  A    I did.

2  Q    When was that?

3  A    I believe that was summer of '74, I believe.  You may have

4  to -- I haven't done a resumé in almost 40 years either.

5  Q    And so that we can put a -- book ends on this, when did

6  you cease working at Von Duprin?

7  A    I believe it was -- it was sometime in 1977, I believe.

8  Q    Can you identify for us the specific Von Duprin location

9  that you were at?

10 A    The location was basically at the corner of 19th and what

11 was Martindale and on the north, 20th Street, roughly.

12 Q    Do you know if Martindale is now Dr. Andrew J. Brown?

13 A    I do know that.  I couldn't remember what it was called,

14 but I do know it changed names.

15         MR. BOWMAN:  Do you have the prior figure that was

16 used --

17 BY MR. BOWMAN:

18 Q    I'll show you a figure.  We have some fun toys, and this

19 won't take long.  That's actually a picture, and you and I can

20 interact with that; and what can happen -- and I will do this.

21 I can actually touch the screen and make an arrow appear.  Did

22 you see that?

23 A    Yes.

24 Q    I can also make it go away.  I am magical.

25         Can you touch the screen, if you see -- I'm

FYE - DIRECT/BOWMAN               Vol. 3 - 703

1  wondering -- I've not shown this to you before.  So I will

2  tell you that it is north and south.  Can you figure out if I

3  showed you Martindale where you think Von Duprin might be?

4  A   Yeah, if you can show me Martindale.

5  Q   I believe this is Martindale.

6  A   Oh, that's Martindale?

7  Q   Yeah.  This is 20th Street.  If that's 20th Street, 19

8  Street corridor.  Does that help you at all?

9  A   Up is north?

10 Q   Up is north.

11 A   Okay.  And this being Martindale -- what's this street

12 right here?

13 Q   I think that might be 18th Street -- yeah, that would be

14 19th -- that would be 19th.  We've got some addresses there.

15 If you can't figure it out, that's all right.  But you

16 remember it being on Martindale around 20th Street?

17 A   Right; but it was, like, 19th and Martindale and then I

18 remember a --

19 Q   And the company was Von Duprin?

20 A   The company was Von Duprin.

21 Q   That's good enough.

22         MR. BOWMAN:  Why don't we pull up Exhibit 1107, page

23 36.  I'll have this up so we can move along, Mr. Fye.

24 BY MR. BOWMAN:

25 Q   When you started at Von Duprin, what did you do?

FYE - DIRECT/BOWMAN                    Vol. 3 - 704

1   A    I was hired as a finishing engineer.

2   Q    What did that involve?

3   A    That involved trouble-shooting issues with painting,

4   plating, anodizing -- I'm sorry -- oxidizing and creating new

5   finishes.

6   Q    What did Von Duprin make?

7   A    Von Duprin made panic exit hardware.

8   Q    For doors?

9   A    For doors.

10  Q    Pretty -- and I looked at your deposition -- lots of

11  different kinds of closure/locking devices for doors with

12  different parts, correct?

13  A    Correct.

14  Q    Some were painted?

15  A    Some were painted.

16  Q    Some were plated I think would be the term?

17  A    Electroplated, yes.

18  Q    Some were brass already and just needed -- they were

19  brass?

20  A    Either oxidized or a clear coat to keep them from

21  oxidizing.

22  Q    Some were stainless?

23  A    Some were stainless.

24  Q    Kind of covered the idea?

25  A    Some were die cast.

FYE - DIRECT/BOWMAN              Vol. 3 - 705

1   Q   But what was not stainless often had to be plated or

2   painted, correct?

3   A   That is correct.

4   Q   Okay.  We can zoom -- well, let's not zoom in yet.  I'll

5   represent to you that that is --

6              MR. BOWMAN:  Go to the first page for us.

7   BY MR. BOWMAN:

8   Q   This is a Columbia Baseline Assessment Report for

9   1925-1940 Columbia Avenue, Indianapolis, Indiana, Mundell

10  project number.  I assume you've never seen this before.

11  A   I have not seen this.

12  Q   Does the address 1925-1940 Columbia Avenue ring a bell at

13  all?

14  A   I believe that was the legal address of Von Duprin.

15             MR. BOWMAN:  If you'll go back to that figure then.

16  BY MR. BOWMAN:

17  Q   I'm not asking you to --

18             MR. BOWMAN:  Scroll up.  I think it's the one up

19  above.

20             MS. FRENCH:  Objection, Your Honor.  Just before we

21  proceed further, I think that this particular exhibit, though

22  in evidence, has some markings and things that this witness

23  hasn't testified to his recollection; and if we're going to

24  have him read off things and try to refresh his recollection

25  based on what's in the exhibit, I'm not sure that's an

1  appropriate use of this particular exhibit.

2            MR. BOWMAN:  I can wait.  Let's that take down.

3  Let's take that down.  We can start.

4  BY MR. BOWMAN:

5  Q   As parts were fabricated, describe the fabrication process

6  in general; and if you can, describe different areas within

7  the facility and what they were set aside to do, if you can do

8  that.

9  A   Raw castings of these various materials -- various parts

10 of various materials came into a production machine shop.  The

11 materials were roughed out, if you will, machined, taking the

12 bare metal exterior edges, machining the insides, machining

13 holes through them and basically roughing it out so it's going

14 to work -- the mechanics will work.  Some of them were rough

15 ground with, you know, big grinders to get the general shape.

16           The ones that were not the really cheap, inexpensive,

17 rough die cast stuff that -- it was machined, it would go

18 directly for cleaning and painting.

19           Most of the other stuff -- I'm talking about the

20 better, if you will, materials, the aluminum, the brass, the

21 stainless steel, that sort of thing, would go to a polishing

22 department.  Polishing department was a series of machines

23 with big grinding wheels and polishing wheels, something like

24 you would want to buff something up with.

25           First of all, you use various abrasives on the wheels,

FYE - DIRECT/BOWMAN                    Vol. 3 - 707

1  getting the surface better.  If it's going to be a -- let's

2  say a matte or a low gloss finish, sort of a brushed finish,

3  it would, kind of end there.

4       Some of the stuff was high polish.  So you would go

5  with different compounds down to a really fine compound to get

6  basically a mirror finish; but then it would go into the

7  finishing department for whatever finish it was going to get,

8  if any.

9  Q   Was there a specific area designated where the cleaning

10 and painting occurred?

11 A   Yes.  That was the finishing department.

12 Q   And where was that located in the building?

13 A   Sort of the mid -- middle of the building on the

14 Martindale Street side.  So that would be the center east.

15 Q   Center east.  Okay.

16      As part of cleaning, what equipment was available or

17 used for cleaning of parts?

18 A   It depends on -- for cleaning, it depended on what the

19 eventual finish was going to be.

20 Q   Okay.

21 A   If it were going to be plated or oxidized, it would be put

22 in a aqueous solution, basically soapy water, rather strong

23 caustic.  Then it would be rinsed, and it would go through a

24 basically semiautomatic electroplating machine where it would

25 be -- the parts would be loaded on racks, loaded onto the

FYE - DIRECT/BOWMAN                    Vol. 3 - 708

1   machine.  This big monorail on a hydraulic structure would

2   lift up; and then it would index over, drop the parts on the

3   racks down, down into the appropriate tanks.

4            After a certain period of time, it would be raised up,

5   move over.  Typically, it was past a process tank.  It's going

6   to be a rinse, may be one or two rinses.  Go up again.  It's

7   ready for a plating operation.  So in the case of the copper,

8   nickel, chrome -- which there's a lot of those parts that got

9   copper, nickel, chrome.  It would go into the copper solution,

10  electrified, get a flash of copper on there, up, over, rinse.

