1      UNITED STATES DISTRICT COURT
       SOUTHERN DISTRICT OF INDIANA
2        INDIANAPOLIS DIVISION

3
  VON DUPRIN, LLC,     )
4            ) CAUSE NO.
     Plaintiff,   ) 1:16-cv-1942-TWP-DML
5            )
     -vs-      )
6            ) Indianapolis, Indiana
  MORAN ELECTRIC SERVICE, INC.) July 25, 2019
7  MAJOR HOLDINGS, LLC,   ) 8:30 a.m.
  MAJOR TOOL AND MACHINE,  )
8  INC. and ZIMMER PAPER   ) VOLUME 4
  PRODUCTS INCORPORATED,   )
9            )
     Defendants.   )
10

11

12

13         **BEFORE THE**
      **HONORABLE TANYA WALTON PRATT**
14

15     OFFICIAL REPORTER'S TRANSCRIPT OF

16        BENCH TRIAL

17

18

19

20

21 Court Reporter:  Cathy Easley Jones, RDR, FCRR
         Official Court Reporter
22         46 East Ohio Street, Room 290
         Indianapolis, IN  46204
23

24

25     PROCEEDINGS TAKEN BY MACHINE SHORTHAND
      COMPUTER-AIDED TRANSCRIPTION

Vol. 4 - 756

**A P P E A R A N C E S**

FOR VON DUPRIN, LLC:          Edward S. Griggs
                              Alexandra Robinson French
                              BARNES & THORNBURG
                              11 South Meridian Street
                              Indianapolis, IN  46204


FOR MORAN ELECTRIC          Glenn D. Bowman
SERVICE, INC.:              Marc A. Menkveld
                            STOLL KEENON OGDEN, PLLC
                            201 North Illinois Street
                            Suite 1225
                            Indianapolis, IN  46204

                            Bruce L. Kamplain
                            NORRIS CHOPLIN & SCHROEDER LLP
                            101 West Ohio Street
                            Ninth Floor
                            Indianapolis, IN 46204


FOR MAJOR HOLDINGS          Angela Pease Krahulik
and MAJOR TOOL AND          Samuel B. Gardner
MACHINE, INC.:              ICE MILLER
                            One American Square
                            Suite 2900
                            Indianapolis, IN  46282

Vol. 4 - 757

1          **I N D E X   O F   W I T N E S S E S**

2                                                    PAGE

3   For Major Holdings and Major Tool and Machine:

4   NATALIE WEIR
    Direct Examination by Ms. Krahulik ............758
5   Cross-examination by Mr. Menkveld ............781
    Cross-examination by Ms. French ..............804
6   Redirect Examination by Ms. Krahulik .........808
    Recross-examination by Mr. Menkveld  .........812
7   Recross-examination by Ms. French  ...........813

8

9

10

11

12

13

14

15

16          **I N D E X   O F   E X H I B I T S**

17                                                    PAGE
    Defendant's Exhibit No.:
18
    600 .........................................803
19  602 (Under Seal) ............................785

20

21

22

23

24

25

Vol. 4 - 758

1      *(In open court)*

2            THE COURT:  Good morning, everyone.  We're back on

3      the record, Von Duprin LLC versus Moran Electric Service,

4      Major Holdings, LLC, Major Tool and Machine and that's it.

5      All right.  And so we are going to hear a witness from?

6            MS. KRAHULIK:  Major Tool and Machine.

7            THE COURT:  You may call your witness.

8            MS. KRAHULIK:  This is subject to the agreement the

9      parties reached yesterday about order of proof and resting

10     cases.

11           THE COURT:  Correct.

12           MS. KRAHULIK:  Major Tool and Machine and Major

13     Holdings calls Natalie Weir.

14           THE COURT:  Ms. Weir, if you would come up to the

15     witness stand and remain standing and raise your right hand.

16     *(Witness sworn.)*

17           THE COURT:  You may have a seat.

18           Ms. Krahulik, you may examine your witness.

19           **NATALIE WEIR, DEFENDANT'S WITNESS, SWORN**

20                        **DIRECT EXAMINATION**

21     BY MS. KRAHULIK:

22     Q    Please state and spell your name.

23     A    Natalie Anne Green Weir, N-A-T-A-L-I-E A-N-N-E G-R-E-E-N

24     W-E-I-R.

25     Q    Now I know what the "AG" stands for.

1          Tell the Court about your role at Major Tool and

2    Machine.

3    A    I'm the CFO, the chief financial officer.  I'm also the

4    facility security officer for Major Tool and Machine.

5    Q    What does Major Tool and Machine do in its business?

6    A    We are a contract manufacturer, also called a job shop.

7    So we make large metal parts usually out of exotic materials,

8    so that there's a sophistication level associated with the

9    fabrication and the machining associated with those parts.

10          Those parts are parts for the Department of Defense,

11   the Department of Energy, for commercial clients.  Right now,

12   about 80 percent of our work is support for the Department of

13   Defense, so the Department of Energy prime contractors.

14   Q    Tell the Court a little bit about Major Tool and Machine's

15   company background.

16   A    We're almost 75 years old.  We have been a job shop our

17   entire history.  Our current owner is the third owner.  He

18   succeeded his father, who started work at Major Tool back in

19   the '40s with a buddy of his from high school; and he ended up

20   buying the company from his friend when his father retired --

21   when his friend's father retired.

22   Q    Has Major Tool and Machine always been located where it is

23   today?

24   A    I believe we moved from College Avenue in the early '60s;

25   but we've been there for many, many, many years, almost 50

1  years.

2  Q    What's the main corporate address?

3  A    1458 East 19th Street in Indianapolis.

4  Q    What is Major Holdings?

5  A    Major Holdings is an LLC that holds the real estate --

6  some of the real estate that we own at Major Tool.

7  Q    I'm going to refer to both Major Holdings and Major Tool

8  and Machine as Major Tool today.

9  A    I do as well, always.

10  Q   Me too.  And so you said Major Tool and Machine moved from

11  College Avenue in the '60s.  How long -- you said 75 years in

12  business?

13  A   Almost 75 years, yes.

14          MS. KRAHULIK:  Ms. Woods, please pull up

15  Exhibit 1198 -- I'm sorry -- 1191, page 58.

16          Scroll so we can see -- maybe a little bit more.

17  There you go.

18  BY MS. KRAHULIK:

19  Q   Would you please tell us what we're looking at here with

20  relation to the properties owned or operated by Major Tool and

21  Machine?

22  A   This is the majority but not all of the property that

23  Major Tool owns at this address, 1458 East 19th Street.

24  Q   Please, if you can, put an arrow on the main 1458

25  building.  You might have to hit it twice.

1  A    There's a little pink dot there.

2  Q    Yes.  So that's where the pink dot is down in the

3  right-hand corner?

4  A    Yes, ma'am.

5  Q    And then what other operations or buildings does Major

6  Tool have in that area?

7  A    We now have all of these buildings.

8         I'm not getting arrows.

9  Q    Hold on one second.

10         THE COURT:  I think you just press it.

11  A    There.  I was being much too hesitant.

12  BY MS. KRAHULIK:

13  Q    That pink arrow there, what is that on?

14  A    That's what we call building 20.

15  Q    And that was formerly Ertel Manufacturing?

16  A    Yes, ma'am.

17  Q    Then over to the right of building 20, what is over there?

18  A    Right here -- I'm sorry.  My tap is -- there.

19  Q    Yes, yes.  What is that?

20  A    That would be what we call building 4U.

21  Q    And that is former Zimmer Packaging?

22  A    Yes, ma'am.

23  Q    How have Major Tool's operations and needs for space

24  changed over the years?

25  A    The two buildings that I just indicated are new since my

1  tenure at Major Tool.

2  Q   And those were efforts -- or those were due to

3  acquisitions by Major Tool since you've been at the company?

4  A   Yes, ma'am.

5  Q   As part of your job responsibilities, do you deal with the

6  environmental issues related to Major Tool and Machine's

7  operations and properties?

8  A   In conjunction with our director of EHS, environmental

9  health and safety, yes, ma'am.

10  Q   Who is that?

11  A   It was Chris Rothenberger until he retired at the end of

12  May.

13  Q   So he would be the one who dealt with all of the issues

14  we've heard about in this lawsuit?

15  A   He dealt with the details of the issues.  I dealt with the

16  legal components of the issues.

17  Q   So let's talk about Major Tool's efforts with regard to

18  these properties.  And start with the former Moran Electric --

19  I think we've called it the motor shop and the dyn shop.  Can

20  you maybe put an arrow on that particular property?

