**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

| | |
|---|---|
| VON DUPRIN LLC, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>MORAN ELECTRIC SERVICE, INC., )<br>MAJOR HOLDINGS, LLC, )<br>MAJOR TOOL AND MACHINE, INC., )<br>ZIMMER PAPER PRODUCTS )<br>INCORPORATED Defaulted on 7/24/2017, )<br>)<br>Defendants. )<br>_____ )<br>)<br>MAJOR HOLDINGS, LLC, )<br>MORAN ELECTRIC SERVICE, INC., )<br>MAJOR HOLDINGS, LLC, )<br>MORAN ELECTRIC SERVICE, INC., )<br>MAJOR TOOL AND MACHINE, INC., )<br>MORAN ELECTRIC SERVICE, INC., )<br>)<br>Counter Claimants, )<br>)<br>v. )<br>)<br>VON DUPRIN LLC, )<br>MAJOR HOLDINGS, LLC, )<br>VON DUPRIN LLC, )<br>VON DUPRIN LLC, )<br>MAJOR HOLDINGS, LLC, )<br>VON DUPRIN LLC, )<br>VON DUPRIN LLC, )<br>MAJOR TOOL AND MACHINE, INC., )<br>)<br>Counter Defendants. )<br>_____ )<br>MAJOR HOLDINGS, LLC, )<br>MAJOR HOLDINGS, LLC, )<br>MAJOR TOOL AND MACHINE, INC., )<br>)<br>Cross Claimants, ) | Case No. 1:16-cv-01942-TWP-DML |

```
                                              )
                    v.                        )
                                              )
MORAN ELECTRIC SERVICE, INC.,                 )
MORAN ELECTRIC SERVICE, INC.,                 )
VON DUPRIN LLC,                               )
                                              )
                    Cross Defendants.         )
```

## FINDINGS OF FACT AND CONCLUSIONS OF LAW
## FOLLOWING BENCH TRIAL

A bench trial on this Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") litigation was held beginning on July 22, 2019 and concluding on August 1, 2019. This CERCLA action brought by Von Duprin, LLC ("Von Duprin") against Defendants Moran Electric Service, Inc. ("Moran"), and Major Holdings, LLC ("Major Holdings"), and Major Tool and Machine, Inc. ("Major Tool") (collectively, "the Major Defendants"), seeks to allocate the responsibility for the pollution that created a toxic groundwater plume under an area in Northeast Indianapolis, Indiana and to determine the parties' respective financial responsibility for cleanup of the polluted area. On February 11, 2019, the Court granted partial summary judgment and determined Moran and Major Defendants are liable only for the proportion of the harm they caused; and the Major Defendants are not liable for any contamination emanating from the Zimmer Packaging Facility of the Moran Property. (Filing No. 203 at 37.) Upon consideration of the evidence presented during the bench trial[1], the Court now issues its Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a)(1). Any finding of fact that is more properly considered a conclusion of law is adopted as such. Similarly, any conclusion of law that is more properly considered a finding of fact is adopted as such.

---

[1] In addition, the Court considers the parties' Joint Stipulation of Facts for Trial (Filing No. 205).

# I.  FINDINGS OF FACT

The pollution necessitating this litigation emanated from four properties: (1) the Von Duprin Property, (2) the Moran Property, (3) the Ertel Property, and (4) the Zimmer Paper Property.[2] Von Duprin seeks to recover costs already incurred to investigate the releases of chlorinated solvents in the plume area and to mitigate the vapor intrusion risks at buildings and residences near that area, as well as future costs. The Major Defendants and Moran each filed counterclaims and crossclaims regarding each parties' cleanup responsibilities. The Major Defendants assert that they are not obligated to pay the costs Von Duprin has incurred or will incur relating to the commingled plume. Moran asserts that it is a liable party as the owner of the Moran Property at the time a release incurred, and the harm in this lawsuit is divisible and ideal for apportionment.

## A.  The Von Duprin Property

The Von Duprin Property is located at 1929 Columbia Avenue, Indianapolis, Indiana. Between 1965 and 1986, Von Duprin's predecessor—Von Duprin, Inc.—owned the Von Duprin Property and manufactured security hardware and safety products there. (Filing No. 205 at 6.) That manufacturing involved the use of the chlorinated solvents trichloroethylene ("TCE") and perchloroethylene ("PCE"), the two toxic chemicals at issue in this case.[3] During the 1970's, the Von Duprin Property housed a large Detrex degreaser that used hundreds of gallons of TCE. (Filing No. 250 at 198-211; Tr. Ex's. 1105 & 1106.) Prior to Von Duprin's ownership, other

---

[2] The Zimmer Paper Property is subdivided into the Zimmer Paper Facility and the Zimmer Packaging Facility.

[3] *Trichloroethylene* (TCE) is used as a solvent for cleaning metal parts. Exposure to very high concentrations of trichloroethylene can cause dizziness, headaches, sleepiness, incoordination, confusion, nausea, unconsciousness, and even death. *See* https://www.atsdr.cdc.gov/toxfaqs/tf.asp?id=172&tid=30. *Perchloroethylene* (PCE) is a colorless liquid that is also called tetrachloroethylene, PERC. It is primarily used for dry cleaning fabrics and degreasing metals. *See* https://toxtown.nlm.nih.gov/chemicals-and-contaminants/perchloroethylene-pce-perc. Both TCE and PCE are designated as hazardous substances under federal regulations. 40 C.F.R. § 302.4(a).

parties, including Atlas Engine Company in the 1910s and Paramount Hardware from 1937-1961, and several dry cleaners operated on or near the Von Duprin Property. Von Duprin's operations resulted in the release of hazardous chemicals, including TCE and PCE, into the soil and groundwater on and around the Von Duprin Property. ([Filing No. 205 at 7](#).)

In 1986, Von Duprin ceased operations, and its owner at that time, Ingersoll-Rand Company, sold the Von Duprin Property to Threaded Rod Company, Inc. ("Threaded Rod") in 1987. Threaded Rod manufactured anchor bolts and connecting rods and did not generate hazardous waste.

In March 2009, the Indiana Department of Environmental Management ("IDEM") determined that soil and groundwater on the Von Duprin Property had been contaminated by chlorinated solvents. In August 2013, IDEM notified Von Duprin that it was a potentially responsible party for contamination of the Von Duprin Property. Threaded Rod brought a lawsuit against Von Duprin (and others) to recover damages relating to the environmental contamination on the Von Duprin Property, alleging that Von Duprin had caused or contributed to the soil and groundwater contamination at the property. Von Duprin settled the litigation with Threaded Rod, agreeing to pay $1.5 million and to undertake certain remedial actions on the Von Duprin Property. ([Filing No. 248 at 53](#), 94, 239-40.)

Von Duprin has undertaken remedial actions both on its own property and at downgradient properties including residences. After it was identified as a potentially responsible party by IDEM in August 2013, Von Duprin began investigating potential vapor intrusion at downgradient properties. In early 2014 Von Duprin entered Indiana's State Cleanup Program and in 2016 transitioned to the Voluntary Remediation Program, an EPA approved remediation program aimed at cleaning up contaminated properties. Von Duprin contacted individual homeowners whose

property was located within the plume area had TCE concentrations above IDEM's site-specific screening levels. Von Duprin also requested that IDEM become involved. (Filing No. 249 at 141.) Von Duprin sent letters, made telephone calls, had face to face conversations and conducted indoor air sampling at residences in the area of contaminated groundwater plume and installed vapor intrusion mitigation systems at homes that were impacted by vapor intrusion. (Filing No. 249 at 91-92, 145-47.) The residential investigations and mitigation work continue today. When the potential for vapor intrusion was identified at the J.T.V. Hill Park facility, Von Duprin conducted investigation activities and interim measures to prevent public exposure to harmful TCE vapors in that building, and ultimately installed a sub-slab depressurization system to address vapor intrusion. (Tr. Ex's. 1022, 1026, 1029, 1085, 1087, 1089.) IDEM was closely involved and provided supervision of Von Duprin's activities. In 2019, Von Duprin excavated 212 tons of soil from the Von Duprin Property. (Filing No. 248 at 103.)

Von Duprin also performed a successful bench scale and pilot test of *in situ* biological reduction, which could accelerate the natural degradation process in order to eliminate chlorinated solvents in the groundwater. (Filing No. 249 at 229-236) (Tr. Ex. 1072; Tr. Ex. 1071). Samples from known affected areas at the former Von Duprin property; specifically, the soils and the groundwater, were collected and sent to a laboratory where some were held aside as control samples and others are inoculated with bacterial cultures in order to understand if this technology will indeed accelerate the natural degradation processes. *Von Duprin* injected a bacterial culture, along with some media that it uses to accelerate its growth to allow it to degrade a greater area of the chlorinated solvents and the injected area saw enhanced degradation of these chlorinated solvents. At the time of trial, a bench scale and pilot test study report had not yet been submitted

to IDEM, but the observations were shared with Moran and Major Tool Defendants as well as IDEM. *Id*. at 234-235.