11           Then it would go into a special nickel bath, and this

12  was an unusual nickel bath.  It actually instead of -- you

13  used to see plating things that are very, very shiny.  This

14  would be a very matte surface.  It was a special bath that had

15  a lot of solids in there that it created when you plated the

16  nickel.

17  Q   So that was plating, and there's plating baths?

18  A   It was plating baths.

19  Q   Let's talk about the other process then.

20  A   Okay.  Nickel, then chrome, then out.  So that's set.

21           The other process before we get the paint would be

22  oxidation where it would be cleaned.  It would be put in a

23  special chemical that would turn the -- in this case brass --

24  it would turn it sort of a brown architectural color and get

25  rinsed and get out.

FYE - DIRECT/BOWMAN                    Vol. 3 - 709

1          Okay.  Painting.  You ready for painting?

2   Q    Yes, sir.

3   A    The painting took place on a -- another monorail, only

4   this monorail wasn't moving -- I should say wasn't moving up

5   and down.  The track was stationary.

6          So there was an area where people would hang racks

7   again, but these weren't plating racks.  These were for

8   painting, and they would load parts.  Each of those racks were

9   designed for an individual part.  So they would load those on,

10  and this chain -- monorail was moving all the time.

11         So the first thing you would need to do before you

12  painted them, you need to clean them.  They would have

13  machining oils.  They would have various waxes and buffing

14  compounds still left on them in molds.

15  Q    Sure, you need to clean them.

16  A    It had to be very clean.  So the monorail would take the

17  parts up in a row, lined up like little soldiers hanging from

18  the ceiling, go into a Detrex degreaser.

19         It would go in.  It would then -- the railing

20  descended into the vapor zone of the Detrex degreaser, move

21  around; and then it would come out of the degreaser, up in the

22  air, come around.  It would then cool at that time because the

23  degreaser was pretty hot, and then it would go into a Ransburg

24  paint booth.  A Ransburg paint booth is a special way of

25  painting that uses electrostatic, and the parts on the racks

FYE - DIRECT/BOWMAN                    Vol. 3 - 710

1  would come in and make a loop around in a paint booth and go

2  back out.

3          In the middle of that booth was something that looked

4  very much like a big LP record in the middle; pump the paint

5  up through the center.  It would get onto this disk -- a

6  spinning disk and would spray out all the way around.

7          Now, it was open in the front.  The reason it didn't

8  come out at you is because both the paint and the parts were

9  oppositely charged.  So the paints --

10  Q   Never heard of that.

11  A   -- mist out, go to the parts, and actually go around and

12  come in the backs.

13  Q   Could I show you a map or a figure that shows a layout of

14  the facility to refresh your memory about the locations of

15  those operations?

16  A   Please.

17          MR. BOWMAN:  I think there's one without the line,

18  Ms. Hill.  Further up.  There it is.  There it is.

19  BY MR. BOWMAN:

20  Q   Do you need water?

21  A   Yeah, I'm dry.  Very dry.

22          MR. BOWMAN:  Let the record show we owe them a

23  bottle of water.

24          THE COURT:  The record will so reflect.

25

FYE - DIRECT/BOWMAN                    Vol. 3 - 711

1   BY MR. BOWMAN:

2   Q   Here's the lid so you don't spill on special government

3   property.

4           MR. BOWMAN:  I'm nothing but humorous, Your Honor.

5           THE COURT:  I see.

6   BY MR. BOWMAN:

7   Q   Okay, Mr. Fye, here we go.

8           MR. BOWMAN:  First of all, zoom out.

9   BY MR. BOWMAN:

10  Q   Is that sort of the general footprint of the building you

11  see?  It's largely square, but there's an area off to the top,

12  right?  We'll zoom in but the general format.

13  A   Oh, okay.

14  Q   Right?  It was kind of a rectangle, but there was a spot

15  up -- there's an area up near the top, right?

16  A   Yeah, I think that's --

17  Q   So we're going to zoom in on the bottom.  Get right to it.

18  Here we go.

19          There was a warehouse near the bottom there; is that

20  right?  Do you recall that warehouse?

21  A   Yeah --

22  Q   Do you remember a warehouse to the south?

23          MS. FRENCH:  Objection, Your Honor.  The warehouse

24  is a 1995 addition.  I think we've already established this

25  witness did not work there from '77 to after.

FYE - DIRECT/BOWMAN               Vol. 3 - 712

1            MR. BOWMAN:  Thank you.

2            So if you'll zoom out further.

3   BY MR. BOWMAN:

4   Q   Do you see -- it says, "Former plating and plating area."

5   Does that -- is that an appropriate location?

6   A   Yes.

7   Q   And then above it was "plating and finishing"?

8   A   Yes.

9   Q   Then it's got "former sumps and drain lines."  Do you

10  remember a sump up in that area?

11  A   You're going to have to expand that for me to see it.

12          Yes, okay.  Wow.

13  Q   Well, I'll withdraw that question.

14  A   I --

15          THE COURT:  The question -- sir, he withdrew the

16  question.

17          Next question.

18  BY MR. BOWMAN:

19  Q   Do you remember, they've got an area marked where the

20  former parts washer area is.  Is that where you recall the

21  parts washer?

22  A   Roughly.  The floor plan there is totally different than

23  when I was there.

24  Q   Where was --

25          MR. BOWMAN:  If you'll zoom out a little Ms. Hill,

FYE - DIRECT/BOWMAN                    Vol. 3 - 713

1   just a little.

2   BY MR. BOWMAN:

3   Q   Where was the parts washer when you were there?

4   A   Are you talking about the degreaser --

5   Q   The degreaser.

6   A   The degreaser was --

7           THE COURT:  And you can touch the screen.

8   A   -- along this wall.  That must be a fence, I think.

9   BY MR. BOWMAN:

10  Q   So it was on the east side of the wall?

11  A   East side.  That's where the washer was.  The paint -- big

12  paint booth and the oven were in here, okay.

13  Q   Okay.

14  A   And the electroplating, the automatic plating was in here;

15  and the hand process line that did various finishes that was

16  not automated but was still doing plating or oxidizing was

17  roughly in here, I believe.  And the lab appears to be in the

18  same place.

19  Q   Where it was?  Okay.  I'm going to clear that because for

20  today, what matters is this area is where you recall the

21  Detrex degreaser.  Right in there.  Is that close enough?

22  A   Yes.

23  Q   Let's talk about that.  You came into the facility in

24  1974?

25  A   Right.

FYE - DIRECT/BOWMAN                Vol. 3 - 714

1  Q   As part of your job duties, did you have reason to be

2  around the Detrex degreaser?

3  A   Yes.

4  Q   Tell me about the condition of the -- finish, please.

5  A   When I first began work there, it was in the middle of a

6  summer shutdown.

7  Q   Okay.

8  A   So the facility was not operating.

9  Q   Okay.

10 A   They were doing summer or scheduled maintenance.  The

11 degreaser was empty.  It was -- it had some problems.  It had

12 some corrosion on the inside, and one of the main things that

13 was supposed to happen during this shutdown is that the

14 machine was supposed to be repaired.

15      Now, when I say "corrosion," I'm talking about

16 internal corrosion.  So the degreaser's designed out of welded

17 mild steel; but to keep them from corroding, they have, like,

18 a two-component paint -- thick paint all around the inside to

19 separate whatever the contents is going to be from the steel.

20      Well, that had broken down.  So there were lots of

21 places where it was down to bare, rusty steel.  The process to

22 get it back up and running was to sandblast the inside.  I'm

23 trying to remember whether we did that ourselves or whether we

24 had somebody in there.  During the shutdown, a lot of work was

25 done by the salary people.

1          So anyway, sandblasted the inside, cleaned it down;

2   and then actually the foreman at that time put on a hood and a

3   suit and went in and sprayed -- you know, repainted the inside

4   of the machine.