21  A   (The witness complied.)

22  Q   So that's the grassy field?

23  A   Yes, ma'am.

24        MS. KRAHULIK:  Actually, can we pull up

25  Exhibit 1001, please?  That might be better because it has

WEIR - DIRECT/KRAHULIK          Vol. 4 - 763

1  property names on it.

2  BY MS. KRAHULIK:

3  Q   All right.  So we're looking at Exhibit 1001.  I think

4  this might be a little bit better for our purposes because it

5  actually has the properties labeled.

6  A   Yes, ma'am.

7  Q   Which property is the former Moran property?

8  A   The orange property.

9  Q   When did Major Tool acquire the former Moran property?

10 A   First, we leased that property for just a short period of

11 time; and I believe it was in about 2005 that we purchased the

12 Moran properties.

13         MS. KRAHULIK:  Let's see Exhibit 1095, please.

14 BY MS. KRAHULIK:

15 Q   And what is this document?

16 A   This is the sheriff's deed by which we purchased the Moran

17 properties.

18 Q   And did Major Tool and Machine conduct a Phase I

19 investigation before purchasing that property?

20 A   Yes, ma'am.

21 Q   I believe the Court's already ruled on Major Tool and

22 Machine's BFPP status for that property.  What was the next

23 property in the general area that Major Tool and Machine

24 acquired?

25 A   The next property we acquired would have been the Zimmer

1  Paper packaging facility, which is also known as the Moran

2  rewind shop.

3  Q   And did Major Tool and Machine conduct a Phase I

4  investigation before acquiring that property?

5  A   Yes, ma'am.

6          MS. KRAHULIK:  Let's see Exhibit 1241, please, at

7  page 2.

8  BY MS. KRAHULIK:

9  Q   Is this the Phase I investigation for the former Zimmer

10 Paper parcel/Moran Electric rewind shop?  We've called it a

11 bunch of different things.

12 A   Yes, ma'am.

13         MS. KRAHULIK:  Please pull up page 58.

14 BY MS. KRAHULIK:

15 Q   So that shows us that it is actually the Zimmer Paper

16 property?

17 A   Yes, ma'am.

18 Q   And who did Major Tool acquire that property from?

19 A   From Zimmer.

20         MS. KRAHULIK:  Let's look at Exhibit 1096, please.

21 BY MS. KRAHULIK:

22 Q   And what is this document?

23 A   This is the deed by which we purchased the Zimmer Paper

24 packaging property.

25         MS. KRAHULIK:  And back to Exhibit 1001, please.

WEIR - DIRECT/KRAHULIK          Vol. 4 - 765

1  BY MS. KRAHULIK:

2  Q   And that -- that's the property that's got the numbers --

3  what on it on this document?

4  A   I can barely see them.  They start with 110- -- there it

5  is.  1104465.

6  Q   Now, tell us about how Major Tool and Machine came to be

7  involved with the former Ertel site?

8  A   Major --

9        MS. FRENCH:  Objection, Your Honor, clarification.

10 I believe the witness was reviewing a document regarding the

11 Zimmer packaging property but has identified the Zimmer Paper

12 property in her response.

13       THE COURT:  Could you clarify which property?

14       MS. KRAHULIK:  I believe she just --

15       THE COURT:  Which property are you identifying?

16       THE WITNESS:  I'm identifying what's labeled on this

17 chart as the Zimmer Paper property.

18 BY MS. KRAHULIK:

19 Q   And to resolve any confusion, the Phase I says, "Zimmer

20 Custom-Made Packaging" on the cover page; but it actually

21 pertains to the Zimmer Paper property that you've identified?

22 A   Yes, ma'am.

23       THE COURT:  Okay.  Thank you.

24 BY MS. KRAHULIK:

25 Q   Tell us about how Major Tool and Machine came to be

1  involved with the former Ertel site.

2  A    In about 2004 or 2005, we produced prototype components

3  for a customer; and it looked like that was going to become an

4  opportunity for Major Tool; and we were looking for areas

5  where we could expand our manufacturing capabilities.

6  Q    And that was logical because?

7  A    Because we had this new contract, and we were growing.

8  Q    And it was adjacent to your current facility?

9  A    Yes.

10           MS. KRAHULIK:  Can we see Exhibit 1021 at page 1?

11  BY MS. KRAHULIK:

12  Q    Do you recognize this document?

13  A    Yes, ma'am.

14  Q    What is this?

15  A    This is the lease where we leased the property that is at

16  2045 Dr. Andrew J. Brown, the former Ertel facility.

17  Q    And who did Major Tool and Machine lease the property

18  from?

19  A    The City of Indianapolis.

20           MS. KRAHULIK:  Okay, let's take a look at

21  Exhibit 1097, first page, please.

22  BY MS. KRAHULIK:

23  Q    Do you recognize this document?

24  A    Yes, ma'am.

25  Q    What is this?

1  A    This is the project agreement that we entered into with

2  the City of Indianapolis for the redevelopment of the former

3  Ertel property.

4          MS. KRAHULIK:  Could we see page 4, please?

5  BY MS. KRAHULIK:

6  Q    What did the city and, specifically, its redevelopment

7  corporation commit to in this agreement?

8  A    They committed to providing Major Tool with a site that

9  had the soil remediated in conformance with IDEM's

10 requirements under the Brownfields Program in order to be able

11 to ultimately sell that property to Major Tool.

12          MS. KRAHULIK:  And let's take a look at page 9,

13 please.

14 BY MS. KRAHULIK:

15 Q    What were Major Tool and Machine's commitments under this

16 project agreement?

17 A    We had a significant capital investment that we were

18 making, in addition to significant job investment that we were

19 making in the community.

20 Q    Can you share with the Court a little bit about the

21 specifics of those commitments?

22 A    So we were talking about over $20 million worth of

23 investment of capital and building, as well as at least 55

24 additional jobs that are more than $25 an hour.

25 Q    And before Major Tool and Machine entered into this lease,

1  did it obtain a Phase I environmental investigation of the

2  property?

3  A    Yes, ma'am.

4          MS. KRAHULIK:  Can we see Exhibit 1166, please?

5  BY MS. KRAHULIK:

6  Q    Is this a copy of that Phase I environmental

7  investigation?

8  A    Yes, ma'am.

9          MS. KRAHULIK:  Can we see Exhibit 1139?

10 BY MS. KRAHULIK:

11 Q    Do you recognize this document.

12 A    I'm not certain.

13 Q    Around the time that Major Tool and Machine leased the

14 former Ertel property, did the Metropolitan Redevelopment

15 Commission have to pass any related ordinance or provisions, a

16 resolution?

17 A    Yes, ma'am, I understand they did.

18 Q    And if you'll take a look at this, I believe it's that

19 resolution.

20 A    This appears to be that resolution, yes, ma'am.

21 Q    So now it's late 2007.  Major Tool and Machine owns Moran.

22 It owns the Zimmer Paper property, former Moran Electric

23 rewind shop; and it has leased the Ertel property.  Again, you

24 performed Phase I before you leased or purchased each of

25 those?

WEIR - DIRECT/KRAHULIK          Vol. 4 - 769

1   A   Yes, ma'am.

2   Q   What next?

3   A   In terms of the development of the property?

4   Q   Yes.

5   A   So once we entered into this agreement, the city began the

6   work with QEPI to remediate the soil in the area of the Ertel

7   and the Zimmer Paper packaging facilities in order to provide

8   a clean basis for us to begin construction of a building.

9   Q   Pursuant to the agreement in the project agreement?

10  A   Yes, ma'am.

11          MS. KRAHULIK:  Can we see Exhibit 1098, please?

12  BY MS. KRAHULIK:

13  Q   Can you identify this document for the Court?

14  A   This is where we actually purchased the property that was

15  the former Ertel Manufacturing site.

16  Q   Is there a date on this document?

17  A   Yes, ma'am.  It is January of 2013.  I believe that's

18  29th.

19  Q   And before you took title pursuant to this deed, Major

20  Tool and Machine got another Phase I -- had another Phase I

21  performed on the Ertel property, right?

22  A   Yes, ma'am.

23          MS. KRAHULIK:  Can we see Exhibit 1191?

24  BY MS. KRAHULIK:

25  Q   What is this document?

1  A    This is the Phase I that we did prior to purchase of the

2  property -- of the Ertel property -- former Ertel property.

3          MS. KRAHULIK:  Can we look at page 60, please?

4  BY MS. KRAHULIK:

5  Q    What are we seeing in these pictures on page 60 of this

6  report?

7  A    That's building 20.

8  Q    That's -- the pictures we saw the other day, that's what's

9  there now?

10  A    Yes, ma'am.

11  Q    And what sort of measures did Major Tool and Machine take

12  in constructing this building?