Although substantial work has been performed, additional investigation and mitigation work in the plume area remains to be done because the source of the vapor intrusion—the TCE contaminated shallow groundwater beneath the homes and J.T.V. Hill Park—has not been eliminated. IDEM will require future groundwater remediation, and the responsible parties identified by IDEM are parties to this litigation. (*See* Filing No. 248 at 251-253.)

## B. **The Moran Property**

The Moran Property refers to the property addressed as 1931 Dr. Andrew J. Brown Avenue and sometimes referenced in documentation as 1401 East 20th Street in Indianapolis. From at least 1946 to 1996, Moran owned and conducted business operations at the Moran Property. It operated multiple shops, including a dynamometer shop, motor shop, compressor shop, and wiring department. Moran's primary business was the rebuilding and repair of heavy-duty electrical motors.

During its operation at the Moran Property, Moran used degreasers and cleaning agents that contained TCE. (Filing No. 250 at 154.) There were multiple pits, parts washers, and tanks located on the properties owned by Moran, and Moran used degreasers and cleaning agents – including TCE – in its  business operations. Moran used somewhere between 55 and 150 gallons of TCE in its degreasing operations. *Id.* at 156; Tr. Ex. 723 at 45-46. Problems arose during Moran's degreasing operations, and employees committed violations when degreasing. (Tr. Ex. 722 at 12; Tr. Ex. 723 at 60-62, 117-118.) Some violations related to the washing of the parts above the vapor line of the degreaser, while others related to the carless handling of TCE that led to TCE splashing out of the degreaser. Moran ceased operations at the Moran Property in 1998.

Major Holdings acquired the Moran Property on October 4, 2005 and is the current owner of the property. In December 2004, before it acquired the Moran Property, Major Holdings retained EnviroForensics & PolicyFind to conduct a Phase II Environmental Site Assessment ("Phase II ESA") on the property.[4] Major Tool operates on the property making large metal parts for commercial clients. It has not used, generated, transported, treated, stored, or disposed of TCE or PCE on the Moran Property. Between December 5 and December 12, 2011, the Major Defendants removed and disposed of 4,641 tons of contaminated soil at the Moran Property. The Major Defendants have not used, generated, transported, treated, stored, or disposed of TCE, PCE, dichloroethylene, or vinyl chloride on the Moran Property. (Tr. Ex. 105 at 5).

## C.    The Ertel Property

The Ertel Property refers to the property addressed as 2045 Dr. Andrew J. Brown Avenue in Indianapolis. Ertel Manufacturing owned and operated the property between 1917 and 1998, using it to make automotive engine parts. This manufacturing included the use of degreasing baths and solvents, likely including TCE and PCE. The Ertel Property was sold to Dynagear in 1998, which used it to manufacture auto parts until 2002, when the property was abandoned, leaving behind soil and groundwater impacted with chlorinated volatile organic compounds ("CVOCs"). Between 2004 and 2008, the city of Indianapolis, IDEM, and the U.S. Environmental Protection Agency ("EPA") performed cleanup activities at the Ertel Property.

On September 25, 2007, Major Tool began leasing the Ertel Property from the city of Indianapolis. Prior to leasing the Ertel Property, Major Tool retained EnviroForensics to conduct

---

[4] A Phase II Environmental Site Assessment is an environmental investigation of a property to characterize and delineate potential contamination at a property or site. A Phase II ESA includes tracing all possible paths of contamination movement from the source, and developing recommendations to remediate the contaminated materials.

a Phase I Environmental Site Assessment ("Phase I ESA")[5] consistent with the American Society for Testing and Materials ("ASTM") Standard E1527-05. (Tr. Ex. 1166.) Major Tool acquired the Ertel Property from the city on January 31, 2013 and is the current owner. Prior to acquiring the Ertel Property the Major Defendants commissioned another Phase I ESA. (Tr. Ex. 1191.) The Major Defendants have not used, generated, transported, treated, stored, or disposed of any hazardous substance, including TCE or PCE at the Ertel Property.

**D.     The Zimmer Paper Property**

The Zimmer Paper Property refers to both the Zimmer Paper Facility, addressed as 1931 Dr. Andrew J. Brown Avenue, and the Zimmer Packaging Facility, addressed as 1450 East 20th Street in Indianapolis. Moran owned and operated the Zimmer Paper Property from 1967 to 1984. Moran used degreasers and chlorinated solvents in its operations during this time. Moran's operations at the Zimmer Paper Property required the use of parts washers, but the specific chemicals used in those washers were not identified at trial. Thus, there is no evidence that Moran used TCE or PCE at the Zimmer Paper Property.

From 1986 to 2006, Zimmer Paper Products, Inc. ("Zimmer") owned and operated the Zimmer Paper Property. Zimmer used the property for chemical and equipment storage, among other things. It used solvents in the course of its work, but it is not clear what kind of solvents.

Major Holdings acquired the Zimmer Paper Property from Zimmer on January 31, 2007 and is the current owner of the property. On November 16, 2006, Major Tool retained EnviroForensics to conduct a Phase I ESA for the Zimmer Paper Property that was consistent with the ASTM E1527-05 standard. (Tr. Ex. 1241.) After Major Holdings purchased the Zimmer Paper

---

[5] A purpose of a Phase I Environmental Site Assessment is to determine the existence of recognized environmental conditions (the presence or likely presence of hazardous substances on a property that indicated an existing release, a past release or material threat of a release of hazardous substances on the property, into the ground, groundwater or surface of the property) at the site. (Tr. Exhibit 1166 at 1.)

Property, contaminated soil was removed from the property and a 16,000-gallon underground storage tank was discovered and removed.

**E.**     **Contaminated Soil and Groundwater**

For many years toxic solvents were used unsafely at each property at issue in this case. These toxic solvents, particularly TCE and PCE, seeped into the soil and groundwater beneath the properties, contaminating that soil and groundwater. The groundwater from the four properties commingled into a plume, which ran downgradient to the southwest and contaminated residential properties and J.T.V. Hill Park, located in the Martindale-Brightwood Neighborhood in Indianapolis.

The groundwater contamination does not present a risk of harm to human health via drinking water or direct contact because the contaminated groundwater is deep below ground and not used for drinking water. Rather, at the concentrations present in this commingled plume, TCE vapors can migrate upward through the overlaying soil, resulting in TCE vapor intrusion into overlying structures and risking inhalation of the harmful vapors. The minimum concentration required for shallow groundwater contamination to off-gas and present a potential risk of vapor intrusion varies from site to site, but within this particular plume area, shallow groundwater TCE concentrations above 18 micrograms per liter ("μg/L") is considered by IDEM to present a risk of vapor intrusion. Indeed, TCE vapor intrusion has occurred at some of the properties in question. More importantly for the general public, TCE vapor intrusion has also occurred or is an ongoing concern at the indoor facility at J.T.V. Hill Park and about 40 homes situated over the plume. In short, the shallow groundwater contamination in this plume is not merely a theoretical problem or a problem only at the sites where releases occurred, but instead presents an actual risk to human health even a considerable distance away from the source properties at issue in the litigation.

In August 2013, IDEM notified Von Duprin, the furthest downgradient of the properties involved in this litigation, that it was a potentially responsible party under the State Cleanup Program in connection with the soil and groundwater contamination in the area. As detailed above, Von Duprin performed extensive sampling and investigation of the soil, soil gas, indoor air, and groundwater at the Von Duprin Property. Von Duprin also installed mitigation systems in downgradient residences and the park building, affected by the contamination and continues to maintain and pay the costs of those systems.

F.    **Expert Testimony**

At trial, three expert witnesses testified.

Von Duprin proffered the expert testimony of Sam Williams, P.G., CHG. ("Mr. Williams"), an environmental consultant with more than 30 years' experience in working on and managing national contingency plan-compliant sites. Mr. Williams works for, and owns less than 1% of Geosyntec Consultants ("Geosyntec"), a company that performs and prepares work plans and reports related to state and federal Superfund sites and contaminated industrial sites. (Filing No. 250 at 6, 105.) Mr. Williams reviewed dozens of environmental work plans (including those prepared by Geosyntec), and reports to IDEM, correspondence between Von Duprin's consultants and regulators and affected members of the public, as well as state and federal regulatory guidance documents for environmental cleanups. He ultimately opined that Von Duprin's response to the contamination, taken as a whole, complied with the national contingency plan ("NCP").