5          Then it had to be heated.  So they used a -- used

6   canvas to close off the openings and used what's known as a

7   salamander.  It's like an industrial heater, propane or

8   whatever you use; and it just blows a flame out the front to

9   heat whatever area -- they use it a lot in open garages and

10  things like that.

11         So anyway, then it was cured.  Then the -- then this

12  unit was secured back up, refilled with the trich, and went

13  back into operation.

14  Q   Bunch of questions, but let's just go from where you are.

15  When you said "trich," what was your understanding of the

16  chemical that was used in that Detrex degreaser?

17  A   Trichloroethylene.

18  Q   Have you ever heard of tetrachlorethylene or PCE?

19  A   Oh, you mean like perchloroethylene?

20  Q   Yes.  Was perchloroethylene used in it?

21  A   No, not while I was there.

22  Q   Was the degreaser in any kind of a pit, containment, or

23  was it on the floor?

24  A   I don't recall a pit.

25  Q   Do you think it was just on the floor?

FYE - DIRECT/BOWMAN                 Vol. 3 - 716

1   A    I do not recall a pit, right.

2   Q    Do you recall it being in any kind of a tray or

3   containment?

4   A    I'm trying to think -- remember if it had any kind of a

5   little dam around it.  Some of our plating tanks had a little

6   dam, but I'm not recalling that.  I really am not.

7   Q    That's fine.  During your three years there, did you ever

8   go through that kind of a full takedown and repair that you

9   were around on this Detrex degreaser?  Did that ever occur

10  again?

11  A    No.  No.

12  Q    Detrex degreaser had, for want of a better word, a lower

13  containment area that contained the solvent, correct?

14  A    Yes.

15  Q    Was your understanding then -- was that heated then into a

16  vapor?

17  A    It was heated.

18  Q    As Von Duprin operated for the three years you were there,

19  was it a situation in which that conveyor and that Detrex

20  degreaser ran the whole time that the plant was operating?

21  A    Pretty much.  I mean, pretty much, with the exception of

22  perhaps monorail issues, chain stretch and adjustments and

23  things like that, I don't recall much -- many issues or

24  downtime with the degreaser at all.

25  Q    Okay.  And the point is none of us have been in that

FYE - DIRECT/BOWMAN                    Vol. 3 - 717

1  operation, and so your testimony is helpful.

2          Once you're in, start the shift, Detrex is on and

3  creating a vapor?

4  A   Right.

5  Q   Parts are able to go in if that's running?

6  A   Right.

7  Q   If parts aren't going in, they're waiting to go in; but

8  the Detrex is still heated up?

9  A   It's still up to heat, and the vapor level is sitting

10 there at the cold zone.

11 Q   Were the repairs conducted on the Detrex degreaser by

12 anyone other than employees of Von Duprin?

13 A   I'm trying to think if our plumber was involved.  I'm sure

14 he was.  A plumber -- the -- most of the maintenance was

15 contracted out.  So we had, like, a regular electrician; and

16 we had a regular plumber.  Plumber from Majors Plumbing and

17 Heating.  His name was Bill Spurlock.

18 Q   Were you ever part of the process of taking spent or old

19 solvent out of the Detrex degreaser?

20 A   No.

21 Q   Were you ever part of the process of putting new, clean

22 solvent into the Detrex degreaser?

23 A   Personally, no, but I saw it.

24 Q   You jumped ahead on me.  You did see new solvent put into

25 it?

FYE - DIRECT/BOWMAN                 Vol. 3 - 718

1   A    Yes.

2   Q    What was the process?

3   A    I want to put a caveat here.  Some of this I recalled

4   after my deposition.

5   Q    Okay.

6   A    When I went to the deposition, I wasn't really sure what I

7   was going to be talking about, so I hadn't done much thinking.

8        So I got some time to think this time, and the one

9   major fill that I remember was after -- early on when we got

10  the machine back working, a tank truck pulled upside the

11  building on Martindale.  They fed a hose through, and they

12  filled the machine and -- with the trich.  I even have a

13  memory of seeing the truck out there and the hose, and the

14  name on the truck was Gold Shield.

15  Q    So you saw the tank being filled?

16  A    Right.

17  Q    Through a hose?

18  A    Yes.

19  Q    Through a window?

20  A    There was a doorway adjacent there, a small area between

21  the building and the fence; and they had an area in the fence

22  where they could pass the hose through the fence from the

23  street.  Big hose.

24  Q    Is that the only time you ever saw it filled?

25  A    I think so.  I think so.

FYE - DIRECT/BOWMAN                    Vol. 3 - 719

1  Q   Do you know how much material solvent was put in it at any

2  one time?

3  A   I do not recall.

4  Q   Did you ever see anyone take old or spent or dirty solvent

5  out of it?

6  A   I honestly don't recall seeing that happen.

7  Q   What were the dimensions of the Detrex degreaser?

8  A   It was close to the wall with room to walk between the

9  wall and the Martindale side and the machine.  Roughly, I'm

10 saying, like, small dimension, maybe 8 or 10 feet wide.

11 Length, 15, 16 feet perhaps.  Height, probably 12 to 15 feet

12 high.

13 Q   You've talked about new solvent being brought in on a

14 truck.  Did you ever have a situation of seeing clean solvent

15 ready to be used sitting in any kind of a barrel or container

16 waiting to be used in the facility?

17 A   Perhaps, but no vivid memory of -- I know it had to be

18 replenished.

19 Q   You've done this so far.  I do not want you to guess.

20 A   Okay.

21 Q   And you haven't so far.

22       Do you remember seeing spent solvent in any kind of a

23 container waiting to be taken away?

24 A   Yes.

25 Q   And the question that we started with here is do you

FYE - DIRECT/BOWMAN              Vol. 3 - 720

1  remember where in the facility of those containers -- where

2  they were stored?

3  A   Outside.

4  Q   On the north side?

5  A   On the north side.  North -- would be the northeast corner

6  of the property.

7        MR. BOWMAN:  We'll go back to this figure.  Ms. Hill

8  is going to zoom out so we can see more.  Okay.  There we go.

9  BY MR. BOWMAN:

10 Q   Can you see on there -- is that enough for you to be able

11 to tell us --

12 A   Let me see farther north.

13 Q   See farther north.

14 A   In that area of the facility.

15 Q   Do a circle.

16 A   In here (indicating).  This various area.  You know,

17 specific to the foot, no; but barrels were kept out there.

18 Q   Barrels that you understood --

19 A   Would be --

20 Q   One at a time.  Barrels that you understood contained

21 older solvent?

22 A   I can say that I believe so.  I did not know for a fact.

23 Q   But you believe so?

24 A   The reason being the -- looking back on it, I know the

25 labeling requirements were not near what they became later.

FYE - DIRECT/BOWMAN                Vol. 3 - 721

1  So --

2  Q   And we're kind of doing this on the fly.  This is fun, and

3  I just realized something.  I keep saying "solvent."  When I

4  say solvent, that would be the trich?

5  A   Right.

6  Q   Anytime I said "solvent," TCE, trich?

7  A   Right.  I mean, there was certainly other solvents.

8  Q   And that's why I needed to clean that up.  I'm only

9  concerned about the trich that was in the Detrex degreaser.

10  Right?

11  A   Okay.

12  Q   And that TCE, trich, would have been stored you think in

13  that area?

14  A   Yes.

15  Q   And the material that was brought in by Gold Shield, you

16  believe, was TCE or trich?

17  A   On the initial fill, I don't think I remember seeing a --

18  I mean, I wasn't there for both shifts.  I don't remember

19  seeing another truck.

20  Q   But you were led to understand that the material in that

21  Detrex degreaser was trich or tri?

22  A   Yes.

23  Q   You weren't involved in the process of purchasing TCE for

24  that Detrex degreaser at any time, were you?