13  A    We installed a vapor mitigation system.

14  Q    And that's a barrier under the building?

15  A    That's a barrier under the building that was intended to

16  mitigate any fumes associated with any residual contamination

17  that had not been removed potentially.

18  Q    Did Major Tool and Machine seek assurances from the

19  regulatory agencies as to its status as a BFPP or bona fide

20  prospective purchaser of the properties?

21  A    Yes, ma'am.

22          MS. KRAHULIK:  Let's see Exhibit 1185, please.

23  BY MS. KRAHULIK:

24  Q    Do you recognize this document?  If you need to see both

25  pages, maybe we can scroll through.  It's only two.

WEIR - DIRECT/KRAHULIK                Vol. 4 - 771

1  A   Yes, ma'am.

2  Q   What is this?

3  A   This is the request, I believe, for the BFPP for the Ertel

4  site.

5  Q   And did IDEM issue a comfort letter for that site?

6  A   Yes, ma'am.

7            MS. KRAHULIK:   Let's see Exhibit 1192, please.

8  BY MS. KRAHULIK:

9  Q   Is this a copy of that comfort letter?

10 A   Yes, ma'am.

11 Q   What did you understand this comfort letter to provide to

12 Major Tool and Machine?

13 A   It was my understanding that this comfort letter would

14 have protected Major Tool and Machine from issues such as the

15 ones we're facing right now, which is being held responsible

16 for contamination in property prior to our ownership.

17            MS. KRAHULIK:   Let's take a look at page 9 of this

18 document, please.

19 BY MS. KRAHULIK:

20 Q   As part of obtaining this comfort letter from IDEM, did

21 Major Tool and Machine have to agree to certain conditions

22 related to the property?

23 A   Yes, ma'am.

24 Q   And do you recall what some of those were?

25 A   They're listed here in this conclusion section of the

WEIR - DIRECT/KRAHULIK          Vol. 4 - 772

1  letter.  It talks about limitations of the use of the

2  property, no use of groundwater wells in order to avoid any

3  future contamination potentially.  The vapor mitigation system

4  had to be monitored, et cetera.

5  Q   And those restrictions were set out in an environmental

6  restrictive covenant that was recorded on the deed, right?

7  A   Yes, ma'am.

8  Q   Let's talk a little bit about the Zimmer Paper parcel.

9  You said that was remediated along with Ertel?

10 A   Yes, ma'am.

11 Q   And what sort of remediation was undertaken there?

12 A   To me, the remediation at Zimmer Paper parcel, the

13 packaging parcel, and the Ertel remediation are all the very

14 same thing.  So it's all a significant amount of soil that was

15 removed in order to recover from the former owner's use and

16 the contamination thereon.

17 Q   And the building that was constructed, does it extend onto

18 that property as well?

19 A   Yes, ma'am.

20 Q   So that blue building we just saw?

21 A   Yes, ma'am.

22 Q   Did Major Tool seek a comfort letter and regulatory

23 closure related to the Zimmer Paper property?

24 A   We understood that that was going to be part of the

25 closure of the Ertel property comfort letter, pursuant to the

WEIR - DIRECT/KRAHULIK          Vol. 4 - 773

1   project agreement.

2          MS. KRAHULIK:  Can we pull up Exhibit 1124, please,

3   at page 11?  Actually, pull up the cover page first.

4   BY MS. KRAHULIK:

5   Q   Do you recognize this document?

6   A   Yes, ma'am.

7   Q   Do you know what this is?

8   A   I believe that this is -- I believe that this is a request

9   for the "no further action" status.

10         MS. KRAHULIK:  And can we look at page 11.  Scroll

11  to the legend, please.  There we go.

12  BY MS. KRAHULIK:

13  Q   And what is identified as the former Ertel site footprint

14  here?

15  A   The -- if you could scroll down just a little bit -- I'm

16  sorry, the other direction -- you can see that it is the

17  Ertel -- what we've been calling the Ertel building, that

18  little blue building I believe is what that little square was

19  called yesterday, and then also the Zimmer parcel, the Zimmer

20  packaging parcel.

21  Q   So is this, in part, what you based your belief upon that

22  the Zimmer property would be closed and issued an NFA along

23  with Ertel?

24  A   Along with the project agreement, yes, ma'am.

25         MS. KRAHULIK:  Let's look at Exhibit 1153, please.

WEIR - DIRECT/KRAHULIK          Vol. 4 - 774

1  Can you rotate that?

2  BY MS. KRAHULIK:

3  Q    What do we see here?

4  A    This is the work that was being done to build building 20.

5           MS. KRAHULIK:  And 1155, please.

6  BY MS. KRAHULIK:

7  Q    What do we see here?

8  A    That's further construction with building 20.

9  Q    What's the blue shown in photo?

10 A    I believe that has to do with the barrier; the vapor

11 intrusion barrier that was placed.

12 Q    Do you understand that that barrier was placed there with

13 IDEM approval?

14 A    Yes, ma'am.

15          MS. KRAHULIK:  Let's take a look at Exhibit 1152.

16 BY MS. KRAHULIK:

17 Q    This is directed to Chris Rothenberger, but do you

18 recognize and are you familiar with this document?

19 A    Yes, ma'am.

20 Q    What is this?

21 A    This is the instruction about how to install the vapor

22 intrusion mitigation system and monitor it.

23          MS. KRAHULIK:  Please scroll to the final paragraph.

24 BY MS. KRAHULIK:

25 Q    What did Brownfields conclude as to the mitigation system?

WEIR - DIRECT/KRAHULIK          Vol. 4 - 775

1  A   We ran it sufficiently -- to run it sufficiently and

2  monitor it to determine when it had mitigated any barrier --

3  or mitigated any contamination that might be coming up.

4  Q   And it's not running actively today, is it?

5  A   No, ma'am.

6  Q   It's in a passive state?

7  A   Yes, ma'am.

8  Q   With approval?

9  A   Yes, ma'am.

10 Q   What was the result of the overall remediation and

11 redevelopment efforts at both the Ertel and Zimmer Paper

12 properties?  In other words, what did it mean for Major Tool

13 and Machine?

14 A   We built a 150,000 square foot facility.  We invested

15 $20 million in that facility and in facilitizing [sic] the

16 equipment as well as the building itself.  We hired 55 people,

17 and we began the process of building 20 centrifuge casings a

18 day for the United States Enrichment Corporation.  That's why

19 we call it building 20.

20 Q   I asked Ms. Vedder from IDEM yesterday about this, but was

21 there an award associated with that project?

22 A   Yes.

23 Q   Can you tell the Court a little bit about that?

24 A   Yes --

25         MS. FRENCH:  Objection, Your Honor.  Relevance.

1          THE COURT:  Oh, I want to hear about it.  I'll

2    overrule.

3    A    It's the Governor's Award in 2008, and it was for the

4    effective and efficient remediation that was done in this

5    project.  There was great pride associated with the quality of

6    this project.

7    BY MS. KRAHULIK:

8    Q    Let's turn back to the former Moran property.  What did

9    Major Tool and Machine do with that property after acquiring

10   it?

11   A    Well, initially we used the buildings that were there just

12   to store fixtures because we had run out of space; hence, the

13   need for the expansion with building 20.

14          MS. KRAHULIK:  Let's take a look at Exhibit 1122 at

15   page 16, please.

16          And if you could give Ms. Weir a moment to read

17   pages 16 and 17, I'll then ask her a question or two about

18   this document.

19   A    And you wanted me to read the next page as well?

20   BY MS. KRAHULIK:

21   Q    Yes, thank you.

22   A    Yes, ma'am.

23   Q    What does this document describe?

24   A    It describes the remediation efforts that we would need to

25   undertake in order to request a No Further Action letter for

1    the Moran properties.

2    Q    And it involved removal of soil?

3    A    Significant removal of soil and monitoring.

4    Q    How many tons?

5    A    I believe it said 4,770.

6    Q    Do you know if this was approved by IDEM?

7    A    We worked with the Brownfields Program and IDEM to approve

8    it, yes, ma'am.

9            MS. KRAHULIK:  Let's see Exhibit 1031, please.

10   BY MS. KRAHULIK:

11   Q    Do you recognize this document?  It's a letter to you.

12   A    Yes.  I believe it's the letter from Kyle Hendricks.

13           MS. KRAHULIK:  Can you scroll to the end of this

14   document, please, Ms. Woods?  And then enlarge that, please.

15   A    I misspoke.  It's from Kevin Davis.

16   BY MS. KRAHULIK:

17   Q    And in the second to last paragraph, it says, "The

18   proposed hot spot removal is approved and" --

19   A    "Appears to be adequate and is acceptable" is the language

20   in the letter.