The Major Defendants proffered the expert testimony of Gary Hokkanen ("Mr. Hokkanen"), who was employed by the EPA when CERCLA was enacted. He has been retained to offer expert opinions relating to NCP compliance on multiple occasions. Mr. Hokkanen reviewed applicable guidance from the EPA relating to the relevant provisions of the NCP prior to

forming his opinions in this matter, and listed that guidance in his expert report. (Ex. 103 at 35-38). Mr. Hokkanen provided an opinion that Von Duprin's response actions did not comply with several provisions of the NCP.

Moran called Adam H. Love, Ph.D. ("Dr. Love") as an expert witness. Dr. Love is an expert in environmental site assessment and remediation, environmental forensics and groundwater modeling, geology, hydrogeology, chemistry, and fate and transport.[6] Dr. Love created a database of the site investigation data from groundwater and native soil that had been collected from the different properties at issue in this case. He used this database to analyze each property's contribution to the contaminated groundwater plume. Because he had no data from earlier time periods, Dr. Love's allocation analysis is limited to the time period covered by the available data (primarily 2005-2017) and does not take into account the releases and migration of chlorinated solvents that occurred in the decades preceding the collection of the first data. (Filing No. 244 at 28). He opined that the harm caused by the releases of CVOCs could be allocated to each property based upon their distinct geographic region and offered an opinion on what percentage of contamination could be attributed to each property. In particular, of the chlorinated solvents in the plume, he opined that 54.2% came from the Von Duprin Property, 3.11% came from the Moran Property, 13.77% came from the Ertel Property, and 28.94% came from the Zimmer Property, with the Zimmer Paper Parcel responsible for the vast majority of that portion. (Tr. Ex. 101 at 23.) He did not offer an opinion on which *parties* contributed to the commingled plume; he only weighed in on the proportion of the contamination each *property* was responsible for. Nor did he opine as to when those chemicals were released from each property.

---

[6] Fate and transport refers to the study of how chemicals degrade and where chemicals travel in the environment when they are released.

## G. The Litigation and Von Duprin's Costs

Von Duprin incurred and continues to incur substantial costs to investigate and mitigate vapor intrusion in the plume area. It initiated this CERCLA litigation to recover some of those costs from parties responsible for the upgradient contamination—Moran, the Major Defendants, and Zimmer. Zimmer did not appear or respond to the Complaint, and the Clerk entered a default against Zimmer under Federal Rule of Civil Procedure 55(a). (Filing No. 90.) In its Amended Complaint, filed on January 4, 2017, Von Duprin alleges the same claims against each Defendant: (1) cost recovery under section 107(a)(4)(B) of CERCLA, and (2) declaratory judgment under section 113(g)(2) of CERCLA.[7] It also alleges environmental claims against Moran and Zimmer under Indiana Code § 13-30-9, *et seq.*, which allows Hoosiers to "bring an environmental legal action against a person that caused or contributed to the release [of hazardous substances or petroleum] to recover reasonable costs of a removal or remedial action." *Id.*

Through this litigation, Von Duprin seeks to recover the following costs from Moran and the Major Defendants:

| | |
|---|---|
| (1) Vapor Intrusion Mitigation at Downgradient Homes | $465,000.00 |
| (2) Investigation of Contamination in the Plume Area Upgradient and Downgradient to Von Duprin Property | $750,000.00 |
| (3) Vapor Intrusion Mitigation at J.T.V. Hill Park | $120,000.00 |
| (4) Bench Scale and Pilot Tests of a Potential Groundwater Remedy, *in situ* Biological Reduction | $365,000.00 |
| (5) IDEM Oversight Costs | $38,945.80.00[8] |

---

[7] Both the case law and administrative materials addressing CERCLA frequently switch back and forth between referring to sections of the Act by their section number, as enacted, and their section by number as codified. "Section 107(a)" of CERCLA, for example, was codified at 42 U.S.C. § 9607(a); "Section 113(f)" corresponds to § 9613(f). See *Bernstein v. Bankert*, 733 F.3d 190, 203 n. 10 (7th Cir. 2013).

[8] On page 12 of its Proposed Facts and Conclusions of Law, Von Duprin indicates it incurred $34,945.80 in IDEM oversight costs, but on page 41 it seeks damages in the amount of $38,945.80 for those costs. (Filing No. 254 at 12,

(6) Threaded Rod Settlement                                                            $1,500,000.00

Those costs total $3,238,945.80.[9]  In addition to these costs Von Duprin has already incurred, it seeks a declaratory judgment requiring Defendants to contribute to the future costs to remediate the plume.[10]  No party presented evidence at trial regarding the anticipated future cost of remediation.

The Major Defendants and Moran asserted cross-claims and counterclaims under Section 113(f), seeking contribution for any liability allocated to them.  (Filing No. 46; Filing No. 52; Filing No. 68.)  Moran asserted a cross-claim against the Major Defendants under the Indiana Environmental Legal Action statute, but at trial it voluntarily dismissed that cross-claim.

Von Duprin, Moran, and the Major Defendants cross-moved for partial summary judgment. (Filing No. 133; Filing No. 138; Filing No. 141.) In the Order denying Von Duprin's Motion for Partial Summary Judgment, the Court determined as a matter of law that the harm in this case was divisible.  Thus, instead of holding all parties jointly and severally liable for the remediation costs, the Court would be able to allocate a share of responsibility to each party and apportion costs according to that percentage.  Because the determination of those percentages is a question of fact, the Court did not resolve it at the summary judgment stage.  In the same Order,

---

41.) The Court's review of Exhibit 1018 confirms that Von Duprin did in fact incur $38,945.80 in IDEM oversight costs.

[9] The Court was forced to resolve an arithmetic discrepancy in Von Duprin's Proposed Facts and Conclusions of Law to arrive at this number. Von Duprin indicated it was seeking to recover "$1.7 million in environmental consulting fees," but its itemized accounting of those fees totaled $1.72 million. (Filing No. 254 at 12.) Von Duprin's itemized list indicated it incurred $770,000.00 in fees "for investigation of contamination in the plume area upgradient and downgradient of the Von Duprin property." *Id.* But the record cite it gives for that figure—testimony of Geosyntec Consultant Alan Ferree—indicates Von Duprin actually incurred only $750,000.00 worth of fees for this service. (Filing No. 249 at 197.) This $750,000.00 figure would render Von Duprin's total of $1.7 million in consulting costs accurate and is consistent with the total Von Duprin gives elsewhere in its Proposed Facts and Conclusions of Law. *See* Filing No. 254 at 41. Von Duprin again refers to this number as $770,000.00 on page 22 of its Proposed Facts and Conclusions of Law. (Filing No. 254 at 22.) The Court treats that reference as a clerical error as well.

[10] Von Duprin does not seek to recover the $688,350.25 it incurred in support of its litigation efforts or the $777,000.00 that was expended solely to investigate the contamination at the Von Duprin Property.

the Court determined that the Major Defendants were Bona Fide Prospective Purchasers of the Moran Property and the Zimmer Packaging Facility, and thus they could not be responsible for any soil or groundwater contamination stemming from those facilities. (Filing No. 203.)

## II.     CONCLUSIONS OF LAW

### A.     Von Duprin's Section 107(a) Claim

#### 1.     Standard

To establish a *prima facie* case of liability in a private party CERCLA action under Section 107, a plaintiff is required to prove the following five elements: (1) the site in question is a "facility" as defined under Section 101(9); (2) there has been a release or threatened release of hazardous substances; (3) the plaintiff has incurred costs in response to the release or threatened release; (4) the costs incurred in responding to the release or threatened release were "necessary response costs" and "were consistent with the national contingency plan"; and (5) the defendant is a responsible party under Section 107(a).  *See* 42 U.S.C. § 9607(a); *see also e.g. Allied Waste Transp., Inc. v. John Sexton Sand & Gravel Corp.*, No. 13 C 1029, 2016 WL 3443897, at *13 (N.D. Ill. June 23, 2016).  Response costs are defined as the "costs of investigating and remedying the effects of a release or threatened release of a hazardous substance into the environment." *Rolan v. Atlantic Richfield Co.*, No. 1:16-CV-357-TLS, 2017 WL 3191791, at *6 (N.D. Ind. July 26, 2017). Response costs are "necessary" if the costs "are incurred in response to a threat to human health or the environment and they are necessary to address that threat." *Id*. The plaintiff bears the burden of proof as to each element of each claim for each property against the defendant.  *G.J. Leasing Co., Inc. v. Union Elec. Co.*, 854 F.Supp. 539, 558 (S.D. Ill. 1994).