25  A   I was not.

FYE - DIRECT/BOWMAN                    Vol. 3 - 722

1  Q   Do you recall seeing any drips of TCE as the parts came

2  out of the Detrex degreaser hitting the floor?

3  A   Yes.

4  Q   So drips of TCE would come out as the parts came out?

5  A   On occasion.

6  Q   That was not a constant thing?  It was more occasional?

7  A   It was more occasional.

8  Q   Explain that occasional to us.

9  A   The occasional would be -- I think if highly loaded, not

10 all of the -- if I may back up and explain how a degreaser

11 works.

12 Q   Sure.

13 A   A degreaser is a tank that is heated.  It has an open area

14 above; and at a certain height, it has a cold water rail

15 around it.  You run city water, cold water.  The solvent is

16 heavier than air.  So you heat it up to its boiling point,

17 which is below the boiling point of water as well.  You would

18 have a vapor; and you could look in there, and you could see

19 this dense vapor coming up just to the point of where it

20 starts cooling.

21      And when you put parts in there that are coming in

22 cold, the degreasing vapor condenses on the parts, drips down;

23 and when it does, it's taking the dirt and whatever else

24 you're trying to get off.

25      So goes through.  It comes back out.  There's

FYE - DIRECT/BOWMAN                Vol. 3 - 723

1  generally an area when it comes back out to the -- above the

2  vapor zone.  The parts are hot, so you get quite a bit of

3  evaporation of whatever was still wetted.

4        If it's loaded really heavily or for whatever reason,

5  sometimes there will be a little bit of residual solvent that

6  will occasionally drip down; and you will see the spot almost

7  immediately because it's warm solvent, almost immediately

8  (indicating) evaporates.

9  Q   The Von Duprin facility was not air-conditioned, was it?

10 A   It was not.

11 Q   So I assume then that process of the extent to which

12 solvents did or did not evaporate from the part did depend

13 upon whether it was winter versus summer, correct?

14 A   Correct.

15 Q   It would depend upon, in your experience, humidity?

16 A   Humidity, yes.

17 Q   A lot of environmental -- building environment impacted

18 whether that happened or not, correct?

19 A   That's correct.

20 Q   Do you ever recall any other releases -- and that's our

21 term of the solvent, TCE, being somewhere other than in that

22 Detrex degreaser?  Ever see it get out anywhere else?

23 A   No.

24 Q   If I understand, there was a time you had to get into a

25 sewer at Von Duprin?

FYE - DIRECT/BOWMAN                    Vol. 3 - 724

1  A    Correct.

2  Q    Tell us about that.

3  A    Toward the end of my time there, there was starting to be

4  all kinds of regulations promulgated to control what was going

5  into the sewers and coming out of plants.  At that time, we

6  really didn't have a collection point for our waste stream,

7  the rinse waters, that sort of thing from the plating

8  operation.

9          So we -- there were, I think, three of us.  We went

10 down in the sewer, entered a manhole I think roughly at 20th

11 and Martindale or whatever, and proceeded down where we

12 thought the number of paces, if you will -- I don't know

13 whether it's been replaced, but I believe the original sewer

14 was built in the 1800s.  It was probably 8 feet in diameter,

15 made of brick; and I walked along and no more than 3 or

16 4 inches of effluent down far enough where we could find the

17 outlet.

18 Q    The lateral from Von Duprin?

19 A    Yeah, coming straight out of the plating area into the

20 sewer.

21 Q    And your purpose was to investigate?

22 A    And collect.

23 Q    And collect a sample?

24 A    Collect a sample, seal it up, send it to a lab to see --

25 for them to check whatever the -- mostly, it was -- we were

FYE - DIRECT/BOWMAN                    Vol. 3 - 725

1   looking for hex chrome.

2   Q   Did you ever see the results?

3   A   I do not -- I probably did.  I do not recall.  It was,

4   like I say, pretty late in my tenure.

5   Q   So this is 1974, you believe -- '77 I mean?

6   A   Yeah, close to there, I believe.

7   Q   During that process, did you remember any unusual smells

8   around that outlet?

9   A   Not around the outlet.

10  Q   Okay.

11  A   Immediately taken by -- when we went into the sewer, there

12  was a concern because a lot of paint fumes, paint solvent

13  fumes, aromatics, MEKs or toluene, sort of a mixture of

14  different solvents, paint solvent smells is how I would

15  recognize it.  Kind of like if you're painting -- if you're

16  painting something in your garage with the windows closed.

17  Q   Do you believe that as you worked there, to come to

18  understand that TCE had a certain smell when it vaporized?

19  A   Yes.

20  Q   Did you smell TCE in the sewer?

21  A   I can't say that I did.  I can't say for sure that I

22  didn't because the -- the paint smell was pretty overpowering.

23  Q   As you were there for the three years, again, depending on

24  the environment, but was it common for there to be a general

25  haze within the facility as you were working there?

FYE - DIRECT/BOWMAN                    Vol. 3 - 726

1   A    Certainly in the summer.  We had tanks of plating

2   solutions that were very hot.  We have a lot of mist and

3   evaporation; and during -- especially during the summers or

4   dry winters, we had to, you know, do a lot of solvent

5   manipulation and changing just so the paint operation would

6   work.  In other words, not flash off too quickly, not flash

7   off too slow.

8   Q    When you say "solvent," you are talking about TCE?

9   A    No.  I'm sorry.  I'm talking about paint solvents.  Paint

10  solvents were -- the paint solvents and the plating tanks were

11  the things that I was certainly most concerned about because

12  the degreaser was working fine.

13  Q    Did the degreaser in those kinds of days add to the haze

14  in the facility?

15  A    I can't say one way or the other really.

16  Q    After you left in '77, did you have a reason ever to come

17  back to the Von Duprin facility on Columbia Avenue, Martindale

18  Hubble -- Martindale Hubble.  That's an inside lawyer joke --

19  Martindale?

20  A    I believe I came back once or twice --

21  Q    You were in sales of chemicals after that, right?

22  A    I was in sales of mostly plating chemicals.

23  Q    And you sold that to Von Duprin for a little while, didn't

24  you?

25  A    The company that I worked for sold stuff to Von Duprin,

*FYE – CROSS/GARDNER*                    Vol. 3 - 727

1    mostly plating chemicals and supplies.  Von Duprin was not my

2    client.

3    Q    The final question then is:  Did you have an opportunity

4    after that to come back -- and what we're interested in -- and

5    see that Detrex degreaser any time really after 1977?

6    A    I'm sure I was in the area.  Did I notice the degreaser or

7    take any active notice of it, no.

8              MR. BOWMAN:  Okay.  Thank you very much.

9              THE COURT:  All right.  We'll go ahead and have our

10   afternoon break.  We'll take about 10, 15 minutes; and then we

11   will allow the remaining lawyers to cross-examine the witness.

12       *(A recess was taken.)*

13             THE COURT:  You may be seated.

14             We're ready for cross-examination.

15             MR. GARDNER:  Very briefly, Your Honor.

16                     **CROSS-EXAMINATION**

17   BY MR. GARDNER:

18   Q    Sir, Sam Gardner on behalf of the Major Defendants, Major

19   Tool and Machine and Major Holdings LLC in this matter.  I've

20   got very brief couple questions for you.

21             During your testimony earlier today, you were asked

22   about the use of trich or TCE at the Von Duprin facility, do

23   you remember that?

24   A    Yes.

25   Q    You also noted that there were -- I wrote down "certainly

*FYE - CROSS/FRENCH*                   Vol. 3 - 728

1  other solvents that were used at the facility"; is that

2  correct?

3  A   That's correct.

4  Q   Are you familiar with the solvents tetrachlorethylene or

5  perchloroethylene?