21   Q    And did Major Tool and Machine perform that work?

22   A    Yes, ma'am.

23           MS. KRAHULIK:  Can we see Exhibit 1093?

24   BY MS. KRAHULIK:

25   Q    What is this document?

1  A   I believe this is the report that verifies that we did do

2  exactly what IDEM said we should do to remediate the ground,

3  the soil.

4  Q   After this remediation, did Major Tool and Machine

5  undertake additional efforts with regard to those properties?

6  A   We've been doing additional efforts with those properties

7  all the way through the last 12 years.

8  Q   Have you conducted regular groundwater monitoring at those

9  properties?

10  A   Yes, ma'am.

11          MS. KRAHULIK:  Let's see Exhibit 1102.  Can you

12  scroll and let Ms. Weir read this, please.

13          THE WITNESS:  You can go to the next page.

14  BY MS. KRAHULIK:

15  Q   Do you recognize this document?

16  A   Yes, ma'am.

17  Q   What is this?

18  A   This is a request for a No Further Action letter for the

19  Moran properties.

20  Q   Did Major Tool and Machine bring a lawsuit against Moran?

21  A   Yes, ma'am.

22  Q   And what was the result of that lawsuit?

23  A   There was a settlement.

24  Q   Do you recall a settlement amount?

25  A   Yes, ma'am.

1  Q    What is it?

2  A    $1.25 million.

3  Q    And was that enough to cover Major Tool and Machine's past

4  costs related to remedial efforts?

5  A    No, ma'am.  It wasn't even half.

6  Q    Obviously after that, we were included in this action.

7  The settlement agreement with Moran, does it have provisions

8  relating to Von Duprin's claims in this lawsuit and the

9  Von Duprin property?

10  A    We specifically carved those out of the settlement because

11  we knew this was ongoing.

12  Q    And it was already filed at the time it was settled?

13  A    Yes, ma'am.

14  Q    Did Major Tool and Machine as a part of that settlement in

15  conjunction with Moran apply to the IDEM Voluntary Remediation

16  Program?

17  A    Yes, ma'am.

18  Q    What was the result of that application?

19  A    The application was denied.

20  Q    And what's happened with IDEM since that time?

21  A    We have received commissioner's orders with extremely

22  short time frames with which to respond, advising us who we

23  need to work with in order to respond to concerns that they've

24  raised regarding groundwater issues that are not on our

25  property.

1  Q   And that commissioner's order came after the Voluntary

2  Remediation Program application?

3  A   Yes, ma'am.

4  Q   Is Major Tool and Machine appealing the commissioner's

5  order?

6  A   We did, yes, ma'am.

7            MS. KRAHULIK:  Could we see Exhibit 1227, please?

8  BY MS. KRAHULIK:

9  Q   Do you understand this to be that appeal?

10 A   Yes, ma'am.  This is the appeal of the order.

11 Q   And is Major Tool and Machine also appealing the denial of

12 entry into the Voluntary Remediation Program?

13 A   Yes, ma'am.

14           MS. KRAHULIK:  Can we see Exhibit 1228, please?

15 BY MS. KRAHULIK:

16 Q   And is this a copy of that appeal petition?

17 A   Yes, ma'am.

18 Q   We heard some testimony in the past couple of days about

19 Major Tool and Machine agreeing to fund some activities

20 related to vapor intrusion testing and potential mitigation at

21 homes along Alvord and Yandes Streets.

22 A   Yes, ma'am.

23 Q   Why has Major Tool and Machine agreed to participate in

24 funding some of that work?

25 A   Because it's the right thing to do.  It's consistent with

*WEIR - CROSS/MENKVELD*          Vol. 4 - 781

1  what we've done in the neighborhood.

2  Q   Did Major Tool and Machine contribute or cause any

3  contamination on the properties we've looked at today?

4  A   No, ma'am.

5  Q   Did Major Tool and Machine use, generate, transport,

6  treat, store, or dispose of PCE or TCE on any of those

7  properties?

8  A   No, ma'am.

9  Q   What are Major Tool and Machine's future plans generally

10  for the properties?

11  A   We actually have a proposal in support of the Navy to

12  expand building 20 to be able to continue to produce

13  components for the nuclear Navy submarine program.

14  Q   There was a recent article about that in the *IBJ*, right?

15  A   *The Road To Mars Goes Through Major Tool*.  We produce

16  components for the Orion rocket system that has plans to take

17  astronauts to Mars.

18         MS. KRAHULIK:  I don't have any further questions.

19  Thank you so much.

20         THE COURT:  Mr. Menkveld, you may cross-examine.

21                    **CROSS-EXAMINATION**

22  BY MR. MENKVELD:

23  Q   Good morning, Ms. Weir.

24  A   Good morning.

25  Q   Major Tool is currently the owner of the Zimmer site as

1   we've identified it in this lawsuit; is that correct?

2   A    Yes, sir.

3   Q    And it's also the current owner of the Zimmer parcel that

4   we've identified, right?

5   A    Yes, sir.

6   Q    To make sure I have the dates correct, Major Tool

7   purchased the Zimmer property in January of 2007?

8   A    The packaging parcel, yes, sir.

9   Q    When did Major Tool purchase the Zimmer parcel?

10  A    I would have to speak from memory.  I believe it was

11  around 2013.

12          MR. MENKVELD:  Let's pull up Exhibit 1001.

13  BY MR. MENKVELD:

14  Q    Let's make sure we are talking about the same properties

15  here.

16  A    Yes, sir.

17  Q    You identified the Zimmer Paper parcel as this property,

18  right?

19  A    Yes, sir.

20  Q    And is it your recollection today that Major Tool bought

21  that property in 2013?

22  A    No, sir.  That property was 2007.  The property beside it

23  was 2013.

24  Q    This property was 2013?

25  A    Yes, sir.

*WEIR - CROSS/MENKVELD*          Vol. 4 - 783

1  Q   And then Major Tool purchased this property in 2013 also;

2  is that correct?

3  A   Yes, sir.

4  Q   There was an agreement for Major Tool to purchase the

5  Ertel property that was dated in 2007, right?  That's the

6  project agreement?

7  A   Yes, sir.

8  Q   And then Major Tool actually accepted the quitclaim deed

9  for the Ertel property in 2013; is that correct?

10 A   Yes, sir.

11 Q   And the purpose for Major Tool initially purchasing and

12 occupying through a lease those two properties, the Zimmer

13 parcel and the Ertel property, was to construct a facility; is

14 that right?

15 A   Yes, sir.

16 Q   And that facility was being developed by Major Tool to

17 manufacture or to construct a new building, right?

18 A   Yes, sir.

19 Q   And that building was supposed to be used to manufacture

20 products in accordance with the contract between Major Tool

21 and a company named USEC, right?

22 A   Yes.

23 Q   And you said what "USEC" is before.  Can you say it again,

24 please, the full name?

25 A   The United States Enrichment Corporation.

*WEIR – CROSS/MENKVELD*          Vol. 4 – 784

1      MR. MENKVELD:  Let's pull up Exhibit 686, please.

2      Actually, I'm sorry.  We renamed it to 602.

3  BY MR. MENKVELD:

4  Q   Ms. Weir, I'm just going to show you the first page of

5  this exhibit.  Do you see on the right-hand side, one of the

6  parties to this contract was Major Tool and Machine, Inc.?

7  A   Yes, sir.

8  Q   Dated August 30 of 2007; is that correct?

9  A   Yes, sir.

10 Q   Now, you see at the bottom right-hand side of this

11 agreement a name under Major Tool and Machine, Inc.?

12 A   Yes.

13 Q   What name is that, Steven Weyreter?  Did I say that right?

14 A   Steven Weyreter.

15 Q   Weyreter is spelled W-E-Y-R-E-T-E-R; is that right?

16 A   Correct.

17 Q   And is this Mr. Weyreter's electronic signature?  Is that

18 what the "S" indicates?

19 A   Yes, sir.

20     MR. MENKVELD:  Your Honor, the authenticity of this

21 document has been stipulated to.  We would move to admit

22 Exhibit 602 into evidence.

23     THE COURT:  Any objection?

24     MS. KRAHULIK:  We do object.  I believe this

25 document has a confidentiality designation on it.  So just to

1  the extent -- and it's also -- if you see at the bottom of it,

2  "USEC Proprietary Information."  I can't see the whole

3  document but --

4          THE COURT:  So would you like to offer it under

5  seal?

6          MR. MENKVELD:  We can offer it under seal, Your

7  Honor, the proprietary components or any confidential

8  components.

9          MS. KRAHULIK:  That would be acceptable.

10          MR. MENKVELD:  With the exception of what we will

11  talk about today, which I believe won't include any of those

12  things.

13          THE COURT:  All right.  Do you have any objection,

14  plaintiffs?