Here, the parties have stipulated that: (1) each party is a "person" under Section 101(21); (2) each property at issue is a "facility" under Section 101(9); (3) there has been a "release" or

"threatened release" of hazardous substances at each property at issue under Section 101(22) and Section 107(a); and (4) some contaminants detected at each property at issue are "hazardous substances" under Section 101(14). (Filing No. 205.) Von Duprin bears the burden of establishing the remaining elements of its claim. *G.J. Leasing Co., Inc.*, 854 F.Supp. at 558. Even where a plaintiff is able to establish each element of its claim, a defendant can avoid liability under Section 107(a) if the defendant proves that it satisfies one of the affirmative defenses enumerated in Section 107(a). The Bona Fide Prospective Purchaser ("BFPP") defense is an enumerated affirmative defense. 42 U.S.C. 9607(a)(1); 42 U.S.C. § 9607(r)(1); 42 U.S.C. § 9601(40).

A defendant can also limit or eliminate its liability under Section 107(a) by demonstrating that the harm at issue is divisible. As Congress intended the scope of liability under CERCLA to be determined from traditional and evolving principles of common law, the Court is not required to find that liability is joint and several in every case. *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 613 (2009) (quoting *United States v. Chem–Dyne Corp.*, 572 F.Supp. 802, 808 (S.D. Ohio 1983)); *see also United States v. NCR Corp.*, 688 F.3d 833, 838 (7th Cir. 2012). Rather, where a party demonstrates that the relevant harm in the case is divisible as between the multiple purported causes, the party only bears liability for the portion of the total harm that he himself has caused. *NCR Corp.*, 688 F.3d at 838 (citing *Burlington Northern*, 556 U.S. at 614).

## 2. <u>Divisibility of Harm</u>

Under CERCLA, although Congress "imposed a 'strict liability standard,' it did not mandate 'joint and several' liability in every case." *Burlington N. & Santa Fe. Ry. Co. v. U.S.*, 556 U.S. 599, 614 (2009) (quoting *United States v. Chem-Dyne Corp.*, 572 F. Supp. 802, 805 & 807 (S.D. Ohio 1983)). The United States Supreme Court embraced *Chem-Dyne* as the seminal

case on apportionment in the CERCLA context, which looks to the Restatement (Second) of Torts to determine when harm was divisible.

> [W]hen two or more persons acting independently caus[e] a distinct or single harm for which there is a reasonable basis for division according to the contribution of each, each is subject to liability only for the portion of the total harm that he has himself caused. Restatement (Second of Torts, §§ 443A, 881 (1976); Prosser, Law of Torts, pp. 313-14 (4th ed. 1971)…. But where two or more persons cause a single and indivisible harm, each is subject to liability for the entire harm. Restatement (Second) of Torts, § 875; Prosser, at 315-17. Chem-Dyne Corp., 572 F. Supp., at 810.

*Burlington N.* at 614 (ellipses in original).

The Seventh Circuit has distilled that analysis into a two-part test. First, a court "must determine whether the harm at issue is theoretically 'capable of apportionment.'" *NCR Corp.*, 688 F.3d at 838 (quoting *Burlington N.* at 614). That determination is a matter of law and will be made by the Court, but underlying factual findings will often guide the Court's inquiry. *Id.* "Second, if the harm is capable of apportionment, the fact-finder must determine how actually to apportion the damages, which is 'a question of fact.'" *Id.* (quoting *Burlington N.* at 614). The Court determined in its Entry on the Parties' Cross-Motions for Summary Judgment that the harm in this case is theoretically capable of apportionment. ([Filing No. 203 at 22-23.](#)) Equitable considerations play no role in the apportionment analysis; rather, apportionment is proper only when the evidence supports the divisibility of the damages jointly caused by the PRPs. *Burlington N.* at 615 n.9.

The harm in this case is groundwater contaminated by CVOCs that can result in a vapor which is toxic when inhaled. It is true but irrelevant that, once a CVOC discharge enters the plume, runs downgradient, and vaporizes, it is impossible to tell where it came from. This is a case involving a single harm "that is nonetheless divisible because it is possible to discern the degree to which different parties contributed to the damages." *U.S. v. Hercules, Inc.* 247 F.3d 706, 718

(8th Cir. 2001). Each party, through the property or properties it is attached to, has caused a separate amount of harm, and no party is responsible for the harm caused by another.

Moran's expert, Dr. Love, demonstrated a reasonable basis for apportionment. He created a database based on at least 30 reports that monitored groundwater on the four properties between 2005 and 2017. (Filing No. 244 at 55-56.) This database contained "thousands of different individual data points." *Id.* He determined, based on that data, that the contamination in this case emanated from four geographically distinct areas. *Id.* at 54. He also determined that both the magnitude of the concentration of CVOCs as well as the chemical characteristics of those CVOCs at the Von Duprin Property are dramatically different from the magnitude and chemical characteristics of the three upgradient properties. *Id.* at 31. "The concentration goes up a factor of five and the concentrations change from being TCE dominated to PCE dominated" as one examines data from the wells on the Von Duprin Property. *Id.* Dr. Love was able to use the ratio of TCE to PCE in the soil and groundwater samples taken from each individual property to determine how much each property contributed to the commingled plume. *Id.* at 32. This evidence, detailed in Dr. Love's report and then explained from the witness stand at trial, confirmed the conclusion the Court reached in its Entry on the Parties' Cross-Motions for Summary Judgment that the harm in this case is divisible and a reasonable basis for its apportionment exists.

### 3. <u>Threaded Rod Settlement</u>

Von Duprin paid $1.5 million to Threaded Rod as part of a settlement and, as part of that settlement, Von Duprin acquired ownership of wells Threaded Rod had dug on the plume area and the data Threaded Rod had obtained from monitoring those wells. (Filing No. 248 at 51-53; 107.) Von Duprin cannot recover the $1.5 million that was paid to Threaded Rod as part of a settlement under 42 U.S.C. § 9607.

As the Supreme Court of the United States has explained, § 9607 and § 9613 provide two clearly distinct remedies. *U.S. v. Atlantic Research Corp.*, 551 U.S. 128, 138 (2007). "CERCLA provide[s] for a right to cost recovery in certain circumstances, [§9607(a)], and separate rights to contribution in other circumstances, [§§ 9613(f)(1), 9613(f)(3)(B)]." *Cooper Indus. Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 163 (2004). Section 9613(f) grants a potentially responsible person the right to contribution when he has paid more than his or her proportionate share. *Atlantic Research*, 551 U.S. at 138. In contrast, section 9607(a) permits recovery of cleanup costs but does not create a right to contribution. *Id.* at 139. "When a party pays to satisfy a settlement agreement or a court judgment, it does not incur its own costs of response. Rather, it reimburses other parties for costs that those parties incurred." *Id.* In other words, the Supreme Court has determined that § 9607 only allows a plaintiff to recover for cleanup costs, and money used to pay a settlement is not strictly a cleanup cost. Thus, the Court will analyze Von Duprin's attempt to recover the $1.5 million it paid in a settlement to Threaded Rod as part of Von Duprin's § 9613 claim.

### 4. National Contingency Plan Compliance

The national contingency plan ("NCP") is a federal regulation promulgated by the United States Environmental Protection Agency that establishes criteria for performing removal and remedial actions designed to assure that a CERCLA-quality cleanup is achieved. 40 C.F.R. Part 300. An issue, argued extensively by the parties, was whether the costs Von Duprin incurred were consistent with the NCP. Under § 9607 of CERCLA, Von Duprin may recover "any … necessary costs of response incurred." To be recoverable, costs must be necessary and comport with the NCP.

Whether a response cost is consistent with the NCP is determined based on the NCP in effect at the time the response costs were incurred. *See, e.g., G.J. Leasing Co. v. Union Elec. Co.*,

854 F. Supp. 539, 563 (S.D. Ill. 1994), *aff'd*, 54 F.3d 379 (7th Cir. 1995); *NL Industries, Inc. v. Kaplan*, 792 F.2d 896, 898 (9th Cir. 1986). Under the current version of the NCP, a "private party response action" is consistent with the NCP "if the action, when evaluated as a whole, is in substantial compliance with the applicable requirements … and results in a CERCLA-quality cleanup." 40 C.F.R. § 300.700(c)(3)(i); *Franklin County Convention Facilities Auth. v. American Premier Underwriters, Inc.*, 240 F.3d 534, 543 (6th Cir. 2001).