6  A   I am.

7  Q   Do you know if those solvents were used at any time at the

8  Von Duprin facility?

9  A   While I was there, I do not recall any use of perc,

10 perchloroethylene.

11 Q   And that would be the same -- also for tetrachlorethylene

12 as well?

13 A   Yes.

14 Q   They're the same thing?

15 A   Yes.

16           MR. GARDNER:  No further questions, Your Honor.

17           THE COURT:  That was brief.

18           Ms. French.

19           MS. FRENCH:  I believe I can be even briefer.

20                      **CROSS-EXAMINATION**

21 BY MS. FRENCH:

22 Q   What exactly was in the barrels that you referenced being

23 stored on the northern part of the Von Duprin property while

24 you were working there?

25 A   They were not identified.

VEDDER – DIRECT/MENKVELD          Vol. 3 – 729

1        MS. FRENCH:  Nothing further.

2        THE COURT:  You have a very narrow area for any

3   redirect.  Do you have any?

4        MR. BOWMAN:  No, no, no.

5        THE COURT:  Wonderful.  Thank you very much, sir.

6   You may be excused.

7     (Witness excused.)

8        THE COURT:  Do you want to get one more witness in?

9        MR. BOWMAN:  Call Kim Vedder.

10    (Witness sworn.)

11        THE COURT:  You may have a seat.

12        Counsel wants to state her name for the record.

13        MS. LASHBROOK:  This is April Lashbrook.  I

14   represent the Indiana Department of Environmental Management.

15   I'm here on behalf of the agency to represent Kim Vedder.

16        THE COURT:  Thank you.

17        All right.  Mr. Menkveld, you may.

18        **KIMBERLY VEDDER, DEFENDANT'S WITNESS, SWORN**

19                   **DIRECT EXAMINATION**

20   BY MR. MENKVELD:

21   Q   Good afternoon, Ms. Vedder.  Would you please state your

22   name?

23   A   Kim Vedder.

24   Q   Will you spell your last name, please?

25   A   V, as in Victor, E, as in Edward, D, as in David, another

VEDDER - DIRECT/MENKVELD          Vol. 3 - 730

1  D, E, as in Edward, R, as in Richard.

2  Q   And your full first name is Kim or something longer?

3  A   Kimberly.

4  Q   Would you spell that, please?

5  A   K-I-M-B-E-R-L-Y.

6  Q   Who are you currently employed by?

7  A   Indiana Department of Environmental Management.

8          COURT REPORTER:  Excuse me, ma'am.  Could you move a

9  little closer to the microphone?

10 BY MR. MENKVELD:

11 Q   Who are you currently employed by?

12 A   Indiana Department of Environmental Management.

13 Q   And what is your position with -- we'll call it IDEM?

14 A   I am a geologist.

15 Q   You have a bachelor's degree, correct?

16 A   I have a bachelor of science in geology from Earlham

17 College in Richmond, Indiana, and a master's of science degree

18 in geology from Miami University in Oxford, Ohio.

19 Q   In your role with IDEM, you worked on a property, a site

20 located at 245 -- 2045 Dr. AJ Brown Avenue in Indianapolis; is

21 that right?

22 A   That is correct.

23         MR. MENKVELD:  Please pull up Exhibit 1001.

24 BY MR. MENKVELD:

25 Q   Ms. Vedder, this is Exhibit 1001.  Can you identify where

VEDDER – DIRECT/MENKVELD              Vol. 3 – 731

1   the Ertel Manufacturing property is located?

2   A   I want my other glasses.

3              THE COURT:  And you can touch the screen, and it'll

4   make a mark.

5   A   (The witness complied.)

6   BY MR. MENKVELD:

7   Q   Thank you.  Now, are you aware that there were buildings

8   on the Ertel site that have been demolished?

9   A   Yes.

10             MR. MENKVELD:  Please pull up Exhibit 1002 and go to

11  page 128.  Bring the picture down for us, please.  Down the

12  other way.

13  BY MR. MENKVELD:

14  Q   Okay, Ms. Vedder.  Now, on this photograph, can you

15  identify the Ertel site as you know it?

16  A   This does not show any property lines.  You want me to

17  click on the building?

18  Q   Yes.  I'm not looking for you to show property lines, just

19  the area where the Ertel site is located.

20  A   (The witness complied.)

21  Q   I see a little pink line that I think you drew.  Sometimes

22  it's an arrow.  Sometimes it's a line.  I just put a green

23  arrow on the screen.  Is that where the Ertel building is

24  located?

25  A   That is where it was located.

VEDDER - DIRECT/MENKVELD          Vol. 3 - 732

1  Q   Right.  Okay.  So that's one of the buildings that was

2  demolished; is that correct?

3  A   That is correct.

4  Q   Now, does this figure also depict a property that we

5  sometimes refer to as the Zimmer Paper parcel?

6  A   There was a Zimmer parcel, and there was a Zimmer Paper

7  Company.

8  Q   Will you tell us on this figure what you refer to as the

9  Zimmer parcel?

10  A   Zimmer parcel is this -- had this building on it.

11  Q   And -- right there, where I just put the arrow?

12  A   That is correct.

13  Q   And the building on the Zimmer parcel is located then to

14  the southeast of where I put the arrow on the Ertel building;

15  is that correct?

16  A   That is correct.

17  Q   Is it your understanding that the buildings that we just

18  highlighted on the screen have been demolished?

19  A   That is correct.

20  Q   Now, you were in your role at IDEM involved in the

21  investigation and remediation of the Ertel site and the Zimmer

22  parcel; is that correct?

23  A   That is correct.

24  Q   When did you become involved in that project?

25  A   February 2005.

VEDDER - DIRECT/MENKVELD          Vol. 3 - 733

1  Q    And if you will, explain to us and the Court what your

2  involvement was with that project?

3  A    I was the assigned geologist.

4  Q    And as the geologist, what was your job to perform in this

5  particular area?

6  A    To review investigative proposals and to review the work

7  and the sampling results that were collected from that work.

8  Q    Did you have any input into what samples were taken and

9  from what locations?

10 A    Some.

11 Q    And you probably worked with a team of people at IDEM who

12 all worked together to investigate this particular area; is

13 that right?

14 A    Yes.

15 Q    And within that team, you were the project geologist; is

16 that correct?

17 A    Yes.

18 Q    Now, were you in every building that made up the Ertel

19 site before the buildings were demolished?

20 A    Yes.

21 Q    Am I right when I say that you had to visit the Ertel site

22 so often that you actually lost track of how many times you

23 were there?

24 A    That is correct.

25 Q    Now, will you please describe for us the condition of the

VEDDER - DIRECT/MENKVELD          Vol. 3 - 734

1  Ertel site when you first saw it before investigations began?

2  A   It was abandoned, neglected.  There was a lot of foundry

3  waste and probably --

4           COURT REPORTER:  Ma'am, I'm sorry.  I'm having

5  trouble hearing you.

6           THE WITNESS:  Sorry.

7           It was abandoned, neglected.  Part of the building

8  was falling down.  There was quite a bit of foundry waste

9  inside and outside.  There was a lot of petroleum oil waste.

10 There were drums in certain parts of the building.  There was

11 oil in the southern part of the building.  There was standing

12 water inside the building in certain parts.

13 BY MR. MENKVELD:

14 Q   Was the Ertel site and the building so bad that it

15 actually gave you nightmares for a period that you recall?

16 A   I don't remember.

17 Q   Now, when you walked in the Ertel building, do you

18 remember a sludge that -- on the floor of some of the Ertel

19 buildings?

20 A   Yes.

21 Q   And I believe you said that there was standing water.

22 That was in some of the buildings, correct?

23 A   That was where you put the top green arrow, yes.

24 Q   Now, did you also witness a basement that was flooded in

25 the Ertel building at one point?