15          MS. FRENCH:  No, Your Honor.

16          THE COURT:  Exhibit 602 is admitted into evidence

17  under seal without objection.

18      (Defendant Exhibit 602 was received in evidence under

19  seal.)

20  BY MR. MENKVELD:

21  Q   Now, Major Tool's arrangement with USEC required Major

22  Tool to construct a new facility, right?

23  A   Yes, sir.

24  Q   And that facility was to be constructed on the Ertel site

25  and the Zimmer parcel, which we've established, right?

*WEIR - CROSS/MENKVELD*          Vol. 4 - 786

1  A   Yes, sir.

2  Q   Now, the price for each unit that Major was manufacturing

3  for USEC depended on the timing of that facility becoming

4  fully operational; is that right?

5  A   I'm not certain I understand your question.

6  Q   I'll ask a different question.

7  A   Yes, sir.

8  Q   Was Major Tool to receive a financial incentive for having

9  the facility that it constructed on the Emmert -- Zimmer and

10 Ertel properties by a certain date?

11 A   Yes, sir.

12 Q   Now, again, that agreement was entered into on August 30

13 of 2007, right?

14 A   Yes, sir.

15 Q   On September 25th of 2007, about a month later, Major

16 entered into the project agreement with the City of

17 Indianapolis; is that right?

18 A   Yes, sir.

19 Q   Now, you actually assisted in the review of the project

20 agreement personally, didn't you?

21 A   Yes, sir.

22 Q   Now, Major was aware at the time that it entered into the

23 project agreement that the Ertel site and the Zimmer parcel

24 were contaminated, right?

25 A   Yes, sir.

1  Q   And Major knew that remediation of those properties would

2  need to happen, correct?

3  A   Yes, sir.

4  Q   Am I correct when I say that under the project agreement,

5  the City of Indianapolis was responsible for performing

6  remediation activities at the Ertel site?

7  A   Yes, sir.

8  Q   Demolition of existing buildings at the Ertel site also

9  had to occur, right?

10  A   Yes, sir.

11  Q   Now, if you go to -- I'll withdraw that.

12       What did Major Tool pay for with respect to

13  remediation activities that occurred on the Ertel site before

14  it constructed its building?

15  A   For the remediation activities on the Ertel site before we

16  constructed our building?

17  Q   Right.

18  A   I would have to review the project agreement to remember

19  the cost share associated with that.

20  Q   Do you recall whether Major Tool paid for demolition of

21  the buildings?

22  A   I do not believe we did, no.

23  Q   Do you recall whether Major Tool actually paid for the

24  excavation of soil at the Zimmer property?

25  A   I do not believe so, no, sir.

WEIR – CROSS/MENKVELD                Vol. 4 – 788

1  Q    Did Major Tool pay for the excavation of soil from the

2  Zimmer property?

3  A    I believe there was a component of the cost of the Zimmer

4  parcel -- Packaging parcel remediation that we assisted in

5  paying.

6  Q    Was that an investigation component?

7  A    Not -- no, sir.  I'm sorry.  I misspoke.  I believe it was

8  follow-up investigation that we were participating in.

9  Q    But the actual excavation of the tens of thousands or tons

10 of soil was paid for by City of Indianapolis money; is that

11 right?

12 A    Yes, sir.  That's my understanding.

13 Q    Now, within the project agreements, there were certain

14 deadlines by which certain phases of the remediation had to be

15 completed; is that right?

16 A    Yes, sir.

17 Q    And all those remediation deadlines were in 2007?

18 A    I believe so.

19 Q    Now, at this time Major's consultant in 2007 was Mr. Nivas

20 Vijay; is that right?

21 A    Yes.

22 Q    And he worked at that time for a company named Quality

23 Environmental Professionals, Inc., otherwise known as QEPI?

24 A    Yes, sir.

25 Q    Mr. Vijay later went to work for a company named Heartland

1  Environmental; is that right?

2  A    Yes.

3  Q    And he actually continues to act as Major's current

4  consultant while employed with Heartland Environmental; is

5  that right?

6  A    Yes.

7  Q    Mr. Vijay was also the City of Indianapolis consultant at

8  the time the city was obligated to do remediation activities

9  at the Zimmer site and the Ertel parcels; is that right?

10  A    Yes, sir.

11  Q    And through QEPI, Mr. Vijay was working to investigate the

12  Zimmer parcel and the Ertel site in 2007, right?

13  A    Yes, sir.

14  Q    Now, in 2007, Mr. Vijay actually did some investigation of

15  PCE and TCE on those properties, correct?

16  A    I assume that was included.

17          MR. MENKVELD:  Let's pull up Exhibit 1100, please.

18  BY MR. MENKVELD:

19  Q    So, Ms. Weir, this is a Limited Subsurface Investigation

20  prepared by QEPI for Major Tool and Machine on the former

21  Zimmer Paper parcel.  Did you see that at the top?

22  A    Yes, sir.

23  Q    Now at this time Major Tool was aware of contaminants of

24  TCE and PCE at the Zimmer parcel; is that right?

25  A    May I see the date on this report, please?

1          Yes, we were.

2   Q    Now, August 3rd of 2007 was the same month that Major Tool

3   entered into the contract with USEC; is that right?

4   A    Yes, sir.

5   Q    And that's also the same month that Major Tool contracted

6   to receive financial incentives for constructing a building

7   over this property; isn't that right?

8   A    Yes, sir.

9   Q    Major Tool entered into a contract to receive financial

10  incentives for constructing a building before remediation of

11  this contamination occurred, right?

12  A    Yes, sir.

13  Q    Now, later in 2007 -- on December 12th of 2007, QEPI

14  removed a large underground storage tank -- do you recall

15  that -- from the Zimmer Paper parcel?

16  A    Yes, sir.

17  Q    And the UST was removed when Major Tool owned that

18  property; is that right?

19  A    Yes, sir.

20  Q    Do you recall that QEPI reported that that UST was filled

21  with residual product and sludge when it was removed?

22  A    I don't recall.

23  Q    If the report said that it was, would you dispute that?

24  A    I would not.

25  Q    Do you have any personal knowledge as to whether that

1  underground storage tank was leaking at the time it was

2  removed?

3  A    I do not.

4  Q    Are you aware, Ms. Weir, of any confirmation sampling that

5  was done where that underground storage tank was actually

6  removed?

7  A    I'm not aware of the specifics of that removal, other than

8  reading the report.

9  Q    After the soil excavation on the Ertel property and the

10 Zimmer property were originally done, are you aware of any

11 further excavation?

12 A    Further excavation?  I don't believe so.

13 Q    Now, Major has made no efforts, as you sit here today, to

14 determine whether contamination on the Zimmer parcel or the

15 Ertel site has migrated to properties to the south; is that

16 right?

17 A    There have been monitoring wells installed for many years

18 south of our property that have tried to monitor that --

19 monitor the groundwater.

20 Q    But Major Tool hasn't hired its own consultants or

21 undertaken any effort to investigate the migration of

22 contaminants from the Ertel or the Zimmer property southward;

23 is that right?

24 A    That is correct.

25 Q    And specifically, Major Tool did not perform any sort of

1  deep groundwater sampling to determine whether there were deep

2  groundwater impacts on the Ertel or Zimmer property; is that

3  right?

4  A   No, sir, we did not.

5  Q   I believe you said earlier that Mr. Vijay -- Nivas Vijay

6  was Major's consultant in 2007; is that right?

7  A   Yes, sir.

8  Q   Are you aware of a concern at any point by the City of

9  Indianapolis or Mr. Vijay that deep groundwater contamination

10 could turn up further -- or excuse me -- deep groundwater

11 testing could turn up further groundwater contamination?

12 A   I don't remember a formal report from Nivas regarding deep

13 groundwater contamination.

14 Q   You understand that when performing redevelopment projects

15 like this, there's typically a budget associated with it,

16 right?

17 A   I would hope so, sir.

18 Q   And the discovery of contamination could cut into that

19 budget because you have to use the money to address it; is

20 that right?

21 A   Ostensibly, yes.

22       MR. MENKVELD:  Pull up Exhibit 1215, please.  Scroll

23 to the bottom first.  Scroll up to the first e-mail.  Right

24 there.  Little higher up, please.  Little higher up.

25

*WEIR - CROSS/MENKVELD*          Vol. 4 - 793

1  BY MR. MENKVELD:

2  Q    Ms. Weir, you'll see that this is an e-mail from a person

3  named Christopher Harrell.  Do you know who Christopher

4  Harrell is?

5  A    Yes, sir.

6  Q    At this time, was he the Brownfields redevelopment

7  coordinator for the City of Indianapolis?