A person seeking to recover response costs must substantially comply with only the portions of the NCP that apply to the task being performed. Importantly, many NCP requirements do not apply in the investigation phase of a response, nor do some requirements apply in actions undertaken to remove, rather than remediate, hazardous substances from a site. Indeed, "because any clean-up proposal and, consequently, any clean-up of a contaminated site must first be preceded by an investigation of the nature and extent of contamination, such investigative and assessment costs need not be incurred in compliance with the NCP and are 'necessary.'" *CNH Am., LLC v. Champion Envtl. Servs.*, 863 F. Supp. 2d 793, 809 (E.D. Wis. 2012) (collecting cases which hold that "initial investigation, site-assessment, and monitoring costs are recoverable under § 107(a) of CERCLA irrespective of compliance with NCP requirements").

### a) <u>Investigation and Assessment Costs</u>

Von Duprin has labeled the $750,000.00 it spent on investigation of contamination in the plume area upgradient and downgradient to Von Duprin Property as investigation and assessment costs. At trial, Von Duprin's environmental consultant Alan Ferree testified that Von Duprin paid his firm $750,000.00 for off-site investigation. (Filing No. 249 at 197.) No evidence in the record directly disputes that claim. Von Duprin's expert, Mr. Williams, issued a report which confirms that many of Von Duprin's costs were investigative. He details investigative reports commissioned

by each party in section 5.6 of his report (Tr. Ex. 106 at 16), but he also lists investigative work in sections 5.1, 5.2.1, 5.2.3, and 5.2.5 (Tr. Ex. 106 at 10-13.) His report does not contradict Alan Ferree's testimony. Neither Mr. Williams' report nor his testimony suggest that the only investigation and assessment costs incurred by the parties in this case were the costs of commissioning the investigations listed in section 5.6 of his report. The Court considers the $750,000.00 Von Duprin spent on investigation of contamination in the plume area upgradient and downgradient to Von Duprin Property to be initial investigation, site-assessment, and monitoring costs. As such, those costs need not be consistent with the NCP to be recoverable under 42 U.S.C. § 9607(a), and these costs are recoverable.

### b)    <u>Remedial Costs</u>

Other costs Von Duprin seeks to recover—the $120,000.00 for remediation of J.T.V. Hill Park, $465,000.00 for residential vapor intrusion remediation, and $365,000.00 for bench scale and pilot testing qualify as costs for remediation actions. 42 U.S.C. § 9601(24). These remedial costs are recoverable under 42 U.S.C. § 9607(a) if Von Duprin shows they were incurred consistent with the NCP. The NCP provisions relevant to Von Duprin's non-investigative costs include: Section 300.150 (Worker Health and Safety); Section 300.160 (Documentation and Cost Recovery); Sections 300.400(c)(1), (4), (5), and (7) (Determining the Need for Fund Financed Response Actions); Section 300.400(g) (Identification of Applicable or Relevant and Appropriate Requirements); Sections 300.410 and 300.415 (Removal Site Evaluations and Actions); Section 300.420 (Remedial Site Evaluation); Section 300.430 (Remedial Investigation/Feasibility Study and Remedy Selection); Section 300.435 (Remedial Design, Remedial Action and Operation and Maintenance); and Sections 300.155, 300.415, and 300.430 (Public Participation and Community Relations). Despite the number of specific provisions listed within the NCP, a "private party

response action" is consistent with the NCP "if the action, when evaluated as a whole, is in substantial compliance with the applicable requirements … and results in a CERCLA-quality cleanup." 40 C.F.R. § 300.700(c)(3)(i); *Franklin County Convention Facilities Auth. v. American Premier Underwriters, Inc.*, 240 F.3d 534, 543 (6th Cir. 2001).

At trial, Von Duprin's expert, Mr. Williams, testified on the issue of whether Von Duprin incurred these costs consistent with the NCP. Mr. Williams opined that taken as a whole, Von Duprin's actions substantially complied with the NCP. The Major Defendants' expert Mr. Hokkanen did not render an opinion regarding whether or not Von Duprin complied with the NCP, instead he responded in rebuttal to Mr. Williams opinions. (Filing No. 245 at 48). The Court considers the following evidence in determining Von Duprin's substantial compliance.

Maintaining Documentation Requirement – 40 C.F.R. § 300.160: In relevant part, Section 300.160 of the NCP requires parties to "maintain documentation to support all actions taken under the NCP and to form the basis for cost recovery." Von Duprin introduced more than 2,000 pages of invoices at trial, which provide phase information and other details that provided Von Duprin with the information it required to process and pay the invoices. (Tr. Ex. 1017.) Von Duprin presented fact testimony from Alan Ferree, Russell Eiler, and Ryan Fimmen that explained the work Von Duprin's consultant performed, the costs incurred, categories of damages, review and approval of Geosyntec's work and invoices, and what costs were non-recoverable, including legal support and costs to investigate and remediate soil contamination at the Von Duprin Property. For the work performed by Geosyntec, Mr. Williams admitted that he only reviewed "three or four" of the hundreds of invoices issued by Geosyntec. (Filing No. 250 at 75-76.) Mr. Williams testified that because he works for and has a portion of ownership in Geosyntec, he is familiar with their invoicing. However, the invoices Mr. Williams reviewed did not contain narratives describing the

work being performed, and a review of the invoices shows that the majority of the invoices similarly lacked that information. (Tr. Ex. 1017; Filing No. 250 at 77-78.) For the work performed by any other consultant, Mr. Williams reviewed "cost summaries" prepared by an unknown person. *Id.* at 72-73. Mr. Hokkanen agreed that narratives are not always listed on invoices for environmental consultants. (Filing No. 245 at 22.) Although expert testimony discussing the invoices in more detail, or narratives confirming specific tasks performed by Geosyntec may have been helpful to the Court, it was not required. The Court determines that the Mr. Williams provided a reliable opinion as to Von Duprin's compliance with Section 300.160.

Engineering Evaluation/Cost Analysis Requirement – 40 C.F.R. 300.415(b)(4)(i): Section 300.415(b)(4)(i) requires a party to conduct an engineering evaluation/cost analysis ("EE/CA") or its equivalent if a planning period of at least six months exists before on-site activities must be initiated. Mr. Williams explained that an EE/CA was required to be prepared for Von Duprin's work, and he admitted that there was no EE/CA created for the work performed. (Filing No. 250 at 94-95.) Mr. Hokkanen agreed, noting that an EE/CA should be prepared immediately after it is determined that a removal action is necessary, but no EE/CA was prepared here. (Filing No. 245 at 32-33.)

Sampling and Analysis Plan and Quality Assurance Project Plan Requirement – 40 C.F.R. § 300.415(b)(4)(ii)(A) and 40 C.F.R. § 300.415(b)(4)(ii)(B): Section 300.415(b)(4)(ii)(A) requires a sampling and analysis plan ("SAP") to be created and Section 300.415(b)(4)(ii)(B) requires a quality assurance project plan ("QAPP") to be created for removal actions. No document relating to the work performed specifically sets forth a SAP. (Filing No. 250 at 95-96; *see also* Tr. Ex. 103 at 11.) At best, the elements of a SAP were included for work performed after 2014, meaning no work performed before that time complied with Section 300.415. (Filing No. 245 at 33.) Both

experts agree no QAPP was created before May 2017, meaning no work performed before that time complied with Section 300.415. (Tr. Ex. 103 at 11; Filing No. 250 at 96; Filing No. 245 at 34.)  In sum, Von Duprin failed to prove that the costs it seeks to recover for work performed before May 2017 were necessary response costs incurred consistent with Section 300.415.

Health and Safety Program Requirement – 40 C.F.R. § 300.150: Section 300.150 of the NCP requires the preparation and implementation of a health and safety program ("HASP") where a response action is taken.  Response actions were taken by Von Duprin, but no HASP was created or implemented for Von Duprin's work before August 2014.  (Tr. Ex. 103 at 8; Filing No. 250 at 87-88; Filing No. 245 at 19-20.)  Von Duprin failed to prove that the costs it seeks to recover for work performed before August 2014 were necessary response costs incurred consistent with Section 300.150.

Applicable or Relevant and Appropriate Requirement – 40 C.F.R. § 300.400(g): Section 300.400(g) and other sections of the NCP require a party to identify and comply with applicable or relevant and appropriate requirements ("ARARs") to the extent practicable.  *See also* 40 C.F.R. § 300.415; 40 C.F.R. § 300.430; 40 C.F.R. § 300.435.  Von Duprin followed IDEM screening levels to evaluate data. (Tr. Ex. 103 at 10; Filing No. 245 at 30.)  Mr. Hokkanen opined that following IDEM screening levels to evaluate data is not equivalent to identifying all ARAR, consistent with Section 300.400(g).  *Id.*  Because Section 300.400(g) only requires Von Duprin to identify and comply with ARARs "to the extent practicable," the Court finds that Von Duprin has satisfied this requirement.