VEDDER - DIRECT/MENKVELD          Vol. 3 - 735

1   A    Yes.

2   Q    Did you refer to that as a PCB basement or was that

3   another basement?

4   A    There were two basements that were both flooded at times.

5   Q    Now, did the water in both of the basements actually rise

6   and fall at various times?

7   A    In the PCB basement it did.  Sometimes it was dry.

8   Sometimes it was up, depending on groundwater.  The other

9   basement, we did not have sufficient information on to

10  evaluate whether it was going up or down.

11  Q    And Ms. Vedder, if I could get you to slow down just a

12  little bit, just for the sake of the court reporter.  Thank

13  you.

14       So I believe you said the water in one of the

15  basements would actually rise and fall with the groundwater

16  rising and falling; is that correct?

17  A    Correct.  That was the PCB basement.  There were no

18  solvents there.  There was just PCB.

19  Q    That's okay.  We're --

20       Now, was there a mosquito problem --

21  A    Yes.  That was the northern basement.

22  Q    Ms. Vedder --

23       THE COURT:  Let me give instructions.

24       Would you please let him finish his question before

25  you talk because the court reporter is doing stenographic

VEDDER - DIRECT/MENKVELD          Vol. 3 - 736

1  transcription, and she can't double take.  So she needs you to

2  let the attorney finish his question, and then you may give

3  your answer; and he'll allow you to finish your answer.  Thank

4  you.

5        And if you would continue to talk into the

6  microphone because I'm having difficulty hearing you also.

7  Thank you.

8  BY MR. MENKVELD:

9  Q   Okay.  Ms. Vedder, you're aware that Moran challenged the

10 issuance of certain IDEM actions, right, an NFA on the Ertel

11 site, for example?

12 A   Yes.

13 Q   And you have given testimony in the hearings on behalf of

14 IDEM; is that correct?

15 A   Yes.

16        MR. MENKVELD:  Your Honor, I would just like to

17 treat the witness as hostile so I can ask leading questions

18 from this point forward.

19        THE COURT:  Any objections?  He wants to lead.

20        MR. GRIGGS:  No.

21        THE COURT:  Okay.  I'll allow you to lead.

22 BY MR. MENKVELD:

23 Q   Now, there was a mosquito problem in the PCE basement that

24 flooded; is that right?

25 A   In the northern basement, correct.

VEDDER - DIRECT/MENKVELD          Vol. 3 - 737

1   Q    What was done to remedy that mosquito problem?

2   A    We contacted Marion County Health Department.  They

3   brought fish to eat the mosquitoes and their larvae.

4   Q    And those mosquitoes would actually spend the winter

5   there, right?

6   A    Correct.

7   Q    So during that period of at least one winter, a building

8   on the Ertel property was flooded; is that right?

9   A    Can you restate the question?

10  Q    Yeah.  So at least during one winter, there were fish

11  living in this basement in the water, correct?

12  A    Correct.

13  Q    Which means that the water was in the basement over the

14  winter for at least one winter, correct?

15  A    In that basement, correct.

16  Q    Now, isn't it also the case that there was a water main

17  that broke inside of an Ertel building?

18  A    Yes, in early 2007 in the foundry building.

19  Q    If you will, you can point to which building the foundry

20  building is on the figure that's on your screen.

21        There are a couple marks on here.  Let me clear them;

22  and if you could point to them again, I would appreciate it?

23  A    (The witness complied.)

24  Q    And because of that water main that broke, there was

25  actually standing water in the Ertel building; is that right?

VEDDER - DIRECT/MENKVELD          Vol. 3 - 738

1  A    Inside that particular building, yes.

2  Q    When that water pooled, did you notice that the pool of

3  water actually had its own sheen on it?

4  A    No, not the water from that broken main.

5  Q    Which water did you once describe as having its own sheen

6  on it?

7  A    I think that's the water in the storm sewer.

8  Q    The water in the storm sewer that's on the Ertel site?

9  A    Correct, next to that foundry building.

10 Q    Now, the water that flooded the Ertel buildings would

11 actually wash out of the Ertel buildings and into the storm

12 sewer; is that correct?

13 A    Somewhat correct.  There was only one building that had

14 water flooding out of it; and that's that last building I

15 marked, the foundry building on the very east side of the

16 property where the water main broke.  That water went into

17 that building that had foundry waste there, and then it --

18 some of that water exited that building on the west side of

19 that building; and it pooled a little bit along the west side

20 of that same building.

21       I'm not really aware of other parts of any of that

22 structure that was flooded to the point where water was

23 leaving the building.  That foundry building is the only one

24 that I recall having water leave the building.

25 Q    Okay.  Wasn't there a concern that the water leaving that

1  building might actually be carrying TCE or PCE?

2  A   I don't recall, but the sampling data shows there was no

3  TCE or PCE in that building.  And it's foundry waste, so

4  foundry waste does not contain PCE or TCE.

5  Q   Okay.  Let's just stick to the question, Ms. Vedder.  I

6  appreciate that.

7        Were you able to test the concentrations of the

8  contaminants leaving the Ertel building and entering the storm

9  sewers?

10  A   We did not sample the water going into the storm sewer.

11        MR. MENKVELD:  Pull up Exhibit 1219, please, PDF

12  page 38.

13  BY MR. MENKVELD:

14  Q   Ms. Vedder, I'm just showing this to you to refresh your

15  recollection.  The last sentence of this building [sic] refers

16  to TCE, PCE and PCBs.  If you read the last part of the

17  sentence, it says, "Based on historic knowledge of the

18  property and without proper sampling of the runoff, these

19  chemicals of concern cannot be ruled out as entering the storm

20  sewer and runoff."

21        Did I read that correctly?

22  A   Yes.

23  Q   And the question is, was the water that was actually

24  running off into the storm sewers tested?

25  A   No.

VEDDER - DIRECT/MENKVELD          Vol. 3 - 740

1   Q   Now, were you also involved in the remediation of the

2   Zimmer parcel?

3   A   Somewhat.

4   Q   What was your involvement in the Zimmer parcel?

5   A   They showed us proposals, but it was not enrolled in the

6   Brownfields program.  So in my mind, we did not provide

7   regulatory feedback in order -- the type of feedback we would

8   normally provide in order to achieve closure from a regulatory

9   program.

10  Q   At that time, you said the Zimmer parcel was not enrolled

11  in a regulatory program?

12  A   That is correct.

13  Q   You're aware that soils were removed from that property?

14  A   Yes.

15  Q   Were those soils removed from that property with IDEM

16  oversight?

17  A   Could you specify "IDEM oversight"?

18  Q   Did IDEM approve of the soil removal on the Zimmer parcel?

19  A   Only to the extent that we felt that removing soil was not

20  going to create a problem.

21  Q   Now, during remediation activities on the Zimmer parcel,

22  are you aware that there was a leaking drum found on the

23  Zimmer parcel?

24  A   I don't remember.

25          MR. MENKVELD:  Pull up Exhibit 1219, please, page 4.

VEDDER - DIRECT/MENKVELD          Vol. 3 - 741

1  BY MR. MENKVELD:

2  Q   Ms. Vedder, this is an e-mail from you to Mr. Chris

3  Harell; is that correct?

4        Is that correct?

5  A   Yes.  I'm still reading it.

6  Q   Okay.  I'll read it for you.  The -- there are only three

7  sentences to this e-mail.  The second one, you can read it to

8  us or I can read it to you, whichever you prefer.

9  A   Would you read it?

10  Q   Sure.  "The drums were Zimmer drums and are being removed

11  to inside the Zimmer building to a containment area.  The

12  leaking drum will be cleaned up and removed by a contractor

13  who will also dispose of other drums."