8  A    That's my understanding, yes, sir.

9  Q    He's sending an e-mail to Nivas Vijay; is that right?

10  A    Yes.

11  Q    And Nivas Vijay is Major Tool's consultant?

12  A    As well as the city's, yes, sir.

13  Q    That was my next question, as well as the city's

14  consultant, right?

15  A    Yes, sir.

16  Q    You can see here in the third paragraph down where it

17  starts with, "I'm a bit" -- do you see that?

18  A    Yes.

19  Q    Where Mr. Harrell is saying, "I'm a bit worried about

20  random sampling events and how that could uncover additional

21  area to further delineate and excavate and how that could make

22  even more budget fun."  And then he goes on.  Do you see where

23  I'm reading?

24  A    Yes, sir.

25          MR. MENKVELD:  Now scroll up to the top, please.

```
 1  BY MR. MENKVELD:

 2  Q   Now, here's an e-mail from Mr. Vijay -- you see the

 3  sentence that starts with "We"?

 4  A   Yes, sir.

 5  Q   Would you read that for us, please?

 6  A   "We can ensure -- and I've asked Andrea about this -- that

 7  our random samples don't uncover further issues."

 8  Q   Now, without performing further investigation, Major

 9  constructed a building on the Ertel and Zimmer properties,

10  right?

11  A   Yes, sir.

12  Q   And it constructed its building just in time to receive

13  incentive payments from USEC; is that right?

14  A   Yes, sir.

15  Q   Ms. Weir, am I correct when I say the project agreement --

16  the dates for remediation on the project agreement were

17  coordinated with the dates that were put in the USEC contract?

18  A   Yes, sir.

19  Q   And at the time Major constructed its building on the

20  Ertel and Zimmer parcel, IDEM did not issue a closure letter

21  for the Ertel site; is that right?

22  A   I'm sorry.  Ask that again?

23  Q   What year did Major construct the building on the Ertel

24  and Zimmer sites?

25  A   2007 and 2008.
```

1  Q   And at that time, there was no No Further Action letter

2  issued by IDEM for those properties; is that right?

3  A   Not yet, no, sir.

4  Q   And at that time, the Zimmer parcel was not placed into a

5  cleanup program; is that correct?

6  A   We understood it was part of the Ertel cleanup.  We

7  completely understood that.

8  Q   What's your understanding today?

9  A   During my deposition, you told me that was not the case,

10 four years ago.

11 Q   But what is your understanding today of whether the Zimmer

12 parcel was placed into a cleanup program?

13 A   It is my understanding it is not.

14 Q   Now, has Major taken any action against the City of

15 Indianapolis in regard to the project agreement at all?

16 A   No, sir.

17 Q   Now, Major, you testified earlier, did not take title to

18 the Ertel site until January of 2013, correct?

19 A   Yes, sir.

20 Q   And that's because Major did not have the obligation to

21 accept title to that property until IDEM issued a No Further

22 Action for that property, right?

23 A   That's correct.

24 Q   And, in fact, it was the issuance of the NFA letter that

25 triggered the transfer of the property -- of that property to

*WEIR – CROSS/MENKVELD*          Vol. 4 - 796

1  Major Tool; is that right?

2  A   As was always the intent, yes, sir.

3  Q   With respect to the purchase of the Ertel property, am I

4  correct when I say Major Tool made a down payment of $100,000

5  to buy that property?

6  A   I would have to review the document to confirm that.

7          MR. MENKVELD:  Let's go to Exhibit 1097, please.

8  Let's try page 11.  Scroll down, please.

9  BY MR. MENKVELD:

10  Q   Well, let's just do this.  Would you dispute if the

11  agreement said there was a down payment of $100,000, that

12  Major Tool actually made that down payment?

13  A   We complied with all components of the project agreement,

14  so we would have complied with that as well.

15  Q   I believe the annual rent Major Tool paid would be

16  $100,000 per year; is that right?  Or excuse me, $1,000 per

17  year?

18  A   We paid the rent due per the project agreement.

19  Q   So we would just turn to the project agreement to find the

20  amount of rent, and that's correct, right?

21  A   Yes, sir.

22  Q   That was never changed by any other agreement?

23  A   No, sir.

24  Q   Now, am I correct when I say the balance of the purchase

25  price, which is I'll say 72,500 per acre, minus any money

1  already paid, would be forgiven if Major Tool met the

2  requirements of Section 5 of the project agreement, which is

3  things like creating jobs and so forth; is that correct?

4  A    It's building the building, creating jobs, investing

5  $20 million, all of those economic development efforts that we

6  incurred.

7  Q    And Major Tool met those requirements, right?

8  A    Yes, sir.

9  Q    And because it met those requirements, it did not pay the

10  balance of the purchase price, correct?

11  A    No, sir.

12  Q    Now, Major hired Heartland and Mr. Vijay to perform a

13  Phase II investigation on the Moran property; is that right,

14  in 2011?

15  A    Yes, sir.

16  Q    That Phase II report was actually sent to your attention,

17  correct?

18  A    Was sent to my attention?

19  Q    Yes.

20  A    Yes, sir.

21        MR. MENKVELD:  Pull up Exhibit 1112, please.

22  BY MR. MENKVELD:

23  Q    You'll see, Ms. Weir, at the top left, this is addressed

24  to you, right?

25  A    Yes, sir.

*WEIR - CROSS/MENKVELD*        Vol. 4 - 798

1  Q   Now, in this report, Major was informed that contamination

2  that could be on the Moran property was likely coming from

3  upgradient properties, right, properties to the north?

4  A   Both soil and groundwater were discussed in this, as I

5  remember.

6        MR. MENKVELD:  Go to page 6, please.  Scroll down,

7  please, so I can see the bottom of the page.  All the way.

8  BY MR. MENKVELD:

9  Q   Look at this paragraph.  You see the sentence that begins

10 with "Concentrations"?  I'll read it.

11       It says, "Concentrations at these groundwater

12 monitoring wells were consistent with those encountered during

13 previous subsurface investigations conducted to the north of

14 the site," meaning the Moran site, "and are likely a result of

15 migration from these areas."

16       Did I read that correctly?

17 A   Yes, sir.

18 Q   Now, Major Tool didn't take -- undertake an effort to

19 investigate whether contamination from the Ertel property or

20 the Zimmer property were, in fact, migrating down to the Moran

21 property; is that right?

22 A   That's correct.

23       MR. MENKVELD:  Go to Exhibit 1192, please, PDF

24 page 8.

25

1  BY MR. MENKVELD:

2  Q   Ms. Weir, you understand, don't you, that Major, as a

3  party who may have received BFPP protection, has certain

4  obligations, right?

5  A   Yes, sir.

6  Q   And part of those obligations you'll see in the first

7  paragraph of this letter, correct?

8  A   Yes, sir.

9  Q   Actually, second paragraph of this letter, right?  I'll

10 just say, "The continuing obligations that the owner," meaning

11 Major in this case, "must undertake to maintain BFPP status

12 are outlined"; and then it cites a statute, and then it goes

13 through a list of things Major is required to do, right?

14 A   Yes, sir.

15          MR. MENKVELD:  Scroll down, please.

16 BY MR. MENKVELD:

17 Q   And then there's a couple specific bullets that IDEM --

18 that IDEM wrote down in this letter.  Do you see where I just

19 put an arrow?

20 A   Yes, sir.

21 Q   One of those requirements, it says, "Upon becoming aware

22 of such information, communicate to IDEM any newly obtained

23 information about existing hazardous substances,

24 contamination, or any information about new or previously

25 unidentified contamination"; is that correct?

1  A   Yes, sir.

2  Q   Did Major Tool inform IDEM that contamination from the

3  Ertel property could potentially be migrating south to the

4  Moran property?

5  A   Nivas Vijay would have to answer that question for you.

6  Q   Do you know if Major Tool did, through Major Tool?  And I

7  understand you act through Mr. Vijay sometimes, but I'm asking

8  if Major Tool made that report?

9  A   I did not report to IDEM on behalf of Major Tool any

10 additional existing hazardous substance contamination or new

11 or previously unidentified contamination.

12 Q   Ms. Weir, you're aware that -- and I believe you even

13 mentioned that Major Tool sued Moran Electric at one point,

14 correct?

15 A   Yes, sir.

16 Q   And that resulted in a settlement of a number that you

17 mentioned earlier, right?

18 A   Yes, sir.

19 Q   What was the settlement amount again?

20 A   1.25 million.

21 Q   How much did it cost for Major Tool to remove soils at the

22 Moran property?

23 A   The whole project was over $2 million.

24 Q   Do you know how much it cost specifically to remove soils?

25 A   Not specifically.

1  Q   When you include numbers in the cost, are you referring to

2  investigations, groundwater monitoring, and soil removal?