Local Community Concerns – 40 C.F.R. § 300.400(c): Section 300.400(c) requires parties to, among other things, be sensitive to local community concerns in determining the need for, planning, or undertaking certain response actions.  Mr. Hokkanen opined that "[y]ou need to

inform the potentially affected community in what you're doing, get their feedback, respond to that feedback, because people are impacted by this contamination, so you need to determine what their concerns are and then respond to those concerns." (Filing No. 245 at 24.) He also opined that performing all work in accordance with schedules from a government agency like IDEM "could" constitute being sensitive to local community concerns.

Von Duprin has sufficiently demonstrated that it was sensitive to local community concerns. Not only did it perform all work in accordance with schedules from IDEM, but Von Duprin communicated with affected residences, as well as community leaders that managed the J.T.V. Hill Community Center. Moreover, Von Duprin's partial Remediation Work Plan included a Community Relations Plan which was timely submitted to IDEM for public comment. (Filing No. 250 at 50, Filing No. 248 at 30.) Taken as a whole, Von Duprin has proven that it substantially complied with the NCP to recover necessary response costs incurred consistent with Section 300.400(c) for the $120,000.00 for remediation of J.T.V. Hill Park and the $465,000.00 for residential vapor intrusion remediation.

Community Relations Requirements: 40 C.F.R. § 300.700(c)(6); 40 C.F.R. § 300.415(n); 40 C.F.R. § 300.430(c); 40 C.F.R. § 300.430(f): These sections of the NCP require parties to undertake various community relations actions when performing response and remedial actions. The requirements relating to remedial actions are particularly onerous, as they include conducting interviews, establishing a local information repository, providing the opportunity for a public meeting, and publishing an analysis of the proposed plan in a local newspaper. 40 C.F.R. § 300.430. Von Duprin's efforts relating to the local community included requesting access to residences for certain sampling and mitigation activities. (*See* Tr. Ex. 106 at 72 (describing all "public participation and community relations" actions taken by Von Duprin)); Tr. Ex. 1002;

Filing No. 250 at 99; Filing No. 245 at 36-37). Mr. Hokkanen opined that these provisions are integral to the NCP and Von Duprin needed to do significantly more to comply with them. (Filing No. 245 at 35-37.) Mr. Hokkanen did not review all of the information which Mr. Williams relied upon in forming his opinions about Von Duprin's outreach to the community and he did not consider the Memorandum of Agreement between IDEM and USEPA which establishes that USEPA finds the public participation requirements of the VRP to be adequate. (Tr. Vol. 6 at 1029:15-22) In addition, Von Duprin's partial Remediation Work Plan included a Community Relations Plan and which was submitted to IDEM for public comment. These efforts, performed with IDEM approval, satisfy some of the community relations requirements for either removal or remedial actions to show that the costs Von Duprin seeks to recover were necessary response costs incurred consistent with Section 300.700(c), 40 Section 300.415(n); Section 300.430(c), and Section 300.430(f).

Von Duprin's compliance was not perfect, however, the NCP requirements are not intended to be a checklist of required actions for private remediations. *See Franklin County* at 546. CERCLA is to be liberally construed to serve its dual purposes of efficiently cleaning the environment, while at the same time holding responsible parties accountable for their actions. *See In re Eagle–Picher Indus., Inc.,* 131 F.3d 1185, 1191 (6th Cir.1997). Taken as a whole, the Court determines that Von Duprin's remediation substantially complied with the NCP and resulted in a "CERCLA-quality" cleanup as that term has been described by the EPA. Because Von Duprin has presented evidence that remedial costs were incurred consistent with the NCP as required by § 9607, Von Duprin can recover a portion of the $465,000.00 it spent to mitigate vapor intrusion at downgradient homes, a portion of the $120,000.00 it spent to mitigate vapor intrusion at J.T.V. Hill Park, and a portion of the $365,000.00 it spent on bench scale and pilot tests.

c)    **IDEM Oversight Costs**

The last cost Von Duprin seeks to recover in its § 9607 claim is the $38,945.80 it spent on IDEM oversight.  These are costs incurred by IDEM, which IDEM later billed to either Threaded Rod or Von Duprin.  (Tr. Ex. 108; Tr. Ex. 1018; Filing No. 248 at 34, 43-44; 242-43.)  Von Duprin cannot recover these costs under § 9607 for several reasons.

As a preliminary matter, it is unclear which of these invoices include costs incurred by *Von Duprin*.  Of the 32 IDEM invoices in the record, 22 of the invoices are addressed to Threaded Rod. (Tr. Ex. 1018.)  It is not clear if Von Duprin is paying those invoices directed to Threaded Rod and, if so, whether it is doing so as a result of its settlement with Threaded Rod (the costs of which are not recoverable in a § 9607 claim).

To the extent Von Duprin is paying all of the invoices, it is not clear if these costs pertain to off-site or on-site work. (Tr. Ex. 1018.) Von Duprin made it clear that it was not seeking to recover costs relating to certain work performed on the Von Duprin Property, as those costs would not be recoverable in this lawsuit.  (Filing No. 248 at 32, 42-43; 107.)  While Von Duprin subtracted the amounts relating to Geosyntec's on-site work from the total damage amount sought, it is not clear that Von Duprin did so with the IDEM costs.  *Id.* at 107.  As the IDEM invoices do not provide enough information regarding the nature of the work performed to allow the Court to make this distinction (*see* Tr. Ex. 1018), Von Duprin has not proven that it is entitled to recover those costs in this case.

Finally, there is no evidence that Mr. Williams reviewed any of the IDEM invoices or offered any opinion regarding whether the work performed relating to those invoices complied with the NCP.  Without any testimony from Mr. Williams regarding whether the consistency of

these costs with the NCP, the Court cannot find the Threaded Rod Settlement costs are recoverable in this lawsuit.

### 5.  **Major Defendants' Bona Fide Prospective Purchaser Defense**

Section 107(a)(1) of CERCLA is subject to certain affirmative defenses, one of which is the bone fide prospective purchaser defense.  42 U.S.C. § 9607(a)(1); 2 U.S.C. § 9607(r)(1).  The BFPP defense exempts from CERCLA liability a purchaser who:

(1) Acquired ownership of the property after January 11, 2002;
(2) Shows that all disposal of hazardous substances at the property occurred before the purchaser's acquisition of the property;
(3) Conducts "all appropriate inquiries" into the previous ownership and uses of the property;
(4) Provides all legally required notices regarding the lease;
(5) Provides full cooperation, assistance, and access to those conducting response actions at the property;
(6) Complies with institutional and engineering controls and does not impede the effectiveness of such controls;
(7) Complies with requests for information and subpoenas from the Environmental Protection Agency;
(8) Is not affiliated with a responsible or potentially responsible party; and
(9) Exercises appropriate care with respect to the hazardous substances found, including: stopping continuing releases, preventing threatened future releases, and preventing exposure to releases.

The Major Defendants argued at trial that they are BFPPs of all the property they own and operate that is at issue in this case.  In its Entry on the Parties' Cross-Motion for Summary Judgment, the Court determined that the Major Defendants were BFPPs of the Moran Property and the Zimmer Packaging Facility and thus could not incur any liability related to CVOCs that entered the commingled plume from those properties.  (Filing No. 203 at 33-34.)  But issues of material fact precluded a determination at the summary judgment stage that the Major Defendants were BFPPs of the Ertel Property and the Zimmer Paper Facility.  *Id.*

The sticking point with those two properties was the "all appropriate inquiries" prong of the BFPP defense.  At trial, the Major Defendants did not show that they satisfied CERCLA's all

appropriate inquiries ("AAI") requirement with regards to the Ertel Property or the Zimmer Paper Facility.

### a)   __The Ertel Property__

In its Entry on the Parties' Cross-Motions for Summary Judgment, the Court found that "[t]he Major Defendants undisputedly became operators of the [Ertel Property] in 2007, when they began leasing it, but they have not designated evidence that they satisfied the BFPP defense's 'all appropriate inquiries' requirement until 2013, just before they purchased the facility." (Filing No. 203 at 31.)

At trial, the Major Defendants offered into evidence a Phase I ESA dated September 8, 2006, and argued that this 2006 Phase I ESA complied with the AAI requirements. (Tr. Tr. Ex. 1166.) Major Tool performed its Phase I ESA pursuant to the ASTM Phase I Environmental Site Assessment Standard (E1527-05), which meant it had to have been completed or updated within 180 days of and prior to the lease in order to be considered valid. 40 C.F.R. § 312.20(b). (Tr. Tr. Ex. 1166.) Major Tool entered into a 99-year Lease on November 16, 2007. (Tr. Tr. Ex. 1021.) Accordingly, the September 6, 2006 Phase I ESA does not satisfy the AAI requirements because it was not completed or updated within 180 days of and prior to the Lease. 40 C.F.R. § 312.20(b); Filing No. 244 at 152-153.