14        Did I read that correctly?

15  A   Yes.

16  Q   And when you refer to "Zimmer drums" in the Zimmer

17  building, are you referring to the Zimmer parcel in this

18  e-mail?

19  A   I presume so.

20  Q   Were any other Zimmer properties being remediated at that

21  time?

22  A   No.

23  Q   Now, at some point, you drew a map of the Ertel and the

24  Zimmer area; is that correct?

25  A   I drew multiple maps, yes.

VEDDER - DIRECT/MENKVELD          Vol. 3 - 742

1   Q   And there were in these maps in this area -- those

2   buildings were actually numbered; is that right, as in A, B,

3   C?

4   A   I am not sure whether I used those numbers.  I know that

5   QEPI used those numbers.  I don't know whether I used them on

6   any of my maps.  I don't remember.

7   Q   Sure.  But you have seen QEPI's maps?

8   A   That is correct.

9   Q   And I'm not going to admit this as an exhibit, but I would

10  like to just hand you figure 1 from a QEPI report.  Just if

11  you would take a look in particular at the numbers on the

12  Zimmer property.

13          Do you see those numbers?

14  A   Yes.

15  Q   Does that refresh your recollection at all as to what

16  numbers were used to identify the buildings on the Zimmer

17  property?

18          MS. KRAHULIK:  Excuse me.  Can you identify for us

19  what you're showing the witness?

20          MR. MENKVELD:  Sure.  It's a figure from a QEPI

21  report dated April 16th of 2007.

22          THE COURT:  Does it have an exhibit number?

23          MR. MENKVELD:  No.  It's just used to refresh her

24  recollection, Your Honor.

25          If you would, please, pull up Exhibit 1073.  Let's

VEDDER - DIRECT/MENKVELD          Vol. 3 - 743

1  go to page 46.

2  BY MR. MENKVELD:

3  Q   Ms. Vedder, do you recollect that this building was

4  referred to often as building K?

5  A   I recollect seeing it on the exhibit you just showed me.

6  Q   But aside from that, you don't remember that?

7  A   No.

8  Q   Did you ever refer to that building as the little blue

9  building on Zimmer?

10 A   Possibly.

11 Q   During IDEM's investigation, do you know if that building

12 I just circled -- it's the sort of irregular shape in the top

13 left -- the northwest corner of the Zimmer parcel -- do you

14 know if that building was determined to be a source of PCE or

15 TCE?

16 A   There was no determination made, at least that I can

17 remember.

18        MR. MENKVELD:  Just pull up Vedder's first

19 deposition, Vedder 1, please.  Go to PDF 52.  Page 205?

20        MR. GRIGGS:  Marc, could you alert us what exhibit

21 number we're looking at?

22        MR. MENKVELD:  This is not an exhibit.  This is a

23 deposition that the witness gave.

24        You know what, I'll actually make this a little

25 easier for you, Ms. Vedder, if I can.

VEDDER - DIRECT/MENKVELD           Vol. 3 - 744

BY MR. MENKVELD:

Q   Ms. Vedder, do you remember your deposition was taken in a
lawsuit previously filed by the City of Indianapolis against
Ertel Manufacturing Corporation on April 7th of 2010?

A   I am aware of that lawsuit, and I'm aware that I gave a
deposition.

Q   It's been a while.  You probably don't remember the exact
date, right?

A   I remember nothing.

Q   If you would, please, just read -- I'm going to hand you a
copy here.  If you would read line 7 of page 205 here, and
then just read all of page 206.

A   Seven through 25?

Q   Um-hum.

A   So this reads --

Q   Just read it to yourself, please.

A   Oh.

Q   Is that sufficient to refresh your recollection that there
was a PCE or TCE source in the little blue building on the
Zimmer property?

A   Yes.

Q   And was there --

        MR. MENKVELD:  If you could pull up 1073 again,
please.

VEDDER - DIRECT/MENKVELD          Vol. 3 - 745

1  BY MR. MENKVELD:

2  Q   Does that refresh your recollection as to whether there's

3  a source from that building that I just circled on the Zimmer

4  property?

5  A   I'm not sure I understand the question.  Are you asking me

6  whether that building was a source or whether the

7  contamination from there had been determined to be derived

8  from there?  You're asking me whether there was a potential

9  source there?

10 Q   I'm asking when you were working on this property, did you

11 determine that there was a TCE or PCE source from that little

12 blue building on the Zimmer parcel?

13 A   A potential source, yes.

14 Q   As part of those lawsuits, you were deposed again about a

15 month later on May 7th of 2010, right?  Do you remember being

16 deposed multiple times during those lawsuits?

17 A   I'm sorry.  I don't remember being deposed multiple times.

18 Q   Well, here again, you were asked -- let's get you to read

19 these two pages.  445, please.

20 A   Here?

21 Q   Um-hum.

22     Does that refresh your recollection, Ms. Vedder?  When

23 you were asked the question, "Do you think the little blue

24 building is a source area," what was your answer?

25 A   I said that I thought it was a source.

VEDDER - DIRECT/MENKVELD          Vol. 3 - 746

1  Q    Thank you.  Now, do you have recollection that the doors

2  from this building that I just circled lined up with the doors

3  of the Ertel building?

4  A    Yes.

5  Q    And based on what you observed, was it your belief that

6  people working in the Ertel building went to this building to

7  wash parts, to clean parts?

8  A    That was a guess.

9  Q    Okay.  Now, was it your belief based on your observations

10 that there was an in-ground degreaser in that building?

11 A    Yes.

12 Q    Now, are you aware in 2007 that a company in the area

13 wanted to redevelop the Ertel and Zimmer parcel?

14 A    Yes.

15 Q    And what was the name of that company?

16 A    Major Tool.

17 Q    Are you aware that Major Tool had certain deadlines to

18 meet to construct a new building on the Ertel site and the

19 Zimmer parcel?

20 A    Yes.

21 Q    Is it your belief that Major Tool was pushing and

22 timing -- or excuse me -- driving the timing and deadlines for

23 remediation of the Ertel site?

24 A    It's my belief that it was a cooperative effort between

25 IDEM and Major Tool and the city to try and meet those

VEDDER - DIRECT/MENKVELD          Vol. 3 - 747

1  deadlines.

2  Q   I appreciate that, but I want you to focus on my question.

3       Do you believe that Major Tool was pushing the

4  deadlines for remediation of the Ertel site?

5  A   I don't know.

6       MR. MENKVELD:  Pull up OEA day 3, please, PDF 13,

7  533.

8  BY MR. MENKVELD:

9  Q   Ms. Vedder, you remember testifying at an OEA hearing

10  involving Moran Electric; is that correct?

11  A   Yes.

12  Q   You actually testified twice -- or actually just once

13  during those hearings; is that correct?

14  A   I don't remember.  I have lost track of how many times I

15  have been asked to testify.

16  Q   And I appreciate that.

17       MR. MENKVELD:  Let's go to the first page, please.

18  BY MR. MENKVELD:

19  Q   So this is a transcript taken from the third day --

20       MR. MENKVELD:  Scroll down, please.

21  BY MR. MENKVELD:

22  Q   -- of an OEA hearing on October 26th of 2016.  Would you

23  dispute that you actually gave testimony on that day, which I

24  understand was some time ago?

25  A   I remember that -- giving testimony on that day.

VEDDER - DIRECT/MENKVELD          Vol. 3 - 748

1          MR. MENKVELD:  Go to PDF page 13, please.

2   BY MR. MENKVELD:

3   Q   On line 5 of this page we see, you were asked, "Wasn't it

4   your belief that Major Tool and Machine, Inc. was pushing the

5   timing and driving the deadlines of Ertel remediation at the

6   Ertel site?"

7          What was your answer on line 9?

8   A   I said, "Yes."

9          MR. MENKVELD:  You can take it down.

10  BY MR. MENKVELD:

11  Q   Do you know who Chris Rothenberger is?

12  A   Yes.

13  Q   Was there a time when you spoke -- actually, tell us who

14  Chris Rothenberger is.

15  A   I believe he was the health and safety person with Major

16  Tool.

17  Q   Did you work with Mr. Rothenberger when some investigation

18  of this particular area was done?