3  A   Yes, sir.

4  Q   Does that include anything having to do with the vapor

5  mitigation system on the Zimmer parcel?

6  A   The vapor mitigation system is on building 20, which

7  includes the Zimmer parcel.

8  Q   And those costs were not included in that settlement,

9  right?

10 A   No, sir.

11 Q   Now, in that settlement, Major Tool also agreed to

12 indemnify Moran for contamination that had to be addressed on

13 the Moran property and the Zimmer parcel; is that right?

14 A   With the exception of that related to this lawsuit, yes,

15 sir.

16 Q   That's my next question.

17 A   Sorry.

18 Q   But my question is Major Tool agreed to indemnify Moran

19 for contamination that had to be addressed on the Moran

20 property and the Zimmer parcel, correct?

21         MS. KRAHULIK:  I object just to the extent that this

22 document speaks for itself, and he's asking her for legal

23 conclusions from a legal document.

24         THE COURT:  I'll sustain.  Why don't you rephrase

25 your question.

1          MR. MENKVELD:  The Rules of Evidence, I can get

2   testimony to show the terms of an agreement, Your Honor.

3          THE COURT:  And you are on cross, so just -- you

4   may.  Go ahead.

5   BY MR. MENKVELD:

6   Q   So the question, Ms. Weir, is whether in that settlement

7   agreement Major Tool agreed to indemnify Moran for

8   contamination on the Moran property and the Zimmer parcel that

9   had to be addressed going forward?

10  A   That is my understanding.

11  Q   And there was a carve-out for any money that Von Duprin is

12  seeking to recover in this case, correct?

13  A   Yes, sir.

14          MR. MENKVELD:  And let's put the document in the

15  record here.  Let's pull it up here.  It's Exhibit 600, I

16  believe, if we could go to our exhibit list.

17  BY MR. MENKVELD:

18  Q   Ms. Weir, this is an exhibit that has not been admitted

19  into evidence.  Have you seen this before, this document?

20  A   Yes, sir.

21  Q   Is this the settlement agreement between Major Tool and

22  Moran Electric to resolve the lawsuit between those entities?

23  A   Yes, sir.

24  Q   Dated September 11, 2017, correct?

25  A   Yes, sir.

*WEIR - CROSS/MENKVELD*          Vol. 4 - 803

1  Q   Have there been any changes to this agreement from the

2  time you actually saw it, aside from the redactions you see on

3  this page?

4  A   No, sir.

5           MR. MENKVELD:  I would move to admit this exhibit

6  into evidence.  There are some redactions.

7           THE COURT:  There's a whole lot of them.

8           THE WITNESS:  Yes, ma'am.

9           MS. KRAHULIK:  We have no objection to the redacted

10 agreement being admitted.

11          MS. FRENCH:  No objection, Your Honor.

12          THE COURT:  The Court will admit into evidence

13 Exhibit 600.

14   *(Defendant Exhibit 600 was received in evidence.)*

15 BY MR. MENKVELD:

16 Q   Ms. Weir, there was a time in Major's dealings with

17 Von Duprin where Von Duprin actually wanted to gain access to

18 properties that Major Tool owned; is that right?

19 A   Yes, sir.

20 Q   Isn't it the case that Major Tool actually denied access

21 to its properties for further testing to be performed?

22 A   Ultimately, no.

23 Q   How about initially?

24 A   Initially, yes.

25 Q   And is it the case that IDEM actually had to send Major

*WEIR – CROSS/FRENCH*                    Vol. 4 - 804

1  Tool a letter to compel Major Tool to provide Von Duprin

2  access to its properties?

3  A   Yes, sir.

4  Q   Now, in a lawsuit that Major Tool filed against Moran,

5  Moran Electric wanted access to Major Tool properties to

6  perform environmental investigation as well; is that correct?

7  A   Yes, sir.

8  Q   To potentially perform investigation of groundwater

9  migration, for example, right?

10 A   Yes, sir.

11 Q   And Major Tool initially rejected that request as well,

12 right?

13 A   Yes, sir.

14 Q   And the court in Marion County actually had to issue an

15 order can compellingly Major Tool to provide access; is that

16 right?

17 A   Yes, sir.

18            MR. MENKVELD:  Pass the witness.

19            THE COURT:  Okay.  Ms. French.

20                    **CROSS-EXAMINATION**

21 BY MS. FRENCH:

22 Q   Good morning, Ms. Weir.

23 A   Good morning.

24 Q   Was Major under any legal obligation to buy the Ertel

25 property?

*WEIR – CROSS/FRENCH*                Vol. 4 - 805

 1  A    No, sir -- no, ma'am.  I'm sorry.  I know better.

 2  Q    Was Major under any legal obligation to buy the Zimmer

 3  Paper property?

 4  A    No, ma'am.

 5  Q    Was Major under any legal obligation to buy the Moran

 6  property?

 7  A    No, ma'am.

 8  Q    So each purchase was voluntary?

 9  A    Yes, ma'am.

10  Q    You testified earlier that Major Tool and Machine has a

11  vapor intrusion mitigation system installed?

12  A    In building 20, yes, ma'am.

13  Q    And the purpose of that system is to protect Major Tool's

14  employees from inhaling chlorinated solvent vapors, correct?

15  A    Yes, ma'am.

16  Q    Because those vapors migrate from contaminated groundwater

17  under the site, correct?

18  A    Or the soil, yes, ma'am.

19  Q    You understand that groundwater moves from place to place?

20  A    Yes, ma'am.  I have learned that.

21  Q    And you testified that Major Tool has not conducted an

22  investigation of how or whether groundwater migrates from its

23  property to downgradient properties referenced on Exhibit

24  1001, which you saw earlier?

25  A    That's correct.

*WEIR - CROSS/FRENCH*                    Vol. 4 - 806

1  Q    When was Moran leased?

2  A    I believe it was 2003.

3  Q    Who was Moran leased from?

4  A    I believe it was from the Green trustee, the Robert Green

5  trustee.

6  Q    What entity leased the Moran property?

7  A    I do not remember.  That was before my time at Major Tool.

8  Q    Did Major Tool or machine or Major Holdings conduct any

9  environmental investigations prior to entering that lease for

10 Moran?

11 A    I would have to look at when that first Phase I was dated

12 to answer that question.

13 Q    Was Zimmer Paper part of the 99-year lease that Major Tool

14 had for the Ertel property?

15 A    No, ma'am.

16 Q    When was the Zimmer Paper parcel acquired?

17 A    I believe the documents said January 30th of 2007.

18         MS. FRENCH:  Let's pull up Exhibit 600 again.

19 BY MS. FRENCH:

20 Q    Does Exhibit 600 establish a contractual relationship

21 between the Major Defendants and Moran Electric?

22 A    No, ma'am.

23 Q    How is that?

24 A    It's purely a settlement agreement for a court case

25 similar to this one.

*WEIR - CROSS/FRENCH*                    Vol. 4 - 807

1  Q   Didn't you just testify that it establishes some ongoing

2  obligations to pay for certain environmental remediation in

3  the area?

4  A   That's a settlement agreement.  That's not a contract, as

5  I understand it.

6  Q   A settlement agreement is not a contract?

7  A   Not a contract that is a typical contract like we would

8  have at Major Tool with our customers, where we would contract

9  to provide specific services for value and provide title to a

10 part to demonstrate it.

11 Q   Does the comfort letter received from IDEM actually

12 address the Zimmer property?

13 A   We always understood it did, until Mr. Menkveld pointed

14 that out to me that it did not.

15 Q   I appreciate what your understanding was prior to your

16 deposition four years ago, but is the answer to my question

17 yes or no?

18 A   Please repeat your question.

19 Q   Was the comfort letter received from IDEM for the Ertel

20 property -- did it include the Zimmer Paper property?

21 A   It is my understanding it does not.

22 Q   Is that also the case for the environmental restrictive

23 covenant on the Ertel property?

24 A   I don't understand your question.

25 Q   You testified earlier there's an environmental restrictive

*WEIR– REDIRECT/KRAHULIK*          Vol. 4 - 808

1  covenant applicable to the Ertel property; is that correct?

2  A   Yes, ma'am.

3  Q   Does that environmental restrictive covenant apply to the

4  Zimmer Paper property as well?

5  A   I don't believe so.

6         MS. FRENCH:  Nothing further.

7         THE COURT:  Okay.  Do you have any redirect?

8         MS. KRAHULIK:  Yes.

9                    **REDIRECT EXAMINATION**

10 BY MS. KRAHULIK:

11 Q   You were asked earlier about some financial incentives

12 that Major Tool received as part of its USEC contract, right?

13 A   Yes.

14 Q   Are those unusual?

15 A   Absolutely not.  We have a 98 percent on-time delivery

16 rate for our customers; and they need parts expedited, and we

17 do that for them.