Because the Major Defendants did not show that they satisfied CERCLA's all appropriate inquiries requirement, they are not BFPPs of the Ertel Property. Thus, they can incur liability from contamination stemming from that property.

### b)   __The Zimmer Paper Facility__

In its Entry on the Parties' Cross-Motions for Summary Judgment, the Court found that the Phase I ESA the Major Defendants conducted prior to acquiring the Zimmer Paper Facility was

insufficient to qualify them as BFPPs of that parcel because it did not comply with the requirements of 40 C.F.R. §§ 312.21 and 312.22. These sections establish federal standard and practices for conducting all appropriate inquiries into the previous ownership and uses of a property and are not satisfied by adhering to the procedures of ASTM International Standard E2247. 40 C.F.R. §§ 312.11. The Major Defendants did not offer any new evidence or testimony at trial to address this Court's prior determination that they do not qualify for the BFPP defense for the Zimmer Paper Property. At trial, the Major Defendants pointed to the same Phase I ESA dated November 16, 2006, that they used at the summary judgment phase. (Tr. Ex. 1241.) The Major Defendants did not offer any evidence at trial to rebut Von Duprin's arguments that the 2006 Phase I ESA failed to comply with the requirements of 40 C.F.R. §§ 312.21 and 312.22. Given the failure of the 2006 Phase I ESA to satisfy the all appropriate inquiries requirements, Major Holdings is not a BFPP for the Zimmer Paper Facility. Therefore, the Major Defendants can incur liability for contamination that joined the commingled plume after it was released from the Zimmer Paper Facility.[11]

### 6. Apportionment

Under 107(a)(1) and (2), the following persons are liable under CERCLA:

(1) the owner and operator of a vessel or a facility,

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of.

---

[11] As the Court noted in its Entry on the Parties' Cross-Motions for Summary Judgment, the Major Defendants' third-party defense, raised under §9607(b)(3), also requires them to have made all appropriate inquiries in regard to all property they own. (Filing No. 203 at 34-35.) Thus, the Major Defendants' third-party defense fails as to the Ertel Property and the Zimmer Paper Facility for the same reason their BFPP defense fails on those properties.

42 U.S.C. 9607(a)(1) and (2).  The Court holds that Major Tool is liable under 107(a) as the current owner of the Ertel Site and Zimmer Paper Facility.  The Court holds that Von Duprin is a liable party as the owner of the Von Duprin Site at the time a release occurred.  The Court holds that Moran is a liable party as the owner of the Moran Property at the time a release occurred.

The parties have disputed whether Zimmer, a party in default, can be apportioned any share of the harm in this case.  In CERCLA, "[w]hen a court cannot assign an ideal measure of monetary responsibility to an otherwise responsible party—because, for example, that party is immune from suit, bankrupt, or defunct—this gives rise to an orphan share."  *Litgo N.J. Inc. v. Comm'r N.J. Dep't of Envtl. Prot.*, 725 F.3d 369, 380 n. 4 (3d Cir. 2013) (internal quotations and citations omitted).  Here, however, no party presented evidence that a release or threatened release of TCE occurred while Zimmer owned and operated the Zimmer Paper Property.[12]  Thus, there is no basis for assigning orphan shares to Zimmer.

Once liable parties are identified under Section 107(a), the Court must determine whether the harm is divisible.  In its Entry on the Parties' Cross-Motions for Summary Judgment, the Court determined that the harm in this case was theoretically capable of apportionment. (Filing No. 230 at 26-27.)  The evidence at trial supports this conclusion.

### 7.    <u>Allocation</u>

Having determined the harm is divisible, the Court must next determine equitable allocation. In allocating response costs between multiple parties, a court "may consider any factor appropriate to balance the equities in the totality of the circumstances." *Evnvtl. Transp. ENSCO Sys. v. ENSCO, Inc.,* 969 F.2d 503, 507-08 (7th Cir. 1992). Under CERCLA, the allocation of responsibility is based on equitable factors determined to be relevant by the Court. 42 U.S.C. §

---

[12] Although Zimmer used solvents in the course of its operations at the Zimmer Paper Property, the particular type of solvents used is unclear. (Tr. Ex. 105 at 6; Filing No. 245 at 70-72.)

9613(f)(1). Some criteria, referred to as the *Gore* factors, that the Court has considered are (a) the distinguishability of each party's waste; (b) the amount of hazardous waste; (c) degree of toxicity of the contaminants at issue; (d) degree of involvement of the parties in waste generation; (e) degree of cooperation with federal, state or local officials to prevent any harm to public health or the environment; and (f) degree of care taken by the parties with respect to the hazardous waste concerned.

Von Duprin suggests, upon consideration of the equitable factors, each source property-- Ertel Property, Zimmer Paper Property, Moran Property and Von Duprin Property--should be allocated an equal 25% share of the response costs. He proffers that Von Duprin is allocated 100% of the 25% share attributable to the Von Duprin Property. Moran is allocated 75% of the 25% share attributable to the Moran site and 75% of the 25% share attributable to the Zimmer Paper Property for a final allocation share of 37.5% of the repose costs. (Filing No. 254-1 at 39-40.) Major Defendants are allocated 100% of the 25% share attributable to the Ertel site, 25% of the 25% share attributable to the Moran site, and 25% of the 25% share attributable to the Zimmer Paper Property for final allocation share of 37.5% of the past response costs. *Id*.

Moran suggests a percentage allocation of 54.2% share attributable to the Von Duprin Property, 3.11% attributable to the Moran Property, 13.77% attributable to the Ertel Property, and 28.94% attributable to the Zimmer Paper Property. Their calculation is based on Dr. Love's testimony that he was able to determine the contribution to harm resulting from releases at the upgradient properties by referring to the level of solvent impacts in shallow soil (vadose zone) at each of the sites – Ertel, Zimmer Paper and Moran. (Filing No. 244 at 93.) Dr. Love was able to calculate the percentage of the total CVOCs in the downgradient area and allocate those portions attributable to the upgradient properties. Dr. Love considered his conclusions to a reasonable

degree of scientific certainty and opined that the harm in this case could be distributed among the four properties in the amounts listed above. In his allocation calculation, Dr. Love did not consider any equitable factors.

The Major Defendants suggests that they should not be allocated any response costs under Section 113(f). They argue that they have not used, generated, transported, treated, stored, or disposed of any of the hazardous substances at issue, including TCE or PCE, on any of the properties at issue, at any time. (Tr. Ex. 105 at 5). There is no evidence that the Major Defendants ever released or threatened to release any of the hazardous substances at issue on any of those properties. They assert that although both Moran and Von Duprin caused and contributed to contamination, neither voluntarily agreed to investigate or remediate their properties. And, Moran has not undertaken any remediation on its properties. Based upon the relevant factors and the totality of the circumstances, the Major Defendants suggests that they should not be allocated any response costs under Section 113(f).

To allow the Major Defendants to avoid liability for its share of the response costs, under the totality of circumstances in this case, would undermine CERCLA's intended purposes. Considering the evidence presented at trial, including the equitable factors, the Court determines the allocution as follows: Von Duprin Property 50%, Ertel Property 10%, Zimmer Property 20% and Moran Property 20%.

On its § 9607 claim, the costs Von Duprin can recover are its $750,000.00 in investigation and assessment costs, $465,000.00 in downgradient residential vapor intrusion mitigation costs and $120,000.00 in J.T.V. Hill vapor intrusion mitigation costs, and the $365,000.00 it spent on bench scale and pilot tests for a total of $1,700,000.00. The $1.5 million it paid in its settlement with Threaded Rod is not recoverable under § 9607, nor is the $38,945.80 it sought to recover for

IDEM oversight costs. The Environmental response costs total $1,700,000.00, and they are hereby apportioned as follows:

1. **Von Duprin Property**: Von Duprin is the only party in this case who owned the Von Duprin Site when a release occurred, and is therefore liable under CERCLA, 42 U.S.C. 9607(a)(2). No other person has been named as a party who may bear responsibility under CERCLA, 42 U.S.C. 9607(a) for pollution at the Von Duprin Property. The Von Duprin Property is apportioned 50% of the total harm. Von Duprin is responsible for 100% of that harm.

2. **Ertel Property**: Major Tool is the only party in this case who currently owns the Ertel site, and is therefore liable under CERCLA, 42 U.S.C. 9607(a)(1). No other person has been named as a party who may bear responsibility under CERCLA, 42 U.S.C. 9607(a) for pollution at the Ertel Property. The Ertel Property is apportioned 10% of the harm, and Major Tool is liable for 100% of that harm.