19  A   Yes.

20  Q   And at some point, you wanted to take soil samples of the

21  Major property; is that correct -- the Major Tool property?

22  A   Yes.

23  Q   And I believe you refer to that as the Dynagear courtyard?

24  A   Yes.

25  Q   And the Dynagear courtyard is what was formerly the Moran

VEDDER - DIRECT/MENKVELD          Vol. 3 - 749

 1  property; is that correct?

 2  A   Yes.

 3  Q   Those samples were not taken, were they -- the groundwater

 4  samples?

 5  A   I don't remember.  It sounds -- I really don't remember.

 6  Q   Do you recall Mr. Rothenberger not being comfortable with

 7  groundwater samples being taken on that property and,

 8  therefore, they weren't?

 9  A   I recall both of us perhaps not being 100 percent

10  comfortable with that topic without getting permission from

11  legal advice; and that may be why they weren't taken, if they

12  weren't taken, which I can't quite remember.

13  Q   Let's see if we can help you.

14        I'm going to hand you the transcript from your

15  deposition dated May 7, 2010, the one that you just looked at

16  a few minutes ago here.  This was taken in the case of the

17  City of Indianapolis versus Ertel Manufacturing.  I realize

18  this was in 2010.  If you would read from line 10 down,

19  please.

20        Done?

21  A   Um-hum.

22  Q   After reading that, can you say today that

23  Mr. Rothenberger was not comfortable with those groundwater

24  samples being taken?

25  A   Yes.

*VEDDER – CROSS/KRAHULIK*          Vol. 3 – 750

1        MR. MENKVELD:  Pass the witness.

2        THE COURT:  Ms. Krahulik, you may cross-examine the

3   witness.

4                        **CROSS-EXAMINATION**

5   BY MS. KRAHULIK:

6   Q   Hi, Ms. Vedder.  I don't know that we've met.  I'm Angela

7   Krahulik, and I represent Major Tool and Machine and Major

8   Holdings in this case.

9        Mr. Menkveld was just asking you about sampling at a

10  property owned by Major Tool and Machine; and that was not to

11  be sampling on the main Major Tool and Machine campus, right?

12  It was on the property formerly owned by Moran Electric?

13  A   Yes.

14  Q   You mentioned earlier that the closure -- the remediation

15  efforts and the closure and redevelopment of the Ertel, former

16  Zimmer properties was a cooperative effort between the

17  agencies and Major Tool and Machine and also the city, right?

18  A   Yes.

19  Q   And was there an award given related to the success of

20  that effort?  Do you remember?

21  A   No, I don't remember.

22  Q   You don't remember going to a dinner where someone

23  received an award for the redevelopment?

24  A   No, I really don't.  I probably would not have been part

25  of that.

*VEDDER - CROSS/KRAHULIK*                    Vol. 3 - 751

1   Q   Do you remember a tank being removed from the former

2   Zimmer property that you marked on the map?

3   A   Yes.

4   Q   A rather large tank?

5   A   Yes.

6   Q   Do you remember if that tank was leaking?

7   A   I don't remember.  I don't remember.

8   Q   If it was, would leaking be caused by the removal or it

9   was leaking so it was removed?

10              MR. MENKVELD:  Objection.  Speculation.

11              THE COURT:  Do you have a response to the objection?

12              MS. KRAHULIK:  I'll withdraw the question.

13   BY MS. KRAHULIK:

14   Q   Would Nivas Vijay be the right person to ask about the

15   removal of that tank and its condition?

16   A   Yes.  I don't think we were present for that removal.  I

17   would ask Nivas, but the tank would have been removed because

18   it was in the way of the redevelopment.

19   Q   And it was the right thing to do to remove the tank?

20   A   Yes.

21              MS. KRAHULIK:  No further questions.  Thank you.

22              MR. GRIGGS:  Von Duprin has no questions for this

23   witness.

24              THE COURT:  Do you have any redirect?

25              MR. MENKVELD:  No redirect, Your Honor.

*VEDDER - CROSS/KRAHULIK*           Vol. 3 - 752

1              THE COURT:  Thank you, ma'am.  You are excused.

2              Counsel, you and your client may leave.

3         *(Witness excused.)*

4              THE COURT:  All right, lawyers.  It's 4:30.  Do you

5    have any more witnesses for today?

6              MR. MENKVELD:  We don't, Your Honor.  The next

7    witness on the list, I believe, is Ms. Weir, who I believe is

8    expected to go in the morning.

9              THE COURT:  Okay.  Ms. Weir will be here in the

10   morning.  We just don't want people to have to keep coming

11   back.

12             MS. KRAHULIK:  Yes, she will be here.

13             THE COURT:  All right.  We'll go ahead and adjourn

14   for the day.  We'll start back at 8:30 a.m.  Who do we have

15   tomorrow other than Ms. Weir?  Is she it for tomorrow?

16             MS. KRAHULIK:  She is because the next witness that

17   Moran was going to call won't be here until Wednesday.

18             THE COURT:  And that's your expert?

19             MS. KRAHULIK:  That is Moran's expert.

20             THE COURT:  Who do you have left?  Who are you going

21   to call?

22             MS. KRAHULIK:  We have Natalie Weir.  We have Chris

23   Rothenberger.  We have Rob Walker, who's our expert; Gary

24   Hokkanen, who is our expert.

25             Who am I forgetting, Sam?  Nivas Vijay, and Nivas

Vol. 3 - 753

1  can't be here until next week either.  He's got an

2  out-of-state wedding.

3          THE COURT:  So you're anticipating doing your four

4  witnesses on Wednesday?

5          MS. KRAHULIK:  Wednesday, Thursday, because I know

6  we're done Thursday early.

7          THE COURT:  Thursday we're going till 3.

8          Tomorrow we'll -- tomorrow I get my award.  So

9  tomorrow we go to noon.

10         MS. KRAHULIK:  I believe Natalie Weir will probably

11 take the whole time tomorrow.  We may be done a little bit

12 earlier.

13         THE COURT:  So we will do Ms. Weir tomorrow.  Then

14 you've got your other three witnesses.  Who do you have left?

15         MR. MENKVELD:  Just our expert, Dr. Love.

16         THE COURT:  Okay.  We're doing --

17         MS. KRAHULIK:  We have four more witnesses, Your

18 Honor.  I believe they will finish their case, and then we

19 will put on the rest of ours.  We're just taking Natalie Weir

20 out of order to use the time.

21         THE COURT:  Mr. Griggs, the only person you have

22 left is Love, right?

23         MR. GRIGGS:  That's correct.

24         THE COURT:  All we need is Love.  As soon as we get

25 Mr. Love here, we can wrap this case up.

Vol. 3 - 754

1            All right, lawyers.  Have a good evening, and I'll

2   see you at 8:30 a.m.

3            COURTROOM DEPUTY:  All rise.

4            *(The proceedings were adjourned at 4:31 p.m.)*

1                    CERTIFICATE OF COURT REPORTER

2

3       I, Cathy Jones, hereby certify that the foregoing is a

4   true and correct transcript from reported proceedings in the

5   above-entitled matter.

6

7

8    /s/ Cathy Jones                        August 14, 2019

9   _____
    CATHY JONES, RDR, FCRR
    Official Court Reporter
10  Southern District of Indiana
    Indianapolis Division
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25