18 Q   And when you entered into that agreement, it was six years

19 before you took title to the former Ertel property, right?

20 A   Yes, ma'am.

21 Q   Did the city commit to Major Tool to clean up that

22 property in the purchase agreement -- sorry -- project

23 agreement?

24 A   Yes, ma'am.

25 Q   And do you understand that the city recovered those costs

1    from Ertel or its insurers?

2    A    That is my understanding, yes, ma'am.

3    Q    There was some talk about this UST on the former Zimmer

4    Paper property.  Did Major Tool and machine ever utilize that

5    UST?

6    A    No, ma'am.

7    Q    You never operated on that property before it was removed?

8    A    No, ma'am.

9    Q    Would you have wanted that left in place when you

10   redeveloped that property?

11   A    No, ma'am.

12   Q    There were some questions about whether there have been

13   additional studies as to deep groundwater, migration.  There

14   have been numerous environmental studies of these properties,

15   right?

16   A    Oh, yes, ma'am.

17   Q    And those reports and the consultants performing them

18   could speak to what they were meant to address?

19   A    Absolutely.

20   Q    I would like to look at Exhibit 1112, please.  What's the

21   date on this document?

22   A    June 6th, 2011.

23          MS. KRAHULIK:  Would you go to page 6, please?  Page

24   6 of the letter, not the PDF.  Keep scrolling, please.  Stop.

25   There you go.

*WEIR— REDIRECT/KRAHULIK*            Vol. 4 - 810

1   BY MS. KRAHULIK:

2   Q    In that paragraph that Mr. Menkveld asked you about, about

3   impacts migrating from the north, it doesn't name any specific

4   source or property to the north?

5   A    No, ma'am, it does not.

6            MS. KRAHULIK:  Let's look at Exhibit 1192, please.

7   BY MS. KRAHULIK:

8   Q    What's the date on this document?

9   A    June 5th, 2013.

10  Q    And there was some discussion of ongoing obligations to

11  report new information to IDEM contained in this document,

12  right?

13  A    Yes, ma'am.

14  Q    This was two years after -- this was issued two years

15  after the report we just looked at?

16  A    Yes, ma'am.

17  Q    Are you aware if Moran has ever conducted any voluntary

18  remediation on any of these properties?

19  A    No, ma'am.  That's why we had to conduct voluntary

20  remediation on that property.

21  Q    And you understand that Moran operated at the Zimmer Paper

22  property?

23  A    Yes, ma'am.

24  Q    For a number of years?

25  A    Yes, ma'am.

*WEIR- REDIRECT/KRAHULIK*          Vol. 4 - 811

1  Q   There was also some discussion of Von Duprin and Moran

2  wanting to conduct additional environmental testing on the

3  Major-Tool-and-Machine-owned properties, right?

4  A   Yes, ma'am.

5  Q   That was eventually allowed?

6  A   Absolutely.

7  Q   What was the concern with allowing some of that work?

8  A   We didn't understand why they needed to be there and what

9  the point was.  We kept asking why they wanted access,

10 especially related to the Von Duprin access; and it was not

11 clear until we got the indication from IDEM why they needed

12 the access.

13 Q   Did we feel -- did Major Tool and Machine feel like it had

14 complete information about what was to be conducted in those

15 studies?

16 A   No, ma'am.

17 Q   Were there concerns about compromising the vapor

18 mitigation system?

19 A   Absolutely.

20 Q   But that access was eventually allowed and that testing

21 went forward?

22 A   Yes.  There was some confusion over the sharing of the

23 information that was gleaned.

24          MS. KRAHULIK:  I don't have anything further.  Thank

25 you.

 1          THE COURT:  Mr. Menkveld, do you have any further

 2   questions?

 3          MR. MENKVELD:  Very quickly.  I think we always feel

 4   compelled to say "very quickly."

 5                        **RECROSS-EXAMINATION**

 6   BY MR. MENKVELD:

 7   Q   Ms. Weir, you were just asked a question about whether

 8   Moran voluntarily did any remediation work on the Moran

 9   property.  I believe you said "no," right?

10   A   Correct.

11   Q   Did Major Tool ever make a request to anyone at Moran to

12   do any work on the Moran property?

13   A   We just voluntarily remediated that property.

14   Q   And then sued Moran for the reimbursement, right?

15   A   Once we knew that Moran existed and could do so, yes.

16   Q   But prior to suing Moran, there was no communication with

17   Moran?

18   A   No, sir.  It was an entirely voluntary effort on our part.

19   Q   There was no communication between Major and Moran to do

20   any remediation on the Moran property before the lawsuit was

21   filed; is that right?

22   A   We did not know anyone to communicate with regarding that.

23   Q   Are you aware at all of IDEM making any request to Moran

24   to perform work on the Moran property?

25   A   I have learned that through this case.

*WEIR– RECROSS/FRENCH*          Vol. 4 - 813

1   Q   And actually, at the time when remediation was done on the

2   Moran property, IDEM wasn't making demands to anybody, right?

3   A   That's absolutely correct.

4          MR. MENKVELD:  Nothing further.

5          THE COURT:  Ms. French, do you have anything

6   further?

7          MS. FRENCH:  Very brief, Your Honor.

8                    **RECROSS-EXAMINATION**

9   BY MS. FRENCH:

10  Q   Was Major Tool provided an upgradient delineation work

11  plan related to the investigation that Von Duprin wanted to

12  perform on its property?

13  A   I do not recall.

14  Q   Looking at a deposition you gave in September of 2015, do

15  you recall that deposition?

16  A   Yes, ma'am.

17  Q   And I believe there was a question posed to you:  "So at

18  the time of Major Tool's refusal to allow further

19  environmental testing, was any sort of scope of work provided

20  to Major Tool to review?"

21          And your response was that, "Yes, they did provide an

22  upgradient delineation work plan."

23          Does that refresh your recollection as to whether

24  Von Duprin provided you with a work plan for that

25  investigative work?

 1  A   Yes, ma'am.

 2           MS. FRENCH:  Thank you.  Nothing further.

 3           THE COURT:  Is that it?

 4           MS. KRAHULIK:  Nothing further.  Thank you.

 5           THE COURT:  Ms. Weir, you may return to your seat.

 6      *(Witness excused.)*

 7           THE COURT:  I believe that's all of the evidence we

 8  have for today.  That's fine, lawyers.

 9           So as we talked about earlier, the Court's going to

10  adjourn tomorrow, Monday and Tuesday for this trial because

11  the Court is going to be engaged in a criminal trial, United

12  States of America versus Freddie Robertson.  It will be two

13  days, July 29th and 30th; and we will resume our bench trial

14  on Wednesday July 31st at 8:30 a.m.

15           And it's my understanding that the witness will be

16  Mr. Love, called by plaintiff, Von Duprin; and then Von Duprin

17  intends to rest on Wednesday after Dr. Love; is that correct?

18           Von Duprin, is that your plan or you've changed the

19  plan?

20           MR. GRIGGS:  I believe everything you've said is

21  correct, Your Honor.  I believe that Moran, whose expert

22  Dr. Love is, is arranging for his presence at court that day.

23           MR. BOWMAN:  Right.  They designated him.  I don't

24  think it matters a bunch who's calling him other than they're

25  calling him; and our understanding then is that when Mr. Love

Vol. 4 - 815

1 is done, that the plaintiff will be able to rest their case,

2 because I think we may have some motions that can narrow

3 things; and we'll look at it over the weekend.  I want the

4 Court to know that for us, that's a Rubicon that we're going

5 to finally have in the sand.

6          THE COURT:  Okay.  Sounds good.

7          All right.  So lawyers, if you want to leave

8 anything, Tanesa they can use the room to my left?

9          Move everything in the room to the left because the

10 witnesses for the criminal trial are going to be in your

11 witness room, and we don't want them to touch anything by

12 mistake.

13          Leave your water and whatever else you want to leave

14 in that room.

15          Okay.  All right.  We are adjourned until July 31st.

16 Everyone have a really good weekend.  You have an opportunity

17 to go get some work done on your other cases, and we'll see

18 you on Wednesday.

19          COURTROOM DEPUTY:  All rise.

20          *(The proceedings were adjourned at 10:00 a.m.)*

21

22

23

24

25

1                    CERTIFICATE OF COURT REPORTER

2

3       I, Cathy Jones, hereby certify that the foregoing is a

4    true and correct transcript from reported proceedings in the

5    above-entitled matter.

6

7

8     /s/ Cathy Jones                        August 14, 2019

9    _____
     CATHY JONES, RDR, FCRR
     Official Court Reporter
10   Southern District of Indiana
     Indianapolis Division
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25