3. **Zimmer Paper Property**: Major Tool is liable under 42 U.S.C. 9607(a)(1) as the current owner of the Zimmer Paper Parcel. Zimmer Paper has been defaulted as a liable party under 42 U.S.C. 9607(a)(2). No other party has been identified as a current owner of the Zimmer Paper Parcel, and there is insufficient evidence in the record showing that Moran ever used chlorinated solvents at the Zimmer Paper Parcel, or that a release occurred during Moran's period of ownership. The Zimmer Paper Parcel has been apportioned 20% of the harm. Major Tool is liable for 100% of that harm.

4. **Moran Property**: Moran is liable under 42 U.S.C. 9607(a)(2) as the owner of the Moran Property at the time that a release occurred there. Major Tool, as a BFPP

of the Moran Property, is not liable for any share of the harm that came from the Moran Property. The harm apportioned to the Moran Property is 20%. Moran is liable for 100% of that harm.

Von Duprin incurred $1,700,000.00 in recoverable investigation and assessment costs-- $465,000.00 in downgradient residential vapor intrusion mitigation costs, $120,000.00 in J.T.V. Hill vapor intrusion mitigation costs and $365,000.00 in bench scale and pilot tests costs. Von Duprin itself is responsible for $850,000.00 of that sum. Moran is responsible for $340,000.00. The Major Defendants are responsible for $510,000.00. Any share attributable to TCE contamination stemming from the Zimmer Packaging Facility cannot be charged to any party in this case, and thus must be borne by Von Duprin, as it was Von Duprin's burden to establish another party's liability for that share of the harm.

## B.   **Von Duprin's Section 113(f) Claims**

In its Amended Complaint, Von Duprin sought

a declaratory judgment on liability for response costs that is binding in any subsequent actions to recover further response costs and declares Moran liable under CERCLA Section 107(a), 42 U.S.C. § 9607(a), for all or its proper share of response costs Von Duprin has incurred and will incur with respect to the Contamination migrating from the Moran Property and Zimmer Paper Parcel, pursuant to CERCLA Section 113(g)(2), 42 U.S.C. § 9613(g)(2), and 22 U.S.C. §§ 2201-2202.

(Filing No. 42 at 13.) It also sought

a declaratory judgment on liability for response costs that is binding in any subsequent actions to recover further response costs and declares Major Holdings liable under CERCLA Section 107(a), 42 U.S.C. § 9607(a), for all or its proper share of response costs that Von Duprin has incurred and will incur with respect to the Contamination migrating from the Moran Property, Ertel Property, Zimmer Packaging Facility, and Zimmer Paper Parcel, pursuant to CERCLA Section 113(g)(2), 42 U.S.C. § 9613(g)(2), and 28 U.S.C. §§ 2201-2202.

*Id.* at 16-17.

Under CERCLA, a plaintiff can obtain a declaratory judgment where it has incurred "some minimal level of expense associated with the alleged contamination, such as assessment or monitoring costs." *City of Gary, Indiana v. Shafer*, 683 F. Supp. 2d 836, 854 (N.D. Ind. 2010) (quoting *VME Americas, Inc. v. Hein-Werner Corp.*, 946 F. Supp. 683, 694 (E.D. Wis. 1996)). A declaratory judgment is an appropriate remedy under CERCLA where it is not yet possible to determine the actual cost of cleanup. *Id.* (quoting *Bowen Eng'g v. Estate of Reeve*, 799 F. Supp. 467, 476 (D.N.J. 1992)). "Once liability is established under section 107(a) of CERCLA, section 113(g) of CERCLA requires entry of a declaratory judgment as to liability for future response costs." *Evansville Greenway and Remediation Trust v. S. Indiana Gas and Elec. Co., Inc.*, 661 F. Supp. 2d 989, 1010 (S.D. Ind. 2009). Consequently, "if a plaintiff successfully establishes liability for the response costs sought in the initial cost-recovery action, it is entitled to a declaratory judgment on present liability that will be binding on future cost-recovery actions." *City of Colton v. Am. Promotional Events, Inc.-West*, 614 F.3d 998, 1007 (9th Cir. 2010). The fact that future costs are somewhat speculative is not a bar to declaratory judgment under CERCLA. *Kelly v. E.I. DuPont de Nemours & Co.*, 17 F.3d 836, 844 (6th Cir. 1994). Accordingly, Von Duprin's request for Declaratory Judgment must be **granted**.

No evidence was presented at trial as to what future cleanup of the upgradient and downgradient properties might cost. Therefore, in addition to the sums awarded under section 107(a), Von Duprin is entitled to an award of future costs in the same allocation percentages as those costs are incurred—30% from the Major Defendants and 20% from Moran. But there are strings attached to this award. First, Von Duprin is only entitled to recover future costs that are "not inconsistent with the NCP." *U.S. v. Saporito*, 2011 WL 2473332 at *13 (N.D. Ill. June 22, 2011). If any future cost recovery action is brought, the burden will be on Von Duprin to identify

cleanup activities and their attendant costs, and to demonstrate those costs are not inconsistent with the NCP. *Id*. Second, this declaratory judgment applies only to downgradient and upgradient costs. Because Von Duprin does not seek to recover the $777,000.00 that was expended solely to investigate the contamination at the Von Duprin Property, neither the Court's ruling on its § 9607(a) claim nor its § 9613(g)(2) claim speak to those costs. Thus, Von Duprin is only entitled to recover in the percentages specified above for future cleanup costs upgradient or downgradient to its own property that are not inconsistent with the NCP.

Because Von Duprin did not bring a claim for contribution under section 113(g)(3) against Moran or the Major Defendants, it cannot recover any portion of the $1.5 million it paid as part of its settlement agreement with Threaded Rod.

## C.  Environmental Legal Action Claims

Von Duprin asserted a state law Environmental Legal Action claim against Moran and Zimmer Paper. (Filing No. 42 at 14-15, 20-21.)  The Environmental Legal Action statute allows the recovery of reasonable costs of environmental assessment and removal and remedial actions, as well as attorneys' fees, from persons who caused or contributed to the releases of a hazardous substance that poses a risk to human health or the environment. Moran admittedly "caused or contributed" to a release of a hazardous substance (TCE) so it is liable for Von Duprin's reasonable costs.  However, any such costs are identical to the costs Von Duprin seeks to recover under its CERCLA claim.

## D.  Cross-claims and Counterclaims

The Major Defendants and Moran filed cross-claims against each other for contribution under 42 U.S.C. § 9613(f).  (Filing No. 19 at 29-31; Filing No. 53-1 at 4-5.)  They also both filed counterclaims against Von Duprin for contribution under 42 U.S.C. § 9613(f).  (Filing No. 46 at

35-38; Filing No. 52 at 43-44.) This Order shall resolve all of those cross-claims and counterclaims. The parties shall pay the judgment awarded by this Order and going forward shall each contribute to any cleanup costs stemming from pollution in the commingled plume according to the percentages enumerated in section II.A.6 of this Order.

### III.     <u>CONCLUSION</u>

Based upon the foregoing findings of fact and conclusions of law, the Court concludes that Von Duprin has shown by a preponderance of the evidence that it is entitled to an award of $510,000.00 plus interest from the Major Defendants and an award of $340,000.00 plus interest from Moran, for past response costs. Von Duprin is also entitled to an award of future costs in the same allocation percentage—30% from the Major Defendants, 20% from Moran—as those costs are incurred.

**SO ORDERED.**

Date: 3/30/2020

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Glenn David Bowman
STOLL KEENON OGDEN, PLLC (Indianapolis)
Glenn.Bowman@skofirm.com

Alexandra Robinson French
BARNES & THORNBURG LLP
arobinson@btlaw.com

Samuel B. Gardner
ICE MILLER LLP
samuel.gardner@icemiller.com

Edward S. Griggs
BARNES & THORNBURG LLP (Indianapolis)
sean.griggs@btlaw.com

Bruce L. Kamplain
NORRIS CHOPLIN & SCHROEDER LLP
bkamplain@ncs-law.com

Angela Pease Krahulik
ICE MILLER LLP
krahulik@icemiller.com

Cynthia Elaine Lasher
NORRIS CHOPLIN & SCHROEDER LLP
clasher@ncs-law.com

Marc Andrew Menkveld
STOLL KEENON OGDEN, PLLC (Indianapolis)
Marc.Menkveld@skofirm.com

Nicholas B. Reuhs
ICE MILLER LLP
nicholas.reuhs@icemiller